IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED by _____ D.C.

MAY - 4 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

JOHN CAPELLETTI

      Petitioner,           CASE NO. 00-6078-CIV-ZLOCH

vs.

                        MAGISTRATE JUDGE SORRENTINO

MICHAEL W. MOORE, et. al.
      Respondents.

_____

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS/ MEMORANDUM OF LAW

COMES NOW Respondent, STATE OF FLORIDA, by and through the undersigned counsel, and pursuant to this Honorable Court's order dated March 2, 2000, hereby files this response to the petition for writ of habeas corpus, and states:

### CUSTODY

Petitioner is currently subject to the lawful custody of the State of Florida pursuant to a valid judgment of guilt entered by the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County Florida.

### PROCEDURAL HISTORY

On May 7, 1997, Petitioner, along with co-defendant, Eduardo Cruz, was charged by information with attempted first degree murder (Exhibit A). Petitioner was tried before a jury on January 5-8, 1998 (Exhibit B). The jury found petitioner guilty of the charged offense (Exhibit C). On January 8, 1998, the trial court imposed

a sentence of thirty years incarceration in Florida State Prison (Exhibit H). This sentence constituted an upward departure from the state sentencing guidelines (Exhibit E). On January 8, 1998, Petitioner filed a motion for new trial and/or arrest of judgment, (Exhibit I) which was denied (Exhibit J). On January 9, 1998, Petitioner filed a Notice of Appeal to the fourth district court of appeal (Exhibit K).

On June 8, 1998, Petitioner filed his initial brief, in which he raised three issues:

> The trial court erred in denying [Petitioner's] motion for judgment of acquittal because the circumstantial evidence presented at trial was insufficient to sustain [Petitioner's] conviction;

> The trial court erred in denying [Petitioner's] multiple motions for mistrial where the cumulative affect of the witness' improper testimony was prejudicial to [Petitioner] and denied [Petitioner] of his right to a fair trial;

> The trial court erred in granting the upward departure sentence where it was not proven

that [Petitioner] was the one who fired the

shotgun at the victim causing the risk of

death or great bodily harm (Exhibit L).

On September 2, 1998, the state responded by an answer brief (exhibits M). On September 10, 1998, Petitioner filed a reply brief (Exhibit N). On February 3, 1999, the Fourth District issued a *per curium* affirmance without a written opinion (Exhibit O). <u>Capelletti v. State</u>, 729 So.2d 935 (Fla. 4th DCA 1999). On February 8, 1999, Petitioner filed a *pro se* motion for rehearing (Exhibit P). On February 16, 1999, respondent filed a response to Petitioner's motion (Exhibit Q). The motion for rehearing was denied on March 18, 1999 (Exhibit R). On April 9, 1999, a mandate issued (Exhibit S).

<u>JURISDICTION</u>

Petitioner properly invokes the jurisdiction of this Court pursuant to § 28 U.S.C. section 2254.

<u>STATUTE OF LIMITATIONS</u>

On January 7, 2000, Petitioner signed his Petition for Writ of Habeas Corpus in this Court. The Petition is timely filed under the provisions of the 1996 Antiterrorism and Effective Death Penalty Act, 28 <u>U.S.C.</u> §2244(d).

## NON CONSTITUTIONAL CLAIM

In his Petition, he raise four grounds for relief:

Petitioner's due process rights were violated by the trial court's denial of the motion for judgment of acquittal when there was no factual evidence to convict Petitioner thus violating his due process rights under the Fifth and Fourteenth Unites States Constitutional Amendments;

Petitioner's due process rights were violated by the trial court's denial of the motions for mistrial and by allowing of [sic] improper, irrelevant and inflammatory testimony thus violating Petitioner's rights under the Fifth and Fourteenth United States Constitutional Amendments;

Petitioner's due process rights were violated by the trial court's departure sentence where there were no valid grounds thus violating his due process rights under the Fifth and Fourteenth United States Constitutional

Amendments; and

The appeals court erred in denying Petitioner's direct appeal where sufficient grounds were presented to remand for a new trial thus violating Petitioner's rights to due process under the Fifth and Fourteenth United States Constitutional Amendments.

Respondant submits that Petitioner's third claim is not based upon a violation of the United States Constitution and thus, is not cognizable in a federal habeas proceeding. <u>Barclay v. Florida</u>, 463 U.S. 939, 103 S. Ct. 3418, 77 L.Ed.2d 1134 (1983). The relevant portion of the statute states:

> ... The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only *on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.*

28 <u>U.S.C.</u> § 2254(a)(e.s.).

In the instant case, Petitioner claims that his "due process" rights were violated in that the trial court imposed an upward departure sentence after finding that the crime for which he was convicted was "committed in a manner that created a substantial risk of death or great bodily harm to many persons..." (Exhibit E). *See,* Section 921.0016(3)(I), <u>Fla Stat.</u>

(1997). At no time during his state court proceeding did Petitioner claim that his sentence violated any provision of the United States Constitution and/or federal statute[1]. (Exhibits L, pp. 35-6; N, p. 6). Rather, his argument deals exclusively with the construction and interpretation of a state sentencing statute, and thus, is non-cognizable. Branan v. Booth, 861 F.2d 1507 (11th Cir. 1988).

UNEXHAUSTED CLAIM

Respondent submits that Petitioners first, second and fourth claims are likewise barred since they have not been exhausted in state court. The statute requires that:

---

[1]The only federal case cited by Petitioner regarding this issue is in his *pro se* motion for rehearing (Exhibit P, Pt. III). There, he cites United States v. Garcia, 907 F.2d 380, 381 (2d Cir. 1990) for the proposition that a conviction for attempted first degree murder is a "nonexistent offense" (Exhibit P, Pt. III). However, that case dealt with violation of the federal crimes of extortion and conspiracy to commit extortion, as defined by 18 U.S.C. §§ 1951 and 371, respectively. Garcia, 907 F.2d at 380.

Further, Petitioner failed to cite this case in either his initial brief, (Exhibit L, pp. 35-6), or reply brief (Exhibit N, p. 6). Petitioner's attempt to argue this case in his motion for rehearing is procedurally barred in state court since it is nothing more than an attempt to reargue the merits of the district court of appeals' order. *See*, Fla. R. App. P. 9.330(a); Seslow v. Seslow, 625 So.2d 1248 (Fla. 4th DCA 1993); State v. Green, 105 So.2d 817, 818-19 (Fla. 1st DCA 1958)("The sole and only purpose of a petition for rehearing is to call to the attention of the court some fact, precedent or rule of law which the court has overlooked in rendering its decision."). Thus, even assuming *arguendo* Garcia somehow supports Petitioner's third claim, he is procedurally defaulted from pursuing it on this petition for a writ of habeas corpus. Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

> ... An application for a writ of habeas
> corpus on behalf of a person in custody
> pursuant to the judgment of a State court
> shall not be granted unless it appears that--
>
> (A) the applicant has exhausted the remedies
> available in the courts of the State;  or
>
> (B)(i) there is an absence of available State
> corrective process;  or
> (ii) circumstances exist that render such
> process ineffective to protect the rights of
> the applicant....

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has interpreted this as:

> [R]equir[ing] that petitioners 'fairly
> presen[t]' federal claims to the state courts
> in order to give the State the 'opportunity
> to pass upon and correct' alleged violations
> of its prisoners' federal rights'... If state
> courts are to be given the opportunity to
> correct alleged violations of prisoners'
> federal rights, they must surely be alerted
> to the fact that the prisoners are asserting
> claims under the United States Constitution.
> If a habeas petitioner wishes to claim that
> an evidentiary ruling at a state court trial
> denied him the due process of law guaranteed
> by the Fourteenth Amendment, he must say so,
> not only in federal court, but in state
> court....

Duncan v. Henry, 513 U.S. 364, 365-6, 115 S.Ct. 887, 888,

130 L.Ed.2d 865 (1995)(citing in part Picard v. Connor, 404 U.S.

270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)).

Further, a claim is "fairly presented" when the substance of

it is presented to the state court by citing the provision of the

Constitution, federal decisions using constitutional analysis, or

state decisions employing constitutional analysis in similar fact

patterns. <u>Hannah v. Conley</u>, 49 F.3d 1193 (6th Cir. 1995). In <u>Duncan</u>, the petitioner appealed his state court conviction to a California appeals court claiming that the trial court erred in overruling his evidentiary objection, including certain testimony of a state's witness. <u>Id.</u> at 364, 115 S.Ct. at 887. He argued that admission of this testimony was a "miscarriage of justice" under the state constitution. <u>Id.</u> The state appeals court affirmed finding harmless error. <u>Id.</u> The petitioner then sought federal habeas review claiming the same error amounted to a denial of due process under the United States Constitution. <u>Id.</u> The Court of Appeals held that the petitioner had exhausted his state remedies. <u>Id.</u> The United States Supreme Court reversed finding that, under <u>Picard</u> and <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), "Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment." <u>Duncan</u>, 513 U.S. at 366, 115 S.Ct. at 888; *See also*, <u>Campbell v. Wainwright</u>, 738 F.2d 1573, 1577, fn. 3 (11th Cir. 1984)(To exhaust a federal constitutional claim in Florida, the claim must, at some point in time, have been raised in state court.)

In the case at bar, Petitioner's first and second claims essentially restate his previously asserted claims which were

made in state court on his direct appeal (Exs. L, pp. 7-34; N; P). However, like the petitioners in <u>Duncan</u> and <u>Picard</u>, Petitioner, for the first time, claims in his federal habeas Petition that these alleged errors violate his "due process rights" (Pet.). Indeed, at no time during his state court proceedings did Petitioner "fairly present" the federal due process arguments he now makes here. This is true since Petitioner has not cited any federal cases and/or provisions of the United States Constitution in either his motion for a new trial/arrest of judgment, (Exhibit I), initial brief, (Exhibit L), or reply brief (Exhibit N).[2] Thus, Petitioner has failed to exhaust this claim as required by the Statute.

Petitioner's fourth claim alleges that the district court of appeals, in affirming the judgment and sentence *per curiam*, "totally usurped" his "due process rights" (Pet.Br.). In support of this, Petitioner argues that a "review of Grounds 1, 2, & 3 in this petition, the petitioner **has** brought forth sufficient grounds to show that he was convicted in error and should not be incarcerated" (Pet.Br.)(emphasis in original). It appears that Petitioner's argument in support of his fourth claim incorporates those made in support of his other claims. As previously argued, those other claims are barred since the third one is non-

_____

[2]Petitioner did cite one federal case in his *pro se* motion for rehearing (Exhibit P). However, this citation was in support of Petitioner's other claim for relief. *See*, f.n. 1, <u>supra.</u>

cognizable as not presenting a federal question and the first and second ones are unexhausted (first and second).  It follows that his fourth claim should be dismissed since it is successive to the first three.

Accordingly, Petitioner's first, second and third claims should likewise be dismissed.

<u>CONCLUSION</u>

WHEREFORE, respondent respectfully requests that this Honorable Court dismiss this petition and deny any and all relief requested.


                         Respectfully submitted,


                         ROBERT A. BUTTERWORTH
                         ATTORNEY GENERAL

                         _____
                         AUGUST A. BONAVITA
                         Assistant Attorney General
                         Florida Bar # 962295
                         1655 Palm Beach Lakes Blvd
                         Suite 300
                         West Palm Beach, FL 33401
                         (561) 688-7759

                         Counsel for Respondent

              CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing response to this Petition for Writ of Habeas Corpus has been furnished by U.S. mail to: JOHN CAPELLETTI, D.C. # 905604, Zephyrhills Correctional Institution, 2739 Gall Boulevard, Zephyrhills, Florida, 33541-9701, on this 3rd day of May, 2000.

                         _____
                         AUGUST A. BONAVITA
                         Assistant Attorney General

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the appendix (without the trial transcript portion) to petition for writ of habeas corpus has been furnished by U.S. mail to: JOHN CAPELLETTI, D.C. # 905604, Zephyrhills Correctional Institution, 2739 Gall Boulevard, Zephyrhills, Florida, 33541-9701, on this 3rd day of May, 2000.

_____
AUGUST A. BONAVITA
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


JOHN CAPELLETTI

     Petitioner,          CASE NO. 00-6078-CIV-ZLOCH

vs.

                    MAGISTRATE JUDGE SORRENTINO

MICHAEL W. MOORE, et. al.
        Respondents.
_____


APPENDIX

<u>APPENDIX</u>

Exhibit A information 5/7/97

Exhibit B trial transcripts 1/5-1/8/98

Exhibit C jury verdict 1/8/98

Exhibit D judgment of conviction 1/8/98

Exhibit E trial court's order granting state's motion for an upward departure sentence 1/8/98

Exhibit F sentencing guidelines scoresheet 1/8/98

Exhibit G supplemental sentencing guidelines scoresheet 1/8/98

Exhibit H sentence 1/8/98

Exhibit I motion for new trial/arrest of judgment 1/8/98

Exhibit J trial court's order denying motion for new trial/arrest of judgment 1/8/98

Exhibit K notice of appeal 1/9/98

Exhibit L initial brief 6/12/98

Exhibit M answer brief 9/2/98

Exhibit N reply brief 9/10/98

Exhibit O filed opinion from the fourth district court of appeal 2/3/99 (<u>State v. Capelletti</u>, 729 So.2d 935 (Fla. 4th DCA 1999))

Exhibit P Petitioner's *pro se* motion for rehearing 2/8/99

Exhibit Q Respondant's response to motion for rehearing 2/16/99

Exhibit R order denying motion for rehearing 3/18/99

Exhibit S mandate from the fourth district court of appeal 4/9/99

# EXHIBIT  A

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, STATE OF FLORIDA

THE STATE OF FLORIDA                          INFORMATION FOR

      vs.

JOHN W. CAPELLETTI                            ATTEMPTED FIRST DEGREE MURDER

EDUARDO RUIZ


IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

MICHAEL J. SATZ, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that JOHN W. CAPELLETTI and EDUARDO RUIZ on the 13th day of April, A.D. 1997, in the County and State aforesaid, did unlawfully attempt to commit murder in the first degree in that John W. Capelletti and Eduardo Ruiz did unlawfully and feloniously and from a premeditated design to effect the death of Christopher Dambrosio, a human being, attempt to kill said Christopher Dambrosio by shooting said Christopher Dambrosio with a firearm, to-wit: shotgun, said firearm being in the possession of John W. Capelletti, and said John W. Capelletti and Eduardo Ruiz did intend to commit murder in the first degree, contrary to F.S. 777.04(1) and F.S. 777.04(4), F.S. 782.04(1)(a) and F.S. 775.087(1)(2), (L9),

PFL/jlg/5/6/97

3

**STATE OF FLORIDA vs.**   **JOHN W. CAPELLETTI**          **INFORMATION, Page 2**
                          **IDENTIFYING DATA**
                          **W/M, 4/7/44, 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**

                          **EDUARDO RUIZ**
                          **W/M, 4/28/63**

**COUNTY OF BROWARD**                              EDWARD L. WALSH
**STATE OF FLORIDA**

    **Personally appeared before me** _____ , **duly
appointed as an Assistant State Attorney of the 17th Judicial Circuit of
Florida by MICHAEL J. SATZ, State Attorney of said Circuit and Prosecuting
Attorney for the State of Florida in the County of Broward, who being first
duly sworn, certifies and says that testimony has been received under oath
from the material witness or witnesses for the offense(s), and the
allegations as set forth in the foregoing Information would constitute the
offense(s) charged, and that this prosecution is instituted in good faith.**

_____
Assistant State Attorney, 17th Judicial Circuit of Florida

    **SWORN TO AND SUBSCRIBED before me this** ____ **day of** May , **A.D. 19** 97
**ROBERT E. LOCKWOOD**

        Clerk of the Circuit Court, 17th Judicial Circuit,
        Broward County, Florida

        By _____
        Deputy Clerk  MAY 13 1997

    **To the within Information, Defendant pleaded**   Stood mute in open court. Not .
                                         Guilty plea entered by court.

Composite "B"               **ROBERT E. LOCKWOOD**

Eduardo Ruiz

File Written Plea of Not Guilty       Clerk of the Circuit Court, 17th Judicial Circuit,
        Broward County, Florida

        By _____
        Deputy Clerk

4

# EXHIBIT   B

```
1                              IN THE CIRCUIT COURT OF THE
                               SEVENTEENTH JUDICIAL CIRCUIT
2                              IN AND FOR BROWARD COUNTY,
                               FLORIDA
3                              CASE NO. 97-7797 CF
                               JUDGE:  JAMES I. COHN
4       STATE OF FLORIDA,
                                   :
5                   Plaintiff,     : VOLUME I
                                   : Pages 1 - 126
6             -vs-                 :
                                   :
7       JOHN CAPELLETTI,           :
                                   :
8             Defendant.           :
       ─────────────────────────────
9                              Fort Lauderdale, Florida
                               January 5, 1998
10                             9:50 o'clock a.m.

11      APPEARANCES:
             OFFICE OF THE STATE ATTORNEY.
12           BY:  JUSTIN GROSZ, ESQ.
             201 S.E. 6th Street
13           Fort Lauderdale, Florida 33301
             Appearing on behalf of the Plaintiff
14
             OFFICE OF THE PUBLIC DEFENDER
15           BY:  RENE DADOWSKI, ESQ.
             201 S.E. 6th Street
16           Fort Lauderdale, Florida 33301
             Appearing on behalf of Defendant John Capelletti
17           SIDNEY FLEISCHMAN, ESQ.

18           Appearing on behalf of Defendant Eduardo Ruiz

19                      ─────────────────────

20           The above-styled cause came on for Jury Trial

21      before the HON. JAMES I. COHN, as Judge of the Circuit

22      Court of the 17th Judicial Circuit, in and for Broward

23      County, Florida, at the Broward County Courthouse, Fort

24      Lauderdale, Florida, on January 5, 1998, commencing at

25      9:50 o'clock a.m.          4 0798
```

COPY

2

1                          <u>I N D E X</u>

2      Motions in Limine                          Page 3
       Opening Statement By Mr. Grosz             Page 42
3      Opening Statement By Ms. Dadowski          Page 58
       Opening Statement By Mr. Fleischman        Page 60
4
       <u>WITNESS</u>                <u>EXAMINATION</u>              <u>PAGE</u>
5      Jessica Miller           Direct
                                By Mr. Grosz                 69
6
                                Cross
7                               By Ms. Dadowski              75

8      Jessica Miller           Direct
                                Mr. Grosz                   102
9
                                Cross
10                              By Ms. Dadowski             123

11     State's Exhibit 1 in Evidence                        103

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THEREUPON, the following proceedings were

2      had:

3          THE COURT:  This is the State of Florida vs.

4      John Capelletti and Edward Ruiz, Case Number

5      97-797CFA and B.

6          Mr. Capelletti is present, represented by

7      Rene Dadowski.  Mr. Ruiz is present, represented

8      by Sidney Fleischman.  The State is represented by

9      Assistant State Attorney Justin Grosz.

10          Are there any matters that need to be

11      addressed before we begin jury selection?

12          MR. GROSZ:  Yes, sir.

13          I filed a request for judicial notice, and I

14      gave you an extra copy.

15          THE COURT:  I received it.

16          MR. GROSZ:  You got that, okay.

17          THE COURT:  I got that.

18          MR. GROSZ:  I didn't really get too specific

19      in my pleading, but I made copies of an entire

20      civil court file which is entitled Express Funding

21      Inc. vs. John and Lorraine Capelletti, Case Number

22      96-1160907CF, civil case.  Actually, there is no

23      CF.

24          But the reason why I'm seeking to admit this

25      evidence, and I'm really only seeking to admit one

1       document that's contained in that entire file, and

2       the document that I'm seeking to submit is a

3       return of service which is noted at the bottom,

4       return of service, that the eviction was executed

5       on February 28th, 1997, at 9:30.

6           There is some other additional writing, but I

7       would agree that I could redact that from the

8       return of service.

9           The purpose of my introduction of this

10      evidence or seeking to introduce it is to show

11      that the location in which Mr. Capelletti was

12      living during the time period of which this

13      offense occurred or previous to the time period of

14      which this offense occurred, he was evicted from

15      by way of this notice on February 28th of 1997.

16      And that's being sought to be introduced in

17      furtherance of establishing motive for the

18      attempted first degree murder of Mr. D'Ambrosio.

19          If you want some further argument, I don't

20      know if you want to hear from Rene first, but I

21      would be happy to lay out why I think it's

22      relevant to help establish that.

23          THE COURT:  Would you please.

24          MR. GROSZ:  The attempted homicide occurs on

25      April 13th, 1997.  Mr. D'Ambrosio and Mr.

1    Capelletti were acquaintances for a period of time

2    prior to that.  At some point in February, Mr.

3    Capelletti assists Mr. D'Ambrosio by helping to go

4    move some furniture for him to Atlanta.  At that

5    time, D'Ambrosio's family is relocating to

6    Atlanta.

7         While in Atlanta, Mr. Capelletti gets

8    arrested and ends up sitting in jail without the

9    ability to post a bond.  He's arrested on February

10   20th and stays in jail to approximately March

11   26th, 1997.

12        While in custody, he gets evicted from his

13   house, and it's my theory, or at least part of my

14   theory, that Mr. Capelletti is in part angered at

15   the fact that he's now been evicted while he's not

16   even here to be able to fight it.

17        THE COURT:  I need to interrupt you for a

18   second.  My apologies, Mr. Grosz.  Judge Horowitz

19   is ready to hear Storm.

20        (Thereupon, a discussion was held off the

21   record, after which the following proceedings were

22   had:)

23        THE COURT:  All right.  Mr. Grosz, you may

24   continue.

25        MR. GROSZ:  In any event, I anticipate there

COUNTY REPORTERS, INC.  (954) 763-6624

1       being some evidence that Mr. D'Ambrosio and Mr.

2       Capelletti had had prior conversation prior to the

3       actual eviction, regarding the fact that Mr.

4       Capelletti was aware that when his wife passed

5       away he would be responsible for making the

6       mortgage payments and he wanted to avoid having to

7       make those payments.  And he makes reference of

8       that to Mr. D'Ambrosio on several different times.

9       And, in fact, at some point says, I'm not even

10      making these payments, I'm no longer making them.

11      That's part and parcel of the reason why he ends

12      up getting evicted from his house.

13          My theory that he is taking that out on Mr.

14      D'Ambrosio when he finally gets out of jail and

15      comes back home and learns that no, now he can't

16      get back in his home because he's been evicted

17      from it, that he goes and finds Mr. D'Ambrosio.

18          That's why I'm seeking the introduction of

19      that document.

20          THE COURT:  So the main portion of the

21      referenced court file is the return of service on

22      the notice of eviction requiring Mr. Capelletti to

23      be out of his house no later than February 28,

24      1997?

25          MR. GROSZ:  Actually, the way it reads, I'll

1       let you take a look at it.  The way it reads, the

2       portion of the bottom of return of service, that's

3       entitled comments by deputy.  Then it's

4       handwritten eviction executed 2/28/97, 9:30 a.m.

5       only occupant was son, Anthony Capelletti,

6       instructed to vacate, notice posted, locks

7       changed, eviction crew on scene.

8           So that's what I'm seeking.  There is other

9       writing, but I'll redact it because it says

10      statements from Sergeant Dunbar, Hollywood PD.

11      Defendant will go out with a bat.  Tenant been

12      Baker-acted.  That stuff, I agree, is not going to

13      be coming in, so I will redact that out.

14          MS. DADOWSKI:  Judge, obviously my argument

15      is that it's not relevant.

16          First of all, Mr. Capelletti was actually

17      evicted on January 7th, 1997.  That's when the

18      foreclosure was, I guess, final.  So his house was

19      sold on January 7th, 1997.  So it's not relevant

20      because anything that had to do with his eviction

21      is not relevant to the attempted first degree

22      murder of Christopher D'Ambrosio.

23          Mr. Capelletti was well aware prior to him

24      even going up to Georgia that his house had been

25      foreclosed on.  One of the documents, which is a

8

1    certificate of title, it says the certificate of

2    sale has been filed in this action on January 7th,

3    1997.  So my argument is that it's not even

4    relevant to this particular charge.

5        There is no testimony in the deposition of

6    the alleged victim that we took, or in any

7    statements, that indicate that the foreclosure was

8    in any way responsibility, or I have felt in any

9    way responsible for Mr. Capelletti wanting to

10   shoot him.

11       Mr. D'Ambrosio's testimony during deposition

12   was the fact that because Mr. Capelletti was

13   arrested when he was in Georgia and he was in jail

14   when he was in Georgia and thought that Mr.

15   D'Ambrosio should have bonded him out.  That's

16   what is responsible for the anger and hostility

17   between them.

18       There is no testimony that I'm aware of where

19   Mr. -- where Mr. D'Ambrosio indicates that the

20   mortgage has anything to do with the foreclosure,

21   has anything to do with this.

22       THE COURT:  What would be the prejudicial

23   effect of the introduction of this evidence?

24       MS. DADOWSKI:  Well, Judge, just to show

25   basically bad character, that my client can't

1    afford to pay his bills, that he's a poor person,

2    that he may not be responsible enough to pay what

3    he's responsible for, what he owes, any obligation

4    he has.  I think it shows bad character.  It has a

5    tendency to prove that he's basically not a

6    responsible person, that, you know, there is a

7    stigmatism to someone that gets foreclosed on or

8    goes bankrupt.  I think there are a lot of

9    people --

10    THE COURT:  Yeah, isn't that going to come

11    out anyway?

12    MS. DADOWSKI:  Why is it going to come out?

13    THE COURT:  I thought you mentioned the

14    January --

15    MS. DADOWSKI:  I'm not bringing that up.  I

16    don't want that in, Your Honor.  That's basically

17    what's in the records from the -- that the State

18    basically has provided to us in discovery

19    regarding the foreclosure that it was, in fact,

20    foreclosed on January 7th, 1997.  He was evicted

21    on February 28th.  But there is no testimony or

22    relevance as far as eviction to this particular

23    charge.

24    I don't think any of this evidence should be

25    submitted.  It is not relevant.  It sheds more

1    light on Mr. Capelletti, implying that he can't

2    afford to pay his bills, bad light.  It has

3    nothing to do with this particular charge.

4         I just want to point out, Judge, that I would

5    object to the Court taking judicial notice because

6    of the hearsay information that's contained in

7    this particular document that the State wants to

8    elicit.  We don't know who is the one that

9    actually executed the warrant on 2/28/97.  And

10   there is basically information that says the only

11   occupant was the defendant's son, Anthony

12   Capelletti, instructed to vacate, notice posted,

13   locks changed.  I think all of that is hearsay.

14        We don't have an opportunity to examine

15   whoever made those comments on this particular

16   note.  I would object to it on that respect also.

17   The prejudicial effect outweighs the probative

18   value.

19        THE COURT:  Mr. Fleischman, do you wish to be

20   heard on behalf of Mr. Ruiz?

21        MR. FLEISCHMAN:  No, Judge, I don't.  It

22   doesn't pertain to us.

23        THE COURT:  Okay.  Under 90.202(6), the Court

24   takes judicial notice of records in court,

25   accordingly the Court does find that the proffered

```
1        evidence does have probative value and the Court

2        further finds that the prejudicial effect does not

3        substantially outweigh the probative value,

4        accordingly the objection will be overruled.

5             MS. DADOWSKI:  Just note my objection.

6             THE COURT:  And the record offered will be

7        redacted in accordance with the proffer made by

8        Mr. Grosz.

9             All right.  Any other matters that we need to

10       address?

11            MS. DADOWSKI:  Yes, Judge.

12            THE COURT:  Okay.  Yes, ma'am?

13            MS. DADOWSKI:  Judge, I -- I want to keep out

14       the fact -- obviously, I make a motion in limine

15       to keep out the fact of John Capelletti's arrest

16       in January.  I think that that basically is not

17       relevant, that all it does is tends to prove a

18       prior bad act of Mr. Capelletti when he was

19       arrested in Georgia for, I believe it was a public

20       drunkenness and interference with

21       government property.

22            THE COURT:  You don't want to offer evidence

23       of that, do you, Mr. Grosz?

24            MR. GROSZ:  I want to offer evidence that he

25       was arrested and incarcerated up there and was
```

1    incarcerated during the time period when the

2    eviction was executed.   I don't particularly care

3    about the facts of the arrest, but the fact that

4    he was arrested and didn't bond out is a large

5    part of motive.   It's inextricably intertwined

6    with the evidence in the case.

7        MS. DADOWSKI:   Judge, I think it's improper.

8    The State didn't file any evidence of Williams'

9    Rule notice.   And I just think that all he tends

10   to establish is that my client has bad character,

11   and the fact that he was arrested in Georgia just

12   tends to prove bad character, and it's not

13   relevant.

14       THE COURT:   Well, there is another way of

15   accomplishing what you seek to accomplish without

16   introduction of evidence of the defendant's arrest

17   and incarceration.

18       MR. GROSZ:   I don't know how you can do that.

19   I mean, Mr. Capelletti gets arrested in January.

20   He's in custody in their county jail with a bond

21   and he's repeatedly calling Mr. D'Ambrosio to help

22   him out.   Mr. D'Ambrosio goes to lengths to try to

23   get a bond raised either through Mr. Capelletti's

24   family or some other means, and it can't be

25   accomplished.   And, you know, my theory is that

1    that angers Mr. Capelletti, and when eventually he

2    is released, that's the next time that my -- that

3    the victim sees Mr. Capelletti, is on the date

4    that he is shot in the head.  So, you know, I

5    don't know how else there is to get in the fact

6    that he's in custody without mentioning that.

7        THE COURT:  All right.  Ms. Dadowski, last

8    word in the matter.

9        MS. DADOWSKI:  Judge, I'm going to stick to

10    my previous objection, basically showing bad

11    character of my client.  There is no relevance and

12    the prejudicial effect outweighs the probative

13    value.

14        THE COURT:  This is a more difficult issue

15    for the Court than the prior matter regarding the

16    foreclosure, but the Court does find that based

17    upon the proffer of Mr. Grosz, that it is

18    probative, and thereby relevant to the issue and

19    motive, and the prejudicial effect does not

20    substantially outweigh the probative value.  So

21    the motion in limine will be respectfully denied.

22        MS. DADOWSKI:  Okay.  Just note my objection

23    on that, as well.

24        THE COURT:  Yes, ma'am.

25        Any others?

```
1              MS. DADOWSKI:  Yes, Judge.

2              In the information, as this State has filed

3         it right now, basically the language in it

4         indicates unlawfully and feloniously.

5              As the Court is aware, under State vs. Gray,

6         there is no such crime, attempted first degree

7         felony murder.  And I would ask that that language

8         be stricken from the information so that there is

9         no implication or that the jury isn't confused,

10        they can find him guilty if they believe it was

11        attempted first degree felony murder as opposed to

12        attempted premeditation.

13             THE COURT:  Let me see if I can find this.

14        The clerk went down to get the jury panel.

15             Okay.  You're seeking to delete -- Ms.

16        Dadowski, you're seeking to delete what words?

17             MS. DADOWSKI:  I'd have to look at it, Your

18        Honor, to get the exact language.

19             MR. GROSZ:  Judge, I've looked at it, if you

20        want to keep looking, I will tell you which words

21        I'm willing to delete.

22             MS. DADOWSKI:  And feloniously, basically,

23        and that.  Because I don't think that the State

24        can -- that he could be convicted since there is

25        no such crime of attempted first degree felony
```

1     murder, and the State charged did unlawfully

2     attempt to commit murder in the first degree.

3     Jonh Capelletti and Eduardo Ruiz did unlawfully

4     and feloniously and from a premeditated design to

5     effect the death of Chris D'Ambrosio.

6          THE COURT:  State agrees to delete?

7          MR. GROSZ:  Sure, I will delete the words and

8     feloniously.  And so the particular sentence would

9     read, John Capelletti and Ed Ruiz did unlawfully,

10    from a premeditated design.

11         THE COURT:  Okay.  That will be granted.

12         MS. DADOWSKI:  A couple other things, Your

13    Honor.

14         THE COURT:  Yes, ma'am?

15         MS. DADOWSKI:  There was a 911 tape in this

16    particular case.  And I would like to keep it out

17    basically on the fact that it was hearsay and that

18    we were not able to find the witness who was on

19    the actual 911 tape.  His name was Angelo Eiland,

20    E-i-l-a-n-d.

21         I just received a message on my voice mail

22    this morning that Mr. Grosz left me on Saturday,

23    but I didn't receive it until this morning, that

24    they did, in fact, find Mr. Eiland.  So I didn't

25    have the opportunity to take the deposition of Mr.

1      Eiland.  I don't know what effect he has regarding

2      those involved in this case.  I certainly feel I

3      would be prejudiced not being able to take his

4      deposition prior to his testimony.  There may be

5      some objections.

6            THE COURT:  When do you anticipate calling

7      him?

8            MR. GROSZ:  After he is deposed.

9            THE COURT:  I will defer ruling.

10           MR. GROSZ:  Judge, what I would like to say

11    in respect to the motion in limine, it is to

12    exclude the introduction of the 911 tape until

13    that depo had been taken.  At least that's the way

14    I understood the motion in limine.

15          THE COURT:  You feel it comes in as an

16    excited utterance?

17          MR. GROSZ:  Sure.  Regardless of whether or

18    not they deposed the declarant on the 911 tape.

19          THE COURT:  I will have to hear the predicate

20    and make a ruling at that time.

21          MR. GROSZ:  Right.  That's fine.  I just

22    didn't want --

23          THE COURT:  I'm just going to defer on the

24    motion in limine.

25          MR. GROSZ:  Okay.

1            THE COURT:  We will address it at the time

2       that the evidence is offered.

3            MS. DADOWSKI:  Judge, just a couple other

4       matters that I have, just to -- maybe Mr. Grosz

5       can warn the police officers if you do grant the

6       motions in limine.

7            Detective Needs, in his deposition, basically

8       had said that he came, that my client had been

9       arrested in Hollywood, and that he got a photo of

10      my client when he was arrested in Hollywood.  And

11      I don't think that that should be admissible,

12      where they got the photograph and the fact that

13      they got it because of a prior arrest of my

14      client.  So I would object to any evidence of my

15      client's arrest and what led to the actual

16      photograph as obtained by Detective Needs.

17           MR. GROSZ:  No problem.

18           THE COURT:  Granted.

19           MS. DADOWSKI:  Also, Detective Needs also

20      said that he was gonna try and contact some person

21      in Georgia because he heard that my client got

22      arrested up there.  I don't think Detective Needs

23      should be able to get into that information about

24      the Georgia arrest.

25           I know the Court has denied my alleged motion

1       in limine about having arrests up there, who was

2       the actual officer up in Georgia regarding the

3       actual arrest, but I don't think the cumulative

4       effect of Mr. Needs being able to rehash the

5       arrest --

6              THE COURT:  You were going to bring that out

7       through D'Ambrosio?

8              MR. GROSZ:  From the arresting officer in

9       Georgia.  I'm not going to bring it out through

10      him.

11             MS. DADOWSKI:  I just want to make sure that

12      Detective Needs doesn't bring out the arrest in

13      Georgia.  I don't want to make it a feature.

14             THE COURT:  All right.

15             MS. DADOWSKI:  And also, Detective Bainey

16      (phonetic), I don't know if the State is intending

17      to call Detective Bainey.  He's the detective that

18      my client turned himself into, but Detective

19      Bainey had, in his depo, just indicated that he

20      had prior involvement with the Capelletti family

21      and that my client had some outstanding traffic

22      warrants that he spoke to about with Detective

23      Bainey.

24             And also there was an allegation in there

25      that Detective Bainey said John, Jr., who is my

1     client's son, indicated that my client purchased

2     the shotgun in an attempt to protect his property

3     from being repossessed, where there is no evidence

4     as to who actually heard that evidence from John,

5     Jr.   It wasn't Detective Bainey.   It is hearsay.

6     It's certainly more prejudicial than the probative

7     value.   There is no evidence that that occurred.

8         MR. GROSZ:   No problem.

9         THE COURT:   Granted.

10        MS. DADOWSKI:   And Mr. D'Ambrosio, just he

11    indicated at one point that my client bragged

12    about attempting to kill people and that he -- he

13    basically indicates that he found out that my

14    client had a prior attempted murder from, I

15    believe it was New York.   I don't think any of

16    that information is relevant.

17        Certainly, if my client takes the stand, the

18    only information they can get into is the fact

19    that he's been convicted of a crime, being a

20    felony or a crime involving dishonesty, or how

21    many times, that's the extent of it.   I don't

22    think the State should be able to get into the

23    fact that my client may have a prior attempted

24    murder out of New York unless we obviously open

25    the door to that information.

1           MR. GROSZ:  No problem.

2           THE COURT:  Granted.

3           MS. DADOWSKI:  And we do want to be

4      able to get into the fact that Mr. D'Ambrosio was

5      on probation and also had a pending DUI at the

6      time of this alleged shooting.  So I think that

7      that is certainly relevant to show that he had

8      motive to lie in favor of the State because he was

9      on felony probation at the time and also the fact

10     that he did have a pending DUI charge at the time

11     of the shooting.  I think that that information

12     should be relevant and the defense should be

13     entitled to get into that.

14           I know Mr. Grosz indicated that he was going

15     to object to, I believe, us getting into the

16     specifics of the felony charge.  And obviously

17     unless Mr. D'Ambrosio opens the door, we can't get

18     into that because we wouldn't be entitled to it.

19           THE COURT:  Now, the fact that D'Ambrosio had

20     a charge pending and was on probation --

21           MR. GROSZ:  The case law is pretty clear at

22     the time this occurred, at the time he gave his

23     first statement, so I don't have an objection to

24     that.  I would like to see if we can get a handle

25     on how it will be worded, because I think that it

1    would be inappropriate to mention what type of

2    charge, the degree of charges, you know, of the

3    crime.  I don't think that's appropriate.  I think

4    the fact that he's on probation and has a pending

5    charge would be sufficient.

6         If the Court's going to allow them to mention

7    the degree, I would like it to be consistent, you

8    know, as opposed to saying on felony probation and

9    then of DUI.  I just rather it be felony

10   probation, a misdemeanor charge, or just pending

11   charge and on probation.

12        MR. FLEISCHMAN:  Judge, I think if he was on

13   felony probation, I think we're entitled to that,

14   without getting into the nature of the charge.

15   Unless the State would rather us get into just

16   what the nature -- you know, what the nature of

17   the charge was, if they would feel more

18   comfortable with that, rather than just saying a

19   felony.

20        MR. GROSZ:  I want it to be consistent.  I

21   don't want to say felony probation and he's

22   charged with DUI.  If you're going to say felony

23   probation, just say that, and a felony charge.

24   That's fine with me.

25        MR. FLEISCHMAN:  Judge, I feel felony could

1    mean anything.  It could mean grand theft auto,

2    all the way up to some type of murder.  I think we

3    should at least be entitled to mention what the

4    charge was, without going into it, the fact that

5    he was on probation at the time, which the case

6    law is clear we're allowed to complete that.  The

7    fact that he did have a pending charge, I think

8    the jury should be allowed to hear what the charge

9    was.  I mean, that certainly goes to a witness'

10   intent to query favorable with the State depending

11   on the nature of the charge.

12        THE COURT:  I will let you go into the nature

13   of the charge.

14        MR. GROSZ:  Both charges?

15        THE COURT:  Both.

16        MS. DADOWSKI:  Just -- I just want to,

17   for the record, adopt Mr. Fleischman's argument.

18   I don't think we'll need it later, but just in

19   case.

20        THE COURT:  Anything else?

21        MS. DADOWSKI:  Not that I can think of at

22   this time.  I will certainly bring it up to you if

23   I think of it later.

24             *  *  *  *  *  *

25

```
 1              (Thereupon, the jury was selected and sworn,

 2      after which the following proceedings were had:)

 3      THE COURT:  Ladies and gentlemen of the jury,

 4      you have been selected and sworn as the jury to

 5      try the case of the State of Florida vs. John W.

 6      Capelletti and Eduardo Ruiz.

 7              This is a criminal case.  Each defendant is

 8      charged with attempted first degree murder.  Now,

 9      the definition of the elements of the crime

10      charged will be explained to you later.

11              It is your solemn responsibility to determine

12      if the State has proved its accusation beyond a

13      reasonable doubt against Mr. Capelletti and Mr.

14      Ruiz.

15              Your verdict must be based solely on the

16      evidence, or lack of evidence, and the law.

17              The information is not evidence and is not to

18      be considered by you as any proof of guilt.

19              It is the judge's responsibility to decide

20      which laws apply to this case and to explain those

21      laws to you.  It is your responsibility to decide

22      what the facts of this case may be and to apply

23      the law to those facts.  Thus, the province of the

24      jury and the province of the court are

25      well-defined, and they do not overlap.  This is
```

1    one of the fundamental principles of our system of

2    justice.

3         Now, before proceeding further, it will be

4    helpful if you understand how a trial is

5    conducted.

6         At the beginning of the trial, the attorneys

7    will have an opportunity, if they wish, to make an

8    opening statement.  The opening statement gives

9    the attorneys a chance to tell you what evidence

10   they believe will be presented during the trial.

11   What the lawyers say is not evidence and you are

12   not consider it as such.

13        Following the opening statements, witnesses

14   will be called to testify under oath.  They will

15   be examined and cross-examined by the attorneys.

16   Documents and other exhibits also may be produced

17   as evidence.

18        After the evidence has been presented, the

19   attorneys will have the opportunity to make their

20   final argument.

21        Following the arguments by the attorneys, the

22   Court will instruct you on the law applicable to

23   the case.

24        After the instructions are given, you will

25   then retire to consider your verdict.

1          Now, you should not form any definite or

2     fixed opinion on the merits of the case until you

3     have heard all the evidence, the argument of the

4     lawyers, and the instructions on the law by the

5     judge.  Until that time you should not discuss the

6     case among yourselves.

7          Now, during the course of the trial, the

8     Court may take recesses during which you will be

9     permitted to separate and go about your personal

10    affairs.  During these recesses, you are not to

11    discuss the case with anyone nor permit anyone to

12    say anything to you or in your presence about the

13    case.  If anyone attempts to say anything to you

14    or in your presence about this case, tell him that

15    you are on the jury trying the case and ask him to

16    stop.  If he persists, leave him at once and

17    immediately report the matter to one of the court

18    deputies, who will then advise me.

19         The case must be tried by you only on the

20    evidence presented during the trial in your

21    presence and in the presence of the defendant, the

22    attorneys and the judge.  Jurors must not conduct

23    any investigation of their own.  Accordingly, you

24    must not visit any of the places described in the

25    evidence, and you must not read nor listen to any

1    reports about the case.  Further, you must not

2    discuss this case with any person and you must not

3    speak with the attorneys, the witnesses or the

4    defendant about any subject until your

5    deliberations are finished.

6         In every criminal proceeding a defendant has

7    the absolute right to remain silent.  At no time

8    is it the duty of a defendant to prove his

9    innocence.  From the exercise of a defendant's

10   right to remain silent, a jury is not permitted to

11   draw any inference of guilt, and the fact that a

12   defendant did not take the witness stand must not

13   influence your verdict in any manner whatsoever.

14        The attorneys are trained in the rules of

15   evidence and trial procedure and it is their duty

16   to make all objections they feel are proper.  When

17   an objection is made, you should not speculate on

18   the reason why it is made; likewise, when an

19   objection is sustained, or upheld by me, you must

20   not speculate on what might have occurred had the

21   objection not been sustained, nor what a witness

22   might have said had he or she been permitted to

23   answer.

24        Additionally, you may see the attorneys in

25   the corridors or on the elevators.  Their rules of

1    professional responsibility, their cannons of

2    ethics preclude them from communicating with

3    jurors who are serving on a case in which they are

4    currently trying.

5        Now, I know all of these lawyers, all three

6    lawyers, they are all not only highly-skilled

7    attorneys, but they are very likeable, affable

8    individuals, and the only reason they don't engage

9    in conversation is their cannons of ethics

10   preclude it.

11       Now, we're going to take a brief recess

12   before we get started with opening statements.

13       The game plan, so to speak, for the rest of

14   the day, will be opening statements, and then

15   we're going to hear from one witness and then

16   we're going to adjourn for the day.  So this

17   will -- we shouldn't be hear too late today.

18       But we're going to take a little recess now.

19   Let me give you about 15 minutes.  If any of you

20   want to go get a cold drink or a cup of coffee,

21   you can do so.  We will -- we'll reconvene at ten

22   minutes till three.

23       Now, Deputy Lytle is going to show you where

24   you're to meet following each break from now on.

25   You won't come back to the courtroom.  You'll go

1 to the judicial reception area here on the fifth

2 floor.  Either Deputy Lytle or Deputy Lichti will

3 come down and get you.  We'll be in recess until

4 3:15.

5   (Thereupon, the jury exited the courtroom,

6 after which the following proceedings were had:)

7   THE COURT:  Was there a matter you wanted to

8 bring up?  How long of a matter is it?

9   MR. GROSZ:  It's some records that apply to

10 medical records that I wanted to object to either

11 their introduction or the reference to them during

12 opening.  So I don't know -- I don't know if you

13 want to address that now or in a couple of

14 minutes.  I would like to address it before

15 openings.

16   THE COURT:  All right.

17   MR. GROSZ:  I'll give you a brief overview.

18 The medical records of Mr. D'Ambrosia were

19 subpoenaed and provided to me.  It's voluminous,

20 but there is a toxicology report that reflects

21 that his blood showed the presence of morphine and

22 amphetamine in trace amounts.  And my objection is

23 that I don't think -- because I've spoken to the

24 witness that they have listed, Dr. Johnson -- I

25 don't think there is any way that they are going

1    to be able to show that that morphine was anything

2    other than morphine drip which is administered at

3    the hospital, and, number two, that the

4    amphetamines is anything beyond therapeutic

5    amount.

6         Mr. D'Ambrosio insists that he was taking a

7    pill that he believes is the nature -- is the

8    basis for the amphetamines.  It's a diet pill.

9    And the hospital says that they administered a

10   morphine drip as soon as he was admitted, and it

11   wasn't until apparently sometime later that the

12   blood was drawn.

13        So the records certainly are business

14   records.  I don't think that there is a problem

15   with them meeting that exception.  My problem is

16   the irrelevance.  And I don't think they are going

17   to have any witnesses that would be able to make

18   them relevant so that the probative value

19   outweighs, you know, any prejudice.  I think

20   prejudicial effect substantially outweighs any

21   probative value of the contents of that particular

22   record.  So I just didn't want it mentioned during

23   opening or admitted.  That's what my objection is.

24        MS. DADOWSKI:  Well, Judge, I think it's

25   admissible for impeachment purposes.  First of

1    all, it goes to his ability to remember accurately

2    and to know what exactly happened at the time.  He

3    gave a couple of statements apparently when he

4    was --

5        THE COURT:  Amphetamine was in his system at

6    the time of the alleged crime?

7        MS. DADOWSKI:  Judge, we have the information

8    that the amphetamine was in his system at the time

9    of the alleged crime.

10        As far as the morphine, Mr. Grosz is saying

11    he believes it was just a part of the drip that

12    was administered by the hospital.  But if it was

13    just trace amounts, I'm quite certain that that

14    wasn't part of the morphine drip that was

15    administered by the hospital because I would

16    certainly expect there would be more than just a

17    trace amount morphine in his system.

18        So my position is that these -- that these

19    drugs were in Mr. D'Ambrosio's system prior to,

20    during the incident, and not as a result of

21    morphine drip by the hospital.

22        And as far as the amphetamines are concerned,

23    I think Mr. D'Ambrosio is admitting -- he is

24    claiming that they are diet pills.  I mean, you

25    know, obviously he wants to say that they are diet

1    pills.

2        MR. GROSZ:  My point, though, Judge, is,

3    number one, they don't have any witnesses to

4    explain that stuff.  And all they're going to do

5    is put into evidence that morphine in that trace

6    amount and amphetamine in that trace amount is

7    found in the blood.  They have no witness that is

8    going to say when that blood is drawn.  They have

9    no witness that will say where that stuff came

10    from.  So the only value is to prejudice

11    D'Ambrosio without any other testimony that can

12    make it relevant.  And, you know, the facts that

13    D'Ambrosio tells me that they came from a diet

14    pill, you know, I don't know that that's the sort

15    of amphetamine that's showing up in the records

16    either, but they, to just throw that out, this is

17    to let these jurors speculate as to what would be

18    the source of that, and it has no relevance as to

19    any -- any material issue.  So I think the

20    prejudice of allowing that substantially outweighs

21    any probative value that you could attach to those

22    records.

23        MS. DADOWSKI:  Well, Mr. D'Ambrosio denied

24    that he used any drugs when we took his

25    deposition.  And --

1          MR. GROSZ:  Diet pill.  That's a pretty vague

2     question.

3          MS. DADOWSKI:  I mean, that's just assuming

4     that we're believing Mr. D'Ambrosio that it's a

5     diet pill.  I mean, that's saying that we believe

6     Mr. D'Ambrosio's version and explanation of what

7     that amphetamine in his system is.

8          THE COURT:  What is the doctor going to

9     testify to, Dr. Johnson?

10         MS. DADOWSKI:  Judge, I don't think I need

11     the doctor.  I think I can establish these records

12     as a medical exception.  I have the medical

13     records custodian.  I just subpoenaed Dr. Johnson

14     just in an abundance of caution, but I don't

15     believe I will need him.  I just will admit this

16     toxicology report into evidence.

17         THE COURT:  Yeah, but Mr. Grosz is saying

18     with just the mere record, and nothing more, what

19     does that -- what does that show?

20         MS. DADOWSKI:  Well, it certainly shows that

21     at the time that -- after the incident, when he

22     was in the hospital, that there were morphine and

23     amphetamines in his system, which would certainly

24     account for the fact that he may be mistaken as to

25     what occurred at the time the incident took place,

1    that he may not be able to remember and to recount

2    and to otherwise testify as to exactly what

3    occurred because of the morphine and amphetamines

4    in his system.

5        THE COURT:  But my point is this, you don't

6    have an expert to say the effect that morphine

7    would have in those amounts on a human being of

8    his size and stature.

9        MS. DADOWSKI:  Well, we don't have --

10    obviously, we don't have an expert that can say

11    that, because we don't even know what amounts they

12    were.  I mean, this is something that, you know,

13    it shouldn't prejudice Mr. Capelletti because the

14    hospital took a blood draw and can't account for

15    the time, you know, when the blood draw was taken.

16    I mean, that's not Mr. Capelletti's fault.  You

17    know, he shouldn't be prejudiced, not allowed to

18    get into the fact that Mr. D'Ambrosio's ability

19    to remember is at issue because we can't establish

20    that.

21        They don't know when this was taken.  Mr.

22    Johnson doesn't know.  And, you know, all we have

23    is a lab report, a toxicology report, saying there

24    was morphine and amphetamines in his system.

25    There is no way that we can ever establish that.

1          MR. GROSZ: That is not necessarily true. An

2     investigation into the hospital can give you more.

3     I made a couple of phone calls and found out more

4     than what's provided in the records. So if they

5     want to establish those things, get out to the

6     hospital, talk to people, show them the records,

7     who is significant is on there, and see if those

8     people can add anything.

9          But, right now, just to put that record in

10    does nothing of any relevance and is not

11    substantiated by anything. So, you know, it's

12    certainly a business record, but I would object to

13    it on the grounds of relevance.

14          THE COURT: What is the -- what is the normal

15    effect of morphine on the human body? I mean, is

16    it a depressant? I mean, how is the jury supposed

17    to assimilate this evidence?

18          MS. DADOWSKI: I think common sense, Your

19    Honor. I mean, I think people know.

20          THE COURT: Well, is it a depressant?

21          MS. DADOWSKI: I don't know that, but I think

22    that people know that people on morphine certainly

23    have a difficult time remembering things. I mean,

24    you've seen television, and it depicts -- I think

25    that's within the common realm of people knowing,

1    just from watching T.V., what morphine can do to

2    someone, what amphetamines can do also.

3        You know, Mr. D'Ambrosio denied that he had

4    anything, ever used any drugs. Okay. He says he

5    never ever used them. So besides going to his

6    credibility, what we have proof of that he's

7    denying at the time that he used drugs and we have

8    proof that there are drugs in his system.

9        It also goes to the fact of his ability to

10   account and observe and remember what occurred at

11   the time of the shooting and shortly thereafter

12   when he was giving a statement regarding my client

13   to the police. I mean, I think that is certainly

14   some argument I can make, Well, isn't it true that

15   you had morphine in your system at the time that

16   you made that statement to the police and you had

17   amphetamines in your system?

18       THE COURT: If the victim had morphine and/or

19   amphetamines in his system at the time of the

20   alleged crime, it would appear to the Court that

21   that would affect -- would have some affect on his

22   ability to perceive and recount those events that

23   occurred at, during, and after the alleged crime.

24   So I can see that the evidence would have a

25   probative value in that regard. With respect to

1        the State's argument that the prejudicial effect

2        would substantially outweigh the probative value,

3        which is the test under 4.03, I'm going to have to

4        disagree with the State.

5            MR. GROSZ: Judge, before you rule, let me

6        just say this, they do not have any evidence that

7        that stuff is in his system at the time the crime

8        occurs.  None, nothing in the record.  And there

9        is going to be no one to testify as to when the

10       blood was drawn, as to when that stuff entered his

11       system, and when it showed up, and when -- or how

12       that relates to the time of the offense.  And I

13       think just to throw that out there, putting the

14       records in, this is completely misleading and is

15       going to result in asking this jury to speculate

16       on things that aren't before them in all different

17       aspects, and, you know, that focus on a whole

18       different issue than now, you know, at the time of

19       trial.

20           I'm going to have to go get other witnesses

21       to try to rebut, and it's really irrelevant.

22       Because I can tell you what their own doctor has

23       already told me, and they're not going to have

24       anyone who's going to say what time the stuff was

25       in his system and what time the blood was drawn.

1       And the records alone don't do that.

2           And if I understand your ruling, you're

3   saying if you can show that the drugs were in the

4   system at the time the offense was committed, that

5   would have some bearing.  They don't have anyone

6   to establish that.

7           MS. DADOWSKI:  Mr. D'Ambrosio will say that

8   he took diet pills and that could account for the

9   amphetamines.  He's not going to say he was given

10  amphetamines at the hospital.  He's saying that

11  the morphine drip may have come from EMS or may

12  have come from the hospital.  But nobody is saying

13  that somebody gave him amphetamines in the

14  hospital.  So how did the amphetamines get in his

15  system?

16          MR. GROSZ:  We don't know, that's the

17  problem.  All you want to do is introduce a record

18  that shows it.  We don't know how it got in there.

19  If you got a prescription, fine.  You don't.

20          I say to D'Ambrosio, Look what's in the

21  toxicology report.  Can you think of anything that

22  can explain this?  He says, I don't know.  I took

23  a diet pill.  I'm asking him how to explain it.

24          That may not be the explanation.  It may be

25  that there is some other explanation, but just to

1      throw that stuff out there without providing a

2      link is misleading.

3           MS. DADOWSKI:  Well, that's like the people

4      that get arrested for DUI and say they took

5      Nyquil, that's how they think alcohol got in their

6      system.  You know, he's blaming amphetamines on a

7      diet pill.

8           The bottom line is we can't get that in.

9      First of all, if Christopher D'Ambrosio has a

10     privacy right, he certainly didn't authorize us.

11     The State didn't have the medical records.  I had

12     to do a subpoena duces tecum to get his medical

13     records.  So the only one that can give us that

14     information is Christopher D'Ambrosio, and give us

15     that information, of course not.

16          MR. GROSZ:  That's reverse logic.  All it

17     takes is to get an investigator to the hospital

18     and do some leg work and find out who's the nurse

19     that drew the blood.  The blood doesn't get drawn

20     in a vacuum, so to speak.  Someone does it.  Who

21     is the nurse, when was the blood drawn, see the

22     health records.  That kind of stuff can be done.

23     We do it all the time for serious bodily injury

24     cases.  It's not like it's impossible to go back

25     in time and check it out.

1          All I'm saying if that's the evidence that

2     they want to produce, they need to put someone in

3     there that provides a link from that substance and

4     at the time of the offense.

5          MS. DADOWSKI:  It's clear that that stuff was

6     in his system at the time that he gave the

7     statement.

8          THE COURT:  When was the blood drawn in

9     relation to the crime?

10         MS. DADOWSKI:  The same day.  It says the

11    report was done at 1947 hours.  He was admitted to

12    the hospital at 1736 hours.

13         MR. GROSZ:  That's not true.  He was admitted

14    into the hospital around 3 or 4:00.

15         MS. DADOWSKI:  Well, the date in time on the

16    medical records that I received from the hospital

17    says that he was admitted at 4/13/97 at 1736.

18    Okay.

19         MR. GROSZ:  Keep looking through the records.

20    I'm telling you there is all different times in

21    here.  That's the problem.

22         THE COURT:  Let me ask you this.  Are there

23    records that substantiate that he was given a

24    morphine drip at the hospital?

25         MR. GROSZ:  I -- I believe there are.  I

1    mean, I asked their doctor, what do these initials

2    mean, MS, and he says that's probably morphine

3    drip.

4         MS. DADOWSKI:  Probably.

5         MR. GROSZ:  But what I'm saying is, is you

6    bring in the people, otherwise all they're doing

7    is putting that stuff in front of the jury and

8    asking them to guess and they get to put whatever

9    twist they want on it without putting on any

10   evidence other than a record.

11        MS. DADOWSKI:  That's the same thing as the

12   foreclosure information, Your Honor, that you're

13   allowing in.  It is the same kind of logic.

14   They're just throwing this foreclosure information

15   in and the jury has to guess that's part of some

16   motive that Capelletti has because he was arrested

17   in Georgia, his house was foreclosed on while he

18   was there.

19        THE COURT:  Isn't it easy enough to find out

20   what drugs were administered to the victim in the

21   hospital?

22        MS. DADOWSKI:  It's not difficult for the

23   State because they have the subpoena power, they

24   have their badges, they have investigators with

25   badges.  They are not going to give that

1        information to the defendant.  This is Mr.

2        D'Ambrosio's privacy interest.  They wouldn't give

3        us that.  That's all we have is the records.

4        They're not going to talk to us.

5              THE COURT:  I will allow it in.  If the State

6        can get records to show that he was given a

7        morphine drip.  I kind of doubt that he was given

8        the amphetamines.  I tend to believe that he had

9        the amphetamines in his system at the time of the

10       alleged crime, and that may or may not affect Mr.

11       D'Ambrosio's ability to recount events that he

12       observed.  But I think it's relevant, and I don't

13       think that the -- the prejudicial effect

14       substantially outweighs the probative value.  So

15       the motion in limine by the State is denied.

16             MR. GROSZ:  Judge, this will entail

17       additional witnesses that I did not mention.  I

18       just want to let you know and let them know.

19             THE COURT:  Okay.  That's fine.

20             MR. GROSZ:  Okay.

21             THE COURT:  Let's make it 3:00 since we have

22       kind of used up our ten minutes.

23             (Thereupon, a break was taken, after which

24       the following proceedings were had:)

25             THE COURT:  All right.  The record will

```
 1          reflect that Mr. Capelletti and Mr. Ruiz are both

 2          present, represented by counsel.

 3               Anything to come before the Court before we

 4          bring the jury in?

 5               MR. FLEISCHMAN:  No.

 6               THE COURT:  Both defendants wish to give

 7          openings?

 8               MR. FLEISCHMAN:  Yes.

 9               MS. DADOWSKI:  Yes, Your Honor.

10               THE COURT:  All right.  Deputy Lytle, would

11          you please bring in the jury.

12               THE BAILIFF:  Jury coming in.

13               (Thereupon, the jury entered the courtroom,

14          after which the following proceedings were had:).

15               THE COURT:  Folks, as I told you prior to the

16          break, at the beginning of the trial the attorneys

17          have an opportunity to make an opening statement.

18          The opening statement gives the attorneys a chance

19          to tell you what evidence they believe will be

20          presented during the course of the trial.  What

21          the lawyers say is not evidence and you are not to

22          consider it as such.  However, please give all of

23          the attorneys your close attention.

24               Mr. Grosz, you may proceed.

25               MR. GROSZ:  Ms. Dadowski, gentlemen.
```

1         On April 13th of 1997, between roughly 2:30

2    and 3:00, it's a Sunday afternoon, John Capelletti

3    is a passenger in a white Honda Civic driven by

4    Eduardo Ruiz.  They are heading northbound on I-95

5    when Mr. Capelletti levels the barrel of a shotgun

6    at the head of Christopher D'Ambrosio, pulls the

7    trigger and sends over 300 pellets at over 750

8    miles an hour into the shoulder, neck and jaw of

9    Christopher D'Ambrosio, who is riding in a vehicle

10   on I-95.  That's what happens.  That's what

11   happens 4/13, 1997 between 2:30, roughly, and 3:00

12   in the afternoon.

13        Mr. D'Ambrosio maneuvers the car off the road

14   where he attempts to call for help and ultimately

15   falls out of the vehicle.  Some other motorists

16   coming by stop and give him some assistance.  Both

17   gentlemen, Eduardo Ruiz and John Capelletti, are

18   charged with attempted murder in the first degree,

19   as you heard.

20        And I anticipate that at the close of this

21   case, you're going to get instructed on the law

22   and elements of attempted murder in the first

23   degree.  I want you to have an overview of those

24   elements before you hear the evidence so that when

25   you listen to the evidence, you can listen to the

1    evidence in light of what I anticipate the judge

2    is going to instruct on the law.

3         I anticipate the judge telling you before the

4    State -- or before you can can find the defendants

5    guilty of what they are charged with and before

6    the State can prove their guilt as to attempted

7    murder in the first degree, the State, myself, has

8    to prove to you certain elements.  And those

9    elements are as follows:

10        Number one, the defendant, Eduardo Ruiz and

11   John Capelletti, did some act which intended to

12   cause the death of Christopher D'Ambrosio that

13   went beyond just thinking or talking about it.

14   That the defendants, both of them, acted with a

15   premeditated design to kill Christopher

16   D'Ambrosio.  That the act would have resulted in

17   the death of Christopher D'Ambrosio, except that

18   someone prevented either defendant from killing

19   the victim, Mr. D'Ambrosio, or the defendant

20   simply failed to do so.  Those are the three

21   elements.

22        You will then further get the definition on

23   premeditation, and other matters regarding those

24   elements as we go along.  So you've got those

25   three elements, that they did an act that goes

1    beyond thinking or talking about it with intent to

2    kill, that they had a premeditated design to do

3    so, and that either someone stopped them or they

4    simply failed to do it.  Those are the three

5    elements.

6         Mr. Ruiz is the driver of the vehicle.  There

7    is going to be no testimony that you will hear

8    that Mr. Ruiz pointed the shotgun at the time that

9    it was fired.  He's charged in what we call a

10   principal fashion.  And I anticipate that you're

11   going to get an instruction that helps you

12   understand what the law of principals is that

13   allows us in Florida to charge two people with a

14   crime such as this.

15        And I anticipate the judge is going to tell

16   that you if the defendant helped another person or

17   persons commit or attempt to commit a crime, the

18   defendant is a principal and must be treated as if

19   he or she had done all of the things the other

20   person or persons did if, number one, the

21   defendant had a conscious intent that the criminal

22   act be done, and, number two, the defendant did

23   some act or said some word which was intended to

24   and which did incite, cause, encourage, assist or

25   advise the other person or persons to actually

1        commit or attempt to commit the crime.

2            To be a principal the defendant does not have

3        to be present when the crime is committed or

4        attempted.

5            Although, in this case, he was present.

6            But, in any event, those are two instructions

7        that I anticipated you're going to get at the end

8        of this trial.  Keep them in mind as you listen to

9        the evidence.

10           And what you will hear in terms of background

11       is this.  That Christopher D'Ambrosio is married

12       now.  And at some point prior to his getting

13       married, his wife was friendly with Mr.

14       Capelletti's wife, who has since passed away.

15       They were neighbors in Hollywood.  They lived on

16       Grant Street.  And at some point in time before

17       Ms. Capelletti passed away, Ms. D'Ambrosio had a

18       great fondness for Ms. Capelletti, felt sorry for

19       Mr. Capelletti and the family.  And during the

20       period of time, I believe that was back in April

21       of '96, between April of '96 and February of 1997,

22       you're going to learn that Mr. D'Ambrosio, because

23       of his wife's feelings for the Capellettis, found

24       jobs around the house, mowing the lawn, that type

25       of thing, to justify helping Mr. Capelletti out

1    financially.  And help me mow the lawn, I'll give

2    you $50.  If you help me do X, Y, Z, I will give

3    you another amount of dollars.

4        There were times where Mr. D'Ambrosio flat

5    out gave Mr. Capelletti increments of money to

6    give him.

7        In February of 1997, Mr. D'Ambrosio and his

8    wife were intending to move to Atlanta.  And Mrs.

9    D'Ambrosio moved up to Atlanta.  All the furniture

10   and everything else remained behind.  Mr.

11   D'Ambrosio was making arrangements to get that up

12   to Atlanta, and what he did was ask Mr. Capelletti

13   if he would like to or like the opportunity to

14   drive a U-Haul truck to take the furniture up to

15   Atlanta.  Mr. D'Ambrosio would fly up ahead, meet

16   him in Atlanta and Mr. D'Ambrosio would unload

17   everything and he would pay Mr. Capelletti.  Mr.

18   Capelletti agrees.  And he agrees to be paid a

19   hundred dollars to transport the furniture.  And

20   that's the way the arrangement works.

21       D'Ambrosio gives Capelletti numbers for once

22   he gets to Atlanta, you can beep me at this

23   number, you can reach me at home at this number,

24   and when you get there, call me and we'll finish

25   this off.

```
 1            Mr. D'Ambrosio goes up to Atlanta.  Mr.

 2      Capelletti brings the U-Haul up to Atlanta, and

 3      the U-Haul runs out of gas some point just outside

 4      of their final destination, and Mr. D'Ambrosio

 5      then goes to pick up the U-Haul, fill it up with

 6      gas and finish the job.

 7            They are scheduled to fly back to Fort

 8      Lauderdale, I believe Fort Lauderdale

 9      International Airport, the night that Mr.

10      Capelletti arrives in Atlanta with the U-Haul

11      truck.  Because of timing, they miss the flight

12      and they have to stay an additional night and then

13      are then scheduled to leave out the next morning.

14            Mr. D'Ambrosio and Mr. Capelletti go to a gas

15      station, not in the U-Haul, but in Mr.

16      D'Ambrosio's car.  And while Mr. D'Ambrosio was on

17      a pay phone, Mr. Capelletti either walks away for

18      a brief period of time, whatever, they separated

19      from each other, Mr. D'Ambrosio, after he's done

20      with the phone, doesn't see Mr. Capelletti

21      anywhere.  And after waiting for a little bit,

22      doesn't know where he went, figures he's a big

23      boy, he knows how to reach me, he already reached

24      me, I'm going to go back to the plane, which he

25      does.
```

1          He finds out later on, Mr. D'Ambrosio finds

2      out later on that Mr. Capelletti had been

3      arrested --

4          MS. DADOWSKI:   Objection based on the

5      pretrial motion.

6          THE COURT:   Same ruling.

7          MR. GROSZ:   -- and is now in the county jail

8      in Georgia.

9          And those charges are not for you to

10     consider.   Obviously, the charges that you are to

11     consider are the attempted first degree murder

12     charges.   But understand that at that point now

13     Mr. Capelletti is sitting in jail and there is a

14     bond that needs to be posted to get him out.

15         He makes several calls to Mr. D'Ambrosio.

16     And the bond is in excess of what Mr. D'Ambrosio

17     is willing to pay at that point.   Mr. D'Ambrosio

18     had already given Mr. Capelletti money for helping

19     him move.   And that money is either in property at

20     the jail or is gone.

21         Mr. D'Ambrosio is a little frustrated at this

22     point and he feels, you know, he's not a

23     baby-sitter, and eventually he comes home.   He's

24     got the flight to come home the next morning and

25     he does.

1          And he comes back.  And you will hear from

2    Mr. D'Ambrosio the efforts he made over the next

3    period of six weeks, approximately, to two months

4    to try to get either members of Mr. Capelletti's

5    family or anyone else to help post the bond for

6    him, and it's all to no avail.

7          Eventually at some point, Mr. D'Ambrosio says

8    to himself, you know, the family is not going to

9    get him or help move to get this guy out, you

10   know, there is only so much I can do, and at some

11   point Mr. D'Ambrosio says enough is enough and he

12   doesn't put up all that's necessary to bond Mr.

13   Capelletti out.

14         Mr. Capelletti eventually bonds out in late

15   March, which would be March of '97.  So he goes in

16   February 12th, comes out on March 26th of 1997,

17   and comes home.  Comes home to find that his doors

18   on his house have been locked while he's in

19   custody in Atlanta, his house had an eviction

20   notice served on it.

21         MS. DADOWSKI:  Objection based on the

22   pretrial motions.

23         THE COURT:  Same ruling.

24         MS. DADOWSKI:  Stand on the objection, Your

25   Honor.

1          THE COURT:  Yes, ma'am.

2          MR. GROSZ:  The doors are barred.  He can't

3      get in.

4          In any event, within the next two weeks, is

5      the day of our shooting.  And what takes place on

6      April 13th, 1997 is Mr. D'Ambrosio was coming out

7      of his house, which is a townhouse at Sheridan

8      Ocean Club in Hollywood, and he sees Mr.

9      Capelletti and Mr. Ruiz in Mr. Ruiz's vehicle.

10         Mr. D'Ambrosio will tell you he doesn't

11     formally know Mr. Ruiz, although he's seen him

12     several times with Mr. Capelletti, in fact, may

13     have met him once, hello, how are you type of

14     thing, but doesn't know him.  Sees both of them

15     outside of his house as he's getting into his car.

16         Mr. Capelletti makes a comment to Mr.

17     D'Ambrosio, something to the effect, we have got

18     to talk, and it's in a tone of voice that Mr.

19     D'Ambrosio feels, you know, a little taken aback

20     by it, but nothing really out of the ordinary.  He

21     says, hey, you know I'm in a rush, I got to go

22     fill up the car at the Amoco.  If you want to talk

23     to me, talk over there.

24         They go to the Amoco station located on

25     Sheridan Street and Federal Highway.  It's on the

 1        northwest corner of the intersection.  Mr.

 2        D'Ambrosio pulls his car in, he's facing one way.

 3        Mr. Capelletti and Mr. Ruiz pull in facing the

 4        opposite way.  And, at some point, Mr. Capelletti

 5        gets out of the car and is making comments to Mr.

 6        D'Ambrosio to the extent of you owe me "x" amount

 7        of dollars, either for the money that was lost or

 8        for the money that it took to bail him out, or why

 9        didn't you bail me out.  It's that kind of a

10        conversation.

11             And, at some point during their

12        conversation -- and words are going back and

13        forth.  You will see D'Ambrosio, you will hear

14        from him.  It's not as though he just took this

15        lying down.  And he starts jousting back a little

16        bit at Mr. Capelletti.

17             Mr. Ruiz gets out of the car and approaches

18        the passenger's side of Mr. D'Ambrosio's car.

19        And, at some point, Mr. Ruiz says to Mr.

20        Capelletti, Are we going to do this thing or what?

21        Do you want this?  Are we going to do this thing

22        here or what?

23             And Mr. D'Ambrosio is going to tell you that

24        he -- well, first of all, you will see, Mr.

25        D'Ambrosio is a pretty big guy, and at that point

1    he's thinking, you know this Mr. Ruiz physically

2    is no match for me, there's got to be something

3    more to it.  Why is he pushing the issue?  There's

4    got to be something behind this.  And he gets a

5    little scared.

6        Capelletti says at some point, I'm going to

7    blow your fucking head off, I'm going to fucking

8    kill you.

9        D'Ambrosio says, Whoa.  He gets in the car

10   and takes off.  He pulls out of the gas station,

11   heads westbound on Sheridan Street, towards 95.

12       Ruiz gets back in the driver's seat,

13   Capelletti in the passenger's seat.  And they

14   follow him.  And as they are going towards 95,

15   they get to the entrance ramp and head north on

16   95.  Mr. Ruiz still in pursuit of Mr. D'Ambrosio's

17   vehicle.  And Mr. D'Ambrosio will tell you that

18   during the entire course of travel, Mr. Ruiz is

19   making efforts to get his vehicle close and

20   parallel with D'Ambrosio's vehicle and, in fact,

21   goes to extraordinary lengths to do so.

22       It's 2:30 in the afternoon, on a Sunday, on

23   95.  There are other cars on the road, and Mr.

24   Ruiz has got to make efforts to either get around

25   him, to slow up, to speed up, to catch up with Mr.

1    D'Ambrosio's vehicle, which he does.  And he does

2    so right outside the airport on 95, just before

3    the big cloverleaf where 595 branches off west and

4    east, and there are some other roads.

5        At that point, Mr. D'Ambrosio will tell you

6    that Mr. Ruiz's vehicle catches up to him, evens

7    off with him.  And he will tell you he doesn't see

8    a shotgun, but he knows the two are in the car, he

9    hears a blast and realizes he's been shot.  And he

10   pulls over and blood's coming out and he tries to

11   call for help.  And then we're back to where we

12   started from, people come to help him.

13       He's taken to the hospital.  And Mr. Ruiz and

14   Mr. Capelletti, in their car, continue on.  That's

15   what you're going to hear.  That's what you're

16   gonna hear.

17       D'Ambrosio is a big guy.  Uhm, Mr. Ruiz and

18   Mr. Capelletti are not quite the same physical

19   stature as Mr. D'Ambrosio.  When you listen to Mr.

20   D'Ambrosio, it's something I tell him all the

21   time, if you listen to him for two minutes he will

22   annoy the crap out of you.  But if you know him

23   for 20 minutes, you get past that.  So do me a

24   favor, listen to his testimony, have some

25   patience.

1          You're going to hear that at the time of the

2     shooting, Mr. D'Ambrosio was on probation, on

3     felony probation, and had a misdemeanor charge

4     pending.  And you promised in voir dire -- and I'm

5     going to ask you to hold to that promise -- not to

6     discredit all of his testimony simply because of

7     that fact.  Certainly, it's something for you to

8     consider.  I'm not going to tell you not to

9     consider that.  A man was on probation at the

10    time.  Consider it, give it whatever weight you

11    deem appropriate, but listen to his testimony.

12    Listen to it, and look at it in light of all of

13    the other physical evidence that you're going to

14    see.

15         No shotgun was ever recovered.  The pellets

16    are recovered from Mr. D'Ambrosio's vehicle.

17    Pellets, spacer wads, a shot column, all recovered

18    from Mr. D'Ambrosio's vehicle.  And all are

19    components of a 12-gauge double quail shotgun.

20    You're going to hear from a firearm's expert from

21    the crime lab who will tell you that.  He will

22    give you more details about the components and

23    what they represent.  But ultimately those parts

24    are found in D'Ambrosio's car.

25         Mr. Ruiz's vehicle is seized in the later

1        part of April, and in his vehicle is simply found

2        an unspent casing, which is consistent with the

3        casing or the pellets and the other components

4        found in the victim's vehicle.  Along with the

5        unspent casing in Mr. Ruiz's car are spent

6        components of another similar, consistent type of

7        shotgun, same thing, 12-gauge double quail

8        shotgun.  In Mr. Ruiz's vehicle is found a spacer

9        wad, a shot column and another spacer wad.  In Mr.

10       D'Ambrosio's car, a spacer wad and a shot column

11       and pellets, as well, all consistent with each

12       other.

13            The crime lab experts will tell you that they

14       are consistent with each other.  He will also tell

15       you that the range the firearm must have been

16       fired, based on where the parts are located, the

17       hole in the vehicle, the injuries, all of that

18       type of information, would have been around eight

19       feet.  Eight feet from the -- at least from the

20       end of the barrel to the point of impact.  That I

21       would tell you there are certain factors that he

22       would like to know that would help him even narrow

23       it down further, such as the length of the barrel,

24       but he doesn't have that.  But what he can tell

25       you is he's comfortable that this was fired at

1    least eight feet away, possibly closer, but he

2    doesn't have the rest of the information.

3        That's what you're going to find.  There is

4    no tricks.  Give it whatever weight you deem

5    appropriate.  Listen to the testimony of Mr.

6    D'Ambrosio.  There is no other eyewitnesses to

7    this.  You're going to have to base your decision

8    on the testimony of Christopher D'Ambrosia, as

9    well as the physical evidence that's found in his

10   car, and Ruiz's car, coupled with the other

11   physical evidence, which is the photographs and

12   the work of the crime lab.  And once you've done

13   that and once you've paid attention and listened

14   to all of that and evaluate all of that, along

15   with the law that the judge is going to give,

16   you're going to be asked to go back there and

17   render a verdict, and you'll do that.  And I just

18   ask that the verdict that you render speaks the

19   truth, and that you not get swayed by the fact

20   that a witness may be on probation and all of a

21   sudden discount his testimony, and not be swayed

22   by anything other than the evidence.

23       Listen to it, be patient, keep an open mind.

24   Thank you.

25       THE COURT:  Thank you, Mr. Grosz.

1          MS. DADOWSKI:  Thank you, Your Honor.  May it

2     please the Court.

3          THE COURT:  Yes, ma'am.

4          MS. DADOWSKI:  Mr. Grosz.  Gentlemen, Mr.

5     Ruiz, Mr. Fleischman.

6          There is no question that Chris D'Ambrosio

7     was shot.  There is no question about that.  John

8     Capelletti is not guilty of attempted first degree

9     murder.  There is no question that Christopher

10    D'Ambrosio is going to come in here and testify to

11    the fact that he was shot and to the fact that

12    John Capelletti and Eduardo Ruiz had something to

13    do with it.  But what I'm going to ask you to do

14    is to listen carefully to Christopher D'Ambrosio's

15    testimony and ask yourself, while you're listening

16    to him, does he have a motive to lie, does he have

17    any reason why he might not be coming in here to

18    tell you the truth, what might that be.

19         You're going to hear that he was on felony

20    probation at the time of the shooting.  You're

21    going to hear that he also had a pending

22    misdemeanor charge at the time of the shooting.

23    And the only evidence that you're going to hear

24    that's going to link John Capelletti is

25    Christopher D'Ambrosio's words.

1          The police officers recovered some spacer wad

2     and some pellets.  Nothing on there is going to in

3     any way link that to John Capelletti.  There were

4     no fingerprints, nothing.  They search Mr. Ruiz's

5     car, they find some shell casings, pellets,

6     cigarette butts, whatever else they find.  There

7     is nothing there that has any evidence linking Mr.

8     Capelletti to this.

9          Now, Mr. D'Ambrosio is going to come in and

10    say that they had a confrontation at the gas

11    station.  There was some yelling involved.  Mr.

12    Ruiz and Mr. Capelletti were both there.  But

13    there is no witnesses at the gas station that are

14    going to come in and tell you that they occurred,

15    that they saw it.

16         You're going to hear from Christopher

17    D'Ambrosio.  He's shot right on I-95, according to

18    Mr. D'Ambrosio.  There are no witnesses that are

19    going to come in and tell you that they saw the

20    shooting on I-95.  D'Ambrosio is the only one.

21    Ask yourself, why would he be saying that?

22         Listen carefully, not only to the direct

23    examination and to Mr. Grosz, but to the

24    cross-examination that myself and Mr. Fleischman

25    are going to conduct.

1        When Mr. D'Ambrosio was taken to the hospital

2        they did a blood draw, and what did they find,

3        they found morphine and amphetamines in Mr.

4        D'Ambrosio's system.  Think about that and think

5        about the ability that that may cause on him on

6        his ability to remember and account on what

7        happened.

8        Listen carefully, please, to all of the

9        evidence that you hear.  And not only through the

10        direct examination of Mr. Grosz, but through the

11        cross-examination that I do, and that Mr.

12        Fleischman does.  And when you hear all of the

13        evidence, think about why Christopher D'Ambrosio

14        may not be telling you the truth, what he may be

15        trying to hide.  And, yes, he may be trying to

16        hide it and you will find that the verdict should

17        be not guilty of attempted first degree murder for

18        John Capelletti.

19        THE COURT:  Thank you, Ms. Dadowski.

20        Mr. Fleischman.

21        MR. FLEISCHMAN:  Thank you, Judge.

22        May it please the Court and counsel.

23        Good afternoon again, ladies and gentlemen.

24        My client, Mr. Ruiz, sits before you here

25        today, first, with this, Mr. Ruiz turned himself

1      in when he found out that his name came up in this

2      investigation.  He presented himself to Detective

3      Needs, who I assume you will hear from in this

4      case.  Just presented himself and now stands

5      before you charged by the State of Florida with

6      attempted first degree murder.

7           And let me start out with this.  The State

8      has brought up two principles, two ideas for you

9      legally.  One is that what they want you to do is

10     they want you to convict Mr. Ruiz as a principal

11     in this case.  And what they have said to you is,

12     well, we don't have direct evidence that Mr. Ruiz

13     had this weapon in his hand, and, in fact, there

14     will be no evidence in this case at all that Mr.

15     Ruiz ever possessed whatever weapon it was that

16     shot at Mr. D'Ambrosio.  There is none.  And what

17     they will do is they will stand up here after the

18     evidence is presented and say to you, ladies and

19     gentlemen, convict Mr. Ruiz of premeditated

20     attempted murder based on the fact that he was in

21     a vehicle where a shot was fired from and where

22     Mr. D'Ambrosio was injured.

23          And what's important is that you obviously --

24     I know you're going to consider the testimony of

25     all of the witnesses, but this case falls on Mr.

62

1     D'Ambrosio.  And this is what's important as far

2     as Mr. D'Ambrosio.  As you've already heard, Mr.

3     D'Ambrosio is on felony probation for an

4     aggravated stalking case.  And while he's on

5     probation for aggravated stalking, he goes out and

6     gets arrested for driving under the influence.

7     He's found to have morphine and amphetamines in

8     his system when he's taken to the hospital.  And

9     what the evidence will show is that on that very

10    same day when he's involved in this shooting --

11    because, again, there is no doubt he got shot, he

12    gives a very detailed statement to not one

13    officer, but two officers.  Very detailed, you

14    will see, I think typed, it came to be about 14

15    pages.  And what you will see is also, because

16    this also is very important, you're going to see

17    how Christopher D'Ambrosio, how he speaks, how he

18    looks, and what his feelings are toward, not only

19    Mr. Capelletti, but towards Mr. Ruiz because of

20    what happened.

21         And you will see that in this first

22    statement -- and, again, it is very detailed --

23    there is absolutely nothing indicating that Mr.

24    Ruiz, number one, had anything to do with this

25    shooting, other than that D'Ambrosio says, well,

1          he was driving in this car that supposedly

2          approached on several occasions.  That's it.

3              He tells the police about a confrontation

4          that he had with Mr. Capelletti before this

5          incident.  He tells them about a confrontation he

6          had with Mr. Capelletti at this gas station that's

7          been referred to on Sheridan in the City of

8          Hollywood.  And that while in the gas station, Mr.

9          Ruiz says nothing and does absolutely nothing.

10             But what I point out to you is this, and

11         you'll see for yourselves when you hear and see

12         Mr. D'Ambrosio, what I'm referring to, he's upset,

13         very upset, and maybe rightly so.  And as some

14         days go by and time goes by -- and, again, this

15         isn't someone -- this is someone that knows about

16         the system, he's on felony probation.  And at a

17         later point in time after the shooting occurs, he

18         again meets with a detective and gives a taped

19         statement.  And after having time to reflect on

20         what's happened to him, and he hates Mr. Ruiz --

21         in fact, he's called him -- he uses many names to

22         describe Mr. Ruiz, a little monkey, a crippled

23         guy -- after he has time to reflect and embellish

24         his statement, all he's interested in is seeing

25         Mr. Capelletti burn and Mr. Ruiz burn at the

1    stake, that's it.  And he comes up with a story

2    later on after all of this rage and anger is

3    burning in him, that now while Mr. Ruiz is at this

4    gas station, that he makes statements and walks

5    towards his car and touches his car.

6        Listen and look how he talks and what he says

7    about my client who had absolutely nothing to do

8    with this shooting.  And, in fact, the unrefuted

9    evidence will be that Mr. Ruiz has never known Mr.

10   D'Ambrosio, other than Mr. D'Ambrosio may have

11   waved to him at one time, said hello to him.

12   That's it.  They had no business dealings

13   together.  They had no social dealings together.

14   They had nothing.  They didn't even know each

15   other.  There is absolutely no reason for Mr. Ruiz

16   to have any contact with Mr. D'Ambrosio, none.

17       All this case is about, ladies and gentlemen,

18   is my client, unfortunately, because he was in the

19   car on that date.  And the State, again, they have

20   the burden of proof and they have to prove this to

21   you beyond every reasonable doubt, number one,

22   that he was a principal, because, again, there is

23   no evidence at all that he ever fired this weapon.

24   And what you will see is that this was a total

25   independent act, that Mr. Ruiz had nothing to do

1    with this.  He had no premeditation on his mind,

2    which they have to prove beyond every reasonable

3    doubt.  He had no motive against Mr. D'Ambrosio.

4    Nothing.

5         And, again, you'll hear as soon as he hears

6    that the police are looking for him, he presents

7    himself.  He had nothing to hide.

8         I feel confident that when you not only hear

9    from the only person, the only witness in this

10   case, because, again, after all of these

11   allegations of crazy -- later on of crazy driving

12   on I-95, of a physical confrontation at a gas

13   station at Sheridan and Hollywood, there are no

14   witnesses.  In fact, the police made no attempts

15   not only to not interview anyone at this gas

16   station, and there were people there, normal

17   business hours, there is no witnesses on 95.  This

18   was a time when I believe the police will even

19   tell you that it was actually somewhat busy and

20   crowded on this stretch I-95, and yet there is no

21   evidence of this alleged crazy driving that Mr.

22   D'Ambrosio comes up with after he has time to

23   reflect on what's happened to him in an attempt to

24   make sure that Mr. Ruiz is held responsible for

25   this.

1          I feel confident that when you listen to the

2     evidence, when you see Mr. D'Ambrosio, that the

3     State will not prove to you that Mr. Ruiz had

4     anything to do with this.  In fact, you will see

5     that he didn't.  And when you apply the facts --

6     and that's what your job is.  The judge is going

7     to give you the law, he's going to explain to you

8     what a principal is, what the law is.  He'll

9     explain to you that if you find that this was an

10    independent act, and that Mr. Ruiz was removed and

11    had nothing to do with this, that you must return

12    a verdict of not guilty.  And just from the

13    evidence, itself, if you find that there is a

14    reasonable doubt, which I feel confident you will,

15    that he had absolutely, again, nothing to do with

16    this, that you return a verdict of not guilty as

17    to the attempted first degree murder.

18          Thank you.

19          THE COURT:  Thank you, Mr. Fleischman.

20          Mr. Grosz, call your first witness.

21          MR. GROSZ:  Jessica Miller.

22          MS. DADOWSKI:  Judge, before we do that, I

23    believe we need to address an issue that we raised

24    pretrial.

25          THE COURT:  All right, folks.  Please step

1          back in the jury room for just a minute.

2                  Remember, do not discuss the facts of case.

3          (Thereupon, the jury exited the courtroom,

4          after which the following proceedings were had:)

5                  THE COURT:  All right, Ms. Dadowski.

6                  MS. DADOWSKI:  Judge, Jessica Miller is the

7          911 operator, and I had made the motion in limine

8          regarding the 911 tape's admissibility as far as

9          hearsay and the fact that one of the declarants or

10         the people on that 911 tape is Angelo Eiland, who

11         Mr. Grosz is going to provide for deposition

12         tomorrow morning, I believe at 8:00 or 8:15 at my

13         office.

14                 So I'm objecting.  First of all, I think it's

15         hearsay, it shouldn't be admissible, unless, of

16         course, the State can lay the proper predicate.

17         But I think that it's obviously more prejudicial

18         than probative.

19                 THE COURT:  What say the State as to the

20         predicate?

21                 MR. GROSZ:  I'm going to lay the predicate

22         with the witness.  Obviously, I wouldn't try to

23         introduce it without laying the predicate.  I

24         think this witness can lay the proper predicate.

25                 MS. DADOWSKI:  Well, Your Honor, I think it's

1          the Court's determination as to whether or not

2          this was an excited utterance or the person had an

3          opportunity to reflect on the information that was

4          given.  So I don't necessarily know that the 911

5          operator can lay the proper predicate.  I think

6          it's up to --

7                THE COURT:  I don't know if the 911 operator

8          can or cannot until I hear her.  She may -- the

9          State may or may not be able to lay a sufficient

10         foundation through her.  I haven't heard the tape.

11         I've got nothing before me other than Mr. Grosz's

12         representation.

13               MS. DADOWSKI:  I think you did hear the tape

14         before, Your Honor, at the Arthur hearing of

15         Eduardo Ruiz.  I don't know if you recall it.

16               THE COURT:  That's been quite some time ago.

17               MR. GROSZ:  I've got it here, if you want to

18         hear it now.

19               THE COURT:  Do you want to make your proffer

20         now outside of the presence of the jury?

21               MR. GROSZ:  Sure.

22               THE COURT:  I'll let you bring in Jessica

23         Miller.

24               MR. GROSZ:  Right.

25               (Thereupon, Jessica Miller entered the

                COUNTY REPORTERS, INC. (954) 763-6624

1    courtroom, after which the following proceedings

2    were had:)

3         THE COURT:  All right, ma'am, if you would

4    step forward, please.

5         THE CLERK:  Ma'am, would you raise your right

6    hand, please.

7    THEREUPON,

8                    JESSICA MILLER

9    being a witness of lawful age, having been first duly

10   sworn, testified upon her oath as follows:

11        THE CLERK:  Thank you.

12             DIRECT EXAMINATION

13   BY MR. GROSZ:

14   Q    Jessica, could you tell the judge what you do

15   for a living?

16   A    I'm a telecommunicator for the Fort

17   Lauderdale Police Department.

18   Q    What are your duties?

19   A    I answer 911 telephone calls that come into

20   the center.

21   Q    How long have you done that for?

22   A    I've been employed with Fort Lauderdale

23   Police since April of 1994.

24   Q    And how long have you been answering or

25   handling 911 calls?

1         A     Since April of 1994.

2         Q     Okay.  Currently, do you have any other

3    positions or authorities within that unit?

4         A     I'm a telecommunications training officer and

5    also an acting supervisor.

6         Q     Okay.  What specifically does that entail?

7         A     Telecommunications training officer, I train

8    the new-coming employees and trainees on 911s.

9         Q     And how many calls would you say, prior to

10   April 13th of 1997, how many calls would you say you've

11   handled, 911 incoming calls that you've had to actually

12   receive?

13        A     Thousands.  There is no way I can actually

14   put a number on them.

15        Q     Okay.  You recall receiving the call that's

16   pertinent to this case?

17        A     Yes, I do.

18        Q     And I put a tape in front of you.  I guess we

19   should mark that as State's Exhibit A for

20   identification.  Have you seen this before?

21        A     Yes.

22              (Thereupon, the tape was marked State's

23   Exhibit A for Identification.)

24        Q     (By Mr. Grosz)  When did you see this?

25        A     This afternoon.

1        Q    And did you have a chance to listen to it?

2        A    Yes, I have.

3        Q    And have you listened to the original before?

4        A    This original?

5        Q    No, no.  The original call.  This is a copy.

6    Correct?

7        A    Oh, yes.  I've heard it.  I have a copy of

8    the tape also.

9        Q    Okay.  And you recall the conversation that

10   took place as it was taking place.  Is that correct?

11   Do you recall?

12       A    Yes, I do.

13       Q    Does State's Exhibit A accurately represent

14   the phone call as you recall it?

15       A    Yes, it does.

16       Q    Can you describe the demeanor of the first

17   voice that you hear on the tape?

18       A    The first voice that I heard on the tape --

19            MS. DADOWSKI:  Your Honor, I'm going to

20       object.  I think that's up to the Court to

21       determine what the demeanor of the voice is.

22            THE COURT:  That will be sustained.

23            MR. GROSZ:  Judge, I have a lot of case law.

24       I don't have it with me, but I will go get it.

25       There is plenty of case law that says a civilian

1    can talk about what they feel the demeanor of a

2    witness, individual, if they can't articulate any

3    other manner of describing it.

4        THE COURT:  Yeah, this is the situation where

5    actually the voice she heard is I assume the same

6    voice on this tape.  Right?

7        MR. GROSZ:  Right.

8        THE COURT:  Can I make that determination by

9    listening to the tape as to the --

10       MR. GROSZ:  Yeah

11       THE COURT:  -- what the voice sounds like?

12       MR. GROSZ:  Yeah, but I think as a 911

13   operator, I think she can tell you how this person

14   sounds.  I mean, I don't think it takes any

15   significant expert qualifications.

16       THE COURT:  I will overrule, since the Court

17   is the trier of fact in this instance, I will give

18   you whatever weight I feel is appropriate at some

19   point in time.  The Court will hear the tape and

20   make its only determination.  So the objection is

21   overruled.

22       Q    (By Mr. Grosz)  Can you tell me how the voice

23   sounds to you and the demeanor of the voice?

24       A    He sounds to me, he sounds afraid.  Like he

25   was pretty much asking for help.

1          Q     Okay.  Do you recall specifically what his

2     words were?

3          A     I've been shot.  Help me, I've been shot.

4          Q     And did it appear to you, based on your

5     experience, did it appear to you that this witness or

6     this individual was relating to you something that they

7     were perceiving at that time?

8          A     He sounded like he needed help, that he was

9     afraid.

10         Q     Did it sound to you like this individual that

11    was talking on the other end of the line was actually

12    under the stress of whatever this incident was that he

13    had witnessed?

14         A     By the tone of his voice, I would say yes.

15         Q     And you hear a second voice?

16         A     Right.

17         Q     And describe the demeanor of the second voice

18    that you hear.

19         A     The second voice was from somebody that -- he

20    also sounds like he was a little nervous about what was

21    going on.

22         Q     Did you later learn the name of that person

23    to be Angelo Eiland?

24         A     Yes.

25         Q     E-i-l-a-n-d.

1        A    I'm not sure of the spelling.  It's on the

2    tape.

3        Q    Did it appear to you that Mr. Eiland was

4    relating to you facts about something he was either

5    witnessing at that time or had just witnessed?

6        A    Yes.

7        Q    And did it appear to you that Mr. Eiland was

8    under the stress of having witnessed whatever it was

9    that he witnessed?

10       A    He sounded -- he was very cooperative

11   actually, but he did sound afraid of what was gonna

12   happen.  He sounded a little nervous, but he was

13   cooperating so we could get somebody out there for him.

14            THE COURT:  Ma'am, what time was the call

15       received?

16            THE WITNESS:  I believe it was 1426 hours,

17       which was 2:26 p.m.

18            THE COURT:  And what was the duration of the

19       conversation?

20            THE WITNESS:  Uhm, that I'm really not sure.

21            THE COURT:  You don't have the records that

22       reflect that?  You don't log these?

23            THE WITNESS:  I don't log them myself.  I

24       have a copy of my notes.  I know I was on the

25       phone up until, uhm, it appears 1434 hours, which

1          is 2:34 p.m., and then I made another phone call

2          to the Florida Highway Patrol to find out if they

3          had arrived on the scene. So we were having a

4          hard time locating. That call was placed

5          approximately 1426 hours.

6          Q    (By Mr. Grosz) So the call came in at 1426

7    and then you made the second call at 1434?

8          A    1434 is when I have on there that the

9    paramedics had found him. I stayed on the phone the

10   whole time. I didn't make the second call until the

11   paramedics and the police were through with him.

12         Q    Okay. So the duration of the call is at

13   least eight minutes?

14         A    I'd say so.

15              MR. GROSZ: I don't have anything else,

16         Judge.

17              THE COURT: All right. Any cross before I

18         hear the tape?

19                   CROSS EXAMINATION

20   BY MS. DADOWSKI:

21         Q    Ms. Miller, you don't have any idea what time

22   the actual shooting took place, do you?

23         A    No, I don't.

24         Q    So you don't know how long it was from the

25   time of the shooting until the time of the 911 call, do

1    you?

2         A    No, I don't.

3         Q    You don't know if the person that made the

4    911 call had had any time to reflect on what

5    information he would be giving you before he called

6    911, do you?

7         A    No, I don't.

8              MS. DADOWSKI:  Okay.  No further questions.

9              THE COURT:  Mr. Fleischman, any questions?

10             MR. FLEISCHMAN:  Just the one question that I

11   have.

12             The other person that's referred to in the

13   call, you don't know how long he had been on the

14   scene, do you?

15             THE WITNESS:  No.  He was -- from what I

16   understood, he was a passerby.

17             MR. FLEISCHMAN:  He was, I'm sorry?

18             THE WITNESS:  A passerby that stopped and

19   helped.

20             THE COURT:  All right.  Do you want to play

21   Exhibit A?

22             MR. GROSZ:  Sure.

23             (Thereupon, the tape was played, and

24   transcribed as understood by this court reporter.)

25             911 OPERATOR:  911.

COUNTY REPORTERS, INC. (954) 763-6624

1          A MALE VOICE:  Help, I've been shot.

2          911 OPERATOR:  Hello.

3          A MALE VOICE:  Help I've been shot.

4          911 OPERATOR:  Where are you?

5          A MALE VOICE:  Help.  Christ, Christ.  Help

6     me, I've been shot.  Please.

7          911 OPERATOR:  Where are you?

8          A MALE VOICE:  I-95.

9          911 OPERATOR:  I-95 and where?

10         A MALE VOICE:  I-95.  You gotta hold on.

11    Here.  I-95 and Davie Boulevard.

12         911 OPERATOR:  Okay.  Listen to me.  Which

13    bound lane are you in?

14         SECOND MALE VOICE:  All right.

15         911 OPERATOR:  Hello.

16         SECOND MALE VOICE:  Hello.

17         911 OPERATOR:  Where is he?

18         SECOND MALE VOICE:  Hello.  Hold on one

19    second.  One second.  One second.  One second.

20    One second.

21         911 OPERATOR:  Someone set me up with FHP for

22    this, please.

23         SECOND MALE VOICE:  Get him out of the car,

24    man (inaudible).

25         Hello.  Hello.

1           911 OPERATOR:  Where is he, sir?

2           SECOND MALE VOICE:  Yes.  He's on -- he's

3    on -- we're just south.  The next, uhm -- it's got

4    one -- one sign pull off Davie Boulevard.  Listen

5    I --

6           911 OPERATOR:  Okay.  Which bound lanes are

7    you in, sir?

8           SECOND MALE VOICE:  Northbound.  Northbound,

9    State Road 84 exit.

10          911 OPERATOR:  You're northbound?

11          SECOND MALE VOICE:  Yes.  Next to the sign

12   that says Griffin, where all the --

13          911 OPERATOR:  Okay.

14          SECOND MALE VOICE:  -- all the crosses are.

15          911 OPERATOR:  Okay.  Listen to me.  Listen

16   to me.

17          SECOND MALE VOICE:  All right.

18          911 OPERATOR:  You need to calm down.

19          Where has he been the shot?

20          SECOND MALE VOICE:  He's been shot in the

21   neck.

22          911 OPERATOR:  In the neck.

23          Who shot him?

24          SECOND MALE VOICE:  I don't know.  He's --

25   he's not trying to think.

1          911 OPERATOR:  Huh?

2          SECOND MALE VOICE:  He's not trying to say.

3     He can't say.

4          911 OPERATOR:  Okay.  Listen to me.

5          SECOND MALE VOICE:  Don't make him talk.

6          911 OPERATOR:  Listen.  Listen to me.  You

7     need to calm down so we can help him.

8          Okay.  Listen.  He is on I-95 and Davie in

9     the northbound lanes?

10         SECOND MALE VOICE:  Yes.

11         911 OPERATOR:  Okay.  Now, listen.  What kind

12    of car is he in?

13         SECOND MALE VOICE:  He's in -- he has like a

14    '95, '96  Chevy Impala SX.

15         911 OPERATOR:  What color?

16         SECOND MALE VOICE:  Burgundy in color,

17    like --

18         911 OPERATOR:  Burgundy Chevy Impala?

19         SECOND MALE VOICE:  Yes.  Yes.

20         911 OPERATOR:  Okay.  Ask him if knows --

21    listen to me.

22         SECOND MALE VOICE:  Yes.

23         911 OPERATOR:  Ask him if he knows who shot

24    him.

25         SECOND MALE VOICE:  The lady wants to know do

1        you know who shot you?

2            A MALE VOICE:  I got no question on it, man.

3            SECOND MALE VOICE:  He knows.

4            911 OPERATOR:  He doesn't know?

5            SECOND MALE VOICE:  Yes, he knows.

6            911 OPERATOR:  He does know.  Okay.  Where

7        is --

8            SECOND MALE VOICE:  John Capelletti he says.

9        John Capelletti.

10           911 OPERATOR:  Okay.  Where is this guy?

11           A MALE VOICE:  I don't know where he is.

12           SECOND MALE VOICE:  She wants to know do you

13       know where he's at?

14           911 OPERATOR:  Where is he?

15           A MALE VOICE:  I-95.

16           SECOND MALE VOICE:  He's going -- he's

17       obviously heading north on 95.

18           911 OPERATOR:  He's going northbound.  What

19       kind of car?

20           SECOND MALE VOICE:  He's -- he's with a guy

21       named Eddie.

22           911 OPERATOR:  Okay.  Listen to me.  What

23       kind of car is he in, sir?

24           SECOND MALE VOICE:  What kind of car is John

25       in?

1          A MALE VOICE:  White Honda car.

2          SECOND MALE VOICE:  A white Honda Civic.

3          911 OPERATOR:  Does he know the -- does he

4      know the tag number?

5          SECOND MALE VOICE:  Do you know the tag

6      number?  No.

7          MALE VOICE:  About an '89 --

8          SECOND MALE VOICE:  About an '89 Honda Civic.

9          911 OPERATOR:  It's a what year?

10         SECOND MALE VOICE:  '89 Honda Civic.

11         911 OPERATOR:  It's an '89 Honda Civic?

12         SECOND MALE VOICE:  Yes.

13         911 OPERATOR:  Okay.  Does he know what he's

14     wearing?

15         SECOND MALE VOICE:  He told me -- listen to

16     me, dude, the guy said -- he said Eddie, uhm --

17         MALE VOICE:  Turn off (inaudible) --

18         SECOND MALE VOICE:  -- this guy was gonna

19     kill him at the Amoco Station.

20         MALE VOICE:  All right.

21         911 OPERATOR:  Okay.  Listen.  What's your

22     name, sir?

23         SECOND MALE VOICE:  My name is Angelo Eiland.

24         911 OPERATOR:  Angelo what?

25         MALE VOICE:  Eiland.

```
 1              I'm not gonna -- I'm not gonna pull it off.

 2              911 OPERATOR:  Eiland?

 3              SECOND MALE VOICE:  E-i-l-a-n-d.

 4              911 OPERATOR:  What is it?

 5              MALE VOICE:  Sure, all right.

 6              SECOND MALE VOICE:  E-i-l-a-n-d.

 7              911 OPERATOR:  E-l-i--

 8              SECOND MALE VOICE:  E-i-l-a-n-d.

 9              MALE VOICE:  Hold this on here.

10      Hold that on --

11              911 OPERATOR:  What's the cellular phone

12      number there?

13              SECOND MALE VOICE:  What's his number?

14      What's your number, the cell phone?

15              He don't know the cell phone number.

16              911 OPERATOR:  He doesn't know it?

17              SECOND MALE VOICE:  Yes.

18              911 OPERATOR:  All right.  I'm gonna put on a

19      paramedic that's gonna help you until we get

20      there.  Okay.

21              SECOND MALE VOICE:  Okay

22              911 OPERATOR:  Hang on.

23              SECOND MALE VOICE:  Come on, man, stay calm.

24      Stay calm.  I know it hurts, man, but stay calm.

25              911 OPERATOR:  Okay.  Listen to me.  We're on
```

1    the way.  Just stay on the phone with me.

2        SECOND MALE VOICE:  Okay.

3        911 OPERATOR:  And you're definitely

4    northbound at Davie?

5        SECOND MALE VOICE:  Northbound, right here at

6    all the crosses and turns

7        911 OPERATOR:  Okay.  So you're -- you're

8    probably gonna be between Davie and State Road 84?

9        SECOND MALE VOICE:  Right. We're off the

10   road.  We're off the road.  We're (inaudible) --

11       THIRD MALE VOICE:  FHP.

12       911 OPERATOR:  Hi.  This is statewide.  We're

13   gonna be calling it in.  I have a shooting victim

14   that was shot in the neck.  He's on I-95.  We're

15   en route.

16       SECOND MALE VOICE:  (Inaudible) I know it

17   hurts, man, but you gotta stay calm.  Whoever

18   wants the address.

19       911 OPERATOR:  Sir, it's just for calling in,

20   we're already en route.

21       THIRD MALE VOICE:  Where was he shot at?

22       911 OPERATOR:  He was shot in the neck.

23       THIRD MALE VOICE:  All right.  Let me talk to

24   the car.

25       Hello, sir.

1           SECOND MALE VOICE:  Right here, man.

2           THIRD MALE VOICE:  Do you have a rag or

3      something to quell (inaudible)?

4           SECOND MALE VOICE:  Say it again.

5           THIRD MALE VOICE:  Do you have a cloth or

6      something like that?

7           SECOND MALE VOICE:  Yes, we do.  Yes, we do.

8           THIRD MALE VOICE:  Okay.  Hold it -- put it

9      on the sight, just cover the wound.  Okay.

10           SECOND MALE VOICE:  Okay.

11           THIRD MALE VOICE:  Okay.

12           SECOND MALE VOICE:  Okay.

13           THIRD MALE VOICE:  Is he talking?

14           SECOND MALE VOICE:  Say it again now.

15           Is he breathing?  He's alive.  He's --

16      he's -- he's, uhm -- he's fully up.  He's fully

17      aware.  And he's talking.

18           THIRD MALE VOICE:  He's talking?

19           SECOND MALE VOICE:  He's talking.

20           THIRD MALE VOICE:  Okay.  Keep him as calm as

21      possible.

22           SECOND MALE VOICE:  Say it again now.  Okay.

23      Yeah.  I told him to stay still.

24           THIRD MALE VOICE:  Is it (inaudible) covering

25      a whole lot or a little bit?

1           SECOND MALE VOICE:  Say it again now.

2           THIRD MALE VOICE:  Is he bleeding a whole lot

3      or a little bit?  Does it cover a lot?

4           SECOND MALE VOICE:  It's not a lot.

5           THIRD MALE VOICE:  Not a lot.

6           SECOND MALE VOICE:  (inaudible) just got a

7      whole in his neck.  I guess he's on -- he's on --

8      he's bleeding.  He's bleeding (inaudible) right

9      now.

10          THIRD MALE VOICE:  I understand.  Okay.

11          What I want you to do is keep him as calm as

12      possible.  Okay.

13          SECOND MALE VOICE:  All right.  Yeah, I told

14      him to stay as calm as possible.

15          THIRD MALE VOICE:  Great, great.  Good job.

16      Good job.  We're on our way there.

17          SECOND MALE VOICE:  He's -- he's being real

18      cooperative.  He's staying calm.  So --

19          THIRD MALE VOICE:  Good.  Good thing.

20          Has he been shot anyplace else?

21          SECOND MALE VOICE:  Say it again now.

22          THIRD MALE VOICE:  Has he been shot anyplace

23      else?

24          SECOND MALE VOICE:  That's it.  That's it.

25          THIRD MALE VOICE:  That's it?

1      SECOND MALE VOICE:  Keep him calm.  Keep him

2      still right there.  Don't move.  Don't move.  I

3      know it hurts.  It hurts, man.  I can see the

4      agony in his face.

5          THIRD MALE VOICE:  Are you all right?

6          SECOND MALE VOICE:  I understand.  All right.

7          THIRD MALE VOICE:  Where is the suspect?  Is

8      he gone?

9          SECOND MALE VOICE:  He's gone, yes.

10         911 OPERATOR:  Okay.  Caller A, can I just

11     interrupt for one second?

12         Sir, sir.

13         SECOND MALE VOICE:  Yes.

14         911 OPERATOR:  Okay.  Can he give me a

15     description of this person because we've got FHP

16     (inaudible) a report.

17         SECOND MALE VOICE:  Of the individual that

18     got shot?

19         911 OPERATOR:  No, no, no, of the guy that

20     shot him.  I know he's in a white Honda, but I --

21         SECOND MALE VOICE:  (Inaudible)  You got a

22     description.  Say he's a crippled guy.  Short,

23     crippled guy.

24         911 OPERATOR:  Is he black or white?

25         SECOND MALE VOICE:  Uhm, the guy that shot

```
1        you.  Eddie.

2              MALE VOICE:  I don't want to talk about it.

3              SECOND MALE VOICE:  He don't want to talk

4        about it he said.

5              911 OPERATOR:  Okay.

6              MALE VOICE:  I want to get out of here.

7              SECOND MALE VOICE:  He just want to get out

8        of here.  He just don't want to talk.

9              911 OPERATOR:  Okay.  Well, we're on our way

10       to help him --

11             SECOND MALE VOICE:  That's all he saying, he

12       don't want to die --

13             911 OPERATOR:  -- so stay on the phone, don't

14       leave.

15             SECOND MALE VOICE:  -- don't want to die.

16             911 OPERATOR:  Well, that's why -- why the

17       paramedics are on the phone, okay.

18             SECOND MALE VOICE:  Okay.  Stay calm, man.

19       Just breathe -- gotta breathe as smooth as

20       possible.  Stay calm, man.

21             MALE VOICE:  Jesus Christ (inaudible).

22             THIRD MALE VOICE:  How you doing?

23             SECOND MALE VOICE:  He's all right.  He's

24       doing.

25             THIRD MALE VOICE:  Okay.
```

1        SECOND MALE VOICE:  His eyes are open.

2    Everything's moving.

3        THIRD MALE VOICE:  Okay.  Great.

4        MALE VOICE:  Get my mother.  Tell her to call

5    Sylvia.  Call Sylvia.  Call Sylvia.  Call Sylvia.

6        FEMALE VOICE:  (inaudible)  Place a call to

7    Sylvia.

8        SECOND MALE VOICE:  Hey, chief.

9        MALE VOICE:  Yeah.

10        SECOND MALE VOICE:  Keep that leg still.

11    Don't let them move around like that.

12        MALE VOICE:  Man --

13        SECOND MALE VOICE:  I know it hurts, but we

14    got to them still, man.  We don't want -- don't

15    let him move it.  Don't move nothing.

16        THIRD MALE VOICE:  He's not trying to get up

17    there.

18        SECOND MALE VOICE:  I know you -- I know --

19    (inaudible).

20        THIRD MALE VOICE:  (inaudible)

21        SECOND MALE VOICE:  Don't do nothing.

22        MALE VOICE:  All right.

23        SECOND MALE VOICE:  Don't do nothing.

24        THIRD MALE VOICE:  You're not losing any more

25    blood?

1                     911 OPERATOR:  Okay.  Caller A, hold on a

2           moment.

3                     Angelo.  Angelo.

4                     SECOND MALE VOICE:  Doing all right, man.

5                     911 OPERATOR:  Angelo.  Hello.

6                     SECOND MALE VOICE:  Right.

7                     911 OPERATOR:  Angelo.

8                     SECOND MALE VOICE:  There you go.

9                     911 OPERATOR:  Sir.  Hello.

10                    SECOND MALE VOICE:  Yes.

11                    911 OPERATOR:  Listen, they can't find you.

12          Where are you?

13                    SECOND MALE VOICE:  Okay.  Like I say, we're

14          northbound.

15                    911 OPERATOR:  Northbound I-95, between?

16                    SECOND MALE VOICE:  (inaudible) Go to the

17          airport.  You can either take the airport there.

18                    911 OPERATOR:  Are you on I-95?

19                    FEMALE VOICE:  (Inaudible).

20                    SECOND MALE VOICE:  Just -- just under the

21          595 freeway.

22                    911 OPERATOR:  I-95 under --

23                    SECOND MALE VOICE:  Yeah, we're past the

24          airport -- uhm, the airport exit.

25                    THIRD MALE VOICE:  Okay.  Past the airport

1       exit.

2               SECOND MALE VOICE:  Just past the airport

3       exit.

4               911 OPERATOR:  Okay.  When you say past the

5       airport exit, are you --

6               SECOND MALE VOICE:  You turn --

7               911 OPERATOR:  -- north or south?

8               SECOND MALE VOICE:  You can turn to go to

9       the --

10              911 OPERATOR:  Listen, listen to me.

11              SECOND MALE VOICE:  Just pass, just --

12              911 OPERATOR:  Listen.  Hello.  Listen.

13              SECOND MALE VOICE:  Okay.

14              911 OPERATOR:  Are you north or south of the

15      airport?

16              SECOND MALE VOICE:  We're north -- we're just

17      north of the airport.

18              911 OPERATOR:  Just north of the airport, so

19      you're under 595?

20              SECOND MALE VOICE:  Right.

21              FOURTH MALE VOICE:  I'm gonna rip my little

22      top down.

23              SECOND MALE VOICE:  We're on the north side.

24              THIRD MALE VOICE:  Which side?

25              SECOND MALE VOICE:  We're going north.

1           THIRD MALE VOICE:  Okay.  Just past the

2     airport exit?

3           SECOND MALE VOICE:  Yes.

4           THIRD MALE VOICE:  Okay.  We're almost there.

5           SECOND MALE VOICE:  All right.

6           911 OPERATOR:  Hold on.  Don't hang up.

7     Okay?

8           SECOND MALE VOICE:  I'm not going anywhere.

9     I'm not going anywhere.

10           911 OPERATOR:  Okay.

11           THIRD MALE VOICE:  Great.  Stay on the line

12     with me.

13           SECOND MALE VOICE:  All right.

14           THIRD MALE VOICE:  I'm just gonna monitor

15     with you.  We're gonna be there momentarily with

16     you.

17           SECOND MALE VOICE:  They're trying to get

18     here.  They missed the exit.

19           MALE VOICE:  Uh-huh.

20           THIRD MALE VOICE:  They're coming.  They

21     should be here shortly.  I'm just gonna monitor

22     with you.

23           911 OPERATOR:  Do you see any police or

24     paramedics there?  They're on their --

25           SECOND MALE VOICE:  Yeah, I just see oncoming

1     traffic.  Nothing yet.  Nothing at all, either

2     direction.

3          911 OPERATOR:  Are you sure you're on I-95?

4          SECOND MALE VOICE:  I mean it's not funny,

5     but, yes, I am.

6          THIRD MALE VOICE:  Okay.  We'll be there

7     shortly.

8          SECOND MALE VOICE:  Okay.

9          THIRD MALE VOICE:  I-95 north.

10         (Inaudible).

11         911 OPERATOR:  Sir, what can you see from

12    where you are, what landmarks?

13         SECOND MALE VOICE:  I'm looking at --

14         911 OPERATOR:  (Inaudible) 595 --

15         SECOND MALE VOICE:  Listen to what I'm

16    saying.  The sign says Davie Boulevard one half

17    mile.

18         911 OPERATOR:  The sign says Davie Boulevard

19    one half mile.

20         SECOND MALE VOICE:  Right.  There's a sign

21    right -- I'm right under it.  He's right under it.

22    He's right under all those twists and turns up

23    ahead to 595.  You're on 730 -- State Road 736,

24    State Road 84 exit.  All those are right here

25    under us -- or above us rather.  We're just north

1           of the airport exit.

2                   911 OPERATOR:  Just north of the airport

3           exit, in the northbound lane?

4                   SECOND MALE VOICE:  Right.

5                   911 OPERATOR:  Okay.  Hold on for me.

6                   SECOND MALE VOICE:  Well -- (inaudible)

7                   A FEMALE VOICE:  911.

8                   911 OPERATOR:  Who's that female with you?

9                   (Inaudible.)

10                  911 OPERATOR:  Do you see the police or

11          paramedics yet, sir?  Sir.

12                  SECOND MALE VOICE:  Yes?

13                  911 OPERATOR:  Do you see the police or the

14          paramedics now?

15                  SECOND MALE VOICE:  Here they come now.  Here

16          they come now.

17                  911 OPERATOR:  You see them coming now.  All

18          right.  Flag them down.  I'll stay on the phone

19          until they get out with you.

20                  SECOND MALE VOICE:  Here they come now.

21                  (Inaudible)  They coming now.

22                  911 OPERATOR:  Is that the paramedics?

23                  SECOND MALE VOICE:  Yes.  They are right

24          here.

25                  911 OPERATOR:  Okay.  What about the police?

1          SECOND MALE VOICE:  Stay calm, buddy.  Stay

2     calm.  Stay calm.

3          THIRD MALE VOICE:  (inaudible) paramedics.

4     Paramedics are gonna take over.  Okay.

5          SECOND MALE VOICE:  Okay.

6          FOURTH MALE VOICE:  Thank you very much.

7     You're doing a good job.

8          911 OPERATOR:  Angelo, stay on the phone with

9     me, though.

10          SECOND MALE VOICE:  Okey doke.

11          911 OPERATOR:  Angelo, what's your home phone

12     number?  What's his home phone number?

13          SECOND MALE VOICE:  628 -- Area Code 305 --

14          911 OPERATOR:  305 --

15          SECOND MALE VOICE:  628-

16          911 OPERATOR:  628 -

17          SECOND MALE VOICE:  - 0485.

18          911 OPERATOR:  - 0485?

19          SECOND MALE VOICE:  Yes.

20          (Inaudible)

21          THIRD MALE VOICE:  What happened?

22          SECOND MALE VOICE:  I seen him from a

23     distance.  No one would stop for him.

24          911 OPERATOR:  Okay.  Are they out there now?

25          SECOND MALE VOICE:  Yeah, I mean -- they're

1       here now.  Everybody's here now.

2               911 OPERATOR:  They're all there now?

3               SECOND MALE VOICE:  Yeah.

4               911 OPERATOR:  Okay.  Go ahead and hang up

5       and speak to them.  Okay?

6               SECOND MALE VOICE:  Okey-doke.

7               911 OPERATOR:  Bye-bye.

8               SECOND MALE VOICE:  Bye-bye.

9               (Thereupon, another phone call was had and

10      was transcriberd as understood by this court

11      reporter.)

12              MALE VOICE:  Somebody want to run out to 595

13      and check on --

14              FEMALE VOICE:  I heard sirens.

15              SECOND FEMALE VOICE:  Hi.

16              FEMALE VOICE:  Hi.  It's Fort Lauderdale.

17      Reference a shooting on I-95.  Are you out with

18      them?

19              SECOND FEMALE VOICE:  Yes.

20              FEMALE VOICE:  Okay.  Where are they, because

21      we can't find them?

22              SECOND FEMALE VOICE:  You can't find them?

23              Where exactly are they?  Fort Lauderdale

24      wants to know.

25              MR. FLEISCHMAN:  Judge, before this is

```
 1          played --

 2              FEMALE VOICE:  Wondering around in circles.

 3      They can't find them.

 4              SECOND FEMALE VOICE:  We're on the northbound

 5      exit of Davie.

 6              FEMALE VOICE:  (inaudible)  I'm sorry?

 7              SECOND FEMALE VOICE:  Northbound exit of

 8      Davie.

 9              On overpass yet?

10              MALE VOICE:  Yes.

11              SECOND FEMALE VOICE:  At the overpass.

12              FEMALE VOICE:  They're on the overpass?

13              SECOND FEMALE VOICE:  Yes.

14              FEMALE VOICE:  So they're on the exit?

15              SECOND FEMALE VOICE:  Yes, exit on Davie.

16              FEMALE VOICE:  (Inaudible) side of I-95,

17      northbound exit of Davie on the overpass?

18              SECOND FEMALE VOICE:  Yeah, northbound.

19              FEMALE VOICE:  Okay.  Great thanks.

20              SECOND FEMALE VOICE:  Okay.

21              FEMALE VOICE:  Bye-bye.

22              (Thereupon, the tape was concluded, after

23      which the following proceedings were had:)

24              THE COURT:  Yes, sir.

25              MR. FLEISCHMAN:  Judge, my objection goes
```

1        to -- is on behalf of Mr. Ruiz, all of this --

2        well, let me address this part first.  The -- I

3        don't feel that the portion of the tape where this

4        witness is on the scene giving directions

5        referring to what was said by Mr. Capelletti,

6        having conversations with the 911 operator, giving

7        descriptions about their location, that that

8        qualifies as an excited utterance.  Not only that,

9        I feel that it's not -- there is no probative

10       value, and it is not relevant.

11            But certainly even before you look at whether

12       or not it's relevant or probative, it has to first

13       be an excited utterance.  My position is that it

14       is not.  He's simply relaying information.  He's

15       simply giving directions.  He's simply giving

16       locations.  My -- my position is that it is not

17       what would qualify as an exited utterance.

18            MS. DADOWSKI:  Judge, I would adopt Mr.

19       Fleischman's argument.  However, the correction is

20       I think he meant to say Mr. D'Ambrosio.

21            MR. FLEISCHMAN:  I'm sorry.  Right, Mr.

22       D'Ambrosio.

23            MS. DADOWSKI:  Judge, I think the excited

24       utterance under 90.803(2) says a statement or

25       excited utterance relating to a startling event or

```
 1        condition made while the declarant was under the

 2        stress of excitement caused by the event or the

 3        condition.

 4            This 911 tape is basically a reillustration

 5        of Angelo Eiland, of what he's hearing from

 6        allegedly Christopher D'Ambrosio.  It is not

 7        Angelo Eiland being the declarant and making the

 8        statement under the time that he's under the

 9        excitement of either the event or the condition.

10        He's basically an eyewitness that came on the

11        scene.

12            THE COURT:  I think that both Mr. D'Ambrosio

13        and Mr. Eiland appeared to the Court, after

14        listening, to the Court, to be under the

15        influence, shall I say, of the startling event.

16        And the Court finds that there is sufficient

17        guarantees as to the truthfulness of those

18        utterances contained in State's Exhibit A to

19        warrant its admission into evidence.

20            So reading from Ehrhardt, a person who is

21        excited as a result of a startling event does not

22        have the reflective capacity, which is essential

23        for conscious misrepresentation, therefore, the

24        statements that are made by the person who is in a

25        state of excitement are spontaneous and has
```

1          sufficient guarantees of truthfulness.  And I

2          think what the Court heard on this tape definitely

3          falls within the gamut of that statement.  So the

4          objection will be overruled up to the point where

5          the 911 operator, I guess she is dialing -- who

6          are you dialing, ma'am?

7              THE WITNESS:  The Highway Patrol.

8              THE COURT:  -- the Highway Patrol.  I think

9          at that point -- from that point on, that would

10         not fall within the excited utterance exception.

11             MS. DADOWSKI:  If I could just make one

12         additional note, Your Honor.

13             THE COURT:  Yes, ma'am.

14             MS. DADOWSKI:  I think that in order for the

15         actual predicate to be laid, though, we need to

16         hear from Christopher D'Ambrosio to establish when

17         he was shot and how long after this alleged -- or

18         the shooting took place.  Was it before he made

19         this 911 call.  Because I don't think you can

20         determine whether there was no time to reflect

21         until you have that testimony as far as the time

22         between the shooting and the 911 call.  I mean,

23         obviously, unless somebody is a good actor, they

24         can certainly have some time to reflect and make

25         it sound this like they're under the stress or

```
1        excitement.  I think that has to be laid in order

2        for the proper predicate to be met.

3            THE COURT:  That will be denied.

4            The Court, after hearing Mr. D'Ambrosio on

5        the tape, he appeared to be definitely in a

6        stressful situation.  It sounds like to me that he

7        thought he was about to die.

8            MR. GROSZ:  Judge, procedurally, the -- if I

9        play the tape now, will anyone have any objection

10       to redacting the last part of it so when the jury

11       gets it, it will not play beyond the point where

12       the judge just ruled inadmissible?  I'm going to

13       admit it now.  Do you have a problem with taking

14       out?

15           MR. FLEISCHMAN:  Obviously, we will get to

16       listen to it before.

17           MR. GROSZ:  Right.

18           MR. FLEISCHMAN:  No, I don't have a problem

19       with that.

20           MS. DADOWSKI:  Do you just know where to

21       stop?

22           MR. GROSZ:  Yeah.

23           THE COURT:  All right.  Do you need to rewind

24       it?

25           MR. GROSZ:  It is rewound.
```

1           THE COURT:  It's rewound.

2           Deputy Lytle, would you bring in the jury,

3      please.

4           MR. FLEISCHMAN:  Judge, I just want the

5      record to reflect now that we're objecting to the

6      introduction of the tape, so that we don't have to

7      keep objecting to the introduction of the tape.

8           MS. DADOWSKI:  Same for the Defendant

9      Capelletti.

10           THE COURT:  All right.

11           Deputy Lytle, please bring them in.

12           THE BAILIFF:  Jury coming in.

13           (Thereupon, the jury entered the courtroom,

14      after which the following proceedings were had:)

15           THE COURT:  All right.  Mr. Fitzpatrick,

16      please swear in the witness.

17           THE CLERK:  Yes, sir.

18           Ma'am, if you could, please raise your right

19      hand to be sworn.

20    THEREUPON,

21                JESSICA MILLER

22    being a witness of lawful age, having been first duly

23    sworn, testified upon her oath as follows:

24           THE CLERK:  Thank you, ma'am.  You may be

25      seated, please.

1          If you would, could you please state your

2      full name and spell your last name for the record.

3          THE WITNESS:  My name is Jessica L. Miller.

4      M-i-l-l-e-r.

5          THE CLERK:  Thank you.

6                    DIRECT EXAMINATION

7  BY MR. GROSZ:

8      Q    Ms. Miller, can you tell us what you do for a

9  living, ma'am.

10     A    I'm a 911 telecommunicator with the Fort

11 Lauderdale Police Department.

12     Q    How long have you done that?

13     A    Since April of 1994.

14     Q    During the course of your duties as an

15 operator, can you tell us specifically what those

16 duties entail?

17     A    I answer the incoming lines and also the 911

18 lines, I'm a telecommunicator training officer and also

19 an acting supervisor.

20     Q    Bringing you back to April 13th, 1997, were

21 you working that day?

22     A    Yes, I was.

23     Q    And did you receive a call regarding a

24 shooting incident on I-95?

25     A    Yes, I did.

1      Q    Let me show you what's been marked as State's

2    Exhibit A.  I will show defense.  Do you recognize

3    this?

4      A    Yes.

5      Q    And what do you recognize that exhibit to be?

6      A    It's a tape.

7      Q    Tape of what?

8      A    The 911 call that I took.

9      Q    Okay.  Have you listened to this particular

10   copy?

11     A    Yes, I did.

12     Q    Does it accurately reflect the phone call as

13   you recall it?

14     A    Yes.

15     Q    And does it appear to you to have been

16   altered in any manner?

17     A    No.

18          MR. GROSZ:  Judge, I would offer as 1 State's

19   A.

20          THE COURT:  A will be receive as State's

21   Exhibit 1.

22          (Thereupon, the tape was marked State's

23   Exhibit 1 in Evidence.)

24          MR. FLEISCHMAN:  Judge, that would be over

25   objection.

1              THE COURT:  Okay.

2        Q    (By Mr. Grosz)  With respect to this exhibit,

3   you first hear one voice.  Then you hear a second

4   voice.  Is that correct?

5        A    Correct.

6        Q    Okay.  Can you describe the first voice that

7   you hear?

8        A    The first voice, he sounds scared.

9              MS. DADOWSKI:  Objection, your Honor.  I

10             think that that evidence will speak for itself,

11             and when the jury listens to the tape, they can

12             make a fair determination.

13             THE COURT:  Sustained.

14        Q    (By Mr. Grosz)  Do you hear a second voice?

15        A    Yes.

16        Q    Okay.  It's a different voice than the first

17   voice that you heard?

18        A    Yes.

19        Q    Other than receiving the 911 call, what are

20   your other duties, like once you get this information,

21   what are your duties after that?

22        A    Once I take the -- I answer the phone and

23   take the information down, it goes into the computer,

24   from there at this time, it went into the police

25   dispatch and the fire dispatch for the units to be

1    dispatched.  I stay on the line until they are out

2    there to help the victim.

3        Q    Is it safe to say because of the location of

4    where they were at there was some confusion in locating

5    them?

6        A    Yes.

7        Q    Other than what you told us so far, did you

8    have any other role in this event?

9        A    No.

10            MR. GROSZ:  Judge, I would like to publish

11        State's 1.

12            THE COURT:  That will be granted.

13            (Thereupon, the State's Exhibit 1 was played,

14    and transcribed as understood by this court reporter.)

15            911 OPERATOR:  911.

16            A MALE VOICE:  Help, I've been shot.

17            911 OPERATOR:  Hello.

18            A MALE VOICE:  Help I've been shot.

19            911 OPERATOR:  Where are you?

20            A MALE VOICE:  Help.  Christ, Christ.  Help

21        me, I've been shot.  Please.

22            911 OPERATOR:  Where are you?

23            A MALE VOICE:  I-95.

24            911 OPERATOR:  I-95 and where?

25            A MALE VOICE:  I-95.  You gotta hold on.

1             Here.  I-95 and Davie Boulevard.

2             911 OPERATOR:  Okay.  Listen to me.  Which

3        bound lane are you in?

4             SECOND MALE VOICE:  All right.

5             911 OPERATOR:  Hello.

6             SECOND MALE VOICE:  Hello.

7             911 OPERATOR:  Where is he?

8             SECOND MALE VOICE:  Hello.  Hold on one

9        second.  One second.  One second.  One second.

10       One second.

11            911 OPERATOR:  Someone set me up with FHP for

12       this, please.

13            SECOND MALE VOICE:  Get him out of the car,

14       man (inaudible).

15            Hello.  Hello.

16            911 OPERATOR:  Where is he, sir?

17            SECOND MALE VOICE:  Yes.  He's on -- he's

18       on -- we're just south.  The next, uhm -- it's got

19       one -- one sign pull off Davie Boulevard.  Listen

20       I --

21            911 OPERATOR:  Okay.  Which bound lanes are

22       you in, sir?

23            SECOND MALE VOICE:  Northbound.  Northbound,

24       State Road 84 exit.

25            911 OPERATOR:  You're northbound?

1          SECOND MALE VOICE:  Yes.  Next to the sign

2      that says Griffin, where all the --

3          911 OPERATOR:  Okay.

4          SECOND MALE VOICE:  -- all the crosses are.

5          911 OPERATOR:  Okay.  Listen to me.  Listen

6      to me.

7          SECOND MALE VOICE:  All right.

8          911 OPERATOR:  You need to calm down.

9          Where has he been the shot?

10         SECOND MALE VOICE:  He's been shot in the

11     neck.

12         911 OPERATOR:  In the neck.

13         Who shot him?

14         SECOND MALE VOICE:  I don't know.  He's --

15     he's not trying to think.

16         911 OPERATOR:  Huh?

17         SECOND MALE VOICE:  He's not trying to say.

18     He can't say.

19         911 OPERATOR:  Okay.  Listen to me.

20         SECOND MALE VOICE:  Don't make him talk.

21         911 OPERATOR:  Listen.  Listen to me.  You

22     need to calm down so we can help him.

23         Okay.  Listen.  He is on I-95 and Davie in

24     the northbound lanes?

25         SECOND MALE VOICE:  Yes.

1          911 OPERATOR:  Okay.  Now, listen.  What kind

2    of car is he in?

3          SECOND MALE VOICE:  He's in -- he has like a

4    '95, '96  Chevy Impala SX.

5          911 OPERATOR:  What color?

6          SECOND MALE VOICE:  Burgundy in color,

7    like --

8          911 OPERATOR:  Burgundy Chevy Impala?

9          SECOND MALE VOICE:  Yes.  Yes.

10          911 OPERATOR:  Okay.  Ask him if knows --

11    listen to me.

12          SECOND MALE VOICE:  Yes.

13          911 OPERATOR:  Ask him if he knows who shot

14    him.

15          SECOND MALE VOICE:  The lady wants to know do

16    you know who shot you?

17          A MALE VOICE:  I got no question on it, man.

18          SECOND MALE VOICE:  He knows.

19          911 OPERATOR:  He doesn't know?

20          SECOND MALE VOICE:  Yes, he knows.

21          911 OPERATOR:  He does know.  Okay.  Where

22    is --

23          SECOND MALE VOICE:  John Capelletti he says.

24    John Capelletti.

25          911 OPERATOR:  Okay.  Where is this guy?

1           A MALE VOICE:  I don't know where he is.

2           SECOND MALE VOICE:  She wants to know do you

3      know where he's at?

4           911 OPERATOR:  Where is he?

5           A MALE VOICE:  I-95.

6           SECOND MALE VOICE:  He's going -- he's

7      obviously heading north on 95.

8           911 OPERATOR:  He's going northbound.  What

9      kind of car?

10          SECOND MALE VOICE:  He's -- he's with a guy

11     named Eddie.

12          911 OPERATOR:  Okay.  Listen to me.  What

13     kind of car is he in, sir?

14          SECOND MALE VOICE:  What kind of car is John

15     in?

16          A MALE VOICE:  White Honda car.

17          SECOND MALE VOICE:  A white Honda Civic.

18          911 OPERATOR:  Does he know the -- does he

19     know the tag number?

20          SECOND MALE VOICE:  Do you know the tag

21     number?  No.

22          MALE VOICE:  About an '89 --

23          SECOND MALE VOICE:  About an '89 Honda Civic.

24          911 OPERATOR:  It's a what year?

25          SECOND MALE VOICE:  '89 Honda Civic.

```
1            911 OPERATOR:  It's an '89 Honda Civic?

2            SECOND MALE VOICE:  Yes.

3            911 OPERATOR:  Okay.  Does he know what he's

4       wearing?

5            SECOND MALE VOICE:  He told me -- listen to

6       me, dude, the guy said -- he said Eddie, uhm --

7            MALE VOICE:  Turn off (inaudible) --

8            SECOND MALE VOICE:  -- this guy was gonna

9       kill him at the Amoco Station.

10           MALE VOICE:  All right.

11           911 OPERATOR:  Okay.  Listen.  What's your

12      name, sir?

13           SECOND MALE VOICE:  My name is Angelo Eiland.

14           911 OPERATOR:  Angelo what?

15           MALE VOICE:  Eiland.

16           I'm not gonna -- I'm not gonna pull it off.

17           911 OPERATOR:  Eiland?

18           SECOND MALE VOICE:  E-i-l-a-n-d.

19           911 OPERATOR:  What is it?

20           MALE VOICE:  Sure, all right.

21           SECOND MALE VOICE:  E-i-l-a-n-d.

22           911 OPERATOR:  E-l-i--

23           SECOND MALE VOICE:  E-i-l-a-n-d.

24           MALE VOICE:  Hold this on here.

25      Hold that on --
```

1          911 OPERATOR:  What's the cellular phone
2     number there?
3          SECOND MALE VOICE:  What's his number?
4     What's your number, the cell phone?
5          He don't know the cell phone number.
6          911 OPERATOR:  He doesn't know it?
7          SECOND MALE VOICE:  Yes.
8          911 OPERATOR:  All right.  I'm gonna put on a
9     paramedic that's gonna help you until we get
10    there.  Okay.
11         SECOND MALE VOICE:  Okay
12         911 OPERATOR:  Hang on.
13         SECOND MALE VOICE:  Come on, man, stay calm.
14    Stay calm.  I know it hurts, man, but stay calm.
15         911 OPERATOR:  Okay.  Listen to me.  We're on
16    the way.  Just stay on the phone with me.
17         SECOND MALE VOICE:  Okay.
18         911 OPERATOR:  And you're definitely
19    northbound at Davie?
20         SECOND MALE VOICE:  Northbound, right here at
21    all the crosses and turns.
22         911 OPERATOR:  Okay.  So you're -- you're
23    probably gonna be between Davie and State Road 84?
24         SECOND MALE VOICE:  Right. We're off the
25    road.  We're off the road.  We're (inaudible) --

1      THIRD MALE VOICE:  FHP.

2      911 OPERATOR:  Hi.  This is statewide.  We're

3  gonna be calling it in.  I have a shooting victim

4  that was shot in the neck.  He's on I-95.  We're

5  en route.

6      SECOND MALE VOICE:  (Inaudible) I know it

7  hurts, man, but you gotta stay calm.  Whoever

8  wants the address.

9      911 OPERATOR:  Sir, it's just for calling in,

10  we're already en route.

11      THIRD MALE VOICE:  Where was he shot at?

12      911 OPERATOR:  He was shot in the neck.

13      THIRD MALE VOICE:  All right.  Let me talk to

14  the car.

15      Hello, sir.

16      SECOND MALE VOICE:  Right here, man.

17      THIRD MALE VOICE:  Do you have a rag or

18  something to quell (inaudible)?

19      SECOND MALE VOICE:  Say it again.

20      THIRD MALE VOICE:  Do you have a cloth or

21  something like that?

22      SECOND MALE VOICE:  Yes, we do.  Yes, we do.

23      THIRD MALE VOICE:  Okay.  Hold it -- put it

24  on the sight, just cover the wound.  Okay.

25      SECOND MALE VOICE:  Okay.

1          THIRD MALE VOICE:  Okay.

2          SECOND MALE VOICE:  Okay.

3          THIRD MALE VOICE:  Is he talking?

4          SECOND MALE VOICE:  Say it again now.

5          Is he breathing?  He's alive.  He's --

6     he's -- he's, uhm -- he's fully up.  He's fully

7     aware.  And he's talking.

8          THIRD MALE VOICE:  He's talking?

9          SECOND MALE VOICE:  He's talking.

10         THIRD MALE VOICE:  Okay.  Keep him as calm as

11    possible.

12         SECOND MALE VOICE:  Say it again now.  Okay.

13    Yeah.  I told him to stay still.

14         THIRD MALE VOICE:  Is it (inaudible) covering

15    a whole lot or a little bit?

16         SECOND MALE VOICE:  Say it again now.

17         THIRD MALE VOICE:  Is he bleeding a whole lot

18    or a little bit?  Does it cover a lot?

19         SECOND MALE VOICE:  It's not a lot.

20         THIRD MALE VOICE:  Not a lot.

21         SECOND MALE VOICE:  (inaudible) just got a

22    whole in his neck.  I guess he's on -- he's on --

23    he's bleeding.  He's bleeding (inaudible) right

24    now.

25         THIRD MALE VOICE:  I understand.  Okay.

1          What I want you to do is keep him as calm as

2     possible.  Okay.

3          SECOND MALE VOICE:  All right.  Yeah, I told

4     him to stay as calm as possible.

5          THIRD MALE VOICE:  Great, great.  Good job.

6     Good job.  We're on our way there.

7          SECOND MALE VOICE:  He's -- he's being real

8     cooperative.  He's staying calm.  So --

9          THIRD MALE VOICE:  Good.  Good thing.

10         Has he been shot anyplace else?

11         SECOND MALE VOICE:  Say it again now.

12         THIRD MALE VOICE:  Has he been shot anyplace

13    else?

14         SECOND MALE VOICE:  That's it.  That's it.

15         THIRD MALE VOICE:  That's it?

16         SECOND MALE VOICE:  Keep him calm.  Keep him

17    still right there.  Don't move.  Don't move.  I

18    know it hurts.  It hurts, man.  I can see the

19    agony in his face.

20         THIRD MALE VOICE:  Are you all right?

21         SECOND MALE VOICE:  I understand.  All right.

22         THIRD MALE VOICE:  Where is the suspect?  Is

23    he gone?

24         SECOND MALE VOICE:  He's gone, yes.

25         911 OPERATOR:  Okay.  Caller A, can I just

1       interrupt for one second?

2            Sir, sir.

3            SECOND MALE VOICE:  Yes.

4            911 OPERATOR:  Okay.  Can he give me a

5       description of this person because we've got FHP

6       (inaudible) a report.

7            SECOND MALE VOICE:  Of the individual that

8       got shot?

9            911 OPERATOR:  No, no, no, of the guy that

10      shot him.  I know he's in a white Honda, but I --

11           SECOND MALE VOICE:  (Inaudible)  You got a

12      description.  Say he's a crippled guy.  Short,

13      crippled guy.

14           911 OPERATOR:  Is he black or white?

15           SECOND MALE VOICE:  Uhm, the guy that shot

16      you.  Eddie.

17           MALE VOICE:  I don't want to talk about it.

18           SECOND MALE VOICE:  He don't want to talk

19      about it he said.

20           911 OPERATOR:  Okay.

21           MALE VOICE:  I want to get out of here.

22           SECOND MALE VOICE:  He just want to get out

23      of here.  He just don't want to talk.

24           911 OPERATOR:  Okay.  Well, we're on our way

25      to help him --

1          SECOND MALE VOICE:  That's all he saying, he

2     don't want to die --

3          911 OPERATOR:  -- so stay on the phone, don't

4     leave.

5          SECOND MALE VOICE:  -- don't want to die.

6          911 OPERATOR:  Well, that's why -- why the

7     paramedics are on the phone, okay.

8          SECOND MALE VOICE:  Okay.  Stay calm, man.

9     Just breathe -- gotta breathe as smooth as

10    possible.  Stay calm, man.

11         MALE VOICE:  Jesus Christ (inaudible).

12         THIRD MALE VOICE:  How you doing?

13         SECOND MALE VOICE:  He's all right.  He's

14    doing.

15         THIRD MALE VOICE:  Okay.

16         SECOND MALE VOICE:  His eyes are open.

17    Everything's moving.

18         THIRD MALE VOICE:  Okay.  Great.

19         MALE VOICE:  Get my mother.  Tell her to call

20    Sylvia.  Call Sylvia.  Call Sylvia.  Call Sylvia.

21         FEMALE VOICE:  (inaudible)  Place a call to

22    Sylvia.

23         SECOND MALE VOICE:  Hey, chief.

24         MALE VOICE:  Yeah.

25         SECOND MALE VOICE:  Keep that leg still.

1          Don't let them move around like that.

2              MALE VOICE:  Man --

3              SECOND MALE VOICE:  I know it hurts, but we

4      got to them still, man.  We don't want -- don't

5      let him move it.  Don't move nothing.

6              THIRD MALE VOICE:  He's not trying to get up

7      there.

8              SECOND MALE VOICE:  I know you -- I know --

9      (inaudible).

10             THIRD MALE VOICE:  (inaudible)

11             SECOND MALE VOICE:  Don't do nothing.

12             MALE VOICE:  All right.

13             SECOND MALE VOICE:  Don't do nothing.

14             THIRD MALE VOICE:  You're not losing any more

15     blood?

16             911 OPERATOR:  Okay.  Caller A, hold on a

17     moment.

18             Angelo.  Angelo.

19             SECOND MALE VOICE:  Doing all right, man.

20             911 OPERATOR:  Angelo.  Hello.

21             SECOND MALE VOICE:  Right.

22             911 OPERATOR:  Angelo.

23             SECOND MALE VOICE:  There you go.

24             911 OPERATOR:  Sir.  Hello.

25             SECOND MALE VOICE:  Yes.

1           911 OPERATOR:  Listen, they can't find you.

2      Where are you?

3           SECOND MALE VOICE:  Okay.  Like I say, we're

4      northbound.

5           911 OPERATOR:  Northbound I-95, between?

6           SECOND MALE VOICE:  (inaudible) go to the

7      airport.  You can either take the airport there.

8           911 OPERATOR:  Are you on I-95?

9           FEMALE VOICE:  (Inaudible).

10           SECOND MALE VOICE:  Just -- just under the

11      595 freeway.

12           911 OPERATOR:  I-95 under --

13           SECOND MALE VOICE:  Yeah, we're past the

14      airport -- uhm, the airport exit.

15           THIRD MALE VOICE:  Okay.  Past the airport

16      exit.

17           SECOND MALE VOICE:  Just past the airport

18      exit.

19           911 OPERATOR:  Okay.  When you say past the

20      airport exit, are you --

21           SECOND MALE VOICE:  You turn --

22           911 OPERATOR:  -- north or south?

23           SECOND MALE VOICE:  You can turn to go to

24      the --

25           911 OPERATOR:  Listen, listen to me.

```
1              SECOND MALE VOICE:  Just pass, just --

2              911 OPERATOR:  Listen.  Hello.  Listen.

3              SECOND MALE VOICE:  Okay.

4              911 OPERATOR:  Are you north or south of the

5      airport?

6              SECOND MALE VOICE:  We're north -- we're just

7      north of the airport.

8              911 OPERATOR:  Just north of the airport, so

9      you're under 595?

10             SECOND MALE VOICE:  Right.

11             FOURTH MALE VOICE:  I'm gonna rip my little

12     top down.

13             SECOND MALE VOICE:  We're on the north side.

14             THIRD MALE VOICE:  Which side?

15             SECOND MALE VOICE:  We're going north.

16             THIRD MALE VOICE:  Okay.  Just past the

17     airport exit?

18             SECOND MALE VOICE:  Yes.

19             THIRD MALE VOICE:  Okay.  We're almost there.

20             SECOND MALE VOICE:  All right.

21             911 OPERATOR:  Hold on.  Don't hang up.

22     Okay?

23             SECOND MALE VOICE:  I'm not going anywhere.

24     I'm not going anywhere.

25             911 OPERATOR:  Okay.
```

```
1          THIRD MALE VOICE:  Great.  Stay on the line
2     with me.
3          SECOND MALE VOICE:  All right.
4          THIRD MALE VOICE:  I'm just gonna monitor
5     with you.  We're gonna be there momentarily with
6     you.
7          SECOND MALE VOICE:  They're trying to get
8     here.  They missed the exit.
9          MALE VOICE:  Uh-huh.
10         THIRD MALE VOICE:  They're coming.  They
11    should be here shortly.  I'm just gonna monitor
12    with you.
13         911 OPERATOR:  Do you see any police or
14    paramedics there?  They're on their --
15         SECOND MALE VOICE:  Yeah, I just see oncoming
16    traffic.  Nothing yet.  Nothing at all, either
17    direction.
18         911 OPERATOR:  Are you sure you're on I-95?
19         SECOND MALE VOICE:  I mean it's not funny,
20    but, yes, I am.
21         THIRD MALE VOICE:  Okay.  We'll be there
22    shortly.
23         SECOND MALE VOICE:  Okay.
24         THIRD MALE VOICE:  I-95 north.
25         (Inaudible).
```

1        911 OPERATOR:  Sir, what can you see from

2   where you are, what landmarks?

3        SECOND MALE VOICE:  I'm looking at --

4        911 OPERATOR:  (Inaudible) 595 --

5        SECOND MALE VOICE:  Listen to what I'm

6   saying.  The sign says Davie Boulevard one half

7   mile.

8        911 OPERATOR:  The sign says Davie Boulevard

9   one half mile.

10       SECOND MALE VOICE:  Right.  There's a sign

11  right -- I'm right under it.  He's right under it.

12  He's right under all those twists and turns up

13  ahead to 595.  You're on 730 -- State Road 736,

14  State Road 84 exit.  All those are right here

15  under us -- or above us rather.  We're just north

16  of the airport exit.

17       911 OPERATOR:  Just north of the airport

18  exit, in the northbound lane?

19       SECOND MALE VOICE:  Right.

20       911 OPERATOR:  Okay.  Hold on for me.

21       SECOND MALE VOICE:  Well -- (inaudible)

22       A FEMALE VOICE:  911.

23       911 OPERATOR:  Who's that female with you?

24       (Inaudible.)

25       911 OPERATOR:  Do you see the police or

1      paramedics yet, sir?  Sir.

2          SECOND MALE VOICE:  Yes?

3          911 OPERATOR:  Do you see the police or the

4      paramedics now?

5          SECOND MALE VOICE:  Here they come now.  Here

6      they come now.

7          911 OPERATOR:  You see them coming now.  All

8      right.  Flag them down.  I'll stay on the phone

9      until they get out with you.

10         SECOND MALE VOICE:  Here they come now.

11         (Inaudible)  They coming now.

12         911 OPERATOR:  Is that the paramedics?

13         SECOND MALE VOICE:  Yes.  They are right

14      here.

15         911 OPERATOR:  Okay.  What about the police?

16         SECOND MALE VOICE:  Stay calm, buddy.  Stay

17      calm.  Stay calm.

18         THIRD MALE VOICE:  (inaudible) paramedics.

19      Paramedics are gonna take over.  Okay.

20         SECOND MALE VOICE:  Okay.

21         FOURTH MALE VOICE:  Thank you very much.

22      You're doing a good job.

23         911 OPERATOR:  Angelo, stay on the phone with

24      me, though.

25         SECOND MALE VOICE:  Okey doke.

```
1              (Thereup

2         the followir

3              MR. GR

4         Judge.

5              THE (

6         Capellett

7

8    BY MS. DADOW

9         Q    G(

10        A    F

11        Q    Ms. Miller, you

12   transpired from the time of the shooti..

13   that you were called as a 911 operator?

14        A    No, I don't.

15        Q    And you don't know how much time passed from

16   the time of the shooting until the time that Mr. Eiland

17   arrived --

18        A    No.

19        Q    -- and took over the phone call?

20        A    No, I don't.

21             MS. DADOWSKI:  I don't have any other

22        questions, Your Honor.

23             MR. FLEISCHMAN:  Judge, I don't have any

24        questions.

25             THE COURT:  All right.  Any redirect?
```

1          MR. GROSZ:  No, sir.

2          THE COURT:  All right.  Thank you very m

3     Ms. Miller.  You are excused, ma'am.

4          THE WITNESS:  Thank you.

5          (Thereupon, the witness exited the court

6     after which the following proceedings were ha

7          THE COURT:  Folks, as promised, we were

8     to hear from one witness today and then reces

9     the evening.

10          The Court has an 8:30 docket.  And havin

11     reviewed that 8:30 docket, Hugh, do you think

12     9:30?

13          THE CLERK:  On the sentencing matter, th

14     Court is aware of, that may take a few minute

15     9:40, 9:45.

16          THE COURT:  Folks, I'm going to ask that

17     be back at 9:30.  If we don't get started at

18     exactly 9:30, please be patient, we will get

19     started as soon thereafter as possible.

20          Now, remember, you will meet in the jud

21     reception area here on the fifth floor, the

22     location you met following the midafternoon

23          Don't discuss the facts of this case wi

24     anyone.  When you get home, if your spouse o

25     significant other asks you what type of case

COUNTY REPORTERS, INC. (954) 763-6624

1        you're on, I guess you can tell them I got

2        selected to serve on a criminal case and it may

3        last as long as Thursday.  But, other than that,

4        do not discuss any aspect of this case with

5        anyone.

6            Don't form any fixed opinions on the merits

7        of the case until you've received all of the

8        evidence, heard the argument by the attorneys and

9        Court's instruction on the law.

10           With that, we will recess for the evening,

11       and we'll see you at 9:30 tomorrow morning.

12           (Thereupon, an evening recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF ACKNOWLEDGMENT</u>
                I, PAMELA S. McGRADY, do hereby certify that
2     the cause of THE STATE OF FLORIDA v. JOHN CAPELLETTI,
      pending in the Circuit Court of the 17th Judicial
3     Circuit, in and for Broward County, Florida, was heard
      before the HON. JAMES I. COHN, as Judge, on January 5,
4     1998; that I was authorized to and did report in
      shorthand the proceedings and evidence in said Jury
5     Trial; that the foregoing pages numbered from 1 to and
      including 125, contains and is a true and correct
6     transcription of my shorthand report of the proceedings
      in said hearing.
7                The foregoing certification of this
      transcript does not apply to any reproduction of the
8     same by any means unless under the direct control
      and/or direction of the certifying reporter.
9                DATED this 30th day of April, 1998.

10

11                          PAMELA S. McGRADY
                            Shorthand Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

| IN THE DISSTRICT COURT OF APPEAL - FOURTH DISTRICT WEST PALM BEACH, FLORIDA | | CLOCK IN |
|---|---|---|
| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION | |
| JOHN CAPELLETTI      Appellant Vs. STATE OF FLORIDA,      Appellee | | CASE NUMBER 97-7797CF10A APPEAL NUMBER 98-879 |

VOLUME ___II___ PAGES ___127___ TO ___287___

4-0798

RICHARD L. JORANDBY, 15TH P.D.
Attorney for Appellant

GEORGINA JIMENEZ OROSA
Assistant Attorney General

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

MAY 1 4 1998

CRIMINAL DIVISION
WEST PALM BEACH

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA


STATE OF FLORIDA,                    )

      vs.                            )   Case No. 97-7797 CFA

JOHN W. CAPPELLETTI,                 )

      Defendant                      )
_____X

COPY

Ft. Lauderdale, Florida
January 6, 1998
10:00 o'clock a.m.


APPEARANCES:

      JUSTIN GROSZ, Esquire
      Assistant State Attorney
      Appearing on behalf of the State of Florida.

      RENEE TERESA DADOWSKI, Esquire
      Assistant Public Defender
      Appearing on behalf of the Defendant.

- - - - - - -

The above-styled cause came on for hearing

before the Honorable JAMES I. COHN, presiding Judge, at

the Broward County Courthouse, Fort Lauderdale, Broward

County, Florida, on the 6th day of January, 1998

commencing at 10:00 o'clock a.m.


VOLUME II

Pages 127 - 287

I-N-D-E-X

| DATE | PROCEEDINGS | PAGE |
|------|-------------|------|
| 01/06/98 | Jury Trial | 127 - 287 |

| State | Direct | Cross | Re-Direct | Re-Cross |
|-------|--------|-------|-----------|----------|
| D'Angelo Eiland | 133 | 142 145 | 146 | 149 151 |
| Dect. Suchomel | 153 | 200 228 | 233 | 234 |
| Dect. Hodges | 236 | 241 | | |
| Chris D'Ambrosio | 243 | | | |

E-X-H-I-B-I-T-S

| State | Page |
|-------|------|
| No. 2 | 139 |
| No. 3 | 168 |
| No. 4 | 169 |
| No. 5 | 173 |
| No. 6 - 8 | 183 |
| No. 9, 10 | 188 |
| No. 11 | 191 |
| No. 12, 13 | 193 |
| No. 14 | 194 |
| No. 15 | 196 |
| No. 16 | 235 |
| No. 17, 18 | 239 |
| No. 19 | 287 |

1

(Thereupon, the following proceedings were had:)

MISS DADOWSKI:  One thing, I don't mean to be so late in this, but Mr. Cappelletti has now advised me that he wants to call his son, Anthony Cappelletti, as a witness.  So I haven't obviously had time to do a formal notice of additional or supplemental defense witness list, but I am now going to be listing his son, Anthony Cappelletti, the address is 2485 Northwest 894th Way, Sunrise, Florida, 33322.

I was not aware of this information till two minutes or five minutes ago when Mr. Cappelletti advised me of some new information and then he is demanding that I list his son Anthony as his witness.

MR. GROSZ:  Well, in light of that, there's a couple issues that I want to address with the Court. It's my understanding that -- from at least all the witnesses that have been deposed, that there's a limited number of people who were present at least at the time of the shooting.

If Mr. Cappelletti is listing his son as a character witness, you know, so be it.  If he's listing him as an alibi witness to suggest that the Defendant was somewhere else at the time of the shooting, I filed a demand for notice of alibi.  And I would ask, you know, at least look in the court file to take notice of my

1

demand which was filed back in May of 1997, May 19th.
And specifically that requires that the evidence of alibi
witness be provided to the State ten days prior to trial.

    So if that's the basis for listing
Mr. Anthony Cappelletti now, I certainly haven't had any
sufficient notice of it. I'm in compliance with the
rules and have not been afforded an opportunity, at
least, to explore the veracity of the alibi.

    MISS DADOWSKI: And Judge, quite frankly, at this
point I think I would request a recess. I think I need
to go speak to somebody in my office to see what I need
to do at this particular point based on this information.

    THE COURT: Well, let me -- let me suggest that
you make Mr. Cappelletti available to Mr. Grosz and
Mr. Grosz is still objecting. I will conduct a
Richardson inquiry prior to -- prior to Mr. Cappelletti
being called.

    MISS DADOWSKI: Okay.

    THE COURT: Is that agreeable with both sides?

    MR. GROSZ: Sure.

    MISS DADOWSKI: It's just that I -- I guess I
just need to speak to somebody in my office before I
proceed because I am not exactly sure at this point what
I need to do.

    THE COURT: How much time do you need?

1

MISS DADOWSKI:  Fifteen minutes, maybe I can go down and speak with somebody in my office.

THE COURT:  Okay.

MISS DADOWSKI:  I need to speak with my client real quick before I do that.

THE COURT:  Okay.  All right, 15 minutes.

(Thereupon, a recess was taken; after which the following proceedings were had:)

MISS DADOWSKI:  I think at this point I'm okay to proceed, but I may have to have some motions that I have to bring to the Court's attention.

THE COURT:  All right.  The record will reflect that Mr. Cappelletti and Mr. Ruiz are both present represented by counsel.

Any other matters to come before the Court before we bring the jury in?

THE CLERK:  Just briefly on a matter I spoke to you about, the State has redacted State's 1, switched the edited version and the original version which we'll make a Court exhibit.

Now, the tape that's in evidence the jury can have a listen to without problems?

THE COURT:  Okay.  Thank you, Mr. Fitzpatrick. Deputy Lithle, will you bring in the jury please.

1    1          (Thereupon, the following proceedings were

2          had within the presence of the jury:)

3          THE COURT:  Folks, good morning.  Let me

4          apologize to you for the delay in getting started this

5          morning.  We had certain legal matters that had to be

6          addressed and of course, those legal matters are matters

7          that don't concern you.  You are the judges of the facts.

8          The Court is the judge of the law.  So we got those

9          matters resolved.  We're now ready to proceed.

10               It's my understanding we have a group from

11          Fort Lauderdale High School?

12               UNKNOWN SPEAKER:  Yes, this is a sophomore class.

13               THE COURT:  Welcome to court.  We are in the

14          second day of the trial.  The Defendants have been

15          charged with attempted first degree murder.  And we're

16          still on the State's case.

17               When we take a break, I will be glad to answer

18          any questions that you might all have.

19               Mr. Grosz, please call your next witness.

20               MR. GROSZ:  D'Angelo Eiland.

21    Thereupon,

22               D'ANGELO LAVELL EILAND

23    having been first duly sworn, was examined and testified upon

24    his oath as follows:

25

1

2

```
 1          THE CLERK:  Sir, if you would please state your
 2     full name and spell your last for the record.
 3          THE WITNESS:  My first name is D'Angelo, middle
 4     name is Lavell, last name is spelled E-i-l-a-n-d, and
 5     pronounced Eiland.
 6                    DIRECT EXAMINATION
 7  BY MR. GROSZ:
 8          Q.    Morning, Mr. Eiland.
 9          A.    How are you doing.
10          Q.    Good.  Tell us how old you are?
11          A.    I am 27 years of age.
12          Q.    Are you married?
13          A.    No, I am not.
14          Q.    Do you have any children?
15          A.    Yes, I do.
16          Q.    And how old are they?
17          A.    They're little boy is three months and my
18  daughter's, she'll be two years next month.
19          Q.    What do you do for a living, sir?
20          A.    I work for Florida Power & Light.
21          Q.    How long have you been doing that?
22          A.    I've been reading electrical meters for three
23  years.
24          Q.    Prior to that were you employed?
25          A.    Yes, I was.
```

Q.    What were you doing?

A.    I was a United States Marine.

Q.    For how long?

A.    Five years six months exactly.

Q.    Let me direct you to April 13, 1997, do you

recall where you were that particular Sunday afternoon?

A.    Yes, I was trying to go fishing.

Q.    Where were you specifically?

A.    I was traveling on I-95 and --

Q.    Did you see something unusual that caused you to

pull off I-95?

A.    Yes, a real nice car with a bullet hole in the

window.

Q.    Tell me where you were and what you saw about the

car that you made you pull over?

A.    Okay.  Due to the fact that I like -- I like high

speed sport sadans, this one caught my eye.  I was like, what

is a nice car like that off -- doing off the side of the

expressway instead of the emergency shoulder.  It was off in

the grass.  And as I got closer to it with my car, it had a

bullet hole in the window.

Q.    What kind of car was it?

A.    Looked like it was a 1996 or 1997 Chevy Impala.

Q.    Do you recall what color?

A.    Yes, burgundy.

Q.   Clean and in pretty good condition?

A.   Nice car to me.

Q.   You pull up, you see the bullet hole in the window?

A.   Yes.

Q.   And what do you do in response to that?

A.   Went up and open up the car door and man was in there with a big hole in his neck.

Q.   Where in the car was the gentleman that you are talking about?

A.   He was in the driver seat.

Q.   Any other people in the car?

A.   No, it was not.

Q.   The car looked to be clean from the inside?

A.   Yes, it was very clean car.

Q.   Did you see any damage other than the bullet hole to the --

MISS DADOWSKI:  Objection, leading.

THE COURT:  Overruled.

BY MR. GROSZ:

Q.   No other damage?

A.   There was no other damage.

Q.   What's the next thing that happens when you open the door and you see this gentleman with the bullet hole?

A.   He was -- he's holding a cell phone.  He was

2    1    trying to talk.  He couldn't -- couldn't talk that loud.

2    And he wasn't bleeding, just had blood splattered

3    all over -- all over the dash and on the seats.  But he handed

4    me his phone and he told me it was 911 on the phone, talk to

5    'em and tell them what happened.

6    Q.    Did you do that?

7    A.    Yes, I did.

8    Q.    Did you have a chance to listen to a copy of that

9    911 tape this morning?

10   A.    Yes, I did.

11   Q.    That was your voice --

12   A.    That was my voice.

13   Q.    -- that you heard on there.

14   Can you describe his physical condition at the

15   time?

16   A.    No.  Obviously he was in pain, I could see -- you

17   could see it in his face.  He had a big hole in his neck with

18   glass fragments around it.  And that alone, you know, just

19   shook me too.

20   Q.    Was he talking to you about what had happened at

21   that time?

22   A.    He tried to explain as much as he could without

23   stressing himself completely out.

24   Q.    And before you tell me the content of what he

25   said, can you tell me whether or not it appeared to you that

2

1    this individual was under the stress of an incident that had

2    just taken place, did it appear that way to you?

3         A.    No, was fully aware of what had happened to him.

4    He explained to me that --

5              MISS DADOWSKI:  Objection, Your Honor.  Again,

6         hearsay testimony.

7              THE COURT:  Sustained at this point.

8    BY MR. GROSZ:

9         Q.    Understand that he's fully aware -- What I'm

10   asking you is, as this gentleman is talking to you, does it

11   appear to you that he's relating to an incident that had just

12   taken place?

13        A.    Yes.

14        Q.    And did it appear to you that he was at least

15   excited from that incident?

16             MISS DADOWSKI:  Objection, leading.

17             THE COURT:  Sustained.

18   BY MR. GROSZ:

19        Q.    Was he relating an incident to you that had just

20   taken place?

21        A.    Yes.

22        Q.    As a result of what he tells you, what do you do?

23        A.    Could you --

24        Q.    After he tells you whatever it is he tells you,

25   you're not allowed to tell us the nature of the conversation?

A.    Okay.

Q.    As a result of what he tells you, what do you do next?

A.    Raise my eye brows.

Q.    What's the next thing that happens?

A.    I got -- got on the cell phone, was on the cell phone -- As a matter of fact, he was talking to me while I was on the phone with 911 as the tape would indicate.

Q.    Okay.

A.    That was -- basically having a three way conversation.  He was talking to me trying to relay information to me to give to the 911 personnel.

Q.    How long did you stay out there on the scene with him?

A.    Up until the paramedics and police arrived.

Q.    Okay.  Other than the police and the paramedics, anyone else get inside the car while you were there?

A.    No, nobody.

Q.    Did this gentleman ever give you anything and say here, hide this?

A.    No, he didn't.

Q.    And did his physical condition remain pretty much the same throughout the entire time that you were present?

A.    Yes.

Q.    Do you recall approximately what time it was?

3    1              A.    Know it was in the afternoon.  It was between

2    2:00 and 4:00 p.m.

3              Q.    Between 2:00 and 4:00 sometime?

4              A.    Yes, if I recall.

5              Q.    Okay.  Let me show defense what's been marked as

6    State's A.  If you can look at that and tell me if you

7    recognize State's K?

8              A.    Yes.

9              Q.    Okay.  What do you recognize this to be?

10              A.    That's the vehicle that caught my attention.

11              Q.    Okay.  And is it parked or at least depicted in

12    these photographs in the same location?

13              A.    Same spot.

14              Q.    Do these photographs accurately represent the

15    location and the type of vehicle that you recall seeing?

16              A.    Vehicle was unmoved.  It still looks the same.

17              MR. GROSZ:  Judge, I offer State's K into

18         evidence.

19              THE COURT:  Any voir dire or objection?

20              MISS DADOWSKI:  No.

21              MR. FLEISCHMAN:  No, Your Honor.

22              THE COURT:  All right.  K will be received as

23         State's Exhibit 2.

24              (Thereupon, State's Exhibit Number 2 was

25         marked into Evidence.)

3

1          MR. GROSZ:  Judge, can I ask the witness step

2     down.

3          THE COURT:  Sure.

4     BY MR. GROSZ:

5          Q.    Would you just show, point out in using the

6     photographs, the direction you were traveling when you first

7     saw the car and where you pulled your car over?

8          A.    Okay.  I was about -- I was about maybe 30 yards

9     away from the car and I realized why is that nice car doing

10    off the side of the road.

11         MR. FLEISCHMAN:  Judge, I have to raise an

12    objection.  My client is not able to see the description.

13         MR. GROSZ:  Judge, what I'll do is have him

14    describe it to the jury and walk it over and have him

15    describe it to the Defendants if that's okay with the

16    Court.

17         THE COURT:  That's fine.

18         THE WITNESS:  What caught my attention was, if

19    anybody is going to park for any reason off the

20    expressway, it would be in the emergency shoulder.  But

21    this car here, as you can see, the turf slopes down, this

22    car is almost down where the slope flattens out, so right

23    there caught my attention.  Why is that nice car doing

24    over there.  As I got closer, that's when I realize the

25    bullet hole.

BY MR. GROSZ:

Q.    Can you point that out?

A.    Here's the bullet hole right here.  That's just the way I saw it.  The way they took the picture's basically the way I saw it, but getting closer, getting closer, closer, closer.  That's about as close as I can get in that picture.

Q.    And then you went and open the door, and there's the gentleman inside?

A.    Yes.

Q.    Do you see any other damage to the outside of the vehicle?

A.    No damage to the car.

Q.    Did you walk around the car?

A.    Yes, I did, I walked around the whole car and no damage.

Q.    You can have a seat.  Hold on one second.

THE COURT:  Folks, all exhibits that will be admitted into evidence will be made available to you during your deliberations, and you will have as much time as you need to peruse the exhibits that you desire at that time.

BY MR. GROSZ:

Q.    Show both Defendants what you showed the jury.

A.    The pictures that were taken -- perfect pictures to me because they were before I got to the car, while I was

in my vehicle traveling north on I-95 and this distance is getting closer, closer, closer, as this is about as close as you can come and this is basically what I saw.

MR. GROSZ:  You can take a seat.

BY MR. GROSZ:

Q.    This gentleman that you saw inside the car mention names to you, correct?

A.    Yes.

Q.    Without telling me what the names were, he mentioned them to you?

A.    Yes.

Q.    You didn't know those name?

A.    No, I don't know 'em.

Q.    You didn't know the gentleman in the car at all?

A.    No, was trying to get him some help.

MR. GROSZ:  Thank you, sir, appreciate it.

THE COURT:  All right.  It makes no difference to the Court which order you go in.

CROSS EXAMINATION

BY MR. FLEISCHMAN:

Q.    Okay.  When you first came upon this person, what was his name, do you know?

A.    He didn't tell me his name right away.

Q.    When you first came upon him, he had the ability to speak with you?

4

1          A.     Yes, very softly.

2          Q.     Okay.  And would you say that he was fully alert

3     and aware at that time?

4          A.     Yes.

5          Q.     Okay.  What made you believe that he was fully

6     alert and aware?

7          A.     Because he was basically trying to tell me, he

8     said talk to 911 for me because I can't talk that good.

9          Q.     When he handed you the 911 phone, was the battery

10    from that phone, was it already attached to it?

11         A.     It was attached.

12         Q.     So in other words, you were able to walk away

13    from the car with the phone rather than it being plugged in,

14    is that correct?

15         A.     Yes.

16         Q.     Did it appear to you when you walked up to the

17    car, that he had just put the battery on or did it appear that

18    the phone was working properly?

19         A.     He already had called 911 so I felt that it was

20    already in process.

21         Q.     How did you know that he had already called 911?

22         A.     Because they were on the phone and he hand me the

23    phone.

24         Q.     Now, you don't know how long he had actually been

25    in that location in that car, isn't that true?

A.    Yes.

Q.    And also the injury that you observed, it was not bleeding profusely, there wasn't blood spurting out of it, right?

A.    No, there was not.

Q.    He also had no visible injuries to his face either, isn't that true?

A.    No.

Q.    And he had no visible injuries to his head, is that also true?

A.    That's correct.

Q.    So the only area then, would you agree with me, that there was some type of blood was the wound on his neck, is that correct?

A.    That's correct.

Q.    Did this person ever stand up in your presence when he got out of the car?

A.    As a matter of fact, he didn't get out of the car, he fell out of the car.

Q.    And did he fall on to the ground?

A.    Yes.

Q.    From the ground though he was able to speak and communicate with you though, is that right?

A.    Yes.

Q.    One point on the tape we hear you speaking to

911, you hear his voice yelling in the background.  How far away were you from him?

    A.   I was maybe -- maybe a foot or so.  I was right by him.  I stayed by him most of the time.

    Q.   You had no trouble understanding him, is that true?

    A.   No.

    Q.   Did the battery ever fall off of that phone?

    A.   Never did.

    MR. FLEISCHMAN:  Okay.  Thank you.  That's all I have.

CROSS EXAMINATION

BY MISS DADOWSKI:

    Q.   Now, the car that you observed, what you said was a Chevy Impala?

    A.   Yes.

    Q.   SS?

    A.   That's correct.

    Q.   That's a very powerful car?

    A.   Yes, it is.

    Q.   It would be able to take off and accelerate at a very easy --

    A.   Easy, easy.

    Q.   Okay.  And the traffic was moderate?

    A.   Yes.

Q.    There wasn't anybody else that pulled over prior to you getting there?

A.    No, ma'am.

A.    You were the first person that pulled over?

A.    Yes, ma'am.

Q.    And you have no idea how long that car had been on the side of the road before you pulled over?

A.    That's correct.

THE COURT:  Any re-direct?

MR. GROSZ:  Yes, sir.

RE-DIRECT EXAMINATION

BY MR. GROSZ:

Q.    You have no idea how long the car had been pulled over, but what did it appear to you?

A.    It had been there no more than two minutes.

Q.    Why do you say that?

A.    Because everything -- everything's is just looking fresh, the car was still running.  And like I say, it was -- it's just using my common sense.  What I saw that car hadn't been there that long because he just got on 911 on the phone, so the incident had just taken place.

Q.    And when you described the traffic as moderate, what does that mean to you?

A.    It was pretty heavy, it wasn't light.  It was like -- trying to think, it was a Sunday, Saturday or Sunday.

1    I know it was on the weekend.  It was pretty heavy for weekend

2    traffic.

3         Q.   Other cars on the road?

4         A.   Plenty of them.

5         Q.   Before when you were there, anybody else stopped?

6         A.   Yes.

7              MISS DADOWSKI:  Objection, leading.

8              THE COURT:  Sustained.

9              MISS DADOWSKI:  And outside the scope.

10             THE COURT:  Sustained as to leading.

11   BY MR. GROSZ:

12        Q.   Did anyone else stop while you were there?

13             MISS DADOWSKI:  Objection, asked and answered.

14             THE COURT:  Overruled.

15   BY MR. GROSZ:

16        Q.   Did anyone else stop while you were there?

17        A.   Only the people I flagged.

18        Q.   When you spoke with this a gentleman, did he

19   appear to you to be coherent?

20        A.   He was pretty much -- he knew what he was talking

21   about, yes.

22        Q.   Did he appear to be under the influence of

23   alcohol?

24        A.   No, was not.

25        Q.   Narcotics, Anything like that?

5

1          MISS DADOWSKI:  Objection, outside of the scope.

2    Move to strike.

3  BY MR. GROSZ:

4      Q.    Did he tell you who shot him?

5      A.    Yes, he told me.

6          MISS DADOWSKI:  Objection.

7          MR. GROSZ:  It's a statement of identification,

8    Judge.

9          MISS DADOWSKI:  I would object, beyond the scope

10   of cross examination.

11         THE COURT:  It's the Court's position that the

12   deponent of the witness is not governed by the scope of

13   cross examination, whereas the apponent is governed by

14   the scope of direct examination because the deponent can

15   always recall the witness.

16         MISS DADOWSKI:  Well, I would object that's

17   hearsay as well.

18         THE COURT:  As to hearsay, let me --

19         MR. GROSZ:  801, Judge.

20         MISS DADOWSKI:  Your Honor, this isn't the actual

21   witness that is making an indentification.  This is

22   hearsay within hearsay.

23         THE COURT:  The Court's going to overrule the

24   objection.

25         MISS DADOWSKI:  Note my objection.

BY MR. GROSZ:

Q.    Did he tell you who shot him, sir?

A.    Yes, he did.

Q.    Who did he tell you who shot him?

A.    He said John.

Q.    Did you ever give you a last name?

A.    Cappelletti.

Q.    Did he mention any other names as to other people that were with Mr. Cappelletti?

A.    Yes, he said -- he said that, uhm, he was with a guy named Eddie.

Q.    Did he describe this gentleman?

A.    He said he's short crippled guy.

MR. GROSZ:    Thank you, sir.  I have nothing else.

THE COURT:    Cross.

RE-CROSS EXAMINATION

BY MR. FLEISCHMAN:

Q.    Okay.  When you were describing this Impala, this photograph, are you familiar with the type of engine in that car?

A.    No, I am not.  I am not.  I just know about its power.

Q.    I'm sorry, you know about what?

A.    I know about the power of the car, never saw the engine face-to-face.

1      Q.    Can you describe what power that car has?

2      A.    This car has enough power to do anything it wants

3  to do.  It can even run with the police if not leave the

4  police.

5      Q.    Okay.  And how was the traffic at that particular

6  time on 95 when you pulled over?

7      A.    It was still -- still heavy.  I consider it

8  heavy.

9      Q.    Describe what you mean by that, heavy?

10     A.    Heavy was like you can't weave in and out safely.

11  Cars just that close within maybe a car and half length away,

12  car length and half away from each other, so that's pretty

13  tight traffic to me.

14     Q.    Okay.  It was in all four lanes like that?

15     A.    All of 'em, the whole thing was booked up like

16  that.

17     Q.    What lane were you in when you pulled over?

18     A.    I was in the far east lane heading north.

19     Q.    Okay.  How long did it take to you actually be

20  able to pull over into this grass area?

21     A.    I stopped immediately.  Kind of got on the breaks

22  hard.

23          MR. FLEISCHMAN:  Q.    Okay.  Thank you.

24          THE WITNESS:  You're welcome.

25

5

### RE-CROSS EXAMINATION

BY MISS DADOWSKI:

Q.    You were also told that the car, the other car that was involved was a 1989 Honda Civic?

A.    Yes.

Q.    Now, this Chevy Impala, would that certainly be able to speed up and get way from the Honda Civic?

A.    In a second.

Q.    Okay.  So it wouldn't be very difficult to elude and avoid a Chevy Impala?

A.    No problem.

Q.    If somebody had seen a shotgun or someone with a shotgun beside them in a Honda Civic, this Impala would have been able to accelerate and get away?

        MR. GROSZ:  I would object.  Calls for speculation.

        THE COURT:  Sustained.

BY MISS DADOWSKI:

Q.    Did Mr. D'Ambrosio tell you that there was anybody beside him with a shotgun pointed at him?

A.    No.

Q.    And he did not tell you?

        MR. GROSZ:  Same objection.  No basis.

        THE COURT:  Overruled.

        THE WITNESS:  Say again the question.

BY MISS DADOWSKI:

Q.    In your opinion, he did not know that there were people with him, beside him with a shotgun pointed at him, is that correct?

A.    In my opinion.

Q.    And that's because the Chevy Impala could get away very easely?

A.    I don't know what, you know, he didn't tell me, you know, I like looked, this guy's on the side of me, but that car had no problem in getting away from that Honda Civic. No problem at all.

Q.    So he never told you he saw anyone and you don't believe there was anyone next to him that he saw at the time of the shooting?

MR. GROSZ:  Objection, this is speculative.

THE COURT:  Sustained.

BY MISS DADOWSKI:

Q.    There were -- There was nobody there that pulled over that said they saw any shooting on I-95?

A.    Not to my knowledge, no.

MISS DADOWSKI:  I have no further questions.

THE COURT:  Thank you, Mr. Eiland.  You're excused.

Call your next witness.

MR. GROSZ:  Detective Mark Suchomel.

6

1    Thereupon,

2                        DETECTIVE MARK SUCHOMEL

3    having been first duly sworn, was examined and testified upon

4    his oath as follows:

5             THE CLERK:  Detective, if you would please, state

6         your full name and spell your last for the record.

7             THE WITNESS:  Mark Allen Suchomel Senior,

8         S-u-c-h-o-m-e-l.

9                        DIRECT EXAMINATION

10   BY MR. GROSZ:

11        Q.    Morning.

12        A.    Morning.

13        Q.    Tell us what you do for a living, sir?

14        A.    I work for the Broward Sheriff's Office.  I am a

15   detective in the crime scene unit.

16        Q.    Specifically, what are your duties in '98?

17        A.    I respond to crime scenes for the purpose of

18   locating, collecting, and preserving evidence, physical

19   evidence.  I also comparing that evidence and ultimately to

20   present it in court.

21        Q.    How long have you done that?

22        A.    I've been with the crime scene unit here with the

23   Sheriff's Office for five-and-a-half years.

24        Q.    And tell us about what other experience you have,

25   law enforcement, prior to being with crime scene?

6    1         A.    I have actually been with the Sheriff's Office

2    for just under eleven years.  Prior to that, I worked for two

3    small agencies in Illinois, Lyons and Willowbrook.  All as an

4    enforcement officer.  I have a total of nineteen-and-a-half

5    years -- I'm sorry, nineteen years as an enforcement officer.

6              While with Willowbrook, I was a field training

7    officer and a training officer in our firearms section for the

8    purpose of training all the individual officers in our

9    department in both basic and tactical firearms.

10         Q.    Let me direct to you April 13th of 1997.  Were

11    you working as a crime scene detective at that time?

12         A.    Yes, I was.

13         Q.    And did you have occasion in the course of your

14    duties to become involved in an investigation that ultimately

15    led to the arrest of John Cappelletti and Eduardo Ruiz?

16         A.    Yes.

17         Q.    Can you tell me where you were when you first

18    came involved in that investigation?

19         A.    I was here in this particular building in our

20    office.  It's about 3:20 in the afternoon on a Sunday, on

21    April 13th, I was contacted here at the office by our

22    communications division.  Who forwarded me to, at that time,

23    acting officer in charge Corpian, George Corpian of our

24    District One subdivision.  He advised me that he was

25    responding to I-95 in the area of I-595 for a reported

155

shooting.

Q.    What did you do in response to that phone call?

A.    I responded to that location and met with him and other members of both the Sheriff's Office and Florida Highway Patrol.

Q.    Describe the scene as you get out to that location?

A.    That particular area is the northbound lanes of I-95.  Approximately at the northwest corner of the Hollywood International Airport.  Just at the end of the runway there, there's an off ramp that takes you onto eastbound I-595 just to the east, and of course I-595 crosses east and west just north of that location.

There I observed a vehicle that was off on the side of the road approximately in that triangular area between those roadways.  It was a maroon in color four door Chevy Impala, SS I believe.

And when I first observed the vehicle, it was out in the grassy area and everybody was back away from that particular vehicle.

Q.    Looking at State's Exhibit 2, is that what you're talking about?

A.    Yes.

Q.    The vehicle?

A.    Yes, it is.

Q.    Is that the location that it was when you responded out there?

A.    Yes.

Q.    Can you tell me what the scene was like in terms of people -- how many people were out there, was it crowded or sparse?

A.    There was quite a few people including the news media.  However, they had been contained to an area approximately at I-595 just below it on the shoulder area. Between that area and approximately 500 feet south of I-595, the only people that were in there, I believe, were a couple state troopers that were protecting that area.  Everybody else was off back towards the south side of the scene.

Q.    The area surrounding the car was secured?

A.    Yes, sir.

Q.    When you got there?

A.    Yes.

Q.    And what's the first thing you do?

A.    After arriving and speaking with one of the investigating troopers there, Trooper Vaughn, I obtained some information about why I was there in particular to this shooting.  And was advised that the victim of the vehicle or the person who was driving the vehicle was know presently at the hospital.

I began by photographing the vehicle as it sat.

7

1    And then ultimately began to exam the vehicle.

2        Q.    In fact, those are your photographs, are they

3    not?

4        A.    I believe they are, yes.

5        Q.    As a crime scene detective, you're responsibility

6    is not specifically to take statements from witnesses, is that

7    correct?

8        A.    No, it is not, but there have been occasion where

9    I will.

10       Q.    Okay.  Tell me what you do next then?

11       A.    Essentially I exam the vehicle.  Due to the

12   weather in that particular day, it was -- it appeared that it

13   was going to start raining anytime soon, so I began to try to

14   identify all those pieces of physical evidence that I might

15   need that I could secure prior to the weather changing.

16           While looking at the vehicle, in the area I

17   noticed just to the left of the driver side of the vehicle on

18   the ground was a blue in color, blueish greenish in color

19   sheet, bed sheet which was just lying there appeared to have

20   traces of possibly blood on them.

21           On the driver's side of the vehicle, specifically

22   the driver's door window, appeared to have been shattered and

23   just several inches above the door skill and about three or

24   four inches in from the pillar, the rear pillar appeared to

25   have an hole about an inch and inch and a half in diameter

7     1     through the glass.

2           On that side of the vehicle, between the two door

3     posts appeared -- and down the side of the vehicle appeared to

4     be what might be blood.  And there appeared to be some latent

5     fingerprint impressions or palm impressions on the side of the

6     vehicle.

7           Q.    The exterior or interior?

8           A.    On the exterior.

9           Q.    What other observations did you make outside the

10    vehicle that day?

11          A.    At that time, that's all I can recall right now.

12          Q.    Can you describe the condition outside of the

13    hole, the bullet hole that you described through the window?

14    Can you describe the overall outer condition of the vehicle,

15    clean, dirty, in good condition?

16          A.    The vehicle?

17          MISS DADOWSKI:  Leading.

18          THE COURT:  Overruled.

19          THE WITNESS:  The vehicle itself appeared to be

20        fairly clean as if somebody may have just washed it

21        recently.  In good condition.  Other than that hole in

22        the window, the vehicle appeared to be in good condition.

23    BY MR. GROSZ:

24          Q.    Any damage that would be consistent with the hole

25    that you saw in the window to any other part of the window?

A.    No, it appeared to be concentrated to that particular hole.

Q.    Okay.  What do you do next?

A.    At one point, I collected several of the suspect blood samples off the side of the vehicle.  And then I processed the areas where I saw the latent fingerprint residue, for the purpose of securing those on the vehicle so that we could remove the vehicle from the scene, again, due to the weather.  I did both of those and secured several areas with tape for the purpose of lifting fingerprints later on.

I then began to tape up -- I'm sorry, let me back up.  After that, I went out and collected measurements to fix the vehicle in its position there on the swale area.

Q.    When you say fix it in position, you're talking about you have to do a sketch later on?

A.    Correct.

Q.    Okay.

A.    I then came back and began to -- using two inch wide tape, began taping over the broken window, the driver's window to secure it in place in hopes that when we move the vehicle, it wouldn't fall out.

Q.    Did it fall out when you moved the car?

A.    No, it did not.

Q.    Were you able to preserve it intacted?

A.    I believe so, yes.

Q.    Okay.  Go ahead.  What's the next thing you do?

A.    At that point, once the vehicle was secured so that I felt the window would stay in place, I then entered the vehicle at one point for the purpose of moving it back on to the roadway because of the grading in that area, it was unable to get the tow truck in there to safely move the vehicle.

The keys were still in the vehicle, so I drove up on to the shoulder area where it was then housed on to the truck.

Q.    Where were the keys within the vehicle?

A.    I believe still in the ignition.

Q.    Okay.

A.    From that point, I had the tow truck operator remove the vehicle and I left the scene following him and the vehicle to our facility here at this building.

Q.    Okay.  Anyone other than yourself enter that vehicle while you were present?

A.    No.

Q.    And the vehicle is towed to what area?

A.    The first floor of this particular -- this particular building is our crime scene office.  We have a two bay garage down there where we exam vehicles

Vehicle was towed directly from the scene to this building and placed inside the building by myself and the tow truck operator.

Q.    You maintained eye contact the vehicle?

A.    Yes.

Q.    And did anyone enter the vehicle other than yourself from the time that it was towed from that location depicted in those photographs in evidence to the time it was brought to the bay here at the crime lab?

A.    No, it was not.  Prior to leaving the scene, I sealed the vehicle with evidence tape for that very purpose and brought the vehicle here.

Q.    Obviously when you go into the vehicle at the crime lab, that tape is still intacted?

A.    Yes, it is.

Q.    What do you do then?

A.    That was all on the first day, on the 13th.

At that point, I left the vehicle here in our facility and I conclude my investigation for the day.

On the 14th of April, I then visited the hospital for the purpose of checking on the condition of the victim and also possibly to obtain some physical evidence that may still be in the victim's body.

He was brought into surgery upon his arrival at the hospital on the 13th and I checked -- went to see if there was any evidence recovered.

Q.    Where did you go to check?

A.    Broward General Medical Center here in

8    1    Fort Lauderdale.

2        Q.    Where specifically is the medical center?

3        A.    In the pathology lab.

4        Q.    Did you recover that evidence?

5        A.    Yes, I did.

6        Q.    Showing Defense State's Q -- Showing you State's

7    Q, tell me what that is, sir?

8        A.    What this is, is a plastic container containing

9    inside the manila folder which contained a sample that was

10    taken from the victim during that surgery.  This was recovered

11    from the pathology lab at the hospital.

12        This was subsequently submitted to our lab here

13    in the crime lab and the plastic bag that's attached are items

14    that were recovered from that sample.

15        Q.    From the tissue that's contained within?

16        A.    Yes.

17        Q.    And who actually seals it up in this manila

18    envelope?

19        A.    I believe in this case, I sealed this.

20        Q.    How would you know that?

21        A.    This envelope itself still bears my original seal

22    with my initials and my signature, or my ID number, it also

23    bears the seal at this point, I believe, of the examiner who

24    collected the sample from the tissue sample.

25        Q.    Okay.  And who would that be?

8

1      A.    I believe it was Carl Haemmerle.

2      Q.    Bud?

3      A.    Bud.

4      Q.    That's how you know him?

5      A.    Yeah, Bud.  Haemmerle from our lab.

6      Q.    That would be his initials the CH up here?

7      A.    Yes.

8      Q.    And does that package appear to you to be in

9  substantially the same condition as it was when you sealed it

10  initially and retrieved it from the lab?

11      A.    Yes.

12      Q.    Okay.  What's the next thing that you do?

13      A.    If I can refer to my report?

14      Q.    Sure.

15      A.    Initially while I was at the hospital, prior to

16  collecting this sample, I spoke with the victim in his

17  hospital room to obtain information about his particular

18  vehicle in regard to whom may have been in it.  If anything,

19  happened within the vehicle.  And approximately where the

20  vehicle was at at the time of the shooting.

21      Q.    Okay.  And in response to what he told you, what

22  did you do next?

23      A.    According to what he gave me, I then also

24  obtained consent to search for the vehicle for the purpose of

25  processing that vehicle and possibly recovering evidence.  I

1    then returned to my office here in this facility or this

2    building and began to exam his vehicle.

3        Q.    And what did you do?  Well, let me ask you this,

4    when you start to exam the vehicle, is the seal that you

5    initially put on there still intacted?

6        A.    Yes.

7        Q.    And what would that indicate to you?

8        A.    That nobody had been in that vehicle since I

9    sealed it.

10        Q.    And what do you do next?

11        A.    As I began to exam the vehicle, I also

12    photographed it again in our facility here.  Specifically the

13    inside of the vehicle.  As I opened it, I then began to search

14    for physical evidence within the vehicle.

15            During that subsequent search, I began to recover

16    what appeared to be components to a shotgun shell being that

17    of led or metal shot, some particular pellets.  A plastic

18    component which is commonly called a shot ring or shot cup

19    which if you look at a shotgun shell that's been taken a part

20    in a case where we have small shot, they use a plastic devise

21    in some cases to hold it together as it exits the gun, so it

22    doesn't immediately spread out, this plastic piece is often

23    ejected and found at the location where the shot is,

24    subsequently comes to rest.  I found a piece of that within

25    the interior of the vehicle.

1          I also found, I believe, a cardboard, what we

2   refer to as a wad.  Again, that is a component of a shotgun

3   shell that separates the shot or the pellets from the gun

4   powder within the shell.

5          Q.   Let me show you what is marked for demonstrative

6   purposes as State's X.  Can you tell me what this

7   demonstrative aid depicts?

8          A.   Basically what this is is a Winchester Dove and

9   Quail load, 3 and a quarter by 1 by 7-and-a-half shotgun

10  shell.  It's what we refer to as low brass or short brass

11  shell.

12             MISS DADOWSKI:  I will object to him showing the

13        jury at this time.  This hasn't been moved into evidence.

14             Additionally, I will object to the relevancy.  I

15        don't know what the relevance of this particular item is

16        at this point.

17             THE COURT:  Sustained at this point.

18  BY MR. GROSZ:

19        Q.   Can you tell me whether or not in looking at the

20  components that are broken down in here, does this contain

21  components that are consistent with the components that you

22  found in the victim's vehicle?

23        A.   Yes.

24        Q.   And specifically, which components within this

25  demonstrative aid are consistent with the ones that you found?

9

1          A.    These cardboard, what described as wads and the

2     led shot, the shot that I found was slightly deformed, but

3     still approximately this size.

4          Q.    Which would be what?

5          A.    It would be the, I believe, the seven-and-a-half

6     shot.

7          Q.    Okay.  And would this demonstrative aid assist

8     the jury in understanding the components that you found in

9     their state that they would have been prior to being fired?

10         A.    Yes.

11              MR. GROSZ:  Judge, at this point, I'd ask that

12         the witness be allowed to show that part of the

13         demonstrative aid to the jury.

14              MISS DADOWSKI:  I'm going to object.  He hasn't

15         been determined to be an expert or have any knowledge

16         concerning the actual extension between shot shells or

17         wads and pellets that are located within the wads.  And I

18         will object to this being used as demonstrative aid.

19              MR. FLEISCHMAN:  Judge, I'll raise the same

20         objection at least to this witness.

21              THE COURT:  You got them early coming in.

22              MR. GROSZ:  Right.

23              THE COURT:  The objection will be sustained.

24    BY MR. GROSZ:

25         Q.    Okay.  Any event, you found space and wads in

1    that car?

2         A.    Yes, that's correct.

3         Q.    Where in the car were they found?

4         A.    Specifically, if I can refer to my report, I find

5    it in the interior of the vehicle in the right front floor

6    area.

7         Q.    Showing you State's Exhibit M for Identification,

8    who took these photographs?

9         A.    I did.

10        Q.    Okay.  What do they depict?

11        A.    They depict the interior of the victim's vehicle

12   after I had opened it at our facility here.

13        Q.    Okay.  And do these photographs accurately depict

14   them at the time that you were inspecting the vehicle?

15        A.    Yes.

16        Q.    And is this the area that you were just talking

17   about where you found the shot wad?

18        A.    Yes.  In this photograph in the middle and also

19   the one -- left and right in the middle.

20        Q.    Okay.  Did there appear to be any alterations?

21        A.    Nope.

22              MR. GROSZ:  Judge, I move State's M into

23      evidence.

24              THE COURT:  Any voir dire or objection?

25              MISS DADOWSKI:  No, Your Honor.

9        1              MR. FLEISCHMAN:  No, Your Honor.

         2              THE COURT:  M will be received as State's

         3         Exhibit 3.

         4              (Thereupon, State's Exhibit Number 3 was

         5         marked into Evidence.)

         6    BY MR. GROSZ:

         7         Q.   Can you just point to what you're talking about?

         8         A.   In the two photographs here in the middle of the

         9    board, these reflect the passengers front seat floor area of

        10    the vehicle.  Specifically, there's a small brown in color

        11    shape here in the close-up photo on the right it shows the

        12    cardboard wadding.  The photograph on the bottom in the center

        13    shows a close-up of that particular wad, photograph of the

        14    photograph with the scale.

        15         Q.   And what are the photographs on the top depict?

        16         A.   Photographs on the top depict the driver's side

        17    area in the front of the vehicle and some suspected blood

        18    that's found on the entry way there.

        19         Q.   What's the next thing you do, sir?

        20         A.   Just to collect the various items within that

        21    particular vehicle and photograph specific areas, the headrest

        22    area of the driver seat.

        23              Also contained, I believe, three or four small

        24    holes where it appeared that some of the shot may have pierced

        25    through the headrest.  These -- this particular area was

1    photographed individually.

2        Q.    I'm showing you what's been marked as State's N.

3    Looking at State's Exhibit N, do you recognize that?

4        A.    Yes.

5        Q.    And what do these photographs depict?

6        A.    Again, these photographs depict the interior

7    surfaces of the vehicle and the exterior -- I'm sorry, just

8    the interior surfaces of the vehicle.  Specifically, the

9    driver's door window, the headrest area, and the rear right

10   passengers door window.

11       Q.    Okay.  Do they accurately depict those surfaces

12   as you recall seeing them when you were investigating the

13   vehicle?

14       A.    Yes.

15            MR. GROSZ:  Judge, I offer State's N in.

16            MISS DADOWSKI:  No objection.

17            THE COURT:  Okay.  N will be received as

18        State's 4.

19            (Thereupon, State's Exhibit Number 4 was

20        marked into Evidence.)

21   BY MR. GROSZ:

22       Q.    Okay.  Again, what were you referring to on the

23   headrest?

24       A.    All right.  In this particular area, this is a

25   view of the driver's headrest looking at it from the front

10

1  seat area back -- looking back toward the back seat.  There's

2  a small hole here that appears to have been caused by possibly

3  a suspect projectile.

4           In the bottom photographs we see a view of the

5  driver -- sorry, passenger side rear door, specifically the

6  window.  It has plastic tinting on the window.  And this

7  tinting has been damaged by what appears to be shot.

8       Q.    What about the top photographs?

9       A.    The top photo is a view, the one on the left, is

10  a view of the driver's side window from the inside showing

11  some of the broken glass along the ledge.  And the hole that I

12  spoke of earlier from the inside view.

13           The photograph on the right also shows this

14  particular hole straight on, showing the direction that it's

15  coming in to the particular vehicle.  The tinting that's here

16  has all been pushed inside the vehicle.

17       Q.    What would that indicate to you?

18       A.    The shot came from outside in.

19       Q.    What's the next thing you do, sir?

20       A.    At one point, I actually, physically remove that

21  window from the vehicle and continue to look for other various

22  components possibly inside that vehicle.

23       Q.    Do you find anything else inside the car?

24       A.    Just additional -- what appeared to be led shot.

25       Q.    Okay.  Did you collect those?

10

1          A.    Yes.  And also I believe a plastic, what I

2    referred to, as shot ring, piece of that.

3          Q.    Okay.  Can you find those in these packages for

4    me?  okay.

5          A.    I believe these items.

6          Q.    Okay.  Showing defense what's been marked as

7    State's R for Identification, these are the pellets.

8                Could you, without showing this to the jury, just

9    open this to yourself and tell me if that contains what you

10   just described?

11         A.    Yes.

12         Q.    Okay.  Go ahead and break the seal.  Do you need

13   scissors?

14         A.    Yes, please.

15         Q.    What's that package that you're holding, what

16   does that contain?

17         A.    The package that was contained inside this bag

18   was the original package that I sealed on that date.

19         Q.    Okay.  This is the package you're talking about?

20         A.    Yes.

21         Q.    And how do you recognize your seal on that?

22         A.    Bears my initials, my ID number, it also bears

23   all the information about this particular case and what's

24   contained inside.

25         Q.    Okay.  And those identifying numbers are

10      1     particular and specific to this case alone, is that correct?

2          A.    Yes.

3          Q.    Okay.  And does this seal appear to be in the

4     same condition as it was when you initially placed it on

5     there?

6          A.    Yes.  With the addition of one more seal by

7     Carl Haemmerle who did the examination.

8          Q.    Okay.  If you could just break that seal, look

9     inside, and tell me if the items inside are substantially the

10    same today as when you placed them in that sealed condition?

11         A.    Yes.

12         Q.    And which items specifically are you referring

13    to?

14         A.    These would be items six through thirteen.  I'm

15    referring to my report, they would contain the shotgun wad and

16    various components of the led shot, and the plastic shot ring.

17              MS. ZIMET:  Okay.  Judge, I offer State's R in.

18            THE COURT:  State's R?

19            MR. GROSZ:  Right.

20            MR. FLEISCHMAN:  Judge, if we can just take a

21      look.

22            THE COURT:  All right.

23            MR. GROSZ:  Judge, I am taking the items out and

24      counting them for defense.  There's eight.

25            Judge, I'm offering State's R.

10

                    THE COURT:  All right.  Any voir dire or

         objection by either party?

                    MR. FLEISCHMAN:  No.

                    THE COURT:  All right.  R will be received as

         State's Exhibit 5.

                    (Thereupon, State's Exhibit Number 5 was

         marked into Evidence.)

BY MR. GROSZ:

         Q.    Okay.  What else did you do?

         A.    At one point, I lifted the latent fingerprints

that I had developed and secured on the 13th from the outside

of the vehicle.

         Q.    Okay.  Tell me what experience you have in the

field of latent fingerprint either analysis or comparison?

         A.    I'm trained by the FBI in both developing and

comparison of fingerprints.  However, I don't do comparison on

day-to-day basis.  My main job is to development for latent

fingerprints as part of my job.

                    From basics of using just black powder and a

fingerprint brush to using techniques involving lasers and

alternate light sources and chemicals over the last five years

here.  And additional two years in Illinois, I've been

developing latent fingerprints.

                    Actually, excuse me, over the last eleven years

here.  At one various point or another even on the road as a

11    1    deputy, road patrol deputy, I was developing fingerprints.

2         Q.    Ever testified in court before in the area of

3    latent fingerprint identificaton?

4         A.    Just in about every case that I've testified in,

5    yes.

6         Q.    Did you lift latents in this case?

7         A.    Yes, I did.

8         Q.    What area of the vehicle did you lift them from?

9         A.    Specifically, the driver side, I believe, in the

10    area above and around the, what would be the center post area

11    of the two doors, and I believe around on the door handle.

12         Q.    How many comparisons would you say you've done in

13    your career over ninetenn-and-a-half years or nineteen years?

14         A.    Physical comparisons, maybe fifty.  As I said, I

15    am not an examiner per se.  Although I am trained in it.  As

16    far as how many latents have I lifted, it's hard to estimate.

17    Well in the thousands.

18         Q.    Let me ask you this, are you familiar with the

19    different type of surfaces that are conducive or not conducive

20    to lifting late fingerprints from?

21         A.    Yes.

22         Q.    And would it be safe to say that it's possible to

23    touch something and not leave a fingerprint?

24         A.    Oh, yes.

25              MISS DADOWSKI:  Object speculation.

11

```
1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, it is.  Some people don't

3    leave fingerprints.

4  BY MR. GROSZ:

5     Q.    And that certainly could also depend on the

6  person and their hands and what --

7          MISS DADOWSKI:  Object, leading, Your Honor.

8          MR. FLEISCHMAN:  Objection.

9          THE COURT:  Sustained as to the form of the

10   question.

11  BY MR. GROSZ:

12    Q.    What factors go into that determination?

13    A.    The type of surface.

14         MISS DADOWSKI:  Objection.  He hasn't been asked

15   to be questioned as an expert.  There's an improper

16   predicate for him to answer these types of questions.

17         THE COURT:  Are you offering the witness as an

18   expert?

19         MR. GROSZ:  Yes, I will offer him as an expert in

20   the area of lifting latent fingerprints.

21         THE COURT:  Lifting latent fingerprints.  Any

22   voir dire?

23         MR. FLEISCHMAN:  Judge, not if he's simply going

24   to be testifying as to the lifting of the prints, then I

25   would have no objection as to that.
```

11    1              THE COURT:  Okay.

2              MR. FLEISCHMAN:  But I don't believe they've laid

3    a proper predicate for this witness to testify about

4    comparisons.

5              THE COURT:  He's not offering him -- He's not

6    tendering the witness as an expert in fingerprint

7    identificaton or comparison.  It's lifting prints.

8              MISS DADOWSKI:  Is he going to testify as to -- I

9    think he was going to get into testimony about why some

10    prints aren't recovered.

11              THE COURT:  The issue before the Court is, he's

12    been tendered before the Court as an expert for latent

13    lifts.

14              MISS DADOWSKI:  As long as that's it.  He's not

15    going to get into why some people don't leave prints and

16    stuff like that.

17              THE COURT:  You object if the question is

18    objectionable.

19              There being no voir dire, the Court will permit

20    the witness to render opinions within the limited area of

21    latent print lifts.  The lifting of latent prints.

22    BY MR. GROSZ:

23         Q.   Based on your experience, can you tell me what

24    factors go into the determination as to whether or not a print

25    can be lifted from a surface?

11

1          A.    The particular surface that the print is applied

2    to, whether it's a pores or unporse type surface, the

3    temperature, the environment that that particular surface is

4    in.  The amount of oils and/or sufficient materials deposited

5    by that particular person on the surface.

6                Any residue or dirt contaminants that maybe on

7    that surface.  All these have an affect as to whether a print

8    can be lifted and/or observed.

9          Q.    And Defendants, is that correct?

10         A.    Yes.

11         Q.    And these prints can come down to either of these

12   two Defendants.

13               After lifting prints, what's the next thing you

14   do?

15         A.    The vehicle itself was released back to the

16   victim's wife later in the evening.  And that particular part

17   of the case was completed with the evidence being submitted to

18   our lab for comparison and then this particular part of the

19   case is concluded.

20         Q.    Okay.  What's the -- What's the next involvement

21   that you have?

22         A.    On, I believe it's April 29th, I was contacted by

23   Detective Needs of our aggravated felonies unit in regard to a

24   second vehicle involved in this particular case.

25               MR. FLEISCHMAN:  Judge, Your Honor, I have an

178

1        objection.  If I can approach for a minute.

2              THE COURT:  Yes, sir.

3              (Thereupon, the following proceedings were

4        had side bar; outside the presence of the

5        jury:)

6              MR. FLEISCHMAN:  Just for the purpose of making

7        it easier so I don't have to keep objecting, I filed a

8        pretrial motion to suppress including everything from the

9        vehicle to any and all items found in the vehicle.

10             So I'm objecting now to the introduction of any

11       evidence of the car that was taken pursuant to the search

12       warrant and any other items that the State would attempt

13       to introduce that were recovered pursuant to that search

14       warrant.

15             THE COURT:  All right.

16             MISS DADOWSKI:  I would adopt the objection.

17             THE COURT:  The objection is noted.  The prior

18       ruling of the Court will stand.

19             MR. FLEISCHMAN:  Okay.

20             (Thereupon, the following proceedings were

21       had within the presence of the jury:)

22  BY MR. GROSZ:

23        Q.    Did Detective Needs advise you that there was

24  another vehicle that he would like you to look at?

25        A.    Yes.

Q.    And what type of vehicle was it?

A.    A Honda Civic.

Q.    And what color was it?

A.    White in color, what we referred to as three door hatchback.

Q.    Where did you view that vehicle for the first time?

A.    Vehicle was brought, again, to this facility downstairs in our crime scene office.  And that's where I first viewed it when it was brought in by a tow truck.

Q.    Were there any markings on it that would indicate to you that it had been sealed by someone?

A.    Yes.

Q.    What markings?

A.    I believe there was evidence tape on the vehicle.

Q.    And when you entered the vehicle, had that tape been broken?

A.    No.

Q.    What would that indicate to you?

A.    Nobody had been in that particular vehicle since it had been sealed.

Q.    And what do you observe inside the vehicle?

A.    While looking through the vehicle, in the rear hatch area which is where the trunk would normally be, upon moving some of the items that were photographing in their

12

1   original places, I discovered a large shotgun shell lying on

2   the carpeting area which would be above where the spare tire

3   would be located.

4        Q.   Do you have that item -- Could you retrieve that

5   and secure it?

6        A.   Yes, I did.  It's contained within that.

7        Q.   Okay.  Showing defense what's been marked as

8   State's S.

9             Do you recognize your initials on the seal?

10        A.   Yes, I do.

11        Q.   Okay.  And is that in substantially the same

12   condition as it was when you initially sealed it?

13        A.   Yes, it is.  With the addition of the --

14   additional seal by the examiner.

15        Q.   That would be Bud?

16        A.   Yes.

17        Q.   Carl Haemmerle?

18        A.   Yes.

19        Q.   Would you please open that without showing it to

20   the jury.

21             And what item -- Do you recognize the items that

22   are inside?

23        A.   Yes, I do.

24        Q.   Or do you need to further open the package?

25        A.   If I could exam each individual.  Yes, I

1    recognize that.

2        Q.    What do you recognize those items to be?

3        A.    They are the live shotgun shell, I believe two

4    cardboard wads, some suspected led shot, and again, a plastic

5    shot ring component.

6        Q.    Where did you find those items?

7        A.    All within the rear seat and/or hatch area of

8    that particular vehicle.

9        Q.    This is the white Honda Civic?

10       A.    Yes.

11       Q.    I'm going to staple this up so we can represent

12   it to Carl Haemmerle.  Staples I put in it are in what area on

13   the package?

14       A.    It would be the bottom portion of the particular

15   package on the back.

16       Q.    Okay.  That item, State's S that I just showed

17   you contains all of the components as well as the live round

18   that you found in the white Honda Civic, right?

19       A.    Yes.

20       Q.    Describe how the interior of the car looked when

21   you first observed it?

22       A.    I would say it was lived in.  There was some dirt

23   and other items scattered around the inside of the vehicle.

24       Q.    Okay.  Showing defense State's G, State's H, and

25   State's I, also showing defense what's marked as State's L and

State's J.

If you could look at State's H, I and G.  G, H and I, whatever comes first in the alphabet, and tell me whether or not you recognize these photographs?

A.    Yes, I do.

Q.    Okay.  Let's take this one which is State's G first.  Before you show it to the jury, what does that depict?

A.    This depicts the exterior of the vehicle, the white Honda with additional photographs showing the V.I.N. number, or vehicle identification number, and the tag that was attached to that particular vehicle being a Florida tag.

Q.    The V.I.N. number, is that the number that's unique to a vehicle?

A.    Yes.  It is also depicted in each of the photographs of the exterior of the vehicle show various areas containing red in color evidence tape which are used as seals for this particular vehicle.

Q.    Okay.  Does that accurately depict the vehicle in the condition that you first saw it in?

A.    Yes.

Q.    Okay.  How about State's I?

A.    I are a series of photographs showing the hatchback area of that particular vehicle and specifically items that were found in that area, and also the -- a portion of the spare tire well which is underneath the carpeting in

13

1    that particular area.

2          Q.    Okay.  And do those photographs accurately depict

3    that area as you recall seeing it?

4          A.    Yes.

5          Q.    Okay.  And last exhibit which should be H?

6          A.    This also shows the interior and portions of the

7    exterior of the vehicle.  Specifically the hatchback area as

8    it was opened, and the initial examinations began on that

9    particular vehicle including items that were found in that

10   hatchback area.

11         Q.    Now, with respect to the chronology, the

12   photographs depicted here in H, this scene is viewed prior to

13   the photographs that are depicted in I, is that correct?

14         A.    Yes.

15         Q.    You have to move things to get from H to I?

16         A.    That's correct.

17               MR. GROSZ:  Judge, I offer G, H and I in.

18               MR. FLEISCHMAN:  No objection.

19               MISS DADOWSKI:  No objection.

20               THE COURT:  All right.  G, H, and I will be

21        received as State's 6, 7 and 8.

22               (Thereupon, State's Exhibit Numbers 6, 7 and 8

23        were marked into Evidence.)

24   BY MR. GROSZ:

25         Q.    Using these photographs, would you walk us

184

1    through what you saw and what you collected?

2        A.    Using now Number 6.

3        Q.    The red number?

4        A.    Red Number 6, this is a series of photographs

5    showing the exterior of the vehicle after it was placed in our

6    facility here the Sheriff's Office.  Specifically the rear

7    area of the vehicle, the front, the passenger side, and

8    driver's side.

9             The red markings that you see depicted in these

10   photographs are evidence tape seals that were placed on the

11   vehicle prior to my seeing the vehicle.

12            The bottom two photographs show the V.I.N. plate

13   or vehicle identification number plate which is attached to

14   the dashboard of this particular vehicle.  And the Florida tag

15   which is attached to the rear of the vehicle.

16       Q.    Would you read those -- V.I.N. numbers and the

17   tag number into the record please?

18       A.    Sure.  The V.I.N. number is JHMED6344JS808240.

19       Q.    The tag number?

20       A.    Tag number is a Florida April of '98 tag, UQS65W.

21       Q.    Okay.  Now, taking a look at State's 7, what are

22   we looking at?

23       A.    We are looking at State's 7, in the upper right

24   hand corner and upper left hand corner is a view of the rear

25   of the vehicle with the hatch after it's been opened.

13

1              The one on the left is just as it's been opened

2    showing the hatch and the interior of the vehicle.  The one on

3    the upper right shows the contents of that hatch area prior to

4    anything being moved.

5         Q.    Okay.  What do you do?

6         A.    At that point, I begin to remove items for

7    possible processing of fingerprints setting those aside.  As

8    I'm going through these particular items and going through the

9    vehicle, viewed in the center left photograph contained in

10   that hatchback area is a what appears to be a steering wheel

11   cover, contained within that steering wheel cover on top of

12   that carpeting is the live shotgun shell.

13        Q.    That's in the rear hatch area?

14        A.    Yes.  The photo on the right center is a close-up

15   of that particular shotgun shell where it's found.  And the

16   bottom center is a photograph of that particular shell with a

17   scale of measure in the photograph.

18        Q.    What's the purpose of doing that?

19        A.    To show size.

20        Q.    Okay.  Now, State's Exhibit Number 8?

21        A.    Okay.  Number 8, starting in the upper left hand

22   corner, what I've done at this point is I've removed all the

23   items from that particular area of the hatchback or hatch

24   area, and I folded the rear seats forward and I photographed

25   that area.

                    In the upper left and upper right -- the upper

right is a little bit more closer version of the first photo

showing a cardboard wad which is actually resting against, at

this point, the rear of the seat.  There's also in the left

photograph in these two locations are cardboard wads.

        Q.    So how many cardboard wads now in that portion of

the vehicle?

        A.    Two.

        Q.    Okay.

        A.    The two center photographs show these -- both

these cardboard wads as scale of measurement of a close-up.

        Q.    When you put these scales down, do you move the

wad to put the scale down or put that in place?

        A.    In just about every attempt we try to do it

without moving it, but sometimes things move.  In this case,

they were taken as they were found.

        Q.    Photographs were taken as they were found?

        A.    Yes.

        Q.    What's on the bottom?

        A.    The bottom photo, this reflects -- looking inside

the hatchback area, the carpeting that's here has been rolled

back exposing a portion of the spare tire well that's

underneath here.  Observed in that area is a piece of plastic,

what we identified as a -- what we think is a shot ring from a

shotgun component or shell component.  The lower right

14

1    photograph is a close-up of that particular item.

2         Q.    Okay.  Now, let me just take you back a couple of

3    minutes to State's J and State's L.  Do you recognize State's

4    J?

5         A.    Yes.

6         Q.    What do you recognize that to depict?

7         A.    These are exterior shots of the victim's vehicle,

8    the maroon Chevy Impala as it sat on the 13th of April along

9    95.

10        Q.    Does it also include a photo of the V.I.N. number

11   and license plate of the victim vehicle?

12        A.    Yes, it does.

13        Q.    How about State's L?

14        A.    L is also the victim's vehicle at a point where I

15   have taped over the latent fingerprints that I observed and

16   developed on the vehicle.  And I have applied a scale of

17   measurement to the driver's side front window, specifically in

18   the area of the hole that was found in that particular window.

19        Q.    Do both these photographs accurately depict the

20   scene as you saw it?

21        A.    Yes.

22             MR. GROSZ:  Judge, I offer State's J and L in.

23             MR. FLEISCHMAN:  No objection.

24             MISS DADOWSKI:  No objection.

25             THE COURT:  State's J and L will be offered as

14 1   State's 9 and 10.

2     (Thereupon, State's Exhibit Numbers 9 and 10 were

3  marked into Evidence.)

4 BY MR. GROSZ:

5   Q. Just so we're clear on the record, I want to show

6 you what you have already identified as State's S?

7   A. Yes.

8   Q. So we're all clear, do you see some blue tape at

9 the top?

10   A. Yes.

11   Q. That was applied here in the courtroom to just

12 reseal the package, is that correct?

13   A. That's correct.

14   Q. Okay.  Back to the Honda, what's the next thing

15 you recall doing?

16   A. If I can just refer to my report?

17   Q. Sure.

18   A. After obtaining these items that we've spoken of

19 out of the vehicle and other items that we were going to use

20 for fingerprint development also from that area, I then,

21 assisted by Detective Cerat of our unit, began processing the

22 vehicle for latent fingerprints.

23   Q. What's your next role?

24   A. The items that were recovered and the latent

25 fingerprints were submitted to the crime lab for analysis.

14

1    And that concluded my involvement in this particular vehicle.

2         Q.    With that vehicle?

3         A.    Yes.

4         Q.    Okay.  What's the next thing that you do with

5    respect to this case?

6         A.    I believe that concluded it.

7         Q.    Let me show you what's been marked as State's

8    Exhibit C.  Have you take a look at State's Exhibit C.

9              And while I'm doing that, how many years have you

10   been working down here in Broward County?

11        A.    I've been actually working here for almost eleven

12   years.  I've been working and/or residing here part-time for

13   the last twenty-five.

14        Q.    Okay.  And in the time that you've lived down

15   here and have been working here, have you become familiar with

16   the layout of the roads and streets and highways of

17   Broward County?

18        A.    As best as I think I can, yes.

19        Q.    Can you take a look at this exhibit and tell me

20   whether or not it appears to you to accurately portray the

21   relationship between the different highways and roads in this

22   portion of Broward County?

23        A.    Yes, it does.

24        Q.    Are you oriented as to where you are on this map?

25        A.    Yes.

14

1          Q.    Okay.  And can you find on here where you found

2     the vehicle and where you responded to referring to the

3     burgundy Impala?

4          A.    This area would be 595, 95.  The vehicle was

5     approximately in this area here.

6          Q.    Okay.  Can you put that little yellow marker

7     where you found the vehicle.

8          A.    Right in this area here.  Specifically it's not

9     on the spot, but in that area.

10          Q.    Okay.  Now, obviously you had no involvement

11     with -- with respect to what's documented here on the lower

12     portion?

13          A.    No, I did not.

14          Q.    Okay.  Up here, you're comfortable with where you

15     found the victim's vehicle in relation to this map, is that

16     correct?

17          A.    Yes.

18          Q.    Showing defense what's marked as State's D for

19     Identification.

20                Showing you, tell me if you recognize this?

21          A.    Yes.  These are all photographs of the area of

22     I-95 and I-595 in Broward County.

23          Q.    Okay.  Do they accurately represent the highways

24     and their relation to the airport as they were back on

25     April 13, 1997?

14      1        A.    Yes.

        2              MR. GROSZ:  Put D in.

        3              MISS DADOWSKI:  Judge, I would object to the

        4        traffic on the roads.  He's not trying to say that's what

        5        the traffic condition was like on April 13th, is that

        6        correct?

        7              MR. GROSZ:  If I am supposed to answer that.

        8              MISS DADOWSKI:  Yeah.  I mean --

        9              MR. GROSZ:  I am just offering these as a

15     10        depiction of what the highway is

       11              MISS DADOWSKI:  Not the traffic condition.

       12              MR. GROSZ:  No.

       13              MISS DADOWSKI:  As long as that's clear.  I don't

       14        want any confusion.

       15              MR. FLEISCHMAN:  No objection.

       16              THE COURT:  D will be received as State's 11.

       17              (Thereupon, State's Exhibit Number 11 was

       18        marked into Evidence.)

       19        BY MR. GROSZ:

       20              Q.    Can you point to us on this exhibit where it was

       21        that the car came to rest or where at least you found the

       22        vehicle?  Can you step down?

       23              A.    Sure.

       24              Q.    So you can show the jury.

       25              A.    Using the top right photograph and the bottom

1    right center, all the right side photographs, the top right

2    being an overall shot of the particular area along this line

3    here is I-595. Along this area here is I-95.

4            The entrance ramps for -- from I-95 to 595 are

5    depicted here and here. The victim's vehicle was found in

6    this area between I-95 and this entrance ramp which would go,

7    I believe this is the westbound entrance, to I-595 in that

8    area there.

9            On the close-up photographs, the center right

10   would be in this particular area here and bottom photo on the

11   right, I believe, it's going to be right in this area here of

12   the photograph.

13       Q.    If you would just show the Defendants. Walk over

14   here.

15       A.    Just these three. In this area here, this is

16   I-95, I-595, westbound entrance ramp just below there. This

17   is that -- is the area which is depicted here in this center

18   photograph and in the bottom in this area right about here.

19       Q.    I'm showing you what's been marked as State's B

20   and W. Do you recognize those?

21       A.    Yes.

22       Q.    Okay. What area do they depict in the vehicle?

23       A.    These are two photographs of the front passenger

24   seat of the victim's vehicle showing specifically a map pocket

25   that's in the back of that particular seat.

15

1          Q.    On the rear of the seat?

2          A.    On the rear side.  Actually in the back seat

3    area.  The first photo just shows the seat as it is.

4                Through my investigation of that particular

5    vehicle, checking that map pocket, I found three $20 bills

6    folded together stuck in that particular map pocket.

7          Q.    Okay.  And you pulled them out and laid them over

8    the top as they're displayed here in Exhibit W?

9          A.    Yes.

10          Q.    Do these photographs accurately reflect the

11    vehicle as you saw it?

12          A.    Yes.

13                MR. GROSZ:  I'd offer them in, Judge.

14                THE COURT:  Any objection?

15                MISS DADOWSKI:  No.

16                MR. FLEISCHMAN:  No, Judge.

17                THE COURT:  B and W will be received as State's

18       12 and 13.

19                (Thereupon, State's Exhibit Numbers 12 and 13

20       were marked into Evidence.)

21    BY MR. GROSZ:

22          Q.    Okay.  What's depicted in this, what's marked as

23    State's U for Identification?

24          A.    State's U is a package containing the sheet that

25    was found at the scene near the vehicle.

15    1          Q.    Okay.  And State's T?

2          A.    T would be the shirt that was recovered by one of

3     my partners.

4          Q.    Okay.  You didn't actually take part in the

5     recovery of State's T, is that correct?

6          A.    No, I did not.

7          Q.    Okay.  State's U appear to you to be in

8     substantially the same condition as it was when you sealed it?

9          A.    Yes, it is.

10         Q.    Okay.  Just open that up at the bottom if you

11    would please.

12                Looking inside that bag, does that appear to be

13    in the same condition as it was?

14         A.    Yes.

15         Q.    And this was the sheet that was found?

16         A.    On the ground by the victim's vehicle.

17         Q.    Depicted here in State's Exhibit 2?

18         A.    Yes.

19                MR. GROSZ:  I'd offer State's U into evidence.

20                THE COURT:  Any objection?

21                MISS DADOWSKI:  No objection.

22                MR. FLEISCHMAN:  No objection.

23                THE COURT:  U will be received as State's 14.

24                (Thereupon, State's Exhibit Number 14 was

25          marked into Evidence.)

15

BY MR. GROSZ:

1

2    Q.    I think this should do it.  State's Exhibit O, do

3    you recognize this?

4    A.    Yes, I do.

5    Q.    What do you recognize this to be?

6    A.    This is the packaging that contains the driver's

7    door window from the victim's vehicle.

8    Q.    Okay.  You recognize your initials on it?

9    A.    Yes.

10   Q.    Does it appear to you to be in the same condition

11   as when it was originally sealed?

12   A.    Yes.

13   Q.    Have you seen the item that's contained inside

14   this package?

15   A.    I sealed it.

16   Q.    Same condition as it was when it was recovered?

17   A.    Yes.

18   Q.    Barring any --

19   A.    Other than the fact that it was taken from the --

20   Q.    Okay.

21         MR. GROSZ:  Judge, I offer State's O into

22   evidence.

23         THE COURT:  What is that?

24         MR. GROSZ:  O.

25         THE COURT:  Any objection or voir dire?

15

1          MR. FLEISCHMAN:  Actually, I just want to take a

2     look at it.   No objection.

3          THE COURT:  All right.  O will be received as

4     State's 15.

5          (Thereupon, State's Exhibit Number 15 was

6     marked into Evidence.)

7  BY MR. GROSZ:

8     Q.    Can you tell me what county and state you found

9  the car in?

10    A.    Broward County, State of Florida.

11    Q.    We're talking about the burgundy Impala?

12    A.    Yes,

13         MR. GROSZ:  I don't have anything else.  Thank

14    you.

16

15         THE COURT:  We can either proceed with cross now

16    or we can recess for lunch, depending on how long defense

17    counsel anticipates their cross examination to be.

18         MR. FLEISCHMAN:  Judge, we would prefer if we can

19    break right now.

20         THE COURT:  Okay.  We'll do that.

21         Folks, we will take our lunch recess.  Better

22    make it 1:30.

23         Remember, do not discuss the facts of this case

24    with anyone.  Do not form any fixed opinions on the

25    merits of the case until you have heard all the evidence,

16    1    the arguments of the attorneys, the Court's instructions

2    on the law.

3    We will see you at 1:30. Remember, meet in the

4    judicial reception area and Deputy Lithle will come down

5    and get you.

6    See you back here at 1:30, Officer.

7    (Thereupon, the following proceedings were

8    had outside the presence of the jury:)

9    MR. GROSZ: Judge, while we're still here, I want

10    to invoke the rule of sequestration.

11    THE COURT: The rule of sequestration is hereby

12    invoked. Counsel for all parties are instructed to

13    advise your respective witnesses of the implications of

14    the rule and its affect.

15    We'll see you all back here at 1:30.

16    MISS DADOWSKI: Judge, I have not had an

17    opportunity to speak to Anthony Cappelletti about what

18    his possible testimony maybe. So I mean, I am in kind of

19    a dilemma here because I don't know what he's going to

20    say if, in fact, I speak to him, I'm going to use him as

21    a witness, so I want that to be clear that I haven't

22    spoken to Anthony Cappelletti regarding what testimony he

23    may offer at this point.

24    THE COURT: Okay.

25

16    1            (Thereupon, a recess was taken; after which the

2       following proceedings were had:)

3               THE COURT:  The record will reflect that

4       Mr. Cappelletti and Mr. Ruiz are both present represented

5       by counsel.

6               Anything to come before the Court before we bring

7       the jury in?

8               MISS DADOWSKI:  Just that I did try to call

9       Anthony Cappelletti during the lunch break and he wasn't

10      home, but I left a message to call me.  Just so the Court

11      is aware that I am trying to make him available for the

12      State and Mr. Fleischman.

13              THE COURT:  At this point in time, you don't know

14      what he's going to testify to?

15              MISS DADOWSKI:  No, Judge.  I did talk to him

16      before, but not about the information that

17      Mr. Cappelletti gave me this morning.

18              THE COURT:  All right.  We will see where this

19      leads us.

20              MR. GROSZ:  I just want to make one quick call to

21      let a witness know what time I need to expect him.  And I

22      have a certified copy of the title to the Honda and it

23      was under Mr. Ruiz.  And I would offer it --

24              THE COURT:  Under self authenticating document?

25              MR. GROSZ:  Yes.  It's now State's Exhibit B for

1    Identification.

2    THE COURT:  902, self authentication.

3    All right.  Are you ready to proceed?

4    MR. GROSZ:  Did that come in?

5    MR. FLEISCHMAN:  I left it up there.

6    THE COURT:  You want to offer it in front of the

7    jury?

8    MR. GROSZ:  I just want to proffer it.  If I can

9    make one quick call to let this --

10    THE COURT:  Is there any objection to the self

11    authenticated document?

12    MR. FLEISCHMAN:  No, Judge.

13    THE COURT:  That pertains to the car registered

14    to Defendant Ruiz?

15    MR. GROSZ:  Yes, sir.

16    THE COURT:  Okay.  Bring in the jury please.

17    (Thereupon, the following proceedings were

18    had within the presence of the jury:)

19    THE COURT:  All right, folks.  Welcome back.

20    When we recessed for lunch, Detective Suchomel was on the

21    stand.

22    Detective, let me remind you that you're still

23    under oath.  And we will continue with cross examination.

24

25

16

1                              CROSS EXAMINATION

2   BY MR. FLEISCHMAN:

3          Q.    Okay.   Detective Suchomel, just so it's clear,

4   when you arrived on the scene on the day of the incident,

5   there had been other police from different departments that

6   had been there before you, is that right?

7          A.    Yes.   The call originally came into Florida

8   Highway Patrol via the City of Fort Lauderdale.

9          Q.    Okay.   And do you know how many Florida Highway

10  Patrol people were out on the scene before you got there?

11         A.    Prior to my arrival, no.   At the time I arrived,

12  I believe there was four.

13         Q.    Okay.   And were there also other units from

14  either Fort Lauderdale or the Broward Sheriff's Office before

15  you arrived that had been on scene?

16         A.    Prior to my arrival I can't tell you.   At the

17  time I arrived, Florida Highway Patrol was there and I believe

18  three members of the Sheriff's Office in addition to myself.

19         Q.    Okay.   Now, the victim had been removed already,

20  is that right?

21         A.    Yes.   I was told he was already at the hospital.

22         Q.    Do you know approximately how long the victim --

23  how long it had been since the victim was removed from the

24  crime scene?

25         A.    No, I did not.

16

17

```
1        Q.     Did you determine that at all, did you check?

2        A.     I do, but right now I don't recall.

3        Q.     Okay.  And also when you arrive on the scene and

4   you begin photographing the car and looking into the car, do

5   know whether or not anyone had previously actually gone into

6   this victim's car prior to your arrival?

7        A.     I was told that no one had gone in, but it had

8   been photographed.

9        Q.     Okay.  Was there any type of evidence tape that

10  had been placed on the car before you got there?

11       A.     No.

12       Q.     Okay.  Do you know what happened to the alleged

13  victim's phone that had been used to call 911?

14       A.     That was collected by one of the troopers and

15  turned over to one of our deputies, ultimately turned over to

16  me.

17       Q.     Do you know where that is?

18       A.     I believe it was returned to the victim's wife.

19       Q.     Okay.  Now, do you know whether or not there was

20  a crime scene unit from the Florida Highway Patrol that had

21  been on scene prior to your arrival?

22       A.     There was a trooper who had photographed the

23  vehicle, Trooper Vaughn I believe it was.  Whether he's a

24  crime scene unit there, I don't know.

25       Q.     Were those photographs turned over to you as part
```

17

1    of your investigation?

2        A.    Yes, they are or were.

3        Q.    And are those photographs part of the ones that

4    you have testified today?

5        A.    Not that I am aware of.

6        Q.    Okay.  Where are those photographs, do you know?

7        A.    The original negatives are contained in my case

8    file and I have copies of what we call a contact sheet here

9    with me.

10        Q.    Okay.  Did you provide copies of those to the

11    State before you testified today?

12        A.    I believe they had been forwarded via the

13    detective.

14        Q.    Okay.  Now, would it be fair to say that besides

15    photographing the vehicle and describing everything that you

16    have done on the scene that day, did you or any other Broward

17    Sheriff's Officers or any Florida Highway Patrol man walk up

18    along this path of travel of these vehicles to see whether or

19    not you could find any other type of shell casings?

20        A.    I assigned detective -- I'm sorry,

21    Deputy George Corpion, who is a former crime scene detective

22    in our unit, who happened to be there on that day.

23            The assignment of traveling between Sheridan

24    Street and the location of the vehicle to ascertain if there

25    were any casings or shotgun shells lying out on the roadway or

17    1    shoulder area.

2        Q.    In fact, none were found, is that true?

3        A.    That's correct.

4        Q.    Did you, yourself, walk along or look along this

5    grass area where the car was parked to see if you could locate

6    any type of shell casings?

7        A.    Yes.

8        Q.    And you, yourself, did not recover any, is that

9    correct?

10        A.    That is correct, I did not.

11        Q.    Now, do you know whether or not a BOLO went out

12    over the radio regarding this white Honda?

13        A.    I am not aware of one, no.

14        Q.    Okay.  And you're on a police radio before you

15    get to the scene?

16        A.    No, I am not.

17        Q.    Okay.  Do you have access to a radio when you are

18    in your office when you are contacted?

19        A.    No, I am not.

20        Q.    When you were on the scene, were you made aware

21    by any other Sheriff's deputies or Florida Highway Patrol

22    people that indicated to you that they were looking for a

23    white Honda?

24        A.    I was told at the scene they were looking for a

25    white Honda.  Whether a BOLO, as you put it, was put out, I

17    1    have no idea about that.

2         Q.    Okay.  Now, you also took the efforts -- It's

3    clear from looking at the photographs and hearing your

4    testimony, to make sure that the victim's vehicle, at least on

5    the exterior, it was not tainted at all so you could print it

6    later on, is that correct?

7         A.    That's correct.

8         Q.    Okay.  And I see in the photograph and I heard

9    that you described there's some tape, you initially did some

10    brushing on the scene, is that right?

11         A.    I processed the vehicle at the scene for latent

12    fingerprints to preserve them.  I then applied lifting tape

13    over those prints and left it on the car.  The main purpose of

14    that, is that it was going to rain soon and I wanted to

15    protect what was there.

16         Q.    You testified to your various experience in

17    lifting prints.  I would assume as part of your training and

18    experience you have done this, what, thousands of times that

19    you have lifted prints?

20         A.    I would say yes.

21         Q.    Would it be fair to say that when you, for

22    example, with the vehicle, when you are determining whether or

23    not you're going to be able to lift any prints, that you check

24    all areas of the exterior of the car, is that a fair

25    statement?

A.    Yes.

Q.    Okay.  Can you explain to the jury what you mean by that?

A.    I look at all the outer surfaces of the vehicle, the door panels, trunk lids, the wheels, windows, even the broken window was examined.

Q.    Okay.  You examined visually, you look at it, I assume, first?

A.    Yes.

Q.    And then you applied some type of, is it a magnetic powder to the outside of the car?

A.    No, it's basically a ground.

Q.    Graphite?

A.    Graphite type powder that adheres to the residue.

Q.    Would you say that the exterior portion of the vehicle that you, in fact, look for fingerprints, are actually a pretty good surface for someone to leave a print, would you agree with that?

A.    Yes.

Q.    Why is that type of exterior made for (sic) good surface for leaving a print?

A.    In general, it's considered to be a non-pores surface, which means the residue does not seep into the surface, even though the paint itself is maybe microscopically pores, but generally speaking it's not ocnsidered pores and it

18   1    would leave the residue primarily on top of that surface.

2        Q.   Now, did you also visually check and also

3    pursuant to your job check the passenger side of the victim's

4    vehicle for any prints?

5        A.   Yes, I did.

6        Q.   Okay.  You did not recover any of Mr. Ruiz's

7    prints from that passenger side, is that correct?

8        A.   I didn't recover -- I am not sure whose would

9    have been recovered at this point, but none from that side,

10   no.

11       Q.   In fact, you didn't get any fingerprints from

12   that side, is that true?

13       A.   That's true.

14       Q.   And the only side that you did recover

15   fingerprints were from, I guess, it would be the driver side,

16   near the door, is that right?

17       A.   Yes.

18       Q.   Okay.  How many prints did you recover from that

19   area?

20       A.   If I can refer to my report?

21       Q.   Sure.

22       A.   Fourteen lifts from the actual outer surface of

23   the vehicle.

24       Q.   Out of those fourteen lifts, none of them came

25   back to Mr. Ruiz, is that true?

18 1   A. Without having a copy of the report, I can't

2 answer that.

3    Q. Okay.  Well, sir, do you know whether -- there

4 were no prints that came back from Eddie Ruiz on that car, is

5 that true?

6    A. I believe so.  Again, without having the report

7 in front of me, I can't say.

8    Q. Did you also do any type of visual inspection on,

9 I guess, the area that leads from the expressway from 95 on to

10 the grass, to determine whether or not there had been any type

11 of skid marks, tire tracks that may have been left?

12    A. Yes, there were some tracks in the grass which

13 led from the back of the vehicle out toward the shoulder area.

14    Q. Okay.  Now, you didn't find any skid marks on 95,

15 is that right?

16    A. No.

17    Q. And you didn't find any -- any markings or any

18 type of damage on the victim's vehicle that would be

19 consistent with some type of contact, is that true?

20    A. No.

21    Q. In other words, you didn't find any white paint

22 transfer on this car, did you?

23    A. No, I did not.

24    Q. You looked at the car for that, is that right?

25    A. Yes.

18

1          Q.    That's something certainly you would look for, I
2    would assume?
3          A.    Yes.
4          Q.    And so then, but for the hole that's in the
5    window that you've described, there was no other damage to the
6    car, is that right?
7          A.    Yes.  I mean, no, there wasn't any.
8          Q.    Okay.  Now, the next, I guess, contact that you
9    had regarding the victim would be at some point in time you
10    went to Broward General Medical Center, is that true?
11          A.    Yes.
12          Q.    Okay.  Now, you know who Detective Needs is?
13          A.    Yes.
14          Q.    Detective Needs, just so we know, who is
15    Detective Needs?
16          A.    He is a detective with our aggravated felonies
17    unit here at the Sheriff's Office.
18          Q.    Had you spoken with Detective Needs prior to
19    going over to the hospital to meet with the victim in this
20    case, Mr. D'Ambrosio?
21          A.    Briefly I believe I did.
22          Q.    What time do you recall that you spoke to
23    Detective Needs?
24          A.    I believe it would have been that morning, the
25    14th.

18

Q.    Okay.  Was Detective Needs aware of this incident?  In other words, had he already been assigned and begun work on this case?

A.    I believe he was aware.  Whether or not he had done any follow up, I don't know.

Q.    He was certainly aware or you made him aware that you were going to be going over to Broward General Medical Center to interview Mr. D'Ambrosio?

A.    Yes.

Q.    And your whole point going over there, I would assume, is to get more information that you could maybe use?

A.    That's correct.

Q.    Now, when you met with Mr. D'Ambrosio, he had already completed his surgery, right?

A.    He had undergone a surgery.  Whether it was complete, I don't know.

Q.    And you met him in the intensive care unit, is that true?

A.    Yes, that's correct.

Q.    Now, you brought with you a consent to search form, is that right?

A.    Yes.

Q.    Okay.  And a consent to search form is a written form where a person is required to place a signature allowing you to either search a car or home, things like that, is that

18

1    true?

2          A.    Yes, it is.

3          Q.    Now, when you meet with Mr. D'Ambrosio that

4    morning, certainly you he was alert, you would agree with me

5    on that?

6          A.    He seemed to be, yes.

7          Q.    Okay.  And you're, again -- I mean, you have been

8    a road patrol officer and a detective and now you're in this

9    unit, right?

10         A.    That's correct.

11         Q.    So you have taken, what, thousands of statements

12   from victims and Defendants?

13         A.    I would say yes.

14         Q.    And certainly you would not speak with someone or

15   take notes on what that person said if they didn't have the

16   ability to communicate with you, isn't that true?    •

17         A.    That's correct.

18         Q.    Okay.  And Mr. D'Ambrosio that morning had no

19   problem communicating with you, correct?

20         A.    Other than the pain that he was in, no.

21         Q.    Okay.  And, in fact, you were able to complete a

22   report after speaking with him, isn't that true?

23         A.    I'm sorry?

24         Q.    Well, you completed a report in this case that

25   included the fact that you met with Mr. D'Ambrosio and he

19

1    seemed alert and had no problem understanding you, is that

2    true?

3           A.    Yes.

4           Q.    Okay.  And in addition to that, you were able to

5    explain to Mr. D'Ambrosio what this consent to search means,

6    right?

7           A.    Yes.

8           Q.    And, in fact, he was able to put his signature on

9    that piece of paper, isn't that true?

10          A.    Yes, he was.

11          Q.    He was able -- I mean, you were able to explain

12   to him what it was and then you presented it to him and he

13   signed it with no problem?

14          A.    Yes.

15          Q.    Do you know how long it was, from the time that

16   you left the hospital that Detective Needs, met with

17   Mr. D'Ambrosio?

18          A.    No idea.

19          Q.    Were you aware of the fact that Detective Needs

20   met with Mr. D'Ambrosio on that same day and took a taped

21   statement from him?

22          A.    Whether he did or not, I don't know.  I know his

23   intentions were to talk to him that day.

24          Q.    Okay.  And he made you aware of that?

25          A.    That he was going there, yes.

19    1        Q.    Okay.  Now, the next contact you had as part of

2    your duties, you testified on April 29th of 1997 that you

3    conducted a search on a vehicle, is that right?

4        A.    That's correct.

5        Q.    Okay.  And that vehicle, again, was in the

6    Sheriff's Office custody?

7        A.    Yes.

8        Q.    Do you know how long that car had been sitting in

9    the Sheriff's Office prior to you conducting your work on it?

10        A.    Without actually looking at the tow sheet, no.

11    The first knowledge I had of that vehicle was on that day.

12        Q.    Okay.  So you don't know if it had been there one

13    week, two weeks, three weeks?

14        A.    No.

15        Q.    Do you know where it came from?

16        A.    I believe it was brought in from Max Towing.

17        Q.    Do you know how long Max Towing had that vehicle?

18        A.    No.  Again, until I look at the actual tow sheet,

19    I don't know.

20        Q.    Okay.  Now, again, besides the physical search of

21    this car -- And this is the white Honda that we're talking

22    about?

23        A.    Okay.

24        Q.    The exterior of the white Honda, would you say it

25    was in good condition?

213

19

1      A.    I think there may have been some small minor

2  damage on it, but I don't recall what it was.  Overall, yes,

3  it was in good condition.

4      Q.    Where was the minor damage, do you recall?

5      A.    I believe on the bumper.  Some scuffs, I believe,

6  on the bumper.

7      Q.    But other than that, the paint was in good

8  condition, the car was generally in good condition?

9      A.    For its age, yes.

10     Q.    Do you know what kind of engine is in that car?

11     A.    Specifically, no.

12     Q.    Okay.  Did you ever open the hood and take a look

13 and see, you know, see what type of engine was in that

14 vehicle?

15     A.    I opened the hood.  Specifically I didn't record

16 what size engine though.

17     Q.    This is a compact car, is that correct?

18     A.    Yes.  I believe it falls --

19     Q.    And is it a two seater or four seater?  In other

20 words, when you first open the door, were there seats that

21 were up in the back?

22     A.    Originally the seats were up in the back.  It's

23 considered a four seater, but it's a three door vehicle.

24     Q.    Was Detective Needs present when the search was

25 conducted on this car?

A.     Yes, he was.

Q.     Okay.  And did you have an opportunity to review or at least look over before Detective Needs signed it a return and inventory that he prepared?

A.     Yes.

Q.     Now, are you familiar -- I assume that's not in your handwriting that return and inventory?

A.     No, I believe that was filled out by him.

Q.     And you're aware that on that inventory, it indicates latent prints multiple?

A.     It may say that.

Q.     Would you like to see it?

A.     Yes, I would like to see it.

MR. FLEISCHMAN:  Your Honor, may I approach the witness?

THE COURT:  Yes.

THE WITNESS:  Okay.

BY MR. FLEISCHMAN:

Q.     Okay.  Does that report contain the words latent prints multiple?

A.     Yes, it does.

Q.     What does that mean?

A.     That being in his handwriting and his explanation, I believe the amount recovered was nine from that particular vehicle.  What he means by multiple, you'll have to

20    1    ask him.

2    Q.    Did you prepare a report showing those -- where

3    those nine latent prints were from?

4    A.    Yes, I did.

5    Q.    Do you have that report with you today?

6    A.    I don't know if I do or not.  I don't have the

7    original.

8    MR. FLEISCHMAN:  Judge, can I come to side bar

9    please for a minute.

10    THE COURT:  Yes, sir.

11    (Thereupon, the following proceedings were

12    had side bar; outside the presence of the

13    jury:)

14    MR. FLEISCHMAN:  Judge, myself, on behalf of

15    Mr. Ruiz, was never given a latent fingerprint report

16    from Mr. Ruiz's vehicle.

17    So if, in fact, the detective has it, I'm asking

18    that I be allowed to at least review it before I do any

19    further questioning.

20    MISS DADOWSKI:  I don't have it either.

21    MR. GROSZ:  This is the -- I've got a copy of a

22    latent fingerprint report.

23    MISS DADOWSKI:  That's from Detective Cerat.

24    MR. GROSZ:  That's the only thing I have.

25    MR. FLEISCHMAN:  I don't know if any comparisons

1    were ever done.  I wasn't made aware of any of this.

2             THE COURT:  Let me send the jury out.

3             (Thereupon, the following proceedings were

4    had within the presence of the jury:)

5             THE COURT:  Folks, let me ask that you step back

6    in the juryroom for just a minute.

7             Remember, don't discuss the facts of the case.

8             (Thereupon, the following proceedings were

9    had outside the presence of the jury:)

10            MR. FLEISCHMAN:  Judge, if I can approach?

11            THE COURT:  Sure.

12  BY MR. FLEISCHMAN:

13       Q.   Detective, this is a report just turned over to

14  me now by the State.  It looks like it was prepared by

15  Detective Roberts or -- What is it?

16       A.   Cerat.

17       Q.   Cerat.

18       A.   Yes.

19       Q.   And it shows -- I'll read it quickly, cover of a

20  book Rules Of Investing, there's an X under exterior, does

21  that mean there was a lift?

22       A.   It was the exterior of the book apparently.

23       Q.   But where the X is, that means there was some

24  type of lift done on those items, is that correct?

25       A.   Just the fact that they were listed means there

was a lift made.  As an explanation where they were from, you
have to ask Detective Cerat because he processed those items.

    Q.    You testified there were nine other lifts that
you actually did?

    A.    Yes.

    Q.    We are not familiar with that.  So do you have
any paperwork if we could please review it?

    A.    I have a copy of my report, but it's like a four
part copy.  And this one is not that clear, but this lists the
nine.  The latent fingerprint examiner would have the original
in this particular case.

    Q.    Do you know if any latent prints were actually
compared and came back to either Mr. Ruiz or Mr. Cappelletti?

    A.    I'd have to look at that.

    Q.    I mean, I can't --

    MR. FLEISCHMAN:  Judge, this is illegible, cannot
    be read.

    THE WITNESS:  There is an original, I just don't
    have it.  These are from the --

BY MR. FLEISCHMAN:

    Q.    That's from the victim's car?

    A.    Right.

    MISS DADOWSKI:  You haven't seen this either?

    MR. FLEISCHMAN:  I mean, I would like --

    MISS DADOWSKI:  We don't have any of this

20

1      information.  The latent fingerprint report that's dated

2      4/14/97, it looks like there's Page 2 of -- 1 of 2, 2 of

3      2 and 1 of 1 where it says the only one that I have is

4      actually the Page 1 of 1, the latent report by

5      Detective Cerat.

6              MR. FLEISCHMAN:  Of my client's car.  And

7      actually --

8              MISS DADOWSKI:  No, it says the victim's.

9              MR. FLEISCHMAN:  I'm sorry.

10             MISS DADOWSKI:  But that's the only one that I

11     have and I don't have 1 of 1 or 2 of 2.  And I don't

12     believe Mr. Grosz has it either.

13             MR. FLEISCHMAN:  Judge, there's some materials on

14     here that I possibly want to bring out on cross

15     examination, so can I get a copy, a copy of these?

16             And the other big question is, maybe the State

17     knows, were any comparisons?  If, in fact, there were

18     lifts of value done, were there any comparisons that came

19     back to Mr. Ruiz?

20             MISS DADOWSKI:  Or Mr. Cappelletti?

21             MR. GROSZ:  Not that I know of.  I mean --

22             MR. FLEISCHMAN:  Because I don't want to be --

23             MR. GROSZ:  I was never made aware of that.  I

24     was under the impression that prints -- all the prints

25     that were taken, nothing matched to these Defendants and

1    that's why I asked the detective that on direct.

2         MR. FLEISCHMAN:  Okay.  Well, it says no, but we

3    need copies of it then.

4         THE COURT:  Okay.  How many copies do you need?

5         MISS DADOWSKI:  I need one.

6         THE COURT:  Two copies?

7         MR. FLEISCHMAN:  Three.

8         THE COURT:  Okay.  We need three copies, okay.

9         THE WITNESS:  Our latent examiners keep the

10    original.

11         MR. FLEISCHMAN:  Because I can't read it.  Are

12    they going to look for the original?

13         MR. GROSZ:  Yeah.

14         THE WITNESS:  Shouldn't take more than ten

15    minutes.

16         THE COURT:  Still waiting on the --

17         MR. GROSZ:  Did I take anything else from you?

18         THE WITNESS:  No, I've got them.

19    BY MR. FLEISCHMAN:

20         Q.    I just want to make sure which car these are

21    from?

22         A.    These would be from Mr. Ruiz's car.

23         Q.    Yeah, 4/29.

24         A.    And then --

25         Q.    These are --

1 A. This is mine from that car.

2 Q. 4/14 is?

3 A. Right, the victim's.

4 MR. FLEISCHMAN:  Okay.  Judge, we're ready.

5 THE COURT:  Okay.  Ready to proceed?  Bring in

6 the jury.

7 (Thereupon, the following proceedings were

8 had within the presence of the jury:)

9 THE COURT:  Okay.  Mr. Fleischman, you may

10 proceed.

11 MR. FLEISCHMAN:  Okay, Judge.

12 BY MR. FLEISCHMAN:

13 Q. Okay.  Detective, I'll just take you back now to

14 April 29th of '97.  You have this vehicle, this white Honda

15 and you begin to conduct your investigation on that as well,

16 is that right?

17 A. That's correct.

18 Q. Now, you've described today in your testimony

19 that you found certain items in that vehicle, is that true?

20 A. Yes.

21 Q. Okay.  And it would also be part of your job that

22 you attempted -- I would like to focus first on this live

23 round that you found, this live round of ammunition?

24 A. Yes.

25 Q. Okay.  I would like you to describe it in this

1

1    sense.  This is a live shotgun round, is that right?

2         A.    Correct.

3         Q.    Okay.  And the exterior is made up of a few

4    different components, is that also true?

5         A.    Yes, it is.

6         Q.    Okay.  And this particular type of live round

7    would have a brass type -- I don't know the terminology, but I

8    know that there's a brass area on the bottom that the hammer

9    hits and that causes the explosion, right?

10        A.    Right.  That would be known as the primer.

11        Q.    Okay.  The primer.  That's made out of brass, is

12   that true?

13        A.    It's various metals.  The actual base of the

14   shotgun shell is a brass component or alloyed.

15        Q.    Okay.  It's a smooth type of surface, is that

16   also true?

17        A.    Without looking at this particular one, generally

18   when they're new, yes, they are, but they can weather.

19        Q.    Okay.  Well, would you like to see this one?

20        A.    Yes, I would like to see it.

21             MR. FLEISCHMAN:  Which bag?

22             MR. GROSZ:  The bag sealed with blue tape.

23             THE WITNESS:  With the blue tape.

24             MR. FLEISCHMAN:  Here.

25             THE WITNESS:  Next one just underneath that.

1          Right there.

2     BY MR. FLEISCHMAN:

3          Q.    Can you just refer, for the record, what you're

4     referring to, which item?

5          A.    This would be item number, it's listed as S which

6     contains my items MAS 20 through 24 which are items taken from

7     the white Honda.  The live round would be MAS 20.

8          Q.    It's not admitted into evidence, so if you can

9     look at it and refer to it?

10         A.    Okay.  Did you want to look at the container

11    before I opened it?

12         Q.    Okay.  It's sealed?

13         A.    Right.

14         Q.    Okay.  You have had an opportunity to look at it,

15    okay.

16              And can you describe that metallic portion that

17    I'm referring to?

18         A.    In this particular case, this item I would say

19    would be weathered.

20         Q.    Okay.  Now, that certainly doesn't affect -- the

21    fact that it's weathered doesn't affect the make up though of

22    the materials, whatever go into that metal, is that true?

23         A.    Evently it would.  It will degrade that

24    particular piece of metal.  As far as I'm concerned, the

25    weathering has an affect on whether or not a fingerprint, one

will be left or can be lift.

Q.    But in this case though, there's no rusting on that particular section, isn't that true?

A.    No rusting, no.  Just it's weathering, corrosion.

Q.    Okay.  But you, in fact, did attempt to lift some type of print off that, is that true?

A.    Yes, I did.

Q.    And there are several methods that you use during the course of the investigation on the items from Mr. Ruiz's car, is that also true?

A.    Yes.

Q.    Okay.  And in fact, several of those methods were used in the examination of that particular live round, is that also true?

A.    Yes, it is.

Q.    Okay.  Now, can you tell us first what type of method was used on this bottom portion, this metallic portion?

A.    It would have been done to the entire round itself.

Q.    Okay.

A.    Essentially what was done is, the entire object was examined with the argon laser.  What that will do is by pointing or directing the beam at the object in a defused mode, the argon blue beam will allow certain chemicals that we release in our perspiration, in the oils that we release as

our fingerprints residue, to luminesce under this light.  This is a non-destructive method.

I can take the light away.  If there's a print there, when I take it away, it will show.  While it's directed at that object, I can photograph it if one was there.  In this particular case, that was not the case.  I didn't develop anything.

Q.    Okay.  And did you attempt other methods as well?

A.    Yes.  Another one was alternate light source which is a variation of using the laser, using different colors of lights directed at the object in attempt to either cause the print to luminesce, come above the color or seperate from the color, or dial out the background color so the print would show.  Again, this met with negative results.

I then subjected this item to what's known as superglue process which is the same superglue you see in the commercials where the guy sticks his helmet to the wire beam and hangs from it.  Same thing you fix items at home with.

The solution we use is a little more liquefied and allows us to heat it.  When we heat it, it gives off a gas.  And molecules attach to fingerprint residue.

If it actually does attach and pulverize to that fingerprint residue, it creates, in an air atmosphere, it creates a residue on the object.

We also have a machine that uses a vacuum.  In

1    that case, it would be clear and we'd have to use other

2    methods to develop it.

3              In this case, I used the air method.  Some

4    residue did develop.  Unfortunately, most of it appeared to be

5    smears.  There was no ridge detail.

6              If you look at your hand, you will see the ridges

7    on your hand.  You also have these ridges on your feet, okay.

8    This is called friction ridge skin, so that's when you pick

9    something up, it doesn't slide out of your hand.  If you

10   didn't have it and picked up a glass or slippery object, it

11   would slide right out of your hand.

12             When you touch something, you leave an exact

13   duplicate of that friction ridge skin on that object in most

14   cases.

15             This is the ridge detail that I'm looking for

16   when I process an item.  In this case, it was absent.  All

17   that was there was smears, as if something or someone had held

18   it, but it slipped in their hand or finger, whatever, didn't

19   leave any ridge detail.

20        Q.   Okay.  Now, Mr. Ruiz's fingerprints were not

21   found on that, isn't that true?

22        A.   Yes.

23        Q.   Now, you also had an opportunity to exam the

24   space cover, is that the term that you had used in your

25   report?  Is there a cover from the back of the vehicle that

2    1    you --

2    A.    Spare cover, tire cover.

3    Q.    I'm sorry.  Yes, tire cover?

4    A.    Yes.

5    Q.    And that came from the back of this white Honda,

6    is that true?

7    A.    Yes, that's true.

8    Q.    And Mr. Ruiz's fingerprints were not recovered

9    from that particular item, is that true?

10    A.    If I could see the report to refresh my memory.

11    Prints were developed.  Whether or not they were matched with

12    him, I don't know.

13    Q.    Do you have any knowledge of that?

14    A.    At this point, no, not from that.

15    Q.    Okay.  Now, this latent fingerprint report that

16    you had done, did you include in the reports that you prepared

17    the fact that this live round had been processed?  Did you

18    include that in your latent fingerprint report?

19    A.    No, I included it in my original report.

20    Q.    It was not within the latent fingerprint report,

21    is that right?

22    A.    Can I see it again?

23    Q.    Sure, okay.

24    A.    No.  In most cases, if I don't develop ridge

25    detail, anything that I can photograph, it's not listed.

1      Q.    Okay.  Did you also print -- you identified today

2   in these photographs area -- I'll show you.  I'm referring to

3   State's 8.

4            Can you describe what this particular area is

5   that I'm pointing to, bottom photo?

6      A.    In the bottom left photo is an overall view of

7   that particular area.  Looking at that, you're standing just

8   outside the back of the vehicle with the hatch up, and you're

9   looking down at the floorboard area of that hatch with the

10  carpeting pulled back toward the left side of the photograph

11  is where the well would be for the spare tire.  And this is

12  just an area just off to the right of that.

13     Q.    Okay.  Did you process that particular area?

14     A.    Yes, I did.

15     Q.    Mr. Ruiz's fingerprints were not present within

16  that well area, is that true?

17     A.    Yes.

18     Q.    There's also the other item, I think you call it

19  the casing that was found within this well area, it's in the

20  photograph?

21     A.    Casing?

22     Q.    It looks like a piece of plastic?

23     A.    Oh, a shot sleeve.

24     Q.    The shot sleeve, I'm sorry.  That was also within

25  that well area, is that true?

228

A.    Just outside, yes.

Q.    Did you attempt to do any type of identification from this sleeve?

A.    I attempted, but came up with nothing.

Q.    Okay.  So Mr. Ruiz's fingerprints were not found on that sleeve, that shotgun sleeve or shot shell sleeve, is that right?

A.    No.

Q.    Okay.  Now, Detective, were you ever involved in -- Well, did you ever go to a gas station, a particular location in Hollywood off of Sheridan?

A.    No, I did not.

Q.    Have you ever directed to do that at all by any anyone (sic)?

A.    No, I was not.

Q.    Were you ever directed to take any statements from any other witnesses in this case, any type of sworn statements?

A.    No.  The only person I spoke with was the victim that day at the hospital about his vehicle.

MR. FLEISCHMAN:  That's all I have.  Thank you.

                    CROSS EXAMINATION

BY MISS DADOWSKI:

Q.    Good afternoon, Detective.

A.    Afternoon.

Q.    Now, you never found a shotgun shell in the area where the alleged shooting took place, is that correct?

A.    No, I did not.

Q.    And whenever you taped up this, the window that's Number 15, did you lose any particles of the glass window when you removed it from the car?

A.    No.  There were some that had fallen out prior to my arrival, but I made every effort from that point on to keep as many as I could from that specific area.

Q.    Okay.  How did you actually remove the window?

A.    I taped it at the scene using two inch wide frosted tape, same tape I used for the fingerprint lifts, up over the outside of the window and over the area where the hole was.

Q.    So you removed it and it's basically in the same condition as it was whenever you removed it from the window and having been in the car?

A.    Not having looked at it, having it been in storage, I can't guarantee what condition it is at this point, but it was in the same condition when I removed it, yes.

Q.    Okay.  Now, numerous prints were lifted from Christopher D'Ambrosio's car?

A.    Fourteen.

Q.    Fourteen.  I guess I should put a number.  That may not be numerous to you?

3    1         A.    No.

2         Q.    None of those matched John Cappelletti either, is

3    that correct?

4         A.    Not as far as I know.

5         Q.    Okay.  And then you evently took some

6    fingerprints from Mr. Ruiz's car, is that correct?

7         A.    That would be the Honda?

8         Q.    Pardon me?

9         A.    That's the hand Honda?

10         Q.    Yes, the white Honda Civic?

11         A.    Yes.

12         Q.    And you, I believe, said you lifted nine prints

13    from that particular car?

14         A.    From the car and/or items from the car.

15         Q.    Okay.  And of those nine prints, none of the

16    lifts matched Mr. Cappelletti, is that correct?

17         A.    I don't know.  Based on the report that you have

18    there, it doesn't show a comparison, so I can't say.

19         Q.    You don't have any knowledge that anything

20    matched Mr. Cappelletti?

21         A.    No.

22         Q.    Now, when you were in Mr. Ruiz's car, there's an

23    indication that some actual shot was recovered, some pellets?

24         A.    Yes.

25         Q.    And those were recovered from the interior of the

car?

A.    Yes.

Q.    Where on the interior of the car?

A.    If you were to fold down the top half of the back seats in the -- In fact, if I could use the photographs, it would be much easier.

Q.    Sure.  Which photograph do you need?

A.    If I can get down.  That section there would be fine.

Q.    Okay.  So we're referring to Exhibit 8.  You want to just stand up?

A.    Sure.  Okay, using this series of photographs that we have here, starting with the upper left, we're viewing the Honda through the hatch area looking from the back toward the front seats.

The area here are the backs of the fronts seats. This area right here is the back seats which have been folded forward allowing for storage generally.

This carpeting area here is the carpeting area that would be down on the deck which would cover the spare tire area.  The alleged shot that was found was scattered in and amoung this area here and across the back seats here and down in this crevice that's created in the seats that are folded in those areas.

MISS DADOWSKI:  If I may have a moment to show my

1    client.

2         THE COURT:  Sure.  Okay?

3         THE WITNESS:  The photo on the right is a

4    close-up of that area.  May even show the individual

5    shot.

6         MISS DADOWSKI:  Top right?

7         THE WITNESS:  I believe so.  If I can look at it

8    real quick.  Yes.

9    BY MISS DADOWSKI:

10        Q.    Did you find any evidence of a shotgun shell

11   being discharged in the car previous to --

12        A.    The only thing I found that indicated a shell was

13   expunded (sic) or dropped, or opened are these components that

14   are in the vehicle that I already spoke of.

15        Q.    And the shell that was recovered from Mr. Ruiz's

16   car, I believe you said it was a live round?

17        A.    Yes.

18        Q.    That did not contain Mr. Cappelletti's

19   fingerprints that you were able to determine?

20        A.    They contained only smudges.

21        Q.    So nothing on that shell is linked in any way to

22   Mr. John Cappelletti based on your investigation?

23        A.    No.

24        Q.    So to your knowledge, there have not been any

25   fingerprints lifted from either Mr. D'Ambrosio's or

1    Mr. Ruiz's car that have been connected to Mr. Cappelletti?

2        A.    I have no knowledge of any based on what you have

3    shown me.

4        THE COURT:  Any re-direct?

5        RE-DIRECT EXAMINATION

6    BY MR. GROSZ:

7        Q.    In the absence of fingerprints, Detective, does

8    that mean someone didn't touch something?

9        A.    No.

10        Q.    And the fact that you looked at the crime scene

11    and looked from Sheridan Street, or had someone look from

12    Sheridan Street up to the rest of the vehicle for a spent

13    casing, no spent casing was found, is that correct?

14        A.    As far as we know, no.

15        Q.    And as a crime scene detective, how did you

16    interpret that?

17        A.    It could mean alot of things --

18        MR. FLEISCHMAN:  Judge, I'll object.  Calls for

19        speculation on his part.

20        THE COURT:  Overruled.

21        THE WITNESS:  Can mean alot of things.  Can mean

22        one, the shotgun shell never exited the vehicle that it

23        was fired from.

24        It could mean the weapon didn't discharge a

25        shell.  It can also mean somebody stopped and picked it

up or it was picked up in the tire of a vehicle and

carried off somewhere north of our location that we

didn't check.

BY MR. GROSZ:

    Q.   You're talking about I-95, correct?

    A.   Yes.

    MR. GROSZ:  I have nothing else.  Thank you, sir.

    THE COURT:  Any re-cross?

    MR. FLEISCHMAN:  Judge, I just have one question.

             RE-CROSS EXAMINATION

BY MR. FLEISCHMAN:

    Q.   Okay.  Detective Suchomel, I want to make sure

the live round that you found, was it found underneath or on

top of this spare tire area?

    A.   It was actually on top of the carpeted area using

the photographs that we looked at just a little bit ago.  In

fact, there's a photograph that shows it in its original

position.

    Q.   So in other words, it was not hidden whatsoever?

    A.   It was hidden by some items that were contained

in that area, but not hidden underneath the spare tire cover

at all.

    Q.   You don't know though whether -- In other words,

the items that you say were either, I guess, they were on top

of it or near it, you don't know how they got there, do you?

4

1      A.    I can only surmised someone placed them in there

2  as things they put in their car.

3      Q.    Okay.  There's nothing unusual about the items

4  that were in that area?

5      A.    No.  Just like things somebody was carrying in

6  the car.  I think one was a cane.  They just put them in that

7  area and it happened to cover that.

8              MR. FLEISCHMAN:  Okay.  Thank you.

9              THE WITNESS:  Sure.

10             THE COURT:  Re-cross?  All right.  Thank you,

11        sir.  You're excused.

12             MR. GROSZ:  Judge, prior to calling the next

13        witness, I would like to offer in State's B, which is a

14        certificate of title pertaining to vehicle V.I.N. number

15        JHMED6344JS808240.

16             THE COURT:  That is letter what?

17             MR. GROSZ:  B as in boy.

18             THE COURT:  Okay.  That will be admitted as

19        State's 16.

20             (Thereupon, State's Exhibit Number 16 was

21        marked into Evidence.)

22             MR. GROSZ:  May I publish the certificate of

23        ownership?

24             THE COURT:  Yes.

25             Call your next witness.

1          MR. GROSZ:  Next witness is

2      Detective Clark Hodges.

3   Thereupon,

4                   DETECTIVE CLARK HODGES

5   having been first duly sworn, was examined and testified upon

6   his oath as follows:

7          THE CLERK:  Detective, if you would please, state

8      your full name and spell your last for the record.

9          THE WITNESS:  William Clark Hodges, H-o-d-g-e-s.

10                  DIRECT EXAMINATION

11  BY MR. GROSZ:

12      Q.    Afternoon, sir.  Tell us what you do for a

13  living?

14      A.    I am a Deputy Sheriff with the Broward County

15  Sheriff's Office.  I'm currently assigned as a detective in

16  the crime scene investigation unit.

17      Q.    Okay.  What specifically are your duties?

18      A.    To document through photography and evidence

19  collection crime scenes, to recover fingerprints and other

20  evidence from crime scenes and to prepare that for use in

21  court.

22      Q.    How long have you done that?

23      A.    I've been in crime scene a little over three

24  years.

25      Q.    How long have you been with the Sheriff's Office?

A.    I've been with the Sheriff's Office since 1990, about eight years now.

Q.    Any experience in law enforcement prior to that?

A.    I was with the Deerfield Beach Police Department for nineteen years before that.  And I was a legal officer of the Navy for two years prior to that.

Q.    With respect to this case that we're here for today, let me direct you to April 13th of 1997 and thereafter, and did you play some role in the investigation that ultimately led to where we are today?

A.    Yes, sir.

Q.    And with respect to your role, is it a fair statement to say that you were asked to go to the hospital at some point?

A.    Yes, sir.

Q.    Broward General?

A.    Yes, sir.

Q.    What were you asked to do there?

A.    I met Detective Suchomel at our office.  He was on his way to a scene.  He asked me to go to the hospital to document the victim's injuries and to determine his condition, and let him know what his status was.

Q.    Did you do that?

A.    Yes, I did.

Q.    Let me show you what has been marked as State's

Exhibits E and F.

        If you would take a look at State's Exhibit E, and tell me without showing the jury first, if you recognize that? I guess I had it upside down.

A.    Yes, I do.

Q.    What do you recognize that to be?

A.    That's a photograph of a shirt that I collected at the hospital which was belonged to the victim.

Q.    Okay. Mr. D'Ambrosio?

A.    Yes.

Q.    And do these photographs accurately represent the condition of the shirt as you saw it when you went to the hospital?

A.    Yes, it does.

Q.    And when was this in relation to April 13th?

A.    This was -- I went to the hospital at 3:36 p.m.

Q.    On the 13th of April?

A.    On the 13th of April.

Q.    And Exhibit F, do you recognize these photographs?

A.    Yes, I do.

Q.    Okay. What do those depict?

A.    Those are three photographs of Mr. D'Ambrosio's injuries.

Q.    Okay. Where were they taken?

5

1          A.    They were taken in the emergency room at

2    Broward General Hospital.

3          Q.    Do they accurately depict the injuries as you saw

4    them on April 13, 1997?

5          A.    Yes.

6          MR. GROSZ:  Judge, I offer State's F and E into

7    Evidence.

8          THE COURT:  Okay.  Any voir dire?

9          MISS DADOWSKI:  Can we see them a little bit.

10         MR. GROSZ:  Sure.

11         MISS DADOWSKI:  No objection.

12         MR. FLEISCHMAN:  No objection.

13         THE COURT:  Okay.  E will be received as State's

14    17, and F as State's 18.

15         (Thereupon, State's Exhibit Numbers 17 and 18

16    were marked into Evidence.)

17    BY MR. GROSZ:

18         Q.    Okay.  Can you tell us what we're looking at, and

19    this is State's Exhibit 17?

20         A.    These are all pictures of the same shirt.

21    Initially I laid it on the floor and basically arranged it in

22    a pattern as it would appear normally.  The shirt has been cut

23    in two areas by -- apparently by the medical personnel when

24    they removed it.

25         The shirt -- The photographs also show specific

5

1    areas that are left shoulder and neck area of the shirt, and

2    also some of them have a scale in it to show the dimensions of

3    the shirt itself.

4        Q.    Why did you photograph the left shoulder and left

5    neck area of the shirt?

6        A.    The left shoulder had numerous penetration holes

7    in it and it was where most of the blood was.  The injuries to

8    Mr. D'Ambrosio were in the left shoulder area.

9        Q.    There's a cut through the shirt that depict those

10   penetration holes, is that something that was done by the

11   hospital?

12       A.    That was done prior to my arrival.

13       Q.    And the photographs depicted in 18, can you tell

14   us what we're looking at there, sir?

15   ***  A.    The top photograph is just a general overall view

16   of the upper portion of Mr. D'Ambrosio.  He was on a treatment

17   gurney in the emergency room.  You can see he has an IV in his

18   right arm, electropads on his chest, and a tube in his nose

19   that was -- went down his throat.

20           The areas that appeared to be injured were the

21   left shoulder, the left side of his neck, and the left side of

22   his face.

23           MR. GROSZ:  Thank you, sir.  I don't have

24       anything else.

25           THE COURT:  Cross?

CROSS EXAMINATION

BY MR. FLEISCHMAN:

Q.    Detective, these photographs that you took of Mr. D'Ambrosio, that was before he was cleaned up, isn't that true?

A.    There are -- there's some evidence in the photographs of what appears to be Betadine which is a swabbing solution normally applied to wounds, but I wasn't present during any.

Q.    Right.  So in other words, some of the yellow discoloration that you can see in the photographs from a -- it's like a solution that they use?

A.    Yes, sir.

Q.    And that's to help fight infections I would think, right?

A.    It's to clean the wound and to prevent infection, yes.

Q.    But these photographs that you took that have been presented today are before Mr. D'Ambrosio was actually cleaned up?  In other words, before any trace amounts of blood were removed from his skin, is that right?

A.    I wouldn't be able to answer that.  There was nothing being done to him at the time that I was there.

When I first got there, he had gauze bandages over those areas which the nurse took off at my request so

that I could photograph the injuries.  He was being -- going

directly to surgery from there so I would assume, normal

procedure, they would have cleaned the wounds by then.

    Q.    Do you know how long you had been at the hospital

prior to taking these photographs?

    A.    No, I don't, sir.

        MR. FLEISCHMAN:  Thank you.  That's all I have.

        MISS DADOWSKI:  No questions.

        THE COURT:  Any re-direct?

        MR. GROSZ:  No, sir.

        THE COURT:  Okay.  Thank you, sir.  You're

excused.

        Call your next witness.

        MR. GROSZ:  Christopher D'Ambrosio.

        MR. FLEISCHMAN:  Judge, can I be heard side bar?

        THE COURT:  Yes, sir.  Will it be necessary for

us to let the jury be excused?

        MR. FLEISCHMAN:  No.

        (Thereupon, the following proceedings were

had side bar; outside the presence of the

jury:)

        MR. FLEISCHMAN:  Judge, my -- what my objection

is, the items include in the photographs that

Mr. D'Ambrosio have been admitted into evidence showing

his injuries, and they appear to be still facing the

6    1          jury.  So I'm objecting to that and the jury would have

2          an opportunity to view all these items.

3               So I'm objecting to while Mr. D'Ambrosio is

4          testifying on the stand, I'm objecting to the photographs

5          of him with blood and tubes in him being shown to the

6          jury because there's other items here.

7               THE COURT:  Okay.  Why don't you turn the

8          exhibits around unless you're using them, okay.

9               (Thereupon, the following proceedings were

10          had within the presence of the jury:)

11     Thereupon,

12                    CHRISTOPHER D'AMBROSIO

13     having been first duly sworn, was examined and testified upon

14     his oath as follows:

15               THE CLERK:  Sir, if you would please state your

16          full name and spell your last for the record.

17               THE WITNESS:  Christopher D'Ambrosio,

18          D-'A-m-b-r-o-s-i-o.

19                         DIRECT EXAMINATION

20     BY MR. GROSZ:

21          Q.    Can you pull yourself just a little closer to the

22     microphone.

23          A.    Sure.

24          Q.    Thank you.  How old are you, sir?

25          A.    Fourty.

244

6    1        Q.    What's your birthday?

2            A.    12/27/57.

3            Q.    Are you currently -- What state are you living

4    in?

5            A.    Right now I'm living in Florida.

6            Q.    Are you in between Florida and Georgia?

7            A.    Yes.

8            Q.    And do you have any children?

9            A.    I have two daughters.

10           Q.    I don't mean to stump you with all these

11   questions.

12           A.    That's quite all right.

13           Q.    Are you married?

14           A.    Yes, I am.

15           Q.    How long have you been married?

16           A.    A little over two years.

17           Q.    What's your wife's name?

18           A.    Maria.

19           Q.    Do you know a gentleman by the name of

20   John Cappelletti?

21           A.    Yes, I do.

22           Q.    Okay.  And do you see him in the courtroom today?

23           A.    Yes, I do.

24           Q.    Would you please identify him by article of

25   clothing that he's wearing?

6

1          A.    He has the Hawaiian shirt on, colorful shirt.

2                MR. GROSZ:  Will the record reflect the in court

3          identification of Mr. Cappelletti?

4                THE COURT:  Yes, it will.

5    BY MR. GROSZ:

6          Q.    How long have you known Mr. Cappelletti for?

7          A.    I met Johnny, think it was around April of '96.

8          Q.    What were you doing for a living at that time?

9          A.    As far as making an income, I didn't have one.

10         Q.    Okay.

11         A.    Income wise, I was working on the house that was

12   directly next to John Cappelletti's which was my wife's house.

13         Q.    Had you been employed prior to that?

14         A.    Yes.

15         Q.    And what did you do for a living prior to that?

16         A.    My occupation?  I was a bartender.

17         Q.    Give me little bit of your background, sir?  Did

18   you go to college at all anywhere?

19         A.    Yes, I have some college.

20         Q.    Where did you go to school?

21         A.    I've gone to Broward Community College and then I

22   went to schools in Virginia and in Massachusett also.

23         Q.    Okay.  What did you do when you got out of

24   school?  Did you start working, did you do any type of

25   service?

A.    I went directly into the military.  My college and some preparatory that I wanted to go to was after the military.  I did that when I went back to Massachusett.  I've been around the country alot.

Q.    Okay.  And what branch were you in?

A.    I was in the United States Navy.

Q.    What did you do when you got out of the Navy?

A.    First I went to school for awhile up in Massachusett.  And I had some brothers there and I played.  And then I became a bartender straight from that.

Q.    Okay.  And at some point did you end up working at the Diplomat in Hollywood?

A.    Yes, I did.

Q.    Now, taking you to April of 19, 1996, you say that's approximately when you met Mr. Cappelletti?

A.    Yes, March, April of '96.

Q.    Tell me the circumstances under how you at least got to know Mr. Cappelletti?

A.    He lived next door to my wife.  I had met my wife at the Diplomat Hotel.  She was married at the time and I was involved.  And then some good years later, we were both shop stuarts for the local 355 and we then met again a number years later.  Good number of years later.

She had left substantially in the 80's and I never left until it closed.

7  1   Q. And when you met Mr. Cappelletti in April or so

2 of 1996, were you married at that point or were you still in

3 the dating stages?

4   A. Just prior to -- just prior I had been introduced

5 or either I had been introduced, or I had introduced myself.

6 I just tried to maybe make an appropriate type of introduction

7 of sorts as anyone would if you knew someone as you would --

8   Q. Are you talking about with Mr. Cappelletti or

9 with your wife?

10   A. With Mr. Cappelletti.  In other words, he lived

11 next door.  In other words, I don't know, at one time there

12 was an introduction like hello, this is John, John this is

13 Chris, you know, or if I had seen him and waved, so I don't

14 know exactly.  I can't remember the specific engagement.

15   Q. Was your wife friendly with Mr. Cappelletti?

16   A. She was somewhat friendly with Mr. Cappelletti,

17 but to in my knowledge, it was significantly more with his

18 present at time wife.

19   Q. And did there come a time when Mr. Cappelletti's

20 wife, to your knowledge, passed away?

21   A. Yes, she had been ill for a number of years, that

22 is as I was told.  That was my understanding, yes.

23   Q. And at that time, did you then, at least, discuss

24 with me or tell me what you're relationship was with

25 Mr. Cappelletti at that time and where it went from there

1    until let's say February of 1997?

2         A.    My relationship was -- it wasn't significant.

3    While I was working on the house, you know, I got to know him.

4    He was next door.  And there were times that he did things

5    for, you know -- minor things.

6              I think it all started with a painting.  All

7    started with painting.  Maria wanted the inside of the house

8    painted and I was doing things on the outside.  This house

9    needed all kinds of work.  So she suggested that I hire him.

10             And -- not hire, if you want to use the word hire

11   you can.  But ask him if he wanted to paint the inside of the

12   house.  It was a mutual thing, not me per se, but she was also

13   very significantly involved.

14        Q.    And did you do that?

15        A.    Yes, I did.

16        Q.    Did you pay Mr. Cappelletti for helping you out?

17        A.    Oh, yes.  Oh, yes.

18        Q.    Did there come times where you would continue to

19   do that type of thing?

20        A.    Yes.  We end up having a relationship to a degree

21   that he's -- the kind of guy you might wanna -- you wouldn't

22   want to open an up a business with him or anything like that,

23   but you talk to.  I'm a social guy.

24        Q.    So there were times that he would do things or

25   help you out around the house you would pay X amount of

dollars to have him help you out?

A.    Yes.    In all fairness, it wasn't alot of help,

but he could smoke cigarettes and drink beer.    He's good

entertainment.

MISS DADOWSKI:    Objection, Your Honor.

THE WITNESS:    Well, I'm sorry.

THE COURT:    Sustained.    Please disregard the last

response by the witness as being nonresponsive.

THE WITNESS:    I didn't intend to be derogatory.

BY MR. GROSZ:

Q.    Would there be times that you would pay him money

to help out around the house, did that happen?

A.    Yes, that happened.

Q.    And directing your attention to February of 1997,

did there come a time that you were relocating to Georgia,

your family?

A.    Yes.

Q.    And at that time, tell me how that was going to

happen?

A.    I wasn't too organized with doing that myself

firstly and I was a little shaky about it.    We already sold

the one house.    We had to sell my house and I wasn't

comfortable with going, you know, going anywhere.    I like

Florida.

So I had to sell my house and it's not that easy

7    1    when you are selling a house.  But my youngest daughter had to

2    be at a school, so they had to go up there and be situated.  I

3    could be unsituated, but not them.

4           I was here, I guess, wrapping up things or

5    getting ready to -- and we had -- I had filled a truck up, it

6    was a very large truck, a U-Haul.  And I had been told that

7    John had drove a truck at one time and I had bounced it off

8    him, would you like to drive the truck up a few weeks prior to

9    that when I was thinking, you know, gees, maybe I'll ask John

10    or something.  I don't know if my wife maybe suggested it and

11    I did.

12           Q.    Did he agree to do that?

8    13           A.    Yes.  I told him let me know.  And as closer time

14    did come on, he told he did drive a very large truck up to

15    Georgia.

16           Q.    And you agreed to pay him to do that?

17           A.    Yes.

18           Q.    And you go up to Georgia ahead of him, is that

19    correct?

20           A.    Yeah.  Yeah, I went up just ahead of him that

21    night.  The night that I had dropped the truck off very close

22    to his house and then I went to the airport and flew there.

23           Q.    Okay.

24           A.    I need to be fresh to do the moving.

25           Q.    Fair to say that's around the 11th or 12th of --

251

A.    Yes, very close.

Q.    10th or 11th or 12th, in that area, of April?

A.    Yes.

Q.    And there comes a time when Mr. Cappelletti obviously reaches Atlanta with the U-Haul truck?

A.    Oh, yeah. Ultimately, yes.

Q.    Okay. Tell me what happens at that point?

A.    Well, unfortunately the truck ran out of gas. We had filled it up before. I think -- I believe that it was -- it was -- I didn't get into, you know, gas money or anything like that. I assumed I am sure if you went to Georgia, you don't leave with nothing in your pocket, but I think he had some money, but not enough.

And I had made a calculation based on what I was told on the mileage of the truck and we figured out, because I sent away for Allstate Motor Club, we sent out for directions how to get there and things like that. It's supposed to be 660 miles, something like that. And I had been told that the truck would get on the highway like nine miles to the gallon, so I made calculations to that fact.

And the truck did not get nine miles to the gallon, it was more like six or something. So he ran out of gas. I think he was supposed to have money for gas. Not like that I had directed him, but I know he was going to be paid when he was there. But he ran out of gas. It was unfortunate

8

1    more my mistake, I guess.  I didn't -- I based my calculations

2    on what I was told and it was inaccurate.

3         Q.    How did you find out?

4         A.    He called me.  We had it arranged.  He had a

5    phone number and beeper number.  I had an 800 beeper number

6    that wouldn't cost him when he -- In other words, if he was at

7    a pay phone or anything, to call me because I didn't even know

8    where they were living, so I would have to get him close to

9    the area.

10         But Atlanta, it's kind of big.  So I -- when you

11   get to Atlanta, give us a call and he did.  And he did both,

12   he called me and beeped.

13        Q.    And then you go down there and find out the truck

14   is out of gas?

15        A.    Right.  He was at an Amoco's.  It was about a

16   ways, about an hour drive from where we were at.

17        Q.    And what do you do next?

18        A.    It was really out of gas.  We pushed the truck.

19   I put gas in it, I don't think alot, half a tank or less than

20   that because we were hopefully idealy turned the truck in.

21        Q.    What's the next things that happens?

22        A.    We go to the house or the apartment and we start

23   unloading.

24        Q.    And did you finish unloading the truck, the

25   U-Haul that day?

253

A.    Yeah, we finish it.  It was pretty -- But it was hot.  I mean, it wasn't -- he wasn't supposed to be involved.  He was good that day.  He helped me more than I was expecting.

I asked him to help me with big stuff.  I had a wardrobe and heavy TV, stuff like that, but he was great.  Great that day.

Q.    And at some point during the evening, you're done unloading, do you pay Mr. Cappelletti for helping you out?

A.    As soon as he gets there, I give him money for -- I think as soon as he gets there.  He gives me toll receipts and I think he gave me gas receipts.  He gave me a few receipts and I paid him.  I don't know know if I gave him 100 right away, but he got his money that day.

Q.    How much money do you know that you gave him?

A.    I believe it was 150 or 160.  I believe it was 160, best that I remember.  Money was not an issue.

Q.    Did you give it to him in cash, check?

A.    Cash.

Q.    Okay.  And do you recall the denominations offhand, what types of bills you gave him?

A.    Not quite, no, sorry.

Q.    Okay.  And at some point, do you leave the house and go somewhere else with Mr. Cappelletti?

A.    Well, I had asked -- I had left in the interim of this, this was a long day, long hot day, but ultimately --

9    1      Q.    You're supposed to fly back to Florida, correct?

2      A.    Right.  That evening I think it's around --

3  somewhere around 7:00 o'clock, 7:30.  It was Value Jet at that

4  time.  I have a dual ticket, be able to fly back -- it wasn't

5  expensive, it was inexpensive.  And we drive to the airport

6  and we don't make it.  I mean, we make it to the airport, but

7  we missed our flight and there's no other flights that night.

8      Q.    What happens then?

9      A.    We go back.  We drive back to the apartment.

10     Q.    And then later that evening, do you leave the

11  apartment and go to a gas station?

12     A.    Yes, I do.

13     Q.    Okay.  Do you recall when it was in the evening?

14     A.    It was around 9:30, 10:00 o'clock.  That's just a

15  guess.

16     Q.    What happens at the gas station?

17     A.    John's a little lit before he gets to the gas

18  station.  When I say lit, I mean --

19     Q.    Just tell me what happens?

20        MISS DADOWSKI:  Objection, irrelevant.  Move to

21    strike.

22        THE COURT:  Sustained.  Sir, please couch your

23    response to the questions.

24        THE WITNESS:  I'm sorry.

25

BY MR. GROSZ:

Q.    You get to the gas station, what do you do?  Do you get gas, what do you do?

A.    I put gas into the car.

Q.    Is Mr. Cappelletti with you at that time?

A.    He's with me at the beginning, but he leaves the car.  And I see him head towards the inside of the Amoco Gas Station.  It's, you know, convenient store like what you see everywhere.

Q.    There comes a time where you get on the telephone?

A.    Yes.

Q.    And is that the last time that you see Mr. Cappelletti that night?

A.    That's the last time I see Mr. Cappelletti that night, yes.

Q.    Okay.  At some point you get back in your car, is that correct?

A.    Ah-huh.  Yes, it is.

Q.    Okay.  Do you realize Mr. Cappelletti is obviously no longer with you?

A.    I go looking for him.  I call out his name, John, John.  He's gone.

Q.    You don't see him at all that night, do you?

A.    No, I looked left -- I looked around.  I looked

9    1    in the dumpster.  Thought maybe he went --

2         Q.    You go home?

3         A.    Yes, I left.

4         Q.    What do you do the next morning?

5         A.    Well, I get up very early.  I left the door open

6    just in case and I put the beeper next to my head in case he

7    beeps me or calls whatever.  Not that I'm, you know, we left

8    in the morning.

9           I go by this Amoco Gas Station to see if he's

10   there or he's returned there, or what have you.  And I ask --

11   there's a gentleman in there and I ask him, you know, you see

12   a little guy in here, whatever.  I don't know if I gave him a

13   description, clothes wise, or whatever, but he says --

14          MISS DADOWSKI:  Objection, Your Honor, as to his

15       answer.  It's going to be hearsay.

16          THE COURT:  Sustained.  Sir, please listen to the

17       question and just respond to the questions and nothing

18       else.

19          THE WITNESS:  Okay.  Sorry.

20   BY MR. GROSZ:

21         Q.    Without telling us about the conversation you had

22   with the gas station attendant, did there come a time that you

23   learned where Mr. Cappelletti was?  Did there come a time

24   where you learned --

25         A.    Yes, there did come a time.

9

1          Q.    Where did you learn that Mr. Cappelletti was?

2          A.    He was in jail.

3                MISS DADOWSKI:  Objection based on my pretrial

4     motion.

5                THE COURT:  Overruled.

6     BY MR. GROSZ:

7          Q.    Now, at that point, you were scheduled to come

8     back to Florida, is that correct?

9          A.    Yes.

10         Q.    Soon thereafter?

11         A.    Myself and John, we were both scheduled to come

12    back.

13         Q.    Do you come back to Florida?

14         A.    Yes, I do.

15         Q.    Did you hear from John Cappelletti while he was

16    in custody?

17         A.    Yes, I did.

18         Q.    How did that come about?

19         A.    He called me.

20         Q.    How did he call you?

21         A.    He called me collect from Fulton County Jail.

22         Q.    Okay.  Do you recognize his voice when you talk

23    to him?

24         A.    Oh, yeah.

25         Q.    Did he identify himself to you, say hey, this is

9  1   John, or how did he identify himself?  How did you know that

2   was him on the other end of the line?

3        A.    From having previously -- previous interactions

4   with this person.  I knew it was John.

5        Q.    You knew it was John?

6        A.    Yes.

7        Q.    Did you know there was bond that needed to be

8   posted to help get Mr. Cappelletti out of custody?

9        A.    So I was told by John.

10       Q.    And at some point, did you learn how much that

11  bond was?

12       A.    It varied.  According to John it varied, but it

13  depended on --

14            MISS DADOWSKI:  I'll object to all this.

15            THE COURT:  Sustained.  Sir, listen to the

16       question.  The question calls for a yes or no response.

17       Answer yes or no.

18            THE WITNESS:  Okay.

19  BY MR. GROSZ:

10 20       Q.    You come back down to Florida, correct?

21       A.    Yes.

22       Q.    And when in relation to when you see

23  Mr. Cappelletti at the gas station, when's the next time that

24  you lay eyes on Mr. Cappelletti?

25       A.    Oh, when he's coming down the street on

10

1    April 13th of '97.

2        Q.    And this would be some two months almost later,

3    correct?

4        A.    Yes.

5        Q.    You're in Atlanta February, and now we're April?

6        A.    Yes.

7        Q.    During that time period between February and

8    April 13, 1997, did you make any efforts to try to raise bond

9    for Mr. Cappelletti?

10        A.    Yes.

11        Q.    Okay.  And just tell me briefly what efforts you

12    made?

13        A.    I contacted --

14            MISS DADOWSKI:  Objection, relevance, Your Honor.

15            THE COURT:  Overruled.

16    BY MR. GROSZ:

17        Q.    What efforts did you make?

18        A.    I contacted the children, his children, the two

19    children that I was aware of.

20        Q.    Okay.  And ultimately were you able to raise the

21    bond, yes or no?

22        A.    No.

23        Q.    Now, we're talking about April 13th of 1997.

24    You're at your house, correct?

25        A.    Yes.

10

1      Q.    Where is that physically located?

2      A.    It's in a security area called Sheridan Ocean

3  Club.

4      Q.    Can you give me some cross roads in that area?

5      A.    Yes, it's Southeast 5th Avenue and Sheridan.

6      Q.    Sheridan Street?

7      A.    Sheridan Street.

8      Q.    Is it east towards the beach or west of I-95?

9      A.    It's east towards the beach.  It's east of 95.

10  It's east of U.S. 1 and it's just east of Southwest 5th.

11     Q.    What city, county, state is that located in?

12     A.    Dania, Florida, Broward County.

13     Q.    Some point you were coming out of your house that

14  particular day, correct?

15     A.    Yes, I'm coming out of the garage.

16     Q.    Okay.  And where were you going?

17     A.    I was going up to Commercial Boulevard to go to a

18  clothing place.

19     Q.    Symms?

20     A.    Symms is where I was, yes.

21     Q.    Do you see Mr. Cappelletti?

22     A.    Yes, he's traveling down the street, coming

23  towards my house.

24     Q.    This is within the community, is that correct?

25     A.    Yes, it's an enclosed -- there's only one

1       entrance to this community.

2               Q.      One on Sheridan Street side and there's one on

3       5th Street side?

4               A.      Yes.  But once you are in the area, to get to my

5       home, you must go into only one entrance, yes.

6               Q.      Okay.  And is Mr. Cappelletti by himself at that

7       point?

8               A.      No, he's not.

9               Q.      Who is he with?

10              A.      He's with a gentleman that I know of by the name

11      of Eddie.

12              Q.      Do you see that gentleman in court today?

13              A.      Yes, I do.

14              Q.      Would you please identify him by an article of

15      clothing?

16              A.      Yes, he has light shirt and wearing glasses.

17              MR. GROSZ:  The record reflect the in court

18          identification of Mr. Ruiz?

19              THE COURT:  Yes, sir.

20      BY MR. GROSZ:

21              Q.      And had you ever met Mr. Ruiz prior to that day?

22      Let me rephrase it.  Had you ever seen him?

23              A.      I had seen him.

24              Q.      Had you seen him in the presence of

25      Mr. Cappelletti before?

10

1          A.     Yes.

2          Q.     Had you ever formerly met him, had a conversation

3    with him?

4          A.     On one isolated occasion only.

5          Q.     Was that some indepth conversation or was it

6    hello, good-bye?

7          A.     It was limited to hello and a hello only, and a

8    handshake.

9          Q.     Now, on this particular occasion we're talking

10   about, April 13th of 1997, where is Mr. Cappelletti situated

11   in the vehicle that's approaching you?

12         A.     He is in the passenger seat.

13         Q.     And this may sound stupid, but who is in the

14   driver's seat?

15         A.     The gentleman, Eddie, is in the driver's seat.

16         Q.     Okay.  And had you seen that vehicle before?

17         A.     Yes, I had seen that vehicle before.

18         Q.     What type of vehicle was it?

19         A.     It was a Honda Civic hatchback.

20         Q.     What color?

21         A.     White.

22         Q.     Okay.  Where had you seen it before, in whose

23   possession?

24         A.     I had always seen it in the fellow Ed's

25   possession at Mr. Cappelletti's home and on maybe one occasion

10      1      rarely in transporting myself, let's say to on the road, but

2      that's -- that's how I have seen him.

3          Q.   Did you have any conversations outside your home

4      with Mr. Cappelletti or Mr. Ruiz at that point?

5          A.   On April 13th?

6          Q.   Right.

7          A.   Yes, I did.

8          Q.   Okay.  And tell me what transpired at that point?

9          A.   Well, Cappelletti pulled up and -- with the car

10     or they pulled up, shall I say, and I'm coming out of the

11     garage.  And I open the doors, I have a, you know, a door

12     opener, little electric thing in your hand, whatever,

13     transmitter.

14              I open the door, the door to the car, and they

15     come pulling up at the same time.  And I said John, how are

16     you doing?  And he said not so good.  And words -- words to

17     that affect.

18              He said we need to talk.  I said, I'm in a hurry

11     19     or a rush.  He says well, you know, when you coming back or

20     this or that, words to that affect.  But I says, I'm heading

21     up to Fort Lauderdale, I'm going to get gas if, you know --

22     That's way I left it.

23          Q.   Did you have a desire to talk to him at that

24     point?

25          A.   No, no, I didn't want to talk.

264

11

1   Q. You go to the gas station, the Amoco.  Does

2 Mr. Cappelletti and Mr. Ruiz show up at the gas station?

3   A. Yes.

4   Q. What happens at the gas station?  Tell me how the

5 cars are parked and what happens?

6   A. My car is parked -- the front of my car is parked

7 in a -- towards the west.  They come around and park with the

8 front of his car towards the east in a fashion that would

9 block me from, let's say, going to the entrance of where you

10 would pay if you were going to make a cash transaction at this

11 Amoco Gas Station.

12   Q. For lack of better words, you're driver's door to

13 driver's door at that point?  Not that close, but I'm saying

14 parked in that fashion?

15   A. No, we're passenger door to passenger door, not

16 driver door to driver door.

17   Q. Okay.

18   A. There's an illustration --

19   Q. He is on the other side of you?

20   A. Yes.

21   Q. Okay.

22   A. Their car is not left of the car.  If the

23 microphone was my car and the cup of water is their car.

24   Q. Okay.  What happens at the gas station?

25   A. I'm pumping gas.  I'm at the back of the car.

11     1    It's a Chevrolet Impala, this vehicle here.  And John gets out

2    of the car and comes over and starts talking.

3         Q.    What was he saying to you?

4         A.    He was giving me -- he was telling me how hot

5    things were for him.

6         Q.    What are you saying back?  Tell me how the

7    conversation goes?

8         A.    I stop -- I'm basically listening at the

9    beginning.  I'm expecting John to ask me, you know, for some

10    money.  And I felt bad for him.  He had been through alot.

11         I was prepared to give him some money if he was

12    going to ask me for it.  He wasn't going to ask me for it --

13         Q.    How much money did you have on you at that point,

14    do you remember?

15         A.    Well, I actually -- I actually had 100 at the

16    time or very close to that shall I say.  I had put some money

17    to the right hand -- in the right hand side of my passenger

18    door, passenger seat, excuse me.  I don't want to say anything

19    because I don't want any objections.

20         Q.    Behind a passenger seat?

21         A.    Only because I didn't want -- in case he wanted

22    to hit me for too much, I've given money to John in the past

23    and if I got it to give and it's --

24         Q.    How much did you put back there?

25         A.    I think it was $60.

11    1         Q.    Okay.  Now you're left with whatever, 40 or

2    whatever it is you have in your wallet?

3         A.    Fourty or whatever is close to that.

4         Q.    What is the next thing that happens?

5         A.    John starts going down this road about how did

6    this happen and how did that happen.  And with him and -- I'm

7    really just listening, but I catch the thrust of it.  I

8    understand he's basically trying to say, you know, gees, how

9    could you leave me in Georgia this or that.

10              I said John, you know I didn't leave, you left

11   yourself in Georgia.  He was basically trying to blame me, but

12   he was walking a line.  It was weird to understand what he was

13   trying to say.  I was really hoping he would say, you know,

14   can I borrow $20's, you know, for his umpteen time and I would

15   give it to him.

16              MISS DADOWSKI:  Objection, move to strike,

17        nonresponsive.

18              THE COURT:  Sustained.  Please disregard the last

19        response by the witness.

20   BY MR. GROSZ:

21        Q.    Did he ask you for money at that point?

22        A.    He never came clean and asked me for money.

23        Q.    Okay.  What was he saying to you?

24        A.    He said words to the affect that after he went on

25   this dissertation of the story, he said basically -- excuse

```
11    1    me, not basically, he said the words well, as far as I see it,

      2    he got hundred -- it was 150 or $160 coming to him.  He was,

      3    in so many words, saying that he had gotten arrested at this

      4    gas station and when he --

      5              MISS DADOWSKI:  I will object to this

      6       characterization.

      7              THE WITNESS:  Okay.  You don't want to know

      8       what's happening then.

      9              THE COURT:  Sustained.

     10    BY MR. GROSZ:

     11       Q.    Tell me, what does he say to you about the money

     12    that he's saying is coming to him?

     13       A.    He says to me that -- the way I see it and that's

     14    not me Chris, this is his words, I quote the way I see it, I

     15    got $160 coming to me.

12   16       Q.    Was he directing that at you or at anyone else in

     17    the gas station?

     18       A.    It had to be me.  It was kind of close to me.

     19       Q.    And what's the next thing that takes place

     20    between the two of you?

     21       A.    Well, this goes on.  I'm pumping gas and I

     22    exchange words.  And basically how do you figure that words to

     23    that affect.  How do you figure that coming to you.

     24              So what you're going to get.  What do you think I

     25    owe you.  I paid you, John.  What are you talking about?
```

12

1           And he never said no, you didn't pay me, but he

2      woke up and became conscious and he was in jail.

3                MISS DADOWSKI:  Objection, Your Honor.

4                THE WITNESS:  I'm telling you what's he's saying.

5                THE COURT:  Hold on.

6                MISS DADOWSKI:  I move to strike.  Can we have a

7      side bar?

8                THE COURT:  Yes, ma'am.

9                (Thereupon, the following proceedings were

10     had side bar; outside the presence of the

11     jury:)

12               MISS DADOWSKI:  Your Honor, I request a mistrial.

13     All these characterizations that this witness keeps

14     making about my client, he was drunk, he was this.

15               Now he says he woke up, he was unconscious.  I

16     think the cumulative fact of all these statements taken

17     as a whole is prejudicing my client and I'm moving for a

18     mistrial.

19               THE COURT:  That is precisely why I kept telling

20     this witness from five minutes into his testimony to just

21     answer the question and nothing more.

22               I'm going to deny the motion.  I don't find that

23     the cumulative affect of the nonresponsive answers have

24     denied the Defendant Cappelletti a right to a fair trial.

25               You have to couch your questions in such a way

12     1          that it limits his freedom to embellish.

       2                    MR. GROSZ:  May I ask for leeway and latitude to

       3          lead him because I'm going to do that.

       4                    THE COURT:  Ask the leading question.  If either

       5          defense counsel feels it appropriate to object, I'm sure

       6          they will.  But we need to prevent the witness from

       7          continuing to go down these side streets.

       8                    MR. FLEISCHMAN:  Judge, just something that's not

       9          related; can we take a bathroom break after the State's

      10          done?

      11                    THE COURT:  Sure.

      12                    MR. FLEISCHMAN:  Thanks.

      13                    (Thereupon, the following proceedings were

      14          had within the presence of the jury:)

      15                    THE COURT:  All right, Mr. Grosz.

      16     BY MR. GROSZ:

      17          Q.    Mr. Cappelletti is saying to you that he has 150,

      18     $160 coming to him, that's what he's saying to you, is that

      19     correct?

      20          A.    That's correct.

      21          Q.    At some point, does the conversation, without

      22     getting into what it was, does a conversation get a little

      23     more heated?

      24          A.    Yes.

      25          Q.    Where is Mr. Ruiz at this point, physically where

270

is he?

    A.    At the initial engagement, Mr. Ruiz, or Eddie as I knew him, was in the driver seat of the vehicle initially.

    Q.    Okay.  Does he ever exit the driver seat?

    A.    Yes, he does.

    Q.    Physically where does he go when he exits the driver seat of his vehicle?

    A.    He walks westerly around the back of his vehicle and then comes to a stop at the passenger side of his vehicle where Mr. Cappelletti had exited.

    Q.    And does there come a time when Mr. Ruiz makes a comment in the direction of Mr. Cappelletti?

    A.    Yes.  Mr. Ed -- Mr. Ruiz yells out, "are we going to do this or what?"  Along with other words.  "Are we going to do this or what?"  "Are we going on with this or what?"  What's the story here, these are his words,

    MR. FLEISCHMAN:  Objection, Judge.

    THE COURT:  Hold on, sir.  When there's an objection, stop.

    MR. FLEISCHMAN:  He says as well as other words. I mean, either he's going to tell us what exactly was said or I'm objecting to him, you know, characterizing or couching his answers like that.

    THE COURT:  All right.  Overruled.

12    1    BY MR. GROSZ:

2      Q.   Go ahead, you can continue telling us what

3    Mr. Ruiz said?

4      A.   He repeats them statements on two or three

5    occasions, the same words.

6      Q.   Prior to his making those statements, "are we

7    going to do this thing or what", had he ever, this particular

8    date, said anything to you at all?

9      A.   No, not a word.

10      Q.   Had you had any conversations with him that day?

11      A.   No.

12      Q.   Now, in response to Mr. Ruiz's comments, does

13    Mr. Cappelletti say anything?

14      A.   He gets very heated.  John --

15      Q.   Does he say anything to you, sir, at that point?

16      A.   He -- he -- he repeats the same thing, there's

17    somewhat -- somewhat just -- yeah, he repeats the same things

18    that he's been doing.

19      Q.   Does he, at any point, say something other than

20    that general conversation about you owing him money?

21      A.   Not at that immediate juncture.

22      Q.   Okay.  When does that happen?

23      A.   When I put -- when the tank is full and I put the

13    24    hose back to the tank and I'm waiting to get the receipt, just

25    a couple seconds, he says well, I want you to know that I'm

13

1    going to kill you, do you understand me?

2        Q.    How does he say it, give me the tone of voice

3    that he's saying it?

4        A.    Initially he says it in a regular harsh voice,

5    but then he, you know, yells it as I'm walking -- You know,

6    I'm trying to get out of here.  I am not trying, but I'm

7    leaving.  I am not there to hear this.

8                So he follows me what little distance to the car,

9    to the entrance of the car, and then he's at full-fledged.

10       Q.    What he's saying?

11       A.    You hear me, you hear me, I'm fuckin' going to

12   blow your fuckin' head off, you hear me.  Very intimidating,

13   very muscling.  I want you to know, mother fucker, I'm going

14   to kill you.

15               MISS DADOWSKI:  I will object.

16               THE WITNESS:  That's what he said and that's the

17      answer.

18               THE COURT:  Overruled.

19   BY MR. GROSZ:

20       Q.    What do you do in response to that?

21       A.    I start the car and I leave.

22       Q.    Okay.  And at any point do you see or in your

23   side view mirrors or without the use of your mirrors, do you

24   see what Mr. Ruiz and Mr. Cappelletti do at that time?

25       A.    I don't see them go back into the car, no.  I

13

1    just leave.

2         Q.    Where do you go?

3         A.    And I drive up Sheridan Street.

4         Q.    In which direction, east or west?

5         A.    West.

6         Q.    Towards I-95?

7         A.    Yes.

8         Q.    At any point do you see that same white Honda

9    Civic with Mr. Ruiz and Mr. Cappelletti?

10        A.    Well, at that point, I see what I believe to be

11   this Honda Civic at my first -- at the first time I look, I'm

12   at about Dixie Highway and I see the white top of a car.  Do I

13   know that that's them?  I feel it could be.  I wasn't sure.

14   Not at that point, but I see a car driving recklessly and I

15   have every reason to believe it was them.

16        Q.    At some --

17        A.    I couldn't see them.

18        Q.    At some point do they get up to you?

19        A.    Very close.  When you say up to me, very close.

20   They never quite got clear with me on Sheridan Street because

21   there were other cars on the road or alot of cars on the road.

22        Q.    Okay.  What happens after you get to I-95 and

23   Sheridan Street, what do you do?

24        A.    Well, I take some evasive movement, but not alot.

25   The road -- there's alot of people on the road.  It's a

274

13    1    Sunday, you know, people are traveling.

2        Q.    What do you do?

3        A.    I try, you know, get away, but within reason.  I

4    don't do anything reckless and really I try to understand

5    what's even happening, it's a weird situation, you know.  I

6    would have never predicted this.

7        Q.    So you get on 95.  Now you're going northbound,

8    correct?

9        A.    Yes.

10        Q.    And which lane are you originally traveling in?

11        A.    I start in the right.  I go to the middle and

12    then to the right.  And then the middle and I end up staying

13    in the right lane.  I do what I can to avoid any

14    confrontation.

15        Q.    Do you see Mr. Ruiz's vehicle at any time --

16        A.    Oh, yes.

17        Q.    -- while you're on I-95?

18        A.    Yes.

19        Q.    Where do you see it?

20        A.    He is all over the read.  He's -- if you've -- if

21    you ever seen TV, a pursuit, it's a pursuit of sorts and he's

22    doing alot of crazy driving.

23        Q.    Okay.  How were you watching this as you're

24    driving?

25        A.    I watch it through my rear view mirror and side

13  1    mirrors.

2         Q.    I mean, driver side?

3         A.    Mostly the driver, but couple occasion on the

4    passenger mirror.

5         Q.    Does there come a time where Mr. Ruiz's vehicle

6    gets parallel to your vehicle on I-95?

7         A.    There are three times when he becomes parallel

8    and adjacent to my vehicle, but never at a time when there's

9    intersection until the final time.

10        Q.    Okay.  When the first -- Let's talk about the

11   three different times when his vehicle actually catches up to

12   your vehicle.  There was an intermittent time where he was --

13   where he was not parallel with your car, is that correct?

14        A.    Yes.

15        Q.    What happens during that time?

16        A.    Well, if you're driving, you know, and let's say

17   someone comes up here and that person in front of you decides

18   to step on the break, now that person can't go through that

19   car so they can't perfectly aline themselves with you.

20             Just as, you know, if you ever driven on I-95,

21   it's not bumper to bumper, but it's moving moderately well,

22   not at a very slow pace.  There's alot of traffic, but they're

23   moving -- they're moving.  The traffic is moving, but if

14  24   you're driving a vehicle, I can't go through this log here

25   because it's here, but if I can move through the log, it's

14

1    here.  Their volleying around.

2         Q.    Mr. Ruiz's vehicle was jerky?

3         A.    Yes.

4         Q.    Is he passing up cars to catch up your vehicle at

5    all?

6         A.    He's doing somersaults.

7         MISS DADOWSKI:  Objection, Judge.

8    BY MR. GROSZ:

9         Q.    He's not doing literally somersaults?

10        A.    No --

11        THE COURT:  Hold on, sir.

12        MISS DADOWSKI:  Objection to the characterization

13    of the words that the witness is using, somersaults.

14        THE COURT:  Overruled.

15   BY MR. GROSZ:

16        Q.    The car is taking evasive action, is what you're

17   saying?

18        A.    I'm taking evasive action and he's agressively

19   pursuing to catch up with my vehicle.

20        Q.    And at some point -- Now, let me direct you to

21   just outside the airport where 595 begins to branch off.  Does

22   Mr. Ruiz's vehicle become parallel or at least somewhat

23   parallel with your car?

24        A.    Yes.

25        Q.    What happens at that point?

14

1          A.      I'm shot with a shotgun.

2          Q.      You don't see the shotgun come out of the car, is

3    that correct?

4          A.      I don't see the shotgun come out of the car, no.

5          Q.      What do you hear?  Do you hear a pop?

6          A.      Boom.  Far more than a pop, an explosion.

7          Q.      You feel something?

8          A.      Yes.

9          Q.      Where do you feel it on your body?

10          A.      Well, my arm goes crazy, but mostly I feel it in

11    my neck.

12          Q.      Which side of your neck, the right side or left

13    side?

14          A.      The right side right next to where they pulled up

15    right next to the car.

16          Q.      And --

17          A.      I see the car pulling up.

18          Q.      You see the white vehicle --

19          A.      I see the car.  The car has been pulling up -- I

20    do all I can within reason to watch the car as anyone would

21    do.  Just -- and I'm following it and I have an electric

22    mirror and I'm watching the car through this in the rear view

23    mirror.

24                  And they pull up to the side of me as they have

25    done before.  And in this particular sequence, there's an

14

1    opportunity available to make a get-a-way and that's what --

2    they come very close to the car and boom, I'm shot.

3         And then I -- when I come up -- my head comes up

4    a little bit, I can see the white of the car going away.

5         Q.   Okay.  When you say going away, in which

6    direction was it traveling?

7         A.   Forward, but I couldn't make distinguishments at

8    that time, but I know it was forward because I really don't

9    know really -- it was difficult to know what was forward

10   because I don't know if my car is oriented at this time in

11   this very small time frame.

12        Q.   Obviously at this time you're not trying to jot

13   things down in anticipation to testify?

14        A.   Correct.

15        Q.   What was the next thing that you recall happening

16   to you?

17        A.   I recall just --

18        Q.   What do you do, what happens?

19        A.   I try to drive the car.

20        Q.   And what happens?

21        A.   I try to drive the car is what happens.

22        Q.   Do you get it off the side of the road?

23        A.   I'm going straight, but I'm tilted so it starts

24   to tilt.

25        Q.   Okay.  Car comes to rest?

14    1        A.    Evently.

2        Q.    What do you remember?

3        A.    I try to put it in park.

4        Q.    You try to use your phone?

5        A.    Yeah, I true to use the phone.

6        Q.    What happens?

7        A.    The battery comes off.

8        Q.    What's the next thing that happens?

9        A.    Well, I realize the car is not in park and it

10    starts to roll again, so I put it in park again and it stays

11    still.

12        Q.    Do you ever get on the phone and get through to

13    anybody?

14        A.    Evently, yes.

15        Q.    People come to the scene and assist you?

16        A.    Yes.

17        Q.    State's 17, is that the shirt you were wearing?

18        A.    Yes.

19        Q.    And State's 18, can you tell me who that is?

20        A.    That's me.

21        Q.    Did you look like this before?

22        A.    No.

23        Q.    Can you show the members of the jury whether or

24    not you have any injuries that have sustained as a result of

25    this?

280

14    1          MR. FLEISCHMAN:  Judge, I'm going to object on

2   the grounds are that that's not a -- Well, can I be heard

3   side bar, Your Honor?

4          THE COURT:  Yes, sir, sure.

5          (Thereupon, the following proceedings were

6   had side bar; outside the presence of the

7   jury:)

8          MR. FLEISCHMAN:  Judge, this is not an aggravated

9   battery case where they've charged my client with causing

10   some type of permanent injuries or disability.

11          So the fact that he may have some scarring from

12   his injuries, they have a photograph of his injuries,

13   he's described them, so the fact that he may stand up in

14   front of the jury and show some type of permanent

15   scarring from this, I think, is cumulative and

16   prejudicial and not relevant.  Especially the way that my

17   client's been charged in the information.

18          MISS DADOWSKI:  Same objection.

15    19          MR. GROSZ:  Judge, the nature of the injuries as

20   well as the type of weapon used to cause them, these are

21   factors that the jury can consider in determining

22   premeditation.

23          THE COURT:  Okay.  The Court's going to overrule

24   the objection.

25

15    1    BY MR. GROSZ:

2    Q.    Do you have any injuries, sir, that resulted from

3    this?

4    A.    Yes, I do.

5    Q.    Can you please just briefly show the members of

6    the panel those injuries on yourself.

7    A.    I have a severed nerve here.

8    Q.    Where are you pointing now?

9    A.    On the tip of the shoulder where the nerve comes

10    out.

11    Q.    Which shoulder, right or left?

12    A.    Left shoulder.  And then the rest of everything

13    is inside.

14    Q.    Inside where?

15    A.    Everywhere, it's everywhere now.

16    Q.    What's everywhere, what are you talking about?

17    A.    The --

18    Q.    Pellets?

19    A.    The pellets are everywhere because they migrated,

20    they went from the heart to the lung, all over.  They're all

21    over.

22    Q.    What about the side of your neck?

23    A.    That's where --

24    Q.    The side of your neck, can you point that out?

25    A.    Yeah.  That's where the greatest amount of them,

15    1    it's closed up.  That's where the greatest amount has been

2    left, but they migrated and they were also blown -- you can

3    see the way that they -- this wasn't here how they go.  Firing

4    it.

5    Q.    There's a dark coloring here on your shoulder

6    near one of the scars, do you know what that dark coloration

7    is?

8    A.    Yeah, that's --

9    MR. FLEISCHMAN:  Judge, I'll raise the same

10    objection now at this point.

11    THE COURT:  Overruled.

12    BY MR. GROSZ:

13    Q.    What's that dark coloring?

14    A.    That's the end result of a scar.

15    Q.    This portion right here, is that the tinting?

16    A.    Oh, some of it is the tint from the window and

17    some of it's powder and all.

18    Q.    Okay.  Thank you.  You can have a seat.

19    Your car window was tinted at the time?

20    A.    Yes.

21    Q.    State's Exhibit 2, is that your vehicle?

22    A.    Yes, it is.

23    Q.    Do you see in this photograph on the bottom here

24    the hole in the window?

25    A.    Yes.

15

1          Q.    What's that hole from?

2          A.    That's from the shotgun that was used to kill me

3    or attempt to kill me.

4          Q.    And did that hole in your window, was that --

5                MISS DADOWSKI:  Objection, Your Honor, I'll move

6          to strike that last answer.  That's a determination for

7          the jury.  That's a fact ultimately by the jury.  I ask

8          that jury disregard.

9                THE COURT:  Overruled.

10   BY MR. GROSZ:

11         Q.    Was this hole in your window from the shotgun,

12   was that there before April 13th of 1997?

13         A.    No, it was not.

14         Q.    Was that there before you saw John Cappelletti

15   and Eduardo Ruiz on April 13th of 1997?

16         A.    No, it was not.

17         Q.    Did you look like this before you saw

18   John Cappelletti and Eduardo Ruiz before April 13th of 1997?

19         A.    No.

20               MR. FLEISCHMAN:  Objection.

21               MISS DADOWSKI:  Objection.

22               THE COURT:  Sustained.

23   BY MR. GROSZ:

24         Q.    State's Exhibit 3, the blood on the bottom of

25   your vehicle, was that there before April 13th of 1997?

15

1          A.    No.

2          Q.    This item, spacer wad that's on your floorboard,

3    was that there prior to your being shot on April 13, 1997?

4          A.    No.

5          Q.    This indentation from a pellet in your headrest,

6    was that there prior to you being shot on April 13, 1997?

7          A.    No.  This was a relatively new vehicle.

8          Q.    How about the damage to the rear passenger door,

9    was that there?

10         A.    No.  There was zero damage to this car.  This was

11   a relatively new vehicle.

12         Q.    State's Exhibit 6, do you recognize that car?

13         A.    Yes.

14         Q.    Okay.  And whose car do you recognize that to be?

15         A.    That's the gentleman Eddie's car.

16         Q.    Is that the car that you're talking about, the

17   white Honda that was pursuing you?

18         A.    That's the white car where the explosion came

19   from.

20               MISS DADOWSKI:  Objection, nonresponsive.

21               THE COURT:  Overruled.

22   BY MR. GROSZ:

23         Q.    In April of 1997, sir, you were on probation at

24   the time, correct?

25         A.    That's correct.

15

1      Q.    And you had entered into a plea, correct?

2      A.    That's correct.

3      Q.    For charge of aggravated stalking?

4      A.    That is correct.

5      Q.    And that did not involve, the nature or

6   circumstances of that case, did not have anything to do with

7   Mr. Ruiz or Mr. Cappelletti, is that correct?

8      A.    That's correct.

9      Q.    And at the time obviously that you were shot,

10  were you on probation?

11     A.    That's correct, I was on probation at the time

12  that I was shot.

13     Q.    And there was also a current DUI that was pending

14  at that time?

15     A.    A pending, correct.

16     Q.    And that case is no longer pending?

17     A.    That case was dismissed by the State of Florida.

18     Q.    And your probation is now terminated?

16

19     A.    That is correct.  After the DUI dismissal, the

20  probation was dismissed, or excuse me, the probation ended.

21     Q.    And just show me on this State's Exhibit C, if

22  you can show me where you were living in relation to this map?

23  And just use this little yellow thing to put it in the

24  position where your house would be.

25            And does this Exhibit C accurately depict the

16    1    area in Broward County that we've just been talking about?

2         A.    Very much so, yes.

3         Q.    And you see where this flag is up here, where the

4    car came to rest, does that look about the right area?

5         A.    Yes, very.

6              MR. GROSZ:  Okay.  Thank you, sir.

7              Judge, I have nothing else.

8              THE COURT:  Folks, let's take our mid afternoon

9    recess.  We'll reconvene in about 20 minutes.

10             Remember, do not discuss the facts of the case.

11   Do not form any fixed opinions on the merits of the case

12   until the case is submitted to you for your

13   deliberations.

14             We'll be in recess for 20 minutes.

15             (Thereupon, the following proceedings were

16   had outside the presence of the jury:)

17             THE COURT:  Sir, you can go out of the courtroom

18   and walk around and go to the restroom.  Just make sure

19   that you're back here in 20 minutes.

20             THE WITNESS:  Thank you, Your Honor.

21             (Thereupon, a recess was taken; after which the

22   following proceedings were had:)

23             THE COURT:  Okay.  The record will reflect that

24   Mr. Cappelletti and Mr. Ruiz are present represented

25   bring counsel.

16

1          Anything to come before the Court before we bring

2     in the jury?

3          MR. GROSZ:  I just wanted to offer the -- State's

4     C.

5          MR. FLEISCHMAN:  I believe we've looked at it.

6     We have no objection.

7          THE COURT:  Okay.  C will be admitted as 19.

8          Okay.  Dell, would you bring in the jury please.

9          (Thereupon, State's Exhibit Number 19 was

10    marked into Evidence.)

11         (Thereupon, the days proceedings were concluded

12    in Volume III:)

13

14

15

16

17

18

19

20

21

22

23

24

25

| IN THE DISSTRICT COURT OF APPEAL - FOURTH DISTRICT WEST PALM BEACH, FLORIDA | | CLOCK IN |
|---|---|---|
| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION | |
| JOHN CAPELLETTI  Appellant<br>Vs.<br>STATE OF FLORIDA,  Appellee | | CASE NUMBER<br>97-7797CF10A<br>APPEAL NUMBER<br>98-879 |

VOLUME ___III___     PAGES ___288___ TO ___353___

*4 0798*

RICHARD L. JORANDBY, 15TH P.D.
  Attorney for Appellant

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

MAY 14 1998

CRIMINAL DIVISION
WEST PALM BEACH

GEORGINA JIMENEZ OROSA
  Assistant Attorney General

```
              IN THE CIRCUIT COURT OF THE
            SEVENTEENTH JUDICIAL CIRCUIT,
          IN AND FOR BROWARD COUNTY, FLORIDA
```

STATE OF FLORIDA,                )
                                 )
        vs.                      )   Case No. 97-7797 CFA
                                 )
JOHN W. CAPPELLETTI,             )
                                 )
        Defendant                )
_____X

                              Ft. Lauderdale, Florida
                              January 6, 1998
                              10:00 o'clock a.m.


APPEARANCES:

        JUSTIN GROSZ, Esquire
        Assistant State Attorney
        Appearing on behalf of the State of Florida.

        RENEE TERESA DADOWSKI, Esquire
        Assistant Public Defender
        Appearing on behalf of the Defendant.

        - - - - - - - -

        The above-styled cause came on for hearing

before the Honorable JAMES I. COHN, presiding Judge, at

the Broward County Courthouse, Fort Lauderdale, Broward

County, Florida, on the 6th day of January, 1998

commencing at 10:00 o'clock a.m.


                         VOLUME III

                       Pages 288 - 353

I-N-D-E-X

| DATE | PROCEEDINGS | PAGE |
|------|-------------|------|
| 01/06/98 | Jury Trial | 288 - 353 |

| State | Direct | Cross | Re-Direct | Re-Cross |
|-------|--------|-------|-----------|----------|
| Chris D'Ambrosio | | 290 | | |
| | | 345 | | |

16

1              (Thereupo.

2       had within the pre.

3              THE COURT:

4              Mr. D'Ambro.

5       still under oath, si.

6              We will proce

7       Mr. Fleischman.

8                    CROSS

9   BY MR. FLEISCHMAN:

10       Q.    Okay.  Mr. D'Aml        ___u. to this incident,

11   you had no relationship with Mr. Ruiz, isn't that true?

12       A.    That's true.

13       Q.    Okay.  I mean, you were not friendly with him,

14   right?

15       A.    Other than just -- No.  I mean, I was not

16   friendly with him.

17       Q.    Well, he wasn't a friend of yours?

18       A.    He wasn't a friend of mine, no, sir.

19       Q.    You had no personal relationship with him?

20       A.    No.

21       Q.    Did not socialize with him?

22       A.    Did not socialize with him.

23       Q.    Had never been to his house, right?

24       A.    No.

25       Q.    You know where he lives?

16    1          A.    I have no idea.

2          Q.    You had never been in his car before, is that

3   true?

4          A.    I had seen the inside of his car, yes.

5          Q.    Were you ever inside his car?

6          A.    Sitting inside the car, no.

7          Q.    Sitting inside his car?

8          A.    No, I never sat inside his car.

9          Q.    And I think you testified there had been a few

10  occasions maybe you waved to him, you saw him at

11  Mr. Cappelletti's house, is that also true?

12         A.    Yes, couple occasions.

13         Q.    Okay.  And Mr. D'Ambrosio, you had -- this

14  business arrangement that you had with Mr. Cappelletti where

15  you would throw money here or there, or have him do odd jobs

16  for you, you had no such relationship with  my client,

17  Mr. Ruiz, is that right?

18         A.    That's right.

19         Q.    He had never been into your house either?

20         A.    No, never been.

21         Q.    He didn't know your family, your wife, your kids,

22  right?

23         A.    I -- I -- I don't know.  From my standpoint, I

24  don't know.  Maybe he knew from -- I don't know.

25         Q.    And also prior to the incident that occurred,

16

1    Mr. Ruiz had never spoken to you or threatened you at all,

2    isn't that also true?

3        A.    No, never spoke to me or threatened me in any

4    way.

5        Q.    He would have no reason, Mr. D'Ambrosio, to ask

6    you for any money either, isn't that also true?

7        A.    I don't know about that.

8        Q.    Well, I'm interested.  Tell me why would Mr. Ruiz

9    have any interest in getting money from you, Mr. D'Ambrosio?

10       A.    Well, 'cause money is a nice commodity to have.

11       Q.    You have a lot of money, is that right?

12       A.    No, that's not right.

13       Q.    Is there some reason in your deposition why you

14   said that you have a lot of money and you've lived a life like

15   no one could imagine, Mr. D'Ambrosio?  Is there some reason

16   why you said that?

17       A.    Is that what I said?

18       Q.    Well, I'm asking you.

19       A.    I don't know.  I said -- I talk alot.  You've

20   asked me hours of questions so I don't know if I said that.

21   If you want show me, I don't recall saying that I lived --

22   what was it again you said?

23       Q.    Okay.  Well, sir, here, let me give you an

24   opportunity to --

25       A.    Thank you.

16    1              MR. FLEISCHMAN:  If I could have a minute please,

   2        Judge.

   3              THE WITNESS:  Yes, sir.

   4              MR. FLEISCHMAN:  Your Honor, may I approach the

17    5        witness please?

   6              THE COURT:  Yes, sir.

   7    BY MR. FLEISCHMAN:

   8        Q.    Well, actually let me ask you this, did you give

   9    a deposition in this case, do you recall that?

  10        A.    I gave a deposition in this case, yes.

  11        Q.    And I had a chance to speak to you, right, and

  12    you had been -- you met with Renee Dadowski and the State in

  13    this case in Georgia?

  14        A.    I met with Mr. Justin Grosz and --

  15        Q.    Right.

  16        A.    I've never met you.

  17        Q.    Right.  But we spoke and I questioned you, right?

  18        A.    We spoke over a speaker phone.  I never seen you

  19    prior to this.

  20        Q.    Well, would your deposition refresh your

  21    recollection as to your answers?

  22        A.    It would -- I am not a computer, it would

  23    certainly refresh my recollection.

  24        Q.    I understand.  What I'm going to do, I would ask

  25    you to read Page 56, okay.  And I ask you to read that please

17   1   and let me know when you are done.

2          A.    You want me to read it to myself or would you

3   like me to read it out loud?

4          Q.    Read it to yourself and see if that refreshes

5   your recollection as to whether or not you said you had a lot

6   of money?

7          A.    I said I had alot of money.

8          Q.    Right.

9          A.    Okay.  Do you want to question me now?

10          Q.    Sir, did you get a chance to read it?

11          A.    Yeah.  I mean, it does refresh my memory.  Thank

12   you, yeah.

13          Q.    Okay.  So in fact, at that deposition, which was

14   taken, again, with the State Attorney present, Miss Dadowski,

15   and I had an opportunity question you, you did, in fact, state

16   that you were a person that has a lot of money, isn't that

17   true?

18          A.    I responded to an employment question.  You were

19   asking me about my employment.  Do I kind of -- as you can

20   read, if you read it in context, prior to that you will see

21   the discussion is not about money at all.  You were suggesting

22   that I wasn't making money or something.

23          Q.    I'll start at Page 55, Line 25.

24          A.    Sure.

25          Q.    Question:  "What did you do after that as far as

17    1    employment?"  Answer, Page 56, beginning at Line 1 and 2,

2    answer:  "I really -- I did just little things for my brother.

3    I play.  I have a lot of money."  Okay.

4    A.    That's correct.  That's -- I worked for 16

5    consecutive years.  I had enough money that I didn't have to

6    go -- Were you asking me a question that was back to 1993 I

7    believe or '92.

8    Q.    So --

9    A.    So when I -- Well, I wasn't trying to suggest

10    that I'm Donald Trump, that I had a lot of money.  The

11    question involved employment or like, you know, actually

12    working.  I have enough money I can wait for another week to

13    work or on another month to work, or decade to work, but I

14    wasn't saying I have a lot of money.  I am a millionaire of

15    sorts.  Certainly the implication was not there.

16    Q.    Do you know what Mr. Ruiz does for a living?

17    A.    I do not know Mr. Ruiz.

18    Q.    You don't know if he has a lot of money either?

19    A.    I do not know Mr. Ruiz.

20    Q.    So there's absolutely no reason, Mr. D'Ambrosio,

21    you have no business connection with him, you have no social

22    relationship with him, you don't know him.  There's no reason

23    for him to ever ask you for any money, is there?

24    A.    To ask me for money?

25    Q.    Yeah, ask you for money?

17

1          A.    You can ask anyone anything.  You know, if

2     you're -- I don't know Mr. Ruiz, I don't know him period.  I

3     don't know him.

4          Q.    And this arrangement, this job situation that you

5     provided Mr. Cappelletti to help move to Georgia with this

6     truck, Mr. Ruiz, my client, had nothing to do with that, did

7     he?

8          A.    To my knowledge, your client had nothing to do

9     with the move to Georgia.

10          Q.    Mr. D'Ambrosio, you say to your knowledge.  So

11     let me do this, did you ever speak to Mr. Ruiz and say to

12     Mr. Ruiz, I will pay you to go with John Cappelletti up to

13     Georgia, did you ever do that?

14          A.    No, I never did that.

15          Q.    Okay.  And in fact, you never paid him any monies

16     whatever to help Mr. Cappelletti with that move to Georgia,

17     did you?

18          A.    That's correct.

19          Q.    Okay.  In fact, Mr. D'Ambrosio, it would be a

20     fair statement to say that you're not fond of Mr. Ruiz, are

21     you?

22          A.    No, that would be an unfair statement.

23          Q.    That would be an unfair statement?

24          A.    Yeah, I think it would be unfair, prejudicial,

25     and improper, I might add.

17

18

1    Q.    And in fact, Mr. D'Ambrosio, you hold Mr. Ruiz

2    responsible for these injuries that you have shown the jury

3    and for this incident that took place, isn't that true?

4    A.    I hold Ruiz, Edward Ruiz, responsible for the

5    State of Florida.

6    Q.    I'm sorry, you hold him responsible for what in

7    the State of Florida?

8    A.    Responsible and accountable to the State of

9    Florida.  I'll let the jury determine whether Mr. Ruiz --

10    Q.    But not to you though, right?

11    A.    I don't know Edward Ruiz.

12    Q.    Okay.  So when you referred to Edward Ruiz as a

13    monkey on August 25th of 1997 when I questioned you regarding

14    this incident, that was done in a light favorable to Mr. Ruiz,

15    is that what you're saying, Mr. D'Ambrosio?

16    A.    That was done in the context as you would imagine

17    in my shoes.  If God forbid if the opportunity ever comes that

18    individuals are out in society and shoot you or participate or

19    conspire to kill you, or assassinate you, I can assure you,

20    you will feel the same derogatory feelings towards that

21    individual.  You would probably not rerefer to him as a good

22    individual, so you may use a word that is derogatory.

23    Q.    Okay.

24    A.    It was an inappropriate and derogatory word.  As

25    is was inappropriate of suggesting that somehow I don't know

18

1  someone, yet I dislike them.  So it was an inappropriate word

2  used at an emotional time during an interrogation of which I

3  was really initially trying to tell people what happened and

4  then they play an attorney game with you where they start

5  flipping and dig and, you know, changing and putting words in

6  your mouth.  So I did use the word monkey inappropriately.

7      Q.    Okay.  And Mr. D'Ambrosio, just so it's clear, I

8  did not put the word monkey in your mouth, did I?

9      A.    The word monkey he did not put in my mouth.  He

10  used countless words that you did put in my mouth.  And if you

11  give me that deposition back, I will be glad to show you.

12      Q.    Mr. Ruiz is not a monkey, is he?

13      A.    No.  But you were a voice on the phone.

14      Q.    I am not a monkey, am I?

15      A.    I am not suggesting -- never made the suggestion.

16  But I can appreciate your desperation in this case.

17      Q.    Okay.  Thank you.

18      A.    You're welcome.

19      Q.    Now, Mr. D'Ambrosio, the only person, again, that

20  you were involved regarding this Georgia incident was

21  Mr. Cappelletti, the only -- out of the people that are

22  sitting here today, is Mr. Cappelletti and yourself, isn't

23  that true?

24      A.    Georgia wasn't an incident for me.  It wasn't an

25  incident Georgia for me.

18

1        Q.    I am not asking you that.

2        A.    You called Georgia an incident, did you not,

3    counsel?

4        Q.    The employment situation with the assisting you

5    to move to Georgia was between yourself and Mr. Cappelletti,

6    right?

7        A.    Yes.

8        Q.    Now, when did you pay Mr. Cappelletti this $160?

9    Was it before you went up there or after he arrived?

10       A.    It was after.

11       Q.    Okay.  You paid that to him in cash?

12       A.    Correct.

13       Q.    Did Mr. Cappelletti stay with you at your home?

14       A.    He stayed at the apartment that we -- that

15    myself, my wife and my daughter were living for the time frame

16    that he was there.

17       Q.    Okay.  Mr. Ruiz did not, is that right?

18       A.    That's correct.

19       Q.    In fact, he wasn't even up there at the time?

20       A.    I don't know Mr. Ruiz.  I don't know where he

21    was.

22       Q.    Okay.  Now, on the date of the -- of this

23    incident where you got shot, would it be fair to say that the

24    first time that you see Mr. Ruiz in his vehicle was when they

25    pulled into this area where you live?

18

1        A.    I am sorry, counsel, would you say that again?

2        Q.    Sure.  Would it be fair to say, Mr. D'Ambrosio,

3 that the first time, on the date of the incident, that you saw

4 Mr. Ruiz was when he pulled into your living area in this

5 vehicle?

6        A.    The first time --

7        Q.    On that day?

8        A.    On that date on April 13th?  Yes.

9        Q.    Okay.  And he was driving, is that right?

10       A.    Yes.

11       Q.    Okay.  And where was Mr. Cappelletti?

12       A.    Passenger seat.

13       Q.    And your conversation at that moment, when they

14 pulled into your complex, I will use that word, was solely

15 with Mr. Cappelletti, isn't that true?

16       A.    That's true.

17       Q.    Mr. Ruiz never made any comments towards you,

18 right?

19       A.    No, never made any comments.

20       Q.    Mr. Ruiz did not threaten you?

21       A.    No.

22       Q.    Did Mr. Ruiz, in fact, didn't make any gestures

23 toward you, did he?

24       A.    Not that I know of.  I -- If he did, I certainly

25 didn't see it.  I didn't see Mr. Ruiz to make any gestures

towards me.

Q.    Okay.  In fact, Mr. D'Ambrosio, isn't it true
that you invited Mr. Cappelletti, obviously being in Mr.
Ruiz's car, to follow you to the gas station, isn't that true?

A.    No, it's not true.  This is where we come to
putting words in peoples mouths.

Q.    Did you tell Mr. Cappelletti that you were going
to this Amoco Station.  That if you wanted to speak with you,
he would be, I guess, more than happy or you would be more
than happy to have him follow you there, how is that?

A.    That's good.  It didn't happen where I was at,
but that's nice.  I don't know where -- You know.

Q.    Well, did you tell him look, if you want to talk
to me, Mr. Cappelletti or John, come to the Amoco Station, I'm
going to be there?

A.    Come to the Amoco Station, I'm going to be there?
Absolutely, unequivocally, no.

Q.    Okay.  Now, do you recall giving a statement to
Detective Needs in this case on April 14, 1997 while you were
at the hospital?

A.    I have a limited and highly anesthetized
recollection of such an event, or more than actually more than
one.

Q.    And let's use the word limited first.  Why is it
that you have a limited recollection of that?

19

1          A.    Because I was under significant anesthesia, not

2     just some anesthesia, but miscellaneous narcotics at the time.

3          Q.    Well, do you recall giving that statement,

4     Mr. D'Ambrosio?

5          A.    As I say, I'm just -- Yes, I do recall giving

6     more than one statement one occasion to the gentleman alone,

7     Mr. Needs, well, Detective Needs.  Good officer I might add.

8          Q.    I'm sorry?

9          A.    A good officer I might add, along with countless

10     others that I've come to know.  And one other occasion where

11     another gentleman by the name of Tony.  He was one -- he was

12     the second person.

13          Q.    Did you have an opportunity to review that

14     statement prior to coming into court today to testify?

15          A.    I reviewed it or I looked over it, yes.

16          Q.    Okay.  Where did you have a chance to do that?

17          A.    Well, I -- I had been sent a copy of it, but I

18     misplaced it.  But I was given a second copy of it here again

19     just a couple days ago.

20          Q.    Isn't it true, Mr. D'Ambrosio, in that statement

21     taken by Detective Needs -- And it was under oath by the way,

22     do you recall that?

23          A.    The specifics of being under oath, no, I don't.

24          Q.    Okay.

25          A.    I would imagine it was under oath, but I don't

19    1    recall.

2         Q.    I have the statement here, so if you would like,

3    I can show it to you before I question you about it.

4         A.    Something of detail if you think it's relevant.

5    I want to offer you as much clarity as possible.

6         Q.    Okay, then, Mr. D'Ambrosio, isn't it true in the

7    statement that you gave to Detective Needs on April 14th of

8    1997 when you were placed under oath and when he came to

9    interview you, that you told him when you met with

10   Mr. Cappelletti in Mr. Ruiz's vehicle, you said, look, I'm on

11   my way out, I'm going to the Amoco.  If you like, I'm going to

12   stop there, if you want to talk to me there, meet you there

13   and we'll speak.

14        Didn't you tell him that?

15        A.    I don't know.  I may have said some words close

16   to that affect.  Words --

17             MR. FLEISCHMAN:  May I approach the witness,

18        Your Honor?

19             THE COURT:  Yes.

20   BY MR. FLEISCHMAN:

21        Q.    I'm going to be referring to Page 5 of 11 of the

22   statement of April 14th of 1997.  Just the first question and

23   answer.  If you just read it to yourself for a minute.

24        A.    As you were walking to me, you were talking.  I

25   just didn't follow you.

19    1        Q.    Right.  I'm referring --

2        A.    Read it and don't talk.

3        Q.    Hold on one second.  I'm referring to Page 5

4    of 11.  I'm asking you to look at the first question and

5    answer.  Let me know when you are done.

6        A.    Okay, counsel.

7        Q.    Okay.  You had an opportunity look at that?

8        A.    Yes.  Would you like me to read it?

9        Q.    Okay.  You recall being asked this question and

10    giving this answer, Mr. D'Ambrosio, question:  "Okay.  Let's

11    go on to the incident, okay.  You were at your residence.  You

12    were fixing -- you were getting ready to leave and then what

13    happened?"

14            Answer:  "Uhm, I asked John how he had been doing

15    because I had known that he had been recently let out of jail.

16    And he said not to good.  And uhm, I says well, how can you

17    expect to be good, John, considering, and words to that

18    affect.  And then he said we needed to talk.  I said okay,

19    whatever, John.  I'm on my way out.  I said if you want, I'm

20    gonna stop at the Amoco if you want to talk to me there.  Said

21    all right."  Okay?

22        A.    I certainly remember as I do here words to that

23    affect.  I am not a digital recorder.  I am not recorder.

20    24            What I said when I had a 150, 150 milligrams of

25    morphine, what have you, whatever they use to knock you out,

20

1   bring you to, but -- it's not way off, but I'm just -- I want

2   to offer you as much clarity as -- start splitting hairs,

3   that's all.  It's not way off.  But I made no invitation.

4   It's not like I made -- how many people have you ever invited

5   to a gas station?

6        Q.    Okay.  And Mr. D'Ambrosio, you also indicated in

7   your deposition, again, that was taken in Georgia and the

8   State was present and Miss Dadowski was present, and I

9   questioned you, that it was clear that your implication was to

10  Mr. Cappelletti that he could follow you to the gas station,

11  isn't that true?

12       A.    No implications are clear to my knowledge.  I

13  never heard of an implication being clear.

14            MR. FLEISCHMAN:  Okay.  Your Honor, may I

15       approach the witness?

16            THE COURT:  Yes, sir.

17  BY MR. FLEISCHMAN:

18       Q.    Okay.  I'm going to be referring to Page 68 and

19  69, beginning at Lines 22 through 25.  On that page and then

20  Page of 69, 1 through 17.  If you just read that please.

21       A.    So you want me to read it so the jury can hear

22  it?

23       Q.    Read it to yourself and let me know when you are

24  done.

25       A.    Give me that again, what am I suppose to read?

20

1    Q.    Yes, starting at Page 68.  Let me show --

2    A.    If you give it to the jury, they can read it too

3  rather than put a spin it on.  Rather than say something here

4  or there.  They can read it themselves.

5    Q.    I understand.  Ready?  68 starting at Lines 22

6  through 25 page 69, Lines 1 through 17.

7    A.    So we won't be in context, correct?  Okay.  Your

8  words, counsel.  Your words, not my words.  So you said

9  question --

10    Q.    Mr. D'Ambrosio, I'm just asking --

11    A.    They're your words.

12    Q.    Let you explain.

13        THE COURT:  Hold on.

14        MR. FLEISCHMAN:  Judge --

15        THE COURT:  Hold on.  Listen to the question.

16    Respond to the question and to the question only.

17        THE WITNESS:  Yes, sir.

18  BY MR. FLEISCHMAN:

19    Q.    I'm just asking you to read it right now and then

20  we'll get into it.

21    A.    Yes, sir.  I read it.

22    Q.    You had a chance to read both pages?

23    A.    Not both pages, no.

24    Q.    Okay.

25    A.    Both pages?

20

1       Q.    Yeah.  Also on Page 69, Lines 1 through 17, if

2  you read those also please.  Okay?

3       A.    Yes.  I read it.

4       Q.    Okay.  Now, reading these questions and answers,

5  it's clear from your words, Mr. D'Ambrosio, that you implied

6  to Mr. Cappelletti that he could follow you to the Amoco,

7  isn't that true?

8       A.    I used the word clear, I do use the word implied.

9       Q.    I'll refer -- I'll start with this page --

10      A.    Start with you putting the words out there.

11  Start with you saying --

12      Q.    Mr. D'Ambrosio, are you claiming that it was

13  typed up improperly?

14      A.    No, no.  I'm -- give it to the jury and let them

15  see it.  Let them see it.  They can read, I'm sure.

16      Q.    I'm going to start at -- referring to Page 68,

17  Line 22.  Question:  --

18          MR. GROSZ:  Judge, I don't mind reading the

19      question and answer, but I think if it's going to be

20      Mr. D'Ambrosio's answer at least let Mr. D'Ambrosio read

21      it so we have Mr. D'Ambrosio's tone of voice, it's not

22      anyone else's tone.  I don't mind reading the questions

23      and answers.

24          MR. FLEISCHMAN:  Judge, I'm entitled to have

25      these answers and questions introduced into evidence.  If

20     1    he wants to explain it --

2           THE COURT:  Overruled.

3           MR. GROSZ:  Well, I am not -- I don't mind them

4    being introduced, but if Mr. Fleischman is reading the

5    answer, he maybe putting tones on it that are not

6    Mr. D'Ambrosio's.  And I don't -- I think that's

7    misleading.  At least let him answer.

8           THE COURT:  Under the rules, you can ask the

9    witness do you recall this question and this answer.  And

10    your response is either yes or no.  Either you recall it

11    or don't recall it.

12           THE WITNESS:  Yes, sir.

13           THE COURT:  Nothing further, yes or no.

14    BY MR. FLEISCHMAN:

15        Q.    Mr. D'Ambrosio, I'll start at Page 68, Line 22

16    through 25.  Do you recall being asked this question and

17    giving this answer.  Question:  "Then you drove to the Amoco

18    Station, did you tell them come on and follow me and I'll talk

19    to you some more at the Amoco Station?"

20           Answer:  "Basically I certainly implied that,

21    yes.  There was a clear implication of that."

22           That's what you said isn't it?

23        A.    I responded to that question.  The answer is yes,

24    I responded to the words that you selected.

25        Q.    And I didn't select your answer though, did I,

20    1    Mr. D'Ambrosio?

2         A.    I don't believe you selected my answer, no.  I

3    have no reason to believe that.

1    4         Q.    Okay.  Now, after the incident happens and you're

5    taken to the hospital, and I already asked you if you recall

6    giving this statement to Detective Needs and you said well,

7    you felt -- you felt a little unsure about it because of your

8    condition at the time, is that right?

9         A.    I didn't use them words.

10         Now, this is again an exemplary example.  I

11    didn't use those words, they're your words.

12         Q.    You're right.  You tell me the words why it was

13    that you're not so sure that you remember giving this

14    statement?

15         A.    Let's make it appropriate.  Let's ask the

16    stenographer to give us the word.

17            MR. FLEISCHMAN:  Judge --

18            THE COURT:  Sustained.

19            MR. FLEISCHMAN:  I'm going to object and just ask

20       that he be directed to answer the question.

21            THE COURT:  All you have to do, Mr. D'Ambrosio,

22       is listen to the question and respond to the question and

23       nothing else.

24         The question calls for a yes or no response.  And

25       I expect you to give a yes or no response.  If you need

1

1    to explain your answer, let me know and we'll give you an

2    opportunity explain.

3        THE WITNESS:  Okay.  Yes, Your Honor.

4  BY MR. FLEISCHMAN:

5        Q.    Okay.  Mr. D'Ambrosio, I'm asking you, you can

6  put it in whatever words obviously that you would like.  You

7  gave this statement on the 14th at the hospital to

8  Detective Needs.  And are you implying that you don't recall

9  providing that statement to him because you were either under

10  the influence of some type of drugs or some other problem?

11        A.    I'm not implying, I'm trying to give you, the

12  jury, the greatest accuracy I can so when I say to you that I

13  just been shot with a shotgun, they've taken me in and out of

14  surgery.  They don't really know if I'm going to live, and

15  someone walks in, for all I know, he could have been the

16  janitor.

17        He's a cop, starts asking me questions.  It's

18  hard for me to recall that well.  I do read the things -- I am

19  not saying there's no mistakes or I didn't say things, I'm

20  saying that I'm trying to offer you the greatest clarity.

21        I think the most fair thing to do is give you all

22  the material rather than put all this spin on it and try to

23  cut it up where you get a certain piece and you really don't

24  get the whole picture.  And you told me use my words.

25        MR. FLEISCHMAN:  I'm going to object to that

1

1       portion of his answer as far as that there's spin put on

2       anything.  It's totally nonresponsive.

3              THE COURT:  Okay.  As to that portion of the

4       response, the Court agrees that it is nonresponsive and

5       motion to strike is granted.

6              Please disregard that portion of the witness'

7       response.

8   BY MR. FLEISCHMAN:

9       Q.   Okay.  Mr. D'Ambrosio, in fact,, isn't it true

10  that you were fully alert and that you understood everything

11  that you were saying to Detective Needs at that point, isn't

12  that true?

13      A.   I was fully alert?

14      Q.   Fully alert and --

15      A.   I was ready for a marathon.

16      Q.   Okay.  Well, sir, Mr. D'Ambrosio, in fact, within

17  your statement -- How many -- Do you know how many pages the

18  statement was that you gave to Detective Needs?

19      A.   Six hundred and thirty-two and one-and-a-half.

20      Q.   Well, it wasn't 600 pages.  It was -- Here, I'll

21  tell you, if I can approach the witness, Your Honor?

22             THE COURT:  Yes.

23  BY MR. FLEISCHMAN:

24      Q.   Okay.  Actually, Mr. D'Ambrosio, it was not 600

25  pages it was 11 pages, if you need to see this.

1

1    A.    Do you -- Okay.

2    Q.    Here take a minute.  It wasn't 600, it was 11.

3    A.    See that, I was wrong.

4    Q.    Okay.  Are you done?

5    A.    You want to look at this, counsel?

6    Q.    Okay.  And in fact, prior to -- prior to going on

7  tape with this detective, he told you, said, look, I am a

8  Deputy Sheriff with the Broward County Sheriff's Office.  He

9  had you raise your right hand, do you recall that in this

10  statement?

11    A.    I have a relative -- that probably did happened.

12  I don't have a vivid imagination.  I wasn't worried about that

13  at the time.

14    Q.    And he swore you in to tell the truth and nothing

15  but the truth.  And you said, yes, I do, isn't that true?

16    A.    I believe so.  I would believe so.

17    Q.    And in fact, Mr. D'Ambrosio, you were so with it,

18  that you were even able to give him specific dates.  In fact,

19  he asked you when was the first time that you met

20  John Cappelletti.  And you remember you told him an exact date

21  in this statement?

22    A.    You got me again. I would have tried to give him

23  as honest answer as I could.  And if -- I probably tried to

24  give him as best -- I'm sure it's not far off, but I would

25  have tried give him the best answer -- the most truthful

1    answer I could.  Especially after having taken the oath.

2         Q.    Okay.  Well, I'll refer to Page 1 of 11.  Do you

3    recall being asked this question and giving this answer:

4    "Okay.  And how long have you known this John Cappelletti?"

5              Answer:  "I've, ah, my first rec -- I first met

6    John Cappelletti I believe it to -- March of 1996."

7         A.    Would you read the first five words of that

8    statement.

9         Q.    Okay.

10        A.    Would you say them again, the first five words

11   give them to me again.

12        Q.    I'm going to.  The whole thing?

13        A.    Okay.  Do what you want to do.

14        Q.    "Okay.  And how long have you know this

15   John Cappelletti?"

16             Answer:  "I've, ah, my first rec -- I first met

17   John Cappelletti I believe it to -- March of 1996."

18        A.    Sounds right to me.  Of, ah, yeah, uhm, I met

19   him, uhm, ah, yeah, I met him.

20        Q.    And then you went onto say, you said you were

21   very clear it was John Cappelletti that had shot you, right,

22   you recall that, right?

23        A.    It makes sense to me, counselor, yes.

24        Q.    Well, did you say that?  You say it makes sense

25   to you.  Do you recall on Page --

2

1        A.    I have no reason to doubt that.  I'm sorry.

2        Q.    She can only take one at a time.

3        A.    Okay.

4        Q.    Third line down, do you recall being asked this

5    question and giving this answer, question:  "Okay.  Uhm, and

6    is this John Cappelletti the same individual that you believe,

7    ah, shoot you?"

8              Answer:  "I'm clear.  Yes, it is."

9        A.    I would probably have made that statement --

10   sounds right to me.  Sounds right to me.

11       Q.    Okay.  And then you recall going on and

12   explaining to Detective Needs about the -- your Georgia

13   situation that you were packing up your clothing and your home

14   to move up to Georgia, do you recall that?

15       A.    I just recall answering questions, you know.  I

16   don't -- I was -- I was not as sharp as I'm sure you

17   understand.  And as far as shoot, you know, I don't know who

18   shoots a gun, the person who aims it or the person that pulls

19   the trigger, who is the shooter.  You got me.  I don't know.

20       Q.    Mr. D'Ambrosio, you also had the ability to

21   recall the exact amount of money that you had given

22   Mr. Cappelletti for his service in helping you move up to

23   Georgia, do you remember that?

24       A.    If I did, that's -- I guess that's good.

25       Q.    Okay.  Well, sir, on Page 2 of 11, 13 lines down,

2    1    do you recall being asked this question by Detective Needs and

2    giving this answer, question:  "Okay.  And you paid him to do

3    this?"

4                    Answer:  "I -- I -- Yes, I gave him $100 cash for

5    service."

6                    You had the ability to recall that, didn't you?

7        A.    Well, if it's there -- I don't recall that -- I

8    mean, I'm saying I don't recall -- I've read what he's reading

9    so I have that recollection of that.  And it makes sense to

10    me.  I am not trying argue with -- if that's -- does that suit

11    you, then okay.

12        Q.    Okay.  What suits me is that you testified today,

13    you said that when you were in the hospital and you met with

14    Detective Needs, that really you don't recall even giving a

15    statement to him and that you're fuzzy because you were under

16    the influence of narcotics, that's what I recall you saying?

17        A.    I said that I think today, right.  All right.  So

18    what's wrong with that?

19        Q.    And in your statement to Detective Needs, you're

20    actually very detailed, aren't you, Mr. D'Ambrosio?  You would

21    have to admit with that?

22        A.    I tried to be detailed, you know.  I mean, if

23    someone's asking a question, I tried to answer it.  There was

24    nobody there stopping me or correcting me, or curtailing it,

25    or putting a spin on it.

MISS DADOWSKI:  Objection, Your Honor.

Nonresponsive.

THE COURT:  Sustained.

BY MR. FLEISCHMAN:

Q.    Okay.  Now, when you are in the hospital -- and again, you have given this statement to Detective Needs, there comes a time where he says to you, look, you know, obviously tell me what happened when you are at the gas station, do you recall that, right?

A.    I don't have a correct -- I recall the -- I recall reading the papers that he has in front of him.  To ask me to recall, you know, Detective Needs and this segment of time that I do the speaking, isn't fair.  I can't recall that kind of thing.

I mean, I recall it, but not like to the point where if you ask me questions like this on a piece of paper, I can't help you.  I can say -- You know, I can try and help you.  I can say sounds right to me, but I don't -- You know, if he starts talking about the price of rice in China, I can't help him.  I don't recall having that conversation.

Q.    Okay.  Well, today, Mr. D'Ambrosio, you testified that after you pull into the gas station, that Mr. Ruiz, he's driving his car and Mr. Cappelletti is the passenger, right, they pulled in.  You've described how they pulled in next to you, right?

3

1          A.    Yes, I have.

2          Q.    And you further also recall that Mr. Cappelletti

3     and you, I guess, have an argument, is that a fair

4     characterization of what happened at the gas pump?

5          A.    That's -- Okay, fair, yes.

6          Q.    Well, you certainly didn't -- I mean, you stood

7     up to Mr. Cappelletti, didn't you?  You weren't happy about

8     him being in your face at that point?

9          A.    I stood up to him?  I was pumping gas, counsel.

10    I was standing up, but when I was pumping gas.

11         Q.    And then you further went onto testify today that

12    Eddie Ruiz at some point gets out of his car, right?

13         A.    Ah-huh.

14         Q.    And you said that he made some statements, are we

15    going to do this, you know, come on, what are we going to do,

16    right?

17         A.    What's with this.  Are we doing this or what,

18    that's right.  What are we doing here.  Are we doing this or,

19    that's right.

20              Not once, but at least -- at least two times, I

21    believe it was more like three, yes, he wanted to know if they

22    were going to go on with whatever it is they already planned

23    to do.  Okay.  Terry Nichols wasn't even in Oklahoma --

24              MR. FLEISCHMAN:  Judge, I'll object.

25              MISS DADOWSKI:  Objection, Your Honor.  Move to

3    1    strike and ask for a mistrial.

2        THE COURT:  Motion to strike is granted.  Please

3    disregard the last response by the witness.  Motion for a

4    mistrial will be denied.

5        MR. FLEISCHMAN:  Whatever happened with some

6    other Defendant has nothing to do with the facts of this

7    case.

8    BY MR. FLEISCHMAN:

9        Q.    Okay.  Now, Mr. D'Ambrosio, after the statements

10   were made, you then testified that, I guess, you continued to

11   have some further conversation with Mr. Cappelletti, right, at

12   the gas station?

13       A.    Some small -- yes.

14       Q.    Okay.  Now, Eddie Ruiz had no weapons in his hand

15   at that point, did he?

16       A.    I didn't see Eddie Ruiz with a weapon in his hand

17   at that point.

18       Q.    He never approached you and threatened you in the

19   gas station, did he?

20       A.    At a personal level he did not approach me or

21   threaten me.

22       Q.    Okay.  You didn't see a shotgun in his hands, did

23   you?

24       A.    No.

25       Q.    Okay.  You didn't see a shotgun in the car, did

3      1    you?

       2        A.    No.

       3        Q.    When they pulled up to your house earlier that

       4    day, before you went to the gas station, you didn't see a

       5    shotgun in Mr. Ruiz's possession, did you?

       6        A.    No, I did not.

       7        Q.    And you didn't see one in the car, did you?

       8        A.    No, I didn't see a shotgun in the car.

       9        Q.    And isn't it true, Mr. D'Ambrosio, that when you

      10    spoke to Detective Needs on April 14th of 1997, when he took

      11    this statement from you, that you told him at the time when

      12    you were in the gas station and Mr. Cappelletti threatened you

      13    that Eddie Ruiz said absolutely nothing, isn't that true?

      14        A.    Give me that again?  No --

      15        Q.    Okay.

      16        A.    I'm sorry, could you repeat the question.

      17        Q.    Okay.  Isn't it true that when you were

      18    interviewed by Detective Needs on April 14th of 1997, after

      19    this incident occurred, Mr. D'Ambrosio, that you told

      20    Detective Needs that at the time when you are fighting with

      21    Mr. Cappelletti, when Mr. Cappelletti threatened you in the

      22    gas station, that Eddie Ruiz said and did nothing, isn't that

      23    true?

      24        A.    No, I don't recall saying that.  If you show me

      25    that I said that.  No, no, I didn't say that.  I told you here

3

1     today what I told you is accurate as best I can be -- as long

2     as I'm a human, I am not a computer, I am not a tape recorder,

3     I am not a video camera.

4          Q.   Okay.  I'm going to be referring to Page 6 of 11

5     of the statement of April 14, 1997.  Let me just get the line.

6               Okay.  Beginning at the 8th Line down which is a

7     question.  Do you recall being asked these questions and

8     giving these answers?

9          A.   No, I want to see it.

10         Q.   I will.

11         A.   I'm sorry, I'm just trying --

12         Q.   There's certain legal things we have to do.

13         A.   I understand.  I apologize.

14         Q.   Okay.  Question:  "And then did he make any

15    threat to you?"

16              Answer:  "Yes."

17              "And what did he say?"

18              "Ultimately he told me, I want you to know that

19    I'm going to kill you.  I'm going to blow your fuckin' head

20    off."

21              Question:  "And did he say this at the gas

22    station?"  "Yes."

23              "And did this guy Eddie, was he there when he

24    said this?"  Answer:  "Yes."

25              Question:  "Okay.  And did Eddie say anything

4

1    when this happened?"

2              Answer:  "At this juncture with -- with that

3    remark, no.  Eddie didn't say anything."

4         A.    Okay.  You got that, at this juncture, no.  At

5    this juncture, okay.  Every second is a juncture.

6         Q.    Okay.  Fine.  Let me move on then.

7         A.    Every second is a juncture.

8         Q.    Okay.  Isn't it true, Mr. D'Ambrosio, that you

9    further went onto tell Detective Needs that at that point, you

10   got in your car and that they followed you out of the gas

11   station, isn't that true?

12             And that no where in your statement on April 14th

13   of 1997, Mr. D'Ambrosio, did you ever tell Detective Needs

14   that Eddie Ruiz made any statements, as you've testified to

15   today in court, did you?  You want to see your statement,

16   Mr. D'Ambrosio?

17        A.    I feel bad -- I mean --

18        Q.    Isn't that true?

19        A.    Give me it again?  Go ahead, go through it again.

20        Q.    In the 11 Page statement that you gave to

21   Detective Needs, Mr. D'Ambrosio, on April 14th of 1997, isn't

22   it true that you never told Detective Needs that Eddie Ruiz

23   made any statements whatsoever in that gas station as you've

24   testified to today in court, isn't that true?

25        A.    Well, I don't know if I was asked that question.

4

1    No --

2          Q.    You want to see your statement, Mr. D'Ambrosio?

3          A.    Gees, I would have sworn I said that a few times

4    here.  Didn't I ask you a few times --

5          Q.    Do you want to read your 11 Pages?

6          A.    I want to -- If you're telling me I said

7    something that I didn't say, of course I want to see it.

8                MR. FLEISCHMAN:  Your Honor, may I approach the

9         witness?

10                THE COURT:  Yes.

11                THE WITNESS:  Can you help me here.  Sid, can you

12         show me what you're talking about rather than -- Don't

13         hand me an alot of pages here, come over here and tell me

14         what you're talking about.

15

16    BY MR. FLEISCHMAN:

17          Q.    Is it there anywhere?

18          A.    You said that to me.

19          Q.    I'll tell you it isn't in here.

20          A.    Did you catch that!  What a razzle-dazzle that

21    was.

22                What's that?  If it ain't here, it ain't here.

23    You got that?  Okay.  If it ain't here, it ain't here.  What

24    was that?

25                MR. FLEISCHMAN:  Judge, I'm --

4

1              THE COURT:  Sir, I don't want to have to tell you

2       this again.  Do you know what the rules are?  Do you,

3       sir?

4              THE WITNESS:  Yes.

5              THE COURT:  I expect you to follow the rules.

6              THE WITNESS:  I'm trying.  Okay.  Thank you.

7    BY MR. FLEISCHMAN:

8       Q.    Now, when you pull out onto I-95, you're in this

9    car that we have photographs of, right, this is a big -- what

10   do they call it, an Impala, Caprice Impala?

11      A.    It's a Chevy Caprice Impala, 430 pounds, big car.

12      Q.    It's a car that a lot of police use?

13      A.    It's a cab, taxi cab.

14      Q.    What kind of engine is in that car?

15      A.    V8.

16      Q.    It's a fast car, isn't it?

17      A.    I don't believe so, no.

18      Q.    You don't think that's a fast car?

19      A.    No.  It's a -- No, it's not a fast car.

20      Q.    And do you believe though that it's a powerful

21   car?

22      A.    It's powerful.  It's a powerful car.  It's not a

23   small car, it's not a weak car.  It's a powerful car.

24      Q.    Okay.  And Mr. Ruiz's vehicle was a -- would you

25   consider to be a compact vehicle, it was a Honda, right?

4

1          A.     Would I consider it to be a small compact

2    vehicle?  Yes.

3          Q.     And your car is not a stick shift either, it's an

4    automatic?

5          A.     That's true.

6          Q.     Okay.  Now, is it your position, Mr. D'Ambrosio,

7    that at the time that you got on I-95 in your vehicle, that

8    you were frightened of what had happened between yourself and

9    Mr. Cappelletti at the gas station?

10          A.     That's true, yes.

11          Q.     Okay.  You had some concern, is that a way to

12    put --

13          A.     Are we back to the word fair here.  No, that's

14    not fair.  No, I was way more concerned.  I was frightened,

15    frightened is the appropriate word.

16          Q.     And you've already testified that even before

17    getting on I-95, that you had the ability, I mean, you saw

18    Mr. Ruiz's vehicle, according to your testimony, behind you,

19    is that true?

20          A.     Yes.

21          Q.     Okay.  And you were able to do that in your rear

22    view mirror, is that right?

23          A.     Yes.

24          Q.     Or in your side mirrors?

25          A.     Yes.

Q.    Okay.  Now, during the time that you're

observing, if you are, you have the ability to see Mr. Ruiz in

your veer view mirror?

A.    On Sheridan Street.

Q.    Sure.

A.    Can I physically see him?

Q.    Yes.

A.    No, I can't physically -- I don't know Eddie

exactly at that juncture, the operative word juncture.  No, I

don't know at that juncture that it's Eddie.

Q.    Okay.  When you get on 95 -- the traffic at that

time of the day on that particular day was heavy, wasn't it?

A.    I would call it heavy, yes.

Q.    Can you describe for the jury please what heavy

is?

A.    Heavy is a lot of traffic, but moving, but

moving.  Little less than let's say 95 at 4:30 to 5:00

o'clock, a little less than that, but it was a lot of traffic.

It was a Sunday there are a lot of people

traveling people to see their families or families going to

the mall.  Not a lot of road where you can do just whatever

you want to do.

Q.    When do you first observe the white Honda in the

rear view mirror or in your side mirrors?

A.    When I look?

5     1       Q.    Okay.  And did you speed up?

2       A.    I moved -- I left the gas station wanting to

3  leave, you know, relatively fast, but not wanting to engage or

4  escalate anything.  I didn't -- Did I speed up, I'm sorry,

5  when I seen the white Honda?

6       Q.    Did you speed up when you saw the white car?

7       A.    I don't know if I sped up right at that point.  I

8  tried to go -- get -- get out of there within reason.  I

9  wasn't -- I was not endangering anyone's lives.

10      Q.    And you testified again today, I guess, Mr. Ruiz

11  pulled up to you on several occasions, is that right?

12      A.    Not on Sheridan Street.

13      Q.    No, not on Sheridan Street, on I-95?

14      A.    Not on Sheridan Street, on I-95, right.  He

15  wasn't able to get to me all the way up to where I was at on

16  Sheridan -- in that distance.

17      Q.    You didn't pull off at any exits, did you, you

18  continued to drive on 95, is that right?

19      A.    Well, I drove on 95 -- I don't know if it was --

20  no, that's the first exit.  No, I drove on 95.

21      Q.    Well, I'm saying, I mean, you're in fear, you say

22  that Mr. Ruiz is driving in an erratic, I think was the word

23  that you used, fashion in your belief to catch up with you, is

24  that right?

25      A.    No, erratic, aggressive and very dangerous

5

1   pursuit.

2           Q.    And you're in a big Caprice Impala.  Did you pull

3   off 95?  Did you make any attempt to pull off 95 to get away

4   from this car that was pursuing you?

5           A.    How to get away?  No way.

6           Q.    I'm asking you, what are you asking them

7   questions for?

8           A.    Because it's a ludicrous proposition.

9           Q.    Did you pull up off -- attempt to pull off 95?

10          A.    There's wheels on that car.  You didn't see

11  wheels?  At least makes sense.  You can't drive -- I'm going

12  to pull off here and that's it.

13          Q.    Did you attempt to pull off 95 in your car at

14  all?

15          A.    No, I did not.

16          Q.    Did there come a point in time that you were able

17  to look in any mirrors in your vehicle and see Eddie Ruiz?

18          A.    Yes.

19          Q.    He had no weapon in his hand, did he?

20          A.    I didn't see a weapon.

21          Q.    Okay.  How many fingers does he have on each

22  hand, do you have any idea?

23          A.    I can't tell you.  I would imagine as many as God

24  gave him.  As many as God decided to give him.

25          Q.    Well, you know certainly that he has -- he has a

5      1    problem with his hand, don't you, Mr. D'Ambrosio?

2         A.   No, I don't.  I would assume that he has what God

3    gave him.  Certainly not enough to take others away.

4         Q.   You never saw a weapon in Mr. Ruiz's hand at all,

5    did you?

6         A.   That's true, I never saw weapon in Ruiz's hand at

7    all.

8         Q.   And Mr. Mr. Ruiz was driving the entire time

9    while you were on I-95, is that true?

10        A.   To the best of my knowledge, yes.  I have no

11   reason to believe that somebody else could have grabbed the

12   wheel as was suggested by someone at deposition.  They come up

13   with outrageous proposition.

14        MISS DADOWSKI:  Objection, Your Honor,

15       nonresponsive.  Move to strike.

16        THE COURT:  Sustained.  Please disregard the last

17       response.

18  BY MR. FLEISCHMAN:

19        Q.   Mr. Ruiz was driving the entire time on I-95?

20        A.   Yes, he was driving the entire time.

21        Q.   It's your position, Mr. D'Ambrosio, is it is not,

22   that Mr. Cappelletti is the person that shot you, isn't that

23   true?

24        A.   If shot means I'm the gun, absolutely.  If it

25   means pull the trigger, it's my belief, yes, I wouldn't think

1    that Eddie would have pullewd the trigger, not if he's driving

2    the car.  But again, this may draw an objection, but it was

3    suggested not by my --

4              MR. FLEISCHMAN:  Okay.  Well, Judge, I'm --

5              THE WITNESS:  There you go.  Okay, I stopped.

6              THE COURT:  Sir, listen to the question.

7              THE WITNESS:  Okay.  I stopped.

8    BY MR. FLEISCHMAN:

9         Q.    And Mr. Ruiz never swerved his vehicle into your

10   car, did he?

11        A.    He swerved it quite a bit, but not into making it

12   hit the car, no.  He didn't hit any cars that I seen.  I mean,

13   there was a commotion, a lot of people, you know, break lights

14   and, you know.

15        Q.    Okay.

16        A.    Flashing all kinds --

17        Q.    What you're saying, he's swerving in and out of

18   all this heavy traffic on I-95?

19        A.    That's correct, that's what I'm saying.

20        Q.    Pulls up to you?

21        A.    That's absolutely without a doubt saying, that's

22   right.

23        Q.    Okay.  Now, Mr. D'Ambrosio, let me start with

24   this, in July of '94 you were placed on felony probation for a

25   count of stalking and count of resisting arrest without

6      1    violence, you were given three years probation?

2         A.   I think we've gone over that, yes.

3         Q.   Well --

4         THE COURT:  Sir, he didn't ask you whether or not

5    you had gone over it.  Just answer the question, okay.

6         THE WITNESS:  Yes, sir.

7         THE COURT:  It's the last time that I'm going to

8    tell you.  Just answer the question.

9         THE WITNESS:  Yes, Your Honor.  Yes, that's

10    correct.

11  BY MR. FLEISCHMAN:

12         Q.   Okay.  Okay.  And in fact, during the time that

13  this case has been pending, you were on probation, felony

14  probation, isn't that true?

15         A.   In the time that this -- I am not on probation.

16         Q.   No, you're not on probation now.  Right, we'll

17  get into that.

18         A.   Other --

19         Q.   My point is though, you were on a felony

20  probation, right?

21         A.   I was on probation, yes.

22         Q.   And then you were arrested for a driving under

23  the influence charge in Broward County and you said the State

24  dismissed the charges, is that right?

25         A.   That's correct.

6

1          Q.   Okay.  And in August of; 96, Mr. D'Ambrosio, your

2     probation was violated based on that DUI and you were placed

3     on another term of felony probation, isn't that true?

4          A.   I -- Give me that again?  Go ahead, go over that?

5          Q.   Sure, I'll go over it again because I don't want

6     there to be any confusion.

7          A.   Good.

8          Q.   In August of 1996, your probation was violated

9     and you were placed on another new term of probation, right,

10    two years probation?

11         A.   I was placed on a term that was terminated.

12         Q.   I'll get to that in a minute.  I understand that.

13         A.   Well, you're asking me -- I'm a laymen here.

14    You're asking me technical questions --

15         Q.   Would your disposition sheet, would that help you

16    refresh your recollection as to what I'm talking about?  And I

17    have it here and you can see what it is I'm talking about.

18    That way there's no misunderstanding?

19         A.   I would not like misunderstandings.

20         MR. FLEISCHMAN:  Judge, may I approach the

21     witness?

22         THE COURT:  Sure.

23         THE WITNESS:  Well, this is not the disposition

24     sheet, but this is not unusual to see this from an

25     attorney.  This is not the disposition sheet.

BY MR. FLEISCHMAN:

Q.    This is not the disposition sheet of August 15, 1996, Mr. D'Ambrosio?

A.    Not to my knowledge.  You were referring to a violation of probation.  This has nothing to do with violation of probation.

Q.    What does that say on there, Mr. D'Ambrosio?

A.    It says the Circuit County Court in and for Broward County, Florida.

Q.    Right.  Read on.

A.    Failure to pay the fine by the below date, may result in a warrant for your arrest.

Q.    Okay.  Read on?

A.    And all the suspension of your driver's license and delinquency fees imposed.

Q.    Okay.  Well, you're just reading one section.

A.    What do you -- Show me what you want me to read.

Q.    Here, let me.  Here, I'll help you.  It says charges --

MR. GROSZ:  Sid, can I see it for a second?

MR. FLEISCHMAN:  Sure, of course.

BY MR. FLEISCHMAN:

Q.    So it's clear, Mr. D'Ambrosio, it says charges, aggravated stalking, Defendant admits material violation, probation revoked.

6    1        A.    I'm sorry, what was that last part, I didn't hear

2    that?

3        Q.    I'm sorry, it says probation revoked.

4        A.    No, before that you said something else.

5        Q.    Sir, it says Defendant.

6        A.    Admits material violation.

7        Q.    Material violation.

8        A.    Did you say material violation?  Is that what you

9    said that the Defendant admitted?

10        Q.    Right.

11        A.    A material violation, that's right.  I didn't dot

12    my I's and cross my T's.

13        Q.    Okay.  And then it says probation revoked.  So

14    we're clear, this is the disposition sheet from your probation

15    revocation?

16        A.    I am not an attorney.  It says probation -- if it

17    says probation revoked, I agree it was revoked.  And I agree

18    that it was ultimately totally revoked.

19        Q.    Okay.  Then in July of 1997, you appeared before

7    20    another judge and you filed a motion to terminate your

21    probation, right, you remember that?

22        A.    Yes, I remember that.

23        Q.    Were you present in court on that date?

24        A.    I was present in court, yes.

25        Q.    Okay.  And there was a prosecutor present also.

7      1    And this is in Broward County, right?

        2        A.    Yes.

        3        Q.    Okay.  And you had an attorney at that time,

        4    right, to represent you?

        5        A.    I had an attorney take the motion to court.

        6    That's the only --

        7        Q.    All right.  There's nothing wrong with that.  I'm

        8    saying you had an attorney?

        9        A.    It has nothing to do with this.  The conversation

     10    is wrong, but if we want to talk about that, let's talk about

     11    it.  I don't want to talk about this case either if I were in

     12    your shoes.

     13            MR. FLEISCHMAN:  Judge, I'm going to --

     14            THE COURT:  Folks, I have to ask you to step back

     15       in the juryroom for a minute.  Don't discuss the facts of

     16       the case.

     17            (Thereupon, the following proceedings were

     18       had outside the presence of the jury:)

     19            THE COURT:  Mr. D'Ambrosio, I don't think it's

     20       possible for you to just answer a question without adding

     21       your own comments that have nothing to do with the

     22       question that was asked.

     23            Sir, think about what you're doing.

     24            THE WITNESS:  I've been through a lot,

     25       Your Honor.

7    1          THE COURT:  I understand that.  Believe me, I

2    understand you have been through a lot.  But --

3          THE WITNESS:  These -- if the Defendant --

4          THE COURT:  The Defendants have a right to a fair

5    trial.  When one of the defense lawyers asks you a

6    question, just respond to the question.  Don't add your

7    spin to it and say if I were your in your shoes, you

8    know, I would feel this way.  He didn't ask you how you

9    would feel if he was -- if you were in his shoes.  Do you

10   understand that?  He didn't ask you that.  So why are you

11   telling him that?

12         THE WITNESS:  Because characterizes to the jury

13   that -- and sets them on some -- in some other space and

14   time.  He's not even talking about the correct year, he's

15   in another year.

16         THE COURT:  That's his business.

17         THE WITNESS:  I understand that.

18         THE COURT:  He's representing his client as best

19   he can.  And you're not to comment on the manner in which

20   he is representing his client in front of the jury, do

21   you understand that?

22         THE WITNESS:  Yes, Your Honor.

23         THE COURT:  We could be here until midnight at

24   the rate we're going.  Just listen to the question and

25   respond to the question and nothing else.

7   1        None of these other comments about your opinion

2        of the question or the questioner, do you understand

3        that?  Do you?

4        THE WITNESS:  I understand it, Your Honor, but I

5        don't want the -- I mean, it's -- the questions are

6        not -- sometimes they are really -- well, you see --

7        THE COURT:  The State of Florida has a fine

8        lawyer right there, Mr. Grosz.  You met Mr. Grosz?

9        THE WITNESS:  Yes, an outstanding lawyer.

10        THE COURT:  And if he feels an objection should

11        be made, I can assure you, he will voice an objection.

12        Chances are, he is saving his comments for final

13        argument, okay?

14        THE WITNESS: Yes, Your Honor.

15        THE COURT:  All right.  Okay?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  Don't feel like you have to advocate

18        this case.  Your role in this case is merely to respond

19        to questions truthfully, do you understand that?

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  I really do not want to see a

22        mistrial at this stage, but at the rate you're going,

23        things are starting to accumulate.

24        So I'm warning you, sir, just listen to the

25        question and respond to the question only.

7    1          MISS DADOWSKI:  Judge, I would like to renew my

2    motion for a mistrial I've made.  I think -- I guess the

3    Court doesn't feel the cumulative affect is prejudicial.

4          However, I would just point out the times the

5    comments that he made regarding my client,

6    John Cappelletti, the comment that he made about

7    Terry Nichols wasn't even in Oklahoma, also the answer

8    attacking Mr. Fleischman's questions and actually

9    Mr. Fleischman, and asking the jurors to put themselves

10   in Mr. D'Ambrosio's position is very prejudicial.  And I

11   would renew my motion for a mistrial.

12         THE COURT:  Okay.  That will be denied at this

13   time.

14         MR. FLEISCHMAN:  Judge, I have just another

15   matter.  It's unrelated to this case.  I don't know if we

16   need to be on the record.  If I can just tell you.

17         Judge, my secretary -- Judge Finer's office just

18   paged me.  I have two cases set for trial.  They need me

19   to call them back right away to tell them if I am in

20   trial.

21         THE COURT:  Okay.  Why don't you call now.

22         MR. GROSZ:  Judge, with respect to the line of

23   questioning involving the probation and motions that were

24   filed, at this point, I just want to make an objection to

25   the questions being possed any further.

1        I asked limited questions on direct and I don't

2   think that the defense can open the door during their

3   cross examination, you know, by way of asking a question

4   and allowing themselves to just open their own door to

5   pursuing any further.  I don't know what the relevance is

6   of asking questions about what motions for termination

7   have been filed.

8        THE COURT:  Feel free to object.

9        MR. GROSZ:  I'm making my objection now.

10       THE COURT:  I am not going to preempt or deny

11  Mr. Fleischman or Miss Dadowski the right to go into this

12  area.  But depending on what the question is, if you feel

13  it's objectionable, you object and I'll rule on it, but

14  to preemptively do it, I will not.

15       MISS DADOWSKI:  Just to make things clear, I want

16  to point out in the copy of a termination for probation

17  his attorney filed on the felony case, he indicates right

18  in the motion that one of the reasons to terminate is the

19  fact that he was a victim of a shooting incident.

20       And therefore, I think it's clearly relevant

21  because that is part of the basis that the State of

22  Florida agreed to terminate his probation based on those

23  grounds.

24       So I think it's clearly proper for us to go into

25  that since his attorney at the time put that allegation

in the motion.

        MR. GROSZ:  Unless there's evidence that the
State agreed to negotiate that.  Certainly if the State
agrees to that, to intercede on Mr. D'Ambrosio's behalf,
I would agree that that's admissible.  But there's no
evidence -- I haven't seen any evidence that that's --

        THE COURT:  He can be asked whether or not the
State agreed to this.

        MR. GROSZ:  Sure.

        THE COURT:  But if he says no, you're kind of
stuck with it unless you can produce evidence otherwise.

        MISS DADOWSKI:  Certainly have the proof that his
probation was terminated.

        MR. GROSZ:  Then we're going to get misleading
because there's no proof that the State interceded on his
behalf.  And I don't want the jury to be left with that
misconception.

        His probation terminated, that's fine.  That's
one thing.  But to rely on a motion filed by the
Defendant with no other evidence indicating the State
interceded or even agreed to this, why should the State
be prejudiced by the jury being misled in that area?

        MR. FLEISCHMAN:  But Judge, part of it is that
we're allowed to go in on cross examination any motives
that the witness may have.  And obviously the fact that

8    1      it was included as part of a motion to terminate his

2      probation that was presented to the court on his behalf

3      that indicated that he was the victim of a gunshot -- it

4      says additionally, the victim was a victim ofa gunshot to

5      his neck several months ago while driving his vehicle on

6      I-95.  There's presently two individuals in custody

7      charged with attempted murder in custody.

8            Certainly it was made part of a motion that was

9      presented in court while this case was pending.  And I

10     think we're certainly allowed to imply and infer to the

11     jury that it maybe a motive on his part why he wanted

12     that presented.

13           I think the case law supports when there's a

14     statement witness and there's evidence such as this that

15     could -- a jury could possible infer motive on his part

16     to testify, you know, behalf of the State, has given

17     statements to the police that we're entitled to go into

18     that.  There's wider latitude.

19           THE COURT:  I think you can ask him if you filed

20     a motion to terminate.  And if one of the grounds that he

21     alleged was that he was a victim in this case, and you

22     can ask him, did the State agree to this.  And, you know,

23     apparently according to Mr. Grosz, the State did not

24     agree to it so his answer is no.

25           MR. FLEISCHMAN:  Well, they didn't object.  I

mean, I have the order here.

THE COURT:  Well --

MISS DADOWSKI:  I don't think Mr. Grosz knows the answer to that question.

MR. GROSZ:  I don't and that's part of the problem.  Is that what you're doing, is speculating.  Because no one -- You know, I don't know what the prosecutor said and certainly the order doesn't -- I mean, someone could tell me the prosecutor said this, fine, let it in.  I mean, I am not trying to be obstructious, but at least put the evidence there.

MR. FLEISCHMAN:  The evidence is that, as part of a motion on his behalf whether or not the State agreed or not, I don't feel is relevant.  But the fact is a witness for the State made it a part of their motion to get off felony probation, that he was a victim on a case, and I think that's something that goes to motive, bias and it's something that that a jury may consider.

MISS DADOWSKI:  I agree.

THE COURT:  I think you're entitled to bring it out.

Okay.  Bring in the jury please.

(Thereupon, the following proceedings were had within the presence of the jury:)

THE COURT:  Okay.  Mr. Fleischman, you may

8    1       proceed.

2              MR. FLEISCHMAN:  Thank you, Judge.

9    3    BY MR. FLEISCHMAN:

4        Q.    Okay.  Mr. D'Ambrosio, on July 23rd of 1997, you

5    appeared before a judge here in Broward County on a motion to

6    terminate your felony probation, is that true?

7        A.    Yes.

8        Q.    Okay.  And were you, again, we went through this,

9    but you were represented by an attorney and the State was also

10    present at that time, is that right?

11        A.    Yes.

12        Q.    Okay.  And isn't it true, Mr. D'Ambrosio, that a

13    motion, an actual written motion, was filed on your behalf by

14    your attorney in an attempt obviously to pursuade a court to

15    terminate your probation, isn't that true?

16        A.    I don't know if it was written.

17        Q.    Well --

18        A.    I don't know if it was a written motion.  I think

19    it was just a verbal motion, but maybe it was written -- I

20    didn't make the motion.

21        Q.    Okay.  Well, would you like me to show you a

22    written motion, if that would refresh your recollection?

23    Again, I don't want to be misleading.

24        A.    Here we go again.  I didn't make a motion.  If my

25    attorney made a motion -- I didn't -- Christopher D'Ambrosio

9

1    did not make a motion.  I'm sorry, but you -- you walked right

2    into it.

3                    MISS DADOWSKI:  Objection, Your Honor.

4                    THE COURT:  Sustained.  Sir, no comments

5        regarding the question, do you understand that?

6                    THE WITNESS:  Yes, Your Honor.

7    BY MR. FLEISCHMAN:

8        Q.    Mr. D'Ambrosio, do you want me to show you the

9    written motion that was filed on your behalf?  Would that

10   refresh your recollection that shows your name and your case

11   number and the judge's name?  You want to see that so there's

12   nothing misleading?

13       A.    I didn't file myself personally a motion.  I

14   don't know if you want -- Yes, if you want to show me it, show

15   it to me.  You just --

16       Q.    You want to see it?  I have it?

17                   THE COURT:  That's irrelevant.  Just show it to

18       him.  Let him see if he's seen it, recalls it.

19                   THE WITNESS:  I see this motion.  I don't recall

20       it.  I didn't make it.

21   BY MR. FLEISCHMAN:

22       Q.    Okay.  Is that your name on there?

23       A.    This is my name, Christopher D'Ambrosio.

24       Q.    And your case number, Mr. D'Ambrosio?

25       A.    I guess it's my case number.

9     1          Q.    And your judge, Judge Gold?

      2          A.    Yes.  I -- Yes, Judge Gold.

      3          Q.    And within that motion, Mr. D'Ambrosio, isn't it

      4     true that you made it a point to make the court aware of the

      5     fact that you were a victim on a case where two people were

      6     charged with attempted first degree murder on you?

      7          A.    No, that is not true.

      8          Q.    So you're saying then it's not in this motion, is

      9     that what you're saying?

     10          A.    No, that's not what I said.

     11          Q.    Well, it's in this motion, isn't it, that was

     12     filed on your behalf, Mr. D'Ambrosio?

     13          A.    I did not say that.  I did not make that motion.

     14     And that was not the position that I went to court with that I

     15     am aware of.

     16                Now, my attorney may have come up with a hundred

     17     ideas, I don't know, but that's not what I was aware of.  I

     18     did not, Christopher D'Ambrosio, the name on that did not.  It

     19     would be a lot easier for you to give them that, but I did

     20     not.

     21          Q.    Jonathan Freedman did that on your behalf?

     22          A.    Put him on your witness list.

     23          Q.    Okay.  And your probation, in fact, on that day

     24     was terminated, that's it, you're off felony probation on

     25     July 23rd of 1997, right?

9

1          A.    Yes.

2          Q.    Okay.  Or rather, again just

3     order was entered that day and it was to t

4     August 14th of 1997, right?

5          A.    That's what I am aware of.  Yes,

6     judge saying that, yes.

7               MR. FLEISCHMAN:  Okay.  Judge, that's all I have.

8               THE COURT:  All right.  Miss Dadowski.

9                      CROSS EXAMINATION

10    BY MISS DADOWSKI:

11         Q.    Now, Mr. D'Ambrosio, at that time in April 13th

12    of 1997, you lived in a gated community?

13         A.    Yes.

14         Q.    And in order to get into your gated community,

15    you have to have a guard let you in?

16         A.    That's one entrance, yes.

17         Q.    There's not -- there's not just a gate that

18    lifts, there's actually a guard there that announces people

19    that are coming into the community, is that correct?

20         A.    At one gate, yes.

21         Q.    Now, you said that you met Mr. Cappelletti

22    whenever he lived next door to your now wife, is that correct?

23         A.    Yes.

24         Q.    At the time she was just your girlfriend?

25         A.    Correct.

9

10

1      Q.    And basically your opinion of Mr. Cappelletti is

2  that he's a low life, is that correct?

3      A.    I don't make opinions of other people like that.

4      Q.    Now, do you recall giving a deposition to me in

5  Atlanta, Georgia on August 25th of 1997?

6      A.    Within reason I recall it.

7      Q.    All right.  Let me direct you to Page 70,

8  Line 14.  I just ask you if that refreshes your memory?

9      A.    Which part, where I said if he didn't shoot me.

10      Q.    No, where you say this is low life guy?

11      A.    If I say, if he didn't shot me.

12      Q.    Okay.  You called him a low life, is that

13  correct?

14      A.    In context it's not correct.

15      Q.    Okay.  I'm going to also rerefer you to Page 28,

16  Line 19.

17          MR. GROSZ:  Judge, I would just ask that the

18      witness be entitled to complete the statement in full.  I

19      mean, this is one line drawn out of a full paragraph.

20          THE COURT:  Sustained.

21  BY MISS DADOWSKI:

22      Q.    I will refer to Page 48, Lines 14 through 20.  Go

23  ahead and read --

24          MR. GROSZ:  I would ask to finish the first one.

25          THE COURT:  The prior page he objected, the

10

1        doctrine of completeness.  Give the witness a chance to

2        explain the context in which he used that phrase.

3              MISS DADOWSKI:  Your Honor, I don't know what

4        page it was.

5              MR. GROSZ:  Page 70.

6              THE WITNESS:  "This is a low life guy, that's how

7        he conducted himself.  Would I say that if he didn't

8        shoot me?  Probably not."

9   BY MISS DADOWSKI:

10             Q.    Okay.  Now, let's go to Page 48, Lines 14 through

11  20.  And why don't you tell me --

12             A.    Page 48?

13             Q.    Actually you can start where your answer is.

14             A.    Can I read it before --

15             Q.    Sure.

16             A.    Is that all right with you and the Court?  All

17  right.

18             Q.    Now, did you call him a low life in Line 11

19  through 20 somewhere in there where you say, but he's a low

20  life?  What's the question that was asked to you?

21             A.    Woe, woe, excuse me, time out, slow down, slow

22  down.  You approached first.  Let me read it.

23             Q.    You gave it back to me.  I assumed you read it.

24             A.    Well, when you say low life, let me read it.

25             Q.    You said where he's a low life?

10

1          A.    You take it out of context, give it to the jury.

2          Q.    My question to you --

3          A.    Give it to the jury.  Let them see it.

4                THE COURT:  Sir, she's asking the question.  You

5     have to respond.  I don't want to tell you again.

6                THE WITNESS:  Yes, sir.  I did say a low life out

7     of context.  In context, I did not say a low life, okay.

8     BY MISS DADOWSKI:

9          Q.    I'll read your answer.

10         A.    Read it.

11         Q.    Here's my question.  I'll go back even one

12    question before you.  "I was intending on moving for

13    sometime."  That's the end of the answer that you give on

14    Page 48, Line 8.

15               My question is then:  "Moving to Georgia?"

16               Your answer:  "Not necessarily.  Wherever she

17    wanted to move.  I was tired of the weather."

18         A.    Can I read it instead of you?  Can I read it so I

19    recall?

20               THE COURT:  Sir, she's going to ask the question

21    the way she wants to ask.

22               THE WITNESS:  Yes, Your Honor, I understand.  But

23    I want to speak to the Court and simply say --

24               THE COURT:  No, sir, you cannot speak right now,

25    sir.  You merely answer the question.

10    1            THE WITNESS:  Yes, sir.

2            THE COURT:  We have a way of doing things in

3    court and it's not predicated on the way you want to do

4    things.

5            THE WITNESS:  I respect that.  I understand.  I

6    apologize.

7  BY MISS DADOWSKI:

8      Q.    So the last part of your answer prior to me

9  asking the question, "I was intending on moving for sometime."

10          And I asked, "Moving to Georgia?"

11          Your answer, "Not necessarily.  Wherever she

12  wanted to move.  I was tired of the weather, tired of the

13  heat.

14          And so she really, you know, she felt that

15  Loraine was a very good friend.  She did a lot of things

16  apparently for Loraine, a lot of things for them.  So she

17  wanted me to be good to John, or not good necessarily, but if

18  there was anything, like he painted things things on occasion,

19  but he's a low life."

20          Now, I didn't ask you anything about that, did I?

21          MR. GROSZ:  Judge, now I would ask that the full,

22    again, the full paragraph be complete.

23          THE COURT:  Okay.  Complete the paragraph.

24  BY MISS DADOWSKI:

25      Q.    I mean, he didn't do nothing.  He's always

10   1   looking to play.  It's like as if -- you're an attorney.  If

2   you're out playing with somebody who's got nothing to lose,

3   they're willing to do anything, right?"

4   A.   Thank you.  I said that.  That's right.

5   Q.   "You lose your head because you've got something

6   to lose.  Well, that's how John was, like a kid, you know.

7   And so I wasn't effective, he didn't get things done.  I get

8   things done.

9   So the point I'm going to make is, so I hired

10   him -- not hired him, but like he would do things."

11   A.   That's correct, I said that.  Actions speak

12   louder than words.  And --

13   THE COURT:  Sir, the answer is yes.  Nothing

14   else.

15   THE WITNESS:  Yes.

16   MISS DADOWSKI:  Your Honor, I'm going to object

17   again.

18   THE COURT:  Sustained.

19   BY MISS DADOWSKI:

20   Q.   But you never really liked John Cappelletti, is

21   that right?

22   A.   No, I liked John Cappelletti.  I liked

11   23   John Cappelletti.  Great guy to play with, but dangerous.

24   MISS DADOWSKI:  Objection, Your Honor.

25   THE WITNESS:  You asked me the question.

11    1          MISS DADOWSKI:  I am renewing my motion.

      2          THE COURT:  Folks, please step back in the

      3    juryroom.  My apologies to you.

      4          (Thereupon, the following proceedings were

      5    had outside the presence of the jury:)

      6          THE COURT:  I'm getting real close to granting a

      7    mistrial in this case, which means we have to start all

      8    over, sir, do you understand that?

      9          THE WITNESS:  Unfortunately yes, Your Honor.  But

      10    I'm trying to -- I am not trying anything.  I'm answering

      11    the questions.

      12          THE COURT:  No, you're not.  No, you're not.

      13    You're embellishing, you're putting your own extra spin

      14    on things.

      15          THE WITNESS:  Did you hear that I -- that I

      16    didn't like this man, is that what you heard?  Did you

      17    hear that while we were here?  I tell you I liked the man

      18    and I'll give you one better if you want them walking --

      19          THE COURT:  We're going to recess for the evening

      20    and we'll come back and finish this witness tomorrow.

      21          Bring in the jury.

      22          (Thereupon, the following proceedings were

      23    had within the presence of the jury:)

      24          THE COURT:  Folks, it's getting rather late in

      25    the day.  I had hoped that we could complete the

11

1    testimony of Mr. D'Ambrosio today, but I think we've

2    gotten to the point now where I think we would all, and

3    the Defendants, all parties, would be best served if we

4    recess for the evening and come back tomorrow morning at

5    9:30.    I do think that we will be able to start pretty

6    close to 9:30 tomorrow morning.

7         Remember, do not discuss the facts of the case.

8    Do not form any fixed opinions on the merits of the case

9    until the case is submitted to you for your

10   deliberations.

11        MISS DADOWSKI:  Your Honor, may I be heard real

12   quick before we do that.

13        (Thereupon, the following proceedings were

14   had side bar; outside the presence of the

15   jury:)

16        MISS DADOWSKI:  Your Honor, when I just walked

17   over to my client, he wanted me to object.  He wants to

18   continue tonight.

19        THE COURT:  Okay.  That will be overruled.

20        (Thereupon, the following proceedings were

21   had within the presence of the jury:)

22        THE COURT:  All right.  Folks, we'll see you 9:30

23   tomorrow morning.  Have a nice evening.

24        (Thereupon, the following proceedings were

25   had outside the presence of the jury:)

11

1          THE COURT:  Mr. D'Ambrosio, you're not to discuss

2     your case with anyone between the time -- between now and

3     the presumption of your testimony at 9:30 tomorrow

4     morning, do you understand that?

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Okay.  See you at 9:30.  Anything

7     further?

8          MR. FLEISCHMAN:  No, Your Honor.

9          (Thereupon, the Court adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| IN THE DISSTRICT COURT OF APPEAL - FOURTH DISTRICT WEST PALM BEACH, FLORIDA | CLOCK IN |
|---|---|

| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION | |

| JOHN CAPELLETTI    Appellant Vs. STATE OF FLORIDA,    Appellee | CASE NUMBER 97-7797CF10A APPEAL NUMBER 98-879 |

VOLUME    IV    PAGES    354    TO    539

4.0798

RICHARD L. JORANDBY, 15TH P.D.
Attorney for Appellant


GEORGINA JIMENEZ OROSA
Assistant Attorney General

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

MAY 14 1998

CRIMINAL DIVISION
WEST PALM BEACH

1                    IN THE CIRCUIT COURT OF THE
                   SEVENTEENTH JUDICIAL CIRCUIT,
2              IN AND FOR BROWARD COUNTY, FLORIDA

3                                   COPY

4    STATE OF FLORIDA,              )
                                    )
5          vs.                      ) Case No. 97-7797 CFA
                                    )
6    JOHN W. CAPPELLETTI,           )
                                    )
7          Defendant               )
     _____X

8

9                                   Ft. Lauderdale, Florida
                                    January 7, 1998
10                                  9:30 o'clock a.m.

11

12   APPEARANCES:

13          JUSTIN GROSZ, Esquire
            Assistant State Attorney
14          Appearing on behalf of the State of Florida.

15          RENEE TERESA DADOWSKI, Esquire
            Assistant Public Defender
16          Appearing on behalf of the Defendant.

17                    - - - - - - -

18          The above-styled cause came on for hearing

19   before the Honorable JAMES I. COHN, presiding Judge, at

20   the Broward County Courthouse, Fort Lauderdale, Broward

21   County, Florida, on the 7th day of January, 1998

22   commencing at 9:30 o'clock a.m.

23

24                         VOLUME IV

25                      Pages 354 - 539

I-N-D-E-X


<u>DATE</u>                    <u>PROCEEDINGS</u>                    <u>PAGE</u>

01/07/98              Jury Trial              354 – 539


| <u>State</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-Direct</u> | <u>Re-Cross</u> |
|---|---|---|---|---|
| Chris D'Ambrosio | | 360 | 393 | |
| Corporal Cruz | 397 | 400 | | |
| Carl Haemmerle | 401 | 423<br>429 | 433 | 435<br>436 |


E-X-H-I-B-I-T-S

| <u>State</u> | <u>Page</u> |
|---|---|
| No. 20 | 395 |
| No. 21 | 407 |
| No. 22 | 409 |

1    (Thereupon, the following proceedings were had:)

2    MR. FLEISCHMAN:  My brother's set down in front

3    of General Marks.  There's a contempt hearing that my

4    secretary did not cancel that I need to cover.

5    I'm just wondering if there's anyway maybe to

6    call down there to make sure that I could, you know, get

7    called or if there's anything that you want to do.  If

8    not, I'll run down there right now, let them know.

9    THE COURT:  You call them up and let them know

10    that you're here in trial with me.  They have to reset

11    it.  You want Ms. Lohsen to assist you in verifying that,

12    be glad to do that.  I am not going --

13    MR. FLEISCHMAN:  Do you want me to run down there

14    and tell them that?

15    THE COURT:  No, sir, I want you to call from

16    here.

17    MR. FLEISCHMAN:  Okay.  I know the other tone is

18    going to be upset, but it was something that I just

19    overlooked.

20    THE COURT:  This Court has priority.

21    MR. FLEISCHMAN:  Okay.  Do you think you could

22    help me with that then?

23    THE COURT:  Yeah.  If you want to go back there

24    to Ms. Lohsen.  Dell, I want to let him back there and

25    Carol will --

1

1          MR. FLEISCHMAN:  Okay.  Thank you.

2              (Thereupon, a recess was taken; after which the

3      following proceedings were had:)

4          THE COURT:  Record will reflect that

5      Mr. Cappelletti and Mr. Ruiz are present represented by

6      counsel.

7              Let's bring in Mr. D'Ambrosio.

8          MISS DADOWSKI:  I want to put on the record that

9      I have Anthony Cappelletti here.  I know the rule's been

10     invoked, but he's available this morning.  I may have

11     some problems depending on what his testimony is.

12             At this point, hopefully we can avoid any

13     problems.  I think he maybe testifying about evidence

14     that he knows about Mr. D'Ambrosio.  So I am not going to

15     have a problem, but if for whatever reason some other

16     information comes to light regarding his testimony, then

17     I may have a problem with the -- I guess I'll address it

18     at that time.

19             So I don't know what you want me to do with him.

20     Have him wait outside, I don't know whether

21     Mr. Fleischman or Mr. Grosz wants to speak to him.

22         MR. GROSZ:  I want to depose him.  Obviously I

23     can't do it this morning, so --

24         THE COURT:  Have him available.  Have him wait

25     here, and when Mr. Grosz has the time, he can take his

358

1   deposition.

2           MR. GROSZ:  I'll get Mr. D'Ambrosio.

3           THE BAILIFF:  I'll get him.

4           THE COURT:  Good morning, Mr. D'Ambrosio.

5           THE WITNESS:  Morning.

6           THE COURT:  Please take a seat on the witness

7   stand.

8           Mr. D'Ambrosio, I don't want things to get out of

9   hand today.

10          THE WITNESS:  Yes.

11          THE COURT:  I don't want any comments from you

12  regarding the question that was asked, your opinion of

13  the question, your opinion of the questioner, your

14  opinion of the defense in this case.

15          All you're to do is to report on facts and

16  observations, do you understand that?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  What either dependent said in your

19  presence.  No other extraneous remarks because we are

20  very close to the Court granting a mistrial, which means

21  that over two days worth of work will be down the drain

22  and we'd have to start all over, okay.

23          THE WITNESS:  I understand.

24          THE COURT:  Do you understand what I'm saying?

25          THE WITNESS:  Yes.

THE COURT:  All you're to do is just listen to
the question.  If the question is what time is it, don't
explain how a watch is made, do you understand that?

THE WITNESS:  Yes, Your Honor.

THE COURT:  I don't know how to make it any
clearer, but if you continue down the path that you were
traveling yesterday, it's going to result in a mistrial
and I cannot be anymore emphatic about that.

You do not have to advocate this case for the
State.  Mr. Grosz is a very good advocate.  All you have
to do is report from your observations, what you saw,
what you heard, what you did, and nothing more.  No
opinions, just a dissertation of fact, okay.  We have an
understanding?

THE WITNESS:  Yes, we do.

THE COURT:  Very important.

THE WITNESS:  I'm sorry that you had to say it
again.

THE COURT:  This is not a game.  This is very
serious business.

All right.  Anything to come before the Court
before we get started?

MISS DADOWSKI:  No, Your Honor.

MR. FLEISCHMAN:  No, Your Honor.

THE COURT:  Deputy Lithle, please bring in the

1          jury.

2                    (Thereupon, the following proceedings were

3          had within the presence of the jury:)

4                    THE COURT:  Good morning.  Welcome back.

5                    Mr. D'Ambrosio, let me remind you that you're

6          still under oath, sir.

7                    We were on cross examination by Miss Dadowski.

8          Miss Dadowski, you may proceed.

9                         CONTINUING CROSS EXAMINATION

10    BY MISS DADOWSKI:

11          Q.    Thank you, Your Honor.  Morning.

12          A.    Morning.

13          Q.    Now, Mr. D'Ambrosio, I believe according to your

14    testimony yesterday, you indicated that you would give money

15    to John Cappelletti all the time, is that correct?

16          A.    All the time?

17          Q.    Frequently?

18          A.    Semi-frequently at least.

19          Q.    Now, you had not worked since 1992 or 1993 when

20    the Diplomat Hotel went out of business, is that correct?

21          A.    No.

22          Q.    You just did little things for your brother after

23    that, is that correct?

24          A.    I didn't draw a wage of significance, but I

25    worked very, very hard.  Extraordinarily hard.

```
 1          Q.    And where did you work?

 2          A.    I worked on the home next to Cappelletti for

 3    months.

 4          A.    I'm talking about for pay?

 5          A.    As I explained, I did not draw a wage of

 6    significance with any organization, for any significant amount

 7    of time including the restaurant.  I didn't work for, let's

 8    say, two years and draw a --

 9          A.    You did a lot of playing, is that correct?

10          A.    I had free time and I enjoyed -- I enjoyed the

11    world.

12          A.    Because you have a lot of money?

13          A.    I had enough money to enjoy the world dependent

14    upon my case.

15          A.    Do you remember giving a deposition on August

16    25th of 1997 where you indicated differently?  Where you gave

17    an answer that's inconsistent with what you're just saying?

18          A.    I apologize, I don't want to get close to an

19    objection, but what's a lot?  What's a lot of money?

20                MISS DADOWSKI:  Well, if I could just approach

21        the witness, Your Honor.

22                THE COURT:  Yes, ma'am.

23    BY MISS DADOWSKI:

24          Q.    Starting on the bottom of Page 55, and I would

25    just ask you to read from the bottom of 55 to your answer
```

here.   Just read it to yourself.

         A.    I used the word -- I used the word lot.  And I
expected to mean something, I don't expect, however, to be
inundated with definitions towards lot.

         Q.    You indicated you had a lot of money, is that
correct?

         A.    I used the word lot.

         A.    A lot of money, is that the word you used?

         A.    Yeah, for whatever definitive purposes lot means.
What's a lot of money?  What's a lot?

         Q.    However, you were not working?

         A.    I was not employed directly towards any long --
at that time.  I had earned money.  I had saved money for 30
years.

         A.    You had no steady employment from the time you
left the Diplomat Hotel, is that correct?

         A.    I had no steady employment, yes.

         A.    And basically everybody does well with you
financially when they're with you, is that correct?

         A.    I don't know, if they're not with me long.  I
mean --

         A.    You think everybody does well with you
financially when they're with you, is that correct?

         A.    Do I think?

         A.    What's the answer?

A.    I have problem with the question.

Q.    Well, let me direct your attention to the deposition once again on August 25th of 1997, bottom of Page 20, Line 25 and then going onto Page 21.

A.    Are we back to the lines again?

A.    I'm just asking you your question.

A.    My question?

A.    I'm just asking you the question.  Do you not think that everybody does well with you financially when they are with you?

A.    In certain contexts, yes, I do think that.  In certain contexts, no, I don't think that.

Q.    But at your deposition on August 25th of 1997, you indicated that everybody does well with me financially when they're with me, is that correct?

A.    In that isolated sentence, that's correct.

Q.    And you normally carry good money, is that correct?

A.    I hope it's not counterfeit.

Q.    Is that correct, you normally carry good money?

A.    I hope it's good money.

Q.    Well, sir, when you made that statement in deposition that you normally carry good money, you weren't talking about counterfeit money, were you, you were talking about a lot of money?

2   1        A.    A lot was isolated in the sentence you pointed

2   out because you didn't want it in context.

3             MISS DADOWSKI:  I'm going to object.  Move to

4        strike.

5             THE COURT:  Sustained.  Please disregard the last

6        comment by the witness.

7   BY MISS DADOWSKI:

8        Q.    In fact, you testified that when you had money,

9   you rolled it, didn't you?

10       A.    Yeah, I sometimes like to roll it.

11       A.    And that's what you meant, you just roll the

12  money?

13       A.    I don't know was it in context, was there a whole

14  paragraph to be read or is there an isolated word again,

15  counsel?

16            MISS DADOWSKI:  Your Honor, may I approach?

17            THE COURT:  Yes.

18  BY MISS DADOWSKI:

19       Q.    Page 58, we'll just start at Lines 19 so you can

20  get it in perspective.  Why don't you read from 19 down to

21  Page 59, Page 1 -- or Line 1.

22       A.    Can I read the whole thing so I can see that's

23  what I see as context or -- It's okay.  I'm just asking the

24  question or do you want me to read -- if I have to read your

25  line --

1          MISS DADOWSKI:  Your Honor, can we have a side

2     bar?  I have an objection and I'd like to have a side bar

3     if I could.

4          THE COURT:  All right.

5          (Thereupon, the following proceedings were

6     had side bar; outside the presence of the

7     jury:)

8          MISS DADOWSKI:  Your Honor, I have a problem with

9     this witness who keeps testifying as to putting it in

10    context.  If there's nothing in context, Mr. Grosz has an

11    opportunity to bring it up on his cross examination.

12         The problem that I have with putting things in

13    context, as you can see by his testimony, that he keeps

14    rambling and rambling.  If we read a whole line of a

15    deposition, there's a very good chance that there's three

16    or four answers in that particular paragraph that have

17    nothing to do with that question being asked.

18         I would object and especially object to him

19    telling me to put things in context.  I think it's highly

20    improper, implying that I'm doing something improper.

21         Based on all the testimony that's improper, I'm

22    requesting a mistrial, but it's implying that

23    Mr. Fleischman yesterday and I am today asking him

24    improper questions and his context, unfortunately, is in

25    his own mind.  I can't get into context because a lot of

3     1    times he goes into things that are not admissible that

2    are highly prejudicial and improper in his answers that

3    are in context according to him in deposition.

4           MR. GROSZ:  Briefly, Judge, it's really the

5    rambling nature of the way that he talks that makes it

6    important that he be allowed to answer his question in

7    full context.  Because to just pull out a snippet of one

8    response, doesn't really give the context of what he is

9    saying.  It's his meaning that is being questioned.  Not

10    anyone else's mind.

11           So if it's meaning that's being in question, he

12    should be entitled to answer that to whatever he was

13    meaning to say.  We can't, you know -- to pull out a

14    black and white word and say this is what you meant and

15    now asking him to explain that.

16           THE COURT:  With respect to this witness, I'm

17    going to take the position, from this point forward, that

18    defense counsel can impeach the prior inconsistent

19    statements by pulling out whatever portions of the

20    deposition they desire.

21           If the State wants to come back on re-direct and

22    offer a more complete response from the witness, the

23    State has the option to do so.  But I think the defense

24    is somewhat handicapped by the manner in which this

25    witness responds to questions and comments, continues to

1    comment on the coerce manner of interrogation which I

2    agree with Miss Dadowski is not proper.

3          I'm going to sustain the objection.  Deny the

4    motion for a mistrial.  Let's proceed forward and see how

5    we do this morning.

6          (Thereupon, the following proceedings were

7    had within the presence of the jury:)

8  BY MISS DADOWSKI:

9          Q.   Now, if you would just read line -- Page 58,

10   Lines -- I'll even let you read a little bit further, up to

11   Page 59, Line 1.  Please do that to yourself.

12         A.   Not to Line 10?

13              MISS DADOWSKI:  Objection, Your Honor.

14              THE WITNESS:  I asked a question of you.

15              MISS DADOWSKI:  To Line 1.

16              THE WITNESS:  To Line 1, okay.  Where do we

17   begin, line 19.  In the past --

18  BY MISS DADOWSKI:

19         Q.   I said read it to yourself please, sir.  Okay?

20         A.   I read it.  Thank you.

21         Q.   Okay.  So now your testimony is when you had

22   money, you rolled it, is that correct?

23         A.   I made that statement.

24         A.   And you weren't talking about rolling money, in

25   fact, you were talking about I did it all, money, lunch,

3    1    anything, is that correct?

2    A.    I was talking about rolling money.

3    Q.    And by that you mean giving money to other

4    people, is that correct?

5    A.    No, I used the words that I used.

6    A.    So your testimony now is when you were talking

7    about rolling money in that deposition, where your answer is

8    "when I had it, I rolled it --"

9    Well, first let me go back to Line 19:  "In the

10    past when I had it, I'd give to anyone."

11    "Like other neighbors?"

12    "Yeah."

13    "Other people that you just meet in the street?"

14    "When I had it, I rolled it.  I did it all;

15    money, lunch, anything."

16    Now, your testimony today is that you were

17    talking about rolling it, mean just rolling the dollar bills

18    that you had in your hand, is that correct?

19    A.    It may have been that or it may have been as

20    you're suggesting.  I don't recall the exact segment of time

21    that that isolated sentence was made.  If that's an

22    appropriate answer.

23    A.    You had all this money, but you weren't working,

24    is that correct?

25    A.    I don't understand the question, counsel.  I

```
 3       1   think -- I've told you that I was working from the age of six.

         2   Today I'm working, today I am not being paid, you are.

         3        A.    Did you work for money after you left the

         4   Diplomat Hotel?

         5        A.    Yes.

         6        Q.    Where did you work for money after the

         7   Diplomat Hotel?

 4       8        A.    I worked for one of the gentleman in the

         9   courtroom right here behind you.  I worked for my brother.  I

        10   worked on the house in an extreme fashion where some point we

        11   sold both houses.

        12            I would guess this -- this something to be said

        13   forgetting some money when you sell a house, right?  Doesn't

        14   mean that it's not necessarily a clean --

        15        A.    Did you file income tax returns?

        16        A.    Absolutely.

        17        A.    That you were being employed?

        18        A.    I filed income tax.  Whatever the guidelines is

        19   for income tax, I filed them.  Whatever I was supposed to do,

        20   I did.

        21        Q.    Now, you didn't really like John Cappelletti, did

        22   you?

        23        A.    Yes, I liked Cappelletti.

        24        A.    Isn't it true that you felt that if you had a

        25   choice, you wouldn't have wanted to know the guy?
```

4

1        A.    I don't know.  As I told you, I told you I liked

2  him.

3        Q.    Okay.  Did you not testify in a deposition on

4  August 25th of 1997, that if you had any choice, you wouldn't

5  have wanted to know the guy?

6        A.    I don't know, let me see the -- let me see the

7  deposition.

8        A.    Page 67, Lines 1 through 4.

9        A.    There's a lot in them four lines.

10       A.    "In other words, what I'm saying, I don't know

11  the guy.  And if I had any choice.  I wouldn't have wanted to

12  know the guy.  He's not a guy that I would like to talk with,

13  this guy."

14       A.    That's part of them four lines.

15       Q.    That's exactly those four lines.  Is that not

16  exactly what is in those four lines?

17       A.    Let me see it again.  "In other words, what I am

18  saying is", right.

19       Q.    That's exactly --

20       A.    "In other words, what I'm saying, I didn't know

21  the guy.  If I had any choice, I wouldn't have wanted to know

22  the guy.  He's not the guy I would like to talk with, this

23  guy."

24       Q.    And is that the exact words you said?

25       A.    Yes, that's the words on the deposition, yes, it

1   is.

2          Q.    In fact, you felt that Cappelletti's aren't your

3   people, is that correct?

4          A.    I don't recall -- Let's go down this road again.

5   Take a look, okay.  Am I isolated now --

6          Q.    Yes, you are.

7          A.    Not even a line.

8          Q.    You are --

9          A.    The words.  In that paragraph --

10         Q.    Page 66, Line 11 and 12.

11         A.    Lines 11 -- It's not even a whole sentence, but

12   okay.  If you want to isolate it.

13              MISS DADOWSKI:  Your Honor, I have another

14         objection.  Can we move side bar?

15              THE COURT:  No, ma'am.  The objection is

16         sustained.

17              Sir, don't comment on the question.  Just respond

18         to the question.

19   BY MISS DADOWSKI:

20         Q.    Wasn't your answer "these are not my people" when

21   you were referring to Mr. Cappelletti and I believe Mr. Ruiz

22   additionally?

23         A.    I used them five words.

24         Q.    Now you're saying that you asked Mr. Cappelletti

25   to go up to Georgia with you and move some furniture for your

4

1    wife and you, is that correct?

2         A.    I spoke to him about driving a truck to Georgia.

3         Q.    And you told him that you would pay him $100 to

4    do that?

5         A.    I don't know if I told him or if I asked him.  I

6    believe I asked him, you know, would you like to -- how much

7    would you, you know.

8         Q.    And when you went up to Georgia, he didn't know

9    what was in the back of that truck, is that right, when he

10   drove the truck?

11        A.    I think in reason he knew.  I mean, I -- I'm sure

12   I probably told him.

13        Q.    The back of the truck was locked, is that

14   correct, and he had no access to it?

15        A.    We put a lock on the truck.

16        Q.    That's correct.  Mr. Cappelletti had no access to

17   the back of that truck, is that correct?

18        A.    I don't believe he had access to it.

19        Q.    He drives up to Georgia for you.  And while he is

20   on his way up there, his car runs out of gas, the truck runs

21   out of gas, is that correct?

22        Q.    Yes.

23        Q.    And you didn't pay him right there when he got to

24   the gas station, did you?

25        A.    I don't think I did.  I don't know.  You can ask

him.  If he tells you I did, I did.  If I didn't, I don't

know.

          I know I -- I think I waited until he was -- we

were at the apartment not because it was asked or anything.

          Q.    Okay.  So then he gets to your apartment and

what, you were suppose to return the truck that night?

          A.    No.

          Q.    Okay.  You were going to leave that night though.

Who was going to return the truck?

          A.    I hadn't planned that.  I didn't plan this thing

that great.  I did my part.  It's one person.  I'm one person.

          Q.    So the truck had to be returned by 5:00 o'clock

that night, is that true?

          Q.    No.

          Q.    Your flight was leaving around 6:00 o'clock that

night?

          A.    Was 6:00 or 7:00.  I -- between -- it was 6:00 or

7:00.

          Q.    Mr. Cappelletti told you, or advised you, that he

is afraid to fly, is that not correct?

          A.    I don't know if he used the word afraid.  He may

have used I don't like to fly or something -- he indicated to

me that he didn't like flying, yeah.

          Q.    Didn't you give him a pill because he was afraid

to fly or uneasy about flying?

5    1            A.    No, no, I didn't give him no pill.

     2            Q.    You gave him some alcohol up there when he was up

     3    there?

     4            A.    No, not one drop of alcohol.

     5            Q.    Now, evently you found out that he had been

     6    arrested when you left him at a gas station up there, is that

     7    correct?

     8            A.    I found out he had been arrested.

     9            Q.    Now, you never got the impression when

    10    Mr. D'Ambrosio (sic) called you, that he thought that you

    11    should bail him out when he got arrested in Georgia, is that

    12    correct?

    13            A.    Mr. D'Ambrosio never called me.

    14            Q.    Mr. Cappelletti, excuse me.

    15            A.    Give me the question again please?

    16            Q.    You never got the impression that when

    17    Mr. Cappelletti called you from Georgia advising you that he

    18    had been arrested up there, that he thought you should bail

    19    him out, is that correct?

    20            A.    Give me that again.  That's really -- I'm sorry,

    21    I didn't sleep well.  If you can say that.

    22            Q.    When Mr. Cappelletti called you from Georgia, he

    23    never made you feel or told you that you would be responsible

    24    and that you should bail him out, is that correct?

    25            A.    I guess one could say, but he asked for help.  He

asked for help in whatever capacity --

Q.   He didn't feel that you were responsible, is that correct?

A.   I can't tell you his feelings.  I can tell you about words.

Q.   Have you ever give --

A.   Some cases -- Wait a minute, you asked me about words.  Then when I go into a little bit more than words, you can't have it both ways.

MISS DADOWSKI:  Objection, Your Honor.

THE COURT:  Sustained .  Sir --

MISS DADOWSKI:  Same motion.

THE COURT:  No comments on your thoughts regarding the question.  Just answer the question, sir.

Motion is hereby denied.

BY MISS DADOWSKI:

Q.   Now, he did not believe that you should bail him out or that you were responsible, is that correct?

A.   I don't know John Cappelletti's state of mind.  I don't know what he believed or what Jonathan Freedman produced my name is Christopher D'Ambrosio if you want to ask me what I think.

MISS DADOWSKI:  Objection.  Now, he's bringing up Mr. Freedman's name who was the attorney that represented him in his probation violation hearing.

5

1              THE COURT:  Sustained.

2              MISS DADOWSKI:  Or early termination, excuse me.

3      BY MISS DADOWSKI:

4          Q.    Now, didn't you, at a different time on

5      August 25, 1997, give a statement that's inconsistent with

6      what you're saying right now, is that correct?

7              Would you like to see it, Line -- on Page 22,

8      Lines 13 through 16.

9          A.    The lines, I am allowed to read?

10         Q.    13 through 16.

11         A.    I can't determine what's being -- I mean -- in --

12     Am I suppose to answer this or something?  I don't know how to

13     answer your question.  You have to either clarify it or --

14         Q.    When you were asked the question:  "He believed

15     that you should bail him out, that you were responsible?"

16              Your answer was:  "Well, I wouldn't go that far.

17     That would be improper that go that far."

18              So isn't it true that you did not think at the

19     time that he called you that he felt you were responsible and

20     you should bail him out, is that correct?

21         A.    Sounds like the word I used was improper.  I

22     didn't use the words that you put on it.  I said sounds like

23     that would be improper to go that far.  That's my answer,

24     that's me.

25         Q.    When he called you from jail, he didn't seem to

```
 5      1    indicate that he was upset, is that correct?

        2         A.    I don't know how, you know, I don't precisely how

        3    he felt.  You have to --

        4              MISS DADOWSKI:  Your Honor, Line -- I'll show you

        5         Page 25, questions 8 -- 18 through 21.

        6              THE WITNESS:  Okay.  And the question is?

        7    BY MISS DADOWSKI:

        8         Q.    So whenever he called you from jail, he wasn't

        9    upset with you, was he?

       10         A.    He didn't indicate that he was upset.

       11         Q.    Not at all, no, there was no indication of being

       12    upset, is that correct?

       13         A.    That was some of the words.

       14         Q.    I'm going to ask you to read Line 20 and 21

       15    because I don't want to imply to the jury that I'm saying

       16    anything improperly?

       17         A.    Just Line 20 and 21 is not the page.  Just Line

       18    20 and 21.  Answer:  "He didn't indicate that he was upset,

 6     19    no, not at all.  No, there was no indication of being upset."

       20         Q.    Which is what I just said, is that correct, sir?

       21         A.    I don't know what you just said.

       22         Q.    Now, isn't it true that you did not like the

       23    Cappelletti family because you knew that your wife had sexual

       24    relationships with all the Cappelletti boys?

       25              MR. GROSZ:  Judge, I'm going to object to that.
```

It's -- Number one, it's assuming facts not in evidence.

No evidence of that.

THE COURT:  Overruled.

THE WITNESS:  Why don't you go ahead and ask the question again.

BY MISS DADOWSKI:

Q.    Isn't it true that you did not like the Cappelletti family because all three sons of the Cappelletti's had sexual relations with your wife, isn't that true?

A.    Not to my knowledge.

Q.    Now, you saw John Cappelletti on the day of August 13, 1997, and he did not appear upset with you or angry with you when you first saw him, is that correct?

A.    When I first saw him?

Q.    When you saw him, he did not appear upset with you or angry, is that correct?

A.    Are you talking about when he drives down the road or is in the passenger on the road?  Help me out a little bit, counselor.

Q.    Yes.

A.    Is that what you're talking about?

Q.    When you first see Mr. Cappelletti, he does not appear upset with you or angry?

MR. GROSZ:  I'm sorry on which date?

6       1    BY MISS DADOWSKI:

2         Q.    April 13th of 1997?

3         A.    He didn't appear extremely angry.  I don't

4    know -- it wasn't too much of an account, or is that the wrong

5    answer?  Here we go.

6         Q.    Let me refer you to Line -- Page 32, Line 14

7    through 16.  And the only answer I'm concerned with is your

8    answer on Page 16 -- Line 16.

9         A.    Didn't appear happy.

10        Q.    The question is:  "Did Cappelletti appear upset

11    with you or angry?"  Answer:  "No."

12        A.    No, that's not the answer.

13        MISS DADOWSKI:  Your Honor, can I have a side

14    bar.  I'd definitely need a side bar on this one.

15        THE WITNESS:  Look at the answer.

16        (Thereupon, the following proceedings were

17    had outside the presence of the jury:)

18        MISS DADOWSKI:  Your Honor, this is one of those

19    situations where I asked Mr. D'Ambrosio a very simple

20    question that called for a yes or no question in Georgia

21    and he proceeded to additional information.

22        I asked on Page 32, Line 14 did Cappelletti

23    appear upset with you or angry.  And on Line 16 the

24    answer is no.  And then he continues to agree he didn't

25    appear happy.  He appeared --

6

1          THE COURT:  Why don't you ask him do you recall

2     this question and this answer.

3          MISS DADOWSKI:  Whenever he says I don't recall

4     and I have him read it, he wants to continue to read the

5     information, so he wants to read the fact that he didn't

6     appear happy, he appeared cooked.

7          THE COURT:  Don't show it to him.  Ask him do you

8     recall this question and this answer.

9          MISS DADOWSKI:  When he says no, impeach him with

10    that without showing it to him?

11         THE COURT:  Sure.

12         MR. GROSZ:  Judge, I mean, any witness should be

13    entitled to, if he doesn't recall, at least be able to

14    read it.

15         THE COURT:  There's nothing that says that --

16    Well, if he says he doesn't recall it.

17         MISS DADOWSKI:  That's the problem.  That is what

18    he's saying.  I have to show it to him and then he

19    insists on improperly getting into evidence that's not

20    admissible.

21         THE COURT:  You're not asking -- you're not

22    asking him ahead of time do you recall this question and

23    this answer.

24         MISS DADOWSKI:  And he says I don't recall, I

25    want to see it.  And then whenever I show it to him, he

6    1    insists on reading the additional information that is

2    prejudicial, not related to the question at all.

3        I didn't ask him whether my client aappeared

4    cooked.  I asked him did he appear upset or angry.  The

5    first answer he gave was no.  And then he continues in

6    that answer to say didn't appear happy, appeared cooked.

7        I don't want to bring in that information.

8    That's the dilemma that I keep getting into.

9        THE COURT:  Just ask the question do you recall

10    this question and this answer and if he says no --

11        MISS DADOWSKI:  Just read it into evidence?

12        THE COURT:  Exactly.

13        (Thereupon, the following proceedings were

14    had within the presence of the jury:)

15    BY MISS DADOWSKI:

16        Q.    So Mr. D'Ambrosio, do you recall this question

17    and this answer, "Did Cappelletti appear upset with you or

18    angry?"  And this -- and your answer was no.  Do you recall

19    that?

20        A.    Yes, the answer was no.

21        Q.    Now, when you saw Mr. Cappelletti at the gas

22    station, he didn't appear upset to you at that time either, is

23    that correct?

24        A.    That's not correct.

25        Q.    Well, I guess I have to use your word at that

1  particular juncture, does that help you out any?

2        When you saw him first at the gas station, he

3  didn't appear upset at that particular juncture, is that

4  correct?

5        A.    I answered the question.  You asked me if he

6  appeared -- you said -- you told -- you said that he didn't

7  appear upset, I said that's not correct.

8        Q.    Do you recall giving a statement in your

9  deposition when I asked the question was he upset and your

10  answer was he didn't appear to be upset at that particular

11  juncture, no?

12        A.    If that's what I said, that's what I said.

13        Q.    And there was nothing extraordinary that day that

14  made you pay any significant notice to Mr. Cappelletti, is

15  that correct?

16        A.    Extraordinary.

17        Q.    There was nothing extraordinary that would make

18  you pay notice?

19        A.    Extraordinary or extra ordinary?

20        Q.    Extraordinary.

21        A.    Extraordinary or extra ordinary?

22        Q.    Extraordinary is the word that you used in the

23  deposition?

24        A.    Extraordinary?

25        Q.    Yes.

A.    I don't recall.

Q.    "There was nothing extraordinary that day that would make me pay significant notice tremendously abouve and beyond any other time."

A.    I don't recall.

Q.    Pages 67, Lines 3 through 13.

A.    No.

MISS DADOWSKI:  Your Honor, may I show him?

THE COURT:  Sure.

THE WITNESS:  Okay.  Are we -- give me the question again.

BY MISS DADOWSKI:

Q.    There was nothing extraordinary that day that would make you pay significant notice tremendously above and beyond any other time, is that correct?

MR. GROSZ:  Judge, I would object at this point and ask for at least a reference as to what time period during the day that she's referring to.

THE COURT:  Sustained.

BY MISS DADOWSKI:

Q.    When you saw him outside of your house that day?

A.    I'm getting a little lost here.  If that's -- I'm getting a little lost.  I need to like -- I need a side bar with you.  I can't keep going here with you.  We don't have a meeting of the minds.  You come from a different school than

7      1    me.

2               MISS DADOWSKI:  Objection, Your Honor.

3               THE COURT:  Rephrase your question.  Witness said

4      he didn't understand the question.

5      BY MISS DADOWSKI:

6          Q.    When you saw Mr. Cappelletti and Mr. Ruiz --

7      Actually just Mr. Cappelletti, that day, there was nothing

8      extraordinary that day that would made -- that made you pay

9      any significant notice to Mr. Cappelletti, is that correct?

10              MR. GROSZ:  Again, Judge, I'm sorry to object.

11      I'd like this to be as specific to time and date.

12      There's several times he sees him.

13              MISS DADOWSKI:  Your Honor, if I might, in his

14      answer he says that day.

15              MR. GROSZ:  Judge, again, it's the context in

16      which the question was asked and that's why I'm asking

17      for this question in the courtroom to be specific to time

18      because that's what it was at the depo.

19              THE COURT:  Objection is sustained.

20      BY MISS DADOWSKI:

21          Q.    When you saw him outside your house, was there

22      anything extraordinary that made you pay significant notice to

23      him?

24          A.    I was surprised by his appearance.  That's -- You

25      want a yes or no, I'll give you a yes or no.  I don't know.  I

7          1    am not being a smart guy, I'm trying to be right with things.

           2          Q.    Basically you told him that you were going to the

           3    gas station and he could follow you there, is that correct?

           4          A.    It maybe.

           5          Q.    Okay.  On line -- Page 69, do you remember your

           6    answer was you want to talk, okay, great.  I'm going by the

           7    Amoco Gas Station, come talk to me there."  Lines 15 through

           8    17.  Do you remember saying that?

           9          A.    I believe I said that.

          10          Q.    Now, when you were pumping gas initially,

          11    John Cappelletti never threatened you, is that correct?

          12          A.    Eventually with the kill factor, no.  If that's

          13    the question.

          14          Q.    He didn't threatened you at all, is that correct?

          15          A.    Threaten my life verbally?  No.

          16          Q.    Or physically at that point, he didn't threaten

          17    you at all, is that correct, when you were pumping?

          18                MR. GROSZ:  Asked and answered.

          19                THE COURT:  Overruled.

          20    BY MISS DADOWSKI:

          21          Q.    Do you recall what your answer to the previous

          22    question was?  "I'm pumping the gas.  I'm like, all right,

          23    let's see what he has to say."

          24                Question, this is on Page 78, lines 12 through

          25    15.  Question:  "Did he threaten you at all at this point?"

7    1              Answer:  "At that point, no."  Okay.

2          A.    I recall saying that.

3          Q.    You didn't distinguish anything between verbal or

4    physical, you said he did not threaten you, is that correct?

5          A.    In that one sentence that's how I say it, yes,

6    but there's a few pages dedicated to that.

7          Q.    Now you're saying that at this point or one point

8    then, Eddie gets out of the car, is that correct?

9          Q.    Yes.

10         Q.    When he gets out of the car, everything gets

11   escalated?

12         A.    That's true, things escalate.

13         Q.    Eddie "pumps things up" in your opinion?

14         Q.    Yes.

15         Q.    Eddie wants a problem?

16         A.    That's true.

17         Q.    Eddie wants a beef?

18         A.    As a terminology, yes.

19         Q.    In fact, in your opinion, John doesn't really

20   want to go as far, is that correct?

8    21         A.    John goes there, but I disarmed to a degree this

22   matter.  John begins to reason --

23         Q.    Do you recall on Page 82 giving a deposition

24   where you indicated John doesn't really want to go as far

25   until Eddie, do you recall that?

8

1      A.    Very possible that that one sentence is in there

2  amoungst pages of sentences.

3      Q.    Now, you never saw John Cappelletti with any type

4  of weapon when you were at the gas station?

5      Q.    No.

6      Q.    You never saw him with a shotgun at the gas

7  station?

8      A.    No, didn't see him with no shotgun.

9      Q.    And John never specifically said for you to give

10  him money, is that correct?

11      A.    Specifically, no.

12      Q.    In fact, the conversation, according to your

13  testimony with you and John, started off courteous, is that

14  correct?

15      A.    I wouldn't find it within courteousness, I think

16  that's mischaracterizing.

17      Q.    Do you recall the answer that you gave at

18  deposition on Page 99, Line 25?  "There was courteous in the

19  beginning, I'll say.  But there was never the word nice, not

20  by my definition, but I'm saying it was courteous in the

21  beginning."

22      A.    I can agree with that statement.  That's a fair

23  statement.

24      Q.    And you are the one that -- you swore a few times

25  because you got mad, is that correct?

8    1          A.    Yeah, I swore.

     2          Q.    You got a little too mad?

     3          Q.    No.

     4          Q.    You don't recall your statement Page 100, Line 9,

     5     "I realize I got a little too mad."

     6          A.    I don't recall how I said that and where it's at

     7     and what we were discussing.  We had significant dialog, you

     8     and I, counsel.

     9          Q.    I'll show you on Page 100 starting Lines 7

    10     through 9.

    11          A.    These are words in a sentence.

    12          Q.    These are words that you used where you said "I

    13     did swear a few times because I got mad.  I realized that I

    14     got a little too mad."

    15          A.    In an isolated statement, I made that statement.

    16                MISS DADOWSKI:  Objection, Your Honor.

    17                THE COURT:  Overruled.

    18                MISS DADOWSKI:  Based on the problems that we've

    19          been having.

    20                MR. GROSZ:  Judge, I'll object to the speaking

    21          objection.

    22                THE COURT:  Overruled.

    23     BY MISS DADOWSKI:

    24          Q.    Now, you indicate that you start leaving the gas

    25     stations and you're driving on Sheridan Street, is that

8    1    correct?

2        Q.    Yes.

3        Q.    And Mr. Ruiz is driving the car, according to

4    you, and they're getting close -- they're trying to get closer

5    to you on Sheridan Street?

6        Q.    Yes.

7        Q.    They've just made these threats to you?

8        A.    No, not they, Ed did not make the threat to me at

9    that point.

10       Q.    His physical presence and his words were not

11   threatening to you?

12       A.    Well, the words that he used to communicate to

13   Cappelletti put, you know -- certainly raised great flags in

14   my eyes.  I certainly --

15       Q.    You were intimidated at that point?

16       A.    Very much I was intimidated.

17       Q.    You felt that Mr. Ruiz was trying to get close to

18   your car?

19       A.    No, not to my car.  I felt he was trying -- his

20   passenger door had been opened and the window was halfway

21   rolled down.  I felt he was going to access (sic) something at

22   the passenger side of his car.  I didn't feel he was trying to

23   get into my car.

24       Q.    I'm talking about whenever you were leaving the

25   gas station, we're on Sheridan Street?

8 1   A. Yeah.  But the gentleman Ed did not make a threat

2 to me.  He spoke to John.

3    Q. Were you threatened or did you feel threatened by

4 the words that he used?

5    A. Very much so, yes.  But he didn't say it to

6 Christopher.

7    Q. What I'm talking about though, you're driving on

8 Sheridan Street in your big '98 Caprice?

9    A. No, my little '98 Caprice.

10    Q. It has a big engine?

11    A. No, it's powerfull.

12    Q. And Mr. Ruiz has a Honda Civic?

13    A. Yes, one-and-a-half second to sixty-and-a-half

14 second.

15    Q. And they're trying to get close to you on

16 Sheridan Street, is that correct, Mr. Ruiz is driving, trying

17 to get closer to you in his car?

18    Q. Yes.

19    Q. But you didn't -- You have your cell phone with

20 you?

21    Q. Yes.

22    Q. You feel very intimidated, but you didn't call

23 911, did you?

24    A. At that point, I didn't call 911.

25    Q. And they're driving -- Mr. Ruiz is driving

recklessly in your opinion and in your testimony, is that correct?

A.    Very recklessly, very reckless.

Q.    And you don't dial 911?

A.    No.  Why?  What am I suppose -- What, a guy's driving reckless?

Q.    And just theatened you, made you feel threatened?

A.    And what?  And then what, I'm driving a car, I'm not going to be on the phone.

Q.    You could have eaten Mr. Ruiz's car off the road, couldn't you?

A.    I don't eat cars.

Q.    Didn't you use those words on Page 112, Lines 16, 17 where you say:  "I mean, I could have eaten him off the road.  He has little piece of shit."

A.    I don't know, let me see.

Q.    Did you say that, sir?

A.    Not quite.  Certainly don't want that page read.

MISS DADOWSKI:  Objection, Your Honor.

THE COURT:  Sustained.  Sir, how many times did I tell you, no extraneous comments.

BY MISS DADOWSKI:

Q.    Now, you very easely could have gotten away from Mr. Ruiz's car, is that correct?

A.    Not absolutely not or I certainly would have.

9

1          Q.    You certainly could have rammed ran Mr. Ruiz's

2    car off the road?

3          A.    It -- I can't comprehend running another person's

4    car off the road.  It was suggested I should have done that,

5    but I don't want -- a cars off the road you -- I don't know --

6    I don't watch TV.

7          Q.    Your testimony is, you were driving northbound on

8    I-95?

9          A.    That's my testimony.

10          Q.    You never saw John Cappelletti have a shotgun

11    when he was driving on I-95 according to your testimony with

12    Mr. Ruiz?

13          A.    I never saw John with a shotgun that day.

14          Q.    In fact, you're amazed that even a shotgun would

15    fit in that car, aren't you?

16          A.    Well, if I used -- I may have used the word

17    amazed.  It's a small car and a shotgun's a big gun.  You

18    wouldn't call it a concealed weapon.

19          Q.    When Mr. Ruiz's car allegedly -- or supposedly

20    got next to you, you never saw a shotgun?

21          A.    I never seen a shotgun.

22          Q.    You don't -- you didn't see who shot you?

23          A.    I don't know who pulled the trigger.

24          Q.    Now, Mr. D'Ambrosio, when you were taken to the

25    hospital, they did a blood test on you, is that correct?

9

1          A.    Whatever the hospi

2    things.

3          Q.    And they found amphe

4          A.    I don't recall that.

5    anything of them finding whatever,

6    hospitals.

7          Q.    Were you taking narcotic

8          A.    No --

9          Q.    That caused and amphetamines to be in your

10   system?

11         A.    I don't recall taking anything.  The day before I

12   may have taken an appetite suppressant.  I don't recall taking

13   anything that day.  If I did, it would have been a

14   prescription.

15              MISS DADOWSKI:  I don't have any other questions

16        at this time, Your Honor.

17              THE COURT:  Any re-direct?

18              MR. GROSZ:  Just one issue, Judge.

19                    RE-DIRECT EXAMINATION

20   BY MR. GROSZ:

21        Q.    Mr. Cappelletti (sic), I'm showing you --

22   Mr. Cappelletti.

23              Mr. D'Ambrosio, I'm showing you what's been

24   marked as State's Exhibit Y for Identification.  Do you

25   recognize this?

9      1          A.    Yes, I do.

2          Q.    Okay.  What do you recognize this exhibit to be?

3          A.    These are some of many miscellaneous x-rays that

4  were taken by the hospital.

5          Q.    Okay.  Who are they taken of?

6          A.    Me.

7          Q.    Okay.  Have you looked at these x-rays?

8          A.    Yes, I have.

9          Q.    Had the doctor explained these x-rays to you?

10         A.    More than one doctor explained these things.

11         Q.    Is what's depicted on the x-ray here consistent

12  with the injuries that you have?

13         Q.    Yes.

14         Q.    Both externally and internally?

15         A.    Mostly internally.

16         MR. GROSZ:  Okay.  I don't have anything else,

17    Judge.  And I'd offer State's Y in.

18         MR. FLEISCHMAN:  Can I just take look at it?

19         THE COURT:  Any voir dire?

20         MR. FLEISCHMAN:  Judge, if I could take a look at

21    it, if I could.

22         THE COURT:  Any objection?

23         MR. FLEISCHMAN:  No objection.

24         THE COURT:  Okay.  Y will be received as State's

25    20.

9    1          (Thereupon, State's Exhibit Number 20 was

2      marked into Evidence.)

3         THE COURT:  Any re-cross by Defendant Ruiz?

4         MR. FLEISCHMAN:  No, Your Honor.

5         THE COURT:  Any re-cross by

6      Defendant Cappelletti?

7         MISS DADOWSKI:  Your Honor, if I may just have a

8      minute with my client.

9         THE COURT:  Yes, ma'am.  Any questions regarding

10     the x-rays?

11        MISS DADOWSKI:  No, Your Honor.

12        THE COURT:  Okay.  Thank you, Mr. D'Ambrosio.

13     You're excused.

14        Okay.  Call your next witness.

15        MR. GROSZ:  Stanley Cruz.

16  Thereupon,

17            CORPORAL STANLEY CRUZ

18  having been first duly sworn, was examined and testified upon

19  his oath as follows:

20        THE CLERK:  Officer, if you would please state

21     your full name and spell your last for the record.

22        MISS DADOWSKI:  Judge, if we may approach side

23     bar before he testifies.

24        THE COURT:  Yes, ma'am.

25

1          (Thereupon, the following proceedings were

2     had side bar; outside the presence of the

3     jury:)

4          MISS DADOWSKI:  I don't think we should be able

5     to get into the specific allegations or charges that my

6     client was charged, just the fact that he was arrested up

7     in Georgia.

8          Mr. Grosz, I believe, wants to get into some

9     statements that my client made about I can't believe the

10    son of bitch left me.  I don't think it's proper.  It's

11    irrelevant.  He doesn't know who Mr. Cappelletti was

12    talking about when he made those statements.

13          I brought it all out on cross examination on

14    Mr. D'Ambrosio right now when John called him from the

15    jail, he did not appear to be upset with him.  And did

16    not blame him at that time for his arrest in Georgia, and

17    I think those statements are highly prejudicial and

18    improper.  And I would ask they be kept out and not

19    relevant and not probative.

20          THE COURT:  What's the purpose of calling Cruz?

21          MR. GROSZ:  Because he's going to testify that

22    Cappelletti is upset about the guy who left him and

23    D'Ambrosio just testified that he's the guy who left him.

24          And I mean, it is prejudicial, but I think the

25    probative value substantially out weighs the prejudice.

10  1          MISS DADOWSKI:  When Mr. D'Ambrosio (sic) had

2     first contact with Mr. D'Ambrosio in jail, he did not

3     hold him responsible.  So I think this would be causing

4     them to speculate as to who he was talking to.

5          THE COURT:  You wish to --

6          MR. FLEISCHMAN:  No, Judge, because I don't have

7     any bearing on this.

8          THE COURT:  Okay.  The objection by Cappelletti

9     will be overruled.

10          (Thereupon, the following proceedings were

11     had within the presence of the jury:)

12          THE CLERK:  Sir, if you would please, could you

13     please state your full name and spell your last name for

14     the record.

15          THE WITNESS:  Stan Michael Cruz, C-r-u-z.

16               DIRECT EXAMINATION

17  BY MR. GROSZ:

18     Q.    Morning, sir.

19     A.    Good morning.

20     Q.    Tell us what you do for a living?

21     A.    I'm a corporal for the Fulton County Police

22  Department, Atlanta, Georgia.

23     Q.    Let me direct you to February 11th and early part

24  of February 12, 1997.  Were you working at that time?

25     Q.    Yes, I was.

Q.    Where were you working?

A.    Uniform patrol, morning watch from 11:00 to 7:00.

Q.    There in what area?

A.    Sandy Springs, Fulton County unincorporated.

Q.    Do you have occasion during that time period to come into contact with someone that later became known to you as John Cappelletti?

Q.    Yes, I did.

Q.    And you placed him under arrest, without getting into any specifics, is that correct?

Q.    That's correct.

Q.    After placing him under arrest, did you have a conversation with him regarding what he was doing there or who he was there with, something along those lines?

A.    Well, actually that was prior to his arrest.

Q.    Okay.  Did you have that conversation?

Q.    Yes, I did.

Q.    And can you tell me what statements Mr. Cappelletti made to you at that point?

MISS DADOWSKI:  Objection based on my previous argument.

THE COURT:  Overruled.

THE WITNESS:  He was cussing and talking about a third person that wasn't there.

10

1    BY MR. GROSZ:

2         Q.    And in what context was he saying that to you?

3         A.    In response to my questions about what he was

4    doing there, how he got there.

5         Q.    Do you recall specifically what he said?

6         A.    He was calling someone that wasn't there a son of

7    a bitch and saying he shouldn't have left me, and just

8    cussing, continuing cussing at someone about someone.

9         Q.    Did he ever mention that third person's name?

10        A.    No, I never got that out of him.

11        Q.    And did you know who he was talking about at that

12   point?

13        Q.    No.

14        Q.    You see that gentleman in court that made those

15   statements to you?

16        A.    Yes, I do.

17        Q.    Would you please identify him?

18        A.    He's the gentleman in the print shirt with the

19   gray hair.

20             MR. GROSZ:  Okay.  The record reflect the in

21        court identification of Mr. Cappelletti.

22             THE COURT:  Yes, sir.

23             MR. GROSZ:  Thank you, sir.  I don't have

24        anything else?

25             THE WITNESS:  Welcome.

10

1                          THE COURT:  Either De1

2                              CROSS EXAMINA'

3      BY MISS DADOWSKI:

4              Q.    Mr. Cappelletti was dru1

5      met him?

6              A.    He was drunk, yes.

7              Q.    He was incoherent?

8              A.    I could understand what he was saying.  I didn't

9      understand what he was talking about or whom he was talking

10     about.

11             Q.    And you have no idea who he was talking about?

12             A.    At that time, no.

13             MISS DADOWSKI:  I don't have any other questions.

14             THE COURT:  Anything further of this witness?

15             MR. GROSZ:  No, sir.

16             THE COURT:  All right.  Thank you, Corporal Cruz.

17             Call your next witness.

18             MR. GROSZ:  Carl Haemmerle.

19             THE COURT:  He is on his way up.  You may want to

20        wait for him outside.

21             How many more witnesses does the State have?

22             MR. GROSZ:  This is the last witness.

23

24

25

Thereupon,

CARL HAEMMERLE

having been first duly sworn, was examined and testified upon

his oath as follows:

  THE CLERK:  Sir, if you would please state your

  full name and spell your last for the record.

  THE WITNESS:  Carl H. Haemmerle,

  H-a-e-m-m-e-r-l-e.

DIRECT EXAMINATION

BY MR. GROSZ:

  Q. Morning.

  A. Good morning, sir.

  Q. Tell us what you do for a living, sir?

  A. I am a firearms and tool mark examiner.  I'm

employed by the Broward Sheriff's Office in the crime

laboratory here in Fort Lauderdale, Florida.

  Q. How long have you done that?

  A. Three-and-a-half years.

  Q. Any prior experience prior to those

three-and-a-half years?

  A. I was a firearms and tool mark examiner at the

Miami Value Reginal Laboratory in Dayton, Ohio.

  Q. For how long?

  A. Six years.

  Q. Give me a brief history in that field, firearms

and tool mark examination?

A.    Started my association with firearms as a police officer with the City of Dayton, Ohio.  I was the range officer and armor for the City of Dayton for five years.

From there I went to the county crime lab and took my formal training in the forensic science of firearm and tool mark examination.  The training was conducted by Mr. David Tolbe, the senior examiner, and the training program was followed by the guidelines established by the Association Of Firearms And Tool Mark Examiners.  That's the business organization for people that do the type of work I do.

Advanced training was had at the State of Ohio main laboratory in London Ohio.  And training after that was had at the FBI National Academy in Quantico for advanced techniques in firearms identification, and for gun powder and gunshot residue detection and distance determinations.

I've also received training from the Bureau Of Alcohol, Tobacco And Firearms, and silenced converted weapons and other illegal firearms.  Also received training from the FBI in the drug fire computer imaging system.

Q.    What's that?

A.    Drug fire system is a system where you can take a bullet or cartridge case, image it into a computer and then do a computer search against the database for like images.

Helps us associate vast amounts of cartridge

11    1    casings and bullet comparisons without having to put

2    everything under the microscope.  Then if we see something

3    that looks promising, we'll call forth evidence and do a

4    formal examination.

5    I received certifications and I have attended

6    armor classes from Glock, Smith and Wesson, Sig Arms,

7    Remmington, and Mossburg, covering rifles, shotguns, pistols

8    and revolvers which were the common types of weapons that we

9    see in the crime laboratory.

10    I'm also familiar with the loading of ammunition,

11    since that was one of my jobs with the police department the

12    first year.  I loaded in excess of quarter of a million

13    practice cartridge.

14    Q.    Okay.  And do you attend refresher courses on the

15    same topics periodically?

16    A.    Yes, sir.  The Association Of Firearms And Tool

17    Mark Examiners has a meeting every year which I attend on a

18    rotating bases.

19    And also the International Association For

20    identification and the Florida Division Of The International

21    Association Of Identification has training seminars.

22    Plus we have a firearms examiners users group

23    meeting from the State of Florida which we attend twice a

24    year.

25    Q.    How many examinations would you say you performed

11    1    on firearms during the course of your employment?

2        A.    Thousands.

3        Q.    And --

4        A.    Literally thousands.

5        Q.    Have you ever testified as an expert in the field

6    of firearm and tool mark examination?

7        A.    A hundred and eighy-nine times I have been

8    allowed to give opinion testimony.

9            MR. GROSZ:  Okay.  Judge, at this point, I'd

10        offer Mr. Haemmerle --

11            THE COURT:  Any voir dire by either Defendant?

12            MR. FLEISCHMAN:  No, Your Honor.

13            MISS DADOWSKI:  No, Your Honor.

14            THE COURT:  Any objection?  All right, folks, the

15        witness, Mr. Haemmerle, will be admitted the 190th time

16        in the field of firearm and tool mark as an expert.

17    BY MR. GROSZ:

18        Q.    Are you commonly known as Bud?

19        A.    Yes, I am.

20        Q.    In other words, if we refer to you as Bud, this

21    is what we're talking about?

22        A.    Right.  I'm technically a junior.  My father

23    passed away so I didn't use the junior designation.  And my

24    father did not want a junior in his house, so he called me

25    Bud.

11

1          Q.    Back in April of 1997, did you have occasion to

2    perform some examinations at the request of law enforcement

3    officers involved in this investigation?

4          Q.    Yes, I did.

5          Q.    And specifically, can you tell us what

6    examinations and what items you were requested to look at?

7          A.    I was requested to look at a piece of tissue that

8    came in a hospital container to see if it contained anything

9    that would be consistent with discharge material from a

10   shotgun.

11               I was also asked to a look at several film

12   canisters that contained suspected discharge material from

13   shotgun.

14         Q.    Let me show you what is in evidence -- what is

15   now in evidence that has been marked as State's Q for

16   Identification.  Ask you if you recognize that?

17         A.    Yes, I do.  The outer plastic has my initials, my

18   seal.  The envelope which has the State's little tag on it

19   also has my seal, 4/21 which is the day I worked it, my case

20   number 84H88 which is the case number for investigation.

21         Q.    And that 84H88, is particular to this

22   investigation, is that correct?

23         A.    That is correct.

12

24         Q.    Would you please open that up outside the

25   presence of the jury and take a look at the contents inside.

12

1    A.    Okay.

2    Q.    Do you recognize that?

3    A.    Yes, I do.

4    Q.    What do you recognize that to be?

5    A.    This is the plastic bag which has the specimen

6    container that was submitted to me.  It also bears my seal

7    with my initials on it.

8    Q.    Okay.  Does it appear to you to be in

9    substantially the same condition as when you last saw it?

10   A.    Yes, it is.

11   Q.    And that's the tissue that you're talking about?

12   A.    It's the hospital container that has the tissue,

13   yes.

14   Q.    What's the package on the outside of the manila

15   envelope?

16   A.    That is the subsequent items that I found in the

17   tissue itself.

18   Q.    Okay.  What do those appear to be?

19   A.    That's led shot.

20   Q.    Does that package or contents that have been

21   packaged appear to you to be in substantially the same

22   condition today as when you reretrieved it from the tissue?

23   A.    Yes.  The outer package is heat sealed and the

24   inner package is sealed with my initials on it.

25              MR. GROSZ:  Judge, at this time I offer State's Q

12    1         in.

2                     THE COURT:  Any voir dire or objection?

3                     MR. FLEISCHMAN:  No, Your Honor.

4                     MISS DADOWSKI:  No, Your Honor.

5                     THE COURT:  State's Q will be offered as

6         State's 21.

7                     (Thereupon, State's Exhibit Number 21 was

8         marked into Evidence.)

9    BY MR. GROSZ:

10        Q.    The other items that you were asked to look at on

11   that same day, you identified as being eight film canisters,

12   is that correct?

13        Q.    That's correct.

14        Q.    Containing what appeared to you to be led shot?

15        A.    No, discharge materials from a shotgun.  Some

16   were shot, some were other things.

17        Q.    Take a look at State's S which has been opened in

18   court.  Tell me if you recognize that?

19        A.    The envelope bears my initials, my seal.  This is

20   the latter, this is not the one that I did on the first day,

21   this is the one I did on the second day.

22        Q.    Okay.  How about what's contained in State's 5 in

23   Evidence.  This is in evidence.

24        A.    Yes, sir.  These are the film canisters.

25        Q.    Okay.

A.    They bear -- each individual film canister bears my initials and a designation.

Q.    Take a look at State's S, the first package that I handed you and that's what you did on the latter date?

A.    This one here?  This is the one I did on the latter date.  Has -- I did them a month apart.  This one bears 4/21, the date it was sealed, this is 5/21.

Q.    You say this, you're talking about Number 5 is --

A.    Number 5.

Q.    Is 4/21?

A.    Is 4/21.

Q.    Letter S is on what?

A.    5/21.

Q.    5/21, okay.  Do the contents in State's S appear to you to be in substantially the same condition as they were when you performed the examination on them?

A.    They still bear my designation and still are sealed and the seals have my initials on them, yes.

MR. GROSZ:  Judge, I offer State's S.

THE COURT:  Any objection?

MR. FLEISCHMAN:  No, Your Honor.

MISS DADOWSKI:  No, Your Honor.

THE COURT:  State's S will be received as State's 22.

12

1              (Thereupon, State's Exhibit Number 22 was

2         marked into Evidence.)

3    BY MR. GROSZ:

4         Q.    Let's start with 4/21, that date.  What

5    examination did you perform and can you walk us through each

6    item.  Tell me what you're examination revealed?

7         A.    First thing I did, I dealt with the hospital

8    container, opened it.  Examined the contents and found it to

9    contain small led particles.  I then look the led particles

10   out and did an examination on those.

11             I had to determine the size, you weigh it, you

12   don't measure it because it's deformed as it comes out the

13   barrel because when the shot shell is fired, the pressure that

14   drives the gases, compresses the shot while it's still in the

15   shot shell before the seal breaks, and the material goes down

16   the barrel.  So the shot is deformed as it comes down the

17   barrel.

18             So you weigh the shot and compare it to known

19   weights of different size.  And by size, I determined the shot

20   that was in the material in the tissue, to be consistent with

21   seven-and-a-half shot.

22             I then --

23        Q.    When you talk about shot, for those of us that

24   may not be familiar with ammunition, what type of ammunition

25   is that -- does that come from?

A.    Shot is the -- is what you call the little pellets that are in a shot shell that is fired from a shotgun.

Q.    Go ahead.

A.    I then opened up the film canisters and examined the contents of each film canister.  Some of the film canisters contained led, some contained paper spacers and some contained -- one contains a piece of plastic which is a shot sleeve.

Q.    Those are all components of State's Exhibit Number 5, correct, which came from the victim's vehicle?

A.    It came from a vehicle.

Q.    You don't know because you're just sitting in the crime lab?

A.    I don't know who belongs to what vehicle.

Q.    Okay.  This is all State's 5 just so we don't get confused, okay.  Go ahead.

A.    I then examined the contents and I found that all of the shot that was in all the different canisters are also consistent with seven-and-half shot.

And that the two -- there are two plastic -- excuse me, two paper spacer wads that are consistent with .12 gage shot shell and there's a plastic sleeve which is consistent with a Winchester .12 gage shot shell.  The plastic sleeve has indentations on it that showed that it was fired from a shot shell loaded with a small shot.  I can't tell you

13

1    if it was a seven, six -- seven-and-a-half or eight, okay,

2    because as I say, they compress.  But you can tell it's a

3    small size shot as opposed to a larger shot, number three,

4    something of that nature because the indentations are smaller.

5                So everything in the one exhibit is consistent

6    with discharge material from a single -- that could be loaded

7    in a single shot shell.

8            Q.    Okay.  And what brand?

9            A.    Winchester, seven-and-a-half.

10           Q.    Why do you say that?

11           A.    Because the paper spacers and the plastic sleeve,

12    the plastic sleeve is proprietory to Winchester.  That

13    particular component is propietory to their shot shells, so

14    they're the only ones that load it.

15                And the plastic sleeve with the two paper spacers

16    are consistent with their seven-and-a-half shot loading.  And

17    what I found, the shot size is seven-and-a-half.  So

18    everything's consistent with seven-and-a-half and the plastic

19    would identify the components to a brand which would be

20    Winchester.

21           Q.    Now, as you mentioned, the size of the shot.  You

22    can't tell by looking at the indentations on the plastic shot

23    sleeve, but you can tell that by weighing the actual shot?

24           A.    That's correct.

25           Q.    Now, the other -- You were then asked to perform

13

1    an examination on what is now State's 22 which came also from

2    a vehicle, correct?

3        Q.    That's correct.

4        Q.    You obviously don't know which vehicle?

5        A.    I don't -- I was -- I did not collect any of the

6    evidence.  The evidence was sent to the laboratory.  It was

7    marked as coming from a vehicle.  And I don't -- it's

8    irrelevant to my examinations whose vehicle they come from.

9        Q.    Okay.  Tell us what examinations you performed

10    and walk us through those items?

11        A.    You have a number of different items in here.

12    You've got a number seven-and-a-half shot shell, okay,

13    Winchester.  Then you've also got --

14        Q.    Is it a live one or spent round?

15        A.    It's unfired.

16        Q.    Okay.  It's -- the star crown still has the

17    primer intacted and still has the weight.  You can hear the

18    components rattling around inside.  That's a seven-and-a-half

19    Winchester shot shell.  And then the other components --

20        Q.    Before we get to the other components, the

21    live -- or unspent round that you just held up, that's part of

22    State's 22, is consistent, in your opinion, as an expert, with

23    the items that you just spoke of which are in State's 5, is

24    that correct?

25        A.    Yes.  If I was to cut this apart and I could then

make a comparison between these items and these items, and they would be consistent with being loaded by the same manufacture, yes.

I've got a number of shot that are approximately 50. Again, by weight they're seven-and-a-half. I've got two paper spacer wads. And I've got the plastic sleeve. Again, which is all components from the same manufacture.

Q.    Consistent with what you just described as being found in State's Exhibit Number 5?

Q.    Yes, sir.

Q.    Let me show you what has been marked for Identification as a demonstrative aid, it's State's X) and ask you if you recognize that?

A.    Yes, I do.

Q.    Okay. And what do you recognize that to be?

A.    This is a packet that I prepared for you which shows all of the components that are in a seven-and-a-half Winchester shot shell.

Q.    Okay. Would these be spent components prior to --

A.    No, these are out of a live. As you can see, the crimp is still intact and primer still intact. All I did is open the top, split the side, pulled the components out and then put them into a package so they could be seen.

Q.    Okay. Would that assist the members of the panel

14

1  in understanding the components of these items that you've

2  just been discussing?

3       A.    Yes, it could.

4       Q.    And obviously this item X has nothing to do

5  particularly with our case and it wasn't one of the items

6  found in the vehicles, correct?

7       A.    That's correct.  This was something -- the item

8  that you're holding for demonstration purposes, was taken from

9  laboratory stock.

10            MR. GROSZ:  Judge, I ask that this be used as

11       demonstrative aid.

12            THE COURT:  Any objection?

13            MR. FLEISCHMAN:  No objection.

14            MISS DADOWSKI:  No.

15            THE COURT:  Okay, granted.

16  BY MR. GROSZ:

17       Q.    Would you mind stepping down and just walking the

18  panel through the components and then how it works if it were

19  to be fired?

20       A.    The components, okay.  First that's visible is

21  the shot shell itself, the brass and plastic.  What's nice

22  about it is they tell you who makes it and they tell you what

23  it is.

24            It says Winchester.  It says, seven-and-a-half

25  and one.  Seven-and-a-half is the size of the shot.  You see

14

1    the led ball with the shot.  The one is one ounce loading, the

2    weight of the shot.  Then the three and quarter, that's three

3    quarter grams of black powder equivalent, that's another way

4    of telling you how much --

5              MR. FLEISCHMAN:  Judge, I do have an objection.

6         There's been no evidence presented yet by the State that

7         indicates that the demonstrative aid that's being used by

8         Mr. Haemmerle is, in fact, the same shot that -- with

9         which Mr. D'Ambrosio was shot and particles that they

10        found in the car.

11             So I'm objecting on those grounds.  It's almost

12        implying that this maybe the exact same type of shot that

13        was fired at Mr. D'Ambrosio.

14             MISS DADOWSKI:  Same objection, Your Honor.

15             THE COURT:  Overruled.

16    BY MR. GROSZ:

17        Q.    Go ahead.

18        A.    The thing that makes it unique, okay, is the

19    combination of the plastic sleeve, which is proprietory to

20    Winchester.  They're the only ones that load it.  And the

21    seven-and-a-half loading, the paper spacers, the two thick

22    paper spacer with the seven-and-a-half or with the plastic

23    powder show the manufacture.

24             In ten years of doing this work, cutting shot

25    shells apart, this is the only loading that you're going to

14

1    find these combinations of components in because this is

2    proprietory to this manufacture.  So seven-and-a-half shot

3    it's got the paper spacers, you've got the plastic sleeve,

4    it's going to be a Winchester.

5        Q.    How would this work now if it's -- let's -- all

6    these components now are back inside the Winchester shot?

7        A.    To load this, first I would have put the primers

8    set into the shot shell, okay.  Then you would go to the

9    powder, keep the powder compressed together, you put a powder

10   wad, print wad that is coded.  Then you put the two spacer

11   wads, then you put the shot, and then you crimp it, it's a six

12   star crimp, keep all the components in together, keep them

13   from falling out.

14        When it's fired, then you're firing acts like a

15   spark plug, throws a very intense spark.  There's a little

16   flash in the bottom of the shot shell that I ignites the

17   powder.  When the powder ignites, it forms gas.  Gas then

18   forces the shot out the end of the shot shell.

19        As the gas builds up, the cartridge for the shot

20   shell is going to stabilized inside the shotgun.  Then as the

21   gas continues to build, the shot simply takes the path of

22   least resistance.  It breaks the tip open and travels down the

23   barrel.  It's the only way it can go because the rest of the

24   shot shell is inside the firearm, the barrel steel.  The

25   bridge base is steel so the only way it could go is out the

1    front end.

2         Q.    Now, the demonstrative aid that you're showing us

3    is a Winchester .12 gage seven-and-a-half shot, correct?

4         A.    Yes, sir.  If you would -- want to compare what

5    was found in evidence already with what was made, you will see

6    that they both read the same.

7         Q.    And how about what you described as being in

8    State's Exhibit 5, the first items that you were asked to

9    test?

10         A.    Everything is consistent with the components in

11    here.

12         Q.    When you talk about a shotgun actually firing,

13    can you describe the path or the pattern that the led would be

14    expelled at?

15         A.    Shot, as it leaves the shotgun, is compressed.

16    And as it leaves, the further it gets from the muzzle, the end

17    of the barrel, it spreads out in a cone shape.

18              For the first -- first -- depending on the choke,

19    the choke is the restriction in the end of the barrel that

20    keeps the pattern tight.  Depending on the type of choke you

21    get, the shots going to travel in one column until it starts

22    to spread.  That column varies with the choke so anywhere from

23    6 to 10 feet.  It's going to be in one column moving together.

24              After that, that's going to start to spread out.

25    As it spreads it spreads approximately one inch per yard and

15

1    it will open up in a cone shape fashion.

2        Q.    Have you ever been requested to look at a bullet

3    hole, for lack of a better word, or shotgun shell in

4    determining the distance that a gun was discharged at?

5        A.    That's one of the things that I have been trained

6    in.  I've done it in training and done it in actual cases.

7        Q.    And what other factors aid in your determination

8    of distance?

9        A.    First of all, you need a shotgun because without

10    the shotgun, you don't know what type of barrel is on it.  You

11    don't know the choke that's at the end of the barrel.

12            So in in order to give a good distance

13    determination based on the size of a hole, you have to have a

14    shotgun.  Without the shotgun, you're giving your best

15    guesstimate.

16        Q.    Okay.  When you say your best guesstimate, within

17    your field of expertise, would you be able to limit that range

18    to a certain -- a certain degree without the shotgun?

19        A.    Without the shotgun I can give a window.  I

20    couldn't tell you -- it would be a broad window because it

21    would have to take into from a straight cylinder buffer all

22    the way to a full choke which would be -- which would make the

23    window quite large.

24        Q.    Does the length of the shotgun, the barrel, make

25    a difference?

15

1          A.    Not as much as the choke.  The choke is what

2     makes the difference.

3          Q.    Let me show you what is in evidence as

4     State's 10.  Have you been asked to look at these photographs

5     before?

6          A.    Yes, I have.

7          Q.    Okay.  And do those photographs aid you in, at

8     least, giving us a window for the distance determination?

9          A.    It can.  But again, it's going to be based on --

10    it has to be a broad window.  I can't tell you exactly.

11         Q.    Okay.  When you look at these photographs and you

12    look at the hole in the window, do you also look for the

13    surrounding areas around the window to help you make a

14    determination?

15         A.    Sure, because you would be looking for to see if

16    there's an opening.  As the shot gets further from the muzzle,

17    it opens up, so you're going to be looking for flyer holes and

18    also be looking for a broader pattern.  So you not only look

19    at the hole itself, but the whole area.

20         Q.    By flyer holes, you mean pellets that spread in a

21    fashion, in a cone fasion?

22         Q.    Yes.

23         Q.    Do you see that in this picture?

24         Q.    No.

25         Q.    What would that indicate to you?

15

A.    It would indicate that there were a number of

flyers.  There could be some that is not a perfectly round

hole, so there could be some also, I don't know how the window

was handled prior to those pictures being taken.

Q.    Let's assume that the window wasn't touched and

that this is as it was found for our purposes, does that aid

you at least in giving us a window?

A.    A window -- I could give you a window.  But

again, it's going to be a broad window.

Q.    Okay.  What is it?

A.    I would say 6 to 10 feet.

Q.    And that's based on --

A.    Maybe 12 depending -- maybe 12 depending on the

choke.

Q.    So in other words, the -- what caused that

pattern in that vehicle, based on your experience, would have

been fired from a period of either 6 to 12 feet?

A.    Approximately, yes, sir.

Q.    Okay.

A.    I'd need a shotgun to narrow it down any further.

Q.    What's the smallest shotgun that you have ever

tested in the lab to find to be operable?

MISS DADOWSKI:  I will object to the relevance of

this.

THE COURT:  Overruled.

15

1              THE WITNESS:  The smallest one I've had the

2      misfortune of testing had an overall length of just under

3       10 inches.

4   BY MR. GROSZ:

5       Q.    Is that legal in the State of Florida?

6       A.    It's not legal anywhere in the United States.

7       Q.    Can you describe the speed -- First of all, how

8   many pellets would be contained in a .12 gage seven-and-a-half

9   shot Winchester shot shell?

10      A.    I'd have to consult my notes.  I don't memorize

11  all those figures.  It's going to be approximately 400, 450, I

12  believe.

13      Q.    Can you tell me the speed in which they would be

14  traveling?

15      A.    That would depend on the size of the barrel.  So

16  out of a test barrel, they're listed at 1240 feet per second.

16

17      Q.    Which converts to what?

18      A.    Which converts --

19      Q.    In English?

20      A.    In English that gives you a speed of

21  approximately 820 miles per hour.

22      Q.    Does the location of the components of the shot

23  shell, after discharge, would that tell you anything about the

24  distance at which a gun was fired?

25      A.    Yes.  Because again, the discharge material --

16    1    the lightest component you have is that paper spacer, that's

2    the most affective by wind.  So it doesn't go as far as the

3    rest of the components.  So finding it through a hole, finding

4    it in a car that has a single hole in the window would, again,

5    put it inside that 6 to 12.

6    Q.    Okay.  So if you learn that State's Exhibit 5 was

7    all found within the victim's vehicle where that hole is that

8    you just saw, that would aid in at least the determination

9    that you gave us?

10    Q.    That's correct.

11    Q.    And that would be consistent with that, is that

12    correct?

13    A.    Yes.

14    Q.    Over 800 miles an hour.  What type of damage

15    would you expect to find from the expenditures or expelling

16    that type of shot shell?

17    A.    Depends on --

18    Q.    Between 6 to 12 feet?

19    A.    A lot of definition.

20    MR. GROSZ:  I don't have anything else, Judge.

21    THE WITNESS:  There's -- Can I make a correction,

22    Your Honor?

23    THE COURT:  Excuse me?

24    THE WITNESS:  Can I make one correction?

25    THE COURT:  Yes, sir.

16

1          THE WITNESS:  Okay.  It's just -- it's trivial.

2     The prior testimony says 198 not 189, I mixed the number.

3          MR. GROSZ:  Another words, this is 199th time?

4          THE COURT:  199 times?

5          THE WITNESS:  I apologize.

6          THE COURT:  Thank you, Mr. Haemmerle.

7                       CROSS EXAMINATION

8     BY MR. FLEISCHMAN:

9          Q.    Mr. Haemmerle, the fact that you have all this

10    evidence in front of you, you don't know who actually may have

11    fired this weapon, is that right?

12         A.    That's correct.  That's beyond the scene of my

13    examination.  I have no way of telling.

14         Q.    Okay.  The evidence that you received, was there

15    any indication on it that it had been checked for any type of

16    fingerprint analysis?

17         A.    Yes.  The shell casing -- the outer casing of the

18    shot shell that's intacted was processed.

19         Q.    Okay.  And how do you know that?

20         A.    The feel -- I can feel the superglue.  I'm

21    sensitive to that.  I used to process firearm evidence so I

22    can feel that.  It's also got black powder still on it.  I had

23    to wipe it off before I conducted my examinatin.  So yes, it

24    has been processed.

25         Q.    So in other words, in your training and

16

1    experience both before and during your tenor with the

2    Sheriff's Office, you have seen cases where fingerprints have

3    actually been removed from these shot shells, is that correct?

4        A.    That's true.

5        Q.    Was there any other materials that you received

6    as part of your duties that also indicated that there had been

7    some work done to try and raise any type of fingerprints, do

8    you recall anything else?

9        A.    I think the shot shell is -- of what I examined,

10   was the -- what was processed.

11       Q.    Okay.  Now, this seven-and-a-half shot -- And

12   again, that's your opinion based on the weight, is that

13   correct?

14       Q.    That's correct.

15       Q.    Okay.  I think you had told us at deposition when

16   we questioned you, you had used the word shot is a shot is a

17   shot?

18       Q.    That's correct.

19       Q.    Could you please explain that to the jury what

20   you mean by that?

21       A.    If I take seven-and-a-half shot that's loaded by

22   federal or seven-and-a-half shot that's loaded by Winchester

23   or Remmington and I put it all in unmarked containers, I

24   couldn't tell you which manufacture loaded which shot.

25   Because you're looking at led shot, it's all the same size or

16    1    basically the same size.

2         Q.    Would it be fair to say the actual shot that you

3    have you can't necessarily say whether or not that is

4    Winchester brand shot, is that true?

5         A.    No, I cannot say that specifically that is

6    Winchester's and nobody else's.  They could all buy it from

7    the same manufacture or -- yeah, from the same manufacture.

8         Q.    And you also cannot say in your expert opinion

9    that the unspent shot shell that you have, which you've

10    identified, I'm sorry I don't know which exhibit it is, if you

11    could just for the record tell us?

12        A.    That would be Exhibit 22 and it's my item M.

13        Q.    Okay.  You cannot say, again, in your opinion

14    beyond every reasonable doubt, Mr. Haemmerle, that the

15    materials that you have are one in the same with this unspent

16    shot, isn't that true?

17        A.    Define one in the same is, sir.  I'm confused by

18    the --

19        Q.    Okay.  Well, you can't say that the batch of shot

20    shells that are loaded under the Winchester name is the exact

21    same as the shots that were found, is that right, recovered by

17    22    the police?

23        A.    I'm still fuzzy on the question.

24        Q.    Okay.  Well, in other words, all you can tell us

25    today is that the shots that you found and the materials that

17

1     you were given are consistent?

2          A.     Are you talking just the shot or the all the

3     materials?

4          Q.     The shot and the components, your position is

5     that it's consistent?

6          A.     It's consistent.  And the reason being, the only

7     reason -- only manufacture that uses the sleeve, that sleeve

8     because it's proprietory to that it is Winchester.

9               If you ask am I sure within a reasonable degree

10    of scientific certainty that we base our opinion on it, is

11    this a Winchester component, yes, I am.  Is the same as the

12    one that was found, yes, they're all the same.  They're all

13    loaded under the same name Winchester.

14         Q.     Except the shots though.  In other words, actual

15    shots that were found, that you cannot say whether those were

16    Winchester shots?

17         A.     No, I can't say that that was only loaded by

18    Winchester.

19         Q.     Okay.  Now, in your experience -- Well, first of

20    all, there's various types of shotguns, is that true?

21         Q.     Yes.

22         Q.     I think you had referred to the fact that based

23    on your experience, there was about four different common

24    types of shotguns, is that right?

25         A.     That's correct.

17

1          Q.    That would be -- Can you describe those please?

2          A.    Okay.  You've got a bolt action shotgun which

3    works by rotating the bolt.  You have a break open shotgun.

4    You have a semi-automatic shotgun.  Then you have a pump

5    shotgun.  Those are the four most common types.

6          Q.    And based, again, on the evidence that was

7    presented to you, you cannot say what type of shotgun these

8    shells came from or these shots came from, is that right?

9          A.    That's correct.

10         Q.    And you're also not able to testify as to the

11   length of the shotgun, is that also correct?

12         Q.    That's correct.

13         Q.    And you're not able to testify as to the choke of

14   the shotgun, is that correct?

15         Q.    That's correct.

16         Q.    Now, you have seen shotguns as little as how --

17   how short would you say?

18         A.    Ten inches.

19         Q.    Okay.  Can you show us approximately what ten

20   inches would look like?

21         A.    (indicating)

22         Q.    From a gun that size, a person would still be

23   able to discharge a shotgun shell, is that true?

24         Q.    That's correct.

25         Q.    What is the purpose of having a ten inch shotgun?

17

1          A.      Concealability.

2          Q.      Okay.  Would it also be fair to say,

3    Mr. Haemmerle, that depending on the type of shotgun that was

4    used, there could have been residue left within the area where

5    it was actually fired?

6          A.      If you fire within the car, you may have some --

7    how -- in the car, you're talking about the muzzle is still in

8    the car?

9          Q.      I'm asking you, would you find some type of

10   particulates?

11         A.      If the muzzle is still in the car, theoretically,

12   it's able to find some particulates.  If the muzzle is outside

13   the car, your chance of finding particulars is zero to none

14   because everything is discharged at the barrel.

15         Q.      Okay.  Again, in your opinion then, when you said

16   from the shot having been fired from 6 to 12 feet, did you

17   say?

18         A.      Right.

19         Q.      Would that mean from the end of -- from the

20   actual end of the shotgun that was fired?  Your opinion is

21   that from the end of the shotgun to where the hole appears in

22   the window, that it could be no more than 6 to 12 feet, is

23   that correct?

24         A.      That's correct.  From the muzzle -- from the end

25   of the muzzle where the shot comes out of, that's correct.

17

1              MR. FLEISCHMAN:  Okay.  That's all I have.  Thank
2        you.
3              THE WITNESS:  You're welcome.
4              THE COURT:  Miss Dadowski, any questions?
5              MISS DADOWSKI:  Yes, sir.  If I may have a
6        moment.
7                          CROSS EXAMINATION
8    BY MISS DADOWSKI:
9        Q.    Good morning.
10       A.    Good morning.  How are you?
11       Q.    Now, you never received the actual shot shell
12   that was used to shoot Mr. D'Ambrosio, is that correct?
13       A.    I never received a shot shell -- a fired shot
14   shell, that's correct.
15       Q.    And you cannot say who fired the weapon, is that
16   true?
17       A.    That's correct.
18       Q.    You cannot say that John Cappelletti shot any
19   weapon on that particular day, is that correct?
20       A.    That's correct.
21       Q.    Now, what is the average length of a shotgun?
22       A.    The average length of a shotgun would -- depends
23   on how it's set up.  I don't mean to be evasive, but the two
24   ways they commonly come, one is with a pistol grip and the
25   other is with a regular shoulder stock.  The one with a pistol

17    1    grip is 340 inches or so.  The other ones would be longer.

2    Q.    How much longer?

3    A.    Pistol grip you're looking between 30 and 36 and

4    the other ones you're looking 38.

5    Q.    Now --

6    A.    36 to 48.

7    Q.    36 to 48?

18    8    A.    Yeah.  They're going to be -- Well, you have a 30

9    inch barrel, then you have to put shoulder stock, I'll give

10    you 40 to 48.  I've never really measured the length of an

11    illegal shotgun.

12    Q.    Okay.  And you said that -- the 36 to 48 was for

13    the --

14    A.    One of the shoulder stock.

15    Q.    Shoulder stock.  And pistol grip you said was?

16    A.    Pistol grip would be around 30.

17    Q.    Now, your testimony is that the person cannot

18    have been no less than six feet or no closer than six feet

19    from the car where that hole was made, is that correct?

20    A.    No.  I said -- I didn't say -- I said that would

21    be my best guesstimate from looking at just the pictures.

22    Q.    No less than six feet, no greater than 12 feet?

23    A.    That's the best guesstimate I would give just

24    looking at the pictures.

25    Q.    And if it was a short barrel shotgun for a

18

1    smaller shotgun barrel, you would expect that there would be a

2    wider spread on the window basically where the shot shells

3    would actually come out, they would spread wider, is that

4    correct?

5        A.    No, it's based on the choke.  If I -- if I have a

6    shotgun with a pistol grip with a legal 18 inch barrel and

7    it's cylinder bore, which means it's a straight tube, it's

8    going to open up at a faster rate than a legal shotgun that

9    has the same barrel length that has a choke on the barrel.

10            But for the first six feet they're going to be

11   about the same.  Then depending on the choke, it's going to

12   start opening up, spreading out at a different rate.  So it's

13   the choke more than the size of the barrel that determines the

14   spread.

15       Q.    Now, in this photograph that the State showed

16   you, in item three, do you see where the actual paper spacer

17   ended up, looks like on the floor mat of the passenger side.

18       A.    Okay.

19       Q.    What does that tell you, the location of the

20   paper spacer in that particular location?

21       A.    That it was found where you indicated.

22       Q.    Does it tell you how far away?  Does it help you,

23   in any way, tell you how far away the shotgun was fired?

24       Q.    No.

25       Q.    The fact that it was still found in the car leads

18

1    to you believe that it was within the 6 to 12 feet range?

2            A.    That's correct.

3            Q.    That's the only thing that basically tells you?

4            A.    Sure, because I don't know what was on the other

5    side of that window at the time the weapon discharged.

6            Q.    And all of the information and all the evidence

7    that you w received to, I guess, do a comparison on, that came

8    from Mr. Ruiz's car and the victim, Christopher D'Ambrosio's

9    car, is that correct?

10           A.    It came from two vehicles.  I haven't checked the

11   names of the owners, the purported owners because as I say,

12   that's irrelevant to my examination.

13           Q.    When you did an examination of, I am not sure

14   exactly which number it was, but you did an examination where

15   you received some pellets from a Honda Civic, 1989 Honda

16   Civic, that was recovered from the back of the Honda Civic, do

17   you recall that?

18           A.    If I look at the property receipts I could tell

19   you which one.

20           Q.    Okay.

21           A.    That would be this over here.  Okay.

22           Q.    All right.  Now, that evidence that was received

23   I think it's MAS 24 on your property receipt?

24           A.    MAS 24.

25           Q.    Okay.  That was the information that was received

18    1    from the Honda Civic?

2         A.    Yes.  It indicates '88 Honda.

3         Q.    '88 Honda, okay.

4              MR. GROSZ:  Which item is in evidence, if you can

5         put that on the record.  I think it's 20?

6              THE WITNESS:  That would be your Exhibit 22.

7    BY MISS DADOWSKI:

8         Q.    Okay.  This is all the items that are over here?

9         A.    Yes, ma'am.

10        Q.    Okay.  And MAS 24 which is part of Exhibit 22

11   were actual projectiles that came and were recovered in the

12   Honda Civic, is that correct?

13        A.    That's correct.

14        Q.    Does that lead you to believe at one time there

15   had previously been a shot fired in that Honda Civic?

16        A.    I would take that, yes.

17             MISS DADOWSKI:  That's all I have.

18             THE COURT:  Any re-direct?

19             MR. GROSZ:  Yes, sir.

20                    RE-DIRECT EXAMINATION

21   BY MR. GROSZ:

22        Q.    Assuming the two cars are traveling down the

23   highway, be fair to assume that there's cross wind that is

24   traveling between the two cars as they travel.

25        A.    Okay.

18    1        Q.   What affect would that have on the components

2  that are expelled from a shotgun in the manner that we've

3  described?

4        A.   In the range that we're talking about?

5        Q.   Right.

6        A.   Negligible.  You have a 12 foot span, furthest

7  you have projectiles moving at 820 miles per hour one way with

19    8  however fashion you want to put the cars, 40, 50, 60 miles an

9  hour, cross wind, in that short distance it's going to have no

10  affect at all.

11       Q.   On the path that the expended projectile is

12  traveling?

13       Q.   Correct.

14       Q.   And where physically on the shotgun does the

15  shell come out?  I mean, obviously it's going to be different

16  for each shotgun, but generally speaking where does it come

17  out?

18       A.   On the four common types that I said, you only

19  have one that expels the shot shell.  All the rest -- all the

20  other three types it's going to stay inside the weapon itself.

21       Q.   And for us laymen, the shot shell never comes out

22  of the barrel, correct, it follows --

23       A.   No, sir, the shot shell doesn't come out the

24  barrel.  The shot shell's expended from the end of the barrel,

25  the breach end, the loading end of the barrel.  Either by

19    1    taking it out or mechanically it's pulled out.

2    Q.    What is the smallest legal shotgun in State of

3    Florida, length of the barrel?

4    A.    Eighteen inches.

5    MR. GROSZ:  Thank you, sir.

6    THE COURT:  Any re-cross?

7    MR. FLEISCHMAN:  One, yes.

8    RE-CROSS EXAMINATION

9    BY MR. FLEISCHMAN:

10    Q.    Mr. Haemmerle, when you talk about a pistol grip

11    shotgun, you're talking about a shotgun that actually has a

12    grip on it that looks like a handgun, is that right?

13    A.    Yes, sir.

14    Q.    Okay.  And in fact, are there some that -- when I

15    say a grip on a handgun, are there some pistol grip shotguns

16    that can be held in one hand, held by a person holding it in

17    one hand?

18    A.    Oh, you can, but it's -- you see it done on

19    movies and in television.  It's not a very comfortable way to

20    shoot a shotgun though.

21    Q.    Can you tell the jury why it would not be

22    comfortable to shoot?

23    A.    Because you're taking a full recoil on your

24    wrist.

25    Q.    What type of recoil would a shotgun have after a

19  1  shot is fired?

2    A. They push fairly -- depending on how you hold it

3  and your wrist, it's locked out, they push.  It's managable if

4  you practiced and did it before.  It's not recommended.

5    MR. FLEISCHMAN:  Okay.  Thank you.  That's all I

6   have.

7        RE-CROSS EXAMINATION

8  BY MISS DADOWSKI:

9    Q. It's also possible that you can rest a shotgun

10  against something to fire the shotgun, is that correct, you

11  don't necessarily need to hold it in your hand?

12    A. No.  If I was in a vehicle, I could rest it on

13  the window sill.

14    MISS DADOWSKI:  Thank you.

15    THE COURT:  Thank you, Mr. Haemmerle.  You're

16   excused, sir.

17    THE WITNESS:  Thank you.  Do you want me to box

18   this stuff up where it came from?

19    THE COURT:  Mr. Grosz?

20    MR. GROSZ:  Yes, please.

21    THE COURT:  All right.  Mr. Grosz, any additional

22   witnesses or any evidence on behalf of the State?

23    MR. GROSZ:  Judge, at this time, the State rests.

24    THE COURT:  All right.  Could I see counsel for

25   all parties at the bench please.

19

1              (Thereupon, the following proceedings were

2      had side bar; outside the presence of the

3      jury:)

4              THE COURT:  What I could do is send the jury to

5      lunch now and come back at 1:30.

6              Now, will that give yaw enough time, number one,

7      to make your motions, Mr. Grosz speak to Mr. Cappelletti

8      and --

9              MR. FLEISCHMAN:  Judge, it won't give me enough

10     time.

11             THE COURT:  It won't?

12             MR. FLEISCHMAN:  No.

13             THE COURT:  Why do you need more time?

14             MR. FLEISCHMAN:  Because I have another hearing I

15     have to go review with another attorney that's covering

16     it for me.  I just need an extra half-an-hour if you

17     could do that.

18             THE COURT:  Do you plan to put on a defense?

19             MR. FLEISCHMAN:  That's something that I will

20     discuss with my client, but I don't anticipate it right

21     now.

22             THE COURT:  Okay.

23             MISS DADOWSKI:  I don't anticipate it right now

24     either.  The last conversation I had with my client was

25     that he may not even want me to call -- have Anthony

testify as a witness.

THE COURT:  So in other words, we may just have closing arguments?

MISS DADOWSKI:  Correct.

MR. GROSZ:  One other thing, are you introducing the medical records?

MISS DADOWSKI:  No, I am not going to do that. Basically explain that they had amphetamines.

THE COURT:  Well, let's make some decisions now. I'm not going to send them to lunch, yet I'm going to send them back there, we'll hear the motions, and you all speak to your clients.

MR. FLEISCHMAN:  Judge, do you think we could have at least until 2:00?

THE COURT:  Let's see where we are headed, okay. Probably so, but let's sort things out now.

MR. GROSZ:  Lessers, we have to think about lessers so I can order them.

THE COURT:  Right.

(Thereupon, the following proceedings were had within the presence of the jury:)

THE COURT:  Folks, let me ask that you step back in the juryroom.

Please do not discuss the facts of the case. It's necessary that I confer with the lawyers at this

19   1    time.

2         (Thereupon, the following proceedings were

3    had outside the presence of the jury:)

4         THE COURT:  The record will reflect that

5    Mr. Cappelletti and Mr. Ruiz are both present represented

6    by counsel.

7         Any motions by either Defendant?

8         MISS DADOWSKI:)  Your Honor, first of all, I would

9    like to renew all my objections and motions for a

10   mistrial that I have made during the course of the

11   State's case and all the motions that I made prior to

20   12   trial

13        And I still think that based on Mr. D'Ambrosio's

14   testimony and his manner of testifying, and his

15   additional comments, especially the fact that he

16   basically eluded to the fact that my client is similar to

17   Terry Nichols, basically when he made the comment that

18   Terry Nichols wasn't even in Oklahoma, somehow implying

19   that my client maybe a person of the caliber of

20   Terry Nichols.

21        I think that's highly prejudicial.  And all the

22   other comments, he's attacking Mr. Fleischman in his

23   questioning and commenting on his answers that were

24   given.  Additionally, in his comments to me in my

25   questioning, I think it's highly prejudicial and

20

1    basically the only outcome to my client is going to be

2    receiving an unfair trial based on all his comments.  And

3    I would ask the Court to grant the motion for a mistrial

4    based on all the evidence.

5            THE COURT:  The Court finds that the cumulative

6    affect of Mr. D'Ambrosio's conduct would not rise to the

7    level of depriving either Defendant the right to a fair

8    trial.

9            The Court did give several jury instructions for

10   the jury to disregard improper remarks made by

11   Mr. D'Ambrosio, including the remark we have regarding

12   Mr. Nichols.  So all prior rulings stand.

13           MISS DADOWSKI:  At this time, I would like to

14   move for a judgement of aquittal.  Based on the fact that

15   when the evidence is viewed in the light most favorable

16   to the State, the State has failed to make out a prima

17   facie case of attempted first degree premeditated murder.

18           They haven't been able to prove that my client

19   did some act intending to cause the death of

20   Christopher D'Ambrosio that went beyond just thinking or

21   talking about it.

22           I understand Mr. D'Ambrosio made a comment that

23   my client threatened to shot his -- blow his brains out

24   or shoot him.  However, they have not been able to prove

25   that my client is actually the one that pulled the

20    1    trigger and actually shot Mr. D'Ambrosio.

      2    In fact, Mr. D'Ambrosio testified that he doesn't

      3    know who shot him.  That he believes that Mr. Ruiz was

      4    driving the car.  Mr. Cappelletti was in the passenger

      5    seat of the car and a shotgun blast came from that

      6    particular location.  However, he cannot say for certain

      7    who actually fired the shot.

      8    And I think it's reasonable, based on

      9    Mr. Haemmerle's testimony, that Mr. Ruiz may have been

     10    the one, based on the fact that he said a shotgun could

     11    be rested on the window of a car, and I don't think that

     12    it's unreasonable to assume that somebody other than

     13    maybe John Cappelletti is the one that actually fired the

     14    shot that shot Mr. D'Ambrosio.

     15    And I don't think that there's been any evidence

     16    or any action -- any evidence to establish that my client

     17    acted with a premeditated design to kill Mr. D'Ambrosio.

     18    They were just some comments and arguments and

     19    Mr. Cappelletti was not following Mr. D'Ambrosio's car by

     20    driving in any way, he was merely a passenger in a car

     21    according to the testimony of Mr. D'Ambrosio.

     22    Mr. Ruiz was the one driving.  And

     23    Mr. D'Ambrosio -- I mean, Mr. Cappelletti was in the

     24    passenger inside of the car.  He did not ever see any

     25    shot or any weapon in Mr. Cappelletti's hand.  Nothing to

20    1          link him to any shotgun.

      2                   So I would make a motion for judgement of

      3          aquittal based on those grounds.

      4                   THE COURT:  Motion will be respectfully denied.

      5                   MR. FLEISCHMAN:  Judge, as to Mr. Ruiz, I would

      6          rerenew any and all objections previously made.

      7                   I also, based on my prior motion to suppress that

      8          had been file with the Court and the Court took testimony

      9          on that, so I renew that objection.

     10                   I move for judgement of aquittal as to my client

     11          on attempted premeditated first degree murder.

     12          Certainly, Judge, at this point in time, looking at

     13          whether or not -- looking at it in light most favorable

     14          to the State, I have two arguments.

     15                   One is, certainly on behalf of Mr. Ruiz, the

     16          State would have to prove under a principal theory, even

     17          to the evidence at this stage of the trial, that Mr. Ruiz

     18          was a principal in this case.

     19                   And they would have to prove beyond a reasonable

     20          doubt that he had a conscious intent that the criminal

     21          act be done and that he did some act or said some word

     22          which was intended to and which did incited, encourage,

     23          or advise the other person or persons to actually commit

     24          or attempt to commit the crime.

     25                   Judge, what my position is, based on the case

20

1    law, I'm going to present some case to the Court which I

2    have previously presented at my Arthur hearing, that

3    number one, certainly the State has presented no evidence

4    whatsoever that the Defendant had a conscious intent that

5    the criminal act be done.

6         And on the second element, even just assuming for

7    argument sake that I am assuming the State is going to

8    present to the Court that there were statements made in

9    the gas station and then because the Defendant drove his

10   vehicle, that that somehow did assist or encourage

11   Mr. Cappelletti in committing this offense.

12        And the first case, Judge, that I want to present

13   is Evans vs. State of Florida and I will be referring

14   to -- actually the cite on that is 643 So.2d 1204.

15        And in that case, it also involves Co-Defendants

16   and I'm reading Page 1205.  It seemed to appellant as the

17   other three discussed such a plan earlier.  They're

18   referring to the crime that was going to take place.

19   Before he and Scott had arrived.  When the ball game

20   ended, all five got into Scott's pickup.  Scott was

21   driving.  And appellant was in the driver seat.  The

22   other three individuals were in the rear.

23        They drove by the store, and one or more of the

24   individuals fired, in the rear, fired at the store.  They

25   then go onto say, Judge -- I would also include that even

1                in that case, that the appellant had given a statement

2                and the Court pointed out, but for appellant statements,

3                there was no evidence placing him at the scene of the

4                offense.

5                     They go onto state that mere knowledge that an

6                offense is being committed is not the same as

7                participation with the requisite criminal intent and that

8                presence at the scene of the offense, and flight from the

9                scene are insufficient to establish participation.

10                    And they discuss that evidence presented at

11               trial, establish that appellant knew when he got into the

12               truck, that one or more of the persons in the rear

13               intended to shoot out the windows of the store.  That one

14               or more of the persons in the rear of the truck did shoot

15               at the store as the truck drove by.  And that appellant

16               was a passenger in the cab.

17                    And even with all that, Judge, which is even more

18               that I would argue that we have here --

19                    THE COURT:  In that case, Scott didn't make --

20                    MR. FLEISCHMAN:  Judge, not Scott, Scott is not

21               the appellant.

22                    THE COURT:  Who is the appellant?

23                    MR. FLEISCHMAN:  I'll give you the case.

24                    THE COURT:  The appellant did not make a

25               statement to the crime such as Ruiz, according to the

1

testimony of D'Ambrosio.  Ruiz yells out "are we going to

do this or what", and then Ruiz allegedly is the driver

of the car, driving erratically, chasing Mr. D'Ambrosio

up 95.

MR. FLEISCHMAN:  But, Judge again, my position on

that, since you mention that now, my position, there's a

big issue on credibility, not only on the driving, but

even on the statements.

And the other point that I want to make, Judge,

since --

THE COURT:  That's a credibility issue left for

the jury to decide.

MR. FLEISCHMAN:  Before letting it to go to the

jury, you had an opportunity see and hear the way

Mr. D'Ambrosio testified.  The fact is, that

Detective Suchomel testified when he met with

Mr. D'Ambrosio at the hospital, he was alert, awake.  We

offer an 11 page statement given by Mr. D'Ambrosio

wherein that statement, not once does he ever mention the

fact that Mr. Ruiz made any statements, none whatsoever

in the gas station.

And I also want to point out the case of Kayo vs.

State of Florida, it's CO, it was a child and the cite is

20 Florida Law Weekly, D2528.

The guilt of an aider and abetter can be

established by circumstantial evidence, of which my

position would be that that's what this case is, a

circumstantial case.  But such evidence must be both

consistent with guilt and inconsistent with any

reasonable hypothesis of innocence.  Evidence which

establishes nothing more than a suspicion or even

probability of guilt is not sufficient.

And that's all you have here.  All you have,

Judge, is allegedly four statements that were made in a

gas station that could be taken any way.  Even assuming

that a jury would believe those statements were made.  It

could have been absolutely anything at that point.

And it's -- the State has not rebutted every

reasonable hypothesis of innocence that he's in the gas

station.  He has no prior knowledge of this whatsoever.

He had no beef with Mr. D'Ambrosio.  He had no business

with him.  He didn't know him.  He had no social -- he

never socialized with him.

I mean, they have not presented sufficient

evidence, Judge, other than is the case says maybe

suspicion or probability and they have not met their

burden of proof.  And certainly there's been no evidence

as to Mr. Ruiz as to any type of premeditation.  So I

would ask the Court to direct a verdict based on that.

THE COURT:  Are you saying the Court should just

2

1    regard the testimony of D'Ambrosio that Ruiz yelled out

2    "are we going to do this or what"?

3        MR. FLEISCHMAN:  Judge, what I'm saying -- Yeah,

4    I'm saying that.  Yes, disregard it.  What I'm saying,

5    assuming for argument sake, that you accept that

6    testimony, what I'm saying to you is that on the standard

7    of proof, this is a circumstantial case.

8        As I said, evidence must be consistent with

9    guilt, inconsistent with any reasonable hypothesis of

10   innocence.  And evidence which only establishes that a

11   mere suspicion or probability is not sufficient and

12   that's what we have here.

13       The State's entire case is that Mr. D'Ambrosio,

14   who never mentioned this to the police initially about

15   Eddie Ruiz, gets on the stand, says that now under oath,

16   Mr. Ruiz made some statements in a gas station, after

17   he's had time to reflect and embellish and drag Mr. Ruiz

18   into this, he made four short statements at a gas

19   station.  And then supposedly did summersault on 95 where

20   it's certainly crowded with traffic and we heard that

21   from one of the State's witnesses.  That there was a lot

22   of traffic that day.

23       And through that, they want, you know, the Court

24   and the jury to assume that Mr. Ruiz knew that there was

25   going to be these shots fired and somehow participated in

that shooting. And my position is, that the evidence is
not sufficient.

THE COURT: There's certainly evidence before the
Court, number one, that Mr. Ruiz's car was used in the
commission of the crime. There was also evidence that
Mr. Ruiz was the driver of the car at the time of the
crime.

And lastly, and most importantly, there was
evidence that Mr. Ruiz said prior to the crime "are we
going to do this or what." And based on that, I think
it's sufficient for the jury to decide the credibility of
the witness D'Ambrosio.

MR. FLEISCHMAN: Judge, I just want to point out
one other point. What the case is talking about, even if
there's prior knowledge, so, again, even assuming for
argument sake that Mr. Ruiz had prior knowledge, that in
and of itself under aider and abetter theory is not
sufficient.

THE COURT: Let me add one other thing, the
driving pattern of Ruiz, I think, also is something that
you could consider as part of the totality of the
circumstances.

Based on those factors, the Court's going to
respectfully deny Ruiz's motion for judgement of
aquittal. All prior rulings as to Ruiz will stand.

2

1    MISS DADOWSKI:  Just as far as Mr. Cappelletti, I

2    would also like to make the argument of the

3    circumstantial evidence.  That's all they have in this

4    case, as far as the fact that Mr. D'Ambrosio didn't

5    actually see who shot him.  And all they have basically

6    is my client supposedly making some statements at a gas

7    station.

8        The State basically has no evidence or they can't

9    prove that the Defendant did not abandon the attempt to

10   commit the offense, he may have been merely a passenger

11   in the car based on the fact that Mr. D'Ambrosio did not

12   see who actually shot him.

13       So I think that under the reasonable hypothesis

14   of innocence, it's reasonable to believe that my client,

15   and reasonable hypothesis maybe that my client was just

16   in a car that Mr. Ruiz was driving, and since no one

17   actually saw who fired the shot, the State cannot put the

18   shotgun in my client's hand and I would therefore add

19   that to my previous argument.

20       THE COURT:  Motion as to Cappelletti is denied.

21       All right.  Does Mr. Cappelletti intend to or

22   wish to offer any evidence on his side of the case?

23       MISS DADOWSKI:  No, Your Honor.

24       THE COURT:  Mr. Cappelletti, do you understand

25   that you have the right to become a witness in this case

1          THE DEFENDANT CAPPELLITT:  Yes.

2          THE COURT:  Do you understand -- Does

3     Mr. Cappelletti have any prior felonies convictions?

4          MR. GROSZ:  Yes.

5          THE COURT:  How many?

6          MR. GROSZ:  He's got one prior grand theft, one

7     prior armed robbery, one prior possession of a loaded

8     firearm, one prior attempt murder first degree, one prior

9     second degree robbery, and a resisting without violence.

10         THE COURT:  So total of what five felony

11    convictions?

12         MR. GROSZ:  Right.

13         THE COURT:  Do you understand if you did elect to

14    testify, that the State could bring out the fact that you

15    have been convicted of felonies on five previous

16    occasions?

17         THE DEFENDANT CAPPELLETTI:  Yes.

18         THE COURT:  Do you understand that if you elected

19    to testify, that the Court would advise the jury that

20    they are to use the same rules and same standards of

21    judging your credibility as they would any other witness

22    in the case, do you understand that?

23         THE DEFENDANT CAPPELLETTI:  Yes.

24         THE COURT:  Do you understand that you have the

25    right to refuse to testify and that the Court would

3

1    advise the jury that they are to draw no inference of

2    guilt whatsoever as a result of your decision not to

3    testify, do you understand that?

4         THE DEFENDANT CAPPELLETTI:  Yes.

5         THE COURT:  Have you had sufficient opportunity

6    to discuss with Miss Dadowski the issue of whether or not

7    you should testify in this case?

8         THE DEFENDANT CAPPELLETTI:  Yes.

9         THE COURT:  Do you need any additional time?

10        THE DEFENDANT CAPPELLETTI:  No.

11        THE COURT:  Have you made a decision?

12        THE DEFENDANT CAPPELLETTI:  Yes.

13        THE COURT:  And what is that decision?

14        THE DEFENDANT CAPPELLITTI:  I do not wish to

15    testify.

16        THE COURT:  Okay.  And has anybody forced you to

17    make that decision?

18        THE DEFENDANT CAPPELLETTI:  No.

19        THE COURT:  Court finds that John W. Cappelletti

20    knowingly, intelligently, and voluntarily waives his

21    right to testify in this proceeding.

22        MISS DADOWSKI:  As far as the other witness, I

23    want to put on the record that Mr. Cappelletti, you have

24    now advised me that you did not want me to call your son,

25    Anthony Cappelletti, as a defense witness, is that

correct?

THE DEFENDANT CAPPELLETTI:  Yes.

MISS DADOWSKI:  That was your decision?

THE DEFENDANT CAPPELLETTI:  Yes.

MISS DADOWSKI:  Nobody forced you or threatened you not to call?

THE DEFENDANT CAPPELLETTI: No.

THE COURT:  Okay.  Mr. Ruiz or Mr. Fleischman, excuse me, does Defendant Ruiz wish to --

MR. FLEISCHMAN:  Judge, actually I need -- if I could have one minute.

THE COURT:  You can have whatever time you need to speak with him.

MR. FLEISCHMAN:  Okay.  Judge, we have discussed it.  I am not going to be presenting any evidence.

THE COURT:  Okay.  Mr. Ruiz, do you understand that you have the right to become a witness in this case. Here, I'll stand up, Mr. Ruiz.  Do you understand you have the right to be a witness in this case?

THE DEFENDANT RUIZ: Yes.

THE COURT:  You heard my colloquy with Mr. Cappelletti, did you not?

THE DEFENDANT RUIZ:  Yes, I did.

THE COURT:  And is anybody forcing you to make this decision not to testify?

3

1              THE DEFENDANT RUIZ:  No, they're not.

2              THE COURT:  This is what you want to do?

3              THE DEFENDANT RUIZ:  Yes, it is.

4              THE COURT:  And you have had ample opportunity to

5       discuss the matter with Mr. Fleischman?

6              THE DEFENDANT RUIZ:  Yes, I did.

7              THE COURT:  And your family?

8              THE DEFENDANT RUIZ:  Yes, I did.

9              THE COURT:  Okay.  Court finds that Mr. Ruiz

10      knowingly, intelligently, and voluntarily waives his

11      right to testify in this proceeding.

12             All right.  You want to recess -- you want to

13      start final arguments at 2:00, is that correct?

14             MR. FLEISCHMAN:  Yes, if we could.

15             THE COURT:  So what we can do is have our charge

16      conference after I let the jury go to lunch.

17             MISS DADOWSKI:  Do you want us to rest in front

18      of the jury?

19             THE COURT:  Oh, definitely.  I'll let you rest in

20      front of the jury and send them out to lunch until --

21      Deputy Lithle, would you please bring in the jury.

22             (Thereupon, the following proceedings were

23      had within the presence of the jury:)

24             THE COURT:  All right.  Does

25      Defendant Cappelletti wish to offer any additional

3      1      testimony or other evidence?

2      MISS DADOWSKI: No, Your Honor. At this time the

3      defense rests.

4      THE COURT: Does Defendant Ruiz wish to offer any

5      additional testimony or other evidence?

6      MR. FLEISCHMAN: No, Your Honor. We would rest

7      at this time.

8      THE COURT: Folks, you have now received all of

9      the evidence that you're going to receive in this trial.

10      What is left are the arguments by the attorneys

11      and the Court's instructions on the law and then you're

12      deliberations.

13      I am going to need sometime with the attorneys to

14      go over jury instructions. So we're going to give you an

15      extended lunch break. I'd like for you to be back at

16      2:00 o'clock and we will begin final arguments at 2:00.

17      Remember, do not discuss the facts of the case.

18      Don't form any fixed opinions on the merits of the case

19      until you have heard the arguments by the attorneys and

20      the Court's instructions on the law. We'll see you back

21      here at 2:00 o'clock.

22      (Thereupon, the following proceedings were

23      had outside the presence of the jury:)

24      MISS DADOWSKI: At this time, I would like to

25      renew all previous motions, motions that I made pretrial,

motions for a mistrial, and renew my motion for judgement

of aquittal now that the standard has changed and it's

whether reasonable minds can differ.

I believe the Court should, at this time, grant a

motion for judgement of aquittal based on basically the

same arguments, that this is a circumstantial evidence

case.  That there's no one has been able to prove and put

the actual shotgun or firearm that was used to shot at

Mr. D'Ambrosio in John Cappelletti's hands.

There's no indication or there's no testimony to

prove that he did not abandon any attempt to commit the

offense.  The only words that he had with Mr. D'Ambrosio

occurred at a gas station.  And according to

Mr. D'Ambrosio's testimony, it was Mr. Ruiz who was

driving trying to catch up with him.

There was no testimony from Mr. D'Ambrosio that

he saw a shotgun from John Cappelletti.  In fact, the

other evidence that was recovered in this case, that was

recovered from Mr. Ruiz's car.  The evidence that was

consistent with the type of shotgun that was used

allegedly to shot Mr. D'Ambrosio.

So other than the circumstantial evidence,

there's nothing to link Mr. Cappelletti to this offense.

And I think that because you cannot exclude every

reasonable hypothesis of innocence, that the Court should

4    1    grant a judgement of aquittal at this time.  And I just

2    like to also adopt previous arguments that I made at

3    judgement of aquittal motion.

4        THE COURT:  Motion for judgement of aquittal on

5    behalf of Mr. Cappelletti will be denied.

6        Mr. Fleishcman.

7        MR. FLEISCHMAN:  Judge, I renew all my motions

8    including my motion to suppress arguments and renewing my

9    argument that I presented.

10       The fact that this was a circumstantial case and

11   State has not presented sufficient evidence beyond a

12   reasonable doubt regarding fact that Mr. Ruiz was a

13   principal to this crime.  And therefore, I would ask the

14   Court to enter a judgement of aquittal.

15       And also that there's been no evidence presented

16   as to Mr. Ruiz regarding premeditation.  So I ask the

17   Court to enter a judgement of aquittal.

18       THE COURT:  Okay.  The motion on behalf of

19   Mr. Ruiz will be respectfully denied.

20       Lesser included offenses.  Anyone requesting

21   attempted second degree murder?

22       MR. GROSZ:  Not the State, Judge.

23       THE COURT:  State requesting any lessers?

24       MR. GROSZ:  No.

25       THE COURT:  Defendant Cappelletti or

4      1        Defendant Ruiz, either Defendant requesting any lessers?

       2               MISS DADOWSKI:  No, Your Honor.

       3               MR. FLEISCHMAN:  No, Your Honor.  I am not asking

       4        for attempted second degree.

       5               MISS DADOWSKI:  Same, not asking for attempted

       6        second degree.

       7               THE COURT:  Is either Defendant requesting any

       8        lessers?

       9               MISS DADOWSKI:  We're discussing them.  Yes,

      10        Judge, we're going to want lessers, but not that

      11        particular lesser.  I thought you were just directing our

      12        comments --

      13               THE COURT:  I did.  I did.  And then when I got

      14        negative response, I figured I just throw it open to you

      15        and let you tell me what lessers, if any, that you

      16        wanted.

      17               Okay, what lessers are being questioned?

      18               MR. FLEISCHMAN:  Judge, on behalf of Mr. Ruiz,

      19        I'm asking for culpable negligence only.

      20               MISS DADOWSKI:  Same on behalf of Mr.

      21        Cappelletti, Judge.

      22               THE COURT:  What say the State?

      23               MR. GROSZ:  What is culpable negligence, third

      24        degree?

      25               MR. FLEISCHMAN:  It's just a misdemeanor.

4

1          MR. GROSZ:  Judge, I don't know that that's a --

2     certainly not a category one, I don't think it's a

3     category two.

4          MR. FLEISCHMAN:  It is a category two, Judge.

5          MR. GROSZ:  Attempted first degree?

6          MR. FLEISCHMAN:  Right.

7          MISS DADOWSKI:  Page 1370 bottom.

8          THE COURT:  Page 1370.

9          MISS DADOWSKI:  From the purple book.

10          THE COURT:  I got the purple book right here.

11          MR. FLEISCHMAN:  That's the schedule of the

12     lessers right at the bottom.

13          THE COURT:  Yeah.

14          MR. GROSZ:  It's a schedule of lessers for first

15     degree murder, right?

16          MISS DADOWSKI:  Right.  But attempt is --

17          MR. FLEISCHMAN:  They don't have separate --

18     there's no separate schedule for attempt.

19          THE COURT:  All right.  The Court will give

20     culpable negligence.

21          Now, is the State requesting any additional

22     lessers?

23          MR. GROSZ:  No.

24          THE COURT:  Okay.  All right.  Let's see what

25     we've got here.  We've got introduction to attempted

4

1    homicide which will be given.

2          And then we've got attempted murder first degree

3    premeditated.  What about aggravation of a felony by a

4    firearm?

5          MR. FLEISCHMAN:  Judge, I would be objecting to

6    that being given on behalf of Mr. Ruiz.  He's not charged

7    in the information by the State of Florida with

8    possessing a firearm.

9          THE COURT:  All right.  Mr. Cappelletti is

10   charged with that.

11         MISS DADOWSKI:  My client is charged, Your Honor,

12   but I would argue the evidence hasn't been -- there's no

13   support for that.

14         No one said there was a firearm in

15   John Cappelletti's hand.  The victim didn't testify that

16   he saw a shotgun or firearm on Mr. Cappelletti, so I

17   would object to that instruction being given.

18         THE COURT:  That objection will be overruled.

19   The instruction is --

20         MR. FLEISCHMAN:  Judge, culpable negligence is

21   found on page --

22         THE COURT:  Hold on, hold on, let me finish with

23   aggravation of a felony before we go to culpable

24   negligence.

25         MISS DADOWSKI:  You're in the purple book on

that, Your Honor?

THE COURT:  No.  But I think the number would be 305(d), if you find Defendant Cappelletti committed attempted first degree murder, you also -- and you also find that during the commission of the crime Mr. Cappelletti possessed a firearm, you should find the Defendant Cappelletti guilty of attempted first degree murder with a firearm.

MISS DADOWSKI:  The instruction that I have in 305(a) it says if you find that the Defendant committed a felony as identified by FS 775.0871 and you also find that during the commission of the crime he carried, displayed, used, threatened to use or attempted to use as being choices, it's not possessed.

THE COURT:  Well, I'm using 305(d) because the information charges possession.

MISS DADOWSKI:  Well 305(d), Your Honor, in the new book the 1998 version is called justifiable use of deadly force -- I'm sorry.

MR. FLEISCHMAN:  305(d)?

MISS DADOWSKI:  I was on the wrong one, sorry. Oops.  I was on 304(d).  305(d), I see, okay.

THE COURT:  All right.  Culpable negligence, Mr. Fleischman --

MR. FLEISCHMAN:  Judge, it's on page 1303.

THE COURT:  What's the --

MR. FLEISCHMAN:  I'm sorry, it's -- well it's 78405.

THE COURT:  Okay.  Before you can find the Defendant guilty of culpable negligence, the State must prove the following two elements beyond a reasonable doubt:  Number one, Defendant exposed victim to personal injury or inflicted actual personal injury on victim.

Would you agree or do you think only one of those applies, are we on the same instruction?

MR. GROSZ:  Yeah, I'm reading with you.  I mean, I --

MR. FLEISCHMAN:  Judge, my position would be that they would have to prove inflicted because they're claiming that Mr. D'Ambrosio was, you know, through the evidence was actually shot.

THE COURT:  Anybody disagree with Mr. Fleischman?

MISS DADOWSKI:  No, Your Honor.

MR. GROSZ:  No.

THE COURT:  Okay.  The Court will give B, inflicted.

And then number two:  He did so through culpable negligence, actual injury -- Well, that does not apply.

MR. GROSZ:  Right.

THE COURT:  And then the Court will give the

5    1    definition.  So that takes care of the lesser.

2    Now, let's start at the beginning of the general

3    instructions.  The Court will give 2.01, which

4    introduction to final instructions.

5    2.02, statement of the charge.

6    2.02(a), when there are lesser included offenses.

7    Then the Court will give the instructions as stated on

8    the crime charged and the lessers.

9    After that, the Court will give 2.03, which is

10    plea of not guilty, reasonable doubt, and burden of

11    proof -- Wait, hold on.  You want principals?

12    MR. GROSZ:  Correct.

13    THE COURT:  Right?

14    MR. GROSZ:  Correct.

15    THE COURT:  After the main crime charged and the

16    lessers, the Court will give principals, which is 301.

17    Now going back to 30 -- 2.03, which is plea of

18    not guilty, reasonable doubt, and burden of proof, Court

19    will give that.

20    And 2.04 which is weighing the evidence.  The

21    Court will give one through five.

22    MR. FLEISCHMAN:  Judge, 1, 3 --

23    MISS DADOWSKI:  One through five.  I would ask

24    for six, Your Honor, just based on the fact that his

25    probation may have been early terminated.

5

1          THE COURT:  Court will give six.

2          MISS DADOWSKI:  And also I would ask for eight.

3          THE COURT:  Eight, okay.  Any others requested by

4     any party?

5          MR. FLEISCHMAN:  Judge, I'm requesting 3.04(h)

6     which is the independent act instruction.

7          THE COURT:  Wait a second, we're on weighing the

8     evidence.  Any other numbers requested on weighing the

9     evidence?

10          MR. FLEISCHMAN:  I think that covers everything

11     except seven.

12          MISS DADOWSKI:  Nine and ten.

13          THE COURT:  Okay.  Court will give 2.04(a), which

14     is expert witnesses.

15          Court will give 2.04(d), both paragraphs.  I

16     assume you're all requesting that, both Defendants

17     requesting Defendant is not testifying?

18          MISS DADOWSKI:  Yes, Your Honor.

19          MR. FLEISCHMAN:  Yes.

20          THE COURT:  Okay.  There were no post arrest

21     statements.  So 2.04(e) would not apply.

22          Court will give -- Excuse me.  Court will give

23     2.05, rules for deliberation, all eight paragraphs.

24          2.07, which is cautionary instruction.

25          2.08, verdict.

And then 2.08(c), which is multiple -- Wait.

MR. FLEISCHMAN:  Actually it would be 2.08(b), single count multiple Defendants.

THE COURT:  Yeah, 2.08(b), excuse me, you're right.  Actually the Court will give 2.08(b) right before the instruction on verdict forms.

And then the Court will give 2.09.  On 2.09, the Court will use the word foreperson instead of foreman and thus eliminating the last sentence of the first paragraph that reads either a man or a woman may be foreman of the jury.

Now, any other requested standard instructions by any party?

MISS DADOWSKI:  3.04(h), Your Honor, was the independent act instruction.

THE COURT:  Okay.  3.04(h).

MR. FLEISCHMAN:  I'm requesting that as well.

THE COURT:  Okay.  All right.  What say the State?

MR. GROSZ:  That's fine, Judge.

THE COURT:  Okay.  The Court -- Ya'll agree that should go right after the instruction on principals?

MR. FLEISCHMAN:  Yes.

THE COURT:  Okay.  That's where that will be given, independent act.

6    1              Any other requested standard instructions?

     2              MR. FLEISCHMAN:  No, Your Honor.

     3              THE COURT:  Okay.  Any requested special

     4     instructions?

     5              MR. GROSZ:  Yes, sir.  Do you have --

     6              MR. FLEISCHMAN:  No, I don't.

     7              MISS DADOWSKI:  No.

     8              MR. GROSZ:  I do.  The special that I'm

     9     requesting reads as follows, I just handwrote it and I

    10     can type it up over lunch, but it's based on

    11     Kearse vs. State, it's K-e-a-r-s-e vs. State cited at

    12     662 So.2d 677.

    13              And specifically comes to Page 681 and the

    14     language reads as follows:  Among the ways that

    15     premeditation may be inferred is from evidence as to the

    16     nature of the weapon used, the manner in which the

    17     attempted murder was committed, and the nature and manner

    18     of the wounds inflicted.  The Supreme Court's ruling of

    19     June 22nd.

    20              THE COURT:  Can I see the case?

    21              MR. GROSZ:  Sure.

    22              THE COURT:  Is this a case where that instruction

    23     was requested?

    24              MR. GROSZ:  I think it was --

    25              THE COURT:  This is a pretty long case.  It's

6     1     going to take me awhile to read it.  So if you could --

2          MR. GROSZ:  Let me see.

3          MISS DADOWSKI:  I'm just going to make a quick

4     objection, if I could.  I believe that the jury

5     instructions are sufficient.

6          The Supreme Court recently approved new jury

7     instructions.  That's a 1995 case.  The jury instructions

8     that I have are the 1998 book.  And in fact, this --

9     the -- there are additional instructions that have been

10    added since 1995.

11        So I think that based on that, I would object.

12    This is not an approved jury instruction by the

13    Supreme Court.  And I would object to that being given.

14        MR. FLEISCHMAN:  Judge, I'm going to raise the

15    same objection.  The standard new jury instruction on

16    attempted murder first degree premeditated, it states

17    right in there, that premeditation is a question of fact

18    to be determined by you from the evidence.  And it goes

19    onto tell them that they can look at the circumstances

20    surrounding the case.  So I'm going to object to that.

21        MR. GROSZ:  This particular -- Are you done?

22        MR. FLEISCHMAN:  Yeah, I'm done.

23        MR. GROSZ:  This particular case, that

24    instruction was requested by the State read by the judge

25    and the Supreme Court found that -- they ruled within

this case that the State sought this more detailed

definition of premeditation as this element of the

offense was an issue in dispute.

Although the added language is not part of the

standard jury instruction, it is an accurate statement of

the law regarding premeditation.  And it goes onto say

that the trial court did not error by giving this

expanded definition on premeditation.

THE COURT:  The Court is going to deny the

request.  The Court feels that the standard jury

instructions sufficiently apprises the jury of the law

with rerespect to premeditation.

All right.  Any other instructions requested by

any other party?

MISS DADOWSKI:  No, Judge.  I would like to renew

my previous objections to the jury instructions regarding

the possession of a firearm, whereas my position is that

Mr. Cappelletti -- there's been no evidence to support

the fact that Mr. Cappelletti ever possessed a firearm

and I would object to that instruct being given.

THE COURT:  Okay.

MR. FLEISCHMAN:  Judge, none on behalf of

Mr. Ruiz.

THE COURT:  Okay.  Insofar as the order of close,

Mr. Grosz is sandwiched.  That's something that we can

all agree on.  It makes no difference to me which

Defendant goes first.  If you cannot agree, we will go in

the order in which the Defendants names appear in the

information, which means Cappelletti, Ruiz, State, Ruiz

and Cappelletti.

    MISS DADOWSKI:  That's fine.

    MR. FLEISCHMAN:  Judge, that's fine.

    THE COURT:  Okay.  How much time do you all want?

    MISS DADOWSKI:  Half-an-hour, 45 minutes.

    MR. FLEISCHMAN:  Fourty-five minutes.

    THE COURT:  Okay.  Fourty-five minutes per --

Actually technically, Mr. Grosz should get more time.

Mr. Grosz, do you need more than 45 minutes?

    MR. GROSZ:  I --

    THE COURT:  You're sandwiched.

    MR. GROSZ:  I know.  I feel comfortable with

about an hour.  I probably won't take, but I would feel

comfortable.

    THE COURT:  Okay.  Mr. Grosz will get an hour and

each Defendant will get 45 minutes.

    We'll take a break at some point during the

arguments.

    When do you want to be notified, Miss Dadowski?

    MISS DADOWSKI:  Probably with 15 minutes left

maybe or maybe 20 minutes left.

7      1            THE COURT:  How do you want to divide your time.

2            MISS DADOWSKI:  Yeah, I was thinking probably 25

3   and 20.

4            THE COURT:  Twenty-fvie and 20, a notification on

5   each end.

6            MISS DADOWSKI:  Couple of minutes, two minutes

7   whatever five minutes.

8            THE COURT:  Five minutes on each end.

9            Mr. Fleischman.

10           MR. FLEISCHMAN:  Judge, that's fine, 25 and 20.

11           THE COURT:  Okay, 25 and 20.  Five minute notice.

12           MR. FLEISCHMAN:  Yes.

13           THE COURT:  You want me to tap or say five

14   minutes?

15           MISS DADOWSKI:  Whatever you want, that's fine

16   with me.

17           THE COURT:  Mr. Grosz, when do you want to be

18   notified?

19           MR. GROSZ:  Ten minutes.

20           THE COURT:  Ten minutes left?

21           MR. GROSZ:  Yes.

22           THE COURT:  Okay.  We'll see you 2:00 o'clock.

23           (Thereupon, a recess was taken; after which the

24   following proceedings were had:)

25           THE COURT:  All here.

7

1          THE BAILIFF:  Yes, sir.  Lady with the red hair

2     is running a little late, but she went right in there.

3          MISS DADOWSKI:  I think as far as the verdict

4     form is concerned for Mr. Cappelletti, I think the fact

5     that he used a firearm is misleading.  I think the jury

6     has to be specifically instructed that he actually

7     possessed the firearm because this is a Co-Defendant

8     case --

9          THE COURT:  I agree with you.  The verdict

10     form -- you're saying that instead of he did use, he did

11     possess.

12          MISS DADOWSKI:  Right.  They're saying that's

13     actually the one that possessed the firearm.  And I think

14     that this case, I unfortunately haven't had a chance to

15     Sheppardize it, but it's called Bussel at 22 Florida Law

16     Weekly, G2556 vs. State.  And basically it indicates --

17     just find the actual language --

18          THE COURT:  You're just --

19          MISS DADOWSKI:  It says, in our opinion the, the

20     Tripp case, the jury has to actually make a finding that

21     a firearm was used, okay.

22          And it says, we recognize, however, there had

23     been more than one assailant or Defendant involved.  A

24     specific finding as to which Defendant used a weapon

25     would be necessary.

7

1          THE COURT:  So you need the word used changed to

2     possess.

3          MISS DADOWSKI:  Actually --

4          THE COURT:  The information uses the word possess

5     as opposed to used, displayed or carried.

6          MISS DADOWSKI:  Okay.  No, that's actually as is

7     is fine.  Except for my client's name is misspelled.

8          THE COURT:  I agree the name is misspelled.  I

9     think it should be possessed.

10          MR. GROSZ:  My only concern was for the operation

11     of the three year minimum mandatory statute.  I wasn't

12     sure if it was possessed or used.  I don't mind either

13     way.

14          THE COURT:  Possess.  So as long as you have to

15     change the verdict form to correct the spelling, I want

16     used to changed to possess.

17          MR. GROSZ:  Okay.

18          MR. FLEISCHMAN:  Judge, the only other objection

19     I had to the verdict form.

20          THE COURT:  Yes, sir.

21          MR. FLEISCHMAN:  Had to do under A, it says the

22     Defendant is guilty of attempted murder in the first

23     degree.

24          He's specifically charged in the information with

25     attempted premeditated murder in the first degree.  So

7    1       I'm asking that language also be included within the

2       verdict form.

3             THE COURT:  That will be.

4             MISS DADOWSKI:  Same with Mr. Cappelletti.

5             THE COURT:  The information is captioned

6       attempted first degree murder, so that --

7             MR. FLEISCHMAN:  Judge, but within the body of

8       the information, in other words, they have to make a

9       finding that it was premeditated.

10           MISS DADOWSKI:  Correct.  There's no such crime

11      as attempted felony murder in Florida.  In fact, at

12      pretrial we did make a motion in limine or actually a

13      motion to have the State amend the information to delete

14      that portion in the information that talked about and

15      feloniously.

16           THE COURT:  That was granted.  But insofar as the

17      verdict form, your objection will be overruled.

18           MISS DADOWSKI:  One second, Your Honor, I think

19      this maybe worded correctly.  I think under the case I

20      have the actual language is use a firearm.  I think they

21      have --

22           THE COURT:  The information in this case says

23      possess.

24           MISS DADOWSKI:  But in order for there to be the

25      three year minimum mandatory, they have to prove that my

7    1    client was the one that actually used a firearm,

2    possessed a firearm.

3          In the case that I cited to earlier, language

4    says we recognize, however, there had been more than one

5    assailant or Defendant involved.  A specific finding as

6    to which Defendant used a weapon would be necessary.  So

7    it doesn't say possess, it actually says use.

8          I think they have to actually prove that he used

9    it.  Because possession can be constructive or actual.

10    And if they believe that he constructively possessed the

11    weapon that wouldn't necessarily mandate a three year

12    mandatory.  They would have to actually prove that he was

8   13    the one that used the weapon.

14          THE COURT:  Well, jury instruction says

15    possessed.  Let's take a look at the statute.  Statute

16    uses the word possessed.

17          MISS DADOWSKI:  I'm just referring to what the

18    authority in bus he will V State of Florida, the language

19    that I read in there.  Basically indicates that the word

20    used should be used.  So I mean, I think the way the

21    State has it now is correct other than the fact that I

22    think they should have premeditated in there and my

23    client's name is spelled Right. , but other than that, I

24    think that's accurate.  Because they have to prove that

25    he used it.  I mean, because you can possess things

8

1    actually or constructively -- you can have actual

2    possession or constructive possession.  Whereas when you

3    use something, in order for there to be a three year

4    mandatory involved they have to actually prove that my

5    client was the one that used the shotgun during the

6    commission of the premeditated murder.

7         THE COURT:  Under 775 .087 two, the statute

8    specifically says any person who is convicted of a felony

9    or attempt to commit a felony and the conviction was for

10   murder, or attempted murder and during the commission of

11   the offense such person possessed a firearm or

12   destructive devise, shall be sentenced to minimum term of

13   imprisonment of three years.

14        Again, the jury instruction also uses the word

15   possess.  Then we're going to go into verdict form and

16   use the word use.  I'll take a look at the case if you

17   want me to.

18        MISS DADOWSKI:  Actually, Judge, I cited -- It's

19   actually Owen Tucker vs. State.  Not Bussel vs. State.

20        THE COURT:  Okay.  The information alleges that

21   Tucker used a firearm to commit the crime.  In this case,

22   the information alleges that he possessed a firearm.  The

23   statute under which the Defendant is charged alleges

24   possession.  The jury instruction that the Court is

25   giving alleges possession.

8    1        The Court -- Court is going to use the word

2    possess in the verdict form so it's consistent throughout

3    over the Defendant's objection.

4        MISS DADOWSKI:  Thank you, Judge.  Another point

5    to be addressed if this case goes to the appellate court.

6        All right.  Mr. Grosz, do you need to call your

7    office, advise them of the change in the verdict form?

8        MR. GROSZ:  Yes.

9        THE COURT:  Record will reflect that both

10    Mr. Cappelletti and Mr. Ruiz are present as they have

11    been throughout these proceedings.

12        Please bring in the jury.

13        (Thereupon, the following proceedings were

14    had within the presence of the jury:)

15        THE COURT:  All right.  Good afternoon.

16        Both the State and the Defendants have now rested

17    their case.  The attorneys now will present their final

18    arguments.

19        Please remember that what the attorneys say is

20    not evidence.  However, do listen closely to their

21    arguments.  They are intended to aid you in understanding

22    the case.

23        Now, the order of final arguments are as follows,

24    Miss Dadowski will have an opportunity to speak on behalf

25    of Mr. Cappelletti.  Then Mr. Fleischman will have an

8

1    opportunity to speak on behalf of Mr. Ruiz.  Then

2    Mr. Grosz will have an opportunity to speak on behalf of

3    the State.

4         Then Miss Dadowski will have another opportunity

5    to speak in rebuttal to what Mr. Grosz argues -- excuse

6    me, Mr. Fleischman will have an opportunity after

7    Mr. Grosz to speak in rebuttal.  And then finally

8    Miss Dadowski will have the final word in rebuttal.

9         Each Defendant has been allotted a total amount

10    of 45 minutes.  The State has a total time allotment of

11    one hour.  We will take one or two breaks during the

12    course of the arguments.

13         So please give all attorneys your close attention

14    and we will begin with Miss Dadowski.

15         MISS DADOWSKI:  Thank you, Your Honor.  May it

16    please the Court, John, Eddie, Mr. Fleischman, Mr. Grosz.

17         John Cappelletti is not guilty of attempted first

18    degree premeditated murder.  That's what I told you when

19    I first spoke to you in my opening statement.  And even

20    though you have heard all the evidence now, I think your

21    verdict should still be the same.  Not guilty of aof

22    premeditated murder.

23         The State has to prove to you beyond and to the

24    exclusion of every reasonable doubt that John Cappelletti

25    shot and attempted to kill Christopher D'Ambrosio on

8

9

1    April 13, 1997.  They have to prove that John Cappelletti

2    is the one that possessed the shotgun or firearm on that

3    day par beyond and to the exclusion of every reasonable

4    doubt.  Have they don't that?  No.

5        Now, the Judge is going to instruct you on how

6    you get reasonable doubt.  Reasonable doubt is going to

7    come from the evidence, from the lack of evidence, and

8    from a conflict in the evidence.  What is the evidence

9    that we've heard so far.  The only evidence that you have

10   heard is that Christopher D'Ambrosio -- is from

11   Christopher D'Ambrosio.  He is the only person that links

12   John Cappelletti in any way to his shooting.  That's it.

13   There's no question that he was shot.  That's not an

14   issue.  The question is, who shot him.  That's the issue.

15   And John Cappelletti is not guilty.

16       What did Christopher D'Ambrosio tell you about

17   John Cappelletti.  He's known him because he was

18   neighbors with his wife.  He thinks John Cappelletti is

19   an a low life.  He doesn't like him too much although he

20   disputes the fact that he said that.  You heard

21   throughout my cross examination, Mr. Fleischman's cross

22   examination that Mr. D'Ambrosio said a lot of things that

23   now he's saying differently.

24       He said that my client helped him move to Georgia

25   and although he said he's never had any problem with him

9

1    my guy helps him move to Georgia.  When my client is up

2    in Georgia he gets arrested in Georgia.  And what does

3    this guy who says he likes John Cappelletti do, while

4    he's up there in Georgia knowing that John doesn't know

5    anybody up there, knowing that at most he has the $100

6    that he was going to give him, Christopher D'Ambrosio

7    leaves him up there without knowing where he is.

8         Now, does that sound like someone who really

9    likes a person, that they're just going to desert them in

10   another state knowing that the person doesn't know

11   anyone.  Knowing that he may have only $100.  My client

12   was supposed to fly home with Christopher D'Ambrosio.  He

13   just leaves the next day.  Doesn't even have any concern

14   for John Cappelletti.

15        But what does he -- what does he tell you then.

16   John calls him from jail and I doesn't sound upset with

17   Chris.  He's not upset with Mr. D'Ambrosio about the fact

18   that he was left in Georgia.  He tries to ask him to get

19   in touch with his sons and family so he can get out of

20   jail.  And evently he does get out of jail.

21   Mr. Cappelletti comes back to Florida.

22        Now, what evidence is there to leaning

23   John Cappelletti to Christopher dams shooting.  Is there

24   any physical evidence.  No there isn't.  There was no

25   shotgun ever recovered that was linked to

9

1      John Cappelletti.  There was no shotgun shell that was

2      ever recovered that was linked to John Cappelletti.

3      There was nothing.  Did Christopher D'Ambrosio tell you

4      who saw shot him.  Did he see who shot him.  He said he

5      didn't see any shotgun.  He didn't see who shot him.

6          The State has to prove to you beyond and to the

7      exclusion of every reasonable doubt that John Cappelletti

8      is the one that did that.  Have they don't that.

9      Christopher D'Ambrosio can't even tell you who did it.

10          Nobody sees John Cappelletti at the Amoco Station

11     where Christopher and John are suppose supposedly having

12     an agrument a very loud argument that turns into yelling.

13          On I-95 in heavy, moderate to heavy traffic,

14     nobody sees John Cappelletti shoot

15     Christopher D'Ambrosio.  A moderate to heavy traffic on

16     I-95.  Nobody.  Nobody sees a shotgun outside the window

17     of Eddie Ruiz car if it is on I-95 as

18     Christopher D'Ambrosio says.

19          Now, on the day of this shooting,

20     Christopher D'Ambrosio says that John and Eddie go to his

21     house and he's surprised they're there because he has

22     security.  And while they're at the house John says we

23     need to talk.  He says John doesn't appear to be upset at

24     that time.  There's nothing to indicate that there's

25     going to be any kind of problem.  And so Chris, although

9

1      it was a struggle to even get him to admit that he

2      offered or told John and Eddie to follow him to the gas

3      station ultimately he concedes that he complied that they

4      could follow him to the Amoco Station.

5           Now, this is assuming that we believe

6      Christopher D'Ambrosio at this point.  They go to the gas

7      station while they are there, John and Chris start

8      talking about money.  He says initially when they get

9      there, John's not upset.  He doesn't appear to be upset.

10     And then at some point, John, for whatever reason, says

11     he's gonna kill him.  Blow your fuckin' head off.  Eddie

12     is out of the car at that point.  And while this yelling

13     is going on, nobody at the Amoco Station comes forward,

14     nobody sees anything.  Nobody does anything.  Do we know

15     that that happened.  The only one that we know that

16     happened by is Chris D'Ambrosio.  He is the only one that

17     testified to that.  There's nobody else.  No evidence

18     that that happened other than through

19     Chris D'Ambrosio.

20          And then supposedly Chris gets in his car.  He

21     has a big 19 -- I don't know what year it is, big Chevy

22     with a V8 engine and Ed east car is supposedly a

23     Honda Civic and he says that at some point he's driving

24     on Sheridan Street.  Eddie's driving recklessly like a

25     main being a trying to get up with him.  Was there

10      1    anybody or did anybody call the police to report this

2    reckless driving.  Were there any witnesses to this

3    supposed reckless driving?  No.

4         And then they're evently followed onto I-95.  And

5    at I-95 Mr. Ruiz is supposedly doing acrobats or

6    summersault, or whatever and able to get his car, his

7    little Honda Civic up to Mr. D'Ambrosio's V8 engine and

8    catches up to him and even though he's right next to 'em

9    and he's afraid and concerned because Mr. Ruiz has been

10   driving feverishly, trying to catch up with him, he

11   doesn't do anything like call 911, slow down, stop.  And

12   then at some point he says he's shot on I-95 by somebody

13   that's in the passenger or driver or somebody in the car

14   of the Honda Civic.  Nobody on I-95 saw anything.  And he

15   was shot by a shotgun.

16        Paul Haemmerle told you that the average length

17   of a shotgun for a pistol grip is 30 inches or -- or

18   could go up to 30 inches or a shoulder stock it could be

19   as much as 36 to 48 inches.  Yet, no one sees the shotgun

20   coming outside of any car on I-95 on that day.

21        Now, what do we know about

22   Christopher D'Ambrosio.  We know that he used to be a

23   bartender at the Diplomat Hotel.  However, when they went

24   bankrupt in 1992 or 1993, he hasn't had any steady

25   employment since.  But he considers himself a player.  He

considers himself to have a lot of money.  He's always

giving.  But he has no steady employment, but he always

has money.  He normally carries a good money.  When you

have it, you roll it.  Where is he getting his money.

Here's a guy who is on felony probation for

aggravated stalking.  He also has a pending misdemeanor

charge.  He doesn't like John Cappelletti.  Do we know

why exactly?  No.  The State has to prove to you beyond

and to the exclusion of every reasonable doubt that

John Cappelletti is the one that shot

Christopher D'Ambrosio.  He's not guilty of attempted

first degree murder.

What other evidence did the State have in this

case.  They searched Mr. Ruiz's car.  What do they find

there.  Anything that links John Cappelletti at all to

being in that car?  No, nothing.  No fingerprints,

nothing.  They find some shotgun -- shotgun pellets.

Anything in that car that links John Cappelletti to that

car?  Nothing, no.

There are no fingerprints in the car, there's no

papers in the car.  No DNA in the car.  There's no

fingerprints on the shotgun shell or pellets recovered

from that car.  No papers no DNA there's nothing.

There's absolutely nothing.  There was no evidence.

And the State has to prove to you beyond and to

the exclusion of every reasonable doubt through the

evidence, lack of evidence or conflict in the evidence

that John Cappelletti is guilty of attempted murder,

first first degree murder.  There was no evidence, there

was a lot of reasonable doubt in this case.

I'm going to get a chance to speak to you again.

But when you think about it, think about what actual

evidence there's to leaning John Cappelletti.  Even

Christopher D'Ambrosio says he didn't see

John Cappelletti shoot him.  He didn't see

John Cappelletti with a shotgun.  There's nothing, no

physical evidence, nothing.  John Cappelletti is not

guilty of attempted first degree murder.

THE COURT:  Thank you, Miss Dadowski.

Mr. Fleischman.

MR. FLEISCHMAN:  Thank you, Judge.  Good

afternoon, ladies and gentlemen.

I just want to start out by thanking you for the

attention that you paid on behalf of myself and my

client.

Before I get into my argument, I want to remind

you and you will get instructions on how the law is from

the Judge when we are finished.  And your job, again, is

to apply whatever facts that you decide that you're going

to rely and apply that to the law that the Judge gives

you.

But to start out, I wanted to remind everyone that first of all, while Mr. Ruiz sits here, even now at this point in time, at that table, that if you're to follow the law and you all took an oath to follow the law in this case, you must presume him to be innocent. He is presumed innocent right now up until the time, if it ever does come and my position is that it will never come in this case, that the State proves beyond and to the exclusion of every reasonable doubt that Mr. Ruiz participated in a shooting of this Mr. D'Ambrosio.

He's charged -- The State has charged my client, again, with premeditated -- attempted premeditated first degree murder, and he's presumed innocent. And the State, again, has the burden of proof beyond and to the exclusion of every reasonable doubt.

You will never hear that the law in the State of Florida is that you may convict Mr. Ruiz because of guilt by association. There's no such thing. The State has to prove to you, again, through independent evidence that Mr. Ruiz is guilty beyond every reasonable doubt of premeditated first degree murder. And I'm standing here taking the position, of course. And I think it's obvious that Mr. Ruiz is innocent.

And I also want to talk to you about the evidence

10    1    the exclusion of every reasonable doubt through the

2    evidence, lack of evidence or conflict in the evidence

3    that John Cappelletti is guilty of attempted murder,

4    first first degree murder.  There was no evidence, there

5    was a lot of reasonable doubt in this case.

6        I'm going to get a chance to speak to you again.

7    But when you think about it, think about what actual

8    evidence there's to leaning John Cappelletti.  Even

9    Christopher D'Ambrosio says he didn't see

10    John Cappelletti shoot him.  He didn't see

11    John Cappelletti with a shotgun.  There's nothing, no

12    physical evidence, nothing.  John Cappelletti is not

13    guilty of attempted first degree murder.

14        THE COURT:  Thank you, Miss Dadowski.

15        Mr. Fleischman.

16        MR. FLEISCHMAN:  Thank you, Judge.  Good

17    afternoon, ladies and gentlemen.

18        I just want to start out by thanking you for the

19    attention that you paid on behalf of myself and my

20    client.

21        Before I get into my argument, I want to remind

11    22    you and you will get instructions on how the law is from

23    the Judge when we are finished.  And your job, again, is

24    to apply whatever facts that you decide that you're going

25    to rely and apply that to the law that the Judge gives

11    1    you.

2    But to start out, I wanted to remind everyone

3    that first of all, while Mr. Ruiz sits here, even now at

4    this point in time, at that table, that if you're to

5    follow the law and you all took an oath to follow the law

6    in this case, you must presume him to be innocent.  He is

7    presumed innocent right now up until the time, if it ever

8    does come and my position is that it will never come in

9    this case, that the State proves beyond and to the

10    exclusion of every reasonable doubt that Mr. Ruiz

11    participated in a shooting of this Mr. D'Ambrosio.

12    He's charged -- The State has charged my client,

13    again, with premeditated -- attempted premeditated first

14    degree murder, and he's presumed innocent.  And the

15    State, again, has the burden of proof beyond and to the

16    exclusion of every reasonable doubt.

17    You will never hear that the law in the State of

18    Florida is that you may convict Mr. Ruiz because of guilt

19    by association.  There's no such thing.  The State has to

20    prove to you, again, through independent evidence that

21    Mr. Ruiz is guilty beyond every reasonable doubt of

22    premeditated first degree murder.  And I'm standing here

23    taking the position, of course.  And I think it's obvious

24    that Mr. Ruiz is innocent.

25    And I also want to talk to you about the evidence

11    1    in this case.  Because you may not find Mr. Ruiz guilty

2    if there's a probability, you may not find him guilty if

3    there's a possibility that one, he was on the scene.

4        That two, that he was at this gas station and

5    three he was in the car.  Possibilities and probabilities

6    are not sufficient.  The State has to prove this to you,

7    again, beyond a reasonable doubt.  I am also standing

8    here telling you that the only evidence in this case is

9    Christopher D'Ambrosio.  And that's what I want to talk

10    about.  Because relying on Mr. D'Ambrosio's testimony,

11    which, again, is all you have, ladies and gentlemen.

12        I'm sure the State is going to get up here and

13    tell you look, we have all these photographs, and we have

14    these shots that were recovered from the car.  But in

15    order to convict Mr. Ruiz, you must rely on

16    Mr. D'Ambrosio's testimony.  That's it.  Because there's

17    absolutely no other physical leaning to my client on any

18    of this physical evidence that was found, not only in

19    this white Honda, but as well in the victim's car,

20    Mr. D'Ambrosio's.  And Mr. D'Ambrosio has absolutely no

21    credibility.  And you should not rely on his testimony to

22    convict my client of premeditated attempted first degree

23    murder.

24        Let me start out with this, Mr. Ruiz has no

25    relationship with Mr. D'Ambrosio, social or otherwise.

11 ·

1    Didn't even know.  Mr. D'Ambrosio told you look all I did

2    was I would see him at Cappelletti's once in awhile and I

3    would wave him to.  His testimony was I saw him simply on

4    couple occasions.  So they had no social relationship

5    together.  They had no business relationship together.

6    They had no friendship.  Never loaned my client any money

7    as he's claiming that he did nor Mr. Cappelletti.

8         And this whole incident regarding this move to

9    Georgia, my client, Mr. Ruiz, had nothing to do with

10    that.  He was never hired by Mr. D'Ambrosio.  He was

11    never made aware of this situation by Mr. D'Ambrosio.

12    Nothing.  So to start out with this, there's no

13    relationship here.  There's absolutely no motive on

14    Mr. Ruiz's part to harm Mr. D'Ambrosio whatsoever.

15    There's nothing.  Absolutely nothing.

16         So what this comes down to, and I'm sure the

17    State is going to stand up here and tell you this,

18    they're going to say ladies and gentlemen, Mr. Ruiz,

19    we've proved our case against Mr. Ruiz in this way,

20    Mr. Ruiz was in a car.  And I tell you find he was in the

21    Honda.  Again, the fact that he was in the Honda, the

22    fact that he was at the scene where Mr. Cappelletti

23    argues with Mr. D'Ambrosio means absolutely nothing.

24    Absolutely nothing.

25         What they're going to say to you is, because

11    1    Mr. D'Ambrosio took this witness stand yesterday and

2    testified to you yesterday that my client made four

3    comments in the gas station, and that he also alleged to

12    4    you yesterday that my client got in his Honda and drove

5    in this reckless manner which I'm going to address

6    obviously, on 95, that he knew what was going to happen

7    and that he actively participated and he is they're going

8    to tell you that because of that convict Mr. Ruiz.  So I

9    have to address that.

10    First of all this is what we do know.

11    Mr. D'Ambrosio was shot and he pulls his car over.  And

12    we know from Mr. Almond's (sic) the only person that's

13    stopped on 95 that day.  We know that when he first has

14    contact with Mr. D'Ambrosio, he told you himself, and the

15    State witness said he was alert and he was able to speak.

16    And we know that from the 911 tape that the State played.

17    And we know he was alert and awake enough to give certain

18    information and he gave that information he provided it

19    not only to Mr. Almond, but you heard on the 911 voice,

20    it's very clear.

21    And we also know that when Mr. Ruiz represents

22    himself in his car with Mr. Cappelletti that day at

23    Mr. D'Ambrosio's home, that there's not one word spoken

24    from Mr. Ruiz to Mr. D'Ambrosio.  There's not one threat

25    made from Mr. Ruiz to Mr. D'Ambrosio.

12    1          Mr. Ruiz is not seen in possession of any type of

2    weapon.  Mr. Ruiz is not seen to speak either -- to speak

3    verbally or to act physically in any type of threatening

4    manner towards Mr. D'Ambrosio.  There's nothing.

5          And in fact, D'Ambrosio, when finally poked and

6    probed into what he really said at his deposition, he

7    admits well I told Cappelletti to follow me to the gas

8    station if he's going to keep, you know,, talking to me,

9    follow me to the gas station.

10          So D'Ambrosio is awake, alert, he's transported

11    to the hospital.  And while he's if he hospital -- well,

12    actually he's there on the 13th and I'll carry you to the

13    14th when Detective Suchomel who also did the print work

14    in this case, goes to see him at the hospital.

15          And what did Detective Suchomel tell you?  He

16    said he met with him, he spoke to him, he was awake, he

17    was alert.  Was he in the hospital.  Yes, of course, he

18    was in the hospital.  But he was able to relay to him

19    information, pertinent to a criminal investigation.  So

20    that Detective Suchomel could go back and begin his

21    investigation.  He was awake and alert.  So not only is

22    he awake and alert at the scene, but then when they get

23    him to the hospital he's also awake and alert.

24          Now, when Mr. D'Ambrosio took the stand

25    yesterday, under oath -- and again, something as jurors

you're going to hear, part of the instruction, that you can disregard any all or any testimony that you wish to believe. And any testimony that you want to disregard, you can do that. That's part of your job, to determine credibility.

And he took the stand yesterday and what's interesting about Mr. D'Ambrosio is he has an excuse for everything that he has said in the past.

Now, this is why this is important. He took that stand under oath and he told you this. When he's confronted with statements that he has made, his excuse was, well, wait a minute, I was shot, okay. I give him that he was shot. I was in a fog. They had probably given me some type of drug. I couldn't remember what I had said. I don't even remember giving this statement.

Okay. Now, why is this important? This is why it's important, ladies and gentlemen. We know this, Detective Suchomel went first that day. He was obviously the first detective that went to see and meet with him. Had very good conversation with him.

Again, he said he was alert, awake and was able to understand everything that was said. In fact, here's another important factor; while he's in the hospital and Detective Suchomel meets with him, he has him sign a consent to search his vehicle which is explained to him.

So he has the ability to understand a legal concept of signing away your consent to search his vehicle which is also done at that time in the hospital. We know that sometime on that day, on the 14th, he meets with a -- the lead detective in this case, Detective Needs.

Now, presumably Detective Needs is an experienced detective as well as Detective Suchomel. They're in the same unit together. He placed him under oath. And what we know is he took an 11 Page statement from Mr. D'Ambrosio, 11 Pages ladies and gentlemen.

We're not talking about, as Mr. D'Ambrosio tried to dismiss, well, I don't even remember giving a taped statement. Well, I am not really so sure when I did that, or how much I said. Well, the statement speaks for self. I placed it right here. If he didn't remember just like I did with everything else, here you go, Mr. D'Ambrosio, take a look. And he gave an 11 Page detailed statement to Detective Needs.

Detective Needs explained the oath to him, I'm placing you under oath, Mr. D'Ambrosio. He's very descriptive, if you recall, when I asked him about dates. Told him exactly when he met Mr. Cappelletti. Told him exactly when he went to Atlanta, Georgia. Told him how much money he paid Mr. Cappelletti to go to Atlanta, Georgia. Told him how much the bond was that

13

1    Mr. Cappelletti wanted.  Told him that he met him at an

2    Amoco Gas Station off Sheridan Street.  Told him

3    everything that went on in that gas station.  Told him

4    about the threats that were made by Mr. Cappelletti.

5         And what's interesting is that he came in

6    yesterday and before you told you, yeah, well, when I was

7    in the gas station and Mr. Cappelletti's threatening me,

8    this monkey, if you remember that's what he calls him, my

9    client, got out of the car and made statements that

10   Mr. D'Ambrosio comes up with to implicate Mr. Ruiz in

11   whatever it is happened to him that day.

12        He says to you in court what are we going to do,

13   are we going to do this, are we going to do that, and

14   when confronted with this very -- this 11 Page statement

15   that a detective with the Broward Sheriff's Office took

16   from him, I showed him specifically the line and the

17   answer in that statement, Mr. D'Ambrosio, didn't you tell

18   that officer under oath that when Mr. Cappelletti was

19   arguing with Mr. D'Ambrosio, that my client did nothing.

20   And that's exactly what he told Detective Needs in that

21   statement.

22        And if you also recall when he went on ranting

23   and raving after that where I, again, presented him with

24   the whole 11 Pages, I said Mr. D'Ambrosio, show me in

25   your statement where you ever told that detective that

13    1          Mr. Ruiz did anything in that gas station.  He couldn't

2          because it never happened.  And he hates Mr. Ruiz.

3                    And yes, I mean, it's a terrible thing he got

4          shot in the neck he was injured.  Is he upset about it.

5          Of course.  Does he have a motive to implicate my client.

6          Of course he does.  He hates him.  And maybe rightly so.

7          But when he had time to reflect on what had happened to

8          him, when he had time to embellish and decide that if

9          Cappelletti's going down, Ruiz is going down with him

10          because I'm holding Ruiz responsible.  That's exactly

11          what he did.  And he came here and he told you that.  And

12          that's exactly what happens with this alleged story of

13          this driving pattern that my client engages in.  Because

14          let's talk about that also for a minute.

15                    Did you hear any evidence that when he meets with

16          Detective Needs and gives this very thorough statement to

17          him, did you hear any evidence about this driving other

18          than when he took the stand yesterday and testified.  And

19          let's talk about that for a minute.

20                    Well he claims that my client in his little five

21          speed Honda, a little five shift gearshift Honda with a

22          four cylinder Honda and you can use common sense we give

23          you the law, but we tell you to use common sense when you

24          are returning a verdict, you see the pictures of his car.

25          He has a huge Caprice Impala that the police and taxi

13

1    driver's use.  And Mr. Almond, the State's witness, is

2    familiar with cars.  Told you, oh, that's why I was

3    attracted to it when I was driving down I-95.  It's a

4    very powerful car.

5        And what Mr. D'Ambrosio wants you to believe is

6    that feeling threatened to the point where he thought

7    that I think his words were some -- I don't know what

8    words he used some convoluted word some harm was going to

9    come to him, he wants you to believe that he continued to

10    drive knowing that this car was behind him, this little

11    Honda was behind him.

12        And that when he gets on I-95 in heavy traffic,

13    which he admitted, which Mr. Almond also admitted, which

14    all the State's witnesses admitted, it was heavy and

15    D'Ambrosio even told you that it was heavy.  It couldn't

16    leave and the words that he used was that Mr. Ruiz in his

14

17    little four cylinder Honda is doing somersaults through

18    the traffic to get up to me.  That's what he told you

19    yesterday.  It's totally incredible.  And should be given

20    no weight by you.

21        I take it to the point that it didn't happen, but

22    you know what, a reasonable doubt, ladies and gentlemen,

23    they got to prove it beyond every reasonable doubt.  And

24    a reasonable doubt can come from the evidence, itself

25    which is Mr. D'Ambrosio.  A lack of evidence or conflict

14

1    in the evidence.

2            And the other thing I want to point out is that

3    when he took the stand yesterday, he tells you, again,

4    that the monkey, Eddie, gets out of his car at some

5    point, walk over to his car and touches the passenger

6    door with his hand.  And what we do know is this?

7    Detective Suchomel, very experienced, took the time, got

8    multiple lifts, multiple lifts off of Mr. D'Ambrosio's

9    car, multiple.  And on top of that he told you it's a

10   great surface, that vehicle to lift prints.  And there's

11   none of Mr. Ruiz.  There's none of Mr. Ruiz prints on

12   anything including that shell that they found in this

13   vehicle.

14           And again, you just can't presume or say well

15   it's possible.  No, the State has to prove this.  When

16   they charge someone with a crime, they have to prove it

17   beyond a reasonable doubt.

18           What Mr. D'Ambrosio's problem is he wants to

19   blame me that I'm putting the words into his mouth and he

20   wants to blame the court reporter's who did this

21   deposition that they put in words in there.  And that

22   we're here putting a spin on what he said.  And he goes

23   so far as to even claim that when I showed him the

24   violation of probation paperwork prepared by the court.

25   And if you will notice what he did, and I'm going to

14

1   point it out to you, when he denied that piece of paper

2   is not a disposition sheet, okay.

3   I am not here to play any tricks with you,

4   Mr. D'Ambrosio. Walked up to him, I handed him the

5   sheet. And if you will notice what he did, he read the

6   upper right hand corner a portion of that sheet. So I

7   had to explain to him, of course, just as with his other

8   statements this in his deposition exactly what that was.

9   Wouldn't even admit that. Wouldn't admit the statements

10   that he had given to Detective Needs. Wouldn't admit

11   statements that he made under oath in a deposition.

12   The only person to use his words is putting a

13   spin on things is Mr. D'Ambrosio. He has a motive, he

14   has a bias, he has benefited. He was on probation,

15   felony probation for aggravated assault. It was

16   terminated. He told you he had a DUI that the State

17   dismissed those were his words. And all he wants to do,

18   because I say, again, he's upset and he had time to think

19   about it. Mr. Ruiz had nothing to do with this. And

20   there's absolutely no evidence at all that Mr. Ruiz was

21   responsible in any manner whatsoever, based on the

22   evidence that the State has presented to you, that he

23   participated in an attempted premeditated murder. It's

24   just not here.

25   And the only verdict that you can return based on

14

1    the evidence that the State has presented to you is a

2    verdict of not guilty, because to rely on

3    Mr. D'Ambrosio's testimony to convict Mr. Ruiz is an

4    injustice.  Thank you.

5         THE COURT:  Thank you Mr. Fleischman.

6         Mr. Grosz,

7         MR. GROSZ:  Well, well, was Mr. D'Ambrosio

8    everything I promised you in opening?  I think he was

9    pretty close.

10         But let's get back together law and the evidence.

11   These two gentlemen are charged with attempted murder in

12   the first degree, premeditated.  The Judge is going to

13   tell you what the elements of that charge are.  And I

14   anticipate that he's going to tell you that before you

15   can find either Defendant guilty of attempted first

16   degree premeditated murder the State pus prove the

17   following three elements beyond a reasonable doubt.

18   Number one:  The Defendants did some act intending to

19   cause the death of Mr. D'Ambrosio that went beyond just

20   thinking or talking about it.

21         Number two:  Defendants acted with a premeditated

22   design to kill Mr. D'Ambrosio.

23         And number three:  That the act would have

24   resulted in the death of Mr. D'Ambrosio except that

25   someone prevented either Defendant from killing him or

14      1    that they failed to do so.  Those are the three elements.

        2              Then you're going to get a definition on

15      3    premeditation.  And I think it's going to go something

        4    like this:  That a premeditated design to kill means that

        5    there was a conscious decision to kill.

        6              The decision must be present in the mind at the

        7    time the act was committed.  The law does not fix the

        8    exact period of time that must pass between the formation

        9    of the premeditated intent to kill and the act.

       10              The period of time must be long enough to allow

       11    reflection by a Defendant.  That's it.  Must only be long

       12    enough to allow for some reflection.

       13              The premeditated intent to kill must be formed

       14    before the act was committed.  And then the definitions

       15    will go on from there.

       16              I put up here deals with the law involving

       17    principals.  I believe you're also going to get an

       18    instruction that tells you:  That if the Defendant helped

       19    another person or persons commit or attempt to commit a

       20    crime, the Defendant is a principal and must be treated

       21    as if he had done all the things the other person or

       22    persons did if:  Number one, the Defendant had a

       23    conscious intent that the criminal act be done.

       24              And number two, that the Defendant did some act

       25    or said some word which was intended to and did enter

15

1    cite, caused, encourage, assist or advise.  It's not all

2    of those, it's either or, or advise the other person or

3    persons to actually attempt to commit the crime.  That's

4    the law on principal instructions.  You're going to get

5    that.

6          You're going to be inundated with instructions.

7    You're going to get instructions on what's called an

8    independent act.  And you're going to get instructions on

9    what in Florida are called lesser included offenses.  And

10   in this case the lesser included offense that you're

11   going to be read is what's called culpable negligence.

12         In the State of Florida, as jurors, your duty is

13   to deliberate weighing the evidence and the law and

14   considering that against the charged offense which is

15   attempted murder in the first degree.  You weigh the

16   evidence.  You listen to the law the Judge gives you and

17   you say, did this charge or was this charge proved.

18   Attempted murder in the first degree, that's the first

19   thing you look at.

20         Only in the situation where you feel that that

21   has not been proven that first charge do you then start

22   to consider what the Court will call lesser included

23   offenses.  Only in that circumstance where you feel that

24   the charged offense wasn't proven do you even begin to

25   look at the lesser included offense.

15    1    Please don't go back in there and think that this

2    lesser included offense is some form of cop out for you

3    to agree on.  Well, we're not sure if he did this, let's

4    just agree to the lesser included.  That's not what it's

5    there for, okay.  Look at the evidence.

6    And you ask yourselves, did the State prove the

7    charged offense attempt premeditated murder, attempt

8    murder in the first degree.  Did they prove that?  If you

9    say yes, based on the evidence, that's your answer.  It's

10    not yes, they proved it, but we feel bad for these guy's

11    so let's go with this culpable negligence.  It's yes, it

12    was proven, that's the answer, that's the box that gets

13    checked.

14    Only if you were to find that that's not proven

15    do you even begin to consider the next lesser included

16    offense.  And I suggest to you, when you weigh the

17    evidence and you hear the instructions the Judge gives

18    you on culpable negligence, you're going to say to

19    yourselves, that that doesn't apply because what happened

20    here was attempted murder in the first degree, not this

21    lesser included offense.

22    Similarly, you're going to get an instruction on

23    the independent act.  I know it's a lot to take in right

24    now, all these legalese, but the more you hear it

25    sometime, the more it sticks so just bear with me.  I

15

1    believe the Judge is going to tell you that if you find

2    that the crime alleged was committed an issue in this

3    case is whether a crime of attempted murder in the first

4    degree was an independent act of a person other than the

5    Defendant.

6         An independent act occurs when a person, other

7    than the Defendant, commits or attempts to commit a

8    crime:  Number one, which the Defendant did not intend to

9    occur.  Number two, in which the Defendant did not

10   participate.  And number three, which was outside of not

11   a reasonably foreseeable consequence of the common design

12   or unlawful act contemplated by the Defendant.

13        If you find the Defendant was not present when

14   the crime occurred, that does not in and of itself

15   established that the crime was an independent act of

16   another.  And if you find that the crime was an

17   independent act of another, then you should find the

18   Defendant not guilty of the crime charged, okay.  That's

19   an independent act.  What we have here are principals.

20   People acting together.  People assisting each other for

21   the common goal of committing this offense.

22        Do not listen to this independent act and say to

23   yourself, oh, that's what definitely happened because

24   that is not what happened in this case.  What happened in

25   this case, is that both acted as a principal to commit

16

1    the charged offense which attempted murder in the first

2    degree.  How do we know that?  We look at the evidence

3    which is what we're going to do.

4         The Judge will tell you that when you weigh the

5    evidence, when you evaluate everything that you have

6    heard over the past couple days, sometimes it's

7    nauseating as it may have been, there are factors and

8    things that you can use to assist you in weighing the

9    evidence.  Such as, did the witness seem to have an

10   opportunity to see and know the things about which the

11   witness testified.

12        Did the witness seem to have an accurate memory.

13        Was the witness honest and straightforward in

14   answering the attorneys questions.

15        Did the witness have some interest in how the

16   case should be decide.

17        Does the witness' testimony agree with the other

18   testimony and other evidence in the case.

19        Has the witness been offered or received any

20   money or preferred treatment or other benefit in order to

21   get the witness to testify.

22        Did the witness at some other time make a

23   statement that's inconsistent with the testimony given in

24   court.

25        None of this is rocket science.  These are all

16

1    basic things, but it's something that the Court will tell

2    you to use, along with most importantly, your common

3    sense.  Because each one of you has different background

4    that are now going to be collectively pulled as jurors

5    when you go back in there to deliberate and no one, not

6    myself, not the Judge, is going to tell you, leave your

7    common sense outside the courtroom.  It's something that

8    you have.  And I suggest it's something that you should

9    take back in there and use when you evaluate.

10        And sometimes you have to look at the evidence

11   and step back and say, wait a minute, what is common

12   sense say what occurred here.  Let's look at the evidence

13   in light of common sense and explain this.  What has

14   happened.  Use your common sense to help you do that.

15        We'll talk a little bit about defense theory and

16   what has been presented to you by way of cross

17   examination and arguments by both defense attorneys.  And

18   Mr. Fleischman says to you that only four statements were

19   made at the gas station at the Amoco by Mr. Ruiz as if to

20   say that only four statements that's really not enough to

21   prove premeditation.

22        And there's an old saying that circumstances

23   don't make a man, they reveal him.  And how many -- you

24   ask yourself, how many questions or how many statements

25   does it take to just give you a peek of what's going on

16

1    inside someone's mind.  Is it a paragraph, is it a page,

2    is it a hours worth of talking, or could it be one word.

3    But what does it really take to show you what someone

4    else is thinking.

5            And in this case when you have to determine

6    whether or not premeditation was there, you need to look

7    inside the mind of Eduardo Ruiz.  You need to look inside

8    the mind of John Cappelletti.  Physically you can't do it

9    obviously.  So how do you do that.  You look at the

10   circumstances surrounding everything.  And from that

11   you're allowed, in law, tells you you can do this, from

12   that you're allowed to infer what took place.  Doesn't

13   matter how many statements are made at a gas station if

14   it's one or 100.  If it gives you insight as to what his

15   enter intent is that's enough.

16           How many times did Mr. Fleischman in the last 10

17   or 15 minutes say a witness, Mr. Almond said this or

18   witness Mr. Almond told you that.  Has there been one

19   witness called throughout the duration of this trial by

20   the name of Almond?  The answer is no.  Is Mr. Fleischman

21   trying to mislead you?  Is Mr. Fleischman lying to you as

22   jurors trying to get you to believe that a witness name

23   almond testified?  No.  He misspoke.  He spoke

24   inaccurately.  It happens.  It happens on the street.  It

25   happens in everyday life, and it happens in a courtroom.

16
17

1    And it happens under oath and not under oath.  That is

2    human nature.

3         Does anyone really believe that Mr. Fleischman is

4    trying to convince you that there's a some witness named

5    Almond?  Absolutely not.  It was just inaccurate.  And

6    mistaken.

7         Yet, what he wants you to do is looking at the

8    one statement, the one time that Christopher D'Ambrosio

9    does not mention those statements by Ruiz and say,

10   uh-huh, he is lying to you.  Four hours of deposition

11   over 140 Pages.  Two days worth of testimony, two

12   statements to Detective Needs, one on the 14th, one on

13   the 18ht.  Both while in the hospital.

14        Where's the one time, the one time that

15   Sid Fleischman will raise his voice to you say look at

16   this right here, uh-huh, he didn't say it.  He's lying.

17   He's lying to you today, this whole thing is unbelievable

18   because on the 14th of April, 1997,

19   Christopher D'Ambrosio did not mention the statements

20   that Edward Ruiz was alleged to have made at that gas

21   station, forget it.  Close your books up, go home.  He's

22   not guilty.  Look at that one time.

23        Look at the one time that Christopher D'Ambrosio

24   had within the last twenty-four hours, been shot in the

25   head with a shotgun, been rushed to the hospital, been

17

1    pumped full of morphine, and a detective starts asking

2    him questions.  That one time where he spoke inaccurately

3    or he didn't mention something, from then on, he is a

4    liar.  That's what they want you to believe.

5         In one breath they will tell you that there was

6    no relationship between Christopher D'Ambrosio and

7    Edward Ruiz.  None whatsoever.  Mr. Fleischman's spin on

8    that is that that means that Edward Ruiz has no motive to

9    harm Christopher D'Ambrosio.  But what about the reverse,

10   what about the reverse, doesn't that also tell you that

11   Christopher D'Ambrosio has no motive to make anything up

12   against Edward Ruiz.

13        Isn't that common sense he doesn't even know him.

14   How many times did he have to say that.  Counselor, I

15   don't know him.  I didn't know the man.  I ain't seen him

16   nothing more than hello, good-bye.  They want you to look

17   at that and say well, he doesn't know him, therefore,

18   this is a lie what he's telling you.  How could this be

19   possibly true, he doesn't even know the man.  Isn't it

20   just as common sense that because he doesn't know him he

21   has no reason to make it up.

22        Ask yourselves, what is Christopher D'Ambrosio

23   getting out of that.  What is he getting out of making up

24   a story about Edward Ruiz.  What possible benefit is he

25   get being from that.  Do you think he enjoyed the past

17

1     two days.  Do you think he enjoyed four hours of

2     depositions.  Do you think he enjoyed having to give two

3     statements to detectives.  Boy, that is enjoyable and

4     it's worth it, so I'll make up a story against somebody

5     and bring that guy into Court.  Why?  Why would he do

6     that if it didn't happen?

7         There have been suggestions made to you as to

8     possible reasons as to why Christopher D'Ambrosio would

9     make up this story, suggestions such as his wife was

10    sleeping with Cappelletti's son or sons.  That's a

11    question thrown at Mr. D'Ambrosio and what was the

12    answer?  I have no knowledge of that, no.  Just throw

13    that out there hoping that that's something that you

14    grasp on.

15        And what did we talk about in voir dire?  The

16    difference between lawyer talk and evidence.  And what a

17    lawyer asks and what a lawyer suggests over here is not

18    evidence.  What the answer is that comes from over there,

19    that is evidence.  That's a perfect example.

20        Now, to come up here to say to you, well, we

21    don't know perhaps that's a reason why he would lie, do

22    you have any evidence of that?  Ask yourselves.  No.  No

23    evidence of that.  They want you to speculate.  The Judge

24    is going to tell you, you can't do it.

25        He hated Cappelletti.  How many times was that

17

1    asked.  Oh, he hated Cappelletti -- didn't you hate him?

2    No, I didn't.  In fact, at one time he says I may have

3    said I don't like him, but that's -- I probably would not

4    have said that prior to him shooting me.  All of a sudden

5    now they can argue to you, he hated him don't you see

6    that.  That's a motive to lie.  Ask yourselves, again,

7    what evidence is there of that.

8         He was on probation.  He's a liar, he is on

9    probation at the time.  How can you believe the word of a

10   man who is on probation at the time of this shooting and

18

11   have a pending misdemeanor DUI.  Liar.  Don't believe

12   him.

13        What what did we talk about, again, in voir dire?

14   What did I ask you all to promise.  Do you promise me

15   that the fact that someone was either arrested or on

16   probation at the time would not discredit them in and of

17   itself?  And what do you all say, yes.  I promise that I

18   can look around that.  That sure, I'll give it whatever

19   weight it's due, but that fact in and of itself is not

20   enough for me to discredit a witness.  I ask you to keep

21   that promise.

22        Did the fact that he was on probation make him

23   look like this.  Did the fact that he was on probation

24   propel the shotgun pellets into his neck and jaw.  Is

25   that what did that?  But they want to throw that out

18    1    there.  They want to throw it out there all the time.

2    This guy's on probation and what are they implying to

3    you, that he's a terrible person, he is on probation,

4    don't believe him.  Remember your promises in voir dire.

5         They tell you there's a lack of fingerprints so

6    therefore, there's no proof.  There's no proof of

7    anything.  Well, what did the fingerprints,

8    Detective Suchomel, what did he tell you?  That there are

9    certain factors that are considered in determining either

10    whether a surface is good to lift prints or whether

11    prints will actually be left.

12         But the bottom line is, even if it's a great

13    surface, even if a person has perfect skin for leaving a

14    print or oily enough or whatever it maybe, the fact that

15    the print is absent doesn't mean that the item wasn't

16    touched.

17         And the perfect example of that is the shotgun

18    shell that's in evidence, the live round found in

19    Mr. Ruiz's car.  You look at the photographs and see

20    where the shell is.  It's in the back by itself it's not

21    in a box.  Well, how did it get there?  The common sense

22    how did the shell get into his car.  Did it grow legs and

23    walk into his car?  Someone put it in there.

24         I mean, sometime during the course of that car's

25    history, someone put that shell in there, whatever it's

18    1    in some things or whatever it maybe, but no print is

2    found on it.  So does that tell you that that's a lie

3    that the photographs lying to you, perhaps the shotgun

4    shell was not in the car?  Don't be misled by that.  The

5    fact that there's no print found on it, that doesn't tell

6    you anything other than there's no print on it.  That's

7    all that tells you.  That's all that tells you.  They

8    want to ignore all the other evidence and just focus on

9    that.

10    Look for the common thread, the common thread

11    throughout all the testimony and all the evidence.  And

12    let's go back through it briefly.  2:25 approximately

13    gunshot rings out.  D'Ambrosio pulls his car over, gets

14    on 911.  And he's saying to the 911 operator, and if you

15    listen to the tape enough times, you will hear as soon as

16    you push the button play, if it's rewound all the way,

17    you will hear the words Cappelletti, it's the first

18    thing.  It's faint, I have listened to this thing 20

19    times.  I suggest you do the same.  You will hear it.

20    It's the first word that is picked up on the recorder

21    even before the operator gets a chance to ask questions.

22    Then there's questions and then you hear it

23    again, and evently who shot yeah, John Cappelletti.

24    John Cappelletti.  Is he making that up?  Is there a

25    reason for him to be making that up?  This is within

18    1    seconds of having been shot and pulling over on the side

2    of the highway.  Is that something that he's fabricating?

3    And ask yourselves with a what evidence is there

4    that it is a lie other than the speculation that they

5    want you to grasp on.  What evidence has been presented

6    through testimony or physical exhibits that this is a

7    lie.  Nothing.

8    Let's forget for one second, forget about

9    everything you've heard so far, just relax, clear your

10    head, take a deep breath and say to yourselves, okay,

11    what are they saying.  Well, they're saying, number one,

12    we don't contest that Mr. D'Ambrosio was shot, okay.

13    Well, what does that mean?  What are they saying to you?

14    They're saying well obviously my client didn't do it.

15    Each one says that.

16    Well, my client didn't do that.  Well, really

17    what does that mean?  What is your common sense -- what

18    does that mean?  Someone else pulled the trigger.  Well,

19    let's go with that theory for a second.  Someone else

20    pulled the trigger.  How does that play?  Mr. D'Ambrosio

21    is driving northbound on I-95 after just having an

22    agrument with John Cappelletti who had threatened to kill

23    him.  Mr. Ruiz is driving the vehicle.  The Honda is

24    pursuing Mr. Ruiz had made some comments at the gas

25    station "are we going to do this thing or what".

19

19

1    They're pursuing on I-95. And coincidentally and

2    conveniently at that moment, another white Honda Civic

3    pulls in with a driver who blasts Chris D'Ambrosio with a

4    shotgun and then takes off never to be seen or heard from

5    again. That must be what happened. It must be because

6    they didn't do it, but he got shot.

7    So how did that happen, someone else did it? And

8    conveniently, although inconveniently for Mr. Ruiz, this

9    mystery shooter uses the same ammunition that's in his

10   car. What a horrible coincidence. I mean, that's awful

11   for Mr. Ruiz. This mystery shooter uses the same

12   ammunition that's found in his car within a week or two

13   of the shooting. Perhaps? Perhaps the mystery shooter

14   saw Mr. Ruiz, followed him and planted more ammunition in

15   Mr. Ruiz's car make it look like Mr. Ruiz was involved.

16   Think about these things.

17   I mean, push yourselves, ask yourself, what are

18   they asking you to believe. What are they asking you to

19   do. Who are they asking me to believe did this. Well,

20   they're saying it's not them. It's not Edward Ruiz, it's

21   not John catch. Well then, who are they suggest

22   suggesting. If they say to you well, no no, it could

23   have been anyone. If they say we don't know what really

24   happened. Then use a phrase like this, they're asking

25   you to speculate. If they use a phrase like that.

19    1        They're asking you to speculate and to get on things that

      2        are not in evidence.  And the Judge going to tell you

      3        that you cannot do that.  Your decision is based on the

      4        evidence and the evidence alone in accord with the law.

      5        Not on guesswork.

      6            Perhaps the wound was self inflicted.  Perhaps

      7        while driving down the street, Mr. D'Ambrosio saw

      8        Mr. Ruiz and Mr. Cappelletti and thought what a

      9        grandopportunity to frame these two guy's that I hate,

      10       and he pulls a shotgun out and D'Ambrosio, blasts himself

      11       in the head through closed window.  Perhaps that's how it

      12       happened.  And then throws the shotgun pulls over and

      13       calls 911.  That could be.  That's a possibility.

      14           I could also wake up tomorrow morning and have a

      15       full head of hair, but that's not really realistic is it.

      16       I'd like it to be realistic, but it's completely

      17       unreasonable.  Use your heads.  What does your common

      18       sense tell you happened.  Listen to the tape.  Look at

      19       the photos.

      20           If you hear things -- see I only have one

      21       opportunity to speak to you.  During the course of the

      22       next couple of arguments, if you hear things such as I

      23       suggest perhaps this is why Mr. D'Ambrosio was lying or

      24       perhaps this is what happened, or who knows what they

      25       were doing in Georgia, or we don't know why they were up

19

1    in Georgia, if you hear phrases like that, translate them

2    in your head to speculation because that's all that is

3    designed to do.

4         Phrases like we don't know what happened thrown

5    out openly to you is saying to you, the jury, hey,

6    speculate as to what may have happened.  That's not what

7    this is all about.  This is about evidence that has been

8    presented, weighing it against the law.  That's what this

9    is about.  If they say phrases like that to you, you say

10   to yourself, what are they asking me to do?  They're

11   asking me to reach at something that has not been

12   presented through testimony or physical exhibits.  That's

13   the evidence.

14        And don't let them make you think that testimony

15   is not as valuable as physical exhibits.  Both are

16   equally valuable.  If you hear phrases like that, say to

17   yourself, hey, I am a juror, I'm not supposed to do that.

18   The law says I base my decision on the law and on the

19   evidence.  Not on guessing at what may have happened or

20   what may not have happened.

21        Things like you've already heard where does he

22   get his money from.  Where does he get his money from.

23   You've heard evidence, he worked and he saved, okay.

24   Now, where does he get his money now.  What are they

25   suggesting you to do.  They want you to guess at some

1    evil -- some evil reason as to why D'Ambrosio has money.

2    They want you to guess at that because there's no

3    evidence of it.  So the only thing they can hope is that

4    you will guess and try to grasp at that.  That's not

5    evidence, don't do that.

6         They say D'Ambrosio is a liar, he hates

7    Cappelletti, don't believe him.  But the part where he

8    says he never saw Cappelletti shot shoot the gun well,

9    that's Okay.  To believe, believe that part.  That make

10    sense to you.  They're picking and choosing.

11         And ask yourselves this question, if Cappelletti

12    was so compelled to lie, make up a story against these

13    two fine gentlemen, if he was so compelled to do that,

14    don't you think -- don't you think that on the one issue

15    that could really matter, he would be consistent.

16         Mr. D'Ambrosio, did you see who pulled the

17    trigger?  Did you see the shotgun in any ones hands?  And

18    what was his answer to you?  Was it a lie, or did he say

19    to you no, I didn't?  He said no, I didn't.  I didn't see

20    who's hands the shotgun was in.  I didn't see them pull

21    the trigger.

22         Don't you think it would have been easy for him,

23    it would have been easy for him to say as they road up,

24    because he says he sees the car pull up, as they pull up,

25    I could see John Cappelletti with the shotgun out of my

20    1    sight before the blast, wouldn't that have just been easy

2    to say that. And does he do it. No. Why not. Because

3    it's the truth. He didn't see it happen.

4        If he is so compelled to lie why not go the extra

5    mile and say that. Because then that's the clincher, but

6    he doesn't. He doesn't because what he's telling you is

7    honest. He you may not like him, but what he's telling

8    you is believable in accord with the evidence.

9        MISS DADOWSKI: Your Honor, I will object to

10    giving his personal opinion as to the testimony.

11        THE COURT: Sustained.

12        MISS DADOWSKI: And I move to strike that.

13        THE COURT: Sustained. Please remove the

14    personal opinion of Mr. Grosz.

15        MR. GROSZ: It doesn't have to be my personal

16    opinion, look at the evidence. The evidence is in accord

17    with what his testimony is and what you're common sense

18    is.

19        Look at evidence of premeditation. You have

20    Cappelletti gets arrested in Georgia after helping move

21    this truck up to Georgia. He gets arrested and left

22    behind. Whether you think that's right or wrong it's a

23    fact, okay. He is left behind at the gas station and

24    he's upset and he's calling D'Ambrosio all sorts of names

25    and they may say Well, we don't know if he's talk about

20    1    D'Ambrosio.  Use your common sense.  D'Ambrosio says he

2    left him and within an hour or two hours, the officers

3    there aarresting Mr. Cappelletti who's spouting out about

4    this son of bitch left me behind.

5         He gets out.  He comes down here to Florida.  He

6    goes to dams house with Ruiz as the driver.  They go to

7    the gas station H Cappelletti gets heated.  He's arguing

8    with him.  Ruiz gets out of the car and says "are we

9    going to do this thing or what".  What is he talking

10    about at that point,.  What's the response?  I'm going to

11    blow your fuckin' head off.  I'm going to blow your

12    fuckin' head off.  And at that point, Cappelletti gets

13    in -- or D'Ambrosio gets in his car and takes off.

14         Cappelletti and Ruiz pursue.  They chase him.

15    That's evidence of premeditation.  The statements are

16    evidence of premeditation.  When coupled with the chase

17    they follow him on Sheridan Street, they don't stop

18    there, they follow him on I-95.  They evently catch up to

19    him and blast him in the shoulder, neck, and head.

20         Let's think about the type of injury that he

21    sustains.  This is Christopher dams x-ray.  Do you see

22    what's in his neck.  Do you see that.  Right in here you

23    take this back in there and you look at that.  Shotgun

24    pellets.  I'm going to blow your fuckin' head off.  Where

25    does the shot go?  Right at the base of his head.  In his

20    1    neck.  You saw his scar, jaw down, shoulder, left

2    shoulder.  As he is driving a car, what's facing the

3    other lanes, his left shoulder, the left side of his

4    head.  I'm going to blow your fuckin' head off and the

5    blast comes right into his head as if what, as if he's

6    trying blow his head off.  It's a shotgun.

1    7    What does Carl Haemmerle tell you to expect, a

8    lot of devastation.  A Winchester .12 gage shot,

9    seven-and-a-half in size over 400 pellets per shot fired

10    at over 800 miles per hour from 6 to 12 feet away.

11    What's that intending to do, scare ya?  Rip your cuticle

12    off?  What's the purpose in that.  No damage to the rest

13    of the car (indicating), number one, the proximity of the

14    shot.  Number two, the intended target?  The head.

15    Look at the photographs State's Number 9, look at

16    this hole.  Is that about where Mr. D'Ambrosio's head

17    would be when he's driving.  Not even a scratch to the

18    rest of the car.  What's the intention.  What's the

19    intention there.  To blow his head off.  The only problem

20    is they didn't succeed.  That's why it's an attempt.

21    They failed to do their job.

22    It's map of Broward County, this is State's 19.

23    Take this back in there and look at something.  When you

24    talk about premeditation, you talk about the ability to

25    reflect.  In other words, to think about the actions that

1    1    your about to commit.  The ability to reflect upon that.

2    Ask yourselves this, here's the Amoco Station, Sheridan

3    and U.S. 1.  They travel, in pursuit of

4    Christopher D'Ambrosio, Ruiz and Cappelletti travel from

5    Sheridan Street and U.S. 1 all the way to 95 passing all

6    these streets and possible turn offs.  They get on I-95

7    and head north past one exit, two exits and before the

8    third exit, is where he gets hit and the car comes to

9    rest.

10          Do you know how long or how far they traveled in

11   pursuit of Christopher D'Ambrosio?  Almost

12   four-and-a-half miles.  Four-and-a-half miles.  We're not

13   talking a block.  You want to think about ability to

14   reflect on your actions.  For four-and-a-half miles

15   Edward Ruiz maneuvers his car throughout traffic in an

16   effort to jockie for position to catch up to

17   Christopher D'Ambrosio to allow John Cappelletti to blow

18   his fuckin' head off.  Four-and-a-half miles.  Time to

19   reflect.

20          Is that evidence of premeditation, the distance

21   of pursuit that was traveled?  Absolutely.  Consider

22   that.  Consider the distance of that pursuit.  You

23   consider the type of weapon that's used, a shotgun is

24   that ment for pinpoint accuracy?  That's meant for taking

25   someone's head off.

1          The nature of the wound, the severity of the

2      wound, consider that.  The pellets have migrated to his

3      heart.  Is that a glancing blow?  Is that a shot fired to

4      warn somebody or scare them?  Absolutely not.  There's

5      one purpose, one purpose for pulling something like this,

6      these pellets, consistent with what's in this shell, this

7      demonstrative aid, there's one purpose for sending this

8      spiraling into somebody's body, that's to kill 'em.

9          Then ask yourselves, is the car registered to

10     Edward Ruiz?  Here's certificate of title.  Take a look

11     at that.  He owns the white Honda.  No question about it.

12         Christopher D'Ambrosio, little things, tells you

13     he stuffed money in the back seat of the seat behind him

14     he thinks it's $60's.  What do they find bag there,

15     $60's.  Little things.

16         They want to tell you perhaps that this is all

17     about circumstantial evidence and Christopher D'Ambrosio

18     never saw who fired the shotgun, therefore, how could you

19     ever possibly believe that these two guy's were involved.

20     He didn't see them do it.  Therefore, it didn't happen

21     that way.  You walk outside your house, you see leaves

22     spinning around on the ground you see --

23             MISS DADOWSKI:  Objection, Golden rule.

24             THE COURT:  Rephrase your argument.

25             MR. GROSZ:  Garbage blows by, leaves are

1      rustling, the trees are rustling, there's no one at the

2      bottom of the tree shake it go, there's no one running

3      with the garbage, passed the front of your house.

4             MISS DADOWSKI:  Same objection, Your Honor.

5             MR. FLEISCHMAN:  Judge, I'll join in that

6      objection.

7             THE COURT:  Sustained as to the word you.

8             MR. GROSZ:  No one is throwing the leaves around.

9      But what's it doing?  Is it the wind.  Well, I don't

10     know, you can't see the wind or someone can't see the

11     wind.  Does that mean the wind must not exist?  This must

12     be a figment of our imagination.  Trees rustle, there's

13     cool breeze on the face, can't see it, therefore, must

14     not happen.  Must be some invisible person there blowing.

15            Just because Christopher D'Ambrosio didn't see

16     John Cappelletti pull the trigger does not mean that

17     John Cappelletti did not pull that trigger.  Use your

18     common sense.  Look at the circumstances surrounding it

19     to answer that question.

20            (Thereupon, the 911 tape was played off the

21     record)

22            MR. GROSZ:  Yesterday I got fustrated with the

23     way D'Ambrosio acts on the stand and asked myself why --

24     why does he act that way?  And Christopher D'Ambrosio

25     sitting up here is a gentleman that feels helpless, wants

2    1    things to go in his way, wants to help out as much as he

2    can, and he feels helpless and scared sitting up here.

3    Much the same way that he felt on April 13th of 1997 when

4    Edward Ruiz maneuvered his vehicle into a position where

5    John Cappelletti could shoot him in the head.  He felt

6    scared and he felt helpless.

7    You say to yourselves why does a man act that

8    way.  Because he's helpless and scared and he is and

9    because his faith is not in his hands and for a guy like

10    that it's scary.  And it is a helpless feeling.  And on

11    April 13th of 1997, he had no one to turn to for

12    protection.  And today he does.  And that's you.

13    MISS DADOWSKI:  I have an objection.

14    THE COURT:  Thank you, Mr. Grosz.

15    Folks, we're going to take a brief five minute

16    recess.  Remember, do not discuss the facts of the case.

17    Step back in the juryroom.

18    (Thereupon, the following proceedings were

19    had outside the presence of the jury:)

20    THE COURT:  Yes, ma'am?

21    MISS DADOWSKI:  My objection is the fact that

22    Mr. Grosz just tried to invoke sympathy from the jury to

23    make them feel sorry for Mr. D'Ambrosio.  And basically

24    because he may feel helpless or be helpless, that the

25    jury should feel sorry for Mr. D'Ambrosio and that that's

1    how why they should come back with a guilty verdict of

2    attempted first degree murder against John Cappelletti.

3         And so I think that that's entirely improper

4    argument, asking the jurors to feel sorry for the

5    witness.  And coupled with the Golden rule violation and

6    all the other evidence that -- all the other times that

7    there have been problems with testimony in this case, I'm

8    renewing my motion for a mistrial.

9         MR. FLEISCHMAN:  Judge, I'm joining in that.  And

10   also add, it was not commented on any evidence that was

11   presented in this case that he was helpless, and that

12   when he was on the witness stand, he was helpless.

13   There's been into evidence of that at all.  It's

14   inflammatory and we would object to it.

15        MISS DADOWSKI:  I join in that also.

16        THE COURT:  I felt that Mr. Grosz was trying to

17   explain Mr. D'Ambrosio's demeanor and conduct on the

18   witness stand.  However, in an abundance of caution, if

19   you want me to give a curative instruction reminding the

20   jury that sympathy is not to play a part in their

21   deliberations, I will be more than happy to do so.

22        MISS DADOWSKI:  I would, Your Honor, although I

23   don't know that it would be much help at this time.

24        THE COURT:  Motion for a mistrial will be denied.

25   I will give a curative instruction.

2

1          MR. FLEISCHMAN:  Judge, you're going to do that

2      first?

3          THE COURT:  Yeah, I'll do that.  And then

4      Mr. Fleischman, you got 26 minutes remaining and

5      Miss Dadowski, you have 34 minutes remaining if you want

6      it.

7          MISS DADOWSKI:  Okay.  Thank you, Judge.

8          THE COURT:  Okay.  We'll be in recess for five

9      minutes.

10          (Thereupon, a recess was taken; after which the

11      following proceedings were had:)

12          THE COURT:  Record will reflect that both

13      Mr. Cappelletti and Mr. Ruiz are present and represented

14      by counsel.

15          Mr. Lithle, will you bring in the jury please.

16          (Thereupon, the following proceedings were

17      had within the presence of the jury:)

18          THE COURT:  Folks, as I've told you, I will

19      instruct you on all the law that you need in order to

20      decide this case after the attorneys have completed their

21      final arguments.

22          But let me just remind you at this point in time,

23      that sympathy is to play no role in your deliberations.

24          We will continue with Mr. Fleischman.

25          MR. FLEISCHMAN:  Okay.  I want to reiterate too,

the State -- I mean, there's no doubt, again,

Mr. D'Ambrosio got shot. And of course he has injuries

and the State is presenting to you, and they are in

evidence, you can take them back and look at them, the

photographs and the x-rays. But I'm going to reiterate

as well, sympathy should never play a part in your

verdict whatsoever. And again, I'm asking you just to

solely look at the evidence in this case which is the

testimony and of course the physical evidence that was

introduced.

    The fact that -- the fact that Mr. D'Ambrosio

maybe helpless, I mean, again, that's speculating no one

knows that. He was up here doing very well for himself

as you can see on that witness stand.

    And I heard the State explain everything about

Mr. D'Ambrosio the fact that he is a helpless person and

he has these injuries and again, I am conceding he got

shot in the neck and jaw and there's photographs of blood

and there's x-rays of these pellets. So what. They have

to prove that Mr. Ruiz, again, and I am not going to be

repetitive, I'm going to stick to what I have to tell you

I'm going to sit down and it's in your hands. But the

fact that he has these injuries doesn't prove beyond a

reasonable doubt that Mr. Ruiz is a principal in this

case. And it doesn't prove beyond a reasonable doubt

3    1    that Mr. Ruiz committed attempted premeditated first

2    degree murder on Mr. D'Ambrosio.  None whatsoever.  It's

3    not important.

4    And I am not conceding to you that when Mr. Ruiz

5    was in that gas station, that Amoco Gas Station, that he

6    even made one statement, I am not conceding that

7    whatsoever.  And I want to make that very clear because

8    it appeared that the State said to you well,

9    Mr. Fleischman is telling you that all he made was four

10    statements.  I am not conceding that at all.  That's what

11    Mr. D'Ambrosio told you.  And the State is simply telling

12    you, hey this is what he said.  He told you that Mr. Ruiz

13    say hey are we going to do this are we going to do that

14    whatever it is he said.

15    And it all goes back to his credibility.  And

16    it's up to you whether or not -- here I'll even carry it

17    this far, again, you are the jurors, you decide whether

18    he took an oath and lied.  But if you even have a doubt,

19    without saying Mr. D'Ambrosio you're a liar, if you have

20    a doubt about the credibility of his evidence, the

21    credibility that when he spoke and told you that when

22    Mr. Ruiz was in that gas station that he made these

23    statements, if you have a doubt about that, it's a

24    reasonable doubt about his credibility and you find that

25    I am not sure if those statements were made, again, based

3    1        on your determination of his credibility, then that's it.

2            And if you have a reasonable doubt again based on

3        his credibility and all these issues are important,

4        they're very important.  The fact that, again, no one's

5        putting words into his mouth.  And I know the State used

6        the word misspoke and accurately.  I guess that's a nice

7        way of putting it.  That Mr. D'Ambrosio on, I don't even

8        know on how many occasions spoke inaccurately.  Well, I

9        think it was clear that it was more than Mr. D'Ambrosio

10        taking the witness stand and misspeaking inaccurately

11        about some very important issues in this case.  And

12        again, we don't convict people in our system because of

13        some blood or because of injuries.  This was more than

14        him just speaking inaccurately, misspeak go.

15            Never told that detective and it is very

16        important, it's very important.  A detailed statement

17        given to an experienced detective which makes absolutely

18        no sense from this standpoint, ladies and gentlemen, the

19        State gets up here and says look it was his only

20        statement it was his deposition to an experienced

21        detective, you really think a detectives going to take a

22        statement from someone and place them under oath and take

23        a 11 page statement from them if they're not alert or if

24        they're under the influence of a drug, or if they're

25        under the influence of some type of narcotic administered

3    1    by the hospital.  Of course not.

2         Mr. D'Ambrosio, and I'm going to use the word,

3    again, hates Mr. Ruiz.  And the State said to you well,

4    Mr. Fleischman got up here and told you, they don't even

5    know each other so where's the motive.  The motive is

6    clear, ladies and gentlemen.  And it's clear from the

7    conduct that Mr. from the conduct of Mr. D'Ambrosio.

8    From the very first time that Mr. D'Ambrosio implicates

9    Mr. Cappelletti, nothing at all is mentioned about any

10   conduct on the part of Mr. Ruiz which the State is now

11   telling you to except to show that he was a print pal in

12   this shooting, and to show that he had knowledge.

13        And is it important that Mr. D'Ambrosio's on

14   probation.  And is it important that Mr. D'Ambrosio had a

15   pending misdemeanor.  Yes for this reason.  Again, I am

16   not telling you take that one sole fact, ladies and

17   gentlemen, the fact that he was on probation, the fact

18   that he had a pending misdemeanor and that he violated

4   19   his probation and because of that totally disbelieve him.

20   That's not the point.

21        The point is, Mr. D'Ambrosio, ladies and

22   gentlemen, he is familiar with the system, okay.  He is

23   on felony probation for aggravated stalking and resisting

24   arrest without violence.  He gets arrested for a DUI

25   offense.  He violates his probation.  The only person

4

1    with the motive here, and I'm only concerned about my

2    client, Mr. Ruiz, Mr. D'Ambrosio has a very clear motive

3    to implicate yesterday when he came in here and testified

4    and to implicate just within the last month when he gave

5    that deposition, Mr. Ruiz. And it's very clear.

6         He's upset. He has severe injuries from this

7    shooting. And the State made it a point to show you,

8    well, look and he has scarring too and of course he does

9    he was shot.

10        And it's very clear what his motive is to

11   implicate my client in this when he had time to sit down

12   and reflect on it. And hey you know what, Eddie Ruiz was

13   there, Eddie Ruiz was at the gas station. Eddie Ruiz was

14   driving that car. And I'm going to make sure that he's

15   held responsible for this. That he goes down. And his

16   motivation is very clear. And it is important. All

17   these issues that were brought up in front of you

18   regarding Mr. D'Ambrosio.

19        Again, this is someone that you can see trying to

20   munipulate to spin what he wants you to hear. And again,

21   I'll repeat this, even couldn't front, I didn't put those

22   words in his statements, I didn't put those words in his

23   deposition. I didn't put those words in his disposition

24   sheet from the Court. He did. And he refuses to admit

25   any and all of that. And he has no credibility.

4

1            And the only evidence, as I told you, that the

2       State will want you to except and convict Mr. Ruiz is

3       based on Mr. D'Ambrosio's statements.

4            The Judge is going to give you an instruction and

5       I believe you heard a little of it already it's called

6       weighing the evidence.  And again, it's up to you as

7       jurors to decide what is reliable and what evidence

8       you're going to use to determine a verdict in this case.

9            And some of the things that, again, you're told

10      to consider, and of course common sense, did the witness

11      seem to have an opportunity to see and know the things

12      about which the witness testified.

13           Okay.  Well, certainly Mr. D'Ambrosio was some

14      someone that certainly was there.  I mean, he was shot.

15      Again, I am not standing here telling you that someone,

16      you know, came down from the sky and shot him.  He was

17      shot and I has injuries.

18           Did the witness seem to have an accurate memory.

19      No.  Again, it's not me telling you that.  It's not me

20      putting the words into his mouth.  It's not me putting

21      the words in his statement or deposition.  It's him.

22           Was the witness honest and straightforward in

23      answering the attorneys questions.  No.  I mean, how long

24      did it take just to pull out an answer from him.  And

25      again, even when couldn't front with his statement, even

4    1    when couldn't front with his deposition, he still denies

2    it.  I'm putting a spin on it.  I'm putting it in a

3    sentence I even went so far to make sure that the entire

4    paragraph or entire sentences were read.

5        Did the witness have some interest in how the

6    case should be decided.  Of course he got shot in the

7    neck in the face.

8        Does the witness' testimony agree with the other

9    testimony and other evidence in the case.  No.  It does

10    not.  As far as my client is concerned.

11        Has the witness been offered received any money,

12    preferred treatment or other benefit in order to get the

13    witness to testify.  Okay.  Well, no one's up here saying

14    that he received money.  But we know this, he's on felony

15    probation for aggravated stalking.  He represents himself

16    in front of a judge, which, again, there's nothing wrong

17    that, with an attorney.  And makes it a point to put in

18    the motion which is something else that he would just not

19    admit to, that I am the victim on a case where there's

20    people that have been charged and is pending in the State

21    of Florida in Broward County.

22        And his testimony was that his DUI was dismissed.

23    And he violates his probation, is placed back on a two

24    year period of probation and then the probation is

25    terminated.

Did the witness at some other time make a

statement that is inconsistent with the testimony he gave

in court.  Well, again, I would submit to you that was

his entire testimony.  His entire testimony was

completely inconsistent with the original information

that the police have.  And again, he wants to burry

Mr. Ruiz.

Sympathy has no business at all in your verdict,

ladies and gentlemen.  I'm asking you to simply, and I

know you will, to look at the evidence in this case.

Or let me put it this way, the lack of evidence regard my

client, Edward Ruiz.

You're going to get a print pal instruction.  I

am not going to sit here and read it to you again.  The

Judge is going to tell you what that is.  But when you

apply, remember, the principals, the State has to prove

the elements of the charge and the elements of these

instructions to you beyond and to the exclusion of every

reasonable doubt.  There's into evidence that Mr. Ruiz

intended to participate in this crime.  There's none.

And again, if you look at the credibility of

Mr. D'Ambrosio, because it goes to both instances when

they're in the gas station and when he's claiming that

Mr. Ruiz's is doing summersault on I-95, when he has the

ability to pull off at all these other exits, when he has

5    1    the ability in that powerful car to pull away and he

2    doesn't, if he's under such threat, the State has to

3    prove to you beyond a reasonable doubt that the driving

4    pattern occurred as Mr. D'Ambrosio's is claiming that it

5    did.  And they haven't.

6         And you're also going to get an independent act

7    instruction which basically tells you that if you find

8    Mr. Cappelletti was responsible for this shooting, and

9    you find that it was an independent act, because the

10    State has not proved to you beyond a reasonable doubt

11    through evidence, testimony of Mr. D'Ambrosio that

12    Mr. Ruiz had anything to do with this, you must find him

13    not guilty.  And you don't even have to rely on that

14    instruction.  From the evidence itself, I'm going back,

15    again to Mr. D'Ambrosio, from the evidence itself, if you

16    have a reasonable doubt, then you must, you must return a

17    verdict of not guilty as to my client, Mr. Ruiz.

18         And I want to point out one other matter before I

19    sit down.  And the Judge is going to tell that you

20    Although we've been sitting together at this table, that

21    we were tried together, the State brought one

22    information, they charged Mr. Cappelletti and Mr. Ruiz in

23    the same information.  You must consider each Defendant

24    and the evidence applicable to him separately.  And you

25    may find one guilty or you may find them both not guilty.

5

1    However, your verdict as to one Defendant must

2    not affect your verdict as the other.  We're here

3    separately.  And the evidence that was before Mr. Ruiz is

4    insufficient and I'll say it again it would be an

5    injustice to return a verdict of guilty on attempted

6    first degree murder based on the evidence that was

7    presented to you over these last three days by the State

8    of Florida because they have not met their burden of

9    proof.  They haven't done it.

10    And so therefore before I sit down, I'm going to

11    ask you, and again, the State of it mentioned you will

12    have the opportunity there's lesser included offense on

13    the verdict form, my client is not guilty, ladies and

14    gentlemen.

15    And I ask when you review the testimony when you

16    get that verdict form that that's the verdict that you

17    Return, not guilty as to my client, Mr. Ruiz of attempted

18    premeditated first degree murder.  Thank you.

19    THE COURT:  Thank you, Mr. Fleischman.

20    And lastly we will hear from Miss Dadowski.

21    MISS DADOWSKI:  You've heard a lot so far, so I

22    will try to keep mine short like Mr. Fleischman did

23    because basically a lot of comments that he made

24    regarding Mr. D'Ambrosio certainly are applicable to

25    Mr. Cappelletti as well.

5

6

1     Mr. Grosz told you don't speculate, don't --

2     whenever you hear a question of certain questions by

3     defense counsel in their closing argument, think about

4     did and think that's speculation and disregard it.  But

5     didn't Mr. Grosz just ask you to do the exact same thing

6     in his closing argue.

7     When he told you that while my client was in

8     Georgia and he's getting -- he gets arrested and he says

9     that {son|is on} of bitch left me, there's into evidence,

10    none whatsoever to tell you who John Cappelletti was

11    talking about when he made that statement if, in fact, he

12    made that statement.  But he wants you to infer and imply

13    that John Cappelletti was talking about

14    Christopher D'Ambrosio.

15    Although there's into evidence whatsoever that

16    John Cappelletti was in any way referring to

17    Christopher D'Ambrosio,, in fact, Officer Cruz says he

18    has no idea who he was talking to, talking about.  But

19    Justin Grosz wants you to speculate.  It's okay.  For him

20    to do it, but it's not okay.  For us to tell you to use

21    your common sense and think of the evidence.

22    And Justin also -- Mr. Grosz also forgot to tell

23    you that the reasonable doubt is coming from the

24    evidence, lack of evidence and conflict in the evidence.

25    And how do we point out the lack of evidence to you.  We

ask you where is it.  Where is the evidence.  That's where the lack of evidence comes from.  We're not asking you to speculate we're asking you to think.  What evidence would you expect and where is it if it's not there.

There were no fingerprints whatsoever linking John Cappelletti either to Christopher D'Ambrosio's car or Edward Ruiz's car.  None.  And you heard Detective Suchomel up there, he said that he lifted 14 prints from Christopher D'Ambrosio's car.  Did any of them match Edward Ruiz, no.  Did any of them match John Cappelletti, no.  Do you think if any of those fourteen prints would have matched Christopher D'Ambrosio that you Certainly would have heard about it.  Of course you would have.

Who did those fourteen prints belong to?  Lack of evidence, we don't know.  But it's a lack of evidence because they certainly don't belong to John Cappelletti.  There's no evidence whatsoever linking him to being around Christopher D'Ambrosio's car.

The police conduct a search warrant on Edward Ruiz's car.  Is there anything in that car that ever even suggests that John Cappelletti was in that car? There's no evidence.  There's no physical evidence, there's no fingerprints, there's no DNA, there's nothing.

6    1         The State has to prove to you beyond and to the

2    exclusion of every reasonable doubt that John Cappelletti

3    is the one that shot Christopher D'Ambrosio.  Nobody saw

4    John Cappelletti shoot Christopher D'Ambrosio.  Nobody

5    saw John Cappelletti with a shotgun.  On busy traffic,

6    I-95, heavy traffic, nobody called the police and said

7    there's a shotgun out the window.

8         When you listen to the 911 tape, at one point in

9    the tape when asked who shot you or who shot you

10   whatever, the answer is the short crippled guy Eddie,

11   that's in the tape too.  The State has to prove to you

12   beyond and to the exclusion of every reasonable doubt

13   that John Cappelletti did it and has there been any

14   evidence whatsoever of that.  On the tape it seems to

15   indicate John or Mr. Edward Ruiz.  And the only reason

16   that you Even get that far is if you believe Christopher

17   D'Ambrosio.  If you believe his testimony that he's

18   credible.

19        Once again, did the witness seem to have an

20   opportunity to see and know the things about which the

21   witness testified.  He didn't see who shot him, according

22   to his testimony.

23        Did the witness seem to have an accurate memory.

24   How many times did we to show him what testimony Ed

25   previously given.  Numerous times.

6    1          Was the witness honest and straightforward in

2    answering the attorneys questions.  Couldn't get a simple

3    yes or no out of Mr. D'Ambrosio.  He's all got to put his

4    little spin on everything.

5          Did he has some interest in how the case should

6    be decided.  Sure, he does.

7          Did his testimony agree with the other testimony

8    and other evidence in the case.  There's no other

9    evidence in the case that links John Cappelletti to

10   anything.  Nothing, no physical evidence, nothing, nobody

11   saw John Cappelletti, nothing.

12          Has the witness been offered any money or

13   preferred treatment or other benefit.  He sure has.

14   What's in his probation termination motion that he's the

15   victim of a shooting and two people are in custody

16   charged with it.  He's helping the State.  Help me now,

17   State.

18          Did the witness at some other time make a

19   statement that is inconsistent with the testimony that he

20   gave in court.  Many times.  If you just think about how

21   many times Mr. D'Ambrosio had to be corrected.

22          John Cappelletti does not have to prove anything.

23   The State of Florida has to prove to you beyond and to

24   the exclusion of every reasonable doubt the elements of

25   the crime charged.  We don't have anything to prove.

7

1    They have to prove it to you beyond a reasonable doubt.

2    And a reasonable doubt comes from the evidence, the lack

3    of evidence and the conflict in the evidence.  We

4    discussed the evidence.  We discussed the lack of

5    evidence.  Certainly there's a conflict in

6    Mr. D'Ambrosio's own testimony.

7         Mr. Haemmerle told you that a shotgun can be --

8    he doesn't know what kind of shotgun was used.  It was

9    from between 6 and 12 feet away.  That someone can shoot

10   a shotgun with one hand by resting it against the window

11   of a car, the door frame, window frame of a car.  Who do

12   those prints belong to that were found on Christopher

13   D'Ambrosio's car.  They're not

14   John Cappelletti's.

15        When you think about all the evidence that was

16   presented, the conflict in the evidence, the lack of

17   evidence, think about how Mr. D'Ambrosio testified.

18   That's the only one that says anything about

19   John Cappelletti.  Think about his credibility.  Think

20   about how many things as far as weighing the evidence

21   that I read to you that applied to Mr. D'Ambrosio's

22   testimony.

23        And think about the fact that there's a

24   reasonable doubt in this case.  There's a very big

25   reasonable doubt in this case.  And the State has not

1   proved their case beyond and to the exclusion of every

2   reasonable doubt.  And therefore, John Cappelletti must

3   be found not guilty.  Thank you.

4           (Thereupon, the proceedings were concluded in

5   Volume V.)

# IN THE DISSTRICT COURT OF APPEAL - FOURTH DISTRICT WEST PALM BEACH, FLORIDA

**CLOCK IN**

| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION |
|---|---|

JOHN CAPELLETTI                    Appellant
Vs.
STATE OF FLORIDA,
                                   Appellee

**CASE NUMBER**
97-7797CF10A
**APPEAL NUMBER**
98-879

VOLUME ___V___    PAGES ___540___    TO ___599___

4·0 798

RICHARD L. JORANDBY, 15TH P.D.
Attorney for Appellant

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

MAY 14 1998

CRIMINAL DIVISION
WEST PALM BEACH

GEORGINA JIMENEZ OROSA
Assistant Attorney General

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,               )
                                )
        vs.                     )  Case No. 97-7797 CFA
                                )
JOHN W. CAPPELLETTI,            )
                                )
        Defendant               )
_____X

COPY

Ft. Lauderdale, Florida
January 7, 1998
9:30 o'clock a.m.


APPEARANCES:

        JUSTIN GROSZ, Esquire
        Assistant State Attorney
        Appearing on behalf of the State of Florida.

        RENEE TERESA DADOWSKI, Esquire
        Assistant Public Defender
        Appearing on behalf of the Defendant.

                - - - - - - -

        The above-styled cause came on for hearing

before the Honorable JAMES I. COHN, presiding Judge, at

the Broward County Courthouse, Fort Lauderdale, Broward

County, Florida, on the 7th day of January, 1998

commencing at 9:30 o'clock a.m.


                        VOLUME V

                    Pages 540 - 566

I-N-D-E-X


DATE                PROCEEDINGS              PAGE

01/07/98            Jury Trial              540 - 566

                  closing arguments

7    1          (Thereupon, the following proceedings were had:)

2          THE COURT:  Thank you, Miss Dadowski.

3          Members of the jury, let me first thank you for

4     your attention during this trial.  Please pay attention

5     to the instructions that I'm about to give you.

6          John W. Cappelletti and Edward Ruiz, the

7     Defendants in this case, have been accused of the crime

8     of attempted first degree murder.

9          Now, in considering the evidence, you should

10    consider the possibility that although the evidence may

11    not convince you that the Defendants committed the main

12    crimes of which they are accused, there maybe evidence

13    that they committed other acts that would constitute a

14    lesser included crime.

15          Therefore, if you decide that the main accusation

16    has not been proved beyond a reasonable doubt, you will

17    next need to decide if the Defendants are guilty of any

18    lesser included crime.

19          Now, the lesser crime indicated in the definition

20    of attempted first degree murder is culpable negligence.

21          Now, as I told you, the Defendants are accused of

22    attempted first degree murder.

23          Now, attempted murder in the first degree

24    includes the lesser crime of culpable negligence, both of

25    which are unlawful.

7  1    An attempted killing that is excusable or was

2  committed by the use of justifiable use deadly force is

3  lawful if you find that there was an attempted killing of

4  Christopher D'Ambrosio by the Defendant.  You will then

5  consider the circumstances surrounding the attempted

6  killing in deciding if it was attempted first degree

7  murder or culpable negligence, or whether the attempted

8  killing was excusable or resulted from justifiable use of

9  deadly force.

10    The attempted killing of a human being is

11  justifiable and lawful if necessarily done while

12  resisting an attempt to murder or commit a felony upon

13  the Defendant, or to commit a felony in any dwelling

14  house in which the Defendant was at the time of the

15  killing.

16    The attempted killing of a human being is

17  excusable and therefore lawful under any one of the

18  following three circumstances:  Number one, when the

19  attempted killing is committed by accident and misfortune

20  in doing any lawful act by lawful means with usual

21  ordinary caution and without any unlawful intent;

22    Or number two, when the attempted killing occurs

23  by accident and misfortune, in the heat of passion, upon

24  any sudden and sufficient provocation;

25    Or number three, when the attempted killing is

7

1    committed by accident and misfortune resulting from a

2    sudden combat if a dangerous weapon is not used and the

3    attempted killing is not done in a cruel and unusual

4    manner.

5        Dangerous weapon is any weapon that taking into

6    account the manner in which it is used is likely to

7    produce death or great bodily harm.

8        I now instruct you on the circumstances that must

9    be proved before the Defendants maybe found guilty of

10   attempted murder or any lesser included crime.

11       Now, before you can find the Defendant guilty of

12   attempted first degree premeditated murder, the State

13   must prove the following three elements beyond a

14   reasonable doubt:  Number one, the Defendant did some act

15   intended to cause the death of Christopher D'Ambrosio

16   that went beyond just thinking or talking about it.

17       Number two, the Defendant acted with a

18   premeditated design to kill Christopher D'Ambrosio.

19       Number three, the act would have resulted in the

20   death of Christopher D'Ambrosio except that someone

21   prevented the Defendant from killing Mr. D'Ambrosio, or

22   he failed to do so.

23       A premeditated design to kill means that there

24   was a conscious decision to kill.  The decision must be

25   present in the mind at the time the act was committed.

8

1    The law does not fix the exact period of time that must

2    pass between the formation of the premeditated intent to

3    kill and the act.  A period of time must be long enough

4    to allow reflection by the Defendant.  The premeditated

5    intent to kill must be formed before the act was

6    committed.

7        The question of premeditation is a question of

8    fact to be determined by you from the evidence.  It will

9    be sufficient proof of premeditation if the circumstances

10   of the attempted killing and the conduct of the accused

11   convince you beyond a reasonable doubt of the existence

12   of premeditation at the time of the attempted killing.

13       It is not an attempt to commit first degree

14   premeditated murder if the Defendant abandoned the

15   attempt to commit the offense, or otherwise prevented its

16   commission under circumstances indicating a complete and

17   voluntary renunciation of his criminal purpose.

18       Now, as to Mr. Cappelletti, if you find

19   Mr. Cappelletti committed attempted first degree murder

20   and you also find that during the commission of the

21   crime, Mr. Cappelletti possessed a firearm, you should

22   find Mr. Cappelletti guilty of attempted first degree

23   murder with a firearm.

24       Now, a firearm is legally defined as any weapon,

25   including a starter gun, which will is designed to or may

8    1    readily be converted to expel a projectile by action of

2    an explosive.

3    If you find only that Mr. Cappelletti committed

4    attempted first degree murder but did not possess a

5    firearm, then you should find Mr. Cappelletti guilty only

6    of attempted first degree murder.

7    Now, as to the lesser offense of culpable

8    negligence.  Before you can find the Defendant guilty of

9    culpable negligence, the State must prove the following

10    two elements beyond a reasonable doubt:  Number one, the

11    Defendant inflicted actual personal injury on

12    Christopher D'Ambrosio.

13    Number two, he did so through culpable

14    negligence.

15    I will now define culpable negligence for you.

16    Each of us has a duty to act reasonably toward others.

17    If there's a violation of that duty without any conscious

18    intention to harm, that violation is negligence.  But

19    culpable negligence is more than a failure to use

20    ordinary care for others.  In order for negligence to be

21    culpable, it must be gross and flagrant.

22    Culpable negligence is a course of conduct

23    showing reckless disregard of human life or of the safety

24    of persons exposed to its dangerous affects, or such an

25    entire want of care as to raise a presumption of a

8    1    conscious indifference to consequences, or which shows

2    wantonness or recklessness, or a grossly careless

3    disregard of the safety and welfare of the public, or

4    such an indifference to the rights of others as is

5    equivalent to an intentional violation of such rights.

6         Now, as to principals.  If the Defendant helped

7    another person or persons commit or attempt to commit a

8    crime, the Defendant is a principal and must be treated

9    as if he had done all the things the other person or

10   persons did if:  Number one, the Defendant had a

11   conscious intent that the criminal act be done.

12        And number two, the Defendant did some act or

13   said some word which was intended to and which did

14   insight, cause, encourage, assist, or advise the other

15   person or persons to actually commit or attempt to commit

16   a crime.

17        To be a principal, the Defendant does not have to

18   be present when the crime is committed or attempted.

19        Now, as to independent act.  If you find the

20   crime alleged was committed, an issue in this case is

21   whether the crime of attempted first degree murder was an

22   independent act of a person other than the Defendant.  An

23   independent act occurs when a person, other than the

24   Defendant, commits or attempts to commit a crime:

25   Number one, which the Defendant did not intend to occur.

And number two, in which the Defendant did not

participate.

And number three, which was outside of and not a

reasonably foreseeable consequence of the common design

or unlawful act contemplated by the Defendant.

Now, if you find the Defendant was not present

when the crime of attempted first degree murder occurred,

that does not in and of itself establish that the

attempted first degree murder was an independent act of

another.

If you find that the attempted first degree

murder was an independent act of another, then you should

find the Defendant not guilty of the crime of attempted

first degree murder.

Now, each Defendant has entered a plea of not

guilty.  This means that you must presume or believe the

Defendant is innocent.

The presumption stays with the Defendant as to

each material allegation in the information, through each

stage of the trial unless it has been overcome by the

evidence to the exclusion of and beyond a reasonable

doubt.

To overcome the Defendants presumption of

innocence, the State has the burden of proving the crime

with which the Defendant is charged was committed, and

9    1    the Defendant is the person who committed the crime.

2        The Defendant is not required to present evidence

3    or prove anything.

4        Whenever the words reasonable doubt are used, you

5    must consider the following, a reasonable doubt is not a

6    mere possible doubt, a speculative, imaginary, or force

7    the forced doubt.  Such such a doubt must not influence

8    you to return a verdict of not guilty if you have an

9    abiding conviction of guilt.

10        On the other hand, if after carefully

11    considering, comparing, and weighing all the evidence

12    there's not an abiding conviction of guilt, or if having

13    a conviction it is one which is not stable but one which

14    waivers and vacillates then the charge is not proved

15    beyond every reasonable doubt and you must find the

16    Defendant not guilty because the doubt is reasonable.

17        Now, it is to the evidence introduced in this

18    trial and to it alone that you're to look for that proof.

19    A reasonable doubt as to the guilt of the Defendant may

20    arise from the evidence, conflict in the evidence or the

21    lack of evidence.  If you have a reasonable doubt, you

22    should find the Defendant not guilty.  If you have no

23    reasonable doubt, you should find the Defendant guilty.

24        Now, it is up to you to decide what evidence is

25    reliable.  You should use your common sense in deciding

9    1    which is the best evidence and which evidence should not

2    be relied upon in considering your verdict.

3    You may find some of the evidence not reliable or

4    less reliable than other evidence.

5    You should consider how the witnesses acted as

6    well as what they said.

7    Some things you should consider are, did the

8    witness seem to have an opportunity to see and know the

9    things about which the witness testified.

10    Did the witness seem to have an accurate memory.

11    Was the witness honest and straightforward in

12    answering the attorneys questions.

13    Did the witness have some interest in how the

14    case should be decided.

15    Does the witness' testimony agree with the other

16    testimony and other evidence in the case.

17    Has the witness been offered or rereceived any

18    money, preferred treatment, or other benefit in order to

19    get the witness to testify.

20    Did the witness at some other time make a

21    statement that is inconsistent with the testimony given

22    in court.

23    You may rely upon your own conclusion about the

24    witness.  A juror may believe or disbelieve all or any

25    part of the evidence or the testimony of any witness.

Expert witnesses are like other witnesses with one acception, the law permits an expert to give his opinion. However, an expert's opinion is only reliable when given on a subject about which you believe him to be an expert.

Like other witnesses, you may believe or disbelieve all or any part of an expert's testimony.

The constitution requires the State to prove it's accusations against each Defendant. It is not necessary for the Defendant to disapprove anything. Nor is the Defendant required to prove his innocence. It is up to the State to prove the Defendants guilt by evidence.

Each Defendant in this case exercised a fundamental right by choosing not to be a witness. You must not view this as an admission of guilt or be influenced in any way by each Defendants decision.

No juror should ever be concerned that a Defendant did or did not take the witness stand to give testimony in the case.

These are some of the general rules that apply to your discussion. You must follow these rules in order to return a lawful verdict.

You must follow the law as it is set out in these instructions. If you fail to follow the law, your verdict will be a miscarriage of just justice. There's

10      1      no reason for failing to follow the law in this case.

2      All of us are depending upon to you make a wise and a

3      legal decision in this matter.

4            This case must be did he see you decided only

5      upon the evidence that you have heard from the testimony

6      of the witnesses and have seen in the form of the

7      exhibits in evidence, and these instructions.

8            This case must not be decided fore or against

9      anyone because you feel sorry for anyone, or are angry at

10     anyone.

11           Remember, the lawyers are not on trial.  Your

12     feelings about them should not influence your decision in

13     this case.

14           Your duty is to determine if the Defendant has

15     been proven guilty or not in accord with the law.  It is

16     the judge's job to determine a proper sentence if the

17     Defendant is found guilty.

18           Now, whatever verdict you render must be

19     unanimous.  That is each juror must agree to the same

20     verdict.  It is entirely proper for a lawyer to talk to a

21     witness about what testimony testimony the witness would

22     give if called to the courtroom.  The witness should not

23     be discredited by talking to a lawyer about his

24     testimony.

25           Your verdict should not be influenced by feelings

10    1    of prejudice, bias, or sympathy.  Your verdict must be

2    based on the evidence and on the law contained in these

3    instructions.

4    Deciding a verdict is exclusively your job.  I

5    cannot participate in that decision in any way.  Please

6    disregard anything I may have said or done that makes

7    that made you think that I preferred one verdict over

8    another.

9    Now, the Defendants Mr. Cappelletti and Mr. Ruiz

10   have been tried together.  However, you must consider

11   each Defendant and the evidence applicable to him

12   separately.  You may find one or both guilty or not

13   guilty.  However, your verdict as to one Defendant must

14   not affect your verdict as to the other.

15   Now, you may find the Defendant guilty as charged

16   in the information or guilty of the lesser included crime

17   as the evidence may justify, or not guilty.  If you

18   return a verdict of guilty, it should be for the highest

19   offense which has been proven beyond a reasonable doubt.

20   If you find that no offense has been proven

21   beyond a reasonable doubt, then of course your verdict

22   must be not guilty.

23   Now, only one verdict may be returned as to the

24   crime charged.  That's one verdict as to each Defendant

25   as to the crime charge.  This verdict must be unanimous

10    1    that is all of you must agree to the same verdict.   The

2    verdict must be in writing and for your convenience, the

3    necessary forms of verdict have been prepared for you.

4         And before I go over the forms of verdict, I need

5    to see the attorneys up here at the bench for a second.

6         (Thereupon, the following proceedings were

7    had side bar; outside the presence of the

8    jury:)

9         THE COURT:  Miss Dadowski, on the verdict form on

10    Cappelletti, we did not address the issue of the lesser

11    offense of attempted first degree -- attempted murder in

12    the first degree with no firearm.

13         MISS DADOWSKI:  Right.  I mentioned that to

14    Mr. Grosz when you were reading the instructions.

15         THE COURT:  Do you want that?

16         MISS DADOWSKI:  Can I discuss it with my client?

17         THE COURT:  Yeah, I prefer that you do.  Why

18    don't do you that and I'll wait.

19         (Thereupon, the following proceedings were

20    had within the presence of the jury:)

21         THE COURT:  Folks, for your convenience, I am

22    tape recording these instructions as I am orally

23    pronouncing them.  So don't think that you got to recall

24    each element, each instruction on the law that's been

25    given to you.  You will have the tape and the recorder

available to you -- You know, here I am talking with the

buzzer on.  Why aren't you all telling me something.

MR. GROSZ:  I thought it was in my ears.

THE COURT:  Did you hear what I said?  I'm tape

recording the instructions.  The recorder is off right

now while we're -- But I'm tape recording the

instructions.  The tape and the recorder will be

available for you during your deliberations so you don't

have to worry about remembering everything.  You can

refer to the tape at any time.

What I will -- Do any of you have any pressing

plans tomorrow?  What I would prefer to do, since it's so

late in the day, is let you begin your deliberations

tomorrow morning rather than start this late in the day.

As long as it doesn't present a problem for you.

I am not going to tell you who the alternates

are.  I'm going to have the alternates come back

tomorrow.  Just make sure that we have enough people here

to deliberate.  I will let you all decide what time you

want to reconvene tomorrow morning.  9:30, is that good

for everybody?

THE JURY PANEL:  That's fine.

THE COURT:  9:30, is that a problem for anybody?

Okay, 9:30 is the time then.

11  1           (Thereupon, the following proceedings were

2    had side bar; outside the presence of the

3    jury:)

4           MISS DADOWSKI:  I need more time to discuss this

5    with my client.  He's not understanding what I am trying

6    to discuss with him regarding the verdict form.  So is it

7    possible that you could just have the jurors go back,

8    finish the instructions, and then we can just send back

9    the verdict forms in a few minutes because --

10          THE COURT:  They're not going to start to

11    deliberating today.

12          MISS DADOWSKI:  They don't want to?

13          THE COURT:  No, we're going to start 9:30

14    tomorrow morning.

15          MISS DADOWSKI:  Because he's --

16          THE COURT:  I can make the decision for them.  I

17    think it should be included.

18          MISS DADOWSKI:  Because he's having difficulty --

19          THE COURT:  Because this is an enhancement and I

20    think it should be on the verdict form, so I'll make the

21    decision.  If he doesn't like my decision, he can appeal

22    it, but I personally think it should be included because

23    the firearm is an enhancement of the crime charged.

24          MR. GROSZ:  Just so I know, the second --

25          THE COURT:  It will be --

11

1          MR. GROSZ:  Attempt murder one as charged in the

2     information.

3          THE COURT:  No.

4          MR. GROSZ:  Just attempt murder one.

5          THE COURT:  The Defendant is guilty of attempted

6     murder in the first degree.  It should read -- Well, I'll

7     hear from any counsel has to how it should be worded.

8          MR. GROSZ:  I mean, I am not sure -- I don't

9     think it's technically a lesser included offense because

10    I think A is an enhancement.

11         THE COURT:  Right, A is an enhancement.  I think

12    it should read the Defendant is guilty of attempted

13    murder in the first degree.

14         MR. GROSZ:  Just leave it at that.

15         THE COURT:  Yeah.

16         MISS DADOWSKI:  Well, I may have an objection

17    later whenever I speak with my client about wanting it.

18         THE COURT:  Okay.  That's fine.

19         MR. FLEISCHMAN:  Judge, the only objection I

20    have, again, is just to on A --

21         THE COURT:  Not putting premeditated.

22         MR. FLEISCHMAN:  Exactly.

23         THE COURT:  Okay.  I got you.

24         MISS DADOWSKI:  Under the case law, we need to

25    renew our objections before the jury --

11

1      THE COURT:  I'm going to bring you back up here.

2   I needed it before I got going over the verdict form.

3      MISS DADOWSKI:  So before the jury deliberates--

4      THE COURT:  Sure, absolutely.

5      (Thereupon, the following proceedings were

6   had within the presence of the jury:)

7      THE COURT:  All right.  Folks, the verdict forms

8   read as follows:  In the Circuit Court of the 17th

9   Judicial Circuit in and for Broward County, Florida, case

10  number 97-7797 CF10A, James I. Cohn.  State of Florida,

11  Plantiff vs. James Cappelletti, Defendant.

12      Verdict:  Count I, we the jury find as follows as

13  to the Defendant in this case.  In parenthesis it says

14  check only one, one is underlined, so check only one.

15      You will find four letters a, b, c, and d.  There

16  will be blanks to the left of each letter.  To the right

17  of each letter reads as follows:  A, the Defendant is

18  guilty of attempted murder in the first degree and during

19  the commission of murder attempted murder in the first

20  degree he did possess a firearm.

21      B, the Defendant is guilty of attempted murder in

22  the first degree.

23      C, the Defendant is guilty of culpable negligence

24  a lesser include offense.

25      D, the Defendant is not guilt.  So say we all

11    1    this blank day of January, AD, 1998 at Fort Lauderdale,

2    Broward County, Florida and place for the foreperson to

3    sign.

4    The verdict form as to Mr. Ruiz is styled exactly

5    the same way.  The case number is 97-7797 CF10B.  State

6    of Florida, Plaintiff vs. Edward Ruiz, Defendant.

7    Verdict:  Count I, we the jury find as follows as

8    to the Defendant in this case, check only one, there are

9    only three letters, a, b, and c.  Again, there are blanks

10    to the left of each letter.

11    To the right of each read as follows:  The

12    Defendant is guilty of attempted murder in the first

13    degree as charged in the information.

14    B, the Defendant is guilty of culpable negligence

15    a lesser included offense.

16    C, the Defendant is not guilty so say we all this

17    blank day of January, AD, 1998 at Fort Lauderdale,

18    Broward County, Florida.  And again, a signature line for

19    the foreperson.

20    Now, in just a few moments you will be --

21    Actually not in just a few moments, the instruction reads

22    in just a few moments you will be taken to the juryroom

23    by one of the court deputies, that will be tomorrow

12    24    morning.  Let me advise you that the first thing that you

25    should do is elect a foreperson.  The foreperson presides

over your deliberations like a chairman chairperson of a meeting.  It is the foreperson's job to sign and date the verdict forms when all of you have agreed on verdicts in in this case.

The foreperson will bring the verdicts back to the courtroom when you return.  Your verdicts finding the Defendants either guilty or not guilty must be unanimous. The verdict must be the verdict of each juror as well as the jury as a whole.

In closing, let me remind you that it is important that you follow the law spelled out in these instructions in deciding your verdict.  There are no other laws that apply to this case.  Even if you do not like the laws that must be applied, you must use them.

For two centuries we have agreed to a constitution and to live bring the law.  No one of us has the right to violate rules that we all share.

Could I see the attorneys at the bench.

(Thereupon, the following proceedings were had side bar; outside the presence of the jury:)

THE COURT:  All right.  Any additional objections to the instructions?

MISS DADOWSKI:  Judge, I just want to renew my previous objections that I've made regarding the

12      1        instructions.

        2                MR. FLEISCHMAN:  Just renew my objections.

        3                THE COURT:  Any objections to the manner in which

        4        the Court read the instructions?

        5                MR. GROSZ:  No.

        6                MR. FLEISCHMAN:  No.

        7                MISS DADOWSKI:  No.

        8                THE COURT:  All right.  Mr. Grosz, if you want a

        9        copy of the information to go back for tomorrow, get us a

        10       cleaned up version without the phrase and feloniously and

        11       which was deleted.

        12               MR. GROSZ:  Okay.

        13               THE COURT:  And you're going to have the verdict

        14       form as to Cappelletti?

        15               MR. GROSZ:  Yes.

        16               MISS DADOWSKI:  I just want to also point out

        17       that I spoke to my client and he does object to you

        18       adding B in the verdict form as far as the Defendant is

        19       guilty of attempted first degree murder.

        20               THE COURT:  Well, let me ask you this question,

        21       what's the State's position.

        22               MR. GROSZ:  Judge, I don't know this area too

        23       well, so, I mean, I don't know.  I really don't know.

        24               THE COURT:  I like honesty.

        25               MR. GROSZ:  I don't know if I have to research

12

1    that and check it out. I really have no idea.

2            THE COURT: Why don't you bring two cleaned up

3    versions tomorrow morning and we can do some research. I

4    thought -- it was the Court's opinion that since the

5    firearm is an enhancement, if you don't have the primary

6    offense charged without the and enhancement, I said I see

7    a problem there, but the Defendants -- the Defendant

8    wants it this way, but we'll address that tomorrow

9    morning. We can always change that.

10            I'm going to send them home. Give them strong

11   admonishment and come back at 9:30. So we'll -- why

12   don't you come here a little bit before 9:30 tomorrow

13   morning so we can address the verdict form issue.

14            MR. FLEISCHMAN: Okay. That's fine.

15            (Thereupon, the following proceedings were

16   had within the presence of the jury:)

17            THE COURT: All right. Folks, what we're going

18   to do is recess until 9:30 tomorrow morning. It's very

19   important, do not discuss this case with anyone and that

20   includes amoungst yourselves. Don't call up one of your

21   fellow jurors tonight and start talking about the case.

22            All deliberations must take place in the juryroom

23   with all jurors, the alternates will be excused before

24   your -- before the case is ultimately submitted to you

25   for your deliberation. The six jurors who will

12

1    deliberate must be in the juryroom together during all

2    deliberations, does everybody understand that?

3         THE JURY PANEL:  Yes.

4         THE COURT:  So please don't discuss it with

5    anybody.  And we'll see you at 9:30 tomorrow morning.

6    We'll get you in here at 9:30.  We don't have any other

7    trial's going on.  We have a heavy morning docket, but

8    I'll make sure the courtroom is cleared so that we'll get

9    to you at 9:30 tomorrow morning.

10         Have a nice evening.

11         (Thereupon, the following proceedings were

12    had outside the presence of the jury:)

13         MR. FLEISCHMAN:  Judge, can I speak on something

14    procedural.

15         THE COURT:  Yes, sir.

16         MR. FLEISCHMAN:  Mr. Ruiz told me that they

17    usually bring him up at 630 in the morning and he has to

18    sit in the holding cell.

19         Since we're not starting until 9:30, is there

20    some way you can do an order so he's brought up just

21    before or even 8:30 quarter to 9:00?

22         THE BAILIFF:  Brought up into the courtroom?

23         MR. FLEISCHMAN:  I mean, in other words, he's

24    over at the main jail.  They bring him over here at 6:30

25    and sits in a holding cell.

THE COURT:  The problem that we've had, believe
me, I would like nothing more than to accommodate people
in matters like this, but the problem with that is, is if
we don't get the Defendants segregated and --

MR. FLEISCHMAN:  You lost them.

THE COURT:  We have so much trouble in the
beginning with getting Defendants here for trial.  I
mean, sometimes we wouldn't get Defendants here until
10:30, 11:00 o'clock.  So rather than start fooling
around with those people at the jail, we're talking about
one more day.  So my apologies to you to have to enter
did your that, but I'd rather have you here and let the
jury get started promptly at 9:30 than to run the risk of
not getting you here until 10:30, 11:00.

THE BAILIFF:  I will be glad to bring him up at
8:30 with the others if that would make him more
comfortable.

THE COURT:  Would you like to come up here in the
courtroom at 8:15.

MR. FLEISCHMAN:  Judge, it doesn't matter if he's
going to be here, he's going to be here.

THE COURT:  If Mr. Ruiz would be more comfortable
waiting in the courtroom then we'll be glad to bring him
in the courtroom.

THE BAILIFF:  That's not a problem.  I will be

13    1        glad to.

2                    THE COURT:  She'll accommodate you.

3                    MISS DADOWSKI:  Your Honor, for one minute,

4        Your Honor.  My client doesn't believe or whatever that I

5        did object to the jury instructions and the verdict

6        forms.

7                    THE COURT:  Let me.

8                    MISS DADOWSKI:  When we went side bar.

9                    THE COURT:  Let me assure you that Miss Dadowski

10       objected.  It's on the record.

11                   MISS DADOWSKI:  His big objection is that he

12       doesn't want the verdict form to reflect possession of a

13       firearm because his possession is --

14                   THE DEFENDANT:  Because the witness.

15                   MISS DADOWSKI:  That he did not possess a firearm

16       and the witness did not see him or did not say that he

17       possessed firearm and that was my motions that I made for

18       judgement of aquittal.

19                   THE COURT:  I understand, but Mr. Cappelletti you

20       must understand that that can be proven through

21       circumstantial evidence.

22                   THE DEFENDANT:  But Your Honor, you're sending

23       back false information to the jury, to the jury.

24                   THE COURT:  No, sir.  I'm going to leave it at

25       that.  It could be proved through circumstantial

13

1    evidence.

2         THE DEFENDANT:  How was it proven the witness

3    said he didn't see a firearm in my hand?

4         THE COURT:  Any other matters that need to be

5    addressed at this time?

6         MISS DADOWSKI:  No, Your Honor.

7         THE COURT:  We'll see you all no later than 9:30.

8         THE DEFENDANT:  Let the record reflect my son

9    asked the witness.

10        THE COURT:  Okay.

11        (Thereupon, Court was adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
15
```

```
 1                IN THE CIRCUIT COURT OF THE
                 SEVENTEENTH JUDICIAL CIRCUIT,
 2            IN AND FOR BROWARD COUNTY, FLORIDA
```

```
 3
```

COPY

```
 4   STATE OF FLORIDA,                )
                                      )
 5           vs.                      ) Case No. 97-7797 CFA
                                      )
 6   JOHN W. CAPPELLETTI,             )
                                      )
 7           Defendant               )
     _____X
```

```
 8
```

```
 9                              Ft. Lauderdale, Florida
                                January 8, 1998
10                              9:30 o'clock a.m.
```

```
11
```

```
12   APPEARANCES:
```

```
13           JUSTIN GROSZ, Esquire
             Assistant State Attorney
14           Appearing on behalf of the State of Florida.
```

```
15           RENEE TERESA DADOWSKI, Esquire
             Assistant Public Defender
16           Appearing on behalf of the Defendant.
```

```
17                    - - - - - - -
```

```
18       The above-styled cause came on for hearing
```

```
19   before the Honorable JAMES I. COHN, presiding Judge, at
```

```
20   the Broward County Courthouse, Fort Lauderdale, Broward
```

```
21   County, Florida, on the 8th day of January, 1998
```

```
22   commencing at 9:30 o'clock a.m.
```

```
23
```

```
24                      VOLUME VI
```

```
25                   Pages 567 - 599
```

568ᴬ

15

I-N-D-E-X

| DATE | PROCEEDINGS | PAGE |
|------|-------------|------|
| 01/08/98 | Jury Trial | 567 - 599 |
|  | verdict |  |
|  | sentencing |  |

1

1             (Thereupon, the following proceedings were had:)

2             THE COURT:  All right.  State of Florida vs. --

3             MISS DADOWSKI:  Mr. Grosz went to get the verdict

4  form.

5             THE COURT:  That's right.  Mr. Grosz is not back

6  yet.

7             (Thereupon, a recess was taken; after which the

8  following proceedings were had:)

9             THE COURT:  State of Florida vs. John Cappelletti

10  and Eduardo Ruiz.  Both Defendants are represented by

11  respective counsel.

12             As to the verdict form, as to Mr. Cappelletti,

13  does the State have a position?

14             MR. GROSZ:  Judge, I'm comfortable with having A,

15  B, C, and D.

16             THE COURT:  Okay.  And that is the verdict form

17  that was requested by Mr. Cappelletti, is that correct?

18             MISS DADOWSKI:  No, Your Honor.  Mr. Cappelletti

19  just wants A, B, and C.

20             THE COURT:  A, B, and C.  And the State prefers

21  A, B, C, and D.

22             MR. GROSZ:  And the reason I prefer that is, in

23  looking at the instructions, they first have to make a

24  determination of whether or not they find Mr. Cappelletti

25  guilty of attempted murder in the first degree.  And if

1      so, then they have to make a second determination as to

2      whether or not it includes the enhancements of possessing

3      the firearm.  So that seems to me to be two different

4      distinctions, and I feel comfortable with both of those

5      on there, on the verdict form.

6              THE COURT:  Well, that was the Court's feeling on

7      the matter yesterday and really there's nothing that's

8      come before me to change my opinion, so the Court will

9      provide the jury with a verdict form as stated yesterday

10     during the Court's instructions, including both guilty of

11     attempted murder in the first murder, in the first

12     degree, and during commission of said attempted murder in

13     the first degree, he did possess a firearm as charged in

14     the information.  And guilty of attempted murder in the

15     first degree.

16             MISS DADOWSKI:  This is over defense objection.

17     My client indicated that the only lesser included offense

18     that he wants is culpable negligent, is that correct,

19     Mr. Cappelletti?

20             THE DEFENDANT CAPPELLETTI:  Yes.

21             THE COURT:  The Court finds that guilty of

22     attempted murder in the first degree is actually not a

23     lesser, it is the crime charged, the firearm is an

24     enhancement.

25             Anything further to come before the Court before

1

1    we bring in the jury?  Deputy Lithle, bring in the jury

2    please.

3                (Thereupon, the following proceedings were

4    had within the presence of the jury:)

5                THE COURT:  Good morning.  Let me first, I'll

6    ask, have any of you discussed this case amoungst

7    yourselves or with anyone else?

8                THE JURY PANEL:  No.

9                THE COURT:  All negative responses.  All right.

10   At this time, the Court is going to discharge alternate

11   juror Cherryl Bowles and Washington B Collado.  Please

12   remain in the courtroom.  I have some special

13   instructions for the two alternates.

14               Our remaining jurors may now retire to consider

15   your verdict.  We will furnish you with verdict forms as

16   to each Defendant, a copy of the information, the

17   charging document, which I remind you is not evidence,

18   the tape of the jury instructions along with a recorder

19   and all evidence, all tangible exhibits that have been

20   admitted during the course of the trial will be provided

21   to you.

22               You may now retire to consider your verdict.

23               Let me ask the lawyers to get together to make

24   sure all exhibits are correct.

25               MISS DADOWSKI:  I don't know if the alternates

1     1     have anything in the juryroom.

2          THE JURY PANEL:  Yes

3          THE COURT:  Okay.  He's going to get it for you.

4          (Thereupon, the following proceedings were

5     had outside the presence of the jury:)

6          MR. FLEISCHMAN:  I have no objection.

7          THE COURT:  I figure it would be easier since we

8     didn't have inmates in the box most of the morning rather

9     than in and out give it all to them now.

10         (Thereupon, a recess was taken; after which the

11    following proceedings were had:)

12        THE COURT:  The record will reflect that

13    Mr. Cappelletti and Mr. Ruiz are both present and

14    represented by counsel.

15        Anything to come before the Court before we bring

16    the -- hold on just a second.  The record will reflect

17    that I have advised the attorneys of a question that was

18    submitted to the Court from the jury.  Question reads:  A

19    copy of Mr. Bud Haemmerle's testimony."

20        I'm going to advise the jury of the process to be

21    followed or the procedure to be followed when testimony

22    is requested.  I think most jurys think they get a

23    transcript of the testimony, so I'm going to advise them

24    that the court reporter will read back the testimony.  It

25    will take between an hour and an hour-and-a-half to do

so.  If they still want the testimony provided to them,
it will be done after lunch break.

MISS DADOWSKI:  I would object to that.  My
client and I would prefer that you instruct the jury that
they should rely on their own memory as to what the
evidence was.  So I object to that being read back.

THE COURT:  Objection is noted.

Bring in the jury.

(Thereupon, the following proceedings were
had within the presence of the jury:)

THE COURT:  The foreperson is Mr. Polley.  The
Court received your note which requested a copy of
Mr. Bud Haemmerle's testimony.

We do not have a transcript of any witness'
testimony.  The procedure that is followed if a jury
wants testimony provided to them, is that the court
reporter would read from her notes that testimony.

Now, I have been advised by Mrs. Greenwell, our
court stenographer, that will take between an hour and an
hour-and-a-half to read that testimony back.

If you still want it, it will be read back to
you, but given the fact that it's just about noon, we
would provide you with a read back after the lunch break.

So basically it's up to ya'll at this juncture
whether or not you want that testimony read back.  Let me

1    suggest that you return to the juryroom and discuss that

2    issue.  And after you have decided that issue, please let

3    us know about mashing the buzzer back there.  You may

4    return to consider your deliberations.

5            (Thereupon, the following proceedings were

6    had outside the presence of the jury:)

7            THE BAILIFF:  Your Honor, they have advised that

8    they do want to hear it.

9            THE COURT:  Okay.  Let's bring them back in.

10            (Thereupon, the following proceedings were

11    had within the presence of the jury:)

12            JUROR JOHN POLLEY:  Could we just hear the last

13    ten minutes as opposed to hearing the whole testimony?

14            THE COURT:  The problem is, is that we would then

15    be putting the onus on the court reporter to decide where

16    to break it off.  And rather than do that, we would have

17    to have all of Mr. Haemmerle's testimony read back.  So

18    answer to your question, unfortunately no.

19            We are going to break for lunch at this point in

20    time.  I would like to be able to provide you with lunch

21    at the expense of the county, but unfortunately the

22    county does not permit me to do so except in capital

23    cases, which this is not.  So unfortunately you're on

24    your own for lunch.

25            Remember, do not discuss the case amongst

2    1    yourselves or with anyone else until all six of you are

2    back in the juryroom.  We will reconvene at 1:15.  And at

3    that point in time, we will have Mrs. Greenwell read back

4    the testimony of Mr. Haemmerle.

5        So with that admonition, your deliberations will

6    be in recess until 1:15.

7        (Thereupon, the following proceedings were

8    had outside the presence of the jury:)

9        THE COURT:  All right, 1:15, folks.

10        (Thereupon, a recess was taken; after which the

11    following proceedings were had:)

12        MR. FLEISCHMAN:  Judge Cohen wants me.  I don't

13    know how this is possible.

14        THE COURT:  Carol is taking care of that, but you

15    were supposed to be here at 1:15.

16        MR. FLEISCHMAN:  I was walking around trying to

17    get everything straightened out.

18        THE COURT:  All right.  The record will reflect

19    that Mr. Cappelletti and Mr. Ruiz are both present

20    represented by counsel.

21        Please bring in the jury.

22        (Thereupon, the following proceedings were

23    had within the presence of the jury:)

24        THE COURT:  All right.  Mrs. Greenwell, will you

25    please read back the testimony of Mr. Haemmerle.

2

1          (Thereupon, the testimony of Carl Haemmerle was

2     read back to the jury; after which the following

3     proceedings were had:)

4          THE COURT:  Folks, you may now retire to continue

5     your deliberations.

6          (Thereupon, a recess was taken; after which the

7     following proceedings were had:)

8          THE COURT:  The record will reflect that

9     Mr. Cappelletti and Mr. Ruiz are booth present

10    represented by counsel.

11         Anything to come before the Court before we bring

12    the jury in?

13         MR. FLEISCHMAN:  No, Your Honor.

14         MISS DADOWSKI:  No, Your Honor.

15         THE COURT:  Okay.  Please bring in the jury,

16    Deputy Lithle.

17         (Thereupon, the following proceedings were

18    had within the presence of the jury:)

19         THE COURT:  All right.  Mr. Polley, have you all

20    reached verdicts as to both Defendants?

21         JUROR JOHN POLLEY:  Yes, sir, we have.

22         THE COURT:  Would you please hand your verdicts

23    to Deputy Lithle.

24         Mr. Fitzpatrick, please publish the verdicts.

25         THE CLERK:  Yes, Your Honor.  In the Circuit

Court of the 17th Judicial Circuit, in and for

Broward County, Florida, case number 97-7797 CF10A,

Judge James I. Cohn presiding.

State of Florida, Plaintiff vs. John Cappelletti,

Defendant, verdict:  We the jury find as follows as to

the Defendant in this case, the Defendant is guilty of

attempted murder in the first degree.

As to case number 97-7797 CF10B, State of

Florida, Plaintiff vs. Eduardo Ruiz, Defendant, verdict:

We the jury find as follows as to the Defendant in this

case, the Defendant is guilty of attempted murder in the

first degree as charged in the information.

So say we all this 8th day of January, AD, 1998

at Broward County, Florida.  John E. Polley, Junior as

foreman.

THE COURT:  Does any party wish the jury to be

polled?

MISS DADOWSKI:  Yes, Your Honor.

MR. FLEISCHMAN:  Yes, Your Honor.

THE COURT:  Please pole the jury.

THE CLERK:  Juror number one, John Polley, are

these your verdicts, sir?

JOHN E. POLLEY:  Yes, sir.

THE CLERK:  Juror number two, Carmen J. Defelice,

are these your verdicts?

1    CARMEN J. DEFELICE:  Yes, sir.

2    THE CLERK:  Juror number three,

3  Suzanne N. Bailey, are these your verdicts, ma'am?

4    SUZANNE BAILEY:  Yes.

5    THE CLERK:  Juror number four, William F. Schram,

6  are these your verdicts, sir?

7    WILLIAM F. SCHRAM:  Yes, sir.

8    THE CLERK:  Juror number five, Walter Radig, are

9  these your verdicts, sir?

10    WALTER RADIG:  They are.

11    THE CLERK:  Juror number six Eric Birch, are

12  these your verdicts?

13    ERIC BIRCH:  Yes.

14    THE CLERK:  Jury polled.

15    THE COURT:  Folks, let me thank you for your

16  performance of your civic duty and contributions to our

17  system of justice.  I know you gave this case your close

18  attention.  You spent certainly a sufficient amount of

19  time deliberating the facts of this case.  And on behalf

20  of the judiciary, I would like to thank for that

21  contribution.

22    I am going to discharge you as jurors at this

23  time.  Let me advise you that you now have the right to

24  discuss this case with anyone if you so desire.  You also

25  have the right to refuse to discuss the case.  It's up to

1    each of you individually as to whether or not you want to

2    talk about the case.

3         Now, it will be necessary for us to collect your

4    juror badges.  If you would please take those off and put

5    them on the rail, and Deputy Lithle will collect those.

6         I do have certificates of appreciation for each

7    of you that I will ask Deputy Lithle to give to you on

8    your exit from the courtroom.  Thank you once again for

9    your service.

10         (Thereupon, the following proceedings were

11    had outside the presence of the jury:)

12         THE COURT:  As to Mr. Ruiz, he has no prior

13    record?

14         MR. FLEISCHMAN:  No, Your Honor.

15         THE COURT:  All right.  The Court, based on the

16    jury's verdict as to Eduardo Ruiz, the Court will defer

17    sentence in this matter, remand Mr. Ruiz to the custody

18    of the Sheriff of Broward County pending sentence which

19    will be set for Friday September 6th.  Good for you?

20         MR. GROSZ:  September?

21         THE COURT:  Did I say September?  Here I go

22    again, February.

23         MR. FLEISCHMAN:  What date?

24         THE COURT:  February the 6th, is that a good date

25    for you, sir?

3    1            MR. FLEISCHMAN:  Sure.

2            THE COURT:  All right at 11:00 a.m.  And the

3    court will order a presentence investigative report

4    returnable to this Court no later than Wednesday,

5    February the 4, 1998.

6            MR. FLEISCHMAN:  Judge, will you hear motions for

7    new trial on that date or should we get --

8            THE COURT:  I'll be glad to hear them on that

9    date, or if you want them heard earlier, I will be glad

10   to do so.  It's up to you.

11           MISS DADOWSKI:  What date is that that you said?

12           THE COURT:  February 11th.

13           Mr. Cappelletti, have you finished a sentencing

14   guideline score sheet?

15           MR. GROSZ:  Judge, I do.  I have one completed.

16   I don't have it with me because I will be seeking

17   aggravation.

18           THE COURT:  Is there any additional evidence that

19   you plan to offer?

20           MR. GROSZ:  Well, the evidence -- I plan to

21   offer, as introduced at trial and the grounds that I'm

22   seeking aggravation on, I want to at least get some case

23   law for you on that.  With the grounds that I'm seeking

24   aggravation on are exposing a number of other individuals

25   to harm or death by his actions.  So --

3

1          THE COURT:  Are there any other grounds?

2          MR. GROSZ:  I think that was the only ground that

3     I was looking for.

4          MR. GROSZ:  Actually, there's one other ground

5     and specifically the two grounds are that the offense

6     creates substantial risk of death or great bodily harm to

7     many persons or to one or more small children.

8          Second ground is that the primary offense is

9     scored at Level 7 or higher, and Defendant has been

10     convicted of one or more offenses that's scored or would

11     have scored at an offense Level A or higher.  And he has

12     the other prior attempt murder in the first degree that

13     he was convicted of.  So if that scored, that would be a

14     Level 8, or Level 8 or higher.

15          THE COURT:  I really don't see the necessity of

16     deferring sentence.  I mean, I will be glad to hear your

17     argument in aggravation now, but Mr. Cappelletti has been

18     convicted of felonies on how many prior occasion?

19          MR. GROSZ:  That I've scored, there are five.

20          THE COURT:  Five.  You have prepared a sentencing

21     guideline score sheet?

22          MR. GROSZ:  I have.  Can I run back to my office

23     and get it.  I apologize.  I left it in my office because

24     I didn't think you would be sentencing him today if he

25     was convicted.  That's what I thought.  The top of the

1    guidelines are, I'm pretty comfortable with, is 19 years.

2        THE COURT:  We're going to need a sentencing

3    guideline score sheet to sentence Mr. Cappelletti.  Why

4    don't you go back to your office and get it, and then

5    we'll proceed with the sentencing of Mr. Cappelletti.

6        MR. GROSZ:  Okay.

7        THE COURT:  The only reason why I wanted to go

8    forward with the sentence on Mr. Cappelletti today is, if

9    there was no additional evidence that the State wanted to

10   offer, I just don't see any reason for delaying his

11   sentence.

12       MR. GROSZ:  Okay.

13       THE COURT:  The jail is over crowded and, you

14   know, we can use that space for something else.

15       MR. GROSZ:  I know Mr. D'Ambrosio wanted to be

16   heard at sentencing.

17       THE COURT:  I've heard everything I think I

18   needed to hear from Mr. D'Ambrosio.

19       MR. GROSZ:  Just wanted to make that clear.

20       THE COURT:  I think I know what his sentiments

21   are, let me put it like that.

22       MR. GROSZ:  Okay.

23       MISS DADOWSKI:  I filed a motion for new trial.

24   I walked down to the office and typed up a motion.

25   However, I do have some other grounds to argue ore

1    tenusly.

2            First of all, I think that the only evidence that

3    they have, that the State was able to convict

4    Mr. Cappelletti on was circumstantial evidence and they

5    have not been able to exclude every reasonable hypothesis

6    of innocence.

7            It's clear from the evidence that they don't

8    believe Mr. Cappelletti is the one that shot

9    Mr. D'Ambrosio Christopher.  So there's really no

10   evidence to convict Mr. Cappelletti of the attempted

11   first degree murder.

12           Mr. Cappelletti apparently was the passenger in

13   the car.  If, according to Mr. D'Ambrosio, the jury

14   doesn't believe that Mr. Cappelletti shot Mr. D'Ambrosio,

15   there's really no independent evidence of this attempted

16   first degree murder.

17           It's conceivable to believe that Mr. Cappelletti

18   just happened to be present in a car and that Mr. Ruiz is

19   the actual person that shot him.  And they weren't acting

20   in concert.  I don't believe that the State was able to

21   prove and exclude every reasonable hypothesis of

22   innocence that my client happened to be there and there

23   wasn't an independent act of Mr. Ruiz in shooting

24   Mr. Christopher D'Ambrosio.

25           So I would like to obviously adopt all my

argument that I made at the judgement of aquittal motions and renew all the motions for a mistrial that I made based on Mr. D'Ambrosio's improper comments during the course of the trial.

I think that my client was denied a fair trial and was prejudiced because of the fact that Mr. D'Ambrosio implied, firstly, that the lawyers were putting improper questions and answers into his testimony.

Secondly, he compared by analogy our clients Mr. Ruiz and Mr. Cappelletti to Terry Nichols, making reference that Terry Nichols wasn't even in Oklahoma; saying basically that our defense is very far fetch and commenting on our defense to the jury.

I think all the other motions pretrial that I made and motions in limine where the evidence was admitted were in error and coupled with Mr. Grosz's comment wherein he argued basically a sympathy arguement and said that Mr. D'Ambrosio was scared, etc. All that together basically deprived Mr. Cappelletti of a fair trial. And I would ask that the Court grant the motion for new trial.

THE COURT: All right. The Defendant Cappelletti's motion for new trial is respectfully denied. All prior rulings of this Court will stand.

4

1              Mr. Grosz, have you completed the guideline score

2      sheet or still working on it?

3              MR. GROSZ:  Yes, sir, it's complete.

4              THE COURT:  Would you show it to Miss Dadowski.

5              MR. GROSZ:  Sure.

6              MISS DADOWSKI:  Justin, what year is the armed

7      robbery?

8              MR. GROSZ:  There's one from '74 and one from

9      '70.

10             THE COURT:  Mr. Grosz, have you completed the

11     sentencing guideline sheet?

12             MR. GROSZ:  No, it was complete.  I gave --

13             MISS DADOWSKI:  We're going over some of the

14     priors because my client is contesting some of the priors

15     that Mr. Grosz has.

16             THE COURT:  Do you have certified copies of

17     convictions?

18             MR. GROSZ:  I have certified copies of his wrap

19     from New York.

20             THE DEFENDANT:  You have certified copies of my

21     convictions?

22             MR. GROSZ:  That's what these are.

23             THE DEFENDANT:  No, they're not.

24             MR. GROSZ:  You want to take a look at them?

25             THE DEFENDANT:  Yes.

4      1            MR. GROSZ:  Well, look at them, they're right in

2      front of you.

3            THE COURT:  Perhaps we should go in reverse order

4      and argue whether there's sufficient reasons to upperly

5      depart or aggravate.

6            MR. GROSZ:  That's fine.  That's fine with me,

7      Judge.

8            THE COURT:  All right.  Mr. Grosz, you cited two

9      grounds for aggravation.

10           MR. GROSZ:  Yes, sir.

11           THE COURT:  Under 921.00163, I and R.

12           MR. GROSZ:  Judge, those pages are taken from

13      this book that --

14           THE COURT:  Yes.  Those are the grounds.

15           Any additional argument by the State?

16           MR. GROSZ:  The cases that I gave you with

17      respect to the first allegation --

18           THE COURT:  Actually, let's back up for a second.

19      As to the -- as to the R, what are the Level 8 or higher

20      convictions that you're relying on.

21           MR. GROSZ:  The attempted murder in the first

22      degree is the Level 8 or higher conviction that I'm lying

23      on.  And that was from 1975 out of the State of New York.

24           THE COURT:  Do you have evidence to support that?

25           MR. GROSZ:  I do.

THE COURT:  All right.

MISS DADOWSKI:  I was looking at the sheet there and it doesn't appear that there -- it indicates the conviction for attempted murder in the first degree.  It looks like the conviction may have been for the robbery.

He was charged with the attempted murder in the first degree and a robbery, but when you look at the right hand side of the sheet and it talks about conviction, the following charges it says he was convicted for was a robbery.  It doesn't indicate that he was actually convicted of the attempted murder in the first degree.  So I don't think that there's any evidence to support the prior for attempted murder in the first degree.

MR. GROSZ:  Judge, in addition, we're all sitting in the courtroom going over there and Mr. Cappelletti is saying the only things I've been convicted of are attempted murder and robbery, so --

THE DEFENDANT:  I must have read the --

MISS DADOWSKI:  The attempted murder is obviously the thing that he was convicted of today.  And he may -- this was from 1974.  And it looks, from the actual sheet that Mr. Grosz has, that there's nothing that indicates that he was ever convicted of attempted first degree murder.  The State doesn't have any proof to establish

1    that he was convicted of attempted first degree murder.

2         THE COURT:  It says here that he was arrested for

3    attempted murder one in 1974.  Can you show me,

4    Mr. Grosz, where it indicates that he was convicted.

5         MR. GROSZ:  The way I was reading it, and perhaps

6    I read it wrong, but the way I read it was, arrest

7    attempt murder one, class A felony and then I went to the

8    right side, disposition convicted upon plea of guilty.

9         MISS DADOWSKI:  But then it shows you the

10   following charges that he was convicted on right below

11   that and it says robbery second.

12        MR. GROSZ:  So I -- Other than -- Other than

13   this, I have nothing.  So this is all I've got.  That's

14   where I'm getting my information.

15        THE COURT:  That would be the only Level 8 or

16   higher offense?

17        MR. GROSZ:  Correct.

18        THE COURT:  The test for departures is clear and

19   convincing evidence, would you all agree that's the

20   standard?

21        MR. GROSZ:  Yes, sir.

22        THE COURT:  Okay.  As to subsection R, the motion

23   for upward departure will be denied.

24        So let's discuss the subsection I, which is the

25   offense created a substantial risk of death or great

5   1    bodily harm to many persons, or to one or more small

2    children.

3        MR. GROSZ:  The cases I gave you, frankly, I have

4    not looked through other than to see a blush of them.

5    Neither one are on point to our case, but they're

6    analogous in the case in that the evidence introduced at

7    our trial is that the shots are fired into

8    Mr. D'Ambrosio's car, or one shot fired into D'Ambrosio's

9    car.  He is the driver.

10        It's on I-95, about heavy traffic, moderate to

11    heavy traffic depending on which of the witnesses

12    testified.  At 2:30 on Sunday afternoon in the north

13    bound lanes between Griffin and 595 which is heavily

14    populated, it was clover leave of highway area.

15        So my analogy to the case law, is that it's no

16    different than firing shots into a crowded bar or into a

17    restaurant, or to a school bus, or whatever it maybe.  In

18    essence, you're shooting to kill the driver which is what

19    they found him guilty of, attempted murder in the first

20    degree.

21        And in that affect take out the driver of the

22    vehicle, that's in excess of 3,000 pounds at

23    approximately 50 miles an hour on the highway, exposes

24    whoever else is on that highway within proximity of that

25    vehicle to either death or great bodily harm.

Happens all the time.  I mean, that's the results

of those traffic accidents.  I would say firing a shot

into the vehicle at the driver with no other occupants in

the vehicle exposes everyone on that highway to death or

great bodily harm.

THE COURT:  All right.  Miss Dadowski.

MISS DADOWSKI:  Well, Your Honor, first of all,

obviously the jury did not believe that my client was the

one that actually fired any shotgun at Mr. D'Ambrosio.

Therefore, my argument is that he was merely a passenger

in the car.  He was not the driver of the car.

Mr. D'Ambrosio obviously went off to the side of

the road.  However, he was not involved in any accident.

There's no evidence whatsoever that anybody else was

affected by his being shot.

I don't think that these cases are on point.  I

don't think they should be appropriate.  I don't think

they're appropriate for this particular type of a case.

And obviously I was just handed these prior to

Mr. Grosz coming back up here from his office.  I mean,

after he got back up here from his office.  And I think

in the other case -- I don't think there was any evidence

to establish that anybody else was affected by this

particular incident.

THE COURT:  Well, is it necessary that the

6

1    evidence show that know one else was affected.    According

2    to subsection I of 921.00163, it just says the offense

3    created a substantial risk of death or great bodily harm

4    to any persons.

5         MISS DADOWSKI:  But Your Honor, there's no proof

6    that my client had anything to do with that creation of

7    the great bodily harm, risk or death.  My client was not

8    the driver of the car.  He obviously was not the shooter

9    of the shotgun according to the jury's verdict.

10        I mean, basically we have, in my opinion,

11   Mr. Cappelletti mere presence at the time.  The State

12   can't establish that he did not renounce his intention to

13   be involved in any alleged threats that he may have made

14   at the Amoco Station.  I mean, there's nothing to

15   establish that my client in any way put anybody else at

16   harm.

17        THE COURT:  All right.  Any further argument?

18        MISS DADOWSKI:  I am not sure.  If I could have a

19   moment.

20        THE COURT:  Sure.  Okay?

21        MISS DADOWSKI:  In addition, the great bodily

22   harm is already assumed within the charge of the

23   attempted first degree murder.

24        And also, according to the State's own evidence,

25   that the way the shot was fired, it was very concentrated

6

1        and there wasn't a substantial risk of harm to anybody

2        else based on the actual shot.

3                MR. GROSZ:  Just so we're clear on my argument, I

4        am not talking about the affect that the shotgun blast

5        has had on other passengers, I'm talking about the

6        intention which is inherent in the charge is murder.

7                Murdering the driver, the only occupant of the

8        vehicle, on the highway at a great rate of speed.  The

9        obvious results of that is to expose anyone else on that

10       highway to great bodily harm or death.  That creates a

11       substantial risk of death to anyone that's on that

12       highway.

13               MISS DADOWSKI:  The testimony of Mr. D'Ambrosio,

14       that he was in the far right lane and that he felt that

15       the people that shot the shotgun at him intended to just

16       hit him obviously and his car immediately went to the

17       side of the road.  There was no problems with him

18       stopping the car or anything like that.  I don't believe

19       there's been any evidence.

20               And first of all, Your Honor, you have to --

21       Mr. D'Ambrosio is the one that testified as to the

22       traffic condition on the road along with Mr. Eiland at

23       the time.  However, Mr. Eiland doesn't know what the risk

24       was at the time of the actual shooting.  How many people

25       were on the road at the time of the actual shooting

6   1    around Mr. D'Ambrosio.

2         THE COURT:  Mr. Eiland testified, I'm looking at

3    my notes from Mr. Eiland's testimony, he testified that

4    traffic was pretty heavy for a weekend.

5         MISS DADOWSKI:  That doesn't necessarily mean

6    that the traffic was heavy or the traffic was moderate.

7    I mean, heavy for a weekend could be slight.  More than

8    two cars on the road could be heavy for a weekend.

9         I mean, weekend traffic is very light.  Heavy for

10   a weekend doesn't necessarily mean heavy.  It doesn't

11   mean there was a lot of traffic.  It doesn't mean that

12   there was moderate traffic.  It could be slight traffic,

13   but slight traffic is what he may considered heavy for a

14   weekend.  I don't think it was established for this

15   condition that there was any risk of death or great

16   bodily harm.

17        THE COURT:  Okay.  The Court finds that clear and

18   convincing evidence of this case that the fire -- that

7  19  the firing of the shotgun into a car on Interstate 95 and

20   an uninterested witness testified that it was pretty

21   heavy for a weekend would create a substantial risk of

22   death or great bodily harm to many persons.

23        And based on that, pursuant to 921.00163(I), the

24   Court is going to grant the State's motion to aggravate

25   sentence.

7    1          That being the case, I don't know that it's

2    necessary that there be any --

3          MISS DADOWSKI:  Your Honor, I think the score

4    sheet needs to be accurate.  Because be obviously, if the

5    appellate court disagrees with the --

6          THE COURT:  Okay.  The State will present the

7    sentencing guideline to the Court and the Court will hear

8    any argument with respect to the offenses alleged on the

9    calculations therein.

10          And I think you're right, Miss Dadowski, we

11    should have a correct sentencing guideline score sheet

12    irrespective of the Court's granting the State's motion

13    to aggravate sentence.

14          We will need a written order on the State's

15    motion for aggravation sentence.

16          MR. GROSZ:  Okay.

17          MISS DADOWSKI:  Your Honor, I want to make the

18    argument, even though it may not be relevant at this

19    point since you've -- the Court found grounds to

20    aggravate, however, most of Mr. Cappelletti's priors, I

21    think the last date of conviction of a felony was a

22    robbery from 1975.

23          And the State is showing on the NCIC/FCIC, that

24    he has a prior arrest for a resisting arrest without

25    violence from 1992.  He got a withhold adjudication.  But

7    1    for that, all of the other offenses would not be scorable

2    because they were outside the ten year time period.

3    So I would just make the objection, the argument,

4    that those offenses should not be scored because the

5    State does not have a certified copy of the conviction

6    from the resisting without violence that would bring it

7    into the ten year time period.

8    So therefore, all the other priors should not be

9    scored on Mr. Cappelletti's score sheet.  And it was a

10    withhold adjudication, it was not adjudication

11    conviction.

12    Judge, I would ask, before you actually do impose

13    a sentence, that you listen to Mr. Cappelletti.

14    THE COURT:  Oh, believe me, I will ask if there's

15    legal cause.  But I want to take care of the sentencing

16    guideline score sheet first and then we'll proceed to the

17    sentence.

18    While I'm thinking about it, is there

19    restitution?

20    MR. GROSZ:  He's got extensive medical bills that

21    haven't been paid yet.  I don't know the exact amount.

22    THE COURT:  So I'll need to reserve jurisdiction.

23    MR. GROSZ:  Right.

24    THE COURT:  My JA is preparing the order on

25    aggravation.

7

1         MR. GROSZ:  Okay.  Thanks, Judge.

2         MISS DADOWSKI:  I have no objection with the

3   score sheet that Mr. Grosz showed me other than my

4   argument that because there has been no proof of the

5   resisting without violence conviction --

6         THE COURT:  Any others are greater than ten

7   years.

8         MISS DADOWSKI:  Any others are greater than ten

9   years.  Actually, that none of those should be scored and

10  it should basically reflect that Mr. Cappelletti has no

11  scorable priors.

12        THE COURT:  All right.  Is there legal cause why

13  sentence should not be imposed at this time?

14        MISS DADOWSKI:  No legal cause, Your Honor.

15  However, I don't know if Mr. Cappelletti has anything

16  that he would like to say.

17        THE COURT:  Mr. Cappelletti, I will be glad to

18  hear anything that you have to say, sir.

19        THE DEFENDANT:  Well, I'm not guilty of the

20  charges.  It's a shame that this man did get shot, but I

21  didn't shoot him.  I don't know who shot him.  I feel

22  sorry for the man, you know.  It's a shame something like

23  that had to happen.  That's all I have to say.

24        THE COURT:  All right.  Mr. Grosz, you wish to be

25  heard as to sentence?

7

1          MR. GROSZ:  My recommendation, Judge, is 30 years

2     which is the max with aggravation.

3          MISS DADOWSKI:  I would just ask you, based on

4     the ground to aggravate, the fact that Mr. Cappelletti,

5     obviously by the jury's verdict did not shoot

6     Mr. D'Ambrosio and he was not the driver of the car,

7     basically I think it was basically that Mr. Cappelletti

8     was with Mr. Ruiz at the time that Christopher D'Ambrosio

9     was shot.

10          I would ask the Court not to aggravate

11     Mr. Cappelletti to 30 years.  I certainly think that a

12     guideline sentence is appropriate in this case based on

13     what the jury felt that John Cappelletti's involvement

14     was in this particular case.

15          THE COURT:  All right.  Mr. Cappelletti, the jury

16     having found you guilty of attempted murder in the first

17     degree, it is the judgement and sentence of this Court

18     that you be adjudicated guilty of murder -- of attempted

19     murder in the first degree and be ordered committed to

20     the custody of the Department of Corrections to serve a

8
21     term of imprisonment of 30 years with credit for time

22     served.

23          In addition, the Court will asses a $490 Public

24     Defender fee, for which you have 30 days to contest, $30

25     court cost.  The Court will reserve jurisdiction to

8

1    determine the amount of restitution if any.

2        You have a right to be present at any restitution

3    hearing or you can waive that right if you want to be

4    transported to another facility without undue delay.

5    It's up to you, Mr. Cappelletti, as to whether or not you

6    want to be present at that restitution hearing.  Do you

7    want to be present?  If you do, it's --

8        THE DEFENDANT:  No, Your Honor.

9        THE COURT:  Okay.  The Court finds that

10    Mr. Cappelletti waives his presence at any future

11    restitution hearing.

12        Let me advise you, Mr. Cappelletti, that you have

13    30 days to appeal and the Court appoints --

14        MISS DADOWSKI:  I would ask that you find

15    Mr. Cappelletti indigent for the purpose of appeal.

16        THE COURT:  Court herein finds Mr. Cappelletti to

17    be indigent for the purpose of appeal.  And the Court

18    will appoint the office of the Public Defender to

19    represent Mr. Cappelletti in his appeal.

20        MISS DADOWSKI:  And I will submit the appropriate

21    order tomorrow.

22        THE COURT:  Thank you, Miss Dadowski.

23        MISS DADOWSKI:  Did you deny my motion for new

24    trial?

25        THE COURT:  Yes, ma'am, I did.

8    1                    (Thereupon, the proceedings were concluded.)

## CERTIFICATE

          I, LISA GREENWELL, hereby certify that the

foregoing, pages 127 and including 599, is a true and

correct transcription to the best of the reporter's

ability of the proceedings had before the

Honorable JAMES I. COHN, presiding Judge, at the

Broward County Courthouse, Fort Lauderdale,

Broward County, Florida, on the 6th through the 8th day

of January, 1998 commencing at 9:30 o'clock a.m.


          IN WITNESS WHEREOF I have hereunto affixed

my hand this 1st day of May, 1998.




                              _____

                                      LISA GREENWELL

                                   Shorthand Reporter

# EXHIBIT   C

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO:    97-7797CF10A

JUDGE:    JAMES I. COHN

STATE OF FLORIDA,                :

        Plaintiff,    :

vs.                              :            **VERDICT**

JOHN CAPPELLETTI,                :

        Defendant.    :

_____

**COUNT I**

WE, THE JURY, find as follows as to the Defendant in this case:
(Check only one)

_____A. The Defendant is Guilty of Attempted Murder in the
First Degree, and during the commission of said
Attempted Murder in the First Degree he did possess a
firearm, as charged in the Information.

___✓___B. The Defendant is Guilty of Attempted Murder in the
First Degree.

_____C. The Defendant is Guilty of Culpable Negligence, a
lesser included offense.

_____D. The Defendant is Not Guilty.

SO SAY WE ALL, this ____ day of January, A.D. 1998, at Fort
Lauderdale, Broward County, Florida.

_____
FOREPERSON

Filed in Open Court,
ROBERT E. LOCKWOOD
CLERK
ON ___JAN 08 1998___
BY _____

31

# EXHIBIT  D

17th Judicial Circuit in and for Broward County

**CLOCK IN**

DIVISION:
CRIMINAL

# JUDGEMENT

DIV:

98-028341 T#006
01-16-98 10:21AM

THE STATE OF FLORIDA VS:

John W. Capelletti

**CASE NUMBER**

92-7797 & 10 A

| PLAINTIFF | DEFENDANT |
|---|---|

[ ] PROBATION VIOLATOR
( Check if Applicable )

STATE ATTORNEY    Justin S. Grosz

COURT REPORTER    Lisa Campanell

The Defendant, __John W. Capelletti__ being personally before this Court represented by: __Gene T. Sadowski__ , his attorney of record, and having:

(Check Applicable Provision)
[x] Been tried and found guilty of the following crime(s).
[ ] Entered a plea of guilty to the following crime(s).
[ ] Entered a plea of nolo contendere to the following crime(s).

| COUNT | CRIME | OFFENSE STATUTE NUMBER(S) | DEGREE OF CRIME | ADD'L MONIES IMPOSED |
|---|---|---|---|---|
| I | Att. Murder | 782.041 (a) | 1°F | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

and no cause having been shown why the Defendant should not be adjudicated guilty. IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s)

The Defendant is hereby ordered to pay the sum of Fifty Dollars ($50.00) pursuant to F.S. 960.20 (Crimes Comp. Trust Fund). The defendant is further ordered to pay the sum of Five Dollars ($5.00) as court costs pursuant to F.S. 943.25(4). + $8 SW1 fee

(Check if Applicable) [ ] The Defendant is further ordered to pay a fine in the sum of $_____ pursuant to F.S. 775.0835.
(This provision refers to the optional fine for the Crimes Compensation Trust Fund, and is not applicable unless checked and completed. Fines imposed as part of a sentence pursuant to F.S. 775.083 are to be recorded on the Sentence page(s).)

[ ] The Court hereby imposed additional court costs in the sum of $_____

Imposition of Sentence Stayed and Withheld
[ ] The Court hereby stays and withholds the imposition of sentence as to count(s) _____ and places the Defendant on probation for a period of _____ under the supervision of the Department of Corrections (condition of probation set forth in separate order.)

Sentence Deferred Until Later Date (Check if Applicable)
[ ] The Court hereby defers imposition of sentence until _____ (Date)

[x] Pay $200.00 Trust Fund pursuant to F.S.27.3455

The Defendant in Open Court was advised of his right to appeal from this Judgment by filing notice of appeal with the Clerk of Court within thirty days following the date sentence is imposed or probation is ordered pursuant to this adjudication. The Defendant was also advised of his right to the assistance of counsel in taking said appeal at the expense of the State upon showing of indigence.

COUNT(S)_____ : _____ DAYS BROWARD COUNTY

JAIL W/CREDIT FOR _____ DAYS TIMES SERVED

BK27560PG0957

32

| DIVISION CRIMINAL | [ ] **ADJUDICATION WITHHELD** ■ **ADJUDICATED GUILTY** | CASE NUMBER 97- 7797 cf 10 A |
|---|---|---|

## FINGERPRINTS OF DEFENDANT

| 1. R. THUMB | 2. R. INDEX | 3. R. MIDDLE | 4. R. RING | 5. R. LITTLE |
|---|---|---|---|---|
| | | | | |

| 6. L. THUMB | 7. L. INDEX | 8. L. MIDDLE | 9. L. RING | 10. L. LITTLE |
|---|---|---|---|---|
| | | | | |

Fingerprints taken by:

DELBERT LYTLE _____ Court Deputy

Name and Title          8243

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR

DONE AND ORDERED in Open Court at Broward County, Florida this __8__ day of __JAN__
A.D., 19__98__. I HEREBY CERTIFY that the above and foregoing fingerprints are the fingerprints of the
Defendant __John W. Goelotti__ , and that they were placed thereon by said Defendant in
my presence in Open Court this date.

_James S. Cohn_

JUDGE

JAMES I. COHN

SS

FORM 150/450
REVISED 7/94          PAGE 2 OF 2          33

BK27560PG0958

# EXHIBIT E

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO:  97-7797CF10A

JUDGE:  COHN

STATE OF FLORIDA,                    )

        Plaintiff,                   )

vs.                                  )

JOHN W. CAPELLETTI,                  )

        Defendant.                   )

---

## ORDER GRANTING DEPARTURE SENTENCE

THIS CAUSE having come before the Court on the State's
Motion for Departure of Sentence, and the Court being fully advised
in the premises finds by clear and convincing evidence that the
offense of Attempted Murder in the First Degree for which the
Defendant has been convicted was committed in a manner that created
a substantial risk of death or great bodily harm to many persons
and thus constitutes an aggravating circumstance and a legal basis
under F.S. 921.0016(3)(i) for departure.  Accordingly, it is

ORDERED AND ADJUDGED that the State's Motion for
Departure of Sentence is hereby granted as the circumstance
reasonably justifies an upward departure from the sentencing

34

guidelines.

DONE AND ORDERED in Open Court, at Fort Lauderdale, Broward County, Florida, this _____8TH_____ day of January, 1998.

_____
JAMES I. COHN
Circuit Court Judge

Copies to:
**State Attorney**
**Defense Attorney**

Filed in Open Court,
ROBERT E. LOCKWOOD
CLERK
ON    JAN 08 1998
BY_____

35

# EXHIBIT   F

# OCTOBER 1, 1995 RULE 3.991(a) SENTENCING GUIDELINES SCORESHEET

| 1. DATE OF SENTENCE | 2. PREPARED BY ☐DC ☑SAO | 3. COUNTY | 4. SENTENCING JUDGE |
|---|---|---|---|
| ☐☐ ☐☐ ☐☐ M O D Y Y R | J. GROSZ | BROWARD | COHN |

| 5. NAME (LAST, FIRST, M.I.) | 6. DOB | 7. DC# | 9. RACE | 10. GENDER |
|---|---|---|---|---|
| CAPPELLETTI, JOHN | 07 07 71 M O D Y Y R | 8. OBTS# | ☐B ☑W ☐OTH | ☑M ☐F ☐PLEA ☑TRIAL |

**I. PRIMARY OFFENSE:** If Qualifier, please check ✓ __A __S __C __R (A=Attempt, S=Solicitation, C=Conspiracy, R=Reclassification)

| DOCKET# | FELONY DEGREE | F.S. # | OFFENSE LEVEL | OFFENSE DATE | POINTS |
|---|---|---|---|---|---|
| 97-7797CF10A | 1° | 777/782 | 09 | 04 13 97 M O D Y Y R | |

Description: ATTEMPTED MURDER FIRST DEGREE
(Level = Pts: 1=4, 2=10, 3=16, 4=22, 5=28, 6=36, 7=56, 8=74, 9=92, 10=116)
Prior capital felony triples primary offense points ☐

I. 92

**II. ADDITIONAL OFFENSE(S):** Supplemental page attached ☐

| DOCKET# | FEL/MM F.S. # | OFFENSE LEVEL | QUALIFY A S C R | CNTS | POINTS |
|---|---|---|---|---|---|
| / / | / | ☐☐☐☐ | __ x __ = __ |
| Description: | | | |
| / / | / | ☐☐☐☐ | __ x __ = __ |
| Description: | | | |
| / / | / | ☐☐☐☐ | __ x __ = __ |
| Description: | | | |

(Level = Pts: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=18, 7=28, 8=37, 9=46, 10=58)
Prior capital felony triples additional offense points ☐

Supplemental page points ____

II. ___

**III. VICTIM INJURY:**

| | Number | Total | | Number | Total |
|---|---|---|---|---|---|
| 2nd Degree Murder | 240 X __ = __ | | Slight | 4 X __ = __ |
| Death | 120 X __ = __ | | Sex Penetration | 80 X __ = __ |
| Severe | 40 X 1 = 40 | | Sex Contact | 40 X __ = __ |
| Moderate | 18 X __ = __ | | | |

III. 40

**IV. PRIOR RECORD:** Supplemental page attached ☐

| FEL/MM DEGREE | F.S. # | OFFENSE LEVEL | QUALIFY A S C R | DESCRIPTION | NUM | POINTS |
|---|---|---|---|---|---|---|
| 2° | 812 | L6 | ☐☐☐☐ | S/A ROBBERY | 2 x 9 = 18 |
| MM | 843 | MM | ☐☐☐☐ | RWOV | 1 x .2 = .2 |
| MM | 812 | MM | ☐☐☐☐ | DOC / P.T (2)(1) | 3 x .2 = .2 |
| | | / | ☐☐☐☐ | | __ x __ = __ |
| | | / | ☐☐☐☐ | | __ x __ = __ |

(Level = Pts: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=9, 7=14, 8=19, 9=23, 10=29)

3 6

Supplemental page points ____

IV. 18.4

Effective Date: For offenses committed under the sentencing guidelines effective October 1, 1995 or any subsequent revision

Page Subtotal 150.4

Page 1 Subtotal **150.4**

V.  Legal Status Violation = 4 Points                                                    V. _____

VI.  Community Sanction Violation before the court for sentencing
    A)  6 Pts x each such successive violation OR                          VI.  A. _____
    B)  New Felony Conviction = 12 Pts x each successive violation       B. _____

VII.  Firearm/Semi-Automatic or Machine Gun = 18 or 25 Points        VII. _____

VIII.  Prior Serious Felony = 30 Pts                                              VIII. _____

Subtotal Sentence Points. **150.4**

IX.  Enhancements (only if the primary offense qualifies for enhancement)

| Law Enforcement Protection | Drug Trafficking | Grand Theft Motor Vehicle | Street Gang (offenses committed on or after 10-1-96) | Domestic Violence (offenses committed on or after 10-1-97) |
|---|---|---|---|---|
| ☐ x 1.5  ☐ x 2.0  ☐ x 2.5 | ☐ x 1.5 | ☐ x 1.5 | ☐ x 1.5 | ☐ x 1.5 |

Enhanced Subtotal Sentence Points  IX. _____

TOTAL SENTENCE POINTS  **150.4**

### SENTENCE COMPUTATION

For any felony committed on or after July 1, 1997, where the defendant has at least one prior felony conviction, the court may impose a state prison sentence not to exceed 22 months when a non state prison sanction is recommended, or when the minimum recommended sentence is less than 22 months in state prison.

- 40 or less total sentence points mandates a non state prison sanction, except as provided above. Sentence points less than or equal to 40 may be increased by 15 percent

    _____ x 1.15 = _____
    Total Sentence Points      Increased Sentence Points

- If total or increased sentence points are greater than 40 or equal to 52, state incarceration is discretionary. A total of more than 52 total or increased sentence points must be a state prison sentence. A life sentence may be imposed at the discretion of the court if total sentence points are 363 or greater.

    **150.4** minus 28 = **122.4**
    Total/Increased Points      State Prison Months

- The sentencing court may increase or decrease prison months by up to 25 percent except where total sentence points were originally increased by 15 percent to exceed 40 points. Any state prison sentence must exceed 12 months.

    **122.4**
    State Prison Months

    x .75 = **91.8**    Min. Prison Months
    x 1.25 = **153**    Max. Prison Months

### TOTAL SENTENCE IMPOSED

| | Years | Months | Days | |
|---|---|---|---|---|
| ☑ State Prison  ☐ Life | **30 yrs** | _____ | _____ | Has more than one scoresheet been used at sentencing? |
| ☐ County Jail  ☑ Time Served | _____ | _____ | _____ | _____ Yes  _____ No |
| ☐ Community Control | _____ | _____ | _____ | |
| ☐ Probation | _____ | _____ | _____ | |

- Please designate the particular type of sentence where an enhanced or mandatory sentence imposed.

☐ Habitual Felony/Habitual Violent Offender    ☑ Guideline Aggravated Departure
☐ Violent Career Criminal    ☐ Guideline Mitigated Departure
☐ Prison Releasee Reoffender Punishment Act
☐ Mandatory pursuant to:   ☐ §775.087   ☐ §893.13   ☐ §893.135

Supplemental Scoresheet
Filed in Open Court.
ROBERT E. LOCKWOOD
CLERK
JAN 08 1998

**JUDGE'S SIGNATURE** _____

37

# EXHIBIT  G

OCTOBER 1, 1995 RULE 3.991 SUPPLEMENTAL SENTENCING GUIDELINES SCORESHEET

| NAME (LAST, FIRST, M.I.) | DOCKET # | DATE OF SENTENCE |
|---|---|---|
| CAPPELLETTI, John | 97-7797CF10 A | MO DY YR |

## II. ADDITIONAL OFFENSE(S)

| DOCKET# | FEL/MM | F.S. # | LEVEL | QUALIFY A S C R | CNTS | POINTS |
|---|---|---|---|---|---|---|
| _____/ | _____/ | _____/ | ☐☐☐☐ | ____X____ | = ____ |
| Description:_____ | | | | | |
| _____/ | _____/ | _____/ | ☐☐☐☐ | ____X____ | = ____ |
| Description:_____ | | | | | |
| _____/ | _____/ | _____/ | ☐☐☐☐ | ____X____ | = ____ |
| Description:_____ | | | | | |
| _____/ | _____/ | _____/ | ☐☐☐☐ | ____X____ | = ____ |
| Description:_____ | | | | | |
| _____/ | _____/ | _____/ | ☐☐☐☐ | ____X____ | = ____ |
| Description:_____ | | | | | |

(Level = Pts: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=18, 7=28, 8=37, 9=46, 10=58)

II._____

## IV. PRIOR RECORD: Supplemental page attached

| FEL/MM DEGREE | F.S. # | LEVEL | QUALIFY A S C R | DESCRIPTION | # NUM | POINTS(s) |
|---|---|---|---|---|---|---|
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |
| _____ | _____/ | ____ | ☐☐☐☐ | _____ | ____ x | ___ = ____ |

(Level = Pts: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=9, 7=14, 8=19, 9=23, 10=29)

-IV._____

REASONS FOR DEPARTURE:_____

_____

_____

_____

_____

_____

_____

_____
JUDGE'S SIGNATURE

Effective Date: For offenses committed on or after October 1, 1995

DISTRIBUTION:
White (Original) / Clerk
Green / DC Data
Canary / State Attorney

Pink / Defense Attorney
Goldenrod / DC Offender File

3 8

If reasons cited for d~~e~~ ~~ure are not listed below, please write r~~ ~~ns on the reverse side.~~ ne area specified "Reasons for Departu~~

## Reasons for Departure - Aggravating Circumstances

☐ Legitimate, uncoerced, plea bargain.

☐ Offense was one of violence and was committed in a manner that was especially heinous, atrocious or cruel.

☐ Offenses arose from separate episodes. Primary offense is at level 4 or higher and the defendant has committed 5 or more offenses within a 180 day period that have resulted in convictions.

☐ Primary offense is scored at level 3 and the defendant has committed 8 or more offenses within a 180 day period that have resulted in convictions.

☐ Offense was committed within 6 months of defendant's discharge from a release program or state prison.

☐ Defendant occupied a leadership role in a criminal organization.

☐ Offense committed by a public official under color of office.

☐ Defendant knew victim to be a law enforcement officer at the time of the offense, the offense was a violent offense; and that status is not an element of the primary offense.

☑ Offense created substantial risk of death or great bodily harm to many persons or to one or more small children.

☐ Victim especially vulnerable due to age or physical or mental disability.

☐ Offense was motivated by prejudice based on race, color, ancestry, ethnicity, religion, sexual orientation or national origin of the victim.

☐ Victim suffered extraordinary physical or emotional trauma or permanent physical injury, or was treated with particular cruelty.

☐ Victim was physically attacked by the defendant in the presence of one or more members of the victim's family.

☐ Offense resulted in substantial economic hardship to a victim and consisted of an illegal act or acts committed by means of concealment, guile or fraud to obtain money or property, to avoid payment or loss of money or property or to obtain business or professional advantage when two or more of the following circumstances were present:

  ☐ Offense involved multiple victims or multiple incidents per victim.

  ☐ Offense involved a high degree of sophistication or planning or occurred over a lengthy period of time.

  ☐ The defendant used position or status to facilitate the commission of the offense, including positions of trust, confidence or fiduciary relationship; or

  ☐ The defendant was in the past involved in other conduct similar to that involved in the current offense.

❙ Offense committed in order to prevent or avoid arrest, to impede or prevent prosecution for the conduct underlying the arrest, or to effect an escape from custody.

❙ Defendant is not amenable to rehabilitation or supervision, as evidenced by an escalating pattern of criminal conduct as described in s. 921.001(8).

Defendant induced a minor to participate in any of the offenses pending before the court for disposition.

Primary offense is scored at level 7 or higher and the defendant has been convicted of one or more offense that scored, or would have scored, at an offense level 8 or higher.

Defendant has an extensive unscoreable juvenile record.

### Reasons for Departure - Mitigating Circumstances

egitimate, uncoerced plea bargain.

Defendant was an accomplice to the offense and was a relatively minor participant in the criminal conduct.

he capacity of the defendant to appreciate the criminal nature of the conduct or to conform that conduct to the requirements of w was substantially impaired.

efendant requires specialized treatment for addiction, mental disorder, or physical disability and the defendant is amenable to atment.

: need for payment of restitution to the victim outweighs the need for a prison sentence.

: victim was an initiator, willing participant, aggressor, or provoker of the incident.

 defendant acted under extreme duress or under the domination of another person.

ore the identity of the defendant was determined, the victim was substantially compensated.

:ndant cooperated with the State to resolve the current offense or any other offense

 offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown rse

: time of the offense the defendant was too young to appreciate the consequences of the offense.

dant to be sentenced as a youthful offender

DISTRIBUTION:
White (Original) / Clerk
Green / DC Data
: /
Pink / Defense Attorney

39

# EXHIBIT   H

| IN; 17th Judicial Circuit in ) for Broward County | CLOCK IN |

| DIVISION: Criminal | as to Count _____ | **SENTENCE** I |

| THE STATE OF FLORIDA VS. | CASE NUMBER |
| John W. Capelletti | 97- 7797 cf 10 A |
| PLAINTIFF          DEFENDANT | |

The Defendant, being personally before this Court, accompanied by his attorney, _Renee T. Dadowski_ and having been adjudicated guilty herein, and the Court having given the Defendant an opportunity to be heard and to offer matters in mitigation of sentence, and to show cause why he sentenced as provided by law, and cause shown,

(Check One)
[ ] and the Court having on _____ deferred imposition of sentence until this date.
[ ] and the Court having previously entered a judgment in this case on the defendant now to sentence the defendant.
[ ] and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked the Defendant's Probation/Community Control.

IT IS THE SENTENCE OF THE COURT that:

The Defendant pay a fine of $ _____ , pursuant to F.S. 775.063, plus $ _____ at the 5% surcharge required by F.S. 960.25

[X] The Defendant is hereby committed to the custody of the Department of Corrections.

[ ] The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

[ ] The Defendant is hereby sentenced as a youthful offender in accordance with F.S. 958.04.

TO BE IMPRISONED (check one: unmarked sections are inapplicable)

[ ] For a term of Natural Life.

[X] For a term of _Thirty (30) years_

[ ] Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in this Order.

If "split" sentence, complete either paragraph.

_____ Followed by a period of _____ on Probation/Community Control under the supervision of the Department of Correction according to the terms and conditions of supervision set forth in separate order entered herein.

_____ However, after serving a period of _____ imprisonment in the balance of such sentence shall be suspended and the defendant shall be placed on Probation/Community Control for a period of _____ under supervision of the Department of Corrections according to the terms and conditions of Probation/Community Control set forth in a separate order entered herein.

FORM 150/090
REVISED 7/93

4 0

| DIVISION: CRIMINAL | SENTENCE<br><br>( AS TO COUNT ___*I*___ ) | CASE NUMBER<br><br>77-7777 *q 10* A |
|---|---|---|

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

## SPECIAL PROVISIONS
### ( As to Count ___*I*___ )

By appropriate notation, the following provisions apply to the sentence imposed:

MANDATORY/MINIMUM PROVISIONS:

**FIREARM** _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

**DRUG TRAFFICKING** _____ It is further ordered that the _____ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this court.

**CONTROLLED SUBSTANCE WITHIN 1000 FEET OF SCHOOL** _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 893.13(1)(e) 1, are hereby imposed for the sentence specified in this court.

**HABITUAL FELONY OFFENDER** _____ The defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statute 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**HABITUAL VIOLENT OFFENDER** _____ The defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provision of Florida Statute 775.084(4). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**LAW ENFORCEMENT PROTECTION ACT** _____ It is further ordered that the Defendant shall serve a minimum of _____ years before release in accordance with Florida Statute 775.0823.

**CAPITAL OFFENSE** _____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1).

**VIOLENT CAREER CRIMINAL** _____ The defendant is adjudicated a violent career criminal offender and has been sentenced to an term in accordance with the provision of Florida Statute 775.084(4)(c). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court a set forth in a separate order or stated on the record in open court.

4 1

| DIVISION: CRIMINAL | SENTENCE<br><br>( AS TO COUNT____I____ ) | CASE NUMBER<br><br>97-7797 ef 10 A |
|---|---|---|

## OTHER PROVISIONS

**SHORT-BARRELED RIFLE, SHOTGUN, MACHINE GUN** _____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this court.

**CONTINUING CRIMINAL ENTERPRISE** _____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.

**RETENTION OF JURISDICTION** _____ The court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

**JAIL CREDIT** ✓ It is further ordered that the defendant shall be allowed a total of ___268___ days as credit for time incarcerated prior to imposition of this sentence.

**PRISON CREDIT** _____ It is further ordered that the defendant be allowed credit for all time previously served on this count in the Department of Corrections prior to resentencing.

**CONSECUTIVE/ CONCURRENT AS TO OTHER COUNTS** _____ It is further ordered that the sentence imposed by this court shall run _____ consecutive to _____ concurrent with (check one) the sentence set forth in count _____ of this case.

**CONSECUTIVE/ CONCURRENT AS TO OTHER CONVICTIONS** _____ It is further ordered that the composite term of all sentences imposed for the courts specified in this order shall run _____ consecutive to _____ concurrent with (check one) the following: _____ Any active sentence being served. _____ Specific sentences:

_____

_____

_____

**PSI ORDERED    YES [ ]    NO [■]**

In the event the above sentence is to the Department of Corrections, the Sheriff of Broward County, Florida, is hereby ordered and directed to deliver the Defendant to the Department of Corrections at the facility designated by the Department together with a copy of this Judgment and Sentence and any other documents specified by Florida Statutes.

The Defendant in Open Court was advised of his right to appeal from this Sentence by filing notice of appeal within thirty days from this date with the Clerk of this Court, and the Defendant's right to assistance of counsel in taking said appeal at the expense of the State upon showing of indigence.

In imposing the above sentence, the Court further recommends_____

_____

_____

**DONE AND ORDERED** in Open Court at Broward County, Florida, this 181 day of JANUARY, 19 98.

_____
**JUDGE**

JAMES I. COHN

42

# EXHIBIT I

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA                    Case No.   97-7797CF10

vs.                                 Judge:     COHN

JOHN CAPELLETTI,

        Defendant

_____/

## MOTION FOR NEW TRIAL AND/OR MOTION FOR ARREST OF JUDGMENT

The Defendant, JOHN CAPELLETTI, by and through the undersigned attorney, pursuant to Rules 3.600 and 3.610 through 3.850, Florida Rules of Criminal Procedure, moves this Honorable Court to order a new trial and/or an arrest of judgment, or for such other and further relief as is proper under the said rule, on the following grounds:

1. The verdict is contrary to the law or the weight of the evidence.

2. Substantial rights of the defendant were prejudiced when the court erred in the decision of any matter of law arising during the course of the trial.

3. Substantial rights of the defendant were prejudiced when the court erroneously instructed the jury on a matter of law or refused to give a proper instruction requested by the defendant.

4. Substantial rights of the defendant were prejudiced when for any other cause not due to the defendant's own fault, the defendant did not receive a fair and impartial trial.

5. The court is without jurisdiction of the cause.

4 6

6. Other grounds to be argued ORE TENUS.

WHEREFORE, the Defendant respectfully requests this Honorable Court grant this Motion for New Trial and/or Motion for Arrest of Judgment.

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion for New Trial and/or Motion for Arrest of Judgment has been furnished by hand to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida, this 8th day of JANUARY, 1998.

ALAN H. SCHREIBER
Public Defender
17th Judicial Circuit

RENEE T. DADOWSKI #764670
Assistant Public Defender
Attorney for Defendant

Filed in Open Court,
ROBERT E. LOCKWOOD CLERK
JAN 08 1998
ON
BY

4 7

# EXHIBIT   J

| | | CLOCK IN |
|---|---|---|
| [✓] 17th Judicial Circuit ... and for Broward County<br>[ ] In the County Court in and for Broward County | | Filed in Open Court,<br>ROBERT E. LOCKWOOD<br>CLERK |
| DIVISION:<br>[✓] CRIMINAL<br>[ ] TRAFFIC<br>[ ] OTHER | ORDER | ON ___ JAN 0 8 1998 ___<br>BY ___ |
| THE STATE OF FLORIDA VS.<br><br>*John Capelletti*<br><br>PLAINTIFF          DEFENDANT | | CASE NUMBER<br>*97-7797 g= 10 A* |

CHARGE  *1. Att. Murder 1°*

*Defense Motion for New Trial*

*is hereby:* _____ *denied.* _____

DONE AND ORDERED THIS ___*8*___ DAY OF ___*January*___, 19 *98*, IN
BROWARD COUNTY, FLORIDA.

*James I. Cohn*
JUDGE

COPIES:     BSO  -  SAO

48

# EXHIBIT   K

JOAN

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

JOHN CAPELLETTI,
          Defendant/Appellant,                    CASE NO.:    97-7797CF

vs.                                               JUDGE:       COHN

STATE OF FLORIDA,
          Plaintiff/Appellee.                     __NOTICE OF APPEAL__

_____

        NOTICE IS HEREBY GIVEN that, JOHN CAPELLETTI, Defendant/Appellant, appeals to

the District Court of Appeal, Fourth District of Florida, the final order imposing judgment of

conviction and sentence rendered on JANUARY 8, 1998 and the denial of the Defendant's Motion

for New Trial and/or Arrest of Judgment rendered on JANUARY 8, 1998 in the above-styled cause.

Notice is also given that the Defendant is in custody. The Defendant was sentenced to 30 years

Florida State Prison, Public Defender Fee and costs.

        I HEREBY CERTIFY that a copy of the foregoing Notice of Appeal was hand delivered to

the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida 33301, and

by U.S. Mail to the Department of Legal Affairs, 1655 Palm Beach Lakes Blvd., 3rd Floor, West

Palm Beach, Florida 33401-2299, this 9TH day of JANUARY, 1998.

                            ALAN H. SCHREIBER
                            Public Defender

                            _____
                            RENEE T. DADOWSKI #764670
                            Assistant Public Defender
                            201 S. E. 6th Street
                            Broward County Courthouse, Rm 3872
                            Fort Lauderdale, Florida 33301
                            (954) 831-8841
                            Attorney for Defendant/Appellant

98 JAN 9

4 9

# EXHIBIT L



# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

JOHN CAPELLETTI,                    )
                                    )
          Appellant,                )
                                    )
vs.                                 )     CASE NO. 98-0879
                                    )
STATE OF FLORIDA,                   )
                                    )
          Appellee.                 )
_____ )

## INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court
of the Judicial Circuit,
In and For  County, Florida
[Criminal Division].

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
JUN 15 1998
CRIMINAL DIVISION
WEST PALM BEACH

RICHARD JORANDBY
Public Defender

*States Brief
Due July 2, 1998
(7-7-98)*

SOPHIA LETTS
Assistant Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(561) 355-7600

Attorney for John Capelletti

*Justine
831-7114
peepy 408-1700*

## CERTIFICATE OF INTERESTED PERSONS

Counsel for defendant/appellant certifies that the following persons and entities have or may have an interest in the outcome of this case.

Robert Butterworth, Attorney General
by Celia Terenzio, Chief, Assistant Attorney General
(Attorney for State/Appellee)

John W. Capelletti
(Defendant/Appellant)

Honorable James I. Cohn
17th Judicial Circuit Court Judge
(Presiding Judge)

Christopher Dambrosio
(Complaining witness)

Richard L. Jorandby, Public Defender, 15th Judicial Circuit
by Sophia Letts, Assistant Public Defender
(Attorney for Defendant/Appellant)

Michael J. Satz, State Attorney, 17th Judicial Circuit
by Justin Grosz, Assistant State Attorney
(Attorney for State)

Alan H. Schreiber, Public Defender, 17th Judicial Circuit
by Rene Dadowski, Assistant Public Defender
(Attorney for Defendant)

ii

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### POINT I

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE CIRCUMSTANTIAL EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### POINT II

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MULTIPLE MOTIONS FOR MISTRIAL WHERE THE CUMULATIVE AFFECT OF THE WITNESS' IMPROPER TESTIMONY WAS PREJUDICIAL TO APPELLANT AND DENIED APPELLANT OF HIS RIGHT TO A FAIR TRIAL . . . . . . . . . . . 11

### POINT III

THE TRIAL COURT ERRED IN GRANTING THE UPWARD DEPARTURE SENTENCE WHERE IT WAS NOT PROVEN THAT APPELLANT WAS THE ONE WHO FIRED THE SHOTGUN AT THE VICTIM CAUSING THE RISK OF DEATH OR GREAT BODILY HARM . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# AUTHORITIES CITED

## CASES CITED                                                    PAGE

Albright v. State, 378 So. 2d 1234
    (Fla. 2d DCA 1979) ............................................... 11, 34

Barwick v. State, 660 So. 2d 685
    (Fla. 1995) ............................................................ 7

Bates v. State, 422 So. 2d 1033
    (Fla. 3d DCA 1982) .............................................. 12

Brown v. State, 672 So. 2d 648
    (Fla. 4th DCA 1996) ............................................. 7, 10

Carter v. State, 332 So.2d 120
    (Fla.2d DCA 1976) ............................................... 12

Chavez v. State, 702 So. 2d 1307
    (Fla. 2d DCA 1997) ............................................... 7

Chenard v. State, 510 So. 2d 363
    (Fla. 3d DCA 1987) .............................................. 35

Cox v. Sate, 555 So. 2d 352
    (Fla. 1989) ........................................................... 7, 10

Davis v. State, 90 So. 2d 629
    (Fla. 1956) ............................................................ 7

Duest v. State, 462 So. 2d 446
    (Fla. 1985) ............................................................ 11, 34

Gonzalez v. State, 538 So. 2d 1343
    (Fla. 4th DCA 1989) ............................................. 12

Gordon v. State, 704 So. 2d 107
    (Fla. 1997) ............................................................ 7

iv

Grant v. State, 194 So. 2d 612
    (Fla. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Jaramillo v. State, 417 So. 2d 257
    (Fla. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lewis v. State, 377 So. 2d 640
    (Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Long v. State, 689 So. 2d 1055
    (Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10

Marshall v. State, 600 So. 2d 474
    (Fla. 3d DCA 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Perkins  v. State, 349 So.2d 776
    (Fla.2d DCA 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Perry v. State, 146 Fla. 187,
    200 So. 525 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Redish v. State, 525 So. 2d 928
    (Fla. 1st DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ryan v. State, 457 So. 2d 1084
    (Fla. 4th DCA 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Seaboard Air Line Railroad v. Strickland, 88 So. 2d 523
    (Fla. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Singletary v. State, 483 So.2d 8
    (Fla. 2d DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

State v. DiGuilio, 491 So. 2d 1129
    (Fla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 34

State v. Murray, 443 So. 2d 955
    (Fla. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Terzado v. State, 232 So. 2d 232
    (Fla. 4th DCA 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

v

Waychoff v. State, 624 So. 2d 392
      (Fla. 2d DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

West v. State, 584 So. 2d 1044
      (Fla. 1st DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## PRELIMINARY STATEMENT

Appellant was the defendant and appellee the prosecution in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida. In this brief the parties will be referred to as they appear before the Court.

The symbol "R" will denote the record on appeal, which consists of the relevant documents filed below.

The symbol "T" will denote the transcript.

1

## STATEMENT OF THE CASE AND FACTS

This is an appeal from a conviction for attempted murder in the first degree (R-32) and a departure sentence of thirty years with a credit of 268 days for time served (R-39-42).

Appellant and Christopher D'Ambrosio met around March of 1996 when D'Ambrosio was working on his wife's house, which was directly next to appellant's (T-245-246,345). D'Ambrosio paid appellant to help him paint the house and do other minor things and they "ended up forming a relationship" (T-248-249).

In February of 1997, D'Ambrosio, who was moving to Atlanta, Georgia, paid appellant to drive a truck to Georgia for him (T-249-250,372). Appellant and D'Ambrosio were scheduled to fly back to Florida after appellant arrived and they unloaded the truck, but they missed their flight (T-254). Later that night, they went to a gas station and while D'Ambrosio was pumping gas, appellant left the car and went towards the convenience store (T-254-255). After calling out appellant's name to no avail, D'Ambrosio left the gas station and did not see appellant again that night (T-255-256). D'Ambrosio flew to Florida the next day (T-257). Appellant was arrested that night and some time later called D'Ambrosio from jail, when D'Ambrosio was back in Florida, and told D'Ambrosio that appellant needed to post bond (T-257-258,374-375,398), but D'Ambrosio did not help appellant raise the bond (T-259).

On April 13, 1997, appellant and Edward Ruiz, who was driving Ruiz's small white Honda Civic hatchback, pulled up outside D'Ambrosio's house as D'Ambrosio was pulling out of his garage in his powerful Chevrolet Caprice Impala (T-262-263,265,300,323). According to D'Ambrosio appellant did not appear upset or angry, but wanted to talk to D'Ambrosio, who

2

was in a rush and told appellant they could talk at the gas station, so appellant and Ruiz followed

him (T-263-264,304,308,381-382).   There appellant asked D'Ambrosio why D'Ambrosio had

left him in Georgia considering appellant had helped D'Ambrosio move furniture there (T-

250,253,266-267,371-372,374).   Appellant told D'Ambrosio that he owed appellant $160 for

helping him move, but D'Ambrosio said he had already paid appellant (T-267).   At this point,

Ruiz got out of the driver's seat of his car and yelled out three separate times, "Are we going to

do this or what?" (T-270,317,386).   D'Ambrosio testified that appellant yelled, "I'm fuckin'

going to blow your fuckin' head off, you hear me.  I want you to know, mother fucker, I'm going

to kill you" (T-272,320).

D'Ambrosio got back in his Chevrolet Impala and drove towards I-95 (T-272-273,388).

Once on I-95 he saw Ruiz driving his white Honda Civic coming up from behind with appellant

in the passenger seat (T-273,328).  D'Ambrosio took some evasive action, but the traffic was

heavy, and on three separate occasions Ruiz's car became parallel with D'Ambrosio's car (T-

146-147,273,275,325-326).  On the third occasion, D'Ambrosio felt a shot in the right side of

his neck from a shotgun, but he did not see a shotgun come out of the car nor did he see a

shotgun in appellant's hands (T-276-277,387,392).  D'Ambrosio pulled off to the side of the

road and called 911 with the help of D'Angelo Eiland (T-73,76-77,136,143,278).

During the course of the trial, appellant made numerous motions for mistrial because of

D'Ambrosio's testimony which was disparaging to appellant's character and to appellant's

defense function, all of which were denied (T-268,317-318,336-337,350-351,365-367,375,439-

440,454-456,583).  Appellant also moved for judgment of acquittal, which the trial court denied

(T-440-442,449,454-456).

The jury returned a verdict of guilty of attempted murder in the first degree on January 8, 1998 (T-576). The trial court gave appellant an upward departure sentence, over appellant's objection, of thirty years with a credit of 268 days for time served (T-589-590,596). The reason given for the upward departure was that the offense created a substantial risk of death of great bodily harm to many persons, or to one or more small children (T-592). Notice of appeal was timely filed (R-49).

4

## SUMMARY OF THE ARGUMENT

### POINT I

A prima facie case of circumstantial evidence must lead to a reasonable and moral certainty that the accused and no one else committed the offense charged. Where the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction.

The state failed to adduce any evidence tending to prove that appellant pulled the trigger and actually shot D'Ambrosio. D'Ambrosio did not know who shot him and no one, not even D'Ambrosio, ever saw appellant with a shotgun that day. No shotgun was ever recovered nor was any fired shot shell recovered. There was no evidence linking appellant to any shotgun or a shot shell. Appellant was merely a passenger in the car, which was driven by Ruiz.

### POINT II

A witness' irrelevant, highly inflammatory, and gratuitous comments, innuendos and implications concerning the defendant's character serve only to highlight a defendant's character and divert the jury from the material evidence in issue. Here the cumulative effect of a D'Ambrosio's prejudicial comments resulted in fundamental prejudice and denied appellant his constitutional right to a fair trial before an impartial jury.

It was highly improper and prejudicial to appellant for D'Ambrosio to make comments regarding appellant's character, compare appellant to Terry Nichols, a convicted, well-known criminal in the Oklahoma City bombing, implying that appellant was of the same caliber as that criminal, comment on appellant's counsel's tactics and defense strategy, by attacking the

questioning techniques, accusing counsel of not putting words in context, and putting words in D'Ambrosio's mouth, implying that the strategy and tactics were improper, and ask the jurors to put themselves in D'Ambrosio's position. It cannot be said beyond a reasonable doubt that appellant would have been convicted without the taint of the impermissible testimony. Because of the scarce, circumstantial evidence presented at trial, appellant's acquittal was reasonably within the realm of possibility. D'Ambrosio's comments were so prejudicial as to vitiate the entire trial.

## POINT III

A departure sentence based upon extraordinary or egregious harm is reversible, where another person struck the victim, and not the defendant. Here, since the verdict specifically found appellant guilty only of the lesser included offense of attempted first degree murder and did not find him guilty of attempted murder in the first degree with a firearm, this verdict is an implicit finding that someone other than appellant had and fired the shotgun. Therefore, the trial court erred in granting the upward departure.

# ARGUMENT

## POINT I

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE CIRCUMSTANTIAL EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTION.**

The state bears the responsibility of proving a defendant's guilt beyond and to the exclusion of a reasonable doubt. Long v. State, 689 So. 2d 1055, 1057 (Fla. 1997) (citing Cox v. Sate, 555 So. 2d 352 (Fla. 1989)). See also Davis v. State, 90 So. 2d 629 (Fla. 1956). In circumstantial evidence cases, "a judgment of acquittal is appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Gordon v. State, 704 So. 2d 107, 112 (Fla. 1997) (citing Barwick v. State, 660 So. 2d 685, 694 (Fla. 1995)). At the outset, "the trial judge must first determine there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences." Id. A jury's verdict on this issue must be reversed on appeal if the verdict is not supported by competent, substantial evidence. Long, 689 So. 2d at 1058.

A prima facie case of circumstantial evidence must lead to a "reasonable and moral certainty that the accused and no one else committed the offense charged." Brown v. State, 672 So. 2d 648 (Fla. 4th DCA 1996) (citing Davis v. State, 90 So. 2d 629 (Fla. 1956)). Where the evidence creates only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction. Cox, 555 So. 2d 352 (Fla. 1989). See also Chavez v. State, 702 So. 2d 1307, 1308 (Fla. 2d DCA 1997). The facts must eliminate all reasonable

7

hypotheses of innocence. <u>Chavez</u>, 702 So. 2d at 1308. <u>See also</u> <u>Terzado v. State</u>, 232 So. 2d 232, 233 (Fla. 4th DCA 1970).

In <u>Long</u>, 689 So. 2d at 1058, a murder prosecution, the State introduced evidence that (1) in a collateral crime, Long abducted and then released Lisa McVey; (2) a search of Long's car, after he was arrested for abducting McVey, revealed two hairs consistent with that of the victim, Virginia Johnson; (3) a carpet fiber from the scene of the crime matched the carpet in Long's car; and (4) Long made vague statements to the effect that he had killed "others." The court felt that while the hair and fiber evidence in conjunction with the other evidence in the case certainly raised a very strong suspicion that Long killed the victim, the court found that it was insufficient to establish beyond a reasonable doubt that he did so. <u>Id.</u> The court found that no one saw Long with the victim, and that no statements were introduced in which Long stated that he killed the victim. <u>Id.</u> Further, the court found that the critical evidence linking Long to the murder, the two strands of hair and the carpet fiber, was not sufficient to support his conviction. <u>Id.</u>

Moreover, the court stated that even where evidence did produce a positive identification, such as fingerprints, the state must still introduce some other evidence to link a defendant to a crime. <u>See, e.g.</u>, <u>Jaramillo v. State</u>, 417 So. 2d 257 (Fla. 1982) (where only evidence connecting defendant to crime was fact that defendant's fingerprints were left at scene, evidence insufficient to convict).

Here, there was inadequate proof of appellant's guilt. All the state presented was circumstantial evidence including a threat made by appellant that he was going to kill D'Ambrosio (T-272) and D'Ambrosio's statement to D'Angelo Eiland that it was appellant who

shot him (T-149). The state failed to adduce any evidence tending to prove that appellant actually pulled the trigger and actually shot D'Ambrosio. Even D'Ambrosio testified that he did not know who shot him (T-392). No one, not even D'Ambrosio, ever saw appellant with a shotgun that day or a shotgun in Ruiz's car (T-318-319,387,392). No shotgun was ever recovered nor was a fired shot shell recovered (T-202-203,229,429). There was no evidence linking appellant to any shotgun or a shot shell (T-232,429). Appellant was merely a passenger in the car, which was driven by Ruiz. There was no evidence to rebut appellant's position that Ruiz fired the shot. There were no witnesses who saw appellant commit the crime. There was also no evidence that appellant in any way aided and abetted Ruiz in the offense, he was just sitting in the car.

There was a reasonable hypothesis that appellant was just in the car that Ruiz was driving since no one actually saw who fired the shot and the state could not put the shotgun in appellant's hands. Nothing refutes appellant's hypothesis that appellant just happened to be present in the car and that Ruiz was the actual person who shot D'Ambrosio. A live shotgun shell, cardboard wads, led shot, and a plastic shot ring component were found in Ruiz's car and none of these items contained appellant's fingerprints (T-180-181,220-221,227,230-232,429). The firearms expert even testified that actual projectiles found in Ruiz's car led him to believe that at one time there had previously been a shot fired in Ruiz's car [prior to this incident] (T-433). This evidence and testimony implied that Ruiz owns a shotgun and was the person who fired the shot at D'Ambrosio. The state was not able to prove and exclude every reasonable hypothesis of innocence that appellant just happened to be there and that there was not an

9

independent act of Ruiz shooting D'Ambrosio.

Here, there was even less evidence connecting appellant to the crime than in **Long**, **supra**, where the court found the evidence insufficient to support Long's conviction. The state could not say that no one else committed the offense. **Brown**. The evidence only created a strong suspicion of appellant's guilt and that evidence was insufficient to sustain appellant's conviction. **Cox**. Because the state was not able to exclude every reasonable hypothesis of innocence, the trial court erred in denying appellant's motion for judgment of acquittal. Therefore, this Court should reverse appellant's conviction.

10

**POINT II**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MULTIPLE MOTIONS FOR MISTRIAL WHERE THE CUMULATIVE AFFECT OF THE WITNESS' IMPROPER TESTIMONY WAS PREJUDICIAL TO APPELLANT AND DENIED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.**

A mistrial is appropriate only when the error is so prejudicial as to vitiate the entire trial. Duest v. State, 462 So. 2d 446 (Fla. 1985). A defendant must establish that the alleged error seriously affected the fairness of his trial and that the trial court abused its discretion in denying the motion. West v. State, 584 So. 2d 1044, 1045 (Fla. 1st DCA 1991). When there is no reasonable possibility that the error contributed to the conviction, the error is harmless. State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

In Albright v. State, 378 So. 2d 1234-1235 (Fla. 2d DCA 1979), the trial judge denied multiple motions for mistrial, yet gave many curative instructions to the jury and admonished the witnesses to stick to answering the questions and to stop volunteering information that was irrelevant. One witness testified that he started cutting himself after he met the defendant because it seemed like they both got off on doing it. Id. at 1234. The prosecutor asked the witness, "Isn't it a fact your life has been threatened concerning your testimony here today?" Id. at 1235. The trial court overruled the defendant's objection and denied his motion for mistrial, but told the jury to disregard the irrelevant testimony. Id. The other witness referred to the defendant as a "junkie," a "criminal," a "backstabber," and a "doublecrosser." Id. The Second District Court of Appeal found that the gratuitous comments by the witnesses were irrelevant and highly inflammatory innuendos and implications concerning the defendant's

11

character. Id. at 1235. The court pointed out that the testimony highlighted the defendant's character and diverted the jury from the material evidence in issue. Id. The court stated that the defendant had chosen to exercise his constitutional right not to testify and therefore did not place his character in issue. Id. See also Lewis v. State, 377 So. 2d 640 (Fla. 1979); Gonzalez v. State, 538 So. 2d 1343 (Fla. 4th DCA 1989) (it is fundamental that the prosection may not impugn the character of an accused unless the accused first puts character into issue at trial); Bates v. State, 422 So. 2d 1033 (Fla. 3d DCA 1982). Nevertheless, the court found that on numerous occasions, the state's witnesses had impermissibly and prominently injected the defendant's character into the trial. Id.

Furthermore, the Albright court held that the cumulative effect of the witnesses' comments resulted in fundamental prejudice and denied the defendant his constitutional right to a fair trial before an impartial jury. Id. More importantly, the court also held that this was so despite the laudable endeavors by the trial judge to pull the trial back on track and proceed with a fair trial by his curative instructions to the jury to disregard the testimony. Id. at 1235- 1236. The court found that on the record, the instructions by the trial judge could not cure the error. Id. at 1236 (citing Perry v. State, 146 Fla. 187, 200 So. 525 (1941)). The court continued saying that while a defendant is not entitled to an error-free trial, he may not be subjected to a trial where error is compounded by error. Id. (citing Perkins v. State, 349 So.2d 776 (Fla.2d DCA 1977)). The court held that since the defendant was denied his constitutional right to a fair trial he was entitled to a new trial. Id. (citing Carter v. State, 332 So.2d 120 (Fla.2d DCA 1976)).

12

Here, appellant moved for a mistrial based on the following improper characterizations

that the witness, D'Ambrosio, kept making about appellant (T- 268):

MR. GROSZ [State Attorney]:      So there were times that he would do things
or help you out around the house you would pay him x amount of dollars to have
him help you out?

D'AMBROSIO:      Yes,  In all fairness, it wasn't alot of help, but <u>he could
smoke cigarettes and drink beer.  He's good entertainment</u>.

MS. DADOWSKI [Appellant's attorney]:  Objection, Your Honor.

COURT:      Sustained.  Please disregard the last response by the witness as
being nonresponsive.

D'AMBROSIO:      <u>I didn't intend to be derogatory</u>.

(T-248-249) (emphasis added).

-----

MR. GROSZ:      What happens at the gas station?

D'AMBROSIO:      <u>John's a little lit before he gets to the gas station.  When I
say lit</u>, I mean ---

MS. DADOWSKI:    Objection, irrelevant.  Move to strike.

COURT:      Sustained.  Sir, please couch your response to the questions.

(T-254) (emphasis added).

----

D'AMBROSIO:      I said John, you know I didn't leave, you left yourself in
Georgia.  He was basically trying to blame me, but he walking a line.  It was
weird to understand what he was trying to say.  I was really hoping he would say,
you know,<u> can I borrow $20's, you know, for his umpteen time and I would give
it to him</u>.

13

(T- 266) (emphasis added).

----

D'AMBROSIO:    He was, in so many words, saying that <u>he had gotten arrested</u> at this gas station and when he ---

MS. DADOWSKI:    I object to this characterization.

D'AMBROSIO:    <u>Okay.  You don't want to know what's happening then.</u>

(T-267) (emphasis added).

----

D'AMBROSIO:    And he never said no, you didn't pay me, but <u>he woke up and became conscious and he was in jail</u>.

MS. DADOWSKI:    Objection, Your Honor.

D'AMBROSIO:    <u>I'm telling you what's he's saying</u>.

COURT:    Hold on.

MS. DADOWSKI:    I move to strike.  Can we have a side bar?

COURT:    Yes, ma'am.

(T-268) (emphasis added).

Appellant argued that all these improper characterizations had a cumulative affect and as a whole were prejudicial to appellant (T-268).  The trial court responded: "That is precisely why I kept telling this witness from five minutes into his testimony to just answer the question and nothing more" (T-268).  However, the trial court denied the motion because it did not find that the cumulative effect of the nonresponsive answers denied appellant a right to a fair trial (T-268).

14

When asked by the prosecutor, "Did you look like this before you saw John Capelletti and Eduardo Ruiz before April 13th of 1997?" D'Ambrosio answered, "No" (T-283). The trial court sustained appellant's objection (T-283); however, the answer was still heard by the jury and served only to prejudice them further. D'Ambrosio also made extraneous and irrelevant comments beyond the scope of the questions asked:

> MR. GROSZ:       And at some point, did you learn how much that bond was?
>
> D'AMBROSIO:      <u>It varied. According to John it varied, but it depended on --</u>
>
> MS. DADOWSKI:    I'll object to all this.
>
> COURT:     Sustained. <u>Sir, listen to the question. The question calls for a yes or no response. Answer yes or no.</u>

(T-258) (emphasis added).

> ----
>
> MR. GROSZ:       Is he passing up cars to catch up your vehicle at all?
>
> D'AMBROSIO:      <u>He's doing somersaults.</u>
>
> MS. DADOWSKI:    Objection, Judge.
>
> Mr. GROSZ:  He's not doing literally somersaults?
>
> D'AMBROSIO:      No --
>
> COURT:     Hold on, sir.
>
> MS. DADOWSKI:    <u>Objection to the characterization of the words that the witness is using, somersaults.</u>

(T-276) (emphasis added).

15

A little later D'Ambrosio again made an improper characterization about appellant (T-350). When answering appellant's question of whether D'Ambrosio had never really liked appellant, D'Ambrosio responded that he liked appellant; that he was a "great guy to play with, but dangerous" (T-350) (emphasis added). Even more erroneous, improper, and prejudicial was D'Ambrosio's reference to Terry Nichols (T-317). Specifically, D'Ambrosio said, "Not once, but at least -- at least two times, I believe it was more like three, yes, he [Ruiz] wanted to know if they [appellant and Ruiz] were going to go on with whatever it is they planned to do. Okay. Terry Nichols wasn't even in Oklahoma --" (T-317) (emphasis added). Appellant objected and again requested a mistrial, without success (T-317-318).

As in Albright, supra, all these prejudicial comments regarding appellant's character were irrelevant and highly inflammatory innuendos and implications concerning appellant's character, which was not at issue. Most particularly D'Ambrosio's reference to Terry Nichols, which eluded to the fact that appellant was similar to Terry Nichols implying that appellant was of the same caliber of person as Terry Nichols, clearly resulted in fundamental prejudice and denied appellant of his constitutional right to a fair trial before an impartial jury. The trial judge was obviously aware of D'Ambrosio's problem of not being able to simply answer the questions asked without adding prejudicial, irrelevant information (T-268). These comments seriously affected the fairness of appellant's trial.

In addition to D'Ambrosio's improper, remarks attacking appellant's character, he also made improper remarks to appellant's counsel, disparaging the defense function. Such remarks when made by the prosecutor can constitute reversible error when such remarks may have

16

prejudiced and influenced the jury into finding the defendant guilty. Grant v. State, 194 So. 2d 612 (Fla. 1967). See also Ryan v. State, 457 So. 2d 1084, 1086 (Fla. 4th DCA 1984). The Florida Supreme Court expounded upon this issue in State v. Murray, 443 So. 2d 955 (Fla. 1984). Justice Shaw, speaking for the Court stated: "Prosecutorial error alone does not warrant automatic reversal of a conviction unless the errors involved are so basic to a fair trial that they can never be treated as harmless." Murray, 443 So. 2d 955. A prosecution's personal attack on defense counsel by referring to his "cheap tricks" was found to be clearly beyond the bounds of proper closing argument in Redish v. State, 525 So. 2d 928, 931 (Fla. 1st DCA 1988), because the improper statements to the jury created improper prejudice to the defendant. The Redish court stated that however probable in light of the evidence it may have been that the defendant would have been convicted had the prosecutor not made the statements to the jury, it could not say that in this case acquittal was not reasonably within the realm of possibility. 525 So. 2d at 931 (citing Singletary v. State, 483 So.2d 8, 9 (Fla. 2d DCA 1985)). The court concluded that it could not be said beyond a reasonable doubt that the defendant would have been convicted without the taint of the impermissible remarks made to the jury. Id. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).

Although the following statements were made by D'Ambrosio and not the prosecutor, their derogatory nature created the same prejudicial effect and may have influenced the jury in finding appellant guilty:

> MR. FLEISCHMAN [Co-Defendant's Attorney]: Okay. So when you referred to Edward Ruiz as a monkey on August 25th of 1997 when I questioned you regarding this incident, that was done in a light favorable to Mr. Ruiz, is that what

17

you're saying, Mr. D'Ambrosio?

D'AMBROSIO:    That was done in the context as you would imagine in my shoes.  If God forbid if the opportunity ever comes that individuals are out in society and shoot you or participate or conspire to kill you, or assassinate you, I can assure you, you will feel the same derogatory feelings towards that individual. You would probably not refer to him as a good individual, so you may use a word that is derogatory.

MR. FLEISCHMAN:         Okay.

D'AMBROSIO:    It was an inappropriate and derogatory word.  As is was inappropriate of suggesting that somehow I don't know someone, yet I dislike them.  So it was an inappropriate word used at an emotional time during an interrogation of which I was really initially trying to tell people what happened and then they play an attorney game with you where they start flipping and dig and, you know, changing and putting words in your mouth.  So I did use the word monkey inappropriately.

MR. FLEISCHMAN:         Okay.  And Mr. D'Ambrosio, just so it's clear, I did not put the word monkey in your mouth, did I?

D'AMBROSIO:    The word monkey he did not put in my mouth.  He used countless words that you did put in my mouth.  And if you give me that deposition back, I will be glad to show you.

MR. FLEISCHMAN:         Mr. Ruiz is not a monkey, is he?

D'AMBROSIO:    No.  But you were a voice on the phone.

MR. FLEISCHMAN:         I am not a monkey, am I?

D'AMBROSIO:    I am not suggesting -- never made the suggestion. But I can appreciate your desperation in this case.

(T-297-298) (emphasis added).

----

MR. FLEISCHMAN:         Now, Mr. D'Ambrosio, the only person, again, that you were involved regarding this Georgia incident was Mr. Capelletti, the only --

18

out of the people that are sitting here today, is Mr. Capelletti and yourself, isn't that true?

D'AMBROSIO:    Georgia wasn't an incident for me.  It wasn't an incident Georgia for me.

MR. FLEISCHMAN:    I am not asking you that.

D'AMBROSIO:    You called Georgia an incident, did you not, counsel?

MR. FLEISCHMAN:    The employment situation with the assisting you to move to Georgia was between yourself and Mr. Capelletti, right?

D'AMBROSIO:    Yes.

(T-298-299) (emphasis added).

----

MR. FLEISCHMAN:    Okay, I'm going to be referring to Page 68 and 69, beginning at Lines 22 through 25.  On that page and then Page of 69, 1 through 17.  If you just read that please.

D'AMBROSIO:    So you want me to read it so that jury can hear it?

MR. FLEISCHMAN:    Read it to yourself and let me know when you are done.

D'AMBROSIO:    Give me that again, what am I supposed to read?

MR. FLEISCHMAN:    Yes, starting at Page 68.  Let me show --

D'AMBROSIO:    If you give it to the jury, they can read it too rather than put a spin it on.  Rather than say something here or there.  They can read it themselves.

MR. FLEISCHMAN:    I understand.  Ready?  68 starting at Lines 22 through 25 page 69, Lines 1 through 17.

D'AMBROSIO:    So we won't be in context, correct?  Okay.  Your words, counsel.  Your words, not my words.  So you said question --

19

MR. FLEISCHMAN:        Mr. D'Ambrosio, I'm just asking --

D'AMBROSIO:        They're your words.

MR. FLEISCHMAN:        Let you explain.

COURT:        Hold on.

MR. FLEISCHMAN:        Judge --

COURT:        Hold on. Listen to the question. Respond to the question and to the question only.

D'AMBROSIO:        Yes, sir.

(T-305-306) (emphasis added).

----

MR. FLEISCHMAN:        Mr. D'Ambrosio, I'll start at Page 68, Line 22 through 25. Do you recall being asked this question and giving this answer. Question: "Then you drove to the Amoco Station, did you tell them come on and follow me and I'll talk to you some more at the Amoco Station?"
        Answer: "Basically I certainly implied that, yes. There was a clear implication of that."
        That's what you said isn't it?

D'AMBROSIO:        I responded to that question. The answer is yes. I responded to the words that you selected.

MR. FLEISCHMAN:        And I didn't select your answer though, did I, Mr. D'Ambrosio?

D'AMBROSIO:        I don't believe you selected my answer, no. I have no reason to believe that.

MR. FLEISCHMAN:        Okay. Now, after the incident happens and you're taken to the hospital, and I already asked you if you recall giving this statement to Detective Needs and you said, well, you felt -- you felt a little unsure about it because of your condition at the time, is that right?

20

D'AMBROSIO:    I didn't use them words.  Now, this is again an exemplary example.  I didn't use those words, they're your words.

MR. FLEISCHMAN:    You're right.  You tell me the words why it was that you're not so sure that you remember giving this statement?

D'AMBROSIO:    Let's make it appropriate.  Let's ask the stenographer to give us the word.

MR. FLEISCHMAN:    Judge --

COURT:    Sustained.

MR. FLEISCHMAN:    I'm going to object and just ask that he be directed to answer the question.

COURT:    All you have to do, Mr. D'Ambrosio, is listen to the question and respond to the question and nothing else.  The question calls for a yes or no response.  If you need to explain your answer, let me know and we'll give you an opportunity explain.

(T-308-310) (emphasis added).

----

D'AMBROSIO:    ...I think the most fair thing to do is give you all the material rather than put all this spin on it and try to cut it up where you get a certain piece and you really don't get the whole picture.  And you told me use my words.

MR. FLEISCHMAN:    I'm going to object to that portion of his answer as far as that there's spin put on anything.  It's totally nonresponsive.

COURT:    Okay.  As to that portion of the response, the Court agrees that it is nonresponsive and motion to strike is granted.

(T-310-311) (emphasis added).

----

MR. FLEISCHMAN:    And in your statement to Detective Needs, you're actually very detailed, aren't you, Mr. D'Ambrosio?  You would have to admit

21

with that?

D'AMBROSIO:    I tried to be detailed, you know.  I mean, if someone's asking a question, I tried to answer it.  There was nobody there stopping me or correcting me, or curtailing it, or putting a spin on it.

MS DADOWSKI:    Objection, Your Honor.  Nonresponsive.

COURT:    Sustained.

(T-315-316) (emphasis added).

----

MR. FLEISCHMAN:    You want to see your statement, Mr. D'Ambrosio?

D'AMBROSIO:    Gees, I would have sworn I said that a few times here. Didn't I ask you a few times --

MR. FLEISCHMAN:    Do you want to read your 11 Pages?

D'AMBROSIO:    I want to -- If you're telling me I said something that I didn't say, of course I want to see it.

MR. FLEISCHMAN:    Your Honor, may I approach the witness?

COURT:    Yes.

D'AMBROSIO:    Can you help me here.  Sid, can you show me what you're talking about rather than -- Don't hand me a lot of pages here, come over here and tell me what you're talking about.

MR. FLEISCHMAN:    Is it there anywhere?

D'AMBROSIO:    You said that to me.

MR. FLEISCHMAN:    I'll tell you it isn't in here.

D'AMBROSIO:    Did you catch that!  What a razzle-dazzle that was.  What's that?  If it ain't here, it ain't here.  You got that?  Okay.  If it ain't here, it ain't here.  What was that?

22

MR. FLEISCHMAN:        Judge, I'm --

COURT:      Sir, I don't have to have to tell you this again. Do you know what the rules are? Do you, sir?

D'AMBROSIO:      Yes.

COURT:      I expect you to follow the rules.

(T-322-323) (emphasis added).

D'Ambrosio also improperly commented on how the attorneys had come up with an outrageous proposition: "I have no reason to believe that somebody else could have grabbed the wheel as was suggested by someone at deposition. They come up with outrageous proposition" (T-328) (emphasis added). Then again D'Ambrosio continued to make extraneous, irrelevant comments:

MR. FLEISCHMAN:        Okay. Now, Mr. D'Ambrosio, let me start with this, in July of '94 you were placed on felony probation for a count of stalking and count of resisting arrest without violence, you were given three years probation?

D'AMBROSIO:      I think we've gone over that, yes.

MR. FLEISCHMAN:        Well --

COURT:      Sir, he didn't ask you whether or not you had gone over it. Just answer the question, okay.

D'AMBROSIO:      Yes, sir.

COURT:      It's the last time that I'm going to tell you. Just answer the question.

(T-329-330) (emphasis added).

----

MR. FLEISCHMAN:        Okay.  Then in July of 1997, you appeared before another judge and you filed a motion to terminate your probation, right, you remember that?

D'AMBROSIO:        Yes, I remember that....

......

D'AMBROSIO:        I had an attorney take the motion to court.  That's the only --

MR. FLEISCHMAN:        All right.  There's nothing wrong with that.  I'm saying you had an attorney?

D'AMBROSIO:        It has nothing to do with this.  The conversation is wrong, but if we want to talk about that, let's talk about it.  I don't want to talk about this case either if I were in your shoes.

MR. FLEISCHMAN:        Judge, I'm going to --

(T-333-334) (emphasis added).  After these remarks were made, the trial judge excused the jury

in order to reprimand D'Ambrosio (T-334-336).  The trial court told D'Ambrosio:

> The defendants have a right to a fair trial.  When one of the defense lawyers asks you a question, just respond to the question.  Don't add your spin to it and say if I were in your shoes, you know, I would feel this way.  He didn't ask you how you would feel if he was -- if you were in his shoes.  Do you understand that? ... He's representing his client as best he can.  And you're not to comment on the manner in which he is representing his client in front of the jury, do you understand that?...We could be here until midnight at the rate we're going.  Just listen to the question and respond to the question and nothing else....None of these other comments about your opinion of the question or the questioner, do you understand that?  Do you? ...So I'm warning you, sir, just listen to the question and respond to the question only.

(T-335-336).  The trial judge finished by saying that he really did not want to see a mistrial at

this stage, but at the rate D'Ambrosio was going, things were starting to accumulate (T-336)

(emphasis added).  Appellant then renewed his motion for mistrial, without success (T-337).

Despite the trial court's warnings, D'Ambrosio's comments continued:

24

MR. FLEISCHMAN:        Okay. Well, would you like me to show you a written motion, if that would refresh your recollection? Again, I don't want to be misleading.

MR. D'AMBROSIO:        Here we go again. I didn't make a motion. If my attorney made a motion -- I didn't -- Christopher D'Ambrosio did not make a motion. I'm sorry, but you -- you walked right into it.

MS. DADOWSKI:    Objection, Your Honor.

COURT:       Sustained. Sir, no comments regarding the question, do you understand that?

(T-342-343) (emphasis added).

----

MS. DADOWSKI:    And basically your opinion of Mr. Capelletti is that he's a low life, is that correct?

MR. D'AMBROSIO:        I don't make opinions of other people like that.

MS. DADOWSKI:    Now, do you recall giving a deposition to me in Atlanta, Georgia on August 25th of 1997?

MR. D'AMBROSIO:        Within reason I recall it.

MS. DADOWSKI:    All right. Let me direct you to Page 70, Line 14. I just ask you if that refreshes your memory?

MR. D'AMBROSIO:        Which part, where I said if he didn't shoot me.

MS. DADOWSKI:    No, where you say this is low life guy?

MR. D'AMBROSIO:        If I say, if he didn't shot me.

MS. DADOWSKI:    Okay. You called him a low life, is that correct?

MR. D'AMBROSIO:        In context it's not correct.

.....

25

MS. DADOWSKI:   Now, did you call him a low life in Line 11 through 20 somewhere in there where you say, but he's a low life?  What's the question that was asked to you?

MR. D'AMBROSIO:        Woe, woe, excuse me, time out, slow down, slow down.  You approached first.  Let me read it.

MS. DADOWSKI:   You gave it back to me.  I assumed you read it.

MR. D'AMBROSIO:        Well, when you say low life, let me read it.

MS. DADOWSKI:   You said where he's a low life?

MR. D'AMBROSIO:        You take it out of context, give it to the jury.

MS. DADOWSKI:   My question to you --

MR. D'AMBROSIO:        Give it to the jury.  Let them see it.

(T-346-348) (emphasis added).  At this point, the trial judge had had enough and admonished

D'Ambrosio this time for questioning the way appellant was asking questions.  The judge stated:

Sir, she's asking the question.  You have to respond.  I don't want to tell you again....[S]ir, she's going to ask the question the way she wants to ask....[S]ir, you cannot speak right now, sir.  You merely answer the question....We have a way of doing things in court and it's not predicated on the way you want to do things.

(T-348-349) (emphasis added).

D'Ambrosio again made another disparaging character comment regarding appellant after

appellant's counsel read a portion of D'Ambrosio's deposition:

MS. DADOWSKI:   "You lose your head because you've got something to lose.  Well, that's how John was, like a kid, you know.  And so I wasn't effective, he didn't get things done.  I get things done.  So the point I'm going to make is, so I hired him -- not hired him, but like he would do things."

D'AMBROSIO:      That's correct, I said that.  Actions speak louder than words.

26

And--

COURT:        <u>Sir, the answer is yes.  Nothing else</u>.

D'AMBROSIO:        Yes.

MS. DADOWSKI:   Your Honor, I'm going to object again.

(T-350) (emphasis added).  In response to appellant's question, "But you never really liked John

Capelletti, is that right?", D'Ambrosio further stated:

D'AMBROSIO:        No, I liked John Capelletti.  I liked John Capelletti.  <u>Great
guy to play with, but dangerous</u>.

MS. DADOWSKI:   Objection, Your Honor.

D'AMBROSIO:        <u>You asked me the question</u>.

(T-350) (emphasis added).  And at this point, the trial judge, for the second time, excused the

jury to reprimand D'Ambrosio (T-351).  The trial judge said, "<u>I'm getting real close to granting</u>

<u>a mistrial in this case</u>, which means we have to start all over, sir, do you understand that?...

<u>You're embellishing, your putting your own extra spin on things</u>" (T-351) (emphasis added).

Not much later D'Ambrosio <u>again</u> attacked appellant's questioning tactics regarding

D'Ambrosio's deposition:

D'AMBROSIO:        <u>A lot was isolated in the sentence you pointed out because
you didn't want it in context</u>.

MS. DADOWSKI:   I'm going to object.  Move to strike.

COURT:        Sustained.  Please disregard the last comment by the witness.

MS. DADOWSKI:   In fact, you testified that when you had money, you rolled
it, didn't you?

27

D'AMBROSIO:      Yeah, I sometimes like to roll it.

MS. DADOWSKI:    And that's what you meant, you just roll the money?

D'AMBROSIO:      I don't know was it in context, was there a whole paragraph to be read or is there an isolated word again, counsel?

MS. DADOWSKI:    Your Honor, may I approach?

COURT:      Yes.

...

MS. DADOWSKI:    Your Honor, can we have a side bar?  I have an objection and I'd like to have a side bar if I could.

COURT:      All right.

(T-364-365) (emphasis added).  At side bar, appellant argued that there was a problem with D'Ambrosio who kept testifying that appellant did not want D'Ambrosio's responses in context (T-364-365).  Appellant pointed out that the problem with putting things in context was that D'Ambrosio kept rambling on as evidenced by his testimony (T-365).  Appellant noted that if the whole line of a deposition was read, there was a very good chance that there would be three or four answers in that particular paragraph that have nothing to do with the question being asked (T-365).  Appellant especially objected to D'Ambrosio's telling appellant to put things in context because it was highly improper and it implied that appellant was doing something improper (T-365).

The trial court believed that the defense was somewhat handicapped by the manner in which D'Ambrosio responded to questions and comments, and continued to comment on the manner of interrogation and the trial court agreed this was not proper (T-366-367).  However,

28

the trial court denied appellant's motion for mistrial (T-367). Despite all the admonishments

from the trial court, D'Ambrosio continued to comment on the questions without responding to

them:

MS. DADOWSKI:    Page 67, Lines 1 through 4.

D'AMBROSIO:    There's a lot in them four lines.

MS. DADOWSKI:    "In other words, what I'm saying, I don't know the guy. And if I had any choice. I wouldn't have wanted to know the guy. He's not a guy that I would like to talk with, this guy."

D'AMBROSIO:    That's part of them four lines.

MS. DADOWSKI:    That's exactly those four lines. Is that not exactly what is in those four lines?

D'AMBROSIO:    Let me see it again. "In other words, what I am saying is", right.

MS. DADOWSKI:    That's exactly --

D'AMBROSIO:    "In other words, what I'm saying, I didn't know the guy. If I had any choice, I wouldn't have wanted to know the guy. He's not the guy I would like to talk with, this guy."

MS. DADOWSKI:    And is that the exact words you said?

D'AMBROSIO:    Yes, that's the words on the deposition, yes, it is.

MS. DADOWSKI:    In fact, you felt that Capelletti's aren't your people, is that correct?

D'AMBROSIO:    I don't recall -- Let's go down this road again. Take a look. okay. Am I isolated now --

MS. DADOWSKI:    Yes, you are.

D'AMBROSIO:    Not even a line.

29

MS. DADOWSKI:    You are --

D'AMBROSIO:    The words. In that paragraph --

MS. DADOWSKI:    Page 66, Line 11 and 12.

D'AMBROSIO:    Lines 11 -- It's not even a whole sentence, but okay. If you want to isolate it.

MS. DADOWSKI:    Your Honor, I have another objection. Can we move side bar?

COURT:    No, ma'am. The objection is sustained. Sir, don't comment on the question. Just respond to the question.

(T-370-371) (emphasis added).

    ----

MS. DADOWSKI:    When Mr. Capelletti called you from Georgia, he never made you feel or told you that you would be responsible and that you should bail him out, is that correct?

D'AMBROSIO:    I guess one could say, but he asked for help. He asked for help in whatever capacity --

MS. DADOWSKI:    He didn't feel that you were responsible, is that correct?

D'AMBROSIO:    I can't tell you his feelings. I can tell you about words.

MS. DADOWSKI:    Have you ever give --

D'AMBROSIO:    Some cases -- Wait a minute, you asked me about words. Then when I go into a little bit more than words, you can't have it both ways.

MS. DADOWSKI:    Objection, Your Honor.

COURT:    Sustained. Sir --

MS. DADOWSKI:    Same motion.

30

COURT:    No comments on your thoughts regarding the question. Just answer the question, sir. Motion is hereby denied.

(T-374-375) (emphasis added).

D'Ambrosio's improper statements regarding appellant's counsel's tactics in front of the jury created improper prejudice to appellant. Even the trial judge warned D'Ambrosio several times that D'Ambrosio's testimony and extraneous comments were beginning to accumulate towards his granting a mistrial (T-336,351). Between the erroneous comments on appellant's character, most particularly the Terry Nichols reference, and the impermissible statements regarding appellant's counsel, these errors are not harmless because they are basic to appellant's right to a fair trial. Murray. It cannot be said beyond a reasonable doubt that appellant would have been convicted without the taint of the impermissible testimony. Redish.

Despite the trial judge's countless admonishments, D'Ambrosio's improper testimony and extraneous comments continued:

MS. DADOWSKI:    When you first see Mr. Capelletti, he does not appear upset with you or angry?

MR. GROSZ:    I'm sorry on which date?

MS. DADOWSKI:    April 13th of 1997?

D'AMBROSIO:    He didn't appear extremely angry. I don't know -- it wasn't too much of an account, or is that the wrong answer? Here we go.

MS. DADOWSKI:    Let me refer you to Line -- Page 32, Line 14 through 16. And the only answer I'm concerned with is your answer on Page 16 -- Line 16.

D'AMBROSIO:    Didn't appear happy.

MS. DADOWSKI:    The question is: "Did Capelletti appear upset with you or

31

angry? Answer: "No."

D'AMBROSIO:   No, that's not the answer.

MS. DADOWSKI:   Your Honor, can I have a side bar. I'd definitely need a side bar on this one.

D'AMBROSIO:   Look at the answer.

(T-378-379) (emphasis added). At side bar, the following occurred:

MS. DADOWSKI:   Whenever he says I don't recall and I have him read it, he wants to continue to read the information, so he wants to read the fact that he [appellant] didn't appear happy, he appeared cooked.

COURT:   Don't show it to him. Ask him do you recall this question and this answer.

MS. DADOWSKI:   When he says no, impeach him with that without showing it to him?

COURT:   Sure.

MR. GROSZ:   Judge, I mean, any witness should be entitled to, if he doesn't recall, at least to be able to read it.

COURT:   There's nothing that says that -- Well, if he says he doesn't recall it.

MS. DADOWSKI:   That's the problem. That is what he's saying. I have to show it to him and then he insists on improperly getting into evidence that's not admissible....I didn't ask him whether my client appeared cooked. I asked him did he appear upset or angry. The first answer he gave was no. And then he continues in that answer to say [he] didn't appear happy, appeared cooked. I don't want to bring in that information. That's the dilemma that I keep getting into.

(T-380-381) (emphasis added). Only moments later, D'Ambrosio made additional extraneous

comments:

MS. DADOWSKI:   You could have eaten Mr. Ruiz's car off the road, couldn't

you?

D'AMBROSIO:      I don't eat cars.

MS. DADOWSKI:   Didn't you use those words on Page 112, lin 16, 17 where you say: "I mean, I could have eaten him off the road.  He has little piece of shit."

D'AMBROSIO:      I don't know, let me see.

MS. DADOWSKI:   Did you say that, sir?

D'AMBROSIO:      Not quite.  Certainly don't want that page read.

MS. DADOWSKI:   Objection, Your Honor.

COURT:      Sustained, Sir, how many time did I tell you, no extraneous comments.

(T-391) (emphasis added).

After the state rested, appellant renewed his multiple motions for mistrial, and again, the trial court denied appellant's motion finding that the cumulative affect of D'Ambrosio's conduct did not rise to the level of depriving appellant of the right to a fair trial (T-439-440).  After the verdict was rendered, appellant again renewed his request for a mistrial, without success (T-583).

By the end of the trial, it was quite clear that even the trial judge had had enough of D'Ambrosio.  D'Ambrosio wanted to be heard at sentencing and the trial court simply stated, "I've heard everything I think I needed to hear from Mr. D'Ambrosio....I think I know what his sentiments are, let me put it like that" (T-581).

It was highly improper and prejudicial to appellant for D'Ambrosio to (1) make comments regarding appellant's character, (2) compare appellant to Terry Nichols, a convicted,

33

well-known criminal in the Oklahoma City bombing, implying that appellant was of the same caliber person, (3) comment on appellant's defense strategy and appellant's counsel's tactics by attacking the questioning techniques, accusing counsel of not putting words in context, and putting words in D'Ambrosio's mouth, implying that the strategy and tactics were improper, and (4) ask the jurors to put themselves in D'Ambrosio's position. There is no way that the prejudicial testimony's taint could be erased from the minds of the jurors. The testimony had the effect of "gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Seaboard Air Line Railroad v. Strickland, 88 So. 2d 523 (Fla. 1956). The trial court's cautionary instructions were insufficient to overcome the incurable effect of D'Ambrosio's numerous prejudicial comments that occurred throughout the trial.

Because of the scarce, circumstantial evidence presented at trial, it cannot be said that acquittal was not reasonably within the realm of possibility. D'Ambrosio's prejudicial comments clearly contributed to appellant's conviction. DiGuilio. The continual improper, prejudicial, extraneous comments were irrelevant and served no purpose but to prejudice the jury against appellant. Appellant should not be subjected to a trial where error is compounded by error. Albright. D'Ambrosio's improper testimony was so prejudicial that it vitiated the entire trial and the trial court abused its discretion by denying the multiple motions for mistrial which should have been granted. Duest. Appellant was denied his right to a fair trial; therefore, this Court should reverse his conviction and remand this case for a new trial.

## POINT III

**THE TRIAL COURT ERRED IN GRANTING THE UPWARD DEPARTURE SENTENCE WHERE IT WAS NOT PROVEN THAT APPELLANT WAS THE ONE WHO FIRED THE SHOTGUN AT THE VICTIM CAUSING THE RISK OF DEATH OR GREAT BODILY HARM.**

When the trial court was considering the possible aggravator of risk of death or great bodily harm, appellant argued that it did not apply to appellant because there was no evidence whatsoever that appellant was the person who fired the shotgun on the highway (T-589-592).

A departure sentence based upon extraordinary or egregious harm was reversed where another perpetrator struck the victim, and not the defendant. Marshall v. State, 600 So. 2d 474 (Fla. 3d DCA 1992). See also Waychoff v. State, 624 So. 2d 392 (Fla. 2d DCA 1993) (Sentence reversed where insufficient evidence found to support that the egregious nature and the excessive brutality of the beatings were caused by the defendant rather than the co-defendants); Chenard v. State, 510 So. 2d 363 (Fla. 3d DCA 1987) (departure based upon unfactored pattern of violence invalid where co-defendant, not defendant, was solely responsible for the assault).

There was no proof that appellant had anything to do with the creation of the risk of bodily harm or death. Since the verdict specifically found appellant guilty only of the lesser included offense of attempted first degree murder and did not find him guilty of attempted murder in the first degree with a firearm (R-31), this verdict is an implicit finding that someone other than appellant had and fired the shotgun. Appellant was merely present at the time of the incident. There was no evidence to establish that appellant put anybody at risk of harm in any way.

35

Because there was no evidence that appellant was the one who fired the shotgun, and thus, created a risk of death or great bodily harm, this Court should remand this cause for resentencing.

## CONCLUSION

Based upon the foregoing argument and the authorities cited therein, appellant respectfully requests this Honorable Court to reverse and remand this cause for a new trial.

Respectfully submitted,

RICHARD JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(561) 355-7600


SOPHIA LETTS
Assistant Public Defender
Florida Bar No. 116440

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished to Celia Terenzio, Assistant Attorney General, 1655 Palm Beach Lakes Blvd., Third Floor, West Palm Beach, Florida 33401 by courier this _12th_ day of June, 1998.


Attorney for John Capelletti

37

# EXHIBIT  M

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

CASE NO. 98-0879    98-1-4330

JOHN CAPELLETTI,
Appellant,

vs.

STATE OF FLORIDA,
Appellee.



*****************************************************************
ON APPEAL FROM THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY, FLORIDA, (Criminal Division)
*****************************************************************

ANSWER BRIEF OF APPELLEE

ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida


ETTIE FEISTMANN
Assistant Attorney General
Florida Bar No. 892830
1655 Palm Beach Lakes Boulevard
Suite 300
West Palm Beach, FL 33401-2299
Telephone: (561) 688-7759

Counsel for Appellee

F:\USERS\APPEALS\ETTIE\CAPELLET.AB1

CASE NO. 98-0879

John Capelletti v. State Of Florida

CERTIFICATE OF INTERESTED PERSONS

Counsel for the State of Florida, appellee herein, certifies that the following additional persons or entities have or may have an interest in the outcome of this case.

Ettie Feistmann, Assistant Attorney General
(Appellate counsel for the State of Florida, Appellee)

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . 6

ARGUMENT   . . . . . . . . . . . . . . . . . . . . . . . . 7
           I.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN
           DENYING  APPELLANT'S  MOTION  FOR  A  JUDGMENT  OF
           ACQUITTAL   WHERE   THE   STATE   PRESENTED   COMPETENT
           SUBSTANTIAL  EVIDENCE  TO  SUPPORT  THE  VERDICT  OF
           ATTEMPTED FIRST DEGREE MURDER WHERE APPELLANT WAS A
           PRINCIPAL.
                . . . . . . . . . . . . . . . . . . . . . . 7

           II.  THE   TRIAL   COURT   DID   NOT   ABUSE   ITS
           DISCRETION IN DENYING APPELLANT'S MOTIONS FOR
           MISTRIAL  WHERE  THE  STATE  WITNESS  WAS  NON-
           RESPONSIVE. . . . . . . . . . . . . . . . . . . 17

           III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
           IN SENTENCING APPELLANT BECAUSE THE REASON FOR THE
           UPWARD  DEPARTURE  SENTENCE  IS  SUPPORTED  BY  THE
           RECORD. . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . 38

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 38

TABLE OF AUTHORITIES

### FEDERAL CASES

United States v. Acevedo, 141 F.3d 1421 (11th Cir. 1998) . . 18

### STATE CASES

A.B.G. v. State, 586 So. 2d 445 (Fla. 1st DCA 1991), dismissed, 605 So. 2d 1261 (Fla. 1992) . . . . . . . . . . . . . . . . . 8

Barwick v. State, 660 So. 2d 685 (Fla. 1995) . . . . . . . . 7

Bedford v. State, 589 So. 2d 245 (Fla. 1991), cert. denied, 503 U.S. 1009 (1992) . . . . . . . . . . . . . . . . . . . . . 17

Booker v. State, 514 So. 2d 1079 (Fla. 1987) . . . . . . . 18

Breedlove v. State, 413 So. 2d 1 (Fla.), cert. denied, 459 U.S. 882, 103 S. Ct. 184, 74 L. Ed. 2d 149 (1982) . . . . . . . 17

Brewer v. State, 413 So. 2d 1217 (Fla. 5th DCA 1982), rev. denied, 426 So. 2d 25 (Fla. 1983) . . . . . . . . . . . . . . . . . 9

Briggs v. State, 455 So. 2d 519 (Fla. 1st DCA 1984) . . . . 34

Buenoano v. State, 527 So. 2d 194 (Fla. 1986) . . . . . . . 17

Busch v. State, 466 So. 2d 1073 (Fla. 3d DCA 1984) . . . . . 9

C.N.W. v. State, 670 So. 2d 1052 (Fla. 2d DCA 1996) . . . . 15

Canakaris v. Canakaris, 382 So. 2d 1197 (Fla. 1980) . . . . 18

Clark v. State, 379 So. 2d 97 (Fla. 1979) . . . . . . . . . 7

Duest v. State, 462 So. 2d 446 (Fla. 1985) . . . . . . . . 18

Erickson v. State, 565 So. 2d 328 (Fla. 4th DCA 1990) . . . 23

Ferguson v. State, 417 So. 2d 639 (Fla. 1982) . . . . . . . 18

Finney v. State, 660 So. 2d 674 (Fla. 1995) . . . . . . . . 17

Ford v. State, 592 So. 2d 348 (Fla. 2d DCA 1992) . . . . . 10

Gorby v. State, 630 So. 2d 544 (Fla. 1993), cert. denied, 115 S. Ct. 99, 63 U.S.L.W. 3259 (U.S.Fla. Oct. 3, 1994) . . . . . . 17

Harmon v. State, 527 So. 2d 182 (Fla. 1988) . . . . . . . 18

Henderson v. State, 679 So. 2d 805 (Fla. 3d DCA 1996), affirmed, 698 So. 2d 1205 (Fla. 1997) . . . . . . . . . . . . . . 16

Herrera v. State, 532 So. 2d 54 (Fla. 3d DCA 1988) . . . . . 10

Hoffman v. State, 397 So. 2d 288 (Fla. 1981) . . . . . . . 34

Huff v. State, 569 So. 2d 1247 (Fla. 1990) . . . . . . . . 18

I.R. v. State, 385 So. 2d 686 (Fla. 3d DCA 1980) . . . . . . 8

In the Interest of T.M.M., 560 So. 2d 805 (Fla. 4th DCA 1990) 7

Johnson v. State, 332 So. 2d 69 (Fla. 1976) . . . . . . . 18

Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995) . . . . 15

Jones v. State, 691 So. 2d 33 (Fla. 4th DCA 1997) . . . . . 8

Kinnon v. State, 439 So. 2d 958 (Fla. 3d DCA 1983), Review denied, 451 So. 2d 849 (Fla. 1984) . . . . . . . . . . . . . . 20

LaPolla v. State, 504 So. 2d 1353 (Fla. 4th DCA 1987) . . . 9

Lawrence v. State, 614 So. 2d 1092 (Fla.), cert. denied, 114 S. Ct. 107, 126 L. Ed. 2d 73, 62 U.S.L.W. 3246 (U.S.Fla. Oct. 4, 1993)18

Lynch v. State, 293 So. 2d 44 (Fla. 1974) . . . . . . . . 7

McCall v. State, 463 So. 2d 425 (Fla. 3d DCA 1985) . . . . 34

Middleton v. State, 426 So. 2d 548 (Fla. 1982) . . . . . . 14

Munroe v. State, 514 So. 2d 397 (Fla. 1st DCA), review denied, 519 So. 2d 987 (Fla.1988) . . . . . . . . . . . . . . . 10

Noel v. State, 705 So. 2d 648 (Fla. 4th DCA 1998)) . . . . 36

Peterka v. State, 640 So. 2d 59 (Fla. 1994) . . . . . . . 16

Ray v. State, 403 So. 2d 956 (Fla. 1981) . . . . . . . . 26

Salvatore v. State, 366 So. 2d 745 (Fla. 1979) . . . . . . 17

Smith v. State, 568 So. 2d 967 (Fla. 1st DCA 1990) . . . . 14

Stark v. State, 316 So. 2d 586 (Fla. 4th DCA 1975), cert. denied,

State v. Duarte, 681 So. 2d 1187 (Fla. 2d DCA 1996)  . . . . . 9

State v. Hamilton, 574 So. 2d 124 (Fla. 1991)(citing Perry v. State, 146 Fla. 187, 200 So. 525, 527 (1941))  . . . . . . . 18

State v. Hart, 632 So. 2d 143 (Fla. 4th DCA 1994)  . . . . . 8

State v. Law, 559 So. 2d 187 (Fla. 1989)  . . . . . . . . . 7

Staten v. State, 519 So. 2d 622 (Fla. 1988)  . . . . . . . 8

Teffeteller v. State, 439 So. 2d 840 (Fla. 1983), cert. denied, 465 U.S. 1074 (1984)  . . . . . . . . . . . . . . . . . . . 14

Thomas v. State, 512 So. 2d 1099 (Fla. 5th DCA 1987)  . . . . . 7

Thompson v. State, 648 So. 2d 692 (Fla. 1994)  . . . . . . . 34

Tibbs v. State, 397 So. 2d 1120 (Fla. 1981), aff'd, 457 U.S. 31 (1982)  . . . . . . . . . . . . . . . . . . . . . . . . 8

West v. State, 585 So. 2d 439 (Fla. 4th DCA 1991)  . . . . . . 8

Fisher v. State, 23 Fla. L. Weekly S351 (Fla. June 12, 1998)  12

Lewis v. State, 23 Fla. L. Weekly D1247 (Fla. 3d DCA May 20, 1998) . . . . . . . . . . . . . . . . . . . . . . . . 33

Mason v. State, 23 Fla. L. Weekly D1540 (Fla. 4th DCA June 24, 1998)  . . . . . . . . . . . . . . . . . . . . . . . 33

Norton v. State, 1997 WL 792794 (Fla. 1997) . . . . . . . . 34

Alcott v. State, 23 Fla. L. Weekly D1592 (Fla. 4th DCA July 1, 1998)  . . . . . . . . . . . . . . . . . . . . . . . 14

Cooper v. State, 23 Fla. L. Weekly D1518 (Fla. 3d DCA June 24, 1998) . . . . . . . . . . . . . . . . . . . . . . . 34

## MISCELLANEOUS

§ 777.011, Fla.Stat. (1993)  . . . . . . . . . . . . . . 9

§ 921.001(6), Fla. Stat. (1997)  . . . . . . . . . . . . 36

§ 921.0016(3)(I)  . . . . . . . . . . . . . . . . . . 35

§ 924.33, Fla. Stat. (1993)  . . . . . . . . . . . . . 34

## PRELIMINARY STATEMENT

Appellant was the Defendant and Appellee was the prosecution in the Criminal Division of the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida.   In this brief, the parties shall be referred to as they appear before this Honorable Court of Appeal except that Appellee may also be referred to as the State.

In this brief, the following symbols will be used:

"R" = Record on appeal;

"T" = Transcript of the trial.

All emphasis in this brief is supplied by Appellee unless otherwise indicated.

## STATEMENT OF THE CASE AND FACTS

Appellee accepts appellant's statement of the case and facts for purposes of this appeal subject to the additions and clarifications set forth below and in the argument portion of this brief which are necessary to resolve the legal issues presented upon appeal.

Appellant was convicted as charged of attempted first degree murder (R 3-4, 31). Appellant was adjudicated guilty (R 32), and was sentenced to thirty years incarceration with credit for time served (R 39-42). The trial judge departed from the sentencing guidelines, finding that the offense created substantial risk of death or great bodily harm to many persons or to one or more small children (R 39; T592).

### The Trial

Appellant and Christopher D'Ambrosio were friendly neighbors (T 245, 246). They met around March or April of 1996 (T 245). Appellant helped D'Ambrosio do things around the house and D'Ambrosio paid for them (T 248-249). In February of 1997, D'Ambrosio paid appellant to drive a truck with his belongings from Florida to Georgia (T 249-250). In Georgia, appellant was very helpful in unloading the truck, and D'Ambrosio paid appellant about $150-$160 for the job (T 253).

After unloading the truck in Georgia, appellant and D'Ambrosio drove to the airport, and were supposed to fly to Florida together, but they missed their flight (T 254, 257). They stopped at a gas

station, where D'Ambrosio filled gas (T 254).   Suddenly, appellant left.   D'Ambrosio tried, but could not find him (T 255).

D'Ambrosio flew back to Florida (T 257).   Shortly later, D'Ambrosio received appellant's collect call from jail (T 257). Appellant told D'Ambrosio that there was bond that needed to be posted to help get him out of custody (T 258).   D'Ambrosio made efforts to raise money for the bond, but ultimately was unsuccessful (T 259).

D'Ambrosio did not hear from appellant until April 13, 1997, at which time D'Ambrosio saw appellant near his house in Florida (T 259-260).   Appellant was with another man, later known as co-defendant, Eddie Ruiz (T 261).   Appellant approached D'Ambrosio and told him that he wanted to speak to him (T 260-264).

D'Ambrosio told appellant to meet him at the gas station (T 264).   At the gas station, appellant blocked D'Ambrosio's car, exited Ruiz's car, and came to speak to D'Ambrosio (T 265). Appellant told D'Ambrosio that things got "hot" for him (T 265). D'Ambrosio felt bad for appellant and was prepared to give him money (T 265).  Appellant blamed D'Ambrosio for leaving him in Georgia, and  insinuated that D'Ambrosio owed him $150-$160 (T 266-267, 269).   D'Ambrosio responded that he had paid appellant (T 268).

During a heated conversation between appellant and D'Ambrosio, Ruiz, who was sitting in the driver's seat, exited his car, walked toward appellant, and yelled out three times, "are we going to do

this or what?" (T 269-270, 271). Appellant got "very heated," and yelled at D'Ambrosio, "I want you to know that I'm going to kill you, do you understand me?" (T 271-272). After this threat, appellant followed D'Ambrosio and yelled, "you hear me, you hear me, I'm funckin' going to blow your fuckin' head off, you hear me" (T 271-272). D'Ambrosio started the car and left (T 272).

D'Ambrosio drove to Sheridan Street toward I-95, at which point he saw a white Honda Civic, which D'Ambrosio recognized as Ruiz's car coming behind him and driving in a reckless manner (T 273, 274, 276, 284). Ruiz pursued D'Ambrosio westbound on Sheridan Street. D'Ambrosio then got on I-95 heading northbound to avoid confrontation. Ruiz and appellant pursued D'Ambrosio on I-95. The road was busy with many cars (T 147, 273, 275). D'Ambrosio kept changing lanes in an attempt to get away and to avoid confrontation (T 274, 276). On three different times appellant and Ruiz's car became parallel with D'Ambrosio's car. On the third occasion, Ruiz's car came very close to D'Ambrosio's car, at which time D'Ambrosio heard a pop and felt a shot in the left side of his neck from a shotgun (T 275, 277, 278). D'Ambrosio rolled off to the side of the road and called 911 with the help of another motorist, Mr. Eiland (T 278). D'Ambrosio told the operator and Eiland that John Capelletti and Eddie shot him (T 149).

Appellant was arrested on the afternoon of April 13, 1998, and D'Ambrosio's car was found in the area of eastbound of I-595 and I-95, with a hole in the driver's window (T 134, 154, 157, 283).

In D'Ambrosio's car at the location of the shot, the police found components of a gunshot shell, and plastic shot sleeves and cardboard component (T 164, 165, 167).

In the rear part of Ruiz's car, the police found a live shotgun shell, 2 cardboard wads, lead shot, and a plastic shot ring component (T 180-181, 185, 186).

Carl Haemmerle, a firearms examiner, examined a piece of tissue taken from D'Ambrosio's body during surgery, and found it to be lead shot (T 162, 405, 406). Haemmerle testified that the material found in D'Ambrosio's body was consistent with Winchester 7½ shot, and the components found in D'Ambrosio's car were also consistent with Winchester 7½ shot (T 409-411). According to Haemmerle, the components of the shell found in Ruiz's car were also consistent with the components of the shell found in D'Ambrosio's car, all of which were from the same manufacturer of shotgun shells (T 411-412).

Haemmerle also opined that the shot was made from a distance of approximately 6 to 12 feet (T 420). Haemmerle calculated the distance from which the shot was made, the type of the shotgun shell, and the components of the shell found in D'Ambrosio's car, and calculated that they were all consistent with each other (T 422).

The pellets from the shell penetrated D'Ambrosio's head and shoulder, and migrated to D'Ambrosio's heart and lungs, causing D'Ambrosio to have severe nerve damage (T 281-282).

The state also presented the testimony of Corporal Cruz, who stated that he arrested appellant in Atlanta on February 12, 1997, and that appellant appeared very upset (T 398).[1]  According to Cruz, appellant was cussing and talking about a third person, calling him "son of a bitch" for leaving him (T 398-399).

### SUMMARY OF THE ARGUMENT

1.  The trial court did not abuse its discretion in denying appellant's motion for judgment of acquittal.  The state presented competent substantial evidence from which the jury could infer that appellant was a principal to the crime of attempted first degree murder.

2.  The trial court did not abuse its discretion in denying appellant's motions for mistrial.  Although some of the witness's testimony was nonresponsive it did not prejudice appellant.  There is no reasonable possibility that it affected the outcome of this case.  The evidence against appellant was overwhelming, and none of appellant's theories of defense were reasonable.

3.  The trial court did not abuse its discretion in sentencing appellant to an upward departure sentence, because the reason given by the judge was supported by the evidence.  Shooting at the head of a driver who was the sole occupant of a moving car on a busy highway creates risks to many people.  The reason given by the

---

[1]This was the same evening appellant disappeared from the gas station after being with D'Amborsio, as testified by D'Ambrosio.

court was valid.  Even if appellant did not hold the gun in his hands, he certainly was a participant in this crime, as the jury found him guilty of attempted first degree murder as a principal.

ARGUMENT

> I.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR A JUDGMENT OF ACQUITTAL WHERE THE STATE PRESENTED COMPETENT SUBSTANTIAL EVIDENCE TO SUPPORT THE VERDICT OF ATTEMPTED FIRST DEGREE MURDER WHERE APPELLANT WAS A PRINCIPAL.

Appellant contends that the trial court abused its discretion in denying his motion for judgment of acquittal.  Appellant asserts that his motion should have been granted because there was no evidence to place the gun in appellant's hands.  Appellant claims that he was merely a passenger in the car driven by Ruiz.  The state disagrees.

At trial defense counsel argued that there was no evidence to show that appellant actually did any act which went beyond thinking, and that there was no evidence that appellant actually pulled the trigger (T 440).  The trial court denied the defendants' motions (T 448).  This was not error.

The entry of judgment of acquittal is appropriate only in those rare instances in which no evidence exists to support entry of a conviction.  In the Interest of T.M.M., 560 So. 2d 805 (Fla. 4th DCA 1990); Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974).  An appellate court may not retry a case or reweigh the evidence.  Clark v. State, 379 So. 2d 97, 101 (Fla. 1979); State v. Law, 559 So. 2d

187, 188 (Fla. 1989); Barwick v. State, 660 So. 2d 685, 695 (Fla. 1995); Thomas v. State, 512 So. 2d 1099, 1101 (Fla. 5th DCA 1987)(circumstantial evidence which contradicts the defendant's theory of innocence should go the jury). The testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction. I.R. v. State, 385 So. 2d 686, 688 (Fla. 3d DCA 1980).

Further, the trial court did not abuse its discretion in denying appellant's motion for a new trial. See State v. Hart, 632 So. 2d 134 (Fla. 4th DCA 1994). "Sufficiency of evidence" is a test of whether the evidence presented is legally adequate to justify the verdict. Tibbs v. State, 397 So.2d 1120, 1123 (Fla. 1981), aff'd, 457 U.S. 31 (1982). As stated by this court:

> Where the only issue presented is the sufficiency of the evidence to sustain the verdict, and adequate evidence is presented to support the verdict, it is improper for the trial court to grant a new trial, even if there is conflicting evidence. [c.o.] In such a situation, it is the jury's function to evaluate the evidence. [c.o.]

State v. Hart, 632 So. 2d at 135, n. 2.

Moreover, in order to be convicted as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime. Staten v. State, 519 So. 2d 622, 624 (Fla. 1988); West v. State, 585 So. 2d 439, 441 (Fla. 4th DCA 1991); Jones v. State, 691 So. 2d 33 (Fla. 4th DCA 1997); A.B.G. v. State,

586 So. 2d 445 (Fla. 1st DCA 1991)("[t]he elements of assistance of the perpetrator and intent may be proven by a combination of surrounding circumstances from which a jury can reasonably infer defendant's guilt"), dismissed, 605 So. 2d 1261 (Fla. 1992); Busch v. State, 466 So. 2d 1075, 1079 (Fla. 3d DCA 1984); § 777.011, Fla.Stat. (1993). When the state relies on the aiding and abetting theory, it can prove intent *either* by showing that the defendant had requisite intent himself or that he knew the principal had that intent. Stark v. State, 316 So. 2d 586, 587 (Fla. 4th DCA 1975), cert. denied, 328 So. 2d 845 (Fla. 1976). However, it was noted in Brewer v. State, 413 So. 2d 1217, 1219-20 (Fla. 5th DCA 1982), rev. denied, 426 So. 2d 25 (Fla. 1983) that:

> Although the State must prove intent just as any other element of a crime... a defendant's mental intent is hardly ever subject to direct proof. Instead, the State must establish the defendant's intent (and jury must reasonably attribute such intent) based on the surrounding circumstances in the case. Keeping in mind the test to be applied to a motion for judgment of acquittal, a trial court should rarely, if ever, grant a motion for judgment of acquittal based on the State's failure to prove mental intent [c.o; f.n.o; e.s.].

In State v. Duarte, 681 So. 2d 1187, 1189 (Fla. 2d DCA 1996), the second district rejected Duarte's claim of mere presence and said the following:

> There is sufficient evidence for a jury to conclude that the appellee was a principal, and the evidence is inconsistent in every instance with his reasonable hypothesis of

innocence as merely a noninvolved Spanish-speaking aider and abettor. <u>See LaPolla v. State</u>, 504 So.2d 1353 (Fla. 4th DCA 1987). The jury may infer from all the circumstances surrounding and accompanying the act that the common purpose to commit the crime existed. <u>Herrera v. State</u>, 532 So.2d 54 (Fla. 3d DCA 1988). An individual's activities can overcome the absence of utterances. <u>Munroe v. State</u>, 514 So.2d 397 (Fla. 1st DCA), <u>review denied</u>, 519 So.2d 987 (Fla.1988). The evidence of the appellee's presence at the transaction and his involvement in every aspect of the agreement clearly went beyond a showing of aiding and abetting. <u>See Ford v. State</u>, 592 So.2d 348 (Fla. 2d DCA 1992). We, therefore, affirm the lower court's denial of the appellee's motion for judgment of acquittal.

Here, the state presented competent substantial evidence to support appellant's conviction for attempted first degree premeditated murder.

The state had to prove the following elements for attempted first degree premeditated murder:

number one, the defendant did some act intended to cause the death of Christopher D'Ambrosio that went beyond just thinking or talking about it.

Number two, the defendant acted with a premeditated design to kill Christopher D'Ambrosio except that someone prevented the defendant from killing Mr. D'Ambrosio, or he failed to do so.

A premeditated design to kill means that there was a conscious decision to kill. The decision must be present in the mind at the time the act was committed. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the act. A period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the act was committed.

> The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstances of the attempted killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at the time of the attempted killing.
>
> ***
>
> If you find only that Mr. Capelletti committed attempted first degree murder but did not possess a firearm, then you should find Mr. Capelletti guilty of attempted first degree murder.

(T 544-545). The judge also charged the jury with "independent act" as follows:

> If you find the crime alleged was committed, an issue in this case is whether the crime of attempted first degree murder was an independent act of a person other than the defendant. An independent act occurs when a person, other than the defendant, commits or attempts to commit a crime: number one, which the defendant did not intend to occur. And number two, in which the defendant did not participate.
> And number three, which was outside of and not reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
> ***

(T 547-548).

In the instant case, the state presented testimony, which indicated that throughout the entire incident appellant and his co-defendant, Mr. Ruiz, acted in concert. The totality of the circumstances establishes that appellant was a principal. Appellant intended to kill Christopher D'Ambrosio and said so.

Further, appellant said words which were intended to and which caused and encouraged Mr. Ruiz to commit the offense. Thus, even if it was Mr. Ruiz and not appellant who actually held the shotgun, appellant must be treated as if he had done all the things Ruiz did. See Fisher v. State, 23 Fla. L. Weekly S351 (Fla. June 12, 1998)("We reject Fisher's contention that he was merely a bystander because it could not be proven that he wielded one of the three guns used in the shooting. The circumstances leading up to this event, as well as hie effort to concoct a false alibi, provide more than enough evidence to convict him as a principal in the crime").

The record shows that on February 12 1997, appellant was very upset at D'Ambrosio for several reasons: first, appellant believed that D'Ambrosio left him in Georgia; next, appellant believed that D'Ambrosio owed him money; and finally, appellant believed that D'Ambrosio could have helped him bond out of jail but chose not to do so (T 398-399).

D'Ambrosio did not hear from appellant until April 13, 1997, at which time appellant came with Ruiz to speak to D'Ambrosio and to collect his alleged owed money (T 259-266). Appellant came to look for D'Ambrosio with his friend, Ruiz, in Ruiz's car. Ruiz drove his car, while appellant was a passenger (T 259-270). When D'Ambrosio saw appellant and Ruiz, D'Ambrosio asked appellant to follow him to the gas station. Ruiz drove appellant to the gas station where they met D'Ambrosio (T 254).

At the gas station, appellant got out of the car and came to

talk to D'Ambrosio.  In a heated argument appellant told D'Ambrosio he was upset at him for owing him money and for leaving him in Georgia.  D'Ambrosio denied owing appellant money, at which point appellant got even more upset (T 266-269).

In the midst of a heated argument, Ruiz got out of his car and yelled out three times, "are we going to do this or what?" (T 265, 269-271).  While D'Ambrosio was filling gas and in the presence of Ruiz, appellant yelled at D'Ambrosio in a threatening voice, "I want you to know that I'm going to kill you, do you understand me?" (T 271-272).  Then, appellant followed D'Ambrosio and yelled, "you hear me, you hear me, I'm funckin' going to blow your fuckin' head off, you hear me" (T 271-272).  D'Ambrosio started the car and left (T 272).

On the highway D'Ambrosio saw Ruiz's white Honda driving in a reckless manner, weaving in and out of traffic (T 273-276).  Knowing that appellant and Ruiz were after him, D'Ambrosio tried to avoid confrontation with them by changing lanes (T 274).  With Ruiz's car, Ruiz and appellant managed to become parallel with D'Ambrosio's car three times (T 275).  On the third occasion, after 4½ miles of chase, D'Ambrosio felt a shot in his neck.  After the shooting Ruiz and appellant fled the scene (T 277, 278).

The record shows that Ruiz and appellant acted in concert, and each knew and intended for the shooting to happen.  Ruiz's statement "are we going to do it or what?" indicates that they planned the shooting.  Appellant threatened in an unambiguous

manner to kill D'Ambrosio. Appellant also fled with Ruiz the scene. Ruiz and appellant had to work in concert in order to get the job done. The record shows that they each knew about the shooting, and intended for it to happen.

### Premeditation

It is appropriate to prove premeditation by circumstantial evidence. See Teffeteller v. State, 439 So. 2d 840 (Fla. 1983), cert. denied, 465 U.S. 1074 (1984); Alcott v. State, 23 Fla. L. Weekly D1592 (Fla. 4th DCA July 1, 1998); Brewer v. State, 413 So. 2d 1217, 1219-20 (Fla. 5th DCA 1982)(a trial court should rarely, if ever, grant a motion for judgment of acquittal based on the State's failure to prove mental intent), rev. denied, 426 So. 2d 25 (Fla. 1983). Premeditation may be inferred from the nature of the weapon, the presence or absence of provocation, previous difficulties between the parties, the manner in which the homicide is committed, the nature and manner of the wound, and the actions of the accused before and after the homicide. Smith v. State, 568 So. 2d 965 (Fla. 1st DCA 1990). Even if the time for reflection was short, premeditation could be inferred. Middleton v. State, 426 So. 2d 548, 549 (Fla. 1982).

Here, the evidence at trial shows that appellant threatened to kill D'Ambrosio. Appellant and Ruiz planned the shooting. Ruiz asked appellant during his heated argument with D'Ambrosio, "are we going to do it or what?" (T 269-272). Appellant and Ruiz followed D'Ambrosio in their car in a reckless manner (T 273-274). Ruiz and

appellant waited for an opportunity to get close to D'Ambrosio's car (T 275). Appellant and Ruiz followed D'Ambrosio for 4½ miles on the highway before shooting, during which they had time to reflect. Appellant and Ruiz used a powerful shotgun. There is no evidence of provocation. Appellant or Ruiz aimed at D'Ambrosio's head, and shot from a close range. D'Ambrosio's injuries were serious (T 281). After the shooting, Ruiz and appellant fled the scene.

The live shell found in Ruiz's car matched the material found in D'Ambrosio's body, and the shell found in D'Ambrosio's car was of the same component as that found in Ruiz's car and that found in D'Ambrosio's body. The record, then, shows that the actions of Ruiz and appellant were planned, and premeditated.

The state clearly presented testimony that shows that appellant was an active participant in an attempt to kill D'Ambrosio. See C.N.W. v. State, 670 So. 2d 1052 (Fla. 2d DCA 1996)(record supports the trial court's finding that the defendant was aider and abettor in the burglary based on her admitted presence with the group and the neighbor's testimony that the group primarily went from car to car as a group); Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995)(to be found guilty as principal it is not necessary for aider and abettor to know of every detail of the crime, so long as there exists evidence of aider's intent to participate).

Appellant knew about the plan to kill D'Ambrosio, as Ruiz

reminded him about their plan at the gas station. In fact, the record shows that it was *appellant* who was upset at D'Ambrosio. This evidence is inconsistent with any reasonable hypothesis of innocence and lack of knowledge or intent. See <u>Henderson v. State</u>, 679 So. 2d 805 (Fla. 3d DCA 1996)(no error in denying defendant's motion for judgment of acquittal based on defendant's claim that he was unknowingly the driver of getaway car; evidence presented gave rise to inference that vehicle occupied by defendant and his two passengers arrived at robbery scene almost simultaneously with victims, that defendant was following victims, that defendant deliberately let his passengers exit at end of victim's driveway, and that vehicle driven by defendant was waiting with engine running when two passengers, having robbed the victims, ran to vehicle and got in; evidence sufficient to refute defendant's contention that he was merely taking two passengers to station and lacks knowledge or intent to rob victims), <u>affirmed</u> 698 So. 2d 1205 (Fla. 1997).

It was up to the fact finder to determine whether under the evidence presented at trial, the hypothesis of innocence advanced by appellant (that he was merely a bystander who did not know what was going to happen, and that he just took a ride with Ruiz who actually pulled the trigger unbeknown to appellant), was reasonable or far fetched. Appellant's conduct was inconsistent with his contention of innocence. Appellant did not call the police after

the shooting, did not call an ambulance, did not rush to help D'Ambrosio after the shooting, and did not withdraw at any point. See Peterka v. State, 640 So. 2d 59, 68 (Fla. 1994)("the circumstantial evidence standard does not require the jury to believe the defense version of the facts"); Bedford v. State, 589 So. 2d 245 (Fla. 1991), cert. denied, 503 U.S. 1009 (1992)(the jury free to reject defendant's version of events as unreasonable); Finney v. State, 660 So. 2d 674, 680 (Fla. 1995). Thus, appellant has failed to present any reasonable theory that would have tended to exculpate him. Appellant's conviction must be affirmed.

> II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANT'S MOTIONS FOR MISTRIAL WHERE THE STATE WITNESS WAS NON-RESPONSIVE.

Appellant contends that the trial court abused its discretion in denying his motions for mistrial, when during trial D'Ambrosio gave some non-responsive answers. The state disagrees.

The law of our State is well settled that a motion for mistrial is addressed to the sound discretion of the trial judge. Salvatore v. State, 366 So. 2d 745 (Fla. 1979); Buenoano v. State, 527 So. 2d 194 (Fla. 1986); Gorby v. State, 630 So. 2d 544 (Fla. 1993), cert. denied, 115 S. Ct. 99, 63 U.S.L.W. 3259 (U.S. Fla. Oct. 3, 1994) (No. 93-8770); Breedlove v. State, 413 So. 2d 1, 7 (Fla.), cert. denied, 459 U.S. 882, 103 S. Ct. 184, 74 L. Ed. 2d 149 (1982). The power to declare a mistrial and discharge the jury should be exercised with great caution and should only be done in

cases of absolute necessity. <u>Salvatore</u>, 366 So. 2d at 750. A mistrial is a device used to halt the proceeding when an error is *so prejudicial and fundamental* that the expenditure of further time and expense would be wasteful if not futile, because the error vitiated the trial. <u>Johnson v. State</u>, 332 So. 2d 69 (Fla. 1976); <u>Ferguson v. State</u>, 417 So. 2d 639 (Fla. 1982); <u>Duest v. State</u>, 462 So. 2d 446 (Fla. 1985); <u>United States v. Acevedo</u>, 141 F. 3d 1421 (11th Cir. 1998)(a mistrial is only warranted if there is a reasonable possibility that the alleged error prejudiced the defendant by affecting the jury's final verdict).

A mistrial is properly denied where the allegedly prejudicial remark can be cured by an appropriate instruction to the jury. <u>Lawrence v. State</u>, 614 So. 2d 1092 (Fla.), <u>cert. denied</u>, 114 S. Ct. 107, 126 L. Ed. 2d 73, 62 U.S.L.W. 3246 (U.S.Fla. Oct. 4, 1993) (No. 92-8730) (testimony that same type weapon used in crime reported missing from defendant's girlfriend's house, after his visit, was harmless error in light of curative instruction); <u>Harmon v. State</u>, 527 So. 2d 182 (Fla. 1988) (error in witness' testimony that he met defendant in jail was alleviated by curative instruction); <u>State v. Hamilton</u>, 574 So. 2d 124, 126 (Fla. 1991) (when an alleged error is committed which does no substantial harm and the defendant is not materially prejudiced by the occurrence, the court should deny the motion for a mistrial)(citing <u>Perry v. State</u>, 146 Fla. 187, 200 So. 525, 527 (1941)).

Further, discretion is abused only where no reasonable man could take the view adopted by the trial court. <u>Booker v. State</u>, 514 So. 2d 1079, 1085 (Fla. 1987); <u>Huff v.  State</u>, 569 So.  2d 1247, 1249 (Fla.  1990); <u>Canakaris v. Canakaris</u>, 382 So. 2d 1197, 1203 (Fla. 1980)(discretion is abused when the  judicial action is arbitrary, fanciful, or unreasonable, but <u>if reasonable men could differ</u> as to the propriety of the action taken by the trial court, then <u>no abuse</u> of discretion occurred).

No abuse of discretion occurred here.  Admittedly, D'Ambrosio was at certain points during the trial non-responsive to counsel's questions.  However, the trial court correctly stated the following in denying the motion for a mistrial:

> The court finds that the cumulative affect of Mr. D'Ambrosio's conduct would not rise to the level of depriving either defendant the right to a fair trial.
> The court did give several jury instructions for the jury to disregard improper remarks made by Mr. D'Ambrosio, including the remarks we have regarding Mr. Nichols...

(T 440).

### D'Ambrosio's Non-responsive Answers to Counsel

Appellant claims that the following non-responsive comments made by D'Ambrosio were offensive, and required a new trial.

The record shows that D'Ambrosio responded the following to a question asked by the prosecutor:

> Q.  So there were times that he would do things or help you out around the house you would pay X amount of dollars to have him help

> you out?
>
> A. Yes. In all fairness, it wasn't a lot of
> help but he could smoke cigarettes and drink
> beer. He's good entertainment.

(T 249). Defense counsel objected, but no motion for a mistrial

was made. The trial judge sustained appellant's objection and gave

a curative instruction (T 249). After the instruction was given

D'Ambrosio stated that he did not intend his comments to be

derogatory (T 249).

Appellee contends that even if D'Ambrosio's comment was non-

responsive, appellant was not prejudiced by this innocuous comment.

Cf. Kinnon v. State, 439 So. 2d 958, 960 (Fla. 3d DCA 1983)("...we

refuse to indulge the anyway dubious presumption that the jurors

inevitably drew the *wrong* conclusion from apparently innocuous

statements in which only lawyers and judges sensitized to possible

error could even detect a sinister implication"[emphasis in

original]), Review denied, 451 So. 2d 849 (Fla. 1984).

Next, in response to the prosecutor's questions, D'Ambrosio

responded as follows:

> Q. What happened in the gas station?
>
> A. John's [sic] a little lit before he gets
> to the gas station. When I say lit, I mean --

(T 254). Defense counsel objected, but no motion for a mistrial

was made (T 254). The trial judge sustained appellant's objection,

and instructed the witness to couch his response to the questions

(T 254). Although defense counsel argued that the testimony was irrelevant it is not clear if it was or was not, because the witness was not allowed to complete the sentence. It is ambiguous as to what D'Ambrosio meant by saying that appellant was "lit" before they got to the gas station (T 254). Although the testimony is perhaps irrelevant, appellant was not prejudiced from this comment. The record shows that the jury had heard that appellant was upset at D'Ambrosio, and that their argument was "heated."

Next, in response the prosecutor's question D'Ambrosio responded as follows:

> Q. And at some point, did you learn how much that bond was?
>
> A. It varied. According to John it varied, but it dependent on --

(T 258). Appellant's objection was sustained and the judge instructed the witness to be responsive to the question. No motion for a mistrial was made. Again, although the witness was not responsive, nothing prejudicial was said. The jury never heard why it varied, nor did it hear what it meant. The response to the prosecutor's question, "it varied," was admittedly non-responsive, but totally meaningless, and certainly not prejudicial.

Next, in response to the prosecutor's question, D'Ambrosio said the following:

> Q. What is the next thing that happens?
>
> A. ... He was basically trying to blame me, but he was walking a line. It was weird to understand what he was trying to say. I was

> really hoping he would say, you know, can I
> borrow $20's, you know, for his umpteen time
> and I would give it to him.

(T 266).   The trial judge sustained appellant's objection and

instructed the jury to disregard the last comment.  Again defense

counsel did not move for a mistrial, apparently because appellant

was not prejudiced by this comment.  It was clear that D'Ambrosio

was testifying as to his own thoughts, and that his testimony had

nothing to do with appellant's actions.  All the jury heard was

that appellant used to borrow money from D'Ambrosio.  Although it

was not responsive, there was nothing prejudicial about the

comment.  D'Ambrosio did not volunteer any testimony that appellant

ever failed to pay back loans.  All the jury heard was that

appellant used to borrow money.  This was not prejudicial.

It was clear to the jury that appellant and D'Ambrosio were no

longer friends at that point, and that there was bad feelings

between them.  Thus, the jury understood that some of these

comments were made because of this deterioration in the

relationship between appellant and D'Ambrosio.

Next, in response to the prosecutor's question D'Ambrosio said

the following:

> Q.  Okay.  What was he saying to you?
>
> A.  He said words to the affect that after he
> went on dissertation of the story, he said
> basically -- excuse me, not basically, he said
> the words well, as far as I see it, he got
> hundred -- it was 150 or $160 coming to him.
> He was, in so many words, saying that he had
> gotten arrested at this gas station and when

```
he --
         ***
A.  And he never said no, you didn't pay me,
but he woke up and became conscious and he was
in jail.
```

(T 266-268).  Appellant objected "to this characterization" and the

trial judge sustained the objection (T 267).  Appellant's request

for a mistrial was denied (T 268).  The trial court reminded

counsel to ask his questions in such a way that it would limit the

witness's freedom to embellish, and allowed the prosecutor to lead

the witness (T 269).

Appellee contends that D'Ambrosio's response did not create a

reversible error such as to vitiate the entire trial.  In Erickson

v. State, 565 So. 2d 328, 334 (Fla. 4th DCA 1990), this Court has

stated that "even incorrectly admitted evidence is deemed harmless

and may not be grounds for reversal when it is essentially the same

as or merely corroborative of other properly considered testimony

at trial."

Here, D'Ambrosio had testified that appellant was in jail and

needed help in bailing him out.  The jury at that point had already

heard about his previous arrest.  Further, it is unlikely, and also

speculative to assume that the jury drew the wrong conclusion from

the unsolicited testimony regarding "becoming conscious."

Next, in response to the following question, the witness

responded as follows:

Q.  Mr. Ruiz's vehicle was jerky?

A.  Yes.

Q.  Is he passing up cars to catch up your vehicle?

A.  He's doing somersaults.

(T 276).  The trial judge overruled appellant's objection to the characterization of the word "somersault."  There was nothing prejudicial about the witness describing that the car in which appellant was a passenger, and which chased D'Ambrosio was driving in a reckless manner.  There is also nothing about the word "somersault" that is so prejudicial to warrant a mistrial.

During the cross-examination of co-defendant's counsel, D'Ambrosio responded the following to counsel's question:

Q.  And you said that he made some statements, are we going to do this, you know, come on, what are we going to do, right?

A.  What's with this.  Are we doing this or what that's right.  What are we doing here. Are we doing this or, that's right.

Not once, but at least -- at least two times, I believe it was more like three, yes, he wanted to know if they were going to go on with whatever it is they already planned to do.  Okay.  Terry Nichols wasn't even in Oklahoma --

(T 317-318).  Counsel's motion to strike was granted and the judge instructed the jury to disregard the last response, but denied the motion for a mistrial, and cross-examination resumed (T 318).  When read in context, it can hardly be said that the comment "Terry Nichols wasn't even in Oklahoma -- " was so prejudicial as to cause a mistrial, especially where the judge gave an immediate curative

instruction.    Further,  although  appellant  argues  that  he  was
analogized  to  Nichols,  the  mention  of  Terry  Nichols  is  too
ambiguous  to  conclude  that  the  jury  perceived  it  that  way.    Also,
the  unsolicited  comment  was  not  made  the  feature  of  the  trial  and
was  isolated  in  nature,  especially  here  where  D'Ambrosio's
testimony  was  lengthy.

In  response  to  defense  counsel's  question,  D'Ambrosio
responded  the  following:

> Q.    But  you  never  really  liked  John
> Capelletti,  is  that  right?
>
> A.  No,  I  liked  John  Capelletti.    I  liked  John
> Capelletti.    Great  guy  to  play  with,  but
> dangerous.

(T 350).    In  response  to  appellant's  objection,  the  trial  judge
asked  the  jury  to  step  to  the  jury  room  and  again  warned  the
witness  that  he  would  grant  a  mistrial  if  the  witness  did  not  stop
to  put  his  "own  extra  spin"  on  his  answers  (T 351).    D'Ambrosio's
volunteered  testimony  that  appellant  was  "a  great  guy"  but
"dangerous"  was  admittedly  non-responsive  and  improper.    However,
appellee  contends  that  even  if  error  it  did  not  warrant  a  new
trial.

Thus,  none  of  the  above  comments  individually,  or  collectively
constitute  reversible  error.    The  trial  judge  did  not  abuse  its
discretion  in  denying  a  mistrial.

### The Alleged Attack on Counsel's Function

### Cross-examination by Co-defendant's Counsel

Appellant also contends that D'Ambrosio's remarks disparaged defense counsel's function in the following instances.

D'Ambrosio testified that he did not know Ruiz (T 297). Then in response to a question asked by co-defendant's counsel of whether D'Ambrosio referred to co-defendant as a monkey, D'Ambrosio responded:

> It was an inappropriate and derogatory. As is was inappropriate of suggesting that somehow I don't know someone, yet I dislike them.... I was really initially trying to tell people what happened and then they play an attorney game with you where they start flipping and dig and you know changing and putting words in your mouth.

(T 297-298). D'Ambrosio stated that counsel "put words in his mouth." There was no objection to this alleged comment. Had appellant's counsel felt that the improper comment **to co-defendant's counsel** prejudiced **appellant** in any way appellant's counsel would have objected. But apparently he did not. See Ray v. State, 403 So.2d 956 (Fla. 1981)("The failure to object is a strong indication that, at the time and under the circumstances, the defendant did not regard the alleged fundamental error as harmful or prejudicial"). There is nothing prejudicial to appellant about this comment to co-defendant's counsel, and certainly it is not fundamental error.

The next alleged improper comment was as follows:

> Q. Now, Mr. D'Ambrosio, the only person, again that you were involved regarding this Georgia incident was Mr. Capelletti....

> A.   Georgia wasn't an incident for me.   It was
> an incident for me.

(T 298-299).   Again, no objection to this alleged improper comment

was made.   Appellee contends that nothing improper or prejudicial

occurred here either, because D'Ambrosio's response was totally

meaningless and did not add anything to the trial.

During cross-examination, defense counsel attempted to impeach

D'Ambrosio and asked him to refer to the transcript of the

deposition.   D'Ambrosio responded: "If you give it to the jury they

can read it too rather than put a spin it on" (T 306).   At that

point, the court reminded D'Ambrosio to listen to the question and

respond to it (T 305-309).   No objection to this alleged improper

comment was made.   Although not responsive, no prejudice occurred

here either.   Perhaps D'Ambrosio's response could be viewed as

disrespectful to the court and to the judicial system.   But, no

prejudicial error occurred. On the contrary, D'Ambrosio's attitude

only might have led the jury to take D'Ambrosio less seriously, and

add to the reasonable doubt, which was appellant's strongest theory

of defense.

Then, again when D'Ambrosio answered non-responsively, the

court instructed the jury to disregard that portion of the answer

in which D'Ambrosio stated that counsel was trying to "put a spin"

on his answers (T 310-311, 315-316).

It was clear that counsel tried to impeach D'Ambrosio.   Thus,

it was not improper for D'Ambrosio to tell counsel that he took

things out of context.  This comment **to co-defendant's counsel** did not prejudice **appellant.**

Appellant alleges that D'Ambrosio made the following improper comments:

> Gees, I would have sworn I said that a few times here, didn't I ask you a few times?

And

> If you're telling me I said something that I didn't say, of course I want to see it.

And

> Did you catch that!  What a razzle-dazzle that was.  What's that?  If it ain't here, it ain't here.  You got that?  Okay.  If it ain't here, it ain't here.  What was that.

(T 322-323).  Although defense counsel did not object to any of these comments, the court reminded D'Ambrosio of the court's rules and ordered him to follow them (T 322-323).  There was nothing prejudicial by any of these comments.  D'Ambrosio's comments were in response to co-defendant's counsel attempts to impeach him.

In response to defense counsel's question of whether D'Ambrosio was placed on probation, D'Ambrosio stated that "I think we've gone over that, yes." (T 329-330).  Again the court ordered D'Ambrosio to "just answer the question" (T 330), and again, no objection was made.  Nothing about any of these unobjected comments prejudiced appellant.  Although admittedly, these comments do not constitute conventional court language, there was nothing about them that could constitute fundamental or reversible error.

When asked about another case, in which D'Ambrosio was placed on probation, D'Ambrosio stated that he would rather not talk about

it and that if counsel was in his shoes counsel would also not want to talk about it (T 333-334).

Although there was no objection, the judge excused the jury, reprimanded D'Ambrosio, and told D'Ambrosio that he did not want to see a mistrial at that stage but would grant it if it was necessary (T 335-336). At that point defense counsel renewed her motion for a mistrial, which was denied (T 337).

In response to counsel's attempt to impeach D'Ambrosio, D'Ambrosio stated, "I didn't make a motion. If my attorney made a motion -- I didn't -- Christopher D'Ambrosio did not make a motion. I am sorry, but you -- you walked right into it" (T 343). Appellant's objection was sustained but no motion for a mistrial was made (T 343). Again, there was nothing about this comment to constitute reversible error. Perhaps D'Ambrosio's response could be considered disrespectful manner of speaking. But it certainly did not hurt appellant in any way.

### Cross-examination by Defense Counsel

Defense counsel tried to impeach D'Ambrosio with his deposition testimony by asking him if he remembered calling appellant a "low life" (T 346). After reading through his deposition transcript, D'Ambrosio said, "you take it out of context, give it to the jury" (T 348). Although there was no objection, the court sua sponte reminded D'Ambrosio to respond to the question (T 348). Nothing about this comment was prejudicial to appellant. As D'Ambrosio did before, he told defense counsel

that the way the question was asked, it was taken out of context. This was not an improper response.

After reading part of the deposition transcript, D'Ambrosio stated "action speak louder than words" (T 350). The trial judge sua sponte reminded D'Ambrosio to answer with the word "yes" only and sustained appellant's objection (T 350).

Again there was nothing about this comment to constitute prejudicial error. It could be arguably be considered non-responsive. But it cannot be considered a reversible error.

During defense counsel's attempt to impeach D'Ambrosio with his deposition, D'Ambrosio stated that counsel takes the lines out of context (T 364-365). The court sustained the objection, denied a mistrial, and allowed defense counsel to repeat the question (T 365-366). Then, when D'Ambrosio was instructed to look at the transcript of his deposition, he said, "Line 11 -- It's not a whole sentence, but O'kay. If you want to isolate it" (T 370-371). At that the trial judge sustained appellant's objection, instructed D'Ambrosio to answer the question without commenting on the question, but denied a side bar (T 371). Other than not being responsive, nothing prejudicial occurred at that point. D'Ambrosio had the right to comment on the improper impeachment.

At one point during the cross-examination counsel asked D'Ambrosio if he knew what appellant's feelings were toward him (D'Ambrosio) (T 374-375). D'Ambrosio responded that he could not tell counsel about appellant's feelings. Then when counsel asked,

"Have you ever give --," D'Ambrosio stated, "Some cases -- wait a minute, you asked me about words. Then when I go into a little bit more than words, you can't have it both ways" (T 375). Counsel's objection was sustained and the court ordered D'Ambrosio to refrain from commenting on the question (T 375). Here, D'Ambrosio commented on the manner in which counsel impeached him. There is nothing about this comment that prejudiced appellant.

During defense counsel's attempt to clarify D'Ambrosio's testimony during deposition, counsel asked whether D'Ambrosio could "eat appellant off the road," D'Ambrosio responded that he does not eat cars. The court sustained the objection to this comment, and reminded D'Ambrosio to refrain from adding extraneous comments (T 391).

D'Ambrosio most likely meant to testify that appellant was very close to D'Ambrosio's car when he was chasing D'Ambrosio in Ruiz's car. Although this comment and use of metaphors is not a conventional talking by some people, there was nothing prejudicial about this comment either.

Admittedly, D'Ambrosio was not responsive. However, the comments volunteered by D'Ambrosio do not prejudice appellant at all. Even when taken collectively, they did not constitute reversible error that warranted the granting of a mistrial. On the contrary, if any thing D'Ambrosio's demeanor at court could have caused the jury to take him less seriously. Thus, no error occurred.

## Harmless Error

However, even if error, it was harmless beyond a reasonable doubt and there is no reasonable possibility that it affected the outcome of this case. Appellant has not demonstrated that his trial contained prejudicial error, as required by § 924.051(7), Fla. Stat. (Supp. 1996). <u>Goodwin v. State</u>, 23 Florida Law Weekly D918 (Fla. 4th DCA April 8, 1998), <u>rehearing denied</u>, 23 Florida Law Weekly D1538 (Fla. 4th DCA June 24, 1998); § 924.051(7), Florida Statutes (Supp. 1996)("the party challenging the judgment ... has the burden of demonstrating that a prejudicial error occurred...."). <u>See also</u> <u>Howard v. State</u>, 471 So. 2d 208 (Fla. 5th DCA 1985)(an improper comment by a state witness concerning alleged other bad conduct on the part of defendant although ordered by the trial judge not to do so was harmless); <u>Webber v. State</u>, 23 Florida Law Weekly D__, Case No. 97-115 (Fla. 5th DCA August 28, 1998)(state witness testified regarding collateral crimes was improper but harmless).

The alleged error did not affect the outcome of the case. The jury heard testimony from which it could conclude that appellant was a principal who acted in concert with Ruiz to shoot D'Ambrosio on April 13, 1997. The state presented evidence that appellant and his co-defendant had premeditated intent to shoot and kill D'Ambrosio. Appellant demanded money he claimed D'Ambrosio owed him. When D'Ambrosio denied it, appellant got angry and threatened to kill D'Ambrosio. During appellant's threats, Ruiz reminded

appellant of their plans.

Immediately following the threats, appellant chased D'Ambrosio on the highway in Ruiz's car for 4½ miles, while appellant's co-defendant drove in a reckless manner. At the third attempt to come close to D'Ambrosio's car, D'Ambrosio got shot in the base of is head, causing him serious injuries. After the shot appellant and his co-defendant fled the scene.

Further, the jury also heard that a live shell was found in Ruiz's car, which matched the material components of a shell found in D'Ambrosio's body, and the material components of the shell found in D'Ambrosio's car.

Moments after D'Ambrosio got shot, he told the 911 operator and another motorist that John Capelletti and Eddie shot him.

The circumstantial evidence of attempted first degree murder was overwhelming and undisputed. Thus, even if error, there is no reasonable possibility that it affected the outcome of the case. See generally Mason v. State, 23 Fla. L. Weekly D1540 (Fla. 4th DCA June 24, 1998).

None of appellant's theories of defense were logical. Appellant's claim that he was merely a bystander and a passenger in Ruiz's car, was refuted by the evidence.

Next, appellant's theory that he did not pull the trigger is without merit, because the state tried the case under the principal theory. Thus, it did not matter who actually pulled the trigger.

Finally, appellant's theory of independent act is also without

merit. Appellant did not present any evidence that would tend to exculpate him or that shows that Ruiz acted by himself, that there was any independent act, and that appellant did not have intent to participate. In fact, the judge instructed the jury that appellant does not even have to be present when the crime is committed or attempted (T 547). Appellant's theory that some unidentified person must have shot D'Ambrosio also does not have any merit and obviously was not believable by the jury. There was nothing in the record to support such a theory of defense.

The alleged error of non-responsive testimony by D'Ambrosio does not merit a reversal of appellant's conviction. Cf. Lewis v. State, 711 So. 2d 205 (Fla. 3d DCA 1998)(*repeated* misconduct of prosecutor throughout the entire trial by bolstering the testimony of the victim and *repeated* attacking of defense counsel was harmless); Briggs v. State, 455 So. 2d 519, 520 (Fla. 1st DCA 1984); Thompson v. State, 648 So. 2d 692, 695 (Fla. 1994)(non-responsive testimony by a witness harmless); McCall v. State, 463 So. 2d 425 (Fla. 3d DCA 1985)(unsolicited comment by a state witness was harmless); Norton v. State, 709 So. 2d 87 (Fla. 1997)(unsolicited comment was invited by defense counsel). Cf. Cooper v. State, 712 So. 2d 1216 (Fla. 3d DCA 1998)(suggestion that defendant suborned perjury or otherwise introduced manufactured testimony by defense witnesses is improper where there is no foundation in the record; however, comments are not so inflammatory

or egregious as to deprive defendant of fair trial, where the evidence of guilt is overwhelming).

Further, "the modern trend in criminal cases 'is to excuse technical defects which have no bearing upon the substantial rights of the parties. When procedural irregularities occur, the emphasis is on determining whether anyone was prejudiced by the departure. A defendant is entitled to a fair trial, not a perfect trial.'" Hoffman v. State, 397 So.2d 288, 290 (Fla. 1981) (emphasis added) (quoting Lackos v. State, 339 So.2d 217, 219 (Fla. 1976)).

Section 924.33, Fla. Stat. (1993), provides that

> [n]o judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant. [e.s.]

Additionally, the trial judge reprimanded D'Ambrosio numerous times in front of the jury. Thus, the jury knew that the court considered D'Ambrosio's non-responsive answers inappropriate. Thus, it was clear to the jury that these non-responsive comments were unacceptable and should be disregarded.

### III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN SENTENCING APPELLANT BECAUSE THE REASON FOR THE UPWARD DEPARTURE SENTENCE IS SUPPORTED BY THE RECORD.

Appellant contends that there was no valid reason for the trial court to depart from the sentencing guidelines. The state disagrees.

Section 921.001(6), Florida Statutes (1997), provides that the trial judge may impose a departure sentence outside the sentencing guidelines based upon circumstances which reasonably justify aggravation.  The level of proof necessary to establish facts supporting a departure is a preponderance of the evidence.  Id. Section 921.0016(3)(I), Florida Statutes (1997), provides that a sentencing judge may depart from the sentencing guidelines if the "offense created a substantial risk of death or great bodily harm to many persons or to one or more small children."

Here, the evidence established that appellant acted in concert with his co-defendant, Ruiz.  Appellant sat as a passenger in Ruiz's car, and they chased D'Ambrosio for a about 4½ miles in order to shoot him in the head.  The traffic on the road was heavy. Ruiz was forced to weave in and out of traffic and drive recklessly in order to catch up with D'Ambrosio who was driving his own car. When Ruiz and appellant finally caught up with D'Ambrosio, they used a shotgun to shoot him in the neck.  D'Ambrosio rolled to the shoulder of the highway while being severely injured, and fortunately did not cause an accident on the highway.  Thus, because appellant and his co-defendant drove recklessly, and because appellant and his co-defendant shot D'Ambrosio in an attempt to kill D'Ambrosio the driver and sole occupant of a moving motor vehicle traveling on the busy highway, appellant and Ruiz risked the safety of many people on the road.

The shooting with a shotgun created substantial risk of death

or great bodily harm to many persons. In this case the preponderance of the evidence demonstrates that the shooting into D'Ambrosio's car crated a substantial risk of death or great bodily harm to many persons (R 34-35; T 592). <u>See</u> § 921.001(6), <u>Fla. Stat.</u> (1997); <u>Noel v. State</u>, 705 So. 2d 648 (Fla. 4th DCA 1998)(held that a substantial risk of death or great bodily harm constitutes sufficient reason for the departure sentence)(citing §§ 921.0016(3)(I) and 921.001(6), <u>Fla. Stat.</u> (1993)).

Because the reason for the departure was valid, and because there was evidence to support it, the trial court did not abuse its discretion in departing from the sentencing guidelines.

CONCLUSION

Wherefore, based on the foregoing arguments and the authorities cited therein, appellee respectfully requests this Court AFFIRM the trial court's judgment and sentence.

Respectfully submitted,
ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

ETTIE FEISTMANN
Assistant Attorney General
Florida Bar No. 892830
1655 Palm Beach Lakes Boulevard
Suite 300
West Palm Beach, FL 33401-2299
(561) 688-7759

Counsel for appellee

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing "Answer Brief of Appellee" has been furnished by Carrier to: SOPHIA LETTS, Assistant Public Defender, Criminal Justice Building, 6th Floor, 421 Third Street, West Palm Beach, FL 33401, on September 2, 1998.

Counsel for appellee

Section 921.001(6), Florida Statutes (1997), provides that the trial judge may impose a departure sentence outside the sentencing guidelines based upon circumstances which reasonably justify aggravation. The level of proof necessary to establish facts supporting a departure is a preponderance of the evidence. **Id.** Section 921.0016(3)(I), Florida Statutes (1997), provides that a sentencing judge may depart from the sentencing guidelines if the "offense created a substantial risk of death or great bodily harm to many persons or to one or more small children."

Here, the evidence established that appellant acted in concert with his co-defendant, Ruiz. Appellant sat as a passenger in Ruiz's car, and they chased D'Ambrosio for a about 4½ miles in order to shoot him in the head. The traffic on the road was heavy. Ruiz was forced to weave in and out of traffic and drive recklessly in order to catch up with D'Ambrosio who was driving his own car. When Ruiz and appellant finally caught up with D'Ambrosio, they used a shotgun to shoot him in the neck. D'Ambrosio rolled to the shoulder of the highway while being severely injured, and fortunately did not cause an accident on the highway. Thus, because appellant and his co-defendant drove recklessly, and because appellant and his co-defendant shot D'Ambrosio in an attempt to kill D'Ambrosio the driver and sole occupant of a moving motor vehicle traveling on the busy highway, appellant and Ruiz risked the safety of many people on the road.

The shooting with a shotgun created substantial risk of death

or great bodily harm to many persons. In this case the preponderance of the evidence demonstrates that the shooting into D'Ambrosio's car crated a substantial risk of death or great bodily harm to many persons (R 34-35; T 592). See § 921.001(6), Fla. Stat. (1997); Noel v. State, 705 So. 2d 648 (Fla. 4th DCA 1998)(held that a substantial risk of death or great bodily harm constitutes sufficient reason for the departure sentence)(citing §§ 921.0016(3)(I) and 921.001(6), Fla. Stat. (1993)).

Because the reason for the departure was valid, and because there was evidence to support it, the trial court did not abuse its discretion in departing from the sentencing guidelines.

CONCLUSION

Wherefore, based on the foregoing arguments and the authorities cited therein, appellee respectfully requests this Court AFFIRM the trial court's judgment and sentence.

Respectfully submitted,
ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

ETTIE FEISTMANN
Assistant Attorney General
Florida Bar No. 892830
1655 Palm Beach Lakes Boulevard
Suite 300
West Palm Beach, FL 33401-2299
(561) 688-7759

Counsel for appellee

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing "Answer Brief of Appellee" has been furnished by Carrier to: SOPHIA LETTS, Assistant Public Defender, Criminal Justice Building, 6th Floor, 421 Third Street, West Palm Beach, FL 33401, on September 2, 1998.

Counsel for appellee

# EXHIBIT   N

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

98-1- 4330

| | | |
|---|---|---|
| JOHN CAPELLETTI, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | CASE NO. 98-0879 |
| | ) | |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Appellee. | ) | |

## REPLY BRIEF OF APPELLANT

On Appeal from the Circuit Court of the Seventeenth
Judicial Circuit, In and For Broward County, Florida
[Criminal Division]

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
SEP 11 1998
CRIMINAL DIVISION
WEST PALM BEACH

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(561) 355-7600

SOPHIA LETTS
Assistant Public Defender
Florida Bar No. 116440

Attorney for John Capelletti

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENTS OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

### POINT I

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE CIRCUMSTANTIAL EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

### POINT II

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MULTIPLE MOTIONS FOR MISTRIAL WHERE THE CUMULATIVE AFFECT OF THE WITNESS' IMPROPER TESTIMONY WAS PREJUDICIAL TO APPELLANT AND DENIED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### POINT III

**THE TRIAL COURT ERRED IN GRANTING THE UPWARD DEPARTURE SENTENCE WHERE IT WAS NOT PROVEN THAT APPELLANT WAS THE ONE WHO FIRED THE SHOTGUN AT THE VICTIM CAUSING THE RISK OF DEATH OR GREAT BODILY HARM.** . . . . . . . . . . . . . . . . . . 6

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## AUTHORITIES CITED

<u>CASES CITED</u>                                                    <u>PAGE</u>

<u>State ex rel. Miami Herald Pub. V. McIntosh</u>, 340 So. 2d 904
        (Fla. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Gold, Vann, and White, P.A. v. DeBerry</u>, 639 So. 2d 47
        (Fla. 4th DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Sentinal Star Co. v. Edwards</u>, 387 So. 2d 367
        (Fla. 5th DCA 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>State Farm Mut. Auto. Ins. Co. v. Resnick</u>, 636 So. 2d 75
        (Fla. 3d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## **PRELIMINARY STATEMENT**

Appellant relies on his <u>Preliminary Statement</u> as stated in his Initial Brief.

The symbol "AB" will denote Appellee's Answer Brief.

1

## STATEMENTS OF THE CASE AND FACTS

Appellant relies on his Statement of The Case and Facts as stated in his Initial Brief.

2

## ARGUMENT

### POINT I

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE CIRCUMSTANTIAL EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTION.**

Appellant relies on Point I as stated in his Initial Brief.

3

## POINT II

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MULTIPLE MOTIONS FOR MISTRIAL WHERE THE CUMULATIVE AFFECT OF THE WITNESS' IMPROPER TESTIMONY WAS PREJUDICIAL TO APPELLANT AND DENIED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.**

Appellee's assertion that "D'Ambrosio had the right to comment on the improper impeachment" (AB-30) is unfounded. Furthermore, Appellee cites no authority for this assertion. For Appellee to maintain that it is not improper for a witness to tell opposing counsel the correct procedure for impeachment (AB-27-28) puts the witness in control of the courtroom.

It is a fundamental principle of law that a trial judge is charged with the conduct of a trial and has the inherent power to control all of its proceedings. Sentinal Star Co. v. Edwards, 387 So. 2d 367 (Fla. 5th DCA 1980). See also Gold, Vann, and White, P.A. v. DeBerry, 639 So. 2d 47, 56 (Fla. 4th DCA 1994); State Farm Mut. Auto. Ins. Co. v. Resnick, 636 So. 2d 75, 77 (Fla. 3d DCA 1994) (trial judge is the dominant figure responsible for the management, direction, and control of the proceedings). It is the trial court's responsibility to protect a defendant in a criminal prosecution from inherently prejudicial influences which threaten fairness of his trial and the abrogation of his constitutional rights. State ex rel. Miami Herald Pub. V. McIntosh, 340 So. 2d 904, 909 (Fla. 1976).

Here, as the trial judge was charged with the conduct of the trial and had the inherent power to control all of its proceedings, D'Ambrosio did not have "the right" to comment on what he believed to be improper impeachment, as Appellee asserts. D'Ambrosio's conduct, as set forth in appellant's Initial Brief, was highly improper and prejudicial to appellant and threatened

4

the fairness of appellant's trial. Therefore, this Court should reverse and remand this cause for a new trial.

## POINT III

**THE TRIAL COURT ERRED IN GRANTING THE UPWARD DEPARTURE SENTENCE WHERE IT WAS NOT PROVEN THAT APPELLANT WAS THE ONE WHO FIRED THE SHOTGUN AT THE VICTIM CAUSING THE RISK OF DEATH OR GREAT BODILY HARM.**

Appellant relies on <u>Point III</u> as stated in his Initial Brief.

## CONCLUSION

Based on the foregoing Argument and the authorities cited therein, Appellant respectfully requests this Honorable Court to reverse the judgment and sentence of the trial court and remand this cause for a new trial.

Respectfully submitted,

RICHARD JORANDBY
Public Defender
15th Judicial Circuit of Florida
Criminal Justice Building
421 Third Street/6th Floor
West Palm Beach, Florida 33401
(561) 355-7600

SOPHIA LETTS
Assistant Public Defender
Florida Bar No. 116440

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished to , Assistant Attorney General, 1655 Palm Beach Lakes Blvd,. Third Street, West Palm Beach, Florida by courier this 10th day of September, 1998.

SOPHIA LETTS
Attorney for John Capelletti

7

# EXHIBIT   O

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT                              JANUARY TERM 1999

**JOHN CAPELLETTI,**

Appellant,

v.

**STATE OF FLORIDA,**

Appellee.

CASE NO. 98-0879

Decision filed   February 3, 1999

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; James I. Cohn, Judge; L.T. Case No. 97-7797CF.

Richard L. Jorandby, Public Defender, and Sophia Letts, Assistant Public Defender, West Palm Beach, for appellant.

Robert A. Butterworth, Attorney General, Tallahassee, and Ettie Feistmann, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

AFFIRMED.

GUNTHER, FARMER and TAYLOR, JJ., concur.

**NOT FINAL UNTIL THE DISPOSITION OF ANY TIMELY FILED MOTION FOR REHEARING.**

**RECEIVED**
OFFICE OF THE ATTORNEY GENERAL

FEB 03 1999

CRIMINAL DIVISION
WEST PALM BEACH

# EXHIBIT  P

( I.)

P.ro

IN The DiSTRicT couRT of Appeal of The State of Florida
FouRTH DisTRicT

John Capelletti,

Appellant

vs.                         Case No. 98-0879

State of Florida

Appellee

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
FEB 15 1999
CRIMINAL DIVISION
WEST PALM BEACH

MOTION For Rehearing

John Capelletti, appellant, pro-se herein,
Pursuant to Florida Rules of Appellate Procedure
Rule 9.330., for a Rehearing of this appeal,
the decision in which was rendered on
February 3, 1999.

Point I.

Appellant points out that he was
charged with attempted murder in the
first degree (R-32), and this conviction
in which he received a departure sentence,
(R-39-42), guilt was not proven. Mere
presence at scene of crime is insufficient
by itself to convict. Brown V. State, 672
So. 2d. 648 (Fla. app. 4 Dist. 1996); Criminal Law

(2.)

Key 59(3); Circumstantial evidence is insufficient when it requires pyramiding of assumptions or inferences in order to arrive at conclusion of guilt; Criminal Law Key 552(1)(3). In a circumstantial evidence case such as this, a judgment of acquittal is appropriate if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Atwater V. State, 626 So.2d. 1325, 1328(Fla.1993), cert. denied, — U.S. —, (114 S. Ct. 1578); 128 L. Ed. 2d. 221 (1994); State V. Law, 559 So. 2d. 187, 188(Fla.1989). The State in appellant case failed to adduce any evidence to prove that appellant actually pulled the trigger. The Victim testified that he did not know who shoot him (T-392). (The State "failed" in linking "appellant",) appellant to any shotgun or shell" (T-318, 319, 387, 392), (T-202-203, 229, 429), See (T-232, 429). Two elements are required to convict appellant of attempt to commit offense, and separate overt act done towards commission of offense, which is interrupted by some circumstance not caused by perpetrator. Ticknor V. State, app. 2 Dist., 595 So. 2d. 109 (1992).

(3.)

attempted First - degree murder in Florida is
a nonexistent offense. Jones V. State, app. 3 Dist.,
669 So. 2d. 1094 (1996), review granted 679 So.
774, approved in part, quashed in part 685 So. 2d
1280. See Florida Supreme Court's decision in
State V. Gray, offense of attempted felony - murder
is no longer recognized, Strtilare V. State,
app. 3 Dist., 669 So. 2d. 1135 (1996),

    Appellant asserts that the state at Trial
relied upon dual theories of murder. "attempted
premeditated murder"; and attempted felony murder.
It is fundamental error for the appellant
to be convicted of a non-existent crime.
The State relied upon the attempted felony
murder theory at trial, there is a chance
the jury convicted appellant upon that theory.
The appellant failed to object to the instruction
therefor this court must apply a fundamental
error analysis to this case. Appellant asserts
that its error for him to be convicted of a
non-existent crime. See Williamson V. State,
510 So. 2d. 335 (Fla. 4th DCA. 1987), State V.
Di Giulis, 491 So. 2d. 1129 (Fla. 1986), appellant
asserts that without evidence to support
premeditation, it was error to instruct
the jury on both premeditated and

(4)

attempted felony murder. See Mc Kennon V. State, 403 So. 2 d. 389 (Fla. 1981); State V. Gray, 654 So. 2d. 552 (Fla. 1995). Relying in part on United States V. Garcia, 907 F. 2 d. 380, 381 (2 d. cir. 1990) ( holding that "because there was insufficient evidence for one of the theories, then the verdict is ambiguous and a new trial must be granted"), because the jury's guilty verdict may have rested on a nonexistent crime. Allen V. State, 676 So. 2 d. 491 (Fla. 5 th DCA. 1996).

Appellant points out that this court should direct the issue that appellate counsel should have pointed or directed this court that the Supreme court in State V. Gray, There is no crime of attempted felony - murder, extension of felony = murder doctaine to make intent irrelevant for purposes of attempt crimes was illogical and with out basis in law. Homicide Key = 25; crime of attempted felony murder does not exist under Fla. law; receding from ambotte V. State, 456 So. 2 2, 448. Wests' F. S. A. 782. 04 (1) (a) 2.

( 5.)

appellate counsel failed to raise the Gray case on direct appeal to this court. In part due to appellate counsel not pointing out due facts of law concerning this case, he has received ineffective assistance of appellate counsel. Stokes V. State, 21 Fla. L. Weekly D2210 (Fla. 2 D.C.A. Oct. 11, 1996); Ford V. State of Fla, "Singletary", 22 Fla. L. Weekly D576, March 14, 1997, causing this court to over look issues that is cause for a new Trial.

### Point II

Appellant relies on Point II as stated in Initial Brief. See Northard V. State, 675 So. 2d. 652, 653 (Fla. 4th DCA.),

### Point III

Appellant asserts that the Florida Courts decision in State V. Gray, 403 So. 2d. 389 (Fla. 1995), United States V. Garcia, 907 F. 2d. 380, 381 (2d. Cir. 1990), that the conviction for attempted First - degree murder is a nonexistent offense. and failure of the State to prove premeditation this offense is therefore non - existent, and the court was with out authority to

( 6 )

impose sentence as to an upward departure.

CONCLUSION

Based upon the foregoing points of facts and authorities cited therein, appellant respectfully requests this Honorable Court to grant this motion for Rehearing, and to grant his request to reverse and remand this cause for a new trial.

Respectfully submitted

John Capelletti

John Capelletti, pro-se
905604    BOX- 296
Zephyrhills Correctional Institution

2739 Gall Blvd

Zephyrhills, Florida

33541-9701

CERTIFICATE OF SERVICE

I Hereby certify that a copy hereof has been furnished to Celia Terenzio, assistant attorney General, 1655 Palm Beach Lakes Blvd., Third Floor, West Palm Beach, Florida 33401, by U.S. mail this 8 day of February 1999

John Capelletti

# EXHIBIT Q



IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

CASE NO. 98-0879

JOHN CAPELLETTI,
Appellant,
vs.
STATE OF FLORIDA,
Appellee.
_____/



## RESPONSE TO MOTION FOR REHEARING

Appellee, the State of Florida, by and through its undersigned counsel, opposes appellant's motion for rehearing, stating:

This motion should be stricken because appellant is currently represented by appellate counsel in this appeal. Because appellant is represented by counsel, he does not have an absolute right to participate and represent himself on appeal. <u>Dagostino v. State</u>, 675 So.2d 194, 195 (Fla. 4th DCA 1996). This is a matter that is within the discretion of the appellate court. <u>Id.</u>

1. Nonetheless, appellant's motion for rehearing violates Florida Rules of Appellate Procedure 9.330(a), which states that the motion shall not reargue the merits of a court's order. <u>See Seslow v. Seslow</u>, 625 So. 2d 1248 (Fla. 4th DCA 1993). <u>See also State v. Green</u>, 105 So. 2d 817, 818-819 (Fla. 1st DCA 1958)("The sole and only purpose of a petition for rehearing is to call to the attention of the court some fact, precedent or rule of law which the court has overlooked in rendering its decision.



F:\USERS\APPEALS\ETTIE CAPELLET.RSP

Certainly it is not the function of a petition for rehearing to furnish a medium through which counsel may advise the court that they disagree with its conclusion, to reargue matters already discussed in briefs and oral arguments and necessarily considered by the court, or to request the court to change its mind as to a matter which has already received the careful attention of the judges, or to further delay the termination of litigation").

Here, appellant is merely presenting arguments which were already made in his brief.  Appellant is not calling this Court's attention to any fact, precedent or rule of law which this Court had overlooked in rendering its decision.  Therefore, appellant's motion for rehearing must be denied.

2.  To the extent the motion contains new argument, it should be denied. See Price Wise Buying Group v. Nuzum, 343 So. 2d 115, 117  (Fla. 1st DCA 1977)(court could not consider matters raised for the first time in motion for rehearing).

3.  Further, this Court's decision was without any written opinion.  Thus, appellant cannot point to any law or fact that the court overlooked or misapprehended. See Snell v. State, 522 So. 2d 407 (Fla. 5th DCA 1988)(to claim that the court has overlooked or misapprehended something when no written analysis is given is not persuasive).

WHEREFORE, the state respectfully requests that appellant's motion be DENIED.

F:\USERS\APPEALS\ETTIE CAPELLET.RSP

Respectfully submitted,

ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

*the Feistmann.*

ETTIE FEISTMANN
Assistant Attorney General
Florida Bar No. 892830
1655 Palm Beach Lakes Blvd
Suite 300
West Palm Beach, FL 33401-2299
Tel (407) 688-7759
Counsel for Respondent

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing "STATE'S RESPONSE TO APPELLANT'S MOTION FOR REHEARING" has been furnished by carrier to: Sophie Letts, Assistant Public Defender, Criminal Justice Building/6th Floor, 421 Third Street, West Palm Beach, FL 33401, and Mr. Capalletti, pro se, 905604, Box 296, Zephyrhills, Florida 33541-9701, on February 16, 1999.

Counsel for appellee

F:\USERS\APPEALS\ETTIE CAPELLET.RSP

# EXHIBIT  R

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

JOHN CAPELLETTI                         CASE NO. 98-00879

  Appellant(s),

vs.

STATE OF FLORIDA                        L.T. CASE NO. 97-7797 CF
                                        BROWARD
  Appellee(s).

March 18, 1999

---

BY ORDER OF THE COURT:

      ORDERED that appellant's motion filed February 16, 1999,
for rehearing is hereby denied.

   I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Public Defender 15
      Attorney General-W. Palm Beach
      John Capelletti

      /CH

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

MAR 1 9 1999

CRIMINAL DIVISION
WEST PALM BEACH

# EXHIBIT  S

# M A N D A T E

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;**

**YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.**

**WITNESS the Honorable Barry J. Stone, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.**

**DATE:**                9th day of April 1999.

**CASE NO.:**            1998-879

**COUNTY OF ORIGIN:**    BROWARD

**T.C. CASE NO.:**       97-7797 CF

**STYLE:**               JOHN CAPELLETTI        **v.** **STATE OF FLORIDA**

**ORIGINAL TO:**         HON. ROBERT E. LOCKWOOD, CLERK

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
APR 12 1999
CRIMINAL DIVISION
WEST PALM BEACH



*Marilyn Beuttenmuller*
**MARILYN BEUTTENMULLER, Clerk**
**Fourth District Court of Appeal**

CC:    PUBLIC DEFENDER #15
       ATTORNEY GENERAL - W PALM BEACH

/AL